No. _____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BERNARD WAITHAKA,
Plaintiff-Petitioner,

v.

AMAZON.COM INC. and AMAZON LOGISTICS, INC.
Defendants-Respondents.

On Petition for Permission to Appeal From
The United States District Court for The
Western District of Washington
Case No. 2:19-cv-01320-JCC
Hon. John C. Coughenour

## PLAINTIFF'S PETITION FOR PERMISSION TO APPEAL
## ORDER DENYING CLASS CERTIFICATION PURSUANT TO
## FEDERAL RULE OF CIVIL PROCEDURE 23(f)

Shannon Liss-Riordan
Jeremy Abay
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800

Michael C. Subit
FRANK FREED SUBIT & THOMAS LLP
705 Second Avenue, Suite 1200
Seattle, WA 98104
(206) 682-6711

*Attorneys for Plaintiff-Petitioner*

## TABLE OF CONTENTS

Jurisdictional Statement ........................................................................1

Issues Presented ..................................................................................1

Statement of the Case ...........................................................................2

Summary of Argument ...........................................................................7

Standard of Review ...............................................................................8

Argument...............................................................................................9

    I.    The District Court manifestly erred in denying class certification on Plaintiff's business expense claim under the Massachusetts Wage Act ........................................................9

    II.    The District Court manifestly erred in denying class certification on Plaintiff's claims for unpaid wages under the Massachusetts Minimum Wage Law .............................................15

    III.    The District Court's denial of class status sounds the death knell of this litigation, thus warranting review ...................................17

Conclusion ..........................................................................................18

Statement of Related Cases Pursuant to Circuit Rule 28-2.6 .................20

Certificate of Compliance for Briefs.....................................................21

Certificate of Service of Service for Electronic Filing ...........................22

i

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Mt. Clemens Pottery Co.*,
    328 U.S. 680 (1946)..................................................................16

*Arredondo v. Delano Farms Co.*,
    301 F.R.D. 493 (E.D. Cal. 2014)..............................................16

*Athol Daily News v. Board of Review of Div. of Emp. and Training*,
    786 N.E.2d 365 (Mass. 2003)....................................................17

*Awuah v. Coverall N. Am., Inc.*,
    952 N.E.2d 890  (Mass. 2011)........................................ 5, 10, 11

*Blair v. Equifax Check Servs., Inc.*,
    181 F.3d 832 (7th Cir. 1999) .....................................................17

*Camara v. Att'y Gen.*,
    941 N.E.2d 1118 (Mass. 2011)....................................... 5, 10, 11

*Chamberlan v. Ford Motor Co.*,
    402 F.3d 952 (9th Cir. 2005) ............................................. 8, 9, 17

*DaSilva v. Border Transfer of MA, Inc.*,
    377 F. Supp. 3d 74 (D. Mass. 2019).......................................5, 11

*Furtado v. Republic Parking Sys., LLC*,
    2020 WL 996849 (D. Mass. Mar. 2, 2020) ...................... 5, 11, 13

*Garcia v. Right at Home, Inc.*,
    2016 WL 3144372 (Mass. Super. Ct. Jan. 19, 2016) ............ 11, 12

*Gomez v. Tyson Foods, Inc.*,
    295 F.R.D. 397 (D. Neb. 2013) .................................................16

*Jackson v. Bloomberg, L.P.*,
    2014 WL 1088001 (S.D.N.Y. Mar. 19, 2014)............................16

*Kalmanovitz v. Standen*,
    2015 WL 9273611 (W.D. Wash. Dec. 21, 2015).........................12

*McLaughlin v. Liberty Mut. Ins.*,
224 F.R.D. 304 (D. Mass. 2004) ....................................................................13

*Microsoft Corp. v. Baker*,
137 S. Ct. 1702 (2017)...................................................................................8

*O'Connor v. Uber Techs., Inc.*,
311 F.R.D. 547 (N.D. Cal. 2015) ..................................................................13

*Schwann v. FedEx Ground Package Sys., Inc.*,
2014 WL 496882 (D. Mass. Feb. 7, 2014)....................................................14

*Serebrennikov v. Proxet Grp. LLC*,
2024 WL 1375971 (D. Mass. Mar. 29, 2024) ................................................5

*Thompson v. Bruister & Associates, Inc.*,
967 F. Supp. 2d 1204 (M.D. Tenn. 2013) .....................................................16

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)............................................................................... 15, 16

*Vaquero v. Ashley Furniture Indus., Inc.*,
824 F.3d 1150 (9th Cir. 2016) ......................................................................15

*Yokoyama v. Midland Nat. Life Ins. Co.*,
594 F.3d 1087 (9th Cir. 2010) ......................................................................15

**STATUTES**

28 U.S.C. § 1292......................................................................................................6

28 U.S.C. § 1332......................................................................................................9

Mass. Gen. Laws ch. 149, § 148 .................................................................... 1, 4, 9

Mass. Gen. Laws ch. 151, § 1 ...................................................................... 1, 4, 15

**RULES**

Federal Rule of Civil Procedure 23 ............................................................... 1, 4, 6

Mass. S.J.C. Rule 1:03 ................................................................................... 6, 7, 14

iii

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over Plaintiff Bernard Waithaka's state law claims under the Class Action Fairness Act of 2005 ("CAFA") because this matter was brought as a class action, diversity of citizenship exists between one or more members of the putative class and Defendants, the number of proposed class members exceeds 100 individuals, and the amount in controversy exceeds $5 million in the aggregate. This Court has appellate jurisdiction over this case under Federal Rule of Civil Procedure 23(f) because the District Court's December 31, 2024, order denied class action certification. This petition is timely.

## ISSUES PRESENTED

1.     Whether the District Court erred in denying class certification of Plaintiff's claim for unpaid business expenses under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148.

2.     Whether the District Court erred in denying class certification of Plaintiff's claim for unpaid minimum wages under the Massachusetts Minimum Wage Law, Mass. Gen. Laws ch. 151, §§ 1, 7.

1

### STATEMENT OF THE CASE

Plaintiff is a delivery driver for Defendants' Amazon's Flex program in Massachusetts. App. 131.[1] Under the program, drivers like Plaintiff deliver products from Amazon's facilities to customers. App. 292. These products vary from groceries to more traditional "brown box" deliveries. App. 292–93. Amazon advertises timely and efficient delivery, which depends, in part, on the delivery drivers here. *See* App. 205–06.

Amazon's delivery drivers use their personal vehicles to make their deliveries. App. 218. Drivers also use a phone-based application to sign up for shifts, confirm that products have been picked up, receive suggested driving routes, and confirm that products have been delivered. App. 216–17. Under its Terms of Service ("TOS"), Amazon classifies all Flex drivers as independent contractors, not employees. *See, e.g.*, App. 374, 392. The drivers pay for their vehicles and phones and data and are not reimbursed by Amazon for these expenses. *See* App. 45.

Amazon's TOS also purports to explain drivers' work and pay. Drivers sign up for "delivery blocks," which are the time Amazon estimates it will take to complete delivery of all products a driver picks up. *See, e.g.*, App. 392. The pay

---

[1] Defendants include Amazon.com Inc. and Amazon Logistics, Inc. and are collectively referred to as "Amazon" herein.

for a block is established when a driver signs up and is based on an algorithm that considers the supply of drivers, among other factors. App. 230–33. The pay may or may not satisfy minimum wage requirements, as Amazon makes no effort to ensure that minimum wage is satisfied (especially considering the expenses that drivers incur in order to do their work). *See* App. 47–48.

Drivers may sign up for a block a week in advance. App. 371. While drivers may cancel their blocks, if a driver repeatedly cancels with less than 45 minutes' notice, they may be penalized or terminated for violating Amazon's Service Standards. *See, e.g.*, App. 315, 322.

 Plaintiff contends that Amazon has misclassified him and other Massachusetts-based delivery drivers as independent contractors, even though they are Amazon's employees under state law. App. 45. This misclassification allows Amazon to unlawfully shift ordinary business costs—such as vehicle expenses, phone plans, and insurance premiums—onto its delivery drivers. App. 45–48. Amazon also avoids paying minimum wages by misclassifying delivery drivers as independent contractors. App. 48–49.

Plaintiff originally brought suit in Massachusetts state court in 2017 before the case was removed to federal court and then transferred to the Western District of Washington. App. 21–39. Plaintiff's complaint asserts three class claims under state law. App. 48–49. Count I alleges that Amazon violated the Massachusetts

3

Independent Contractor Law, Mass. Gen. Laws ch. 149, § 148B, by misclassifying its delivery drivers in Massachusetts as independent contractors. App. 48. Count II alleges that Amazon violated the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, by forcing delivery drivers to incur business expenses necessary to perform their work. App. 49. Count III alleges that Amazon violated the Massachusetts Minimum Wage Law, Mass. Gen. Laws ch. 151, §§ 1, 7, by failing to pay delivery drivers the state minimum wage. App. 49.

Plaintiff first moved for class certification under Federal Rule of Civil Procedure 23 in May 2021 (App. 67), but the District Court stayed litigation pending various appeals. (App. 51, 96). The District Court lifted the stay last year (App. 100), and Plaintiff again moved for class certification. App. 102. Amazon opposed certification, arguing that there was insufficient commonality between class members and that individual issues predominated over common ones. App. 251.

Before deciding Plaintiff's renewed motion for class certification, the District Court requested supplemental briefing "as to why the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148 (2009), requires employers to pay employee business expenses, rather than forbids the unlawful wage deductions[.]" App. 412. In response, Amazon claimed that "no on-point cases" support Plaintiff's assertion that employers must reimburse employees' business expenses under the

4

Massachusetts Wage Act, Mass. Gen. Laws Ann. ch. 149, § 148.  App. 418.  By

contrast, Plaintiff's supplemental brief cited opinions in which the Massachusetts

Supreme Judicial Court (SJC) held that employer policies shifting "the ordinary

costs of doing business" onto employees violate the Wage Act.  App. 414 (citing,

among other cases, *Camara v. Att'y Gen.*, 941 N.E.2d 1118, 1123 n.11  (Mass.

2011), and *Awuah v. Coverall N. Am., Inc.*, 952 N.E.2d 890, 893 (Mass. 2011)).[2]

  After receiving the parties' supplemental briefs (App. 414–432), the District

Court *sua sponte* dismissed Plaintiff's claim for unpaid business expenses and

denied class certification.  App. 1–20.  The District Court ruled that while the

central issue—whether Amazon misclassified its delivery drivers—could be

addressed on a class-wide basis, this issue alone would not resolve the litigation

and could not support class certification.  App. 13.  According to the District

Court, Plaintiff also had to "establish a common contention as to his business

expense or minimum wage claim."  App. 13–14.

---

[2]      Plaintiff also cited *DaSilva v. Border Transfer of MA, Inc.*, 377 F. Supp. 3d
74, 89 (D. Mass. 2019) (rejecting argument that plaintiffs cannot recover expenses
under the Massachusetts Wage Act because they were paid out of pocket, and not
as deductions); *Furtado v. Republic Parking Sys., LLC*, 2020 WL 996849, at *4
(D. Mass. Mar. 2, 2020) (holding that an employer's failure to reimburse the
plaintiff for travel expenses violated the Wage Act because the statute bars
reducing wages by any means); *Serebrennikov v. Proxet Grp. LLC*, 2024 WL
1375971, at *5 (D. Mass. Mar. 29, 2024) (same, but with no "contractual
commitment to reimburse" business expenses).

The District Court then held that Plaintiff's claim for unpaid business expenses under the Wage Act could not support class certification because it was not a valid claim. Despite acknowledging that "the Wage Act protects against . . . shifting some employer costs against public policy (like workers' compensation insurance)," the District Court concluded that "it is not a violation of the Wage Act for an employer to refuse compensation for generic business expenses like those alleged here." App. 10. The District Court also noted "there is no authority" on whether "business expenses constitute wages."[3] App. 8–9.

The District Court next held that Plaintiff's claim for unpaid minimum wages would necessitate individual inquiries into whether each putative class member was engaged in compensable work time during delivery blocks. App. 14–15.

Plaintiff has timely filed this petition for review pursuant to Federal Rule of Civil Procedure 23(f).

---

[3] Because Massachusetts law is unclear on this issue, and it is a significant issue under state law that has not yet been addressed by Massachusetts' highest court, Plaintiff has moved the District Court to certify the issue directly to the Massachusetts Supreme Judicial Court pursuant to Mass. S.J.C. Rule 1:03. Plaintiff has alternatively moved to certify the District Court's December 31, 2024, order for an immediate appeal under 28 U.S.C. § 1292(b) so that this Court can address the issue or certify it to the Massachusetts Supreme Judicial Court.

### SUMMARY OF ARGUMENT

This worker misclassification case is suitable for class certification under Rule 23. Plaintiff Bernard Waithaka contends that Amazon has misclassified him and other Flex delivery drivers in Massachusetts as independent contractors even though they are employees under state law. His class claims seek compensation for business expenses and unpaid minimum wages. After eight years of litigation, the District Court denied Plaintiff's second motion for class certification under Rule 23, committing two manifest errors.

First, the District Court erred in holding that Plaintiff's claim for business expenses was improper under the Massachusetts Wage Act and thus could not be certified. The District Court also *sua sponte* dismissed Plaintiff's business expense claim. This Court should grant review under Rule 23(f) to rectify the District Court's misinterpretation of the Wage Act or, alternatively, to certify this pivotal question of state law to the Massachusetts Supreme Judicial Court pursuant to Mass. S.J.C. Rule 1:03.

Second, the District Court erred in holding that Plaintiff's claim for unpaid wages would require individual inquiries into how drivers spent their time working for Amazon. Rather than reward Amazon for failing to keep proper time records, the District Court should have inferred that all gap time is compensable because Amazon prohibits concurrent work during delivery blocks. Alternatively, the

District Court should have recognized that representative samples can establish compensable time across the class. This Court should grant review under Rule 23(f) to correct these manifest errors.

Finally, by denying class certification, the District Court sounded the death knell on litigation. In fact, Plaintiff's individual damages are below the threshold for federal diversity jurisdiction. The death knell doctrine alone warrants appellate review here under Rule 23(f).

## STANDARD OF REVIEW

Rule 23(f) grants courts of appeals "unfettered" discretion to grant or deny review "on the basis of any consideration." *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1709–10 (2017) (emphasis in original). "Review of class certification decisions will be most appropriate when: (1) there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable; (2) the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; or (3) the district court's class certification decision is manifestly erroneous." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005). The first and third causes exist here.

## ARGUMENT

Rule 23(f) review is warranted here because the District Court committed two manifest errors, discussed below. *Chamberlan*, 402 F.3d at 959. The District Court's decision also "sounds the death knell of the litigation" because Plaintiff's individual surviving minimum wage claim falls below the monetary threshold for federal jurisdiction under CAFA and 28 U.S.C. § 1332. *Id.* at 957 (citation omitted).

## I. The District Court manifestly erred in denying class certification on Plaintiff's business expense claim under the Massachusetts Wage Act

In its order denying class certification, the Court *sua sponte* dismissed Plaintiff's claim for unpaid business expenses under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148.[4] App. 10–11. Despite recognizing that the Wage Act prohibits "special contracts" that reduce wages earned by an employee, the District Court interpreted the Act as allowing Amazon to reduce delivery drivers' wages by refusing to compensate them for "generic business expenses" they must incur in order to do their work. (*Id.* at 9–10). The District Court's interpretation of this Massachusetts was a manifest error leading to its denial of class certification.

The Massachusetts SJC has not directly addressed whether the Wage Act requires employers to compensate employees for business expenses. That said,

---

[4]    Alleged in Count II of Plaintiff's Complaint. App. 49.

Massachusetts' highest court has interpreted the Wage Act as barring employment policies that shift business expenses onto their employees.  Federal and state courts in Massachusetts have since held that the Wage Act permits the recovery of business expenses—the opposite of what the District Court held below.

First, in *Camara v. Att'y Gen.*, 941 N.E.2d 1118, 1119–21 (Mass. 2011), the SJC held unlawful an employer's policy that allowed for deductions from truck drivers' pay when they damaged vehicles.  In explaining why this policy violated the Wage Act, the Court noted that "the [employer's] policy shift[ed] to the . . . employees some of what appear to be the ordinary costs of doing business." *Id.* at 1123 n.11.

Soon thereafter, the SJC in *Awuah v. Coverall N. Am., Inc.*, 952 N.E.2d 890, 893 (Mass. 2011), held that an employer could not lawfully shift the cost of workers' compensation or other insurance coverage onto its employees.   Even if the insurance payments are not deducted from the employees' wages, the Court noted that "[a]n employer's insurance costs, when borne by an employee, [will] reduce wages just as effectively as if the employer had obtained the policy and deducted funds from the wages." *Id.* at 900 n.22.

Following those decisions, other courts have recognized that the Wage Act forbids employers from requiring employees to pay ordinary business expenses out of their own pockets.  For example, in *Garcia v. Right at Home, Inc.*, 2016 WL

10

3144372, at *3 (Mass. Super. Ct. Jan. 19, 2016), a group of healthcare aides alleged that the defendants violated the Wage Act by failing to reimburse them for travel expenses. Citing *Camara*, the court held that the plaintiffs stated a valid claim, since "[s]ection 148 of the Wage Act prohibits wage reductions achieved by 'any other means,' thus preventing an employer from effectively reducing wages by shifting ordinary business costs to the employee."

Similarly, in *DaSilva v. Border Transfer of MA, Inc.*, 377 F. Supp. 3d 74, 88-89 (D. Mass. 2019), the district court recognized that employees cannot be required to pay business expenses themselves:

> Defendants argue the class cannot recover these insurance premiums because they paid these expenses out of pocket, not as deductions from wages like the plaintiff in *Awuah*. Because the holding in *Awuah* aims to prevent an employer from shifting expenses onto an employee that it is or might be obliged to bear, 952 N.E.2d at 898-99, the fact that the class members paid premiums directly to an insurance company is not dispositive.

The district court in *Furtado v. Republic Parking Sys., LLC*, 2020 WL 996849, at *4 (D. Mass. Mar. 2, 2020), reached the same conclusion, holding that forcing an employee to personally incur travel expenses violated the Wage Act claim. The district court reasoned that "incurring these expenses effectively 'reduce[s] wages just as effectively as if the employer had . . . [to pay travel expenses] and deducted funds from . . . [the employee's] wages.'" 2020 WL 996849, at *5 (quoting *Awuah*, 952 N.E.2d at 900 n.22).

11

In addition to these court decisions, Massachusetts regulations specify that: "[a]n employee required or directed to travel from one place to another after the beginning of or before the close of the work day shall be compensated for all travel time and **shall be reimbursed for all transportation expenses**." 454 Mass. Code Regs. 27.04(4)(d) (emphasis added). Consistent with Section 148, this regulation "prevents a wage reduction achieved by 'any other means' in that it prohibits employers from shifting the costs of travel related business expenses to employees." *Garcia*, 2016 WL 3144372, at *4.

Based on this precedent, the District Court's holding that the Wage Act allows Amazon to classify drivers as independent contractors in order to shift business expenses onto its delivery drivers was a manifest error.[5] For the same reason, the District Court's denial of class certification—premised on its *sua sponte* dismissal of Plaintiff's claim for unpaid business expenses under the Wage Act—was also a manifest error.

---

[5] Indeed, the District Court reached the opposition conclusion when it construed a similar statute in *Kalmanovitz v. Standen*, 2015 WL 9273611, at *5 (W.D. Wash. Dec. 21, 2015) ("Having reviewed the relevant case law, the intent of the legislature, and the facts of this case, the Court finds that allowable business expenses are to be paid 'by reason of employment' and are therefore 'wages' for purposes of the WRA.").

Clearly, if business expenses are recoverable under the Massachusetts Wage Act, that issue is certifiable under Rule 23 because every Amazon Flex driver incurs business expenses—including phone plans, gas, vehicle maintenance, and insurance—that are not reimbursed by Amazon. *See McLaughlin v. Liberty Mut. Ins.*, 224 F.R.D. 304, 309-10 (D. Mass. 2004) (holding that commonality satisfied where plaintiffs "were all employed by the defendant" and their claims arose "out of the same policies and wrongful conduct of the [d]efendant, and [were] based on the same legal theories"); *O'Connor v. Uber Techs., Inc.*, 311 F.R.D. 547, 567 (N.D. Cal. 2015) (noting that "certifying vehicle-related and phone expenses will not cause individualized issues to predominate" and certifying the case as as a class action). Class damages for business expenses can also be easily ascertained using the IRS reimbursement rate because Amazon tracks pickup and drop-off locations and "planned mileage" for all deliveries. (Hawrysz Dep. Trans. 107:18-25, Ex. L). *See, e.g., O'Connor*, 311 F.R.D. at 566 (approving use of IRS reimbursement rate for calculating expense reimbursement claims and certifying case as class action); *Furtado*, 2020 WL 996849, at *5 (recognizing this way to calculate mileage expense reimbursement under Massachusetts law).

Thus, this Court should grant review under Rule 23(f) to address the District Court's erroneous interpretation of this Massachusetts law. Alternatively, the District Court should grant review so that it can certify to the SJC the critical

13

question of whether the Massachusetts Wage Act requires an employer to reimburse employees for business expenses associated with their work. *See* Mass. S.J.C. Rule 1:03 ("This court may answer questions of law certified to it by . . . a United States Court of Appeals").

In fact, the federal court for the District of Massachusetts previously certified this exact issue to the SJC, recognizing that "the question of whether business expenses and deductions borne by employees are recoverable under the Wage Act is unsettled under state law." *Schwann v. FedEx Ground Package Sys., Inc.*, 2014 WL 496882, at *3 (D. Mass. Feb. 7, 2014). Not only did the SJC accept this certified question, it solicited amicus briefs on the issue. *See Schwann, et al., v. FedEx Ground Package Sys., Inc.*, No. JSC-11653.[6] Alas, the SJC never answered the certified question because of procedural developments in the *Schwann* case. *Id.*

This case presents the perfect opportunity for the SJC to finally address the critical state law question of whether the Wage Act requires an employer to compensate employees for business expenses. This Court should thus grant review and certify this unsettled question of state law to the SJC pursuant to Mass. S.J.C. Rule 1:03.

---

[6] A copy of the certification order, SJC docket, and appellant's briefs are attached as Exhibits 1–4.

## II. The District Court manifestly erred in denying class certification on Plaintiff's claims for unpaid wages under the Massachusetts Minimum Wage Law

After erroneously dismissing Plaintiff's claim for unpaid business expenses, the District Court denied class certification on Plaintiff's claim for unpaid wages under the Massachusetts Minimum Wage Law, Mass. Gen. Laws ch. 151, §§ 1, 7. The District Court reasoned that "individual methods would be necessary to assess how drivers spent their gap time" between the first pickup and the last delivery. App. 15. In other words, the District Court thought individual inquiries would be needed to determine each driver's compensable work time. (*Id.* at 15–16). This portion of the District Court's order was manifestly erroneous for three reasons.

First, it is well settled that "[t]he potential existence of individualized damage assessments . . . does not detract from the action's suitability for class certification." *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010). As this Court has recognized, "the rule is clear: the need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)).

Second, the Supreme Court has instructed against rewarding an employer for failing to account for time worked:

> When the employer has kept proper and accurate records the employee may easily discharge his burden by

15

> securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946); *see also Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 545 (E.D. Cal. 2014) (finding that defendant "frustrated . . . due process rights" by failing to keep records of all hours worked by its employees). For this reason, plaintiffs may use representative samples to establish "the employees' hours worked in a class action." *Tyson Foods*, 577 U.S. at 455. Thus, courts routinely certify classes of misclassified workers even when the employer failed to track their hours. *See, e.g.*, *Thompson v. Bruister & Associates, Inc.*, 967 F. Supp. 2d 1204, 1220 (M.D. Tenn. 2013); *Gomez v. Tyson Foods, Inc.*, 295 F.R.D. 397, 400–02 (D. Neb. 2013); *Jackson v. Bloomberg, L.P.*, 2014 WL 1088001, at *15 (S.D.N.Y. Mar. 19, 2014).

Third, Amazon's terms of service barred drivers from engaging in any non-Amazon business while performing services for Amazon:

> You agree that while actively performing the Services, your Vehicle is under an exclusive lease as defined under Federal Motor Carrier Safety Administration ("FMCSA") section 49 C.F.R. Part 376.12(c)(1), which requires exclusive possession, control and use by Amazon of both the Services and your Vehicle during that time.

(TOS ¶ 5, Defs.' Exs. L-P, Dkts. 179.12-179.16). The District Court should have inferred from this prohibition that all time that drivers were on a block with Amazon is compensable. *See Athol Daily News v. Board of Review of Div. of Emp. and Training*, 786 N.E.2d 365, 374 (Mass. 2003) (holding that newspaper carriers' ability to deliver for multiple publishers was evidence of their independent contractor status).

The District Court manifestly erred by denying class certification based on the speculative need for individual inquiries into compensable time—i.e., damages calculations. Rather than reward Amazon for failing to keep proper time records, the District Court should have inferred that all time on block is compensable because Amazon prohibits concurrent work for another company during this time. Alternatively, the District Court should have recognized that representative samples can establish compensable time across the class. This Court should grant review under Rule 23(f) to correct these manifest errors.

## III. The District Court's denial of class status sounds the death knell of this litigation, thus warranting review

Plaintiff's individual "claim is too small to justify the expense of litigation," so the District Court's denial of class certification created a "death-knell" situation. *Chamberlan*, 402 F.3d at 958 (quoting *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 834 (7th Cir. 1999)). In fact, Plaintiff's individual surviving claim for minimum wage falls below the monetary threshold for diversity jurisdiction. *See*

17

28 U.S. Code § 1332. So, after eight years of litigation in federal court, this case will be remanded to state court unless this Court vacates the District Court's order denying class certification. This point alone warrants review in this case under Rule 23(f). *Chamberlan*, 402 F.3d at 959.

### CONCLUSION

The District Court's denial of class certification was manifestly erroneous. Appellate review will allow this Court to resolve an extremely important unsettled question of Massachusetts law that has been addressed by lower courts (and has resulted in conflicting decisions) but has not been addressed by Massachusetts highest court. This Court should grant an immediate appeal in this case to either decide this issue itself or certify it to the SJC. The Court should also grant an appeal in order to clarify that compensable work time inquiries (particularly one where workers work on a shift) do not preclude class certification.

This Court should grant review under Rule 23(f).

January 14, 2024        Respectfully submitted,
*s/ Shannon Liss-Riordan*
Shannon Liss-Riordan
Jeremy Abay
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800

Michael C. Subit
FRANK FREED SUBIT & THOMAS LLP

705 Second Avenue, Suite 1200
Seattle, WA 98104
(206) 682-6711

*Attorneys for Plaintiff-Petitioner*

## STATEMENT OF RELATED CASES PURSUANT TO CIRCUIT RULE 28-2.6

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[  ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:


**Signature**: _s/ Shannon Liss-Riordan_          **Date**: January 14, 2025
             Shannon Liss-Riordan

20

### CERTIFICATE OF COMPLIANCE FOR BRIEFS

1.      I am the attorney or self-represented party.

2.      **This brief contains 4,042 words,** including zero words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

3.      I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

      [ ] it is a joint brief submitted by separately represented parties.
      [ ] a party or parties are filing a single brief in response to multiple briefs.
      [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**: _s/ Shannon Liss-Riordan_      **Date**: January 14, 2025
             Shannon Liss-Riordan

**CERTIFICATE OF SERVICE OF SERVICE FOR ELECTRONIC FILING**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[X] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

| |
|---|
| None |

**Description of Document(s)** *(required for all documents)***:**

| |
|---|
| Plaintiff's petition for permission to appeal order denying class certification pursuant to Federal Rule of Civil Procedure 23(f) with appendix. |

**Signature**: *s/ Shannon Liss-Riordan*          **Date**: January 14, 2025
             Shannon Liss-Riordan

No. _____

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

BERNARD WAITHAKA,
Plaintiff-Petitioner,

v.

AMAZON.COM INC. and AMAZON LOGISTICS, INC.
Defendants-Respondents.

---

On Petition for Permission to Appeal From
The United States District Court for The
Western District of Washington
Case No. 2:19-cv-01320-JCC
Hon. John C. Coughenour

---

## APPENDIX TO PLAINTIFF'S PETITION FOR PERMISSION TO APPEAL ORDER DENYING CLASS CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

---

Shannon Liss-Riordan
Jeremy Abay
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800

Michael C. Subit
FRANK FREED SUBIT & THOMAS LLP
705 Second Avenue, Suite 1200
Seattle, WA 98104
(206) 682-6711

*Attorneys for Plaintiff-Petitioner*

## TABLE OF CONTENTS

Order Denying Class Certification.................................................... 1
(Dkt. 186, Dec. 31, 2024)

Notice of Removal ........................................................ 21
(Dkt. 1, Sept. 7, 2018)

Class Action Complaint – Exhibit A to Notice of Removal............................ 45
(Dkt. 1-1, Aug. 28, 2017)

Order Extending Stay................................................ 51
(Dkt. 91, Nov. 30, 2020)

Plaintiff's Motion for Class Certification ....................................... 67
(Dkt. 97, May 14, 2021)

Order Staying Proceedings ............................................ 96
(Dkt. 153, Feb. 14, 2023)

Order Lifting Stay ..................................................... 100
(Dkt. 166, May 14, 2024)

Plaintiff's Renewed Motion for Class Certification ........................................ 102
(Dkt. 172, Aug. 1, 2024)

Declaration of Bernard Waithaka in Support of Class Certification ................ 131
(Dkt. 172-1, Aug. 1, 2024)

Declaration of Shannon Liss-Riordan in Support of Class Certification ......... 134
(Dkt. 172-2, Aug .1, 2024)

Defendants' Opposition to Class Certification ................................ 251
(Dkt. 178, Sept. 3, 2024)

Defendants Relevant Exhibits to Opposition to Class Certification................. 362
(Dkt. 179, Sept. 3, 2024)

Minute Order Directing Supplemental Briefing ............................... 412
(Dkt. 182, Oct. 15, 2024)

Plaintiffs' Supplemental Brief in Support of Class Certification .................... 414
(Dkt. 183, Oct. 29, 2024)

Defendant's Supplemental Brief in Opposition to Class Certification............. 418
(Dkt. 184, Nov. 12, 2024)

Plaintiffs' Supplemental Reply Brief in Support of Class Certification .......... 427
(Dkt. 185, Nov. 19, 2024)

THE HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7                              UNITED STATES DISTRICT COURT
                              WESTERN DISTRICT OF WASHINGTON
8                                        AT SEATTLE

9   BERNARD WAITHAKA, *et al.*,

10                          Plaintiffs,

11           v.                                      CASE NO. C19-1320-JCC

12   AMAZON, INC., *et al.*,                          ORDER

13                          Defendants.

14

15          This matter comes before the Court on Plaintiff Bernard Waithaka's second motion for

16   class certification (Dkt. No. 172). Having thoroughly considered the briefing and the relevant

17   record, the Court finds oral argument unnecessary and hereby DENIES the motion for the

18   reasons explained herein.

19   **I.   BACKGROUND**

20          Plaintiff is a delivery driver for Defendants' Amazon Flex program. (Dkt. No. 172-1 at

21   1.) Under the program, drivers like Plaintiff deliver products from Defendants' facilities to end

22   customers. (Dkt. No. 178-1 at 2.) These products vary from groceries to more traditional "brown

23   box" deliveries. (*Id.* at 2–3.) Defendants advertise timely and efficient delivery, which depends,

24   in part, on the delivery drivers here. (*See* Dkt. Nos. 172-7 at 2–3, 172-3 at 4.)

25          Delivery drivers use personal vehicles (with minimal requirements from Defendants).

26   (Dkt. No. 172-14 at 11.) Drivers also use a phone-based application to sign up for shifts, confirm

1    that products have been picked up, receive suggested driving routes, and confirm that products

2    have been delivered. (Dkt. Nos. 178-1 at 3, 172-14 at 9–10, 178-9 at 3.) The Terms of Service

3    ("TOS") that govern Amazon Flex have varied since the program's creation in 2014, (Dkt. No.

4    178-1 at 4), but two provisions relevant to the allegations here have not. First, Defendants have

5    always classified delivery drivers as independent contractors, not employees. (*See, e.g.,* Dkt.

6    Nos. 178-1 at 7, 179-14 at 3, 179-16 at 2.) Second, pay is governed exclusively by the "Service

7    Fees" provision. (*See, e.g.,* Dkt. Nos. 178-1 at 23, 179-14 at 3, 179-16 at 3.) The TOS specify

8    these fees are the entirety of drivers' pay and are meant to cover their expenses. (*See id.*)

9          The TOS also explain the work and pay. Drivers sign up for "delivery blocks," which are

10   the time Defendants estimate it will take to complete delivery of all products a driver picks up.

11   (Dkt. Nos. 179-16 at 2, 178-1 at 3.) For example, driver Brad Oswalt signed up for a three-hour

12   block in June 2021. (Dkt. No 178-6 at 4.) The pay for a block is established when a driver signs

13   up and is based on an algorithm that takes into account, among other factors, potential expenses

14   and the supply of drivers. (Dkt. No. 172-14 at 23–26.) A driver whose actual delivery time is

15   under the block estimate is paid the full amount. (Dkt. No. 178-1 at 3.) Oswalt completed his

16   three-hour delivery block in one hour and was still paid the $96 he signed up for. (Dkt. No. 178-

17   6 at 4) (*see also* Dkt. No. 179-1 at 23–24 (Plaintiff explaining he often finishes blocks early)). It

18   is undisputed that actual delivery times are usually less than the estimated blocks. (*See* Dkt. No.

19   178-10 at 43–44.)[1] Drivers may sign up for a block a week in advance, (Dkt. No. 179-11 at 10),

20   and may cancel up to 45 minutes before a block begins. If a driver repeatedly cancels with less

21   than 45 minutes' notice, they may be penalized or terminated for violating Defendants' Service

22   Standards. (*See, e.g.,* Dkt. No. 178-1 at 25, 32.)

23         A delivery block is different than a "delivery window," the timeframe during which

24   Defendants expect drivers to deliver products. (*Id.* at 32.) The delivery window varies by

25

26   ---
   [1] Drivers may request additional compensation if some "unforeseen circumstance" results in
more working time than the estimated block. (Dkt. No. 168-1 at 3.)

ORDER
C19-1320-JCC
PAGE - 2

App. 2

1   product: perishable groceries may have a two-hour window, while the window for consumer

2   goods in brown boxes is longer. (Dkt. Nos. 179-11 at 3–4, 178-1 at 3–4, 178-6 at 3.) Most

3   products have a longer window that simply requires delivery by 9 P.M. on the same day the

4   product is picked up. (Dkt. Nos. 178-1 at 3, 179-11 at 3.)[2] It is undisputed that actual delivery

5   times are usually within the acceptable window. (*See* Dkt. No. 178-10 at 43.) Again, drivers are

6   not paid based on windows; they are paid based on blocks. Defendants paid Oswalt $96 for his

7   three-hour block regardless of when he actually delivered the last product. (*See* Dkt. No. 178-6 at

8   4.) Drivers' "Delivery Quality" and "Standing," however, are tied to the window. (Dkt. Nos.

9   178-1 at 32, 172-5 at 9–10.) Drivers who repeatedly fail to meet the expectation—usually, to

10   deliver all products by 9 P.M.—may be terminated, and Defendants retain discretion over all

11   Service Standard violations. (*See* Dkt. No. 178-1 at 25, 32.)

12         Both parties submit that the length of delivery blocks and windows create flexibility. (*See*

13   Dkt. Nos. 172 at 19–20, 178 at 13.) They disagree on what that means for Plaintiff's employment

14   claims. According to Plaintiff, drivers are unpaid for some working time during the delivery

15   window but outside of the delivery block. (Dkt. No. 172 at 19.) He submits working time can

16   and should be measured from pickup to delivery. (*Id.*) But according to Defendants, drivers

17   spend time between pickup and delivery performing personal tasks or working for other

18   companies, not for Defendants. (Dkt. No. 178 at 33–34.) They submit that the time between

19   pickup and delivery does not represent drivers' working hours because of this unaccounted "gap

20   time." (*Id.*)

21         Plaintiff originally brought suit in Massachusetts state court in 2018 before the case was

22   removed and then transferred to this District. (Dkt. Nos. 1 at 1, 1-1 at 3, 59 at 22.) The complaint

23   brings three employment claims under state law. Count I alleges that Defendants misclassified

24

25

26

---

[2] Prime Now and Whole Foods products require a tighter window, (Dkt. No. 179-11 at 4), though usually pay better. (*See* Dkt. No. 178-7 at 2.) Amazon Logistics windows for brown box deliveries are open until 9 P.M., (Dkt. No. 179-11 at 3), and constitute the majority of the deliveries drivers make. (Dkt. No. 178-10 at 18.)

ORDER
C19-1320-JCC
PAGE - 3

1    Plaintiff as an independent contractor. (Dkt. No. 1-1 at 8) (citing Mass. Gen. Laws ch. 149,

2    § 148B). Count II alleges that Plaintiff is owed unpaid business expenses under the

3    Massachusetts Wage Act. (Dkt. No. 1-1 at 9) (citing Mass. Gen. Laws ch. 149, § 148). These

4    expenses include the cost of his phone to use the Amazon Flex application and the mileage on

5    his personal vehicle. (Dkt. No. 1-1 at 3.) Count III alleges that Defendants did not pay Plaintiff

6    the state minimum wage under the Massachusetts Minimum Wage Law. (*Id.* at 9) (citing Mass.

7    Gen. Laws ch. 151, §§ 1, 7).

8         This case has been stayed pending appeals in various others, including one before this

9    Court. (Dkt. Nos. 91 at 16, 153 at 3.) The Court lifted the stay earlier this year, (Dkt. No. 166 at

10   1), and Plaintiff moved for class certification under Federal Rule of Civil Procedure 23. (Dkt.

11   No. 172 at 9.)[3] Plaintiff also requests that he and his counsel be appointed class representatives.

12   (*Id.* at 21.) Defendants oppose certification, primarily on the grounds that there is insufficient

13   commonality between class members and that individual issues will predominate over common

14   ones. (Dkt. No. 178 at 17–35.) They also contest the validity of Plaintiff's business expense

15   claim under the Wage Act. (*Id.* at 28.)

16   **II. DISCUSSION**

17        To certify a class under Rule 23, the Court must consider whether a class action is an

18   appropriate vehicle to redress the underlying claims. It must conduct a "rigorous analysis" of the

19   Plaintiff's proposed class, the evidence that will be offered on the merits, and the individual

20   issues that could derail collective litigation. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351

21   (2011). However, these considerations all require some inspection of the claims and their merits.

22   *Id.* If the Court seeks to assess whether "common answers" will resolve the litigation, *id.* at 350,

23   then it must be confident that the answers to the questions posed by the claims are legally valid.

24

25   _____

26   [3] Defendants did not renew a motion to compel arbitration, (*see* Dkt. No. 171), nor has there
     been a motion to dismiss.

ORDER
C19-1320-JCC
PAGE - 4

1   To understand the merits of Plaintiff's state law claims, the Court therefore reviews the standards

2   for the claims before turning to class certification.

3       **A.    Legal Standard for Massachusetts Employment Claims**

4               1.    <u>Relationship Between the Claims</u>

5           Plaintiff's misclassification, Wage Act, and Minimum Wage Law claims are

6   interconnected. With respect to Plaintiff's misclassification claim, under Massachusetts law, a

7   worker is presumed an employee—not an independent contractor—unless three factors are met

8   (the "ABC test"). Mass. Gen. Laws ch. 149, § 148B(a). First (A), the employer must lack control

9   over the work itself, both in contract and in fact. *Id.* § 148B(a)(1). Second (B), the work must be

10  outside of the employer's usual course of business. *Id.* § 148B(a)(2). And third (C), the work

11  must be the sort that the worker usually performs as their trade. *Id.* § 148B(a)(3). It is a

12  defendant employer's burden to show that all three prongs of the ABC test are met to defeat a

13  misclassification claim. *Chambers v. RDI Logistics, Inc.*, 65 N.E.3d 1, 8 (Mass. 2016).

14  Conversely, a plaintiff employee need only show that one factor is not met. *Ouadani v. Dynamex*

15  *Operations E., LLC*, 405 F. Supp. 3d 149, 165 (D. Mass. 2019). Plaintiff here claims (in Count I)

16  that he and his proposed class can demonstrate that all three factors are absent but focuses on

17  prong B. (Dkt. No. 172 at 10–11.)[4] In other words, he argues that Amazon Flex drivers complete

18  _____

19  [4] Defendants argue that Massachusetts's prong B is preempted in this case by the Federal
    Aviation Administration Authorization Act ("FAAAA"), citing First Circuit and Massachusetts
20  case law. (Dkt. No. 178 at 18) (citing *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d
    429 (1st Cir. 2016), *Chambers*, 65 N.E.3d 1). Those courts held that prong B was preempted
21  because of significant, although indirect, effects on motor carriers' operations, which frequently
    rely on independent contractors. *Schwann*, 813 F.3d at 429, *Chambers*, 65 N.E.3d at 9. Plaintiff
22  does not dispute that Defendants are motor carriers for the purposes of this litigation, but he
    submits that preemption is a matter of federal law and that this Court is bound by contrary Ninth
23  Circuit precedent. (Dkt. No. 181 at 7–9) (citing *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644 (9th
24  Cir. 2021)).

25  The Court is more persuaded by Plaintiff's argument. Preemption is always a federal question.
    *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 388 (1986); *see also Insolvency*
26  *Srvs. Grp., Inc. v. Fed. Express Corp*, 2014 WL 12613262, slip op. at 2 (C.D. Cal. 2014)

ORDER
C19-1320-JCC
PAGE - 5

1   the crucial last-mile in the usual course of Amazon's order, fulfillment, and delivery business.

2   (Dkt. No. 1-1 at 6–7.)

3          But even if Plaintiff could show that prong B is absent, that showing alone would not

4   establish liability. Massachusetts General Law § 150—which provides a private cause of action

5   for misclassification—also requires the misclassified employee to suffer a harm ("damages") to

6   recover. Mass. Gen. Laws ch. 149, § 150. In the alternative, § 148B provides a cause of action

7   for misclassification combined with another employment violation. *Id.* § 148B(d). Thus, Plaintiff

8   and his proposed class must be able to establish liability on either (or both) his Wage Act (Count

9   II) or Minimum Wage Law (Count III) claims to succeed on his misclassification claim (Count I)

10  in this litigation. *See Hoffman v. Thras.io Inc.*, 538 F. Supp. 3d 196, 202 (D. Mass. 2021).

11         The Minimum Wage Law sets a floor for wages. Mass. Gen. Laws ch. 151, § 1.

12  Currently, the statute sets that minimum at $15 per hour, under which a wage is presumed

13  "oppressive and unreasonable." *Id.* Thus, the minimum wage requirement is a function of

14  payment and time. The statute itself does not define what constitutes "wages." *See generally id.*

15  § 2. The Commissioner of the Department of Labor Standards is tasked with setting regulations

16  to enforce and define the state minimum wage. *Id.* § 3(4). In terms of time, compensable hours

17  do not include commute time, 454 Mass. Code Regs. 27.04(4)(a), but obviously include

18  "working time:" time spent on duty or at a location prescribed by their employer. *Id.* at 27.02. It

19  _____

20  (holding that a district court may look to state courts on state law questions, but must follow
    Ninth Circuit precedent on preemption questions). A transferee court like the Court here must

21  apply the federal law of the circuit in which it sits. *Newton v. Thomason*, 22 F.3d 1455, 1460 (9th
    Cir. 1994).

22  In *Cal. Trucking Ass'n*, the Ninth Circuit found that the FAAAA does not preempt prong B of

23  the ABC test. 996 F.3d at 658–63 (explaining that generally applicable laws may significantly
    impact motor carriers, but that alone does not mean they "relate to" the "rates, routes, or

24  services" of motor carriers and their consumers). In so finding, it noted that the Massachusetts
    ABC test is identical to the California ABC test at issue there. *Id.* at 663. Therefore, under this

25  circuit's precedent, prong B is not preempted by the FAAAA, and Plaintiff may establish that
    delivery drivers like himself were misclassified because they worked within Defendants' usual

26  course of business.

ORDER
C19-1320-JCC
PAGE - 6

App. 6

1    does not, however, include on-call time where an employee is free to be where and do what they

2    want. *Dagan v. Jewish Cmty. Housing for Elderly*, 699 N.E.2d 840, 847 (Mass. App. Ct. 1998).

3    Employers may not contract around the minimum wage requirement. Mass. Gen. Laws ch. 151,

4    § 20. If an employee's payment divided by their total compensable hours is less than $15 per

5    hour, then the employer is liable under the Minimum Wage Law.

6         The Massachusetts Wage Act, in contrast, ensures that workers are paid their "wages

7    earned." Mass. Gen. Laws ch. 149, § 148. Rather than set a wage floor like the Minimum Wage

8    Law, it prohibits withholding payments from or delaying payments to employees. *See Awuah v.*

9    *Coverall N. Am.*, 952 N.E.2d 890, 895 (Mass. 2011). This statute defines "wages" to include

10   commissions "definitely determined" and vacation pay "under an oral or written agreement."

11   Mass. Gen. Laws. Ch. 149, § 148. Courts are loath to "add language to [the Wage Act] where the

12   Legislature itself has not done so." *Tze-Kit Mui v. Mass. Port Auth.*, 89 N.E.3d 460, 462 (Mass.

13   2018) (listing cases and declining to expand the meaning of wages to include sick pay)*.* But they

14   have strictly followed the statute's prohibition on "special contracts" that try to exempt

15   employers from the Wage Act's requirements. *See Camara v. Att'y Gen.*, 941 N.E.2d 1118, 1122

16   (Mass. 2011) (noting Wage Act's purpose to protect employees' right to wages). An otherwise

17   valid employment agreement may not reduce the wages an employee has earned. *Awuah*, 952

18   N.E.2d at 892*.* Still, the Wage Act's protections only extend to wages earned, not employment

19   agreements about other payments. *Fraelick v. PerkettPR, Inc.*, 989 N.E.2d 517, 523–24 (Mass.

20   App. Ct. 2013).

21            2.    Plaintiff's Wage Act Claim

22        Plaintiff's Wage Act claim (Count II) is premised on Defendants' failure to compensate

23   him for business expenses such as his phone and vehicle (even though Defendants' TOS specify

24   that the Service Fees omit expenses). But Plaintiff's claim suffers a fatal defect—it presumes that

25   business expenses constitute wages under the Wage Act when no binding or persuasive authority

26   supports this presumption. That is, whether or not delivery drivers were deprived of business

expenses simply has no bearing on Wage Act liability because there is no authority that stands for the proposition that business expenses constitute wages.[5]

As a matter of statutory law, the text of the Wage Act defines some benefits as "wages," but not expenses. *See* Mass. Gen. Laws 149, § 148. Plaintiff cites a single Massachusetts administrative regulation that requires employers to pay "transportation expenses" during work hours. (Dkt. No. 183 at 3) (citing 454 Mass. Code Regs. 27.04(4)(d)). But, even if this regulation could be stretched to cover all business expenses, it was passed pursuant to the Commissioner's power to set a pay floor under the Minimum Wage Law, not the Wage Act's prohibition on taking what is earned. *See* 454 Mass. Code Regs. 27.01(1). In other words, employers must pay Massachusetts employees a minimum wage that accounts for transportation expenses, but that does not mean failure to do so deprives them of "wages earned." *Cf. Escorbor v. Helping Hands Co.*, 2017 WL 4872657, slip op. at 2 (Mass. Super. 2017) (analyzing complaint for travel expenses under the Minimum Wage Law). Thus, while the Minimum Wage regulation is compatible with the Wage Act, *see Garcia v. Right at Home, Inc.*, 2016 WL 3144372, slip op. at 4 (Mass. Super. 2016), the regulation itself does not shed any light on what properly constitutes "wages earned" and whether failure to pay business expenses is a violation of the Wage Act.

As a matter of case law, the precedents to which Plaintiff cite are inapposite. His motion includes several California cases where a state statute specifically requires employers to pay business expenses. (Dkt. No. 172 at 18) (citing *O'Connor v. Uber Techs., Inc.*, 311 F.R.D. 547 (N.D. Cal. 2015), *James v. Uber Techs., Inc.*, 338 F.R.D. 123 (N.D. Cal. 2021)). But the Massachusetts precedent he cites feature *deductions* from payments that employers previously

---

[5] Although Defendants pointed this out in their briefing, (Dkt. No. 178 at 28), Plaintiff's reply was unresponsive. (*See generally* Dkt. No. 181.) In the interest of understanding the common questions and answers that may resolve this litigation, the Court ordered and received supplemental briefing as to whether the Wage Act requires employers to pay employee business expenses. (Dkt. Nos. 182, 183, 184, 185.)

ORDER
C19-1320-JCC
PAGE - 8

1    agreed to, not omissions that employers like Defendants disclaimed in their TOS. (*See* Dkt. Nos.

2    172 at 17 n.5, 183 at 3.)[6]

3         The highest state authority Plaintiff cites is *Awuah*, where the Supreme Judicial Court

4    observed that the term "earned" is not defined in the Wage Act. 952 N.E.2d at 896. In trying to

5    define the term, the court noted that an employment agreement is relevant to what is "earned,"

6    but the statute also prohibits "special contracts." *Id.* at 896–97. The Supreme Judicial Court

7    concluded that contractual arrangements requiring employees to pay workers' compensation and

8    franchise fees were void as a matter of public policy. *Id.* at 899–901. Here, there is no such

9    public policy argument, on statutory or other grounds, that agreements to use phones or vehicles

10   are otherwise invalid.[7] In fact, in the *Awuah* litigation, claims for business equipment deductions

11   akin to those here were rejected under the Wage Act. *Awuah v. Coverall N. Am., Inc.*, 740 F.

12   Supp. 2d 240, 243–44 (D. Mass. 2010). Other Wage Act cases feature reimbursements that an

13   employer expressly agreed to pay. *See Furtado v. Republic Parking Sys., LLC*, 2020 WL 996849,

14   slip op. at 1 (D. Mass. 2020) (employment contract to reimburse travel expenses), *Fraelick*, 989

15   N.E.2d at 524 ("the otherwise permissible expense reimbursement arrangement . . . was

16   *abandoned and replaced* with a policy and practice that required the employee . . . to advance,

17   indefinitely, expenses for the employer's benefit") (emphasis added), *Serebrennikov v. Proxet*

18

---

19   [6] *See, e.g., Camara v. Att'y Gen.*, 941 N.E. 2d 1118, 1119 (Mass. 2011) (deduction from wages
     for damages caused by employee)*, Awuah v. Coverall N. Am., Inc.*, 952 N.E. 2d 890, 897–901

20   (Mass. 2011) (various deductions from "wages earned"), *DaSilva v. Border Transfer of MA, Inc.*,
     296 F. Supp. 3d 389, 396 (D. Mass. 2017) (deductions from pay for uniforms and damage

21   claims), *Martins v. 3PD, Inc.*, 2013 WL 1230454, slip op. at 1 (D. Mass. 2013) ("Under

22   Massachusetts wage law, an employer may not *deduct* certain expenses from its payment to
     employees") (emphasis added).

23   [7] Similar considerations permeate insurance cases that Plaintiff cites, which focus on the risk that

24   employees are forced to bear on behalf of their employers without any other benefit. *See
     DaSilva*, 296 F. Supp. 3d at 396 (workers' compensation and cargo insurance), *Martins*, 2013

25   WL 1230454 at 7–8 (deductions for insurance and repair to employer vehicles). These concerns
     are not relevant here, either: a personal phone or vehicle has present value to the employee

26   distinct from their engagement with Amazon Flex.

1  *Grp. LLC*, 2024 WL 1375971, slip op. at 1 (D. Mass. 2024) (citing Dkt. No. 28-1 at 1)

2  (considering business expenses incurred and unreimbursed pursuant to a "Consulting

3  Agreement").[8]

4      Plaintiff has not cited, nor has the Court identified, *any* case where a worker's contract

5  disclaimed business expenses *and* a Massachusetts court required the employer to pay them. This

6  Court is loath to take that leap in this class action litigation due to the Wage Act's language, the

7  complementary role of the Minimum Wage Law, and contrary precedent. The Wage Act protects

8  against reducing what an employer has committed to pay or shifting some employer costs against

9  public policy (like workers' compensation insurance). It does not prevent many valid

10 compensation agreements. *Grogan v. All My Sons Bus. Dev. LLC*, 552 F. Supp. 3d 142, 145–46

11 (D. Mass. 2021) ("[t]he purpose of the Wage Act is to prevent the unreasonable detention of

12 wages, not to prescribe any particular method by which employees must be paid their earned

13 wages") (cleaned up). Therefore, it is not a violation of the Wage Act for an employer to refuse

14 compensation for generic business expenses like those alleged here.

15     Having considered the parties' supplemental briefing, the Court DISMISSES Plaintiff's

16 Wage Act claim (Count II), without prejudice, for failure to state a viable claim. *See Omar v.*

17 *Sea-Land Srv., Inc.,* 813 F.2d 986, 991 (9th Cir. 1987); *see also Wong v. Bell*, 642 F.2d 359,

18 361–62 (court may dismiss a claim *sua sponte*), 5C Charles Alan Wright & Arthur R. Miller,

---

19 [8] Plaintiff's most on-point case is an unreported trial court decision that considered claims for

20 unreimbursed travel expenses, apparently in the absence of a prior agreement. *Garcia*, 2016 WL
3144372 at 1–4*; see also Ohio Sec. Ins. Co. v. Axis Ins. Co.*, 2017 WL 1710987, slip op. at 10

21 (explaining the low weight of intermediate and trial court cases). The employee there claimed
expenses, citing the same Massachusetts minimum wage regulations as Plaintiffs do. *Garcia*,

22 2016 WL 3144372 at 3. But plaintiff in *Garcia* brought claims for these expenses under both the
Wage Act *and* the Minimum Wage Law. *See id.*; *see also Garcia v. Right at Home, Inc.*, Case

23 No. SUCV2015-00808, Dkt. No. 28 at 11–12 (Mass. Super. 2016) (Amended Complaint, Count

24 II). Plaintiffs here bring their claim for expenses *exclusively* under the Wage Act. (Dkt. No. 1-1
at 9.) And the court in *Garcia* only considered the Wage Act because defendant employer argued

25 that the 27.04(4) regulations were incompatible with the Wage Act and therefore invalid. *Garcia*,
2016 WL 3144372 at 4. Not so here. The *Garcia* court did not consider whether the Wage Act

26 alone supports a claim for business expenses under Massachusetts law.

1    Federal Practice & Procedure § 1657 (4th ed. 2013) ("the district judge on his or her own

2    initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as

3    long as the procedure employed is fair to the parties").

4         In the remaining counts, Plaintiff claims that he was misclassified (Count I) and was paid

5    less than the state minimum for the hours that he worked (Count III). As previously explained,

6    Plaintiff must prevail on Count III in order to prevail on Count I. To certify these claims for class

7    treatment, Plaintiff must meet the requirements of Rule 23.

8        **B.    Class Certification under Rule 23**

9          1.    <u>Legal Standard</u>

10        A plaintiff seeking class certification on their claim(s) must satisfy the requirements of

11   Rule 23(a) and the requirements of at least one of the categories under Rule 23(b). *Dukes*, 564

12   U.S. at 345–46. The plaintiff "bears the burden of proving by a preponderance of the evidence

13   that all requirements for class certification are met." *Byorth v. USAA Cas. Ins. Co.*, 333 F.R.D.

14   519, 525 (D. Mont. 2019).

15        Plaintiff proposes the following class: "[A]ll Amazon Flex delivery drivers who have

16   worked in the Commonwealth of Massachusetts at any time since August 23, 2014." (Dkt. No.

17   172 at 28.) Defendants argue that the inquiry necessary to establish liability to each class

18   member will be so varied and particular as to preclude certification. (Dkt. No. 178 at 17–35.)

19   Their opposition focuses on commonality and predominance. (*Id.*) In determining whether

20   Plaintiff has carried his burden for certification, the Court must conduct a "rigorous analysis" on

21   each requirement. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). This inquiry may

22   "entail some overlap with the merits of the plaintiff's underlying claim." *Ellis v. Costco*

23   *Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011). The Rule 23 requirements are necessary

24   conditions for certification; the ultimate decision is within the Court's discretion. Fed. R. Civ. P.

25   23 ("*may* sue on behalf of all members . . . *only if* . . .") (emphases added); *see also Vinole v.*

26   *Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (reviewing for abuse of

1    discretion).

2        2.    Rule 23(a) Requirements

3        Rule 23(a) requires a showing that (1) the class is so numerous that joinder is

4    impracticable ("numerosity"); (2) there are common questions of law or fact to the class

5    ("commonality"); (3) the plaintiff's claims are typical of those in the class ("typicality"); and (4)

6    the representatives will fairly and adequately protect the interests of the absent class members

7    ("adequacy"). Fed. R. Civ. P. 23(a). These requirements are meant to protect the due process

8    rights of plaintiffs as well as defendants to litigate their claims and defenses. *See Dukes*, 564 U.S.

9    at 348, 367 (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).

10        a.    *Numerosity*

11        Numerosity is satisfied where joinder is impracticable. Fed. R. Civ. P. 23(a)(1).

12    While the inquiry is fact-dependent, "in general, courts find the numerosity requirement satisfied

13    when a class includes at least 40 members." *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir.

14    2010). Here, it is undisputed that there are thousands of Amazon Flex delivery drivers who have

15    worked for Defendants in Massachusetts during the relevant period. (*See* Dkt. Nos. 172 at 16,

16    178 at 10.) Defendants' submissions confirm that fact. (*See* Dkt. No. 178-10 at 5.) Therefore,

17    numerosity is satisfied.

18        b.    *Commonality*

19        Defendants submit, however, that the size of the class creates disparity between the

20    factual and legal issues presented. (Dkt. No. 178 at 116–17.) Commonality under Rule 23(a)(2)

21    requires that the claims depend upon a "common contention . . . that determination of its truth or

22    falsity will resolve an issue that is central to the validity of *each one of the claims* in one stroke."

23    *Dukes*, 564 U.S. at 350 (emphasis added). The key inquiry is not whether a plaintiff's claims

24    have raised common questions, but "whether class treatment will 'generate common *answers* apt

25    to drive the resolution of the litigation.'" *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957

26    (9th Cir. 2013) (quoting *Dukes*, 564 U.S. at 350) (emphasis in original). It is Plaintiff's burden

ORDER
C19-1320-JCC
PAGE - 12

App. 12

1   not only to pose the questions but convince the Court that the evidence for their common

2   answers will resolve the litigation. The Court must assess the factual and legal contentions

3   presented by each claim.

4          The central question posed by Plaintiff's first claim is whether Defendants misclassified

5   Amazon Flex delivery drivers as independent contractors rather than employees. There are

6   peripheral factual questions that are common and relevant, such as whether class members are

7   employed in Massachusetts. Defendant's business records seem sufficient to answer such

8   questions. (*See* Dkt. No. 178-10 at 17.) But the primary legal answer that Plaintiff says will

9   establish liability is that delivery drivers like him are employees under prong B of the ABC test.

10  (Dkt. Nos. 172 at 16–17, 181 at 9.) In other words, drivers are employees because they work

11  within Defendants' usual course of business. Plaintiff has already put forward common evidence

12  of drivers' classification under the TOS, Defendants' course of business, as well as Defendants'

13  internal and external communications about that business. *See supra* Part I. While Defendants

14  engage in a sprawling trade that provides a host of products, that breadth does not exclude

15  delivery to end customers—the critical last-mile—from their course of business. Plaintiff

16  proposes a valid and common answer apt to resolve the misclassification claim for the class.

17  Defendants are incorrect that prong B is preempted here, *see supra* Part II(A)(1) n.4, and the

18  Court is not persuaded at this stage that delivery services are outside their usual course of

19  business. If anything, that is a common factual question on the merits of Plaintiff's

20  misclassification claim unsuitable for the class certification stage.[9]

21         But a common answer on the misclassification claim is not apt to resolve this litigation.

22  *See Dukes*, 564 U.S. at 350 Plaintiff must also establish a common contention as to his business

---

[9] Plaintiff also argues that he can establish liability under prong A (contractual or factual
control). (Dkt. No. 181 at 9–11.) While it appears that Defendants' individual control over
drivers' routes and deliveries presents highly individualized questions, *see Magalhaes v. Lowe's
Home Ctrs., Inc.*, 2014 WL 907675, slip op. at 4–5 (D. Mass 2014), the common TOS may
permit this answer, too. The Court is less convinced that there is common evidence that would
establish each class member's individual trade (under prong C).

ORDER
C19-1320-JCC
PAGE - 13

expense or minimum wage claim. However, as rigorously analyzed above, his business expense

claim is not cognizable under the Massachusetts Wage Act. *See supra* Part II(A)(2). The Court

need not expend judicial resources, let alone certify a class, on an invalid claim. *Cf. Sanders v.*

*Apple, Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009) (court may avoid "expenditures of time

and money that must arise from litigating spurious issues"), *Dukes*, 564 U.S. at 357 (proposed

common answer—that employer gave discretion to supervisors—would not establish defendant's

liability for discrimination against employees).

      Satisfaction of the commonality requirement thus hinges on Plaintiff's third claim. The

common question there is whether delivery drivers received the Massachusetts minimum wage.

It can be answered by comparing the payments drivers received with the minimum they should

have received based on their total hours worked. The numerator (the pay drivers received) is not

in dispute here; the denominator (the hours they worked) is. (*See* Dkt. No. 178 at 33.) Plaintiff

proposes to establish total hours on a class-wide basis using Defendants' delivery records. (*See*

Dkt. No. 172 at 19.) They submit that total hours worked can be calculated by the difference

between when a driver picks products up and when they deliver them. (*Id.*) The trouble with this

answer is that, while measurable, it assumes that each driver was working for Defendants during

that entire timeframe. In order to establish liability under the Minimum Wage Law, Plaintiff

must show hours when they were, in fact, working for their employer. And to satisfy the

commonality requirement, Plaintiff must show that each class member worked for the employer

during the proposed timeframe. Here, Plaintiff's proposed working window is too wide open.

      Defendants have submitted uncontroverted evidence that drivers are permitted to make

deliveries outside of their delivery blocks. (Dkt. Nos. 178-1 at 3, 179-11 at 3.) Most deliveries

can be made any time before 9 P.M. (*Id.*) Therefore, an Amazon Flex driver could sign up for a

three-hour block, pick up products at 9 A.M., and deliver the last at 9 P.M. without running afoul

of Defendants' Quality and Standing policies. Under Plaintiff's proposed class evidence, that

driver would have worked 12 hours. But Defendants have shown that the program's flexibility

1   leads to "gap time" that multiple drivers have used for their own purposes—not delivering

2   products for Defendants. (*See* Dkt. No. 178-10 at 41–51.) Plaintiff Waithaka used his gap time,

3   for example, to perform gig work for other companies like Uber. (Dkt. No. 179-1 at 25.) He was

4   not "on duty" or at a "prescribed work site" during those times. *See* 454 Mass. Code Regs. 27.02.

5   Defendants only require him to deliver packages at some point before 9 P.M. *Cf. Lawson v.*

6   *GrubHub*, 665 F. Supp. 3d 1108, 1127–30 (N.D. Cal 2023) (finding time spent "Available" to

7   employer in a given area was compensable working time). And if on-call time generally does not

8   count toward hours worked for the purposes of the Minimum Wage Law, *see Dagan*, 699 N.E.2d

9   at 847, surely time spent by an employee for other employers does not count, either.

10        Plaintiff's proposed definition of working time would also pervert delivery blocks as

11   ascribed in the TOS, to which both parties agreed. Drivers sign up for these shifts knowing the

12   estimated time it will take and the pay they will receive; Defendants pay them that amount

13   regardless of how long it takes (usually less). Plaintiff cannot now, through litigation, force that

14   window open and take advantage of the flexibility he chose. And much less through a class

15   action, where common evidence must establish common liability. Plaintiff tries to dismiss the

16   concern about gap time in a flippant footnote, saying that Defendants "cannot seriously dispute"

17   the proposed pickup-to-delivery methodology. (Dkt. No. 181 at 15.) But they do, and Plaintiff

18   does not seriously respond. (*See generally* Dkt. No. 181.) Therefore, the Court finds that pickup-

19   to-delivery does not establish liability for the "actual time it took drivers to deliver all of their

20   assigned packages," (Dkt. No. 172 at 19), and cannot form the factual basis of commonality for

21   Plaintiff's alleged minimum wage class action claim. Plaintiff offers no alternative to satisfy his

22   burden and the Court can only assume that individual methods would be necessary to assess how

23   drivers spent their gap time.

24        While Plaintiff has posed common questions of fact and law on his misclassification

25   claim, the answers these will generate nevertheless fail to resolve this litigation because there are

26   insufficient common answers on his wage claim (upon which Plaintiff's misclassification claim

ORDER
C19-1320-JCC
PAGE - 15

App. 15

1  necessarily depends). Therefore, Plaintiff has not satisfied commonality.

2          c.    *Typicality*

3          Plaintiff must also show that his claims are typical of the proposed class. Fed. R. Civ. P.

4   23(a)(3). "The test of typicality is whether other members have the same or similar injury,

5   whether the action is based on conduct not unique to the named plaintiffs, and whether other

6   class members have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984. The

7   commonality and typicality inquiries, which "tend to merge," both serve as "guideposts for

8   determining whether under the particular circumstances maintenance of a class action is

9   economical and whether the named plaintiff's claim and the class claims are so interrelated that

10  the interests of the class members will be fairly and adequately protected in their absence."

11  *Dukes*, 564 U.S. at 349 n.5 (internal quotation omitted). Ultimately, representative class claims

12  are typical if they are "reasonably co-extensive with those of absent class members; they need

13  not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

14          While Plaintiff's misclassification claim may be typical for delivery drivers, his

15  minimum wage claim runs into similar issues with typicality as it does commonality. It is unclear

16  how typical it is for delivery drivers to take on other gig work like Plaintiff did on some days he

17  worked for Defendants. This litigation could become bogged down in a factual morass

18  accounting for Plaintiff's working time that is not co-extensive with other class members. (*See*

19  Dkt. No. 178 at 36.) Conversely, other drivers may regularly use the time between first pickup

20  and last delivery for personal errands that Plaintiff does not. Though it poses a lower barrier to

21  certification than that of commonality, the Court also expresses reservations about the typicality

22  of Plaintiff's claims.

23          d.    *Adequacy of Representation*

24          Finally, Rule 23(a)(4) requires that the named plaintiff and class counsel "fairly and

25  adequately" protect the interests of the class. Fed. R. Civ. P. 23(a)(4). To determine whether said

26  individuals will adequately represent a class, the Court must examine (1) whether the named

ORDER
C19-1320-JCC
PAGE - 16

1   plaintiff and his counsel have any conflicts of interest with other class members; and (2) whether

2   the named plaintiff and his counsel will prosecute the action vigorously on behalf of the class.

3   *Ellis*, 657 F.3d at 985.

4         The Court is less concerned here about Plaintiff's or their counsel's representation of

5   other delivery drivers. No conflicts of interest have been raised and counsel has sufficient

6   expertise with class actions to prosecute the claims. (*See* Dkt. No. 172-2 at 3–5.) Defendants

7   raise credibility issues with named Plaintiff, (Dkt. No. 178 at 36), but these are not as relevant to

8   his prosecution of this case. Therefore, the Court finds that Plaintiff would be an adequate class

9   representative.

10        3.    Rule 23(b)(3) Requirements

11         Plaintiff seeks certification under Rule 23(b)(3), (*see* Dkt. No. 172 at 11), which requires

12   the Court to additionally find that the common questions of law or fact "predominate over any

13   questions affecting only individual members" and that the proposed class action "is superior to

14   other available methods." Fed. R. Civ. P. 23(b)(3). These requirements promote sound judicial

15   administration by assessing the efficiency and manageability of the litigation.

16        a.    *Predominance*

17         In addition to the problems Plaintiff encounters under Rule 23(a), Plaintiff has issues

18   satisfying the conditions of Rule 23(b)(3). Certification under Rule 23(b)(3) is only appropriate

19   "whenever the actual interests of the parties can be served best by settling their differences in a

20   single action." *Hanlon*, 150 F.3d at 1022 (quoting 7A Charles Alan Wright, Arthur R. Miller &

21   Mary Kay Kane, *Federal Practice & Procedure* § 1777 (2d ed. 1986)).

22         With these additional interests at stake, predominance is a more stringent standard than

23   commonality. The predominance inquiry "tests whether proposed classes are sufficiently

24   cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S.

25   591, 623 (1997). This inquiry presumes the existence of common factual or legal issues and

26   instead "focuses on the relationship between the common and individual issues." *Hanlon*, 150

ORDER
C19-1320-JCC
PAGE - 17

F.3d at 1023. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* Litigation that depends on individual testimony to establish individual liability is unlikely appropriate for class-wide resolution. *See Bowerman v. Field Asset Srvs., Inc.*, 60 F.4th 459, 469 (9th Cir. 2023).

The common misclassification issues here on Count I are susceptible to classwide resolution. Individual issues under prongs A and C of the ABC test are unlikely to be disputed. Plaintiff has clearly indicated his preference to litigate on prong B, which other courts have found amenable to class treatment because the common evidence pertains to a single defendant employer rather than numerous plaintiff employees. *See, e.g., Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059–60 (7th Cir. 2016). Here, Defendants employ all Amazon Flex delivery drivers in Massachusetts under TOS common for the purposes of this litigation. (*See, e.g.,* Dkt. Nos. 178-1 at 7, 179-14 at 3, 179-16). Therefore, the few individual issues are insignificant compared to the common issue: whether the relevant deliveries are within Defendants' usual course of business.

The commonality issues with Plaintiff's business expense and minimum wage claims, on the other hand, are compounded by the predominance requirement. Even assuming that Plaintiff has an actionable Wage Act claim for his phone and vehicle (he does not, *see supra* Part II(A)(2)), individual issues predominate on Count II. For one, the amount each class member used their phone or vehicle at work will vary because of the drivers' flexibility to do what they want and go where they please during gap times. For another, the variety of possible makes, models, and vintages across both phones and vehicles is substantial under Defendants' minimal requirements. (*See* Dkt. Nos. 172-14 at 11, 178-10 at 30–33.) Defendants have the right to contest liability as to each class member, which would lead to potentially thousands of mini-trials on liability and damages. *See Bowerman*, 60 F.4th at 470.

On Count III, the gap time issue raises individual questions as to liability for minimum wages. Each of the thousands of class members could have worked for other companies between

ORDER
C19-1320-JCC
PAGE - 18

1    the time they first picked up packages and last delivered them. That poses thousands of different

2    questions, each one of which would diminish some or all of Defendants' liability. And each may

3    significantly delay the valid claims of other class members. As a matter of sound judicial

4    administration, the Court is not inclined to certify such an incohesive class. And Rule 23 does

5    not permit it. "In light of the complexity of the individualized questions and the absence of any

6    representative evidence introduced to fill the class members' evidentiary gap, the individual

7    issues predominate over the common questions in this case." *Bowerman*, 60 F.4th at 471.

8                    b.    *Superiority*

9          Finally, Rule 23(b)(3) requires the Court to find that a "class action is superior to other

10   available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

11   23(b)(3). The Court considers (1) the interest of individuals within the class in controlling their

12   own litigation; (2) the extent and nature of any pending litigation commenced by or against the

13   class involving the same issues; (3) the convenience and desirability of concentrating the

14   litigation in a particular forum; and (4) the manageability of the class action. *See* Fed. R. Civ. P.

15   23(b)(3)(A)–(D); *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001). This

16   analysis must "focus on the efficiency and economy elements of the class action so that cases

17   allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a

18   representative basis." *Id.*

19         As the foregoing analysis lays bare, Plaintiff has proposed a class that is neither fair to

20   litigants nor efficient for the Court. While he may prefer class-wide litigation, it is not only his

21   rights the Court must consider. Defendants' right to litigate their defenses could be unfairly

22   hindered by lumping drivers together who took advantage of the program's flexibility in a

23   variety of ways. Otherwise, the Court would be forced to consider an unmanageable amount of

24   evidence on each potential class member. Therefore, the Court finds that the class proposed here

25   is not a superior method for litigation.

26

ORDER
C19-1320-JCC
PAGE - 19

App. 19

**III. CONCLUSION**

Plaintiff's proposed class does not meet the commonality, predominance, and superiority requirements of Rule 23. For the foregoing reasons, the Court DENIES Plaintiffs' motion for class certification (Dkt. No. 172) and DISMISSES Plaintiff's Wage Act claim (Count II) without prejudice.

DATED this 31st day of December 2024.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER
C19-1320-JCC
PAGE - 20

App. 20

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| BERNARD WAITHAKA; on behalf of himself and all others similarly situated, | : : : | |
| | : | CIVIL ACTION NO.: |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AMAZON.COM, INC., AMAZON LOGISTICS, INC., | : : | |
| | : | |
| Defendant. | : | |

**NOTICE OF REMOVAL**

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1332, 1441, 1446 and 1453, Defendants Amazon.com, Inc. and Amazon Logistics, Inc. (together, "Amazon" or "Defendants") hereby remove this action from the Superior Court of the Commonwealth of Massachusetts, Worcester County, to the United States District Court for the District of Massachusetts. This Court has original subject matter jurisdiction over the lawsuit of plaintiff Bernard Waithaka ("Plaintiff") under the Class Action Fairness Act of 2005 ("CAFA") because this matter was brought as a class action, diversity of citizenship exists between one or more members of the putative class and Amazon, the number of proposed class members exceeds 100 individuals, and the amount in controversy exceeds $5 million in the aggregate.

**I.    PRELIMINARY STATEMENT**

1.    On or about August 28, 2017, Plaintiff Bernard Waithaka ("Plaintiff") commenced this action against Defendants by filing a Complaint in the Worcester County Superior Court for the Commonwealth of Massachusetts, captioned *Bernard Waithaka, on behalf of himself and all others similarly situated v. Amazon.com, Inc. and Amazon Logistics, Inc*., No. 1785-CV-01403D. A true and correct copy of the Complaint ("Compl.") together with all process filed with the

Worcester Superior Court in the state court action is attached as <u>Exhibit</u> <u>A</u>.

2.      Plaintiff's Complaint does not allege the amount of alleged damages sought on behalf of Plaintiff or the putative class.  Notwithstanding Plaintiff's attempt to avoid this Court's jurisdiction, Amazon timely removed this action to this Court on October 29, 2017, pursuant to CAFA and traditional diversity jurisdiction, 18 U.S.C. § 1332(a).  *See Waithaka v. Amazon.com, et al.*, No. 4:17-cv-40141 (D. Mass. Nov. 15, 2017) ("*Waithaka*"), Dkt. No. 1.  On August 28, 2018, the Court remanded this case after declining to adopt the common fund method for determining the amount in controversy attributable to the statutory attorneys' fees sought in the Complaint.  *See id.*, Dkt. No. 29.   As described below, the amount in controversy under CAFA is now met without taking *any* attorneys' fees into account, and therefore the lone jurisdictional hurdle identified by the Court no longer applies.

3.      Since Amazon filed its initial Notice of Removal over 10 months ago, the facts and circumstances supporting the Court's jurisdiction over Plaintiff's Complaint have changed significantly, giving Amazon new grounds for removal.  Specifically, the number of independent contractors who have provided delivery services through the Amazon Flex program in Massachusetts increased more than threefold between October 2017 and the present.  *See* Declaration of Peter Nickerson ("Nickerson Decl."), ¶¶ 7-8.   As the size of the putative class has swelled, so too has each category of damages alleged in the Complaint.  Consequently, **as of the date of this Notice, the amount in controversy is over $19,110,00 million,** ***exclusive of attorneys' fees***.

4.      Under well-settled First Circuit law, Amazon is entitled to remove this action based on the new grounds and information described herein.  *See, e.g., Romulus v. CVS Pharmacy, Inc.*, 770 F.3d 67, 72-74 (1st Cir. 2014) (reversing district court's order remanding second notice of

removal after holding that new developments concerning alleged class-wide damages provided grounds for jurisdiction under CAFA); *Amoche v. Guarantee Tr. Life Ins. Co.*, 556 F.3d 41, 53 (1st Cir. 2009) ("Successive attempts at removal are permissible where the grounds for removal become apparent only later in the litigation."); *Fed. Deposit Ins. Corp. v. Santiago*, 598 F.2d 634, 636 (1st Cir. 1979) ("[A] defendant who fails in an attempt to remove on the initial pleadings can file a removal petition when subsequent pleadings or events reveal a [n]ew and [d]ifferent ground for removal."); *Baker v. Equity Residential Mgmt., L.L.C.*, No. 18-11175-PBS, 2018 WL 3637501, at *1 (D. Mass. July 31, 2018) (denying motion to remand defendant's second removal under CAFA after case was initially remanded on the grounds that defendant had not demonstrated that the amount in controversy exceeded $5 million); *Arrigo v. Scholarship Storage, Inc.*, No. 10-11650-MLW, 2011 WL 3584715, at *6 (D. Mass. Aug. 10, 2011) ("Where 'subsequent pleadings, conduct by the parties, or various other circumstances bring a case that previously was not removable within the jurisdiction of the federal courts, a timely second notice of removal is permissible and may succeed.'" (quoting 14C Charles A. Wright, et al., *Federal Practice & Procedure* § 3739 (4th ed. 2009))); *see also Sloan v. Soul Circus, Inc.*, No. 15-01389 (RC), 2015 WL 9272838, at *5 n.5 (D.D.C. Dec. 18, 2015) ("'[U]nder CAFA, class actions may be removed at *any* point during the pendency of the litigation in state court, so long as removal is initiated within thirty days after the defendant is put on notice that a case which was not removable based on the face of the complaint has become removable'") (quoting *Dudley v. Eli Lilly & Co.*, 778 F.3d 909, 14-17 (11th Cir. 2014)); 28 U.S.C. §1446(b)(3) ("[I]f the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant . . . of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."), §1446(c)(3)(A).

App. 23

## II.    **FACTUAL BACKGROUND**

5.    This lawsuit is a civil action within the meaning of the Acts of Congress relating to the removal of class actions.  *See* 28 U.S.C. § 1453.

6.    The earliest date on which Plaintiff served a copy of the Complaint on either Defendant was September 29, 2017.

7.    Plaintiff purports to bring and maintain this action as a class action under Mass. R. Civ. P. 23 and Mass. Gen. Laws ch. 149 § 150.  Compl. ¶ 2, p. 5.

8.    Plaintiff seeks to represent and certify the following class: "[I]ndividuals who have worked as delivery drivers for [Defendants] in the Commonwealth of Massachusetts and have been classified as independent contractors."  Compl. ¶ 1.[1]

9.    Plaintiff seeks to recover "all damages due to the Plaintiff and other class members because of their misclassification as independent contractors and related wage law violations," including unpaid wages and unreimbursed business expenses, statutory trebling of damages, attorneys' fees and costs and injunctive relief for claims allegedly arising from Defendants' purported misclassification of putative class members under the Massachusetts Independent Contractor Law, Mass. Gen. Laws ch. 149 § 148B; Defendants' purported failure to reimburse class members' business expenses under Mass. Gen. Laws ch. 149 §§ 148, 150; and purported failure to pay class members all wages owed and the Massachusetts minimum wage under Mass. Gen. Laws ch. 149 § 150 and Mass. Gen. Laws ch. 151 §§ 1, 7.  *See generally* Compl.  Therefore, for the purposes of this Notice of Removal, this matter is a class action as that term is defined pursuant to 28 U.S.C. §§ 1332(d)(1)(B) and 1453.

---

[1] Defendants do not concede, and reserve the right to contest, *inter alia*, Plaintiff's allegation that this lawsuit may properly proceed as a class action.  Amazon also reserves its right to compel arbitration of Plaintiff's claims.

App. 24

### III.    REMOVAL IS PROCEDURALLY PROPER.

10.    Amazon timely filed its first notice of removal on October 29, 2017.  Looking only at the circumstances that existed as of that date, this Court held that the amount in controversy was insufficient to establish jurisdiction under CAFA.  The Court based that holding on its adoption of the lodestar, rather than the common fund, method of calculating the attorneys' fees at issue.  This Court entered an order remanding the case to state court on August 28, 2018.  Amazon now timely files this notice of removal.  The circumstances have changed significantly since the prior notice of removal.  Those circumstances and/or this Court's order now make clear that CAFA's amount-in-controversy requirement is satisfied without regard to the calculation of attorneys' fees and make possible the removal of this civil action.  Thus, under the framework set forth in this Court's remand decision and CAFA, the amount-in-controversy requirement is satisfied and removal is proper.  *See* 28 U.S.C. §§ 1441(a), 1446(b, c); *see also* Sections IV & V *infra*.

### IV.    THIS COURT HAS JURISDICTION UNDER THE CLASS ACTION FAIRNESS ACT OF 2005.

11.    The Supreme Court recently clarified that "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court." *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 554 (2014).

12.    This Court has jurisdiction over this matter pursuant to CAFA.  *See* 28 U.S.C. §§ 1332(d), 1453.  Under CAFA, District Courts have original diversity jurisdiction over a class action whenever: (1) "any member of a [putative] class of plaintiffs is a citizen of a State different from any defendant," (28 U.S.C. § 1332(d)(2)(A)); (2) "the number of members of all proposed plaintiff classes in the aggregate is" more than 100 (28 U.S.C. § 1332(d)(5)(B)); and (3) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs" (28 U.S.C. § 1332(d)(2)).  All CAFA requirements are satisfied in this case.  Further, no exception to the

exercise of federal jurisdiction applies. *See, e.g.*, U.S.C. § 1332(d)(4)(A)-(B). Therefore, removal is proper pursuant to 28 U.S.C. §§ 1441, 1446, and 1453.

### A.   Diversity of Citizenship Exists.

13.   To satisfy CAFA's diversity requirement, a party seeking removal need only show that minimal diversity exists—that is, that one putative class member is a citizen of a state different from that of one defendant. 28 U.S.C. § 1332(d)(2); *Lenahan v. Dick's Sporting Goods, Inc*., No. 10-11832-RGS, 2010 WL 5092254, at *1 (D. Mass. Dec. 8, 2010).

#### 1.   *Plaintiff is a citizen of Massachusetts.*

14.   Plaintiff Bernard Waithaka was at the time of the commencement of this action a resident and citizen of the Commonwealth of Massachusetts. Compl. ¶ 3.

#### 2.   *Neither Defendant is a citizen of Massachusetts.*

15.   Defendant Amazon.com, Inc. was at the time of the commencement of this action, and is now, a Delaware corporation, headquartered in Seattle, Washington. Compl. ¶ 4.

16.   Defendant Amazon Logistics, Inc. was at the time of the commencement of this action, and is now, a Delaware corporation, headquartered in Seattle, Washington. Compl. ¶ 5.

17.   As a result, Defendants are now, and were at the time of the filing of this action, citizens and/or residents of the State of Washington and Delaware within the meaning of the Acts of Congress relating to the removal of class actions. *See McCarthy v. Bank of N.Y./Mellon,* No. 10-10486-GAO, 2010 WL 2144241, at *1 (D. Mass. May 27, 2010) (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 92 (2010)). Thus, Defendants are citizens of Washington and Delaware for diversity purposes under CAFA. *See* 28 U.S.C. § 1332(d)(10).

18.   Accordingly, there is diversity of citizenship pursuant to CAFA because a member of the putative class "is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2).

**B.     The Proposed Class Consists of At Least 100 Proposed Class Members.**

19.     The second jurisdictional requirement under CAFA is that the number of members of all proposed plaintiff classes in the aggregate is more than 100.  *See* 28 U.S.C. § 1332(d)(5)(B).

20.     The Complaint alleges claims on behalf of Plaintiff and a putative class of similarly situated individuals in Massachusetts.  Compl. ¶ 1.

21.     During the Class Period (as defined below), over 100 individuals, including Plaintiff, performed delivery services for Amazon in the Commonwealth of Massachusetts and were classified as independent contractors.  *See* Nickerson Decl. ¶¶ 7-8.  As the number of members of the proposed putative class exceeds 100, the second jurisdictional requirement under CAFA is met.  *See* 28 U.S.C. § 1332(d)(5)(B).

**C.     The Amount In Controversy Requirement Is Satisfied[2]**

22.     As the Supreme Court has held, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Dart Cherokee*, 135 S. Ct. at 554.

23.     CAFA provides for the aggregation of the claims of the individual members in a class action to determine if the amount in controversy exceeds the sum or value of $5 million, exclusive of interests and costs.  *See* 28 U.S.C. § 1332(d)(6).

24.     In addition, Congress intended for federal jurisdiction to attach under CAFA "if the value of the matter in litigation exceeds $5,000,000 either from the viewpoint of the plaintiff or

---

[2] This Notice of Removal discusses the nature and amount of damages placed at issue by Plaintiff's Complaint. Defendants' reference to specific damages amounts and their citation to comparable cases are provided solely for the purpose of establishing that the amount in controversy is more likely than not in excess of the jurisdictional minimum. Defendants maintain that each of Plaintiff's claims is without merit and that Defendants are not liable to Plaintiff or the putative class he claims to represent. Defendants specifically deny that Plaintiff has suffered any damage as a result of any act or omission by Defendants. No statement or reference contained herein shall constitute an admission of liability or a suggestion that Plaintiff will or could actually recover these damages based upon the allegations contained in the Complaint or otherwise.

the viewpoint of the defendant, and regardless of the type of relief sought (*e.g.*, damages, injunctive relief, or declaratory relief)."  S. Rep. No. 109-14, *as reprinted in* 2005 WL 627977, at *42 (1st Sess. 2005).

25.     Where, as here, the plaintiff does not expressly plead a specific amount of damages, a defendant must only show a reasonable probability that the amount in controversy exceeds $5 million.  *See Sierra v. Progressive Direct Ins. Co.*, No. 12–30020–FDS, 2012 WL 4572923, at *2 (D. Mass. Sept. 28, 2012). Plaintiff's likelihood of success on the merits is irrelevant to determining the court's jurisdiction because "the pertinent question is what is *in controversy* in the case, not how much the plaintiffs are ultimately likely to recover." *Manson v. GMAC Mortg., LLC*, 602 F. Supp. 2d 289, 293 n.6 (D. Mass. 2009) (quoting *Amoche*, 556 F.3d at 51). Because "questions of removal are typically decided at the pleadings stage where little or no evidence has yet been produced, the issue should be resolved without an extensive fact-finding inquiry or 'mini-trial' about the amount in controversy." *Sierra*, 2012 WL 4572923, at *2 (internal citations omitted).  In determining whether the removing defendant has met its burden, courts look first to the plaintiff's complaint and then to the defendant's petition for removal.  *See Williams v. Am. Honda Fin. Corp.*, No. 14-12859-LTS, 2014 WL 5494914, at *3 (D. Mass. Oct. 30, 2014).

26.      "In calculating the amount in controversy, a federal court must examine relevant state law to determine the nature and extent of the damages which may be awarded." *Lucas v. Ultima Framingham LLC*, 973 F. Supp. 2d 98, 101 (D. Mass. 2013) (citing *Stewart v. Tupperware Corp.*, 356 F.3d 335, 339 (1st Cir. 2004)). Thus, where the statute at issue includes both a damage multiplier and the awarding of attorneys' fees, the "court must apply [those] factor[s] in evaluating the amount in controversy." *Id.* (internal citations omitted).

27.     Further, CAFA's legislative history makes clear that doubts regarding the

maintenance of class actions in state or federal court should be resolved in favor of federal jurisdiction. *See, e.g.*, S. Rep. No. 109-14, *as reprinted in* 2005 WL 627977, at *43 (1st Sess. 2005) ("Overall, new section 1332(d) is intended to expand substantially federal court jurisdiction over class actions. Its provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.").

28.     While Amazon denies Plaintiff's claims and denies that Plaintiff or the putative class members he purports to represent are entitled to the relief for which he has prayed, it is clear that, when the potential values of the claims of Plaintiff and the putative class members are aggregated, the allegations within the Complaint "more likely than not" put into controversy an amount in excess of $5 million.

1.     *Information Relevant to Amounts at Issue.*

29.     Plaintiff's Complaint does not define the class period, but the statute of limitations for Plaintiff's claims stemming from his alleged misclassification as an independent contractor is three years. *See* Mass. Gen. Laws ch. 149, § 150.

30.     Plaintiff filed the Complaint on or around August 28, 2017. Thus, the class period for purposes of establishing jurisdiction under CAFA would be August 28, 2014 through the conclusion of this action (the "Class Period").

31.     According to Amazon's data, over 8,000 putative class members have driven, in the aggregate, over 9,200,000 miles to deliver packages to Amazon customers through August 26, 2018. *See* Nickerson Decl. ¶¶ 8, 12. The number of aggregate miles driven by putative class members as of the date of this Notice of Removal is over six times larger than in October 2017, when the prior notice of removal was filed. *See id.* ¶¶ 11-12.

32.     The Complaint alleges that Plaintiff used the applicable Internal Revenue Service

App. 29

(IRS) reimbursement rate to calculate alleged unreimbursed vehicle expenses.  Compl. ¶ 10.  In 2017, the IRS rate was $0.535 per mile.  *See* IRS Standard Mileage Rates, http://www.irs.gov/Tax-Professionals/Standard-Mileage-Rates (last visited Sept. 7, 2018), attached hereto as Exhibit B.  In 2016, the IRS rate was $0.54 per mile.  *Id.*

33.     On January 1, 2018, the IRS rate increased to $0.545 per mile.  *Id.*

34.     Through August 26, 2018, the putative class members have contracted to provide delivery services for more than 840,000 block hours.  *See* Nickerson Decl. ¶ 10.[3]  The number of aggregate block hours in which members of the putative class contracted to provide delivery services is over three times larger than in October 2017.  *See id.* ¶¶ 9-10.

35.     Massachusetts' minimum wage has been $11.00 per hour since January 1, 2017.  *See* Mass. Gen. Laws ch. 151, § 1. Massachusetts' minimum wage was $10.00 per hour from January 1, 2016 through December 31, 2016.  *Id.*

## 2.     *Calculation of Plaintiff's Claimed Damages.*

36.     The Complaint alleges that because Plaintiff and the other putative class members were classified as independent contractors rather than as employees, they have incurred unreimbursed expenses for, among other things, maintaining their vehicles, gas, phone, phone data, and other expenses.  Compl. ¶ 9.

37.     The Complaint alleges that Plaintiff used the applicable IRS reimbursement rate to calculate alleged unreimbursed expenses for operating a vehicle.  Compl. ¶ 10.

38.     For purposes of this Notice of Removal only, Amazon's calculations assume that

---

[3] Amazon pays Service Fees per block that vary depending on circumstances, including geography and whether "surge" pricing is in effect because of weather or special events increasing demand.  Declaration of Kyle Bowers ("Bowers Decl."), ¶ 6.  Amazon generally pays Service Fees per block that roughly equate to a rate of between $18 and $25 per hour, multiplied accordingly by the anticipated duration of block (*e.g.*, a "two-hour" block would receive at least $36).  *Id.* at ¶ 7.  Delivery blocks run as short as one hour and may exceed four hours.  In the event Plaintiff completed a "block" of deliveries in less time than estimated, he would still be paid for the full block.  *Id.* at ¶ 8.

putative class members incurred vehicle expenses based on the IRS reimbursement rate of $0.54 for delivery services in 2016, $0.535 for delivery services in 2017, and $0.545 for delivery services in 2018. Based on delivery addresses, the estimated mileage for the putative class now exceeds 9,200,000. *See* Nickerson Decl. ¶ 12. Under these assumptions, the total unpaid mileage expenses for the putative class would exceed $4,900,000. *Id*. ¶ 14. When trebled under Mass. Gen. Laws ch. 149, § 150, the amount in controversy with respect to alleged unpaid mileage expenditures significantly **exceeds $14,700,000** ($4,900,000 trebled totals $14,700,000). *See Lucas*, 973 F. Supp. 2d at 101 (recognizing that Court should include multiple damages in calculating amount in controversy); *see also* Compl. at p. 5 (requesting treble damages). **<u>This amount alone, the calculation of which Plaintiff does not dispute, satisfies the amount in controversy under CAFA</u>**.

39.    During the Class Period, Amazon's U.S.-based employees have been eligible to receive $50 per month as reimbursement for cell phone expenses.[4] *See* Declaration of Elizabeth M. Bresnahan, Ex. 1. For purposes of this Notice of Removal only, Amazon's calculations assume the following rate of reimbursement for any month in which a putative class member contracted and received Service Fees for a block: $50 per month for any month in which a class member contracted for more than 80 block hours; $25 per month for any month in which a class member contracted for more than 40 block hours; $12.50 per month for any month in which a class member contracted for up to 40 block hours. *See* Nickerson Decl. ¶ 16. These are conservative assumptions because Amazon's policy for reimbursing U.S.-based employees for cell phone expenses does not cap the reimbursement amount based on the number of hours

---

[4] Reference to this policy is for purposes of calculating the amount in controversy only and shall not constitute an admission that the policy applies to Plaintiff or any members of the putative class.

worked per month.  Indeed, this Court accepted Amazon's alternative (and higher) calculation of cell phone data reimbursement, finding "calculations based on established company policy will suffice in the absence of extensive fact finding."  *Waithaka*, Dkt. No. 29 at p. 3 (citing *Spielman v. Genzyme Corp.*, 251 F.3d 1, 4-5 (1st Cir. 2001) (holding a determination of removal should be done "quickly, without an extensive fact-finding inquiry.")).

40.     There are over 25,000 aggregate work months in the Class Period through August 26, 2018.  *See* Nickerson Decl. ¶ 8.  The number of aggregate work months is over three times larger than in October 2017.  *See id*. ¶¶ 7-8.

41.     Applying the assumptions above in Paragraphs 39 and 40 with respect to reimbursement of cell phone data, the amount placed at issue by Plaintiff relating to the putative class members' unpaid phone data expenses exceeds $475,000.  *See* Nickerson Decl. ¶ 17.  When trebled under Mass. Gen. Laws ch. 149, § 150, the amount in controversy as to alleged unpaid phone data expenses **exceeds $1,425,000** (over $475,000 trebled totals $**1,425,000**).

42.     Plaintiff also alleges that Amazon violated the Wage Act, Mass. Gen. Laws ch. 151, §§ 1,7 by failing to pay Plaintiff and other drivers the minimum wage of $11.00 required under Massachusetts law.  *See* Compl. ¶ 2.  Plaintiff specifically alleges that he earned nearly three dollars less than the minimum wage "after subtracting mileage at the standard IRS reimbursement rate."  *Id.* at ¶ 10.[5]

43.     The putative class members have performed delivery services for more than 840,000 hours.  *See* Nickerson Decl. ¶ 10.  Under these assumptions, the amount placed at issue by Plaintiff relating to the putative class members' claims for unpaid minimum wage damages

---

[5] Plaintiff's allegations concerning damages related to tips, Compl. ¶ 10, does not change this analysis.  While Amazon is not aware of tips received by Plaintiff, any damages associated with alleged tips would increase the amount in controversy at issue.

App. 32

exceeds $410,000 based on delivery data.  *See id.* ¶ 20.  When trebled under Mass. Gen. Laws ch. 151, § 20, the amount in controversy as to the putative class members' alleged unpaid minimum wage damages **exceeds $1,230,000**.

44.    Plaintiff also alleges Amazon violated the Wage Act, Mass. Gen. Laws ch. 151, §§ 1,7 by not paying Plaintiff and the putative class members for all hours worked between the end of their scheduled shifts and their last delivery (*i.e.*, alleged unpaid wages).  *See, e.g.*, Compl. ¶¶ 2, 11 (alleging that "it often takes drivers more time to complete their scheduled shifts, but drivers do not receive additional compensation for this extra time"), ¶ 12 ("Not only is this unpaid time a violation of Massachusetts state law, but this unpaid time also further pushes the drivers' wages below minimum wage.").

45.    The estimated amount of alleged unpaid wages is over $585,000 for the putative class members based on delivery data.  *See* Nickerson Decl. ¶ 22.  When trebled under Mass. Gen. Laws ch. 151, § 20, the amount in controversy as to Plaintiff's alleged unpaid wage claims on behalf of the putative class **exceeds $1,755,000**.    This amount is in addition to the amounts described in Paragraph 43 regarding alleged minimum wage damages.

46.    Thus, the total amount placed in controversy by Plaintiff's claims on behalf of the putative class, *not including attorneys' fees*, exceeds $19,110,000.

### 3.    *Attorneys' Fees in Controversy*

47.    Where the statute provides for the recovery of attorneys' fees, such fees must be considered in calculating the amount in controversy.  *See Lucas*, 973 F. Supp. 2d at 101; *see also* Compl. at p. 5 (requesting attorneys' fees).

48.    Courts have routinely used the common fund method to determine the amount in controversy for purposes of removal under CAFA.  *See Pazol v. Tough Mudder Inc.,* 819 F.3d 548,

App. 33

553 (1st Cir. 2016) (adopting estimate of 33% attorneys' fees for purposes of determining amount in controversy under CAFA); *Fields v. Sony Corp. of Am.*, No. 13-6520, 2014 WL 3877431, at *2 (S.D.N.Y. Aug. 4, 2014) (in wage and hour case: "Applying [one-third] attorneys' fees to the approximately $4.2 million at issue in this case brings the total amount in controversy to as much as $5.6 million, satisfying the required jurisdictional amount under CAFA"); *DiPonzio v. Bank of Am. Corp.*, No. 11-CV-06192, 2011 WL 2693912, at *3 (W.D.N.Y. July 11, 2011) ("[F]or the limited purpose of determining the amount in controversy, attorneys' fees will be estimated to be 33% of the total damages otherwise contemplated.").

49.    Plaintiff's counsel, in a case also brought pursuant to Mass. Gen. Laws ch. 149, § 150, received thirty-three percent of a court-approved settlement to account for her fees and expenses (an award totaling $1,666,666). *See* Order Approving Settlement (ECF No. 57), *Crenshaw v. Texas Roadhouse, Inc. et al.*, No. 1:11–cv–10549–JLT (D. Mass. Sept. 6, 2012); Plaintiffs' Assented-to Motion for Final Approval of Class Action Settlement (ECF No. 53-3), *Crenshaw v. Texas Roadhouse, Inc. et al.*, No. 1:11–cv–10549–JLT (D. Mass. Sept. 4, 2012). It is reasonable to conclude that Plaintiff's counsel will seek a similar recovery in this case. *See* Plaintiff's Assented-to Motion for Final Approval of Class Action Settlement (ECF No. 72), *Sheehan et al. v. RCN Telecom Servs., Inc.*, No. 1:16-cv-10509-DPW (D. Mass. Oct. 20, 2017) (requesting attorneys' fees for Plaintiff's counsel valued at thirty-three percent of class settlement in independent contractor classification litigation). Even an attorneys' fees award of twenty-five percent would add over $4,777,500 million to the amount in controversy.

50.    Amazon acknowledges that the Court relied on the lodestar method to determine the attorneys' fees in controversy in deciding Amazon's initial Notice of Removal. *Waithaka*, Dkt. No. 29-30. For the reasons Amazon set forth in its opposition to Plaintiff's motion to remand,

Amazon believes that $1,000,000 is a reasonable estimate of the attorneys' fees in controversy under the lodestar method. *See* Dkt No. 13. However, even if the Court were to apply a lesser amount of attorneys' fees to calculate the amount in controversy, the Court would still retain jurisdiction over this case because, as of the date of this Notice of Removal, the amount in controversy is over $5 million *even if no attorneys' fees are included*.

### D. Summary of Amount in Controversy

51.     Based on the categories of damages and calculations outlined above, the amount placed in controversy by the class allegations in Plaintiff's Complaint, *exclusive of attorneys' fees*, easily exceeds $5 million, as follows:

| | |
|---|---|
| **Vehicle Expenses** | at least $14,700,000 |
| **Phone Expenses** | at least $1,425,000 |
| **Minimum Wage Damages** | at least $1,230,000 |
| **Unpaid Wage Damages** | at least $1,755,000 |
| **TOTAL**: | at least **$19,110,000** |

52.     If Amazon were to apply less conservative assumptions, the amount in controversy would increase substantially.[6]

---

[6] Amazon's estimated amount in controversy does not account for future amounts that would continue to accrue over the lifespan of this large class action litigation. "Though the amount in controversy in a case removed to federal court depends on the circumstances existing at the time of removal . . . the calculation includes monies not yet due the plaintiff at that point—so long as 'judgment will clearly and finally create an obligation to pay, over a number of years, a sum in excess of the jurisdictional amount, even though future events may alter or cut off the defendant's obligation.'" *Williams v. Toys "R" Us – Delaware, Inc.*, No. CV 15-13943-MLW, 2016 WL 5723588, at *2 (D. Mass. Sept. 28, 2016) (quoting 14B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice & Procedure* § 3702, at 87 (3d ed. 1998)) (citations omitted). Here, each of the categories of monetary damages alleged in the Complaint would run through the date of a final judgment in Plaintiff's favor. *See Costello v. Whole Foods Mkt. Grp., Inc.*, No. 16-10673-GAO (D. Mass. 2016) (ECF. No. 34) ("[T]he amount in controversy includes all back pay due . . . through the date of final judgment.").

App. 35

53.     Although Amazon expressly denies Plaintiff's allegations and theories of recovery, and expressly denies that Plaintiff or the putative class he purports to represent are entitled to any of the requested relief, the amount in controversy clearly exceeds the $5 million threshold set forth under 28 U.S.C. § 1332(d)(2).

### E.     No Exceptions to CAFA Jurisdiction Apply.

54.     CAFA provides for two primary exceptions to the exercise of federal jurisdiction, the so-called "home-state" and "local controversy" exceptions.  *See* 28 U.S.C. § 1332(d)(3)(A)-(B). *Plaintiff* bears the burden of proof as to the applicability of these exceptions.  *McMorris v. TJX Cos.*, 493 F. Supp. 2d 158, 165 (D. Mass. 2007); *cf.* S. Rep. No. 109-14, *as reprinted in* 2005 WL 627977, at *42 (1st Sess. 2005) (exceptions to CAFA jurisdiction should be interpreted narrowly and doubts should be resolved "in favor of exercising jurisdiction over the matter"). Plaintiff cannot meet his burden of proving that either exception applies because neither Defendant is a citizen of Massachusetts.  *Waithaka,* Dkt. No. 29 at p. 2 n. 1 ("It is not disputed that the case meets other requirements under CAFA….").

## V.     THE OTHER PREREQUISITES FOR REMOVAL HAVE BEEN SATISFIED

55.     Defendants timely, and in good faith, filed their initial notice of removal on October 29, 2017.  *Amoche*, 556 F.3d at 53 (finding defendant's removal "at the earliest possible date was understandable, given the removal statute's requirement that a defendant file a notice of removal within thirty days of his receipt of the first removable document.").

56.     The notice of removal effected this Court's jurisdiction and divested the state court of jurisdiction.  28 U.S.C. § 1446(d).  Thereafter, until August 28, 2018, removal was neither necessary (this Court had jurisdiction over the case) nor possible (this case was not pending in state court).  *Id.; see also* § 1441(a).

57.     On August 28, 2018, this Court held that this case was not initially removable solely

App. 36

because the amount in controversy requirement had not been met as of October 29th.  Dkt No. 29 at p. 7 (citing *Amoche, supra* at 51).  However, the "remand order does not permanently foreclose [Amazon] from attempting to remove this case to federal court. … [T]he text of the removal statute itself contemplates that a case that was not initially removable may later be removed if the basis for removal becomes apparent through a subsequent "amended pleading, motion, order or other paper." *Amoche, supra* at 53 (citing 28 U.S.C. § 1446(b)).  "[E]specially now that class actions under CAFA are exempt from the removal statute's one-year time limit." *Id.* (citing 28 U.S.C. §1453(b)).

58.     This second Notice of Removal is filed within thirty (30) days after Amazon's receipt of the August 28, 2018 order from which it could "first be ascertained that the case is one which is or has become removable." 28 U.S.C. §1446(b)(3); *Amoche, supra* at 53; *see also* 28 U.S.C. §1446(c)(3)(A); *accord Romulus*, 770 F.3d at 74 & n. 5.  Accordingly, this Notice of Removal is timely under 28 U.S.C. § 1446(b) (establishing a 30-day period for removal).

59.     Moreover, precedent establishes the right of the defendant to file a notice of removal based on changed circumstances and its own investigation showing that the requisite amount in controversy is satisfied.  *See, e.g.*, *Roth v. CHA Hollywood Med. Ctr., L.P.*, 720 F.3d 1121, 1125 (9th Cir. 2013) ("We conclude that §§ 1441 and 1446, read together, permit a defendant to remove outside the two thirty-day periods on the basis of its own information, provided that it has not run afoul of either of the thirty-day deadlines."); *Cutrone v. Mortg. Elec. Registration Sys., Inc.*, 749 F.3d 137, 147 (2d Cir. 2014) ("We agree with the Ninth Circuit that the text of 28 U.S.C. § 1446(b) does not indicate that the two 30-day periods listed therein are the exclusive authorization of removal. . . . Defendants are permitted to remove outside of these periods when the time limits of 28 U.S.C. § 1446(b) are not triggered." (citation omitted)); *Paros Props. LLC v.*

App. 37

*Colo. Cas. Ins. Co.*, 835 F.3d 1264, 1271 n.5 (10th Cir. 2016) ("[A] defendant need not await . . . notice before filing a notice of removal.  Once it reasonably believes that the jurisdictional prerequisites have been satisfied, it can properly seek removal."); *Walker v. Trailer Transit, Inc.*, 727 F.3d 819, 825-26 (7th Cir. 2013) (observing that the defendant's removal of litigation to federal court based on its "estimate" of damages was proper where neither of the 30-day periods under Section 1446(b) had begun to run); *accord Williams*, 2014 WL 5494914, at *3 n.4 (discussing the holdings in *Roth*, *Cutrone*, and *Walker*, and observing that "[t]he reasoning applied by those Courts of Appeals is persuasive").  This Notice thus fits squarely within both the plain terms of 28 U.S.C. §§ 1441(a) and 1446(b)(3), and precedent establishing that the defendant may, on the basis of its own investigation and determination, remove whenever it can demonstrate that the minimum amount in controversy has been met.

60.    As Plaintiff originally filed this action in the Worcester County Superior Court of Massachusetts, removal to the United States District Court, District of Massachusetts, is proper under 28 U.S.C. § 1441(a).

61.    As required by 28 U.S.C. § 1446(d), Defendants will provide notice of this removal to Plaintiff through his attorneys of record.

62.    As required by 28 U.S.C. § 1446(d), a copy of this Notice will be filed with the Clerk of the Court for the Worcester County Superior Court of Massachusetts.

63.    If any questions arise as to the propriety of the removal of this action, Defendants request the opportunity to present a brief in support of its position that this case is removable and that CAFA's limited exceptions to federal jurisdiction are inapplicable.

App. 38

WHEREFORE, Defendants Amazon.com, Inc. and Amazon Logistics, Inc., desiring to remove this case to the United States District Court for the District of Massachusetts, prays that the filing of this Notice of Removal shall effect the removal of this action to this Court.

Respectfully submitted,

**AMAZON.COM, INC. and**
**AMAZON LOGISTICS, INC.,**
By their attorneys,

/s/ *Elizabeth M. Bresnahan*
Douglas T. Schwarz, BBO# 548558
  douglas.schwarz@morganlewis.com
Elizabeth M. Bresnahan, BBO# 672577
  elizabeth.bresnahan@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA  02110
Tel. (617) 951-8000

Dated:  September 7, 2018

App. 39

**CERTIFICATE OF SERVICE**

I hereby certify that on September 7, 2018, the foregoing document was filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). A paper copy also will be served by first class mail to:

Shannon Liss-Riordan, Esq.
Adelaide Pagano, Esq.
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Tel. (617) 994-5800

_s/ Elizabeth M. Bresnahan_
Elizabeth M. Bresnahan

App. 40

# Exhibit A



NJH / ALL
**Transmittal Number: 17205203**
**Date Processed: 09/30/2017**

# Notice of Service of Process

| | |
|---|---|
| Primary Contact: | Ms. Lynn Radliff<br>Amazon.Com, Inc.<br>P.O. Box 81226<br>Seattle, WA 98108-1226 |
| Electronic copy provided to: | Lynn Foley-Jefferson<br>Maria Catana<br>Joell Parks<br>Theresa Nixon<br>Scotty Bauder<br>Rochelle Lewis<br>Jesse Jensen<br>Kimberly Thomas<br>Elizabeth Hernandez<br>Annamaria Taskai<br>Christine Schram<br>Lizette Fernandez<br>Karen Curtis<br>Gianmarco Vairo<br>Tammy Malley-Naslund |

| | |
|---|---|
| Entity: | Amazon.Com, Inc.<br>Entity ID Number 1662773 |
| Entity Served: | Amazon.com, Inc. |
| Title of Action: | Bernard Waithaka vs. Amazon.Com Inc |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Class Action |
| Court/Agency: | Superior Court, Massachusetts |
| Case/Reference No: | 1785CV01401D |
| Jurisdiction Served: | Washington |
| Date Served on CSC: | 09/29/2017 |
| Answer or Appearance Due: | 20 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Sender Information: | Shannon Liss-Riordan<br>617-994-5800 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

App. 42

## Commonwealth of Massachusetts

|  | TRIAL COURT OF THE COMMONWEALTH SUPERIOR COURT DEPARTMENT |
|---|---|

BERNARD WAITHAKA, on behalf of himself and all others similarly situated, _____, PLAINTIFF(S),

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. __1785CV01403D__

v.   AMAZON.COM INC,.
AMAZON LOGISTICS
INC. _____ DEFENDANT(S)

### SUMMONS

THIS SUMMONS IS DIRECTED TO __AMAZON.COM INC.._____ . (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the __Worcester Superior__ Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

   a. Filing your **signed original** response with the Clerk's Office for Civil Business, Worcester Superior Court, 225 Main St, Worcester, MA (address), by mail or in person, **AND**
   01608
   b. Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: 729 Boylston St, Suite 2000, Boston, MA 02116

3. **What to include in your response.** An **"Answer"** is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov.courts/case-legal-res/rules of court.

4. **Legal Assistance.** You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5. **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on _____, 20_____. (SEAL)

Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____, 20____, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4 (d)(1-5)):

_____

_____

_____

Dated: _____, 20____          Signature: _____

**N.B.     TO PROCESS SERVER:**

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX – BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

App. 44

8/28.

## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT
C. A. NO. 1785CV01403D

BERNARD WAITHAKA, on behalf of
himself and all others similarly situated,

                    Plaintiffs,

v.

AMAZON.COM INC., AMAZON
LOGISTICS INC.,

                    Defendants.

FILED

AUG 28 2017

ATTEST: _Del Hh_ CLERK

### CLASS ACTION COMPLAINT

1.    This case is brought on behalf of individuals who have worked as delivery drivers for Amazon.com, Inc. or Amazon Logistics, Inc. (together, "Amazon") in the Commonwealth of Massachusetts and have been classified as independent contractors. Amazon is a commercial seller of electronic and consumer goods through its website, providing delivery service of its various products to its customers' homes.

2.    As described further below, Amazon has misclassified delivery drivers as independent contractors when they are actually employees. In so doing, Amazon has violated Mass. Gen. L. c. 149 §§ 148B, 148 by failing to reimburse drivers' necessary business expenses such as gas and car maintenance and Mass. Gen. L. c. 151 §§ 1, 7 by failing to pay drivers the Massachusetts minimum wage of $11.00 after accounting for drivers' expenses and time spent working past the end of the shift without

1

compensation. Plaintiff bring this claim on behalf of all similarly situated employees pursuant to Mass. Gen. L. c. 149 § 150.

## PARTIES

3.    Plaintiff Bernard Waithaka is an adult resident of Westborough, Massachusetts. He has worked as an Amazon delivery driver in Massachusetts since January 2017.

4.    Defendant Amazon.com, Inc. is a Delaware corporation, headquartered in Seattle, Washington. It has more than fifty employees.

5.    Defendant Amazon Logistics, Inc. is a Delaware corporation, headquartered in Seattle, Washington. It has more than fifty employees. On information and belief, Amazon Logistics, Inc. is a subsidiary of Amazon.com, Inc., and delivery drivers such as the named Plaintiff have contracted directly with Amazon through Amazon Logistics, Inc. Together, Amazon.com, Inc. and Amazon Logistics, Inc. are referred to in this complaint collectively as "Amazon".

## STATEMENT OF FACTS

6.    Amazon is a Seattle-based electronic retailer that provides delivery service of consumer and electronic goods to its customers in cities throughout the country.

7.    Amazon contracts to have drivers in Massachusetts provide these delivery services. Although classified as independent contractors, these delivery drivers are actually Amazon's employees. Drivers must follow Amazon's instructions regarding where to make deliveries, in what order, and which route to take. Drivers can be

2

penalized or terminated for missing scheduled shifts or cancelling their shifts too close to the start time. Drivers also must follow requirements and rules imposed on them by Amazon and are subject to termination, based on Amazon's discretion and/or their failure to adhere to these requirements (such as rules regarding their conduct with customers, their timeliness in making deliveries, their scanning of packages, and their conduct when picking up or returning packages to the warehouse, etc.).

8.    In addition, Amazon is in the business of providing delivery service to customers, and that is the service that delivery drivers provide. The drivers' services are fully integrated into Amazon's business.

9.    However, based on their classification as independent contractors, Amazon drivers must pay for many of the expenses necessary to perform their job, including expenses for their vehicles, gas, phone, and data plan.

10.    In light of the expenses Amazon drivers bear in order to perform their jobs, the drivers' hourly wages sometimes fall below the state minimum wage. For example, Plaintiff Waithaka estimates that his weekly wage fell below the current Massachusetts minimum wage of $11.00 during the week of April 9-15, 2017, after accounting for fuel and vehicle maintenance and excluding tips from customers (which cannot be counted towards the minimum wage because Amazon has not given appropriate notice that it is taking, and thus is not entitled to take, the tip credit against the minimum wage, see 454 Mass. Code Regs. 27.03). Specifically, Plaintiff Waithaka estimates he made $8.10 per hour that week after subtracting mileage at the standard IRS reimbursement rate as well as tips.

3

11.    In addition, when driving for Amazon, delivery drivers receive an hourly rate of pay for scheduled shifts. However, it often takes the drivers more time to complete their deliveries than their scheduled shifts, but drivers do not receive additional compensation for this extra time.

12.    Not only is this unpaid time a violation of Massachusetts state law, but this unpaid time also further pushes the drivers' wages below minimum wage.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13.    Pursuant to the state law requirements as set forth in Massachusetts General Law Chapter 149 § 150, the above-named plaintiff submitted his statutory claims with the Office of the Attorney General and received a right to sue letter in order to proceed on these claims in court.

## COUNT I
### Independent Contractor Misclassification
### MASSACHUSETTS GENERAL LAW CHAPTER 149 § 148B

Amazon has misclassified delivery drivers in Massachusetts who provide delivery services for the company as independent contractors instead of employees, in violation of the Massachusetts Independent Contractor Law, Mass. Gen. L. c. 149 §148B. This claim is asserted pursuant to Mass. Gen. L. c. 149 § 150.

4

### COUNT II
### Wage Act Violation
### MASSACHUSETTS GENERAL LAW CHAPTER 149 § 148

Amazon has violated the Wage Act, in that, Amazon delivery drivers have had to

bear business expenses necessary to perform their work, such as gas and car

maintenance and supplying their own smartphones and phone data plans, in violation of

Gen. L. c. 149 § 148. This claim is asserted pursuant to Mass. Gen. L. c. 149 §150.

### COUNT III
### Minimum Wage
### MASSACHUSETTS GENERAL LAW CHAPTER 151 §§ 1,7

As set forth above, Defendants have violated the Massachusetts Minimum Wage

Law, M.G.L. c. 151, §§ 1 and 7, by failing to ensure that its delivery drivers are paid at

least the full state minimum wage. This claim is brought pursuant to M.G.L. c. 151, §20.

WHEREFORE, Plaintiff requests that this Court enter the following relief:

1. Certification of this case as a class action pursuant to Mass. R. Civ. P. 23
   and/or Mass. Gen. L. c. 149 § 150;

2. Restitution for all damages due to the Plaintiff and other class members
   because of their misclassification as independent contractors and related wage
   law violations;

3. An injunction ordering Amazon to cease its unlawful practices;

4. Statutory trebling of damages;

5. Attorneys' fees and costs

6. Prejudgment interest; and,

7. Any other relief to which Plaintiffs may be entitled.

5

DATED:  August 22, 2017

Respectfully submitted,

BERNARD WAITHAKA, on behalf of himself
and all others similarly situated,

By his attorneys,

*Shannon Liss-Riad*

Shannon Liss-Riordan, BBO # 640716
Adelaide Pagano, BBO # 690518
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
617-994-5800
sliss@llrlaw.com
apagano@llrlaw.com

6

1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
8 AT SEATTLE

9

10 BERNARD WAITHAKA, on behalf of
himself and all others similarly situated,                    No. C19-01320-RSM

11                    Plaintiff,                               ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY
12            v.

13 AMAZON.COM, INC., AMAZON
LOGISTICS, INC.,
14
                   Defendants.
15

16

17                        **I.      INTRODUCTION**

18        This matter comes before the Court on Defendants Amazon.com, Inc. and Amazon

19 Logistics, Inc. (collectively, "Amazon")'s Motion to extend stay pending the U.S. Supreme

20 Court's decision on Defendants' petitions for writ of certiorari.  Dkt. #84.  Plaintiff Bernard

21 Waithaka opposes Amazon's motion.  Dkt. #87.  The Court finds oral argument unnecessary to

22 rule on the issues.   Having reviewed Defendants' motion, Plaintiff's response, and the

23 remainder of the record, the Court GRANTS Defendants' motion.

24 //

25
//
26

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 1

## II.     BACKGROUND

### A.  Factual Background

Plaintiff Waithaka is an Amazon Flex ("AmFlex") delivery driver for Amazon. Amazon historically used third-party delivery providers like FedEx and UPS to deliver its products but recently began using independent contractors for delivery services for the last mile of the order.  These "last mile" delivery drivers, like Plaintiff, use the AmFlex smartphone application to sign up for delivery shifts and use their own methods of transportation, such as a private vehicle, to deliver products subject to Amazon's service standards.  Contractors are paid an hourly rate for their shifts but are not compensated for additional time needed to complete all their deliveries, nor are they reimbursed for gas, vehicle maintenance, or cellphone data expenses.

To work as an AmFlex driver, contractors like Plaintiff must download the AmFlex app and agree to the AmFlex Independent Contractor Terms of Service ("Agreement").  Section 11 of the Agreement provides, in part, that the Federal Arbitration Act ("FAA") and applicable federal law "will govern any dispute that may arise between the parties."  Dkt. #31-2 at 10.  In a separate section, the Agreement states that "interpretation of this Agreement is governed by the law of the state of Washington without regard to its conflict of laws principles, except for Section 11 of this Agreement, which is governed by the Federal Arbitration Act and applicable federal law." *Id.* at 15.

### B.  Procedural Background

Plaintiff brought this action against Defendants in Massachusetts state court alleging (1) misclassification of AmFlex drivers as contractors; (2) violation of the Massachusetts Wage Act; and (3) violation of the Massachusetts Minimum Wage Law.  Dkt. #1-1.  Amazon removed

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 2

the action to the U.S. District Court for the District of Massachusetts.  Dkt. #1.  Amazon then moved to compel arbitration or, in the alternative, to transfer or stay the case.  Dkt. #29.

On August 20, 2019, Judge Hillman of the District of Massachusetts granted in part and denied in part Amazon's motion, concluding that a transfer to the Western District of Washington was proper but denying Amazon's motion to compel arbitration.  Dkt. #59.  On the arbitration issue, Judge Hillman concluded that Plaintiff and those similarly situated fall within the FAA's transportation worker exemption, 9 U.S.C. § 1, that Massachusetts law therefore governed the enforceability of the arbitration provision, and that the provision was unenforceable based on Massachusetts public policy.  *Waithaka v. Amazon.com, Inc.*, 404 F. Supp. 3d 335, 343, 346, 348 (D. Mass. 2019).  Amazon appealed Judge Hillman's ruling on the FAA transportation worker exemption to the U.S. Court of Appeals for the First Circuit.

On July 17, 2020, the First Circuit affirmed the district court's holding as to the scope of 9 U.S.C. § 1, agreeing that the FAA transportation worker exemption encompasses the contracts of transportation workers, like Plaintiff, "who transport goods or people within the flow of interstate commerce, not simply those who physically cross state lines the course of their work." *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 13 (1st Cir. 2020).  On September 1, 2020, the First Circuit denied Amazon's petition for rehearing en banc.  *See Waithaka*, No. 19-1848 (1st Cir. Sept. 1, 2020).

**C.  *Rittmann* Litigation**

A group of AmFlex delivery drivers brought a separate action against Defendants in the U.S. District Court for the Western District of Washington before Judge Coughenour, alleging misclassification of AmFlex drivers as independent contractors.  Amazon moved to compel arbitration pursuant to the Agreement.  The district court denied Amazon's motion to compel

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 3

arbitration on the basis that plaintiffs fell within the FAA's transportation worker exemption, which the Ninth Circuit affirmed. *Rittmann v. Amazon.com, Inc.*, 383 F. Supp. 3d 1196 (W.D. Wash. 2019), *aff'd*, 971 F.3d 904 (9th Cir. 2020). Judge Bress dissented with the majority's interpretation of "engaged in foreign or interstate commerce" under 9 U.S.C. § 1 on the basis that a delivery worker must belong to a "class of workers" that crosses state lines in order to qualify for the FAA's transportation worker exemption. *Rittman*, 971 F.3d at 921 (J. Bress, dissenting). Amazon filed a petition to the Ninth Circuit for a rehearing en banc, which was pending at the time Amazon filed the instant motion.

### D. Motion to Extend Stay

Amazon moves to extend the stay of this case while awaiting (1) the Supreme Court's ruling on Amazon's forthcoming petition for a writ of certiorari in *Waithaka*; and (2) the Ninth Circuit's ruling on Amazon's petition for rehearing in *Rittmann*. After Amazon filed the instant motion, the Ninth Circuit denied rehearing en banc, *see Rittmann*, No. 19-35381, (9th Cir. Sept. 25, 2020), Dkt. #70, and Amazon filed a petition for a writ of certiorari that is now pending before the U.S. Supreme Court. *See id.*, *petition for cert. filed*, No. 20-622 (U.S. Nov. 4, 2020). Accordingly, the only basis for Amazon's motion to extend the stay is the Supreme Court's decision on its forthcoming and pending petitions for certiorari in *Waithaka* and *Rittmann*.

### III.   DISCUSSION

#### A. Legal Standard

Whether to stay a lawsuit is within this Court's discretion. *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1105 (9th Cir. 2005). In considering a stay request, courts weigh the competing interests that will be affected:

//

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 4

> the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.

*CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). "'[I]f there is even a fair possibility that the stay . . . will work damage to some one else,' the party seeking the stay 'must make out a clear case of hardship or inequity.'" *Lockyer*, 398 F.3d at 1105 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)). "The proponent of a stay bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997).

Here, Amazon seeks a stay pending the U.S. Supreme Court's decision on its petitions for writ of certiorari. In this situation, the Supreme Court has provided criteria to consider when determining whether a stay is appropriate. "[J]udges of the lower courts [ ] apply the same criteria" as the Supreme Court. *United States v. Holland,* 1 F.3d 454, 456 (7th Cir. 1993). An applicant seeking a stay must demonstrate: "(1) a reasonable probability that four Justices would vote to grant certiorari; (2) a significant possibility that the [Supreme] Court would reverse the judgment below; and (3) a likelihood of irreparable harm, assuming the correctness of the applicant's position, if the judgment is not stayed." *Packwood v. Senate Select Comm. on Ethics,* 510 U.S. 1319 (1994) (Rhenquist, J., in chambers) (citing *Barnes v. E–Systems, Inc. Group Hosp. Med. & Surgical Ins. Plan,* 501 U.S. 1301, 1302 (1991) (Scalia, J., in chambers)). In addition to considering these factors, courts must "balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes*, 501 U.S. at 1305.

//

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 5

**B.  Authority to Issue a Stay**

As an initial matter, Plaintiff argues that this Court lacks authority to stay the case under 28 U.S.C. § 2101(f) pending the Supreme Court's disposition of Amazon's certiorari petitions. Dkt. #87 at 6-7.  However, as Amazon correctly points out, it is not moving to stay an appellate mandate or enforcement of a judgment under Section 2101.  *See* 28 U.S.C. § 2101(f).  Rather, Amazon moves to stay trial court proceedings pursuant to this Court's "inherent power" to control its docket.  Dkt. #88 at 6 (citing *Clinton*, 520 U.S. at 706-07; *Lockyer v. Mirant Corp.*, 398 F.3d at 1109).

The Court agrees with Amazon.  While district courts are not routinely presented with motions to stay due to pending certiorari petitions, several have considered the issue pursuant to their inherent power to manage their own dockets. *See, e.g.*, *Fletcher v. Losh*, No. 1:15-CV-00029-REB, 2019 WL 4453703, at *3 (D. Idaho Sept. 17, 2019); *Bryant v. Jones*, No. 1:04-CV-2462-WSD, 2010 WL 11482535, at *1 (N.D. Ga. Feb. 2, 2010); *United States v. Mandycz*, 321 F. Supp. 2d 862 (E.D. Mich. 2004).  Consistent with these cases, this Court finds that it has sufficient authority to issue a stay in this matter.

Having resolved this preliminary issue, the Court will now analyze whether a stay is warranted.

**C.  Analysis of *Packwood* Factors**

For the Court to grant a stay, Amazon must demonstrate (1) a reasonable probability that four Justices will vote to grant certiorari; (2) a significant possibility that the Supreme Court will reverse the First and Ninth Circuits; and (3) a likelihood of irreparable harm, assuming the correctness of Amazon's position, if the judgment is not stayed.  *Packwood*, 510 U.S. 1319. Amazon bears the burden to show that each of these factors is met.  *Clinton*, 520 U.S. at 708.

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 6

i.     Probability of Granting Certiorari

It is well-established that the Supreme Court rarely grants certiorari.  *See* Margaret Meriwether Cordray & Richard Cordray, *The Calendar of the Justices: How the Supreme Court's Timing Affects its Decisionmaking*, 36 Ariz. St. L.J. 183, 204 (2004) (Observing that Court granted, on average, 1.19% of the petitions for certiorari that it reviewed).  Pursuant to Supreme Court rules, review on a writ of ceriotrari "is not a matter of right, but of judicial discretion."  Sup. Ct. R. 10.  Rule 10 sets forth several circumstances in which the Supreme Court may consider granting a writ, including:

> (a) a United States court of appeals has entered a decision in conflict with the decision of another United States court of appeals on the same important matter; has decided an important federal question in a way that conflicts with a decision by a state court of last resort; or has so far departed from the accepted and usual course of judicial proceedings, or sanctioned such a departure by a lower court, as to call for an exercise of this Court's supervisory power;
> . . .
>
> (c) a state court or a United States court of appeals has decided an important question of federal law that has not been, but should be, settled by this Court, or has decided an important federal question in a way that conflicts with relevant decisions of this Court.

Sup. Ct. R. 10.

Here, Amazon argues it is likely to succeed in seeking review by the Supreme Court due to (1) a circuit split on the issue of whether AmFlex workers involved in "last mile" transport may qualify for the arbitration exemption; and (2) conflict between Supreme Court precedent and the *Waithaka* and *Rittman* decisions.  The Court will address each argument in turn.

//

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 7

First, Amazon argues that conflict between the courts of appeals creates a "greater than usual likelihood" that the Supreme Court will grant certiorari.  Dkt. #84 at 7 (Citing Sup. Ct. R. 10(a)).   The Supreme Court's rules define a "circuit split" warranting certiorari as a disagreement between circuit courts that is severe enough to the point that one court of appeals' decision is "*in conflict with* the decision of another United States court of appeals on the same important matter . . . ."  S. Ct. R. 10 (emphasis added).  For the reasons set forth below, the Court does not find "reasonable probability" that certiorari will be granted based on a circuit split.

On the narrow issue of whether AmFlex drivers are exempt from the FAA, both courts that have considered this issue reached the same conclusion.  *See Waithaka*, 966 F.3d 10 (Transportation worker exemption applies to AmFlex drivers); *Rittmann*, 971 F.3d 904 (same).  Since Amazon filed this motion, the Ninth Circuit denied rehearing en banc in *Rittman*.  Consequently, there is no circuit split on the specific issue of whether the FAA transportation worker exemption applies to AmFlex drivers.

In light of the consistent rulings in *Rittman* and *Waithaka*, Amazon poses a broader question to this Court of whether other circuit courts have applied standards different from those applied in *Waithaka* and *Rittman* when analyzing whether employees are subject to the FAA transportation worker exemption.  Specifically, Amazon argues that the First and Ninth Circuits have read 9 U.S.C. § 1 to encompass workers who transport goods in localized intrastate commerce, so long as interstate transportation by other workers is involved at some point, whereas the Third, Fifth, Sixth, Seventh, and Eleventh Circuits require that employees transport goods or persons across state lines in order to be engaged in "interstate commerce" for purposes of qualifying for the exemption.  *Id.* (*comparing Waithaka, Inc.*, 966 F.3d at 13; *Rittmann*, 971

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 8

1    F.3d 904 *with Singh v. Uber Techs. Inc.*, 939 F.3d 210 (3d Cir. 2019); *Eastus v. ISS Facility*

2    *Servs., Inc.*, 960 F.3d 207 (5th Cir. 2020); *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592 (6th

3    Cir. 1995); *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798 (7th Cir. 2020); *Hill v. Rent-A-*

4    *Center, Inc.*, 398 F.3d 1286 (11th Cir. 2005)).  Amazon contends that this inter-circuit conflict

5    is evidenced by (1) the Ninth Circuit's recent decision in *Grice*, 974 F.3d 950; and (2) Judge

6    Bress' dissent in *Rittman*, which identified conflict with *Wallace* and *Singh*.  Dkt. #84 at 13.

7    Having reviewed the Ninth Circuits' decisions in *Grice* and *Rittman*, the Court finds that neither

8    supports a "reasonable probability" that the Supreme Court will grant certiorari based on a

9    circuit split.

10        In *Grice*, the Ninth Circuit did not identify a conflict with its earlier decision in *Rittman*

11   or the First Circuit's holding in *Waithaka*.  On the contrary, it merely distinguished the nature

12   of the work performed by Uber drivers compared to AmFlex drivers.  *See Grice*, 974 F.3d at

13   957 ("*Waithaka*'s holding was limited to the § 1 exemption status of AmFlex drivers, not gig-

14   economy drivers in general . . . Our recent decision in *Rittman* confirms this conclusion. . . . On

15   this record, we cannot say that Uber drivers perform, or are hired to perform, a similar function

16   to AmFlex workers.").  Despite the Ninth Circuit's effort to distinguish *Waithaka* and *Rittman*

17   from *Grice*, Amazon insists that the panel "admitted that the district court ruling it upheld was

18   'in tension' with *Waithaka* and *Rittman*."  Dkt. #84 at 13 (citing *Grice*, 974 F.3d at 957).  The

19   Court disagrees.  The full excerpt from *Grice* reads:

20
21       > Grice notes that the district court also found it significant that he
       > transported passengers, as opposed to goods, and that he never
22       > personally crossed state lines. But *to the extent these findings are
       > in tension* with cases such as *Singh, Waithaka, Rittman*, and
23       > *Rogers*, which emphasized the interstate nature of an employer's
       > business as the critical factor for determining whether a worker
24       > qualifies for the § 1 exemption, Grice has still not shown that he

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 9

App. 59

1    is entitled to mandamus relief.

2    *Grice*, 974 F.3d at 957 (emphasis added).  Here, *Grice* merely acknowledges the possibility of

3    tension between the district court's analysis and other FAA Section 1 cases.  It does not support

4    the more drastic position advocated by Amazon that a clear circuit split exists.[1]

5

6        Turning to the *Rittman* dissent, the Court likewise finds minimal support for Amazon's

7    argument that certiorari is "reasonably possible" based on a circuit split.  Amazon relies on

8    Judge Bress' dissent as an indication of "real disagreement" among the Courts of Appeal.  Dkt.

9    #88 at 7 (internal quotations omitted).  However, Amazon points to no other circuit that has

10   agreed with the Bress dissent and rejected the majority opinion, as a circuit split requires.  *Cf.*

11   *NGV Gaming, Ltd. v. Harrah's Operating Co.*, No. 04-3955 SC, 2008 WL 4951587, at *1 (N.D.

12   Cal. Nov. 18, 2008) (Finding a "possible circuit split" in light of "a recent decision by the

13   Second Circuit agreeing with the dissent and rejecting the majority in the Ninth Circuit's

14   decision").  Consequently, the Court finds Judge Bress' dissent insufficient, on its own, to

15   support a "reasonable probability" that certiorari will be granted based on a circuit split.

16

17       Next, Amazon argues that certiorari is likely given the First and Ninth Circuits'

18   inconsistency with Supreme Court precedent on an important question of federal law.  Dkt. #84

19   at 13-15 (citing Sup. Ct. R. 10(c)).  Amazon argues that the Supreme Court is likely to grant

20   certiorari given that the First and Ninth Circuits' decisions in *Waithaka* and *Rittman* conflict

21   with Supreme Court precedent in (1) *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001);

22   (2) *Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 563 (2017); and (3) *McDermott Int'l,*

23

24

25   _____

26   [1] The Seventh Circuit in *Wallace* took a similar approach to *Grice*, where it approvingly cited *Waithaka*, *Singh*, *Hill* and *Asplundh* and distinguished the facts of each case without identifying any conflict with its sister circuits' holdings.  *See Wallace*, 970 F.3d at 802, n.2.

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 10

*Inc. v. Wilander*, 498 U.S. 337, 348 (1991).   Because the Court finds conflict with *Circuit City* dispositive of the issue, it need not address *Lightfoot* and *McDermott*.

Amazon argues that *Circuit City* focused on "whether the § 1 exemption applied *only* to transportation workers (as opposed to all workers)" whereas the First and Ninth Circuits "focused on whether there are 'transport[ed] goods or people *within* the flow of interstate commerce.'"   Dkt. #84 at 14 (emphases in original) (quoting *Waithaka*, 966 F.3d at 13). Plaintiff counters that both *Waithaka* and *Rittman* "cited *Circuit City* numerous times, and duly considered its principles."   Dkt. #87 at 13.   Indeed, in reaching their decisions, *Waithaka* and *Rittman* expressly applied the principles set forth in *Circuit City*.   *See Waithaka,* 966 F.3d at 17; *Rittmann,* 971 F.3d at 909–10.

Notwithstanding the fact that the First Circuit and Ninth Circuit majority addressed *Circuit City*, one judge on the Ninth Circuit panel agreed with Amazon's position.   Judge Bress stated in dissent that Amazon's reading of 9 U.S.C. § 1 was more consistent with the principles set forth in *Circuit City*, whereas the majority's approach improperly stretched the transportation worker exemption beyond the "narrow and precise" construction urged by the Supreme Court.   *See id.* at 928, 931 ("The Supreme Court has cautioned against introducing 'complexity and uncertainty [into] the construction of § 1'because it 'undermin[es] the FAA's proarbitration purposes,' . . . Amazon's reading of the FAA is much more consistent with this objective.   The majority's interpretation, by contrast, foments substantial problems of practical application and produces inequities among similarly situated workers.") (J. Bress, dissenting) (quoting *Circuit City*, 532 U.S. at 123).   Considering Judge Bress' dissent, and the fact that the Supreme Court has not previously considered the issue of whether AmFlex drivers are exempt

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 11

from the FAA under 9 U.S.C. § 1, the Court finds "reasonable probability" that certiorari could be granted to address a conflict with *Circuit City*.

### ii.   Likelihood of Reversal

With respect to likelihood of reversal, the Court acknowledges that the Ninth Circuit and First Circuit denied rehearing en banc in *Rittman* and *Waithaka*, respectively. This procedural history ostensibly diminishes the likelihood of success at the Supreme Court level. Nevertheless, the Court finds that Judge Bress' dissent, compounded by the novelty of the issue on review, raises a sufficiently "significant possibility" of reversal to satisfy the second *Packwood* factor. *Packwood*, 510 U.S. 1319.

### iii.   Likelihood of Irreparable Harm

Finally, the Court considers the likelihood of irreparable harm Amazon would suffer, assuming its position is correct. *See id.* Amazon argues that without an extension of the stay, it would be irreparably harmed by the costs of continuing to litigate the dispute—particularly given the possibility of a class action. Dkt. #84 at 15-17. The Court finds that this factor strongly favors a stay for the reasons set forth below.

In cases where an interlocutory appeal of a motion to compel arbitration is pending, courts find a stay warranted to prevent "the risk of arbitration becoming moot and the possibility of having to litigate a class action." *Wilson v. Huuuge, Inc.*, No. 3:18-CV-05276-RBL, 2019 WL 998319, at *4 (W.D. Wash. Mar. 1, 2019). Plaintiff argues that findings of irreparable harm are limited to cases where the movant would incur trial expenses, *see* Dkt. #87 at 12-13, but courts have also recognized burdensome discovery as a basis to grant a stay. *See Bradberry v. T-Mobile USA, Inc.*, No. C 06 6567 CW, 2007 WL 2221076, at *4 (N.D. Cal. Aug. 2, 2007) ("[A] stay would be appropriate when the trial date approaches *or if discovery were*

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 12

*burdensome.* . . . The cost of some pretrial litigation does not constitute an irreparable harm to Defendant.") (emphasis added). It is undisputed that in a putative class action, as is the case here, the burdens of discovery "are substantially greater than in an individual arbitration." *Kwan v. Clearwire Corp.*, No. C09-1392JLR, 2011 WL 1213176 (W.D. Wash. Apr. 24, 2012).

Furthermore, when the pending issue concerns the arbitrability of the dispute, courts in the Ninth Circuit "have taken a more relaxed approach to stay requests" given the fact that "the right to arbitrate would be devalued, if not rendered meaningless, if litigation proceeded apace." *Cherny v. AT&T, Inc.*, No. CV 09-3625-GW AGRX, 2010 WL 2572929, at *1 (C.D. Cal. Feb. 8, 2010) (granting stay pending outcome of certiorari petition). Here, denial of the stay could potentially result in Amazon litigating hundreds of claims on a class-wide basis. Assuming Amazon's position is correct, the costs of burdensome class action discovery, including time, money, and resources, would be unrecoverable.

Plaintiff counters that burdensome discovery costs are not compelling reasons to stay the case, given that "substantial discovery into Amazon's business practices" would be necessary regardless of whether Mr. Waithaka is required to arbitrate his claim. Dkt. #87 at 12. This argument is unavailing, given that discovery would be significantly more burdensome in a class action against Amazon compared to Mr. Waithaka's individual claim. *See Del Rio v. Creditanswers, LLC*, No. 10-CV-346 WQH (BLM), 2010 WL 3418430, at *4 (S.D. Cal. Aug. 26, 2010) ("The difference in litigation expenses between a two-party case and a class action is substantial.").

Plaintiff also points out that many of the cases Amazon relies upon address irreparable harm in the context of interlocutory appeals, not petitions for certiorari, which are "materially different" because the moving party's varying likelihood of success. Dkt. #87 at 13, n.9. While

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 13

the likelihood of Amazon prevailing at the certiorari stage is certainly lower compared to the interlocutory appeal stage, *Packwood* merely requires this Court to determine whether a "significant possibility" of reversal exists and, if so, to analyze whether irreparable harm exists "assuming the correctness of the applicant's position, if the judgment is not stayed." *Packwood,* 510 U.S. at 1319. Here, the Court has determined that the possibility of reversal exists, and that Amazon would suffer irreparable harm if improperly forced to litigate hundreds of claims.

For these reasons, the Court finds that Amazon has satisfied the third *Packwood* factor.

### D.  Balance of the Equities

Finally, the Court considers the balance of the equities, including the relative harms to Plaintiff and Amazon and the public interest. *Barnes*, 501 U.S. at 1305. Regarding the harms to Plaintiff, the Court is well-aware of the protracted nature of this dispute, which has been pending for three years, and acknowledges the risk of evidence growing stale as the case proceeds through various procedural stages. However, while courts have found that lengthy delays weigh heavily against a stay, the cases relied upon by Plaintiff involve cases that were pending between four and five years. *See, e.g. 1st Media, LLC v. doPi Karaoke, Inc.,* No. 2:07-CV-1589 JCM NJK, 2013 WL 1250834, at *1 (D. Nev. Mar. 27, 2013); *Fletcher,* 2019 WL 4453703, at *3. This matter, in contrast, has not been pending for that length of time.

Moreover, an extension of the stay in this matter would not be "indefinite," as Plaintiff contends. *See* Dkt. #87 at 6. Rather, the stay would only last until the arbitration question is more conclusively resolved, which may happen as soon as February 2021. *See* Dkt. #90 at 2 (Amazon representing that the Supreme Court is scheduled to rule on the *Rittman* certiorari petition in February). In considering the harms Plaintiff will suffer from further delay, including stale evidence, unavailable witnesses, and ongoing harm due to unpaid wages, the

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 14

Court considers the fact that Plaintiff may at any time avoid further delay by proceeding to arbitration.  In contrast, the significant time, money and resources spent litigating a class action claim that is ultimately sent to arbitration would not be recoverable.

In sum, having balanced the relative harms to Plaintiff and Amazon, the Court finds that a stay is warranted until the arbitration question is more conclusively resolved.  While the probability of certiorari and reversal are not inordinately high, the *Rittman* dissent indicates that a reasonable possibility exists.  Thus, considering these probabilities alongside the relatively high harm to Amazon if a stay is denied compared to the relatively low harm to Plaintiff if a stay is granted, the balance of the equities tips in favor of Amazon.  Finally, while the Court finds the public interest factor less relevant here, it notes that the interests of judicial economy, as well as the novelty of the question before the Supreme Court, also weigh in favor of a stay.

**E.  Length of Stay**

Amazon requests that the Court extend the stay until the final resolution of *Waithaka v. Amazon.com, Inc., et al.* (1st Cir. No. 19-1848), **and** *Rittmann v. Amazon.com, Inc., et al.* (9th Cir. No. 19-35381).  *See* Dkt. #84-1 at 1.  However, Amazon has not yet filed its certiorari petition in *Waithaka*.  *See* Dkt. #90 at 2.  Considering that the disposition of the *Rittman* petition directly implicates the probability that *Waithaka* will be granted, and visa versa, the Court will extend the stay until the final resolution of *Waithaka* **or** *Rittman*, but not both.  Should Amazon seek to extend the stay until both are resolved, it may seek such relief at a later time.

**IV.  CONCLUSION**

Having reviewed Defendants' motion, Plaintiff's response, and the remainder of the record, the Court GRANTS Defendants' Motion to Extend Stay, Dkt. #84, and ORDERS as follows:

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 15

(1) This matter is stayed until the final resolution of *Waithaka v. Amazon.com, Inc., et al.* (1st Cir. No. 19-1848), or *Rittmann v. Amazon.com, Inc., et al.* (9th Cir. No. 19-35381), whichever occurs first;

(2) Defendants shall notify the Court in writing, within ten days of any disposition of its petitions for certiorari by the Supreme Court.

IT IS SO ORDERED.

Dated this 30th day of November, 2020.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER GRANTING DEFENDANTS'
MOTION TO EXTEND STAY- 16

1

2                                                                      **Hon. Ricardo S. Martinez**

3

4                                      UNITED STATES DISTRICT COURT

5                           WESTERN DISTRICT OF WASHINGTON AT SEATTLE

6

7

8   BERNARD WAITHAKA, on behalf of
    himself and all others similarly situated,
9                                                          C.A. NO. 2:19-cv-01320-RSM
                        Plaintiff,                         Class Action
10          v.
                                                           **PLAINTIFF'S MOTION FOR CLASS**
11  AMAZON.COM, INC., AMAZON                               **CERTIFICATION**
    LOGISTICS, INC.,
12                      Defendants.                         NOTE ON MOTION CALENDAR:
                                                            June 11, 2021
13

14                                                         ORAL ARGUMENT REQUESTED

15

16

17

18

19

20

21

22

23

24

25

26
    PLAINTIFF'S MOTION FOR
    CLASS CERTIFICATION - i                      LICHTEN & LISS-RIORDAN, P.C.
    Case No. 2:19-cv-01320-RSM                       729 Boylston Street, Suite 2000
                                                 Boston, Massachusetts 02116 ~ (617) 994-5800

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**Table of Contents**

I.     INTRODUCTION ......................................................................................................... 1

II.    FACTUAL BACKGROUND ....................................................................................... 4

III.   ARGUMENT ............................................................................................................... 8

   A.   Legal Standard ....................................................................................................... 8

   B.   The Class Satisfies The Requirements of Rule 23(A) ........................................... 9

      1.   The members of the class are so numerous that joinder is impracticable ................. 9

      2.   The claims satisfy the commonality requirement ................................................. 9

      3.   Plaintiff satisfies the typicality requirement ..................................................... 16

      4.   Plaintiff and his counsel adequately represent the interests of the class ................. 17

   C.   The Class Satisfies The Requirements of Rule 23(b) .......................................... 19

      1.   Common questions predominate over questions affecting individual
           class members ................................................................................................. 19

      2.   A class action is the superior mechanism for addressing the drivers' claims ......... 21

IV.    CONCLUSION .......................................................................................................... 22

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - ii
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

1

2

## Table of Authorities

3

**Cases**

Anchem Prods., Inc. v. Windsor,
  512 U.S. 591 (1997) ...............................................................................21
Athol Daily News v. Board of Review of Div. of Employment & Training,
  439 Mass. 171 (2003) ............................................................................. 2
Awuah v. Coverall North America, Inc.
  Case No. 1:07-cv-10287-WGY (D. Mass. Sept. 27, 2011) ......................3, 18, 20
Blackie v. Barrack,
  524 F.2d 891 (9th Cir. 1975) .................................................................. 8
Carey v. Gatehouse Media Massachusetts I, Inc.
  92 Mass. App. Ct. 801 (2018) ............................................................... 13
Carr v. Flowers Foods, Inc.
  2019 WL 2027299 (E.D. Pa. May 7, 2019)............................................. 11
Chaves v. King Arthur's Lounge, Inc.,
   Suffolk C.A. No. 2007-2505 (Mass. Super. July 31, 2009) ............................3, 18
Chun-Hoon v. McKee Foods Corp.,
  2006 WL 3093764 (N.D. Cal. Oct. 31, 2006) ......................................... 8
Costello v. BeavEx, Inc.,
  810 F.3d 1045 (7th Cir. 2016) ..............................................................3, 11, 20
Cotter v. Lyft, Inc.,
  60 F.Supp.3d 1067 (N.D. Cal. 2015)..................................................... 18
Coverall N. Am. V. Com'r of Div. of Unemployment Assistance
  447 Mass. 852 (2006) .............................................................................13, 14, 20
Cruz v. Manlo Enterprises, Inc. d/b/a Mario's Showplace ("Mario's Showplace"),
   Worcester C.A. No. 2010-01931 (Mass. Super. June 10, 2011) ............................3
Cutter v. HealthMarkets, Inc.,
  C.A. No. 1:10-cv-11488-JLT (D. Mass. July 26, 2011)............................3
Da Costa v. Vanguard Cleaning Sys., Inc.,
  No. CV 15-04743, 2017 WL 4817349 (Mass. Super. Sept. 29, 2017)....................2
Dalton v. Lee Publications, Inc.,
  270 F.R.D. 555  (S.D. Cal. 2010) ..........................................................16, 17
DaSilva v. Border Transfer of MA, Inc.
  296 F. Supp. 3d 389 (D. Mass. 2017)....................................................2, 11, 13, 20
De Giovanni v. Jani-King Intern., Inc.,
  262 F. R. D. 71 (D. Mass. Sep. 21, 2009) .............................................2, 3, 11, 20
D'Italia v. Lowe's Home Centers, Inc.,
  Civ. No. 11-4758-BLS1 (Suffolk Super. Ct. December 12, 2012) ..........................3, 11, 13
Eisen v. Carlisle & Jacquelin,
  417 U.S. 156 (1974) .............................................................................. 8
Hanlon v. Chrysler Corp.,
  150 F.3d 1011 (9th Cir 1998) ................................................................9, 16
Hogan v. InStore Grp., LLC,
  2021 WL 91386, at *25 (D. Mass. Jan. 11, 2021)................................. 2
James v. Uber Techs. Inc.
  (N.D. Cal. Jan. 26, 2021) 2021 WL 254303 ..........................................passim

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S MOTION FOR
  CLASS CERTIFICATION - iii
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

Johnson v. Serenity Transportation, Inc.
  2018 WL 3646540 (N.D. Cal. Aug. 1, 2018), aff'd, 802 F. App'x 250 (9th Cir. 2020) ....... 12
Kamm v. Cal. City Dev. Co.,
  509 F.2d 205 (9th Cir.1975) .................................................................................................. 21
Kirby v. Cullinet Software,
  116 F.R.D. 303 (D. Mass. 1987) .............................................................................................. 9
Lawson v. Grubhub, Inc.,
  302 F.Supp.3d 1071 (N.D. Cal. 2018) ................................................................................... 13
Martin v. Tango's Restaurant, Inc.,
  969 F.2d 1319 (1st Cir. 1992) ................................................................................................ 22
Martins v. 3PD, Inc.
  2013 WL 1320454 (D. Mass. Mar. 28, 2013) ............................................................. 2, 11, 20
Massachusetts Delivery Ass'n v. Healey
  2015 WL 4111413 (D. Mass. July 8, 2015) .......................................................................... 15
Matamoros v. Starbucks Corp.,
  699 F.3d 129 (1st Cir. 2012) .................................................................................................. 17
McAdams v. Massachusetts Mut. Life Ins. Co.,
  2002 WL 1067449 (D. Mass. May 15, 2002).......................................................................... 9
McLaughlin v. Liberty Mut. Ins. Co.,
  224 F.R.D. 304 (D. Mass. 2004) ..................................................................................... 15, 16
Meier v. MasTec North America, Inc.,
  Hampden C.A. No. 13-448 (Super. Ct. Jan. 6, 2015)............................................................... 2
Messner v. Northshore Univ. HealthSystem,
  669 F.3d 802 (7th Cir. 2012)................................................................................................... 20
Moreno v. JCT Logistics, Inc.
  2019 WL 3858999 (C.D. Cal. May 29, 2019)....................................................................... 11
Neurontin Mktg. and Sale Practices Litig.,
  244 F.R.D. 89 (D. Mass. 2007) .............................................................................................. 19
Norris-Wilson v. Delta-T Grp., Inc.,
  270 F.R.D. 596 (S.D. Cal. 2010) ........................................................................................... 17
O'Brien v. Encotech Const. Servs., Inc.,
  203 F.R.D. 346  (N.D. Ill. 2001) ........................................................................................... 22
O'Connor v. Uber Technologies, Inc.
  (N.D. Cal. 2015) 82 F.Supp.3d 1133................................................................... 14, 15, 17, 18
Ouadani v. Dynamex Operations E., LLC,
  405 F. Supp. 3d 149, 153 (D. Mass. 2019)............................................................................... 2
Overka v. American Airlines,
  265 F.R.D. 14 (D. Mass. 2010) ....................................................................................... 10, 22
Raposa v. Mardi Gras Entertainment, Inc.,
  Hampden C.A. No. 2010-00034 (Mass. Super. Dec. 11, 2013) ............................................... 3
Relafen Antitrust Litig.,
  218 F.R.D. 337 (D. Mass. 2003) .............................................................................................. 9
Reynolds v. City Express, Inc.,
  2014 WL 1758301, (Mass. Super. Jan. 8, 2014) ..................................................................... 2
Rivera v. Holder,
  307 F.R.D. 539 (W.D. Wash. 2015) ......................................................................................... 8
Salvas v. Wal-Mart Stores, Inc.,
  452 Mass. 337 (2008) ................................................................................................. 14, 21, 22
Sandoval, et al. v. M.J.F. Bowery Corp. d/b/a/ Ten's Show Club,
  29 Mass. L. Rptr. 11 (Essex Super. July 22, 2011) ................................................................. 3
Schwann et al v. FedEx Ground Package System, Inc.,

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - iv
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

App. 70

C.A. No. 11-cv-11094-RGS (D. Mass. July 3, 2013) .......................................... 18
Simmons v. Kilnapp Enterprises, Inc.,
    Essex C.A. No. 13-551 (Super. Ct. June 13, 2014).................................................... 2
Smilow v. Southwestern Bell Mobile Systems, Inc.,
    323 F.3d 32 (1st Cir. 2003) ......................................................................... 19
Smith v. Cardinal Logistics Mgmt. Corp.,
    2008 WL 4156364 (N.D. Cal. Sept. 5, 2008)...................................................... 16
Somers v. Converged Access, Inc.,
    454 Mass. 582 (2009).......................................................................... 10, 22
Soto v. Diakon Logistics (Delaware), Inc.,
    2013 WL 4500693 (S.D. Cal. Aug. 21, 2013)............................................... 10, 20
Vargas v. Spirit Delivery & Distribution Servs., Inc.,
    2017 WL 1115163 (D. Mass. Mar. 24, 2017) ........................................................ 2
Vasquez v. Ye Olde Lamplighter II, Inc. ("Lamplighter"),
    Worcester C. A. No. 2011-1610-D (Mass. Super. Nov. 13, 2013) ......................... 3
Villalpando v. Exel Direct Inc.,
    303 F.R.D. 588 (N.D. Cal. 2014) ............................................................... 9, 19
Waste Mgmt. Holdings, Inc. v. Mowbray,
    208 F.3d 296 (1st Cir. 2000) ...................................................................... 19
Weld v. Glaxo Wellcome Inc., 434 Mass. 81, 92, 746 N.E.2d 522 (2001).............................. 21

**Statutes**

Massachusetts General L.
    c. 149, § 148B.............................................................................. 1, 3, 9

**Rules**

Fed. R. Civ. P. 23 .................................................................... 1, 8, 22, 27

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - v
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

I.       **INTRODUCTION**

This case is brought on behalf of Amazon Flex drivers who have performed delivery services in Massachusetts for Defendants Amazon.com, Inc. and Amazon Logistics, Inc. (hereinafter "Amazon").  Plaintiff Bernard Waithaka has alleged, *inter alia*, that he and other Amazon Flex delivery drivers are employees under Mass. Gen. L. c. 149, § 148B, not independent contractors as Amazon has classified them. As a result of their misclassification, these drivers have been forced to bear expenses necessary to perform their jobs, such as gas and car maintenance and phone data plans, and have not been paid minimum wage for all hours work, due to the fact that drivers must bear their own expenses and often work beyond their scheduled shift to complete their deliveries, without additional compensation.  Having brought this action on his own behalf and on behalf of all other individuals who have worked as Amazon Flex delivery drivers in Massachusetts, the plaintiff now moves for class certification pursuant to Fed. R. Civ. P. 23 of all individuals who have worked as Amazon Flex delivery drivers in Massachusetts at any time since August 23, 2014.[1]

Class treatment is particularly appropriate here; adjudication of the putative class's claims for expense reimbursement under Mass. Gen. L. c. 149 § 148 and minimum wage under Mass. Gen. L. c. 151 §§ 1, 7 hinge on analysis of the same underlying legal question, common to every member of the proposed class – whether Amazon Flex delivery drivers are independent contractors or employees under Massachusetts law, Mass. Gen. L. c. 149 § 148B. Massachusetts courts have consistently recognized that it makes little sense to determine classification of a given position based on an individualized analysis that would not be

---

[1]      Plaintiffs' claims under the Massachusetts Wage Act and Minimum Wage Law may extend three years prior to the filing of the Complaint on August 23, 2017. See Mass. Gen. L. c. 149 § 150; Mass. Gen. Laws c. 151, § 20A.

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 1
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

pragmatically workable for a company or an industry and that would also make it virtually

impossible to challenge a company's systemic decision to misclassify its workers. See Athol

Daily News v. Board of Review of Div. of Employment & Training, 439 Mass. 171, 181 n.14

(2003) (criteria based on the factual circumstances of each individual worker, rather than on

the nature of the services performed, would have the anomalous result of inconsistent status

determinations with respect to workers performing identical services for the same company");

Martins v. 3PD, Inc., 2013 WL 1320454, at *8-9 (D. Mass. Mar. 28, 2013) (noting that

"[c]lass actions are [] the preferred vehicle for adjudicating employment classification claims"

because "[o]f necessity, a company's employee-classification scheme applies to all

individuals classified under it"); De Giovanni v. Jani-King Int'l, Inc., 262 F.R.D. 71, 85 (D.

Mass. 2009) ("Both the United States Supreme Court and the Massachusetts Supreme Judicial

Court have expressed a strong preference for rendering decisions on the classification of

employees on class wide basis").

    Thus, courts considering the status of Massachusetts workers as employees or

independent contractors under Massachusetts state law have consistently certified such cases

as class actions, applying the strict, conjunctive "ABC" test that applies in Massachusetts for

employee status.[2]  Indeed, as set forth further below, claims under the Massachusetts

---

[2]    See, e.g.,  Hogan v. InStore Grp., LLC, 2021 WL 91386, at *25 (D. Mass. Jan. 11,
2021); Ouadani v. Dynamex Operations E., LLC, 405 F. Supp. 3d 149, 153 (D. Mass. 2019);
DaSilva v. Border Transfer of MA, Inc., 2017 WL 5196382 (D. Mass. Nov. 9, 2017); Vargas
v. Spirit Delivery & Distribution Servs., Inc., 245 F. Supp. 3d 268, 273 (D. Mass. 2017); Da
Costa v. Vanguard Cleaning Sys., Inc., 2017 WL 4817349, at *1 (Mass. Super. Sept. 29,
2017); Vargas v. Spirit Delivery & Distribution Servs., Inc., 2017 WL 1115163, at *12 (D.
Mass. Mar. 24, 2017); Meier v. MasTec North America, Inc., Hampden C.A. No. 13-448
(Super. Ct. Jan. 6, 2015) (Ex. 2 to Liss-Riordan Decl.); Simmons v. Kilnapp Enterprises, Inc.,
Essex C.A. No. 13-551 (Super. Ct. June 13, 2014) (Ex. 3 to Liss-Riordan Decl.); Reynolds v.
City Express, Inc., 2014 WL 1758301, at *12 (Mass. Super. Jan. 8, 2014); Raposa v. Mardi
Gras Entertainment, Inc., Hampden C.A. No. 2010-00034 (Mass. Super. Dec. 11, 2013) (Ex.

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 2
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

1    Independent Contractor Law, Mass. Gen. L. c. 149 § 148B, are especially suitable for

2    certification under the second prong of the "ABC" test, which requires the alleged employer

3    to prove that the work performed by the plaintiffs is outside its usual course of business,

4    because this question will obviously be proven through common evidence. See D'Italia v.

5    Lowe's Home Centers, Inc., Civ. No. 11-4758-BLS1 (Suffolk Super. Ct. December 12, 2012)

6    (Billings, J.) (Ex. 1 to Liss-Riordan Decl., filed herewith) at *13 ("Lowe's either is in the

7    businesses of kitchen and bath remodeling, or it isn't."); De Giovanni, 262 F.R.D. at 85

8    ("common issues will predominate to determine whether the services performed by the class

9    fall outside of Jani–King's usual course of business" because there are no individualized

10   inquiries regarding "the type of business operated by Jani–King").  In fact, courts in

11   Massachusetts have certified classes under the "ABC" test, regardless of whether they find

12   commonality under all three prongs, since Prong B is often itself dispositive, and the issue

13   under Prong B turns on the clearly common question of what the defendant's usual course of

14   business is (and thus whether the workers provide services that are within that usual course of

15   business).  See, supra, note 2; Costello v. BeavEx, Inc., 810 F.3d 1045, 1060 (7th Cir. 2016)

16   (reversing denial of class certification based on lack of commonality on Prong A, holding that

---

20   4 to Liss-Riordan Decl.); Vasquez v. Ye Olde Lamplighter II, Inc., Worcester C. A. No. 2011-
     1610-D (Mass. Super. Nov. 13, 2013) (Ex. 5 to Liss-Riordan Decl.); D'Italia v. Lowe's Home
21   Centers, Inc., Civ. No. 11-4758 (Suffolk Super. Dec. 12, 2012); Awuah v. Coverall North
     America, Inc., Case No. 1:07-cv-10287, Dkt. 365 at 2-3 (D. Mass. Sept. 27, 2011); Cutter v.
22   HealthMarkets, Inc., C.A. No. 1:10-cv-11488-JLT (D. Mass. July 26, 2011), Dkt. No.
     57; Sandoval, et al. v. M.J.F. Bowery Corp. d/b/a/ Ten's Show Club, 29 Mass. L. Rptr. 11,
23   2011 WL 5517330 (Essex Super. July 22, 2011); Cruz v. Manlo Enterprises, Inc. d/b/a
     Mario's Showplace, Worcester C.A. No. 2010-01931 (Mass. Super. June 10, 2011) (Ex. 6 to
24   Liss-Riordan Decl.); De Giovanni v. Jani-King Intern., Inc., 262 F. R. D. 71, 84-88 (D. Mass.
     Sep. 21, 2009); Chaves v. King Arthur's Lounge, Inc., Suffolk C.A. No. 2007-2505 (Mass.
25   Super. July 31, 2009) (Ex. 7 to Liss-Riordan Decl.).

26

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 3
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

1  class certification may be granted when commonality and predominance exists on Prong B,

2  since the "ABC" test is conjunctive and failure to prove even one prong results in a finding of

3  liability).

4          The prerequisites of Fed. R. Civ. P. 23 are clearly met.  Rule 23(a)'s four requirements

5  – numerosity, commonality, typicality, and adequacy – are all satisfied.  There are thousands

6  of Amazon Flex delivery drivers in Massachusetts who have driven for Amazon, so joinder is

7  clearly impracticable.  The misclassification issue at the heart of this case is common to all

8  those delivery drivers, as are the legal questions regarding the consequences of that

9  misclassification.  The named plaintiff's experiences as an Amazon Flex driver are typical of

10  the experiences of other class members, and the plaintiff will serve as an adequate

11  representative because there is no conflict between his interest in being properly classified as

12  an employee and reimbursed for his expenses, and the interests of the class.  Likewise,

13  Plaintiff's counsel will serve as an adequate representative for the class in light of their

14  substantial experience in wage-and-hour class actions, particularly regarding independent

15  contractor misclassification under Massachusetts law.  Furthermore, this case also satisfies the

16  two requirements of Fed. R. Civ. P. 23 (b), because common questions plainly predominate

17  over individual damages issues, and because a class action is superior to thousands of

18  identical claims.  For all these reasons, the class should be certified.

19

20  **II.     FACTUAL BACKGROUND**

21          Amazon is an electronic retailer based in Seattle, Washington, which does business

22  throughout the country, including extensively in Massachusetts, where it fulfills customer

23  orders by dispatching delivery drivers to deliver orders to its customers. See Ex. A to Liss-

24  Riordan Decl. at p. 3 (describing its consumer services, "**We fulfill customer orders** in a

25

26
PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 4
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS–RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

App. 75

number of ways…"; describing seller services, "We offer programs that enable sellers to grow their businesses, sell their products in our stores, and **fulfill orders through us**.").  Order fulfillment covers the process from when a sale takes place all the way through delivery to the customer, and thus, it necessarily involves package delivery.

Amazon promotes efficient delivery as a key offering to its customers. <u>See</u> Ex. A at p. 3 (describing its consumer services: "**We seek to offer our customers** low prices, **fast and free delivery**, easy-to-use functionality, and timely customer service.") (emphasis supplied). Amazon's website provides a "Shipping and Delivery" FAQ section, which includes an explanation of its Shipping Policies and subsections setting forth, for example, Amazon's "Delivery Guarantees", and Special Shipping Options (e.g. how to instruct the delivery driver to leave a large item for delivery on the "front porch", "inside the entryway", or "room of choice"). <u>See</u> Ex. F.  In addition to its regular delivery services, Amazon offers a Prime membership program that touts free "One-day delivery", "Same-day delivery" and "2-hour grocery delivery". <u>See</u> Ex. E ("More of what you love, delivered in more ways"); <u>see also</u> Ex. A at p. 3 ("[W]e offer Amazon Prime, a membership program that includes unlimited free shipping on over 100 million items…").  As demonstrated by its 2020 Securities and Exchange Commission Current Report, Amazon's "faster delivery" offerings are central to its business model and planned growth.  <u>See</u> Ex. A at p. 3 (describing consumer services, as quoted herein).  Indeed, Amazon identifies its "ability to… fulfill orders", and "the extent to which [it] offer[s] fast and free delivery" and "invest[s] in .. fulfillment" as key factors to its growth rate.  <u>Id.</u> at p. 9; <u>see also</u> <u>id.</u> at p. 19 ("**To increase sales of products and services, we focus on** improving all aspects of the customer experience, including lowering prices, improving availability, **offering faster delivery and performance times**, ….") (emphasis supplied).

Amazon considers its competitors to be other companies whose usual course of

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 5
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

1   business is fulfillment and delivery.  Id. at p. 4 ("Our current and potential competitors

2   include:… (5) **companies that provide fulfillment and logistics services for themselves** or

3   for third parties, whether online or offline"); id. at p. 6 ("Our businesses are rapidly evolving

4   and intensely competitive, and we have many competitors across geographies, including**…**

5   **logistics services**.") (emphasis supplied).  Amazon has also promoted in press releases its

6   efforts to grow its business by ensuring fast delivery, including through its Amazon Flex

7   delivery drivers.  See Ex. G ("**Amazon has launched several initiatives to ensure fast**

8   **delivery speeds and supply chain capacity for its customers, including** … **Amazon Flex**,

9   the company's mobile application that allows individuals to sign-up, be vetted and begin

10  delivering for Amazon, a dedicated network of over 10,000 trailers to increase trucking

11  capacity and, now, the expanded fleet of cargo aircraft."); see also Ex. A at p. 20 ("we have

12  hired over 400,000 full-time and part-time employees to increase **our fulfillment network**

13  **capacity**.") (emphasis supplied).

14

15      Amazon Flex delivery drivers currently work for Amazon in more than 50 cities in the

16  United States, including in Massachusetts. See Ex. B. Amazon decides when to hire more

17  Amazon Flex delivery drivers based on its own needs, and it limits the number of spots

18  available for new drivers accordingly.  Id.  Amazon Flex delivery drivers must download the

19  Amazon Flex Application on their phone and can then sign up for shifts or "delivery blocks"

20  as they are known by Amazon. See Ex. C; see also Declaration of Bernard Waithaka

21  ("Waithaka Decl.") at ¶ 4.  The length of shifts varies, but shifts are typically anywhere from

22  two to six hours. See Ex. D; see also Waithaka Decl. at ¶ 4.  Amazon's app directs drivers to

23  a start location for each shift, such as an Amazon warehouse, and once there, drivers are

24  assigned items to deliver by Amazon personnel and a route that directs them where to make

25  deliveries. Ex. C; see also Waithaka Decl. at ¶¶ 5-6.  Drivers must log each delivery as they

26

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 6
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS–RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994–5800

App. 77

go, using the Application and must take pictures of where the packages are left.  Waithaka Decl. at ¶ 6.  If there are any packages or items left over at the end of the shift that were not able to be delivered for any reason, drivers must return them.  Id.  Drivers may be penalized for a number of reasons, including: (1) if they deliver items late, outside the prescribed window set by Amazon, (2) if a customer does not receive an item that the driver marks as having been delivered, (3) if the driver does not return undeliverable packages to the delivery station at the end of his or her shift, or (4) if the driver fails to follow customers' preferences regarding where and how to deliver items.  See Ex. A to Lumba Decl. (Dkt. 31-2) at pp. 8-9; see also Waithaka Decl. at ¶ 8.  Drivers can cancel a shift up to 45 minutes ahead of time, but if they cancel outside this window, the cancellation will count against them and can result in their termination.  Ex. C; see also Waithaka Decl. at ¶ 8.  Recently, Amazon started a "points" system where drivers have points given or taken away based on their reliability, timely cancellation, and delivery quality. Amazon can choose to deactivate drivers based on their "points" performance. Waithaka Decl. at ¶ 8.

Amazon's contract with its Amazon Flex delivery drivers uniformly classifies the drivers as independent contractors.  See, e.g., Ex. A to Lumba Decl. (Dkt. 31-2) at § 2 ("This Agreement creates an independent contractor relationship, not an employment relationship.").  Likewise, Amazon's contract uniformly requires that drivers "will provide and maintain a mobile device compatible with the Amzon Flex app" and "any vehicle identified by you within the Amazon Flex app", with which to make deliveries.  Id. at § 5(a).  Vehicles must be 4-door, midsize sedans or larger.  See Ex. D.  Drivers are paid what Amazon terms "Service fees" in exchange for every shift or "block", and Amazon advertises that drivers will make anywhere between $18-$25 per hour in Service Fees while making deliveries.  Id.  Amazon unilaterally sets the Service Fees that will be offered for any given

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 7
Case No. 2:19-cv-01320-RSM

shift.  Ex. A to Lumba Decl. (Dkt. 31-2) at § 3; <u>see also</u> Waithaka Decl., ℙ 7.  Amazon

processes drivers' payments and pays them by direct deposit twice weekly.  <u>See</u> Ex. D.

Amazon's pay formula does not ensure that drivers receive at least minimum wage.

Waithaka Decl., ℙ 10.  Plaintiff Waithaka, like all other Amazon delivery drivers in

Massachusetts, performed deliveries pursuant to Amazon's policies, as set forth above.

Plaintiff Waithaka currently drives for Amazon Flex and has done so since January 2017.

Waithaka Decl., ℙℙ 3-4.

### III.   <u>ARGUMENT</u>

#### A.  Legal Standard

Fed. R. Civ. P. Rule 23 provides courts with "broad discretion" to determine whether

to certify a class action.  <u>See</u> <u>Rivera v. Holder</u>, 307 F.R.D. 539, 545 (W.D. Wash. 2015).In

exercising that discretion, courts must be mindful of the liberal standard governing class

certification.  <u>Payne v. Goodyear Tire & Rubber Co.</u>, 216 F.R.D. 21, 24-25 (D. Mass. 2003).

"The court is bound to take the substantive allegations of the complaint as true" in

determining the appropriateness of class certification.  <u>Blackie v. Barrack</u>, 524 F.2d 891, 901

n. 17 (9th Cir. 1975).  "[T]he court must only determine if the plaintiffs have proffered

enough evidence to meet the requirements of FRCP 23, not weigh competing evidence."

<u>Chun-Hoon v. McKee Foods Corp.</u>, 2006 WL 3093764, at *4 (N.D. Cal. Oct. 31, 2006)

(internal citation omitted).

In deciding a motion for class certification, courts focus on whether the requirements

of Rule 23 have been satisfied.  <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 178 (1974).  To

obtain certification, Plaintiff must show that the case meets all four requirements of Rule

23(a) (numerosity, commonality, typicality, and adequacy) and satisfies the "predominance"

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 8
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

App. 79

and "superiority" requirements of Rule 23(b)(3).  Id.  As described below, these categories are

all satisfied here, and the Court can and should now certify a class of all individuals who have

worked as Amazon Flex delivery drivers in Massachusetts at any time since August 23, 2014.

**B.  The Class Satisfies the Requirements of Rule 23(a)**

**1.  The members of the class are so numerous that joinder is impracticable**

A plaintiff will satisfy the numerosity requirement if "the class is so large that joinder

of all members is impracticable." Hanlon v. Chrysler Corp., 150 F 3d 1011, 1019 (9th Cir.

1998).  The numerosity requirement is "not a difficult burden to satisfy." McAdams v.

Massachusetts Mut. Life Ins. Co., 2002 WL 1067449, *3 (D. Mass. May 15, 2002), aff'd, 391

F.3d 287 (1st Cir. 2004) (internal citation omitted).  Plaintiff need not prove the precise size

of the class, as the Court may make "common sense assumptions in order to support a finding

of numerosity." Kirby v. Cullinet Software, 116 F.R.D. 303, 306 (D. Mass. 1987).  In any

event, it is well settled that classes of at least 35-40 individuals are sufficiently numerous to

warrant class certification. See, e.g., In re Relafen Antitrust Litig., 218 F.R.D. 337, 342 (D.

Mass. 2003); Villalpando v. Exel Direct Inc., 303 F.R.D. 588, 605-06 (N.D. Cal. 2014).  Here,

there are plainly more than forty members of the class.  See Dkt. 3 (Bowers Decl.) at ¶ 5

(noting that between "December 18, 2016 and October 28, 2017" alone, "thousands of

Delivery Partners contracted to provide delivery services in the Commonwealth of

Massachusetts.").  Thus, the numerosity requirement is plainly satisfied.

**2.  The claims satisfy the commonality requirement**

"Rule 23(a)(2) has been construed permissively" such that "[a]ll questions of fact and

law need not be common to satisfy the rule."  Hanlon, 150 F.3d at 1019 When the claims arise

out of a companywide policy or practice, the commonality prerequisite is satisfied. See, e.g.,

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 9
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

1   Overka v. American Airlines, 265 F.R.D. 14, 18 (D. Mass. 2010) (the "commonality

2   requirement is usually satisfied" where "implementation of [a] common scheme is alleged").

3   Thus, courts "have found that commonality is met when the proposed class of plaintiffs

4   asserts that class members were improperly classified as independent contractors instead of

5   employees." Soto v. Diakon Logistics (Delaware), Inc., 2013 WL 4500693, *4 (S.D. Cal.

6   Aug. 21, 2013), clarified on denial of reconsideration, 2013 WL 5939787 (S.D. Cal. Nov. 5,

7   2013) (collecting cases).

8          This case readily satisfies the commonality requirement, because all Amazon Flex

9   delivery drivers in Massachusetts have been classified as independent contractors.  By its

10  plain terms, Mass. Gen. L. c. 149, § 148B's test is conjunctive, meaning that Amazon Flex

11  delivery drivers are Amazon's employees for purposes of the Massachusetts wage laws unless

12  Amazon can satisfy **all three** prongs of the test. See Somers v. Converged Access, Inc., 454

13  Mass. 582, 590-91 (2009) ("[U]nless [the defendant] were to prove at trial the three criteria

14  required to establish that the plaintiff was an independent contractor under G.L. c. 149, §148B

15  the plaintiff, as a matter of law, *was* an employee of [the defendant] *even if he was not hired*

16  *as an employee*.") (emphasis added).  Thus, under Massachusetts law, Plaintiff – and the

17  putative class - will be successful on their misclassification claims unless *the Defendants can*

18  *prove all of the following*: (1) that the drivers are free from Amazon's control and direction;

19  (2) that the drivers' services were performed outside of Amazon's usual course of business;

20  *and* (3) that the drivers were customarily engaged in an independently-established trade,

21  occupation, profession or business.  Mass. Gen. L. c. 149, § 148B(a).   While Plaintiff submits

22  that common evidence can be used to determine all three prongs, because the test is

23  conjunctive, and the inability for an alleged employer to establish just *one* prong results in a

24

25

26

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 10
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS–RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994–5800

finding of liability, commonality as to even one prong is sufficient to warrant certification. See, e.g., Costello v. Beavex, 810 F. 3d at 1060; see also James v. Uber Techs. Inc., 2021 WL 254303, at *7 (N.D. Cal. Jan. 26, 2021) (certifying class, based on commonality of Prongs A & B under California's identical ABC test); Moreno v. JCT Logistics, Inc., 2019 WL 3858999, at *13 (C.D. Cal. May 29, 2019) (certifying class on Prong B alone; "Because the type of work performed by the putative class members and the scope of Defendants' business are capable of determination on a classwide basis, the Court finds that common issues predominate under the ABC test."); Carr v. Flowers Foods, Inc., 2019 WL 2027299, at *20 (E.D. Pa. May 7, 2019) ("[B]ecause two of the three factors of the ABC test are readily provable through common evidence—and Plaintiffs need only establish one to prevail on their claim—their employee status is susceptible to class-wide determination."); see also DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 400 (D. Mass. 2017) (certifying class under prongs A and C); Martins v. 3PD, Inc., 2013 WL 1320454, at *6 (D. Mass. Mar. 28, 2013) (certifying class under Prongs A and B).

Certification is most obviously appropriate under Prong B of the "ABC" test, which requires the alleged employer to demonstrate that the work performed by the plaintiff is outside its usual course of business. See Mass. Gen. L. c. § 148B(a)(2). The defendant's "usual course of business" will obviously be proven through common evidence and will not vary from one worker to another. See Lowes, Ex. A, at *13 ("Lowe's either is in the businesses of kitchen and bath remodeling, or it isn't."); De Giovanni, 262 F.R.D. at 84–85 ("With respect to prong two, the defendants do not assert that any individualized issues would complicate the identification of (1) the types of businesses operated by the purported class or (2) the type of business operated by Jani–King…"); see also Johnson v. Serenity

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 11
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS–RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994–5800

Transportation, Inc., 2018 WL 3646540, at *11 (N.D. Cal. Aug. 1, 2018), aff'd, 802 F. App'x 250 (9th Cir. 2020) (certifying class under California's identical ABC test; "whether Plaintiffs provide services within Serenity's usual course of business is subject to common proof because Serenity defines itself as a mortuary transportation service and all drivers perform the same work: mortuary delivery services.").

Here, Amazon defines its *own* activities as including package delivery and logistics services – even in filings to the government.  For instance, in its 2020 Securities and Exchange Commission ("SEC") filing, Amazon states, "**[t]o increase sales of products and services, we focus on** improving all aspects of the customer experience, including lowering prices, improving availability, **[and] offering faster delivery and performance times**." Ex. C at p. 19.  Its filings frequently mention "order fulfillment" as a central part of its business, of which last-mile delivery is a critical component.  Id. at p. 3.  In press releases, Amazon promotes the Amazon Flex program as one of its "initiatives to ensure fast delivery speeds and supply chain capacity for its customers", alongside efforts like expanding its own cargo aircraft fleet and trucking capacity.  See Ex. G.  Amazon also holds itself out to the public as offering package delivery service, using the lure of unlimited free shipping to attract customers to its Amazon Prime membership program; its website touts free "One-day delivery", "Same-day delivery" and "2-hour grocery delivery." See Ex. E.  Its website also includes a "Shipping and Delivery" FAQ section, which includes an explanation of its Shipping Policies and subsections setting forth, for example, Amazon's "Delivery Guarantees", and Special Shipping Options. See Ex. F.  Indeed, Amazon-branded boxes and packages have become a familiar sight in many places, see Waithaka Decl. at ¶ 5, and public perception plainly considers Amazon to be in the business of fulfilling online retail orders

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 12
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

App. 83

through package delivery to its customers.  As a result, class certification is plainly warranted

in this case under Prong B because all members of the plaintiff class perform the same

services (delivery services) and whether that service forms part of Amazon's usual course of

business will be capable of common resolution across the class.[3]

While it is not necessary for Plaintiff to establish commonality under Prongs A and C,

adjudication of these prongs would likewise turn on common evidence.  Under Prong A, the

issue is whether the alleged employer has the *right* to exercise control over the worker's

performance.  DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 400 (D. Mass.

2017).  This question would go to Amazon's *contractual* right to control drivers, which would

be the same, based on Amazon's uniform contracts with drivers.  D'Italia, Civ. No. 11-4758-

BLS1 (Ex. 1 to Liss-Riordan Decl.) at *13.

Under Prong C, the issue is whether the worker is "customarily engaged in an

independently established" business of the same nature as the work performed for the putative

employer.  The Massachusetts Supreme Judicial Court in Coverall N. Am. V. Com'r of Div.

of Unemployment Assistance, 447 Mass. 852, 859 (2006), made clear that the relevant

examination under Prong C is whether the individual performs the services under his or her

own "hat", reflecting an independently established business, or wears the hat of the employer.

---

[3]      Amazon may argue that it has multiple courses of business, in addition to providing
order fulfillment and delivery service to customers.  However, Prong B does not require that
the services provided are in the defendant's *only* course of business.  See Carey v. Gatehouse,
92 Mass. App. Ct. 801, 806-07, 811 (2018) (affirming summary judgment for newspaper
delivery drivers under Prong B, holding that companies may have multiple courses of
business for purposes of Prong B, and drivers were employees where they provided services
within one of those courses of business; newspaper defendant was in the business of both
publishing and delivering the news).  See also Lawson v. Grubhub, Inc., 302 F.Supp.3d 1071,
1090 (N.D. Cal. 2018) (finding plaintiff delivery driver provided services within GrubHub's
usual course of business, even though GrubHub had multiple lines of business – including
food delivery, as well as providing marketing and online ordering platform for restaurants),
appeal pending, Case No. 18-15386 (9th Cir.).

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 13
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

App. 84

1    In Coverall, the Court held that a cleaning worker who was classified as an independent

2    contractor franchisee was actually an employee for unemployment purposes.  In that case, the

3    Court relied on the defendant's inability to satisfy Prong C because the cleaning worker –

4    even though she could work for other cleaning companies or could expand her business

5    beyond the clients assigned to her by the defendant – wore the "hat" of the defendant when

6    she was performing services for the defendant's customers.  Similarly, here, Plaintiff will

7    argue that Amazon drivers "wear the hat" of Amazon when they are transporting Amazon's

8    packages to Amazon's customers, not the hat of their own independent business.  Even if they

9    drive for other "gig economy" companies, or have their own independent delivery business,

10   when they transport packages for Amazon, they do so in the name of Amazon and subject to

11   Amazon's terms and policies, not in the name of their own independent businesses.

12       Thus, while commonality is clear in this case with respect to Prong B – and that is

13   sufficient for Plaintiff to win class certification, as well as their misclassification claim –

14   Plaintiff also satisfies the commonality test under Prongs A and C as well.  While Plaintiff

15   submits that commonality on the misclassification inquiry alone is sufficient for a class to be

16   certified,[4] if the Court believes it is necessary to address each of the claims Plaintiff has

17   asserted, Plaintiff notes here why each of these claims raises common issues as well.

18       First, the expense reimbursement claim is clearly subject to common proof.  Plaintiff

19   and members of the proposed class are engaged in a common type of job performing the same

20   task (i.e. delivering packages and other items to Amazon customers), which require them to

21   regularly incur a common set of expenses which principally include: gas, car maintenance, car

22

---

23   [4]    Courts routinely certify classes on the issue of misclassification, reserving for later the
     question of what specific wage violations may have occurred, and what damages result. See,
24   e.g., Garcia v. E.J. Amusements of New Hampshire, Inc., 98 F. Supp. 3d 277, 289 (D. Mass.
     2015); Salvas v. Wal-Mart Stores, Inc., 452 Mass. 337, 364 (Mass. 2008); O'Connor, 2015
25   WL 5138097, at *2 (certifying class for "the threshold employment classification question");
     James, 2021 WL 254303, at *12.
26

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 14
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

1  wear and tear, insurance, and phone data charges.  Amazon's policy is to require drivers to

2  provide their own vehicles and phones, see Ex. D, and its uniform compensation systems does

3  not reimburse drivers for any of these expenses. Ex. A to Lumba Decl. (Dkt. 31-2) at § 5(a);

4  Waithaka Decl. at ¶ 9. Thus, whether this policy violates Mass. Gen. L. c. 149 § 148 is a

5  question common to the class.[5]  When all workers are subject to a common employment

6  practice like this, the commonality requirement is plainly satisfied. See McLaughlin v. Liberty

7  Mut. Ins. Co., 224 F.R.D. 304, 309-10 (D. Mass. 2004) (commonality satisfied where

8  plaintiffs "were all employed by the defendant" and their claims arose "out of the same

9  policies and wrongful conduct of the [d]efendant, and [were] based on the same legal

10  theories"); see also James. v. Uber Techs. Inc., 2021 WL 254303, at *5 (N.D. Cal. Jan. 26,

11  2021) (commonality satisfied where plaintiff brought expense reimbursement claims as "the

12  question that will generate a common answer 'apt to drive the resolution of the litigation' is

13  whether the class member drivers were misclassified as independent contractors because Uber

14  failed to satisfy one or more prongs of the ABC test."), citing O'Connor v. Uber Techs. Inc.,

15  2015 WL 5138097, at *8 (N.D. Cal. Sept. 1, 2015) (same).

16

17  [5]      In Awuah v. Coverall North America Inc., 460 Mass. 484, 494 (2011), the
    Massachusetts Supreme Judicial Court ruled that workers who were misclassified as
18  independent contractors were entitled to reimbursement of fees they had to pay in order to
    obtain their jobs, as well as reimbursement for expenses such as insurance payments under the
19  Massachusetts Wage Act.  See also Camara v. Attorney Gen., 458 Mass. 756, 763 n. 11
    (2011) (a policy that "shifts to the ... employees some of what appear to be the ordinary costs
20  of doing business" violates the Wage Act); Massachusetts Delivery Ass'n v. Healey, 2015
    WL 4111413, *6 (D. Mass. July 8, 2015) (noting that liability under § 148B would require
21  courier company "to supply company vehicles to its couriers who currently use their own
    vehicles for deliveries, . . . [or] [a]lternatively, ...[to] forego investment in delivery vehicles
22  and instead reimburse courier-employees for the miles they drive in their own cars"); Martins
    v. 3PD, Inc., 2014 WL 1271761, *7-10 (D. Mass. Mar. 27, 2014) (delivery company violated
23  § 148 by requiring delivery drivers – who were adjudicated to be employees under Mass. Gen.
    L. c. 149 § 148B – to bear expenses, such as lease payments, administrative fees, uniforms,
24  chargebacks for physical damage caused during the delivery process, and various forms of
    insurance including liability insurance, vehicle insurance, and workers' compensation
25  insurance).

26
    PLAINTIFF'S MOTION FOR
    CLASS CERTIFICATION - 15
    Case No. 2:19-cv-01320-RSM

Likewise, Plaintiff's claims that Amazon has failed to pay minimum wage for all hours worked likewise satisfies the commonality requirement.  That Amazon does not ensure that its drivers are compensated at least minimum wage for each hour worked can be proven through common evidence, namely a review of drivers' pay records. Thus, all of Plaintiff's claims are susceptible to common proof, and the commonality requirement is satisfied.

### 3. Plaintiff satisfies the typicality requirement

Rule 23(a)(3) provides that class certification is appropriate where the claims of the representative plaintiffs are typical of the claims of the class as a whole.  Typicality is "not highly demanding because the claims only need to share the same essential characteristics, and need not be identical."  Payne, 216 F.R.D. at 24-25 (internal quotation marks and citation omitted); see also Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998) ("[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.").  "For purposes of demonstrating typicality, [a] sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." In re Relafen, 231 F.R.D. at 69 (internal quotation omitted); see also McLaughlin, 224 F.R.D. at 309-310 (typicality satisfied where plaintiffs "were all employed by the defendant" and their claims arose "out of the same policies and wrongful conduct of the [d]efendant, and [were] based on the same legal theories"); Dalton v. Lee Publications, Inc., 270 F.R.D. 555, 560 (S.D. Cal. 2010) ("Typicality is a permissive standard…"); Smith v. Cardinal Logistics Mgmt. Corp., 2008 WL 4156364, *1 (N.D. Cal. Sept. 5, 2008) ("Some degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality.").

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 16
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

App. 87

1    Here, there are no factual distinctions between Plaintiff Waithaka's claims and those

2    of putative class members.  Waithaka predicates his claims on Amazon's uniform practice of

3    misclassifying drivers as independent contractors (and failing to reimburse them for business

4    expenses and pay them minimum wage for all hours worked).  See Dkt. 1-1; Waithaka Decl.

5    ¶¶ 9-10. Indeed, the claims of the named plaintiff here are not merely typical of the claims of

6    the proposed class but are, in fact, identical. See Norris-Wilson v. Delta-T Grp., Inc., 270

7    F.R.D. 596, 605 (S.D. Cal. 2010) (noting that "[t]he injuries alleged—a denial of various

8    benefits—and the alleged source of those injuries—a sinister classification by an employer

9    attempting to evade its obligations under labor laws—are the same for all members of the

10   putative class" such that "[t]he typicality requirement is therefore satisfied").

11

12        **4.  Plaintiff and his counsel adequately represent the interests of the class**

13        To meet the adequacy requirement of Fed. R. Civ. P. 23(a)(4), courts require "(1) that

14   the proposed representative Plaintiffs do not have conflicts of interest with the proposed class,

15   and (2) that Plaintiffs are represented by qualified and competent counsel." Dalton, 270

16   F.R.D. at 560.  First, there is no potential conflict between Waithaka and the other class

17   members since they are challenging practices applied uniformly to all class members.

18   Similarly, Plaintiff Waithaka's interests do not differ from those of the class as a whole, in

19   that he seeks to benefit the proposed class by obtaining damages for those class members.[6]

20

21   ────────────────
     [6]      If Amazon attempts to argue that the named plaintiff is not an adequate class
22   representative because some Amazon Flex delivery drivers want to be classified as
     independent contractors, that argument should be rejected.  "It will almost always be the case
23   that some putative class members are happy with things as they are." Norris–Wilson, 270
     F.R.D. at 606.  Courts have regularly recognized that "an interest by certain putative class
24   members in maintaining the allegedly unlawful policy is not a reason to deny class
     certification." Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012) (rejecting
25   argument that intra-class conflict precluded class certification); see also O'Connor, 2015 WL
     5138097, at *13 (finding that even if some class members would prefer to remain independent
26

Additionally, Plaintiff has retained counsel with extensive expertise and experience in prosecuting wage and hour cases, in particular cases alleging independent contractor misclassification and with the resources to represent the class effectively.  Lichten & Liss-Riordan, P.C. has been widely recognized as one of the nation's leading plaintiffs' firms representing workers in wage and hour litigation. Attorney Liss-Riordan has been noted as one of the top plaintiffs' lawyers nationally for her work on behalf of low-wage workers in class actions. Liss-Riordan Decl. at ¶¶ 3-5.  She has obtained many ground-breaking victories in wage and hour and employment law, with a particular expertise in cases involving independent contractor misclassification.[7]  Thus, Plaintiff and his counsel have satisfied the

---

contractors, "courts have refused to find inadequacy on these grounds."); James, 2021 WL 254303, at *6 (same).

[7]     Attorney Liss-Riordan has been a leader and pioneer in the field of independent contractor misclassification over the last fifteen years, obtaining significant and first-of-their-kind victories in cases challenging misclassification in a variety of industries, including the gig economy, cleaning, trucking, adult entertainment, and call center industries.  See, e.g., James v. Uber Techs. Inc., (N.D. Cal. Jan. 26, 2021) 2021 WL 254303 (certifying class of Uber drivers claiming misclassification); Cotter v. Lyft, Inc., 60 F.Supp.3d 1067 (N.D. Cal. 2015) (denying the defendant's motion for summary judgment on drivers' misclassification claim); O'Connor v. Uber Technologies, Inc. 82 F.Supp.3d 1133 (N.D. Cal. 2015) (same).  Examples of other precedent-setting independent contractor cases she has litigated include Vazquez v. Jan-Pro Franchising Int'l , Inc., 986 F.3d 1106 (9th Cir. 2021) (reversing summary judgment in misclassification case and reinforcing strength of California ABC test); Awuah et al. v. Coverall North America, Inc., 460 Mass. 484 (2011) (in case where federal court held "franchisee" cleaning workers to have been misclassified as independent contractors, Mass. Supreme Judicial Court established the damages awardable for the misclassification, including refunds of "franchise fees"); Schwann et al v. FedEx Ground Package System, Inc., C.A. No. 11-cv-11094 (D. Mass. July 3, 2013) (granting plaintiffs' motion for summary judgment, holding FedEx drivers to have been misclassified as independent contractors), reversed on other grounds, 2015 WL 501512 (D. Mass. Feb. 05, 2015); Chaves v. King Arthur's Lounge, Inc., 2009 WL 3188948 (Mass. Super. Jul. 30, 2009) (finding exotic dancers to have been misclassified as independent contractors); see also Liss-Riordan Decl. at ¶¶ 3-7.
        Plaintiff's counsel has also associated with local counsel who are highly experienced in litigating class action wage and hour cases. Michael C. Subit of Frank Freed Subit & Thomas has spent his career litigating employment and civil rights cases.  He was named "Lawyer of the

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 18
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

App. 89

1    adequacy requirement of Rule 23(a).

2        **C. The Class Satisfies the Requirements of Rule 23(b)**

3        **1. Common questions predominate over questions affecting individual class
4            members**

5        "Predominance is satisfied upon showing that a sufficient constellation of common

6    issues bind class members together."  Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 296

7    (1st Cir. 2000).  The requirement is "merely that common issues predominate, not that all

8    issues be common to the class."  Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d

9    32, 39 (1st Cir. 2003).[8]  "A court evaluating predominance must determine whether the

10   elements necessary to establish liability [here, any of the § 148B's three prongs] are

11   susceptible to common proof or, if not, whether there are ways to manage effectively proof of

12   any element that may require individualized evidence."  Villalpando, 303 F.R.D. at 608.

13       Common questions regarding liability plainly predominate in this case for the same

14   reasons that the proposed class satisfies Rule 23(a)'s commonality requirement – the core

15   claims of all class members turn on the legality of Amazon's practice of classifying Amazon

16   Flex delivery drivers as independent contractors.  In the event the Court finds that it needs to

17   address Plaintiff's underlying claims for expense reimbursement and minimum wage, these

18   claims likewise turn on common issues – Amazon's failing to reimburse drivers for vehicle

19

20

21   _____

22   Year" in the field of Labor and Employment Litigation in Seattle in 2016 and has been named
     a Washington "Super Lawyer" in the area of Labor & Employment every year since 2001.  See
23   https://www.frankfreed.com/Our-Attorneys/Michael-C-Subit.aspx

24   [8]    "Where common questions predominate regarding liability, then courts generally find
     the predominance requirement to be satisfied . . . ."  In re Neurontin Mktg. and Sale Practices
25   Litig., 244 F.R.D. 89, 106 (D. Mass. 2007) (internal quotation marks and citations omitted).
     Thus, class certification is "appropriate where common issues of law and fact . . . form the
26   nucleus of a liability claim."  Smilow, 323 F.3d at 39.

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 19                          LICHTEN & LISS-RIORDAN, P.C.
Case No. 2:19-cv-01320-RSM                           729 Boylston Street, Suite 2000
                                                    Boston, Massachusetts 02116 ~ (617) 994-5800

App. 90

and telephone expenses,[9] and Amazon's not ensuring drivers receive minimum wage for all

hours worked.  However, many courts have certified classes on the misclassification issue

alone, deferring analysis of specific claims to a later stage.[10] Indeed, any individualized

questions (in terms of amounts of damages, etc.) are secondary to the predominant question of

whether drivers performed services in the usual course of Amazon's business (or whether they

performed services under its direction and control). Costello, 810 F.3d at 1060 ("Regardless

of which party wins, the common answer on prong two 'represent[s] a significant aspect of [a]

case and ... can be resolved for all members of [a] class in a single adjudication.'"), quoting

Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 815 (7th Cir. 2012); Martins, 2013

WL 1320454, at *6 ("That Part 2 of the Section 148B test presents common questions of law

and fact is beyond dispute. …The inquiry under Part 2 is whether delivery services were in

the usual course of 3PD's business. Not only does this present common issues of law and fact,

---

[9]      See O'Connor v. Uber Techs., Inc., 311 F.R.D. 547, 567 (N.D. Cal. 2015) (certifying class on expense reimbursement claim and holding that the commonality of phone and vehicle expenses is clear because "[t]o even access the Uber app, a smart phone and data plan is required" such that "like a vehicle, phone expenses are plainly required for every Uber driver, as it would be impossible to be an Uber driver without these items."); James v. Uber Techs. Inc., 2021 WL 254303, at *7 (N.D. Cal. Jan. 26, 2021) (certifying class on expense reimbursement claim based on drivers' vehicle and phone expenses).

[10]      Courts throughout the Ninth Circuit "have found that commonality is met when the proposed class of plaintiffs asserts that class members were improperly classified as independent contractors instead of employees." Soto v. Diakon Logistics (Delaware), Inc., 2013 WL 4500693, *4 (S.D. Cal. Aug. 21, 2013), clarified on denial of reconsideration, 2013 WL 5939787 (S.D. Cal. Nov. 5, 2013) (collecting cases); see also De Giovanni v. Jani-King Intern., Inc., 262 F. R. D. 71, 84-88 (D. Mass. Sep. 21, 2009) (certifying class of janitorial workers alleging they were misclassified as independent contractors under Massachusetts "ABC" test); Awuah v. Coverall North America, Inc., 843 F. Supp. 2d 172, 174 (D. Mass. Feb. 10, 2012) (same); DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 401 (D. Mass. 2017); Coverall N. Am.. Inc. v. Com'r of Div. of Unemployment Assistance, 447 Mass. 852, 859 (2006) (citing Boston Bicycle Couriers, Inc. v. Deputy Director of the Div. of Employment & Training, 56 Mass. App. Ct. 473, 480 (2002)).

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 20
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

but *only* evidence common to the class is relevant to this consideration"); <u>Salvas v. Wal-Mart Stores, Inc.</u>, 452 Mass. 337, 364 (2008) ("Class certification may be appropriate where common issues of law and fact are shown to form the nucleus of a liability claim, even though the appropriateness of class action treatment in the damages phase is an open question."); <u>Weld v. Glaxo Wellcome Inc.</u>, 434 Mass. 81, 92 (2001) (noting that even if "an individualized inquiry is necessary to determine damages…such a necessity at the damages stage does not preclude class certification where all other requirements are met." ). Thus, common issues predominate and class treatment is appropriate.

### 2.  A class action is the superior mechanism for addressing the drivers' claims

The superiority requirement is designed to ensure the "'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents to court at all.'" <u>Anchem Prods., Inc. v. Windsor</u>, 512 U.S. 591, 617 (1997).  A district court has "broad discretion" in determining whether class treatment is superior. <u>Kamm v. Cal. City Dev. Co.</u>, 509 F.2d 205, 210 (9th Cir.1975).

The following factors are pertinent to this analysis:

(A) the class members' interest in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Here, a class action is clearly a superior method.  It would be grossly inefficient to require each driver to individually bring a case challenging these practices, resulting in increased expense, duplication of discovery, and potentially inconsistent results. Moreover, that individual drivers might not vindicate their statutory rights would undermine

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 21
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS–RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994–5800

App. 92

the effectiveness of those rights, which protect workers and ensure fair competition.[11]

Moreover, "class adjudication is superior in the employment context because fear of employer retaliation may have a chilling effect on employees bringing claims on an individual basis." <u>Overka</u>, 265 F.R.D. at 24; <u>see also</u> <u>Perez v. Safety-Kleen Systems,Inc.</u>, 253 F.R.D. 508, 520 (N.D. Cal. 2008); <u>O'Brien v. Encotech Const. Servs., Inc.</u>, 203 F.R.D. 346, 350 (N.D. Ill. 2001) (noting that workers' fear of employer retaliation is "a very important concern" because the "nature of the economic dependency involved in the employment relationship is inherently inhibiting.").  Permitting Plaintiff to prosecute these claims on behalf of the proposed class meets these challenges and provides a superior method of resolving the claims of the putative class members.

Finally, this case offers a readily identifiable class of people in a limited geographical area (Massachusetts), which presents no unusual management problems.  Thus, for all these reasons, the superiority requirement of Rule 23(b) has been met.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiff's Motion for Class Certification. The class to be certified should include all Amazon Flex delivery drivers who have worked for Amazon in Massachusetts at any time since August 23, 2014.

---

[11]    <u>See</u> <u>Somers</u>, 454 Mass. at 592 (enforcement of wage laws is important not only because those laws protect employees, but because they protect the government and law-abiding competitors); <u>Salvas</u>, 452 Mass. at 368-69, 370-71 (emphasizing importance of class action device in enforcing wage laws and underscoring deterrence purpose of class actions) (citations omitted); <u>Martin v. Tango's Restaurant, Inc.</u>, 969 F.2d 1319, 1324 (1st Cir. 1992) (recognizing that wage laws are "intended to protect complying competitors of the defendants, in addition to making the employee whole"); <u>Western States Trucking Association v. Becerra</u> 2020 WL 1032348, at *3 (C.D. Cal., Mar. 2, 2020) (noting that complying companies may be "underbid by competitors that save costs by misclassifying their drivers as independent contractors").

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 22
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Respectfully submitted,

*s/ Shannon Liss-Riordan*
Shannon Liss-Riordan (*Pro Hac Vice*)
Harold L. Lichten (*Pro Hac Vice*)
Adelaide Pagano (*Pro Hac Vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
Fax: (617) 994-5801
Email: sliss@llrlaw.com
Email: hlichten@llrlaw.com
Email: apagano@llrlaw.com

*s/ Michael C. Subit*
Michael C. Subit, WSBA No. 29189
FRANK FREED SUBIT & THOMAS LLP
705 Second Avenue, Suite 1200
Seattle, Washington 98104-1729
Telephone: (206) 682-6711
Fax: (206) 682-0401
Email: msubit@frankfreed.com

*Attorneys for Plaintiffs*

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 23
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

1

## <u>CERTIFICATE OF SERVICE</u>

2   I hereby certify that I caused to be electronically filed the foregoing Motion for Class

3 Certification with the Clerk of Court using the CM/ECF system, which will automatically

4 send email notification of such filing to the registered attorneys of record.

5

6 DATED: May 14, 2021     _s/ Shannon Liss-Riordan_

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 24
Case No. 2:19-cv-01320-RSM

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116 ~ (617) 994-5800

App. 95

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BERNARD WAITHAKA,

    Plaintiff,

    v.

AMAZON.COM, INC., *et al.*,

    Defendants.

Case No. C19-1320RSM

ORDER STAYING PROCEEDINGS

    Before the Court is Defendants Amazon.com, Inc. and Amazon Logistics, Inc.'s ("Amazon") Motion to Stay (Dkt. #113), Amazon's Renewed Motion to Compel Arbitration (Dkt. #134) and Amazon's Notice of Supplemental Authority (Dkt. #146) filed pursuant to Local Civil Rule 7(n) an in support of their Renewed Motion to Compel Arbitration.  On January 30, 2023, the Court issued an Order to Show Cause why this case should not be stayed pending the outcome of *Carmona v. Domino's Pizza* in the Ninth Circuit.  Dkt. #150.  Defendant Amazon filed a response arguing this case should be stayed.  Dkt. #151.  Plaintiff Waithaka filed a response arguing this case should not be stayed.  Dkt. 152.  Having thoroughly considered the parties' briefing and the relevant record, the Court hereby STAYS this case pending (1) the Ninth Circuit's decision in *Carmona v. Domino's Pizza  LLC*, No. No. 21-55009 (9th Cir.) and (2) the Ninth Circuit's decision in *Miller v. Amazon.com*, Inc., No. 21-36048 (9th Cir.).

ORDER TO SHOW CAUSE
PAGE - 1

A district court has broad discretion to stay proceedings, incidental to the inherent power to control its own docket. *Clinton v. Jones*, 520 U.S. 681, 706 (1997) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). This power includes staying an action "pending resolution of independent proceedings which bear upon the case." *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). In determining whether to grant a stay pending the result of independent proceedings, courts consider three factors: (1) the orderly course of justice "measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay," (2) the hardship or inequity that a party may suffer in being required to go forward, and (3) the possible "damage" that may result from granting a stay. *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (quoting *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)).

As to the first factor, the Court finds that a stay will avoid the possibility that this Court's resolution on whether an Amazon Flex delivery driver is exempt from the Federal Arbitration Act will conflict with the Ninth Circuit's upcoming decisions. The legal landscape has become even more complex since the Court described it in its Order to Show Cause. First, the Court has already mentioned that in Amazon's Notice of Supplemental Authority it informed the Court that the Supreme Court had vacated the Ninth Circuit's decision in *Carmona v. Domino's Pizza*, LLC, 21 F.4th 627 (9th Cir. 2021), deciding that the Ninth Circuit's conclusion warrants "further consideration in light of *Southwest Airlines Co. v. Saxon*, 596 U.S. ___ (2022)." *Domino's Pizza, LLC v. Carmona*, 143 S.Ct. 361, 2022 WL 9552609, at *1 (U.S. Oct. 17, 2022). Second, in Amazon's Response to the Court's Order to Show Cause,

ORDER TO SHOW CAUSE
PAGE - 2

App. 97

it identified that the Honorable Barbara J. Rothstein has issued a stay in *Miller v. Amazon.com*, Inc., No. C21-0204-BJR, which also involves whether the Federal Arbitration Act exemption applies to Amazon Flex drivers (the same issue here), pending the Ninth Circuit's review of Judge Rothstein's denial of Amazon's motion to compel arbitration in which she applied *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020).  And finally, third, in *Rittmann v. Amazon.com, Inc.*, No. C16-1554-JCC itself, the Honorable John C. Coughenour has allowed the parties to file a renewed motion to compel arbitration in light of recent Supreme Court arbitration cases.  *See Rittmann v. Amazon.com, Inc.*, No. C16-1554-JCC, Dkt. #237).

As to the second and third factors, the Court does not take lightly the arguments made by Plaintiff Waithaka in his response to the Court's Order to Show Cause.  *See* Dkt. #152.  As Plaintiff explains, this case was filed more than five years ago and the issue of the applicability of the transportation worker exemption has been reviewed multiple times by multiple courts all in Plaintiff Waithaka's favor.  The Court is also aware that Amazon is the defendant in both *Rittman* and *Miller* and has sent this issue up and down the courts there as well.  Yet, this Court finds that the need to eliminate the potential for conflicting rulings and to promote judicial economy tips the scale in favor of a stay, especially given that decisions from the Ninth Circuit in *Carmona* and *Miller* are expected within a matter of months.

Accordingly, the Court hereby ORDERS:

1.  The current case management dates are VACATED, and this action is STAYED pending the Ninth Circuit's resolution in (1) *Carmona v. Domino's Pizza  LLC*, No. No. 21-55009 (9th Cir.); and (2) *Miller v. Amazon.com*, Inc., No. 21-36048 (9th Cir.).

2.  Amazon's Renewed Motion to Compel Arbitration (Dkt. #134) is STRICKEN.

ORDER TO SHOW CAUSE
PAGE - 3

3.  Amazon is ORDERED to refile its motion to compel arbitration, or file an updated

motion to compel arbitration, within fourteen (14) days after the date the Ninth Circuit

issues its mandate in *Carmona* or *Miller,* whichever is issued later.

DATED this 14th day of February, 2023.


RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER TO SHOW CAUSE
PAGE - 4

App. 99

THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

| | |
|---|---|
| 9 BERNARD WAITHAKA, | CASE NO. C19-1320-JCC |
| 10           Plaintiff, | ORDER |
| 11    v. | |
| 12 AMAZON.COM, INC., *et al.*, | |
| 13         Defendants. | |
| 14 | |

15      This matter comes before the Court on the parties' supplemental joint status report

16 ("JSR") (Dkt. No. 165), filed in response to the Court's minute order (Dkt. No. 164). The Court

17 indicated it will lift the stay and set a case management schedule, after considering a proposed

18 schedule from the parties. (*See generally id.*) Having duly considered that report and the record

19 in this matter, the Court hereby LIFTS the stay and establishes the following case management

20 deadlines, through class certification:

21      1.   Supplemental discovery responses – No later than June 14, 2024.[1]

22      2.   Concurrent deadlines for Motion for Class Certification and Motion to Compel

23            Arbitration – File no later than July 5, 2024. Opposition briefs are due August 5,

24            2024. Reply briefs are due August 20, 2024. Motions are to be noted for this date.

25
26

---

[1] Discovery is limited to the intervening period beginning September 25, 2019, when the stay in this matter was first entered. (*See* Dkt. No. 73.) The Court declines Defendants' request for a period and scope supplementation beyond what Plaintiff proposes.

ORDER
C19-1320-JCC
PAGE - 1

App. 100

1    It is so ORDERED this 14th day of May 2024.

2

3

4                                                   _____

5                                                   John C. Coughenour
                                                    UNITED STATES DISTRICT JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER
C19-1320-JCC
PAGE - 2

App. 101

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BERNARD WAITHAKA, on behalf of
himself and all others similarly situated,

Plaintiff,

v.

AMAZON.COM INC. and
AMAZON LOGISTICS, INC.,

Defendants.

Case No. 2:19-cv-01320-JCC

**PLAINTIFF'S RENEWED MOTION
FOR CLASS CERTIFICATION**

NOTE DATE:
August 28, 2024

ORAL ARGUMENT REQUESTED

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

i

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 102

## **Table of Contents**

I.    Introduction ................................................................................................. 1

II.   Factual Background ...................................................................................... 3

III.  Argument ...................................................................................................... 7

     A.    Legal Standard ................................................................................ 7

     B.    The Class Satisfies the Requirements of Rule 23(a) ........................ 8

          1.    Cass members are so numerous that joinder is impracticable. ............... 8

          2.    The claims satisfy the commonality requirement. .................................. 8

          3.    Plaintiff satisfies the typicality requirement. ....................................... 12

          4.    Plaintiff and his counsel adequately represent the interests of the class. ........................................................................................... 13

     C.    The Class Satisfies the Requirements of Rule 23(b) ...................... 14

          1.    Common questions predominate over questions affecting individual class members. ................................................................. 14

          2.    A class action is the superior method for addressing the drivers' claims ................................................................................. 19

IV.   Conclusion ................................................................................................. 20

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

ii

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

1

## Table of Authorities

2

3

**Cases**

4

Anchem Prods., Inc. v. Windsor,
    512 U.S. 591 (1997) ................................................... 19

5

6

Athol Daily News v. Board of Review of Div. of Employment & Training,
    439 Mass. 171 (2003) ............................................. 1, 9

7

Awuah v. Coverall N. Am., Inc.
    No. 1:07-cv-10287-WGY (D. Mass. Sept. 27, 2011).................... 2

8

9

Blackie v. Barrack,
    524 F.2d 891 (9th Cir. 1975) ........................................ 7

10

Carey v. Gatehouse Media Massachusetts I, Inc.
    92 Mass. App. Ct. 801 (2018) ...................................... 17

11

12

Carr v. Flowers Foods, Inc.
    2019 WL 2027299 (E.D. Pa. May 7, 2019)............................ 15

13

14

Chaves v. King Arthur's Lounge, Inc.,
    Suffolk C.A. No. 2007-2505 (Mass. Super. July 31, 2009) ............. 2

15

16

Costello v. BeavEx, Inc.,
    810 F.3d 1045 (7th Cir. 2016) ............................... 3, 15, 19

17

Cotter v. Lyft, Inc.,
    60 F.Supp.3d 1067 (N.D. Cal. 2015)................................ 14

18

19

Coverall N. Am. V. Com'r of Div. of Unemployment Assistance
    447 Mass. 852 (2006) ............................................. 18

20

21

Cruz v. Manlo Enterprises, Inc. d/b/a Mario's Showplace ("Mario's Showplace"),
    Worcester C.A. No. 2010-01931 (Mass. Super. June 10, 2011) .................... 2

22

Cutter v. HealthMarkets, Inc.,
    C.A. No. 1:10-cv-11488-JLT (D. Mass. July 26, 2011)................... 2

23

24

Da Costa v. Vanguard Cleaning Sys., Inc.,
    2017 WL 4817349 (Mass. Super. Sept. 29, 2017) ...................... 2

25

26

PLAINTIFFS' RENEWED MOT.                 **LICHTEN & LISS-RIORDAN, P.C.**
FOR CLASS CERTIFICATION      iii      729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                  Boston, MA 02116

Dalton v. Lee Publications, Inc.,
    270 F.R.D. 555 (S.D. Cal. 2010) ................................................................. 11

Darrow v. WKRP Mgmt., LLC,
    2011 WL 2174496 (D. Colo. June 3, 2011) ............................................. 11

DaSilva v. Border Transfer of MA, Inc.
    296 F. Supp. 3d 389 (D. Mass. 2017)................................................... 2, 15, 17

De Giovanni v. Jani-King Intern., Inc.,
    262 F. R. D. 71 (D. Mass. Sep. 21, 2009) ........................................... 2, 9, 16

D'Italia v. Lowe's Home Centers, Inc.,
    No. 11-4758-BLS1 (Suffolk Super. Ct. Dec. 12, 2012) .................... 2, 16, 17

Eisen v. Carlisle & Jacquelin,
    417 U.S. 156 (1974) ...................................................................................... 7

Furtado v. Republic Parking Sys., LLC,
    No. 19-CV-11481-DJC, 2020 WL 996849 (D. Mass. Mar. 2, 2020).......................... 11

Gammella v. P.F. Chang's China Bistro, Inc.
    120 N.E.3d 690 (2019) ................................................................................ 12

Gattuso v. Harte-Hanks Shoppers, Inc.,
    42 Cal.4th 554, 569 (2007) ......................................................................... 11

Gonzalez v. XPO Last Mile, Inc.,
    2022 WL 95930 (D. Mass. Jan. 10, 2022) .................................................. 18

Hanlon v. Chrysler Corp.,
    150 F.3d 1011 (9th Cir. 1998) ............................................................... 8, 12

Hogan v. InStore Grp., LLC,
    2021 WL 91386 (D. Mass. Jan. 11, 2021).................................................... 2

James v. Uber Techs. Inc.
    2021 WL 254303 (N.D. Cal. Jan. 26, 2021)............................... 10, 11, 14, 15

Johnson v. Serenity Transp., Inc.
    2018 WL 3646540 (N.D. Cal. Aug. 1, 2018), aff'd,
    802 F. App'x 250 (9th Cir. 2020) .............................................................. 16

Kamm v. Cal. City Dev. Co.,
    509 F.2d 205 (9th Cir.1975) ....................................................................... 19

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

iv

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 105

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Kirby v. Cullinet Software,
 116 F.R.D. 303 (D. Mass. 1987) ................................................. 8

Koral v. Inflated Dough, Inc.,
 2014 WL 4904400 (D. Co. Sept. 9, 2014)................................... 11

Lawson v. Grubhub, Inc.,
 302 F.Supp.3d 1071 (N.D. Cal. 2018)........................................ 17

Ludlow v. Flowers Foods, Inc.,
 2022 WL 2441295, at *6 (S.D. Cal. July 5, 2022) ...................... 15

Madrigal v. Tommy Bahama Grp., Inc.,
 2011 WL 10511339 (C.D. Cal. June 27, 2011).............................. 7

Martin v. Tango's Rest., Inc.,
 969 F.2d 1319 (1st Cir. 1992) ................................................... 20

Martins v. 3PD, Inc.
 2013 WL 1320454 (D. Mass. Mar. 28, 2013) ................. 1, 9, 15, 19

Massachusetts Delivery Ass'n v. Healey
 2015 WL 4111413 (D. Mass. July 8, 2015) ................................ 10

Matamoros v. Starbucks Corp.,
 699 F.3d 129 (1st Cir. 2012) .................................................... 13

McLaughlin v. Liberty Mut. Ins., 224 F.R.D. 304 (D. Mass. 2004) ................................ 10, 12

Meier v. MasTec N. Am., Inc.,
 Hampden C.A. No. 13-448 (Super. Ct. Jan. 6, 2015).................... 2

Messner v. Northshore Univ. HealthSystem,
 669 F.3d 802 (7th Cir. 2012) ................................................... 19

Mogel v. UNUM Life Ins. of Am.,
 677 F. Supp. 2d 362 (D. Mass. 2009)........................................... 7

Moreno v. JCT Logistics, Inc.
 2019 WL 3858999 (C.D. Cal. May 29, 2019).............................. 15

Muniz v. XPO Last Mile, Inc.,
 342 F.R.D. 189 (D. Mass. 2022) ................................................. 2

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                    v
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 106

_Neurontin Mktg. and Sale Practices Litig._,
    244 F.R.D. 89 (D. Mass. 2007) ................................................................... 14

_Norris-Wilson v. Delta-T Grp., Inc._,
    270 F.R.D. 596 (S.D. Cal. 2010) ................................................................ 13

_O'Brien v. Encotech Const. Servs., Inc._,
    203 F.R.D. 346  (N.D. Ill. 2001) ................................................................ 20

_O'Connor v. Uber Technologies, Inc._
    (N.D. Cal. 2015) 82 F.Supp.3d 1133 ....................................................... 14

_O'Connor v. Uber Techs., Inc._
    311 F.R.D. 547 (N.D. Cal. 2015) .............................................................. 10

_O'Connor v. Uber Techs., Inc._,
    2015 WL 5138097, at *2 (N.D. Cal. Sept. 1, 2015), _rev'd on other grounds_,
    904 F.3d 1087 (9th Cir. 2018) ..................................................................... 9

_Ouadani v. Dynamex Operations E., LLC_,
    405 F. Supp. 3d 149, (D. Mass. 2019) ........................................................ 2

_Overka v. American Airlines_,
    265 F.R.D. 14 (D. Mass. 2010) .............................................................. 8, 20

_Perez v. Safety-Kleen Systems,Inc._,
    253 F.R.D. 508, (N.D. Cal. 2008) ............................................................ 20

_Raposa v. Mardi Gras Ent., Inc._,
    Hampden C.A. No. 2010-00034 (Mass. Super. Dec. 11, 2013) .................... 2

_Relafen Antitrust Litig._,
    218 F.R.D. 337 (D. Mass. 2003) ................................................................ 8

_Reynolds v. City Express, Inc._,
    2014 WL 1758301 (Mass. Super. Jan. 8, 2014) .......................................... 2

_Rivera v. Holder_,
    307 F.R.D. 539 (W.D. Wash. 2015) ............................................................ 7

_Roman v. Jan-Pro Franchising Int'l Inc._,
    2022 WL 3046758 (N.D. Cal. August 2, 2022) ........................................ 15

_Salvas v. Wal-Mart Stores, Inc._,
    452 Mass. 337 (2008) .......................................................................... 19, 20

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION         vi
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 107

*Sampson v. Knight Transp., Inc.*,
    2020 WL 3050217 (W.D. Wash. June 8, 2020) ........................................................... 13

*Sandoval, et al. v. M.J.F. Bowery Corp. d/b/a/ Ten's Show Club*,
    29 Mass. L. Rptr. 11 (Essex Super. July 22, 2011) ...................................................... 2

*Simmons v. Kilnapp Enterprises, Inc.*,
    Essex C.A. No. 13-551 (Super. Ct. June 13, 2014) ..................................................... 2

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
    323 F.3d 32 (1st Cir. 2003) ......................................................................................... 14

*Somers v. Converged Access, Inc.*,
    454 Mass. 582 (2009) ............................................................................................ 11, 15

*Soto v. Diakon Logistics (Delaware), Inc.*
    2013 WL 4500693 (S.D. Cal. Aug. 21, 2013), *clarified on denial of reconsideration*,
    2013 WL 5939787 (S.D. Cal. Nov. 5, 2013) ................................................................ 9

*Soto v. Diakon Logistics (Delaware), Inc.*,
    2013 WL 4500693 (S.D. Cal. Aug. 21, 2013) .............................................................. 8

*Vaquero v. Ashley Furniture Indus., Inc.*,
    824 F.3d 1150 (9th Cir. 2016). ................................................................................... 12

*Vargas v. Spirit Delivery & Distrib. Servs., Inc.*,
    2017 WL 1115163 (D. Mass. Mar. 24, 2017) ............................................................. 2

*Vasquez v. Ye Olde Lamplighter II, Inc.*,
    Worcester C. A. No. 2011-1610-D (Mass. Super. Nov. 13, 2013) .............................. 2

*Villalpando v. Exel Direct Inc.*,
    303 F.R.D. 588 (N.D. Cal. 2014) ........................................................................... 8, 14

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d 296 (1st Cir. 2000) ....................................................................................... 14

*Weld v. Glaxo Wellcome Inc.*,
    746 N.E.2d 522 (2001) ................................................................................................ 19

*Zellagui v. MCD Pizza, Inc.*,
    59 F. Supp. 3d 712 (E.D. Pa. 2014) ............................................................................ 11

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

vii

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 108

**Statutes**

Massachusetts General L.c. 149 § 148B ..................................................... 1, 3, 15, 17

**Rules**

Fed. R. Civ. P. 23 ................................................................................... 1, 4, 13, 21

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                           viii
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 109

I.   **INTRODUCTION**

This case is brought on behalf of Amazon Flex drivers who have performed delivery services in Massachusetts for Defendants Amazon.com, Inc. and Amazon Logistics, Inc. (hereinafter "Amazon"). Plaintiff Bernard Waithaka alleges that he and other Amazon Flex delivery drivers are employees under Mass. Gen. L. c. 149 § 148B, and not independent contractors as Amazon has classified them. As a result of their misclassification, these drivers have been forced to bear expenses necessary to perform their job and have not been paid the minimum wage for all hours worked. These drivers also work beyond their scheduled shift to complete deliveries, without additional compensation. Plaintiff now moves for class certification under Fed. R. Civ. P. 23 for all individuals who have worked as Amazon Flex drivers in Massachusetts at any time since August 23, 2014.[1]

Class treatment is appropriate because adjudication of the putative class's claims for expense reimbursement under Mass. Gen. L. c. 149 § 148 and minimum wages under Mass. Gen. L. c. 151 §§ 1, 7 turn on the same legal question—whether Amazon Flex drivers are independent contractors or employees under Massachusetts law, Mass. Gen. L. c. 149 § 148B. Massachusetts courts have consistently recognized that it makes little sense to determine the classification of groups of workers on an individualized basis. See Athol Daily News v. Board of Review of Div. of Employment & Training, 439 Mass. 171, 181 n.14 (2003) (recognizing that inquiries into each worker's circumstances, rather than the nature of the services, would lead to inconsistent determinations for workers performing identical services); Martins v. 3PD, Inc., 2013 WL 1320454, at *8-9 (D. Mass. Mar. 28, 2013) ( "a company's employee-classification scheme applies to all individuals classified under it," making class treatment proper); De Giovanni v. Jani-King Int'l, Inc., 262 F.R.D. 71, 85 (D. Mass. 2009) (recognizing "strong

---

[1]   Plaintiffs' claims extend three years prior the Complaint's filing on August 23, 2017. See Mass. Gen. L. c. 149 § 150; Mass. Gen. Laws c. 151 § 20A.

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                           1
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

1  preference for rendering decisions on the classification of employees on class wide basis").

2     Thus, courts considering whether workers are employees or independent contractors

3  under Massachusetts law—which applies a strict, conjunctive "ABC" test to determine

4  employee status—have consistently certified class actions.[2]  Indeed, claims under the

5  Massachusetts Independent Contractor Law, Mass. Gen. L. c. 149 § 148B, are especially

6  suitable for certification because common evidence is used to determine whether the plaintiff's

7  work is outside the defendant's usual course of business under the ABC test's second prong. See

8  D'Italia v. Lowe's Home Centers, Inc., No. 11-4758-BLS1 (Suffolk Super. Ct. Dec. 12, 2012)

9  (Billings, J.) (Ex. 1 to Liss-Riordan Decl.) at *13; De Giovanni, 262 F.R.D. at 85 ("common

10  issues will predominate to determine whether the services performed by the class fall outside of

11  Jani–King's usual course of business").

12

13  _____

14  [2]     See, e.g., Muniz v. XPO Last Mile, Inc., 342 F.R.D. 189, 196 (D. Mass. 2022)
   Hogan v. InStore Grp., LLC, 2021 WL 91386 (D. Mass. Jan. 11, 2021); Ouadani v. Dynamex

15  Operations E., LLC, 405 F. Supp. 3d 149, 153 (D. Mass. 2019); DaSilva v. Border Transfer of
   MA, Inc., 2017 WL 5196382 (D. Mass. Nov. 9, 2017); Vargas v. Spirit Delivery & Distribution

16  Servs., Inc., 245 F. Supp. 3d 268, 273 (D. Mass. 2017); Da Costa v. Vanguard Cleaning Sys.,
   Inc., 2017 WL 4817349 (Mass. Super. Sept. 29, 2017); Vargas v. Spirit Delivery & Distribution

17  Servs., Inc., 2017 WL 1115163 (D. Mass. Mar. 24, 2017); Meier v. MasTec North America,
   Inc., Hampden C.A. No. 13-448 (Super. Ct. Jan. 6, 2015) (Ex. 2 to Liss-Riordan Decl.);

18  Simmons v. Kilnapp Enterprises, Inc., Essex C.A. No. 13-551 (Super. Ct. June 13, 2014) (Ex. 3
   to Liss-Riordan Decl.); Reynolds v. City Express, Inc., 2014 WL 1758301 (Mass. Super. Jan. 8,

19  2014); Raposa v. Mardi Gras Entertainment, Inc., Hampden C.A. No. 2010-00034 (Mass. Super.

20  Dec. 11, 2013) (Ex. 4 to Liss-Riordan Decl.); Vasquez v. Ye Olde Lamplighter II, Inc., No.
   2011-1610-D (Mass. Super. Nov. 13, 2013) (Ex. 5 to Liss-Riordan Decl.); D'Italia v. Lowe's

21  Home Centers, Inc., No. 11-4758 (Suffolk Super. Dec. 12, 2012) (Exhibit 1 to Liss-Riordan
   Decl.); Awuah v. Coverall North America, Inc., Case No. 1:07-cv-10287, Dkt. 365 (D. Mass.

22  Sept. 27, 2011); Cutter v. HealthMarkets, Inc., C.A. No. 1:10-cv-11488-JLT (D. Mass. July 26,

23  2011), Dkt. No. 57; Sandoval, et al. v. M.J.F. Bowery Corp. d/b/a/ Ten's Show Club, 2011 WL
   5517330 (Essex Super. July 22, 2011); Cruz v. Manlo Enterprises, Inc. d/b/a Mario's

24  Showplace, Worcester C.A. No. 2010-01931 (Mass. Super. June 10, 2011) (Ex. 6 to Liss-
   Riordan Decl.); De Giovanni v. Jani-King Intern., Inc., 262 F.R.D. 71, 84-88 (D. Mass. Sep. 21,

25  2009); Chaves v. King Arthur's Lounge, Inc., Suffolk C.A. No. 2007-2505 (Mass. Super. July

26  31, 2009) (Ex. 7 to Liss-Riordan Decl.).

PLAINTIFFS' RENEWED MOT.                            **LICHTEN & LISS-RIORDAN, P.C.**
FOR CLASS CERTIFICATION            2               729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                         Boston, MA 02116

Because a defendant must satisfy all three prongs of the ABC test, courts have certified classes when commonality exists under only one prong. For instance, Prong B usually warrants certification because it turns on an inherently common (and dispositive) question—are the workers' services within the defendant's usual course of business. See note 2; Costello v. BeavEx, Inc., 810 F.3d 1045, 1060 (7th Cir. 2016) (holding that class certification may be granted when commonality and predominance exists on only Prong B).

Fed. R. Civ. P. 23's four requirements— numerosity, commonality, typicality, and adequacy—are all satisfied here. Thousands of individuals have worked as Amazon Flex drivers in Massachusetts during the relevant period, making joinder impracticable. The misclassification issue at the heart of this case is common to all those delivery drivers, as are the consequences of that misclassification. Plaintiff's experiences as an Amazon Flex driver are shared by the putative class members, and Plaintiff will serve as an adequate representative because there is no conflict between his interests and those of the class. Likewise, Plaintiff's attorneys are adequate class counsel based on their substantial experience in wage-and-hour class actions involving independent contractor misclassification under Massachusetts law.

This case also satisfies the two requirements of Fed. R. Civ. P. 23(b). Common questions predominate over individual damages issues. And a class action is superior to thousands of identical claims. For these reasons, the class should be certified.

## II.   FACTUAL BACKGROUND

Amazon is an electronic retailer and logistics company based in Seattle, Washington, which does business throughout the country, including in Massachusetts, where it fulfills customer orders using delivery drivers. See Ex. A to Liss-Riordan Decl. at p. 3 ("We fulfill customer orders in a number of ways…"; describing seller services, "We offer programs that enable sellers to grow their businesses, sell their products in our stores, and fulfill orders through us."). Order fulfillment covers the process from when a sale takes place through delivery to the

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                    3
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

1  customer, and so it necessarily involves package delivery.

2       Amazon promotes efficient delivery as a key offering to its customers. See Ex. A at p. 3

3  (describing its consumer services: "We seek to offer our customers low prices, fast and free

4  delivery, easy-to-use functionality, and timely customer service."). Amazon's website provides a

5  "Shipping and Delivery" FAQ section, which includes an explanation of its Shipping Policies

6  and subsections setting forth, for example, Amazon's "Delivery Guarantees", and Special

7  Shipping Options (e.g., how to instruct the delivery driver to leave a large item for delivery on

8  the "front porch", "inside the entryway", or "room of choice"). See Ex. F. Besides its regular

9  delivery services, Amazon offers a Prime membership program that touts free "One-day

10 delivery", "Same-day delivery" and "2-hour grocery delivery." See Ex. E ("More of what you

11 love, delivered in more ways"); see also Ex. A at p. 3 ("[W]e offer Amazon Prime, a

12 membership program that includes unlimited free shipping on over 100 million items…"). Ex. H

13 (Amazon's tagline for the Flex program: "[T]hank you for delivering smiles with us!").

14 Amazon's 2020 SEC Report describes "faster delivery" offerings as central to its business

15 model and planned growth. See Ex. A at 3. Indeed, Amazon identifies its "ability to… fulfill

16 orders" and "the extent to which [it] offer[s] fast and free delivery" and "invest[s] in ..

17 fulfillment" as key factors in its growth. Id. at 9; see also id. at 19.

18       Amazon considers its competitors to be other companies whose usual course of business

19 is fulfillment and delivery.[3] Id. at p. 4 ("Our current and potential competitors include:…

20 (5) **companies that provide fulfillment and logistics services for themselves** or for third

21 parties, whether online or offline"); id. at p. 6. Amazon has also sought to grow its business by

22 ensuring faster delivery through Amazon Flex drivers. See Ex. G ("Amazon has launched

23 several initiatives to ensure fast delivery speeds and supply chain capacity for its customers,

24 including … Amazon Flex"); see also Ex. A at p. 20.

25 _____

26 [3]

PLAINTIFFS' RENEWED MOT.                                    **LICHTEN & LISS-RIORDAN, P.C.**
FOR CLASS CERTIFICATION                 4              729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                                   Boston, MA 02116

App. 113

Amazon Flex drivers work in more than 50 cities in the United States, including in Massachusetts. See Ex. B. Amazon decides when to hire more Amazon Flex drivers based on its own needs, and it limits the number of spots available for new drivers accordingly. Id. Drivers must download the Amazon Flex Application on their phone and can then sign up for shifts or "delivery blocks" as they are known by Amazon. See Ex. C; see also Declaration of Bernard Waithaka ("Waithaka Decl.") at ¶ 4. Shifts are typically anywhere from two to six hours. See Ex. D; see also Waithaka Decl. ¶ 4; Ex. L (Hawrysz Dep.) at 73.

The Amazon Flex Application directs drivers to a start location for each shift, such as an Amazon warehouse, and once there, drivers are assigned items to deliver by Amazon personnel and a route that directs them where to make deliveries. Ex. C; see also Waithaka Decl. ¶¶ 5-6; Ex. L (Hawrysz Dep.) at 52; 101; 114. Drivers must scan each item at the warehouse and must scan them again, using the Application and in most cases, must take pictures of where the packages are left. Waithaka Decl. ¶ 6; Ex. L (Hawrysz Dep.) at 27-28; 115-16; 53-54. Drivers must personally deliver their packages and cannot allow others to fill in for them. Ex. L (Hawrysz Dep.) at 59 (drives "need to deliver their own packages" and cannot hire employees to make deliveries in their stead). Amazon uses mandatory facial recognition checks to verify that only the Amazon Flex driver is making deliveries. Id. at 60. Undelivered packages at the end of a shift must returned to Amazon. Ex. L (Hawrysz Dep.) at 27-28.[4]

Drivers may be penalized for many reasons, including: (1) if they deliver items late, outside the prescribed window set by Amazon, (2) if a customer does not receive an item that the driver marks as having been delivered, (3) if the driver does not return undeliverable packages to the delivery station at the end of his or her shift, or (4) if the driver fails to follow

---

[4]    Amazon's own Rule 30(b)(6) witness confirmed that the process is the same, regardless of whether the delivery is of traditional brown boxes, a "Prime Now" delivery, or Whole Foods groceries. Ex. L (Hawrysz Dep.) at 24-28; see also Ex. M (Waithaka Dep.), at 150-51.

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

5

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

1   customers' preferences regarding where and how to deliver items. See Ex. A to Lumba Decl.

2   (Dkt. 31-2) at pp. 8-9; see also Waithaka Decl. ¶ 8; Ex. L (Hawrysz Dep.) at 75; 78-79; Ex. H;

3   Ex. K (showing contractual service standards).

4         Drivers can cancel a shift up to 45 minutes ahead of time, but cancelling outside this

5   window may result in their termination. Ex. C; see also Waithaka Decl. ¶ 8; Ex. L (Hawrysz

6   Dep.) at 117-18; 79. In 2021, Amazon started a "points" system whereby drivers have points

7   given or taken away based on their reliability, timely cancellation, and delivery quality. Amazon

8   can choose to terminate or "offboard" drivers based on their "points." Waithaka Decl. ¶ 8.

9         Amazon maintains records of "planned mileage" for each delivery route—generated by

10   Amazon—and if the driver follows Amazon's route, they will drive the same number of miles as

11   the "planned mileage." Ex. L (Hawrysz Dep.) at 107; Liss-Riordan Decl. ¶ 20. Likewise,

12   Amazon maintains time stamps and locations for when and where each item was picked up and

13   when and where each item was delivered. Ex. L (Hawrysz Dep.) at 114; 100-01; Liss-Riordan

14   Decl. ¶ 20.

15         Amazon's contract with its Amazon Flex drivers uniformly classifies the drivers as

16   independent contractors. See, e.g., Ex. A to Lumba Decl. (Dkt. 31-2) at § 2 ("This Agreement

17   creates an independent contractor relationship, not an employment relationship."); see also Ex.

18   K (comparing contracts over time). Likewise, Amazon's contract uniformly requires that drivers

19   "will provide and maintain a mobile device compatible with the Amazon Flex app" and "any

20   vehicle identified by you within the Amazon Flex app", with which to make deliveries. Id. at §

21   5(a); see also Ex. K. Vehicles must be 4-door, midsize sedans or larger. See Ex. D at *3. Drivers

22   are paid what Amazon terms "service fees" in exchange for every shift or "block", and Amazon

23   advertises that drivers will make between $18- $25 per hour in service fees while making

24   deliveries. Id. Amazon unilaterally sets the service fees. Ex. A to Lumba Decl. (Dkt. 31-2) at §

25   3; see also Waithaka Decl., ¶ 7; Ex. L (Hawrysz Dep.) at 129. Amazon processes drivers'

26

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION     6
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 115

1  payments and pays them by direct deposit twice weekly. <u>See</u> Ex. D at *3; Ex. C at *8; Ex. L

2  (Hawrysz Dep.) at 97. Amazon's pay formula does not ensure that drivers receive at least

3  minimum wage.  Waithaka Decl., ¶ 10; Ex. L (Hawrysz Dep.) at 130; 88-93. Amazon has also

4  knowingly allowed Amazon Flex drivers to work more than forty hours per week during the

5  holiday season and promotional days (e.g., Cyber Monday) but does not pay them overtime. Ex.

6  L (Hawrysz Dep.) at 96.

7      Plaintiff, like all other Amazon delivery drivers in Massachusetts, performed deliveries

8  pursuant to Amazon's policies. Plaintiff Waithaka currently drives for Amazon Flex and has

9  done so since January 2017. Waithaka Decl., ¶ 3-4.

10 **III.   ARGUMENT**

11     **A.   Legal Standard**

12     Fed. R. Civ. P. Rule 23 provides courts with "broad discretion" to determine whether to

13 certify a class action. <u>See</u> <u>Rivera v. Holder</u>, 307 F.R.D. 539, 545 (W.D. Wash. 2015); <u>Mogel v.</u>

14 <u>UNUM Life Ins. of Am.</u>, 677 F. Supp. 2d 362, 365 (D. Mass. 2009). In exercising that

15 discretion, courts must be mindful of the liberal standard governing class certification. <u>Payne v.</u>

16 <u>Goodyear Tire & Rubber Co.</u>, 216 F.R.D. 21, 24-25 (D. Mass. 2003). "The court is bound to

17 take the substantive allegations of the complaint as true" in determining the appropriateness of

18 class certification. <u>Blackie v. Barrack</u>, 524 F.2d 891, 901 n. 17 (9th Cir. 1975).

19     In deciding a motion for class certification, courts focus on whether the requirements of

20 Rule 23 have been satisfied. <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 178 (1974). To obtain

21 certification, Plaintiff must show that the case meets all four requirements of Rule 23(a)

22 (numerosity, commonality, typicality, and adequacy) and satisfies the "predominance" and

23 "superiority" requirements of Rule 23(b)(3). <u>Id.</u>  As described below, these categories are all

24 satisfied here, and the Court can and should now certify a class of all individuals who have

25 worked as Amazon Flex delivery drivers in Massachusetts at any time since August 23, 2014.

26

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION          7
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

**B.     The Class Satisfies the Requirements of Rule 23(a)**

    **1.     Cass members are so numerous that joinder is impracticable.**

A plaintiff will satisfy the numerosity requirement if "the class is so large that joinder of all members is impracticable." Hanlon v. Chrysler Corp., 150 F 3d 1011, 1019 (9th Cir. 1998). Plaintiff need not prove the precise size of the class, as the Court may make "common sense assumptions" in finding numerosity. Kirby v. Cullinet Software, 116 F.R.D. 303, 306 (D. Mass. 1987). Classes of 35-40 individuals are numerous enough to warrant class certification. See, e.g., In re Relafen Antitrust Litig., 218 F.R.D. 337, 342 (D. Mass. 2003); Villalpando v. Exel Direct Inc., 303 F.R.D. 588, 605-06 (N.D. Cal. 2014). Here, there are plainly more than forty class members. See Dkt. 3 (Bowers Decl.) at ¶ 5 (noting that between "December 18, 2016 and October 28, 2017," "thousands of Delivery Partners contracted to provide delivery services in the Commonwealth of Massachusetts."). The numerosity requirement is satisfied.

    **2.     The claims satisfy the commonality requirement.**

"Rule 23(a)(2) has been construed permissively" such that "[a]ll questions of fact and law need not be common to satisfy the rule." Hanlon, 150 F.3d at 1019. When the claims arise out of a companywide practice, the commonality prerequisite is satisfied. See, e.g., Overka v. American Airlines, 265 F.R.D. 14, 18 (D. Mass. 2010) (the "commonality requirement is usually satisfied" where "implementation of [a] common scheme is alleged"). Thus, courts "have found that commonality is met when the proposed class of plaintiffs asserts that class members were improperly classified as independent contractors instead of employees." Soto v. Diakon Logistics (Delaware), Inc., 2013 WL 4500693, *4 (S.D. Cal. Aug. 21, 2013), clarified on denial of reconsideration, 2013 WL 5939787 (S.D. Cal. Nov. 5, 2013) (collecting cases).

This case readily satisfies the commonality requirement. All Amazon Flex drivers in Massachusetts have been classified as independent contractors. "Both the United States Supreme Court and the Massachusetts Supreme Judicial Court have expressed a strong preference for

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

8

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 117

1   rendering decisions on the classification of employees on class wide basis." De Giovanni v.

2   Jani-King Int'l, Inc., 262 F.R.D. 71, 85 (D. Mass. 2009); see also Athol Daily News, 439 Mass.

3   at 181 n.14; Martins, 2013 WL 1320454, at *8-9; Soto v. Diakon Logistics (Delaware), Inc.,

4   2013 WL 4500693, *4 (S.D. Cal. Aug. 21, 2013), clarified on denial of reconsideration, 2013

5   WL 5939787 (S.D. Cal. Nov. 5, 2013) (collecting cases); O'Connor v. Uber Techs., Inc., 2015

6   WL 5138097, at *2 (N.D. Cal. Sept. 1, 2015), rev'd on other grounds, 904 F.3d 1087 (9th Cir.

7   2018) ("[T]here is inherent tension between this argument and Uber's position on the merits: on

8   one hand, Uber argues that it has properly classified *every single driver* as an independent

9   contractor; on the other, Uber argues that individual issues with respect to each driver's "unique"

10  relationship with Uber so predominate that this Court (unlike, apparently, Uber itself) cannot

11  make a classwide determination of its drivers' proper job classification.").

12       Likewise, the expense reimbursement claim is subject to common proof. Plaintiff and

13  putative class members are engaged in a common type of job performing the same task

14  (delivering packages and other items to Amazon customers), which require them to regularly

15  incur a common set of expenses which include gas, car maintenance, car wear and tear,

16  insurance, and phone data charges. Waithaka Decl. ¶ 9; Ex. C at *1. Amazon's policy is to

17  require drivers to provide their own vehicles and phones, see Ex. D at *2, and its uniform

18  compensation systems does not reimburse drivers for any of these expenses. Ex. A to Lumba

19  Decl. (Dkt. 31-2) at § 5(a); Waithaka Decl. ¶ 9; Ex. L (Hawrysz Dep.) at 92:19-93:2 ("The

20  pricing is not being generated on kind of a route-by-route basis."). Thus, whether this policy

21  violates Mass. Gen. L. c. 149 § 148 is a question common to the class.[5] When all workers are

22  _____

23  [5]     In Awuah v. Coverall North America Inc., 460 Mass. 484, 494 (2011), the Massachusetts
         Supreme Judicial Court ruled that workers who were misclassified as independent contractors

24       were entitled to reimbursement of fees they had to pay to obtain their jobs, along with
         reimbursement for expenses like insurance payments under the Massachusetts Wage Act.  See

25  also Camara v. Attorney Gen., 458 Mass. 756, 763 n. 11 (2011) (a policy that "shifts to the …
         employees some of what appear to be the ordinary costs of doing business" violates the Wage

26

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                    9
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

1  subject to a common employment practice like this, the commonality requirement is satisfied.

2  See McLaughlin v. Liberty Mut. Ins., 224 F.R.D. 304, 309-10 (D. Mass. 2004) (commonality

3  satisfied where plaintiffs "were all employed by the defendant" and their claims arose "out of

4  the same policies and wrongful conduct of the [d]efendant, and [were] based on the same legal

5  theories"); O'Connor v. Uber Techs., Inc., 311 F.R.D. 547, 567 (N.D. Cal. 2015) ("[t]o even

6  access the Uber app, a smart phone and data plan is required" such that "like a vehicle, phone

7  expenses are plainly required for every Uber driver, as it would be impossible to be an Uber

8  driver without these items."); Id. at 566 ("certifying vehicle-related and phone expenses will not

9  cause individualized issues to predominate."); James, 2021 WL 254303, at *7 (same). Amazon

10  has tracked "planned mileage" for its delivery routes and has information on where the packages

11  were picked up and dropped off. Ex. L (Hawrysz Dep.) at 107:18-25; Ex. L. From this

12  information, damages are easily ascertainable, using the IRS reimbursement rate.[6] See, e.g.,

13  O'Connor, 311 F.R.D. at 566 (certifying expense claim for mileage driven for Uber; approving

14  use of IRS reimbursement rate); James, 338 F.R.D. at 139; Furtado v. Republic Parking Sys.,

15  LLC, 2020 WL 996849, at *5 (D. Mass. Mar. 2, 2020) (endorsing mileage expense

16  reimbursement under Massachusetts law).[7]

17  _____

18  Act); Massachusetts Delivery Ass'n v. Healey, 2015 WL 4111413, *6 (D. Mass. July 8, 2015)
(noting that liability under § 148B would require courier company "to supply company vehicles

19  to its couriers who currently use their own vehicles for deliveries, . . . [or] [a]lternatively, …[to]
forego investment in delivery vehicles and instead reimburse courier-employees for the miles

20  they drive in their own cars"); Martins, 2014 WL 1271761, *7-10 (delivery company violated §

21  148 by requiring delivery drivers – who were adjudicated to be employees under Mass. Gen. L.
c. 149 § 148B – to bear expenses).

22  [6]      The mileage records Waithaka kept on his own would not be the basis for calculating his
damages; these are records that Waithaka kept because Amazon did not provide him or other

23  Amazon Flex drivers with access to the mileage it calculated for each delivery route, forcing
him to keep his own imperfect records for the purpose of filing his taxes.

24
[7]      See also Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal.4th 554, 569 (2007) (IRS

25  reimbursement rate is considered a generally permissible measure of vehicle expenses); Dalton
v. Lee Publications, Inc., 270 F.R.D. 555, 564 (S.D. Cal. 2010); Zellagui v. MCD Pizza, Inc., 59

26

PLAINTIFFS' RENEWED MOT.                                    **LICHTEN & LISS-RIORDAN, P.C.**
FOR CLASS CERTIFICATION                  10              729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                                        Boston, MA 02116

App. 119

1    Amazon may argue that each class member would need to prove that they incurred

2    necessary expenses *that exceeded* the expenses Amazon allegedly already included in its base

3    pay. Any such argument is unavailing under Massachusetts law. See Somers v. Converged

4    Access, Inc., 454 Mass. 582, 594 (2009) (rejecting defendants' argument that "had they known

5    they were obliged to pay overtime, they would have paid the employee a lower wage for the first

6    forty hours worked in a week."). But such arguments go to the merits, and what matters for class

7    certification is that drivers are compensated uniformly through service fees that Amazon

8    unilaterally set (and which do not include a set mileage component or other portion that is

9    denominated as expense reimbursement). Indeed, Amazon's Rule 30(b)(6) deponent made clear

10   that pay is not set differently depending on the length of a particular route or how much mileage

11   a driver is likely to incur to for a set of deliveries. See Ex. L (Hawrysz Dep.) at 92-93 ("The

12   pricing is not being generated on kind of a route-by-route basis.").

13   Finally, Plaintiff's claims that Amazon has failed to pay minimum wage for all hours

14   worked likewise satisfies the commonality requirement. Because Amazon keeps records of

15   when individual deliveries are made, it will be simple to determine hours for which drivers were

16   unpaid by comparing the time of the shift or "block" for which drivers were paid versus the

17   actual time it took drivers to deliver all of their assigned packages. It does not matter if

18   Waithaka or other class member sometimes finished his shifts early; Amazon's records show

19   when he and other class members worked longer (or shorter) than scheduled as they show when

20   they picked up and dropped off packages, allowing for calculation of their hourly rates, both

21   before and after their mileage expenses are considered. Even if this calculation did require an

22   individualized inquiry, it is well recognized that "damage calculations alone cannot defeat class

23

24   _____

25   F. Supp. 3d 712, 721 (E.D. Pa. 2014); Koral v. Inflated Dough, Inc., 2014 WL 4904400, *3 (D.
     Co. Sept. 9, 2014); Darrow v. WKRP Mgmt., LLC, 2011 WL 2174496, *4 (D. Colo. June 3,

26   2011).

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                    11
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 120

1    certification." <u>Vaquero v. Ashley Furniture Indus., Inc.</u>, 824 F.3d 1150, 1155 (9th Cir. 2016).

2    Likewise, the fact that some drivers may not have minimum wage claims does not preclude class

3    certification. <u>See</u> <u>Gammella v. P.F. Chang's China Bistro, Inc.</u>, 120 N.E.3d 690, 701 (Mass.

4    2019); <u>Cope v. Let's Eat Out, Inc.</u>, 319 F.R.D. 544, 555 (W.D. Mo. 2017).

5                    **3.        Plaintiff satisfies the typicality requirement.**

6            Rule 23(a)(3) provides that class certification is appropriate where the claims of the

7    representative plaintiffs are typical of the claims of the class as a whole. Typicality is "not

8    highly demanding because the claims only need to share the same essential characteristics, and

9    need not be identical." <u>Payne</u>, 216 F.R.D. at 24-25 (internal quotation marks and citation

10   omitted); <u>see also</u> <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1020 (9th Cir. 1998)

11   ("[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent

12   class members; they need not be substantially identical."). "For purposes of demonstrating

13   typicality, [a] sufficient nexus is established if the claims or defenses of the class and the class

14   representative arise from the same event or pattern or practice and are based on the same legal

15   theory." <u>In re Relafen</u>, 231 F.R.D. at 69 (internal quotation omitted); <u>see also</u> <u>McLaughlin</u>, 224

16   F.R.D. at 309-10 (typicality satisfied where plaintiffs "were all employed by the defendant" and

17   their claims arose "out of the same policies and wrongful conduct of the [d]efendant, and [were]

18   based on the same legal theories").

19           Here, there are no factual distinctions between Plaintiff Waithaka's claims and those of

20   putative class members. Waithaka predicates his claims on Amazon's uniform practice of

21   misclassifying drivers as independent contractors (and failing to reimburse them for business

22   expenses and pay them minimum wage for all hours worked). <u>See</u> Dkt. 1-1; Waithaka Decl. ¶¶

23   9-10; <u>see also</u> Dkt. 106-3 at ¶¶ 2-3. Indeed, the claims of the named plaintiff here are not merely

24   typical of the claims of the proposed class but are, in fact, identical. <u>See</u> <u>Sampson v. Knight</u>

25   <u>Transp., Inc.</u>, 2020 WL 3050217 *4 (W.D. Wash. June 8, 2020); <u>Norris-Wilson v. Delta-T Grp.,</u>

26

Inc., 270 F.R.D. 596, 605 (S.D. Cal. 2010).

**4.    Plaintiff and his counsel adequately represent the interests of the class.**

To meet the adequacy requirement of Fed. R. Civ. P. 23(a)(4), courts require "(1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel." Dalton, 270 F.R.D. at 560. First, there is no potential conflict between Waithaka and the other class members since they are challenging practices applied uniformly to all class members. Similarly, Plaintiff Waithaka's interests do not differ from those of the whole class, in that he seeks to benefit the proposed class by obtaining damages for those class members.[8] Plaintiff has also retained counsel with extensive expertise and experience in prosecuting wage and hour cases, in particular cases alleging independent contractor misclassification and with the resources to represent the class effectively. Lichten & Liss-Riordan, P.C. has been widely recognized as one of the nation's leading plaintiffs' firms representing workers in wage and hour litigation. Attorney Liss-Riordan has been noted as one of the top plaintiffs' lawyers nationally for her work on behalf of low-wage workers in class actions. Liss-Riordan Decl. ¶¶ 3-5. She has obtained ground-breaking victories in wage and hour cases involving independent contractor misclassification. Id. at ¶¶ 6-7.[9]  Thus, Plaintiff and his counsel have satisfied the adequacy

---

[8]    If Amazon attempts to argue that the named plaintiff is not an adequate class representative because some Amazon Flex drivers want to be classified as independent contractors, that argument should be rejected. "It will almost always be the case that some putative class members are happy with things as they are." Norris–Wilson, 270 F.R.D. at 606; Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012) ("an interest by certain putative class members in maintaining the allegedly unlawful policy is not a reason to deny class certification.").

[9]    See, e.g., James v. Uber Techs. Inc., 2021 WL 254303 (N.D. Cal. Jan. 26, 2021); Cotter v. Lyft, Inc., 60 F.Supp.3d 1067 (N.D. Cal. 2015); O'Connor v. Uber Technologies, Inc. 82 F.Supp.3d 1133 (N.D. Cal. 2015) (same); see also Liss-Riordan Decl. at ¶¶ 3-7.

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                      13
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

requirement of Rule 23(a).[10]

### C.   The Class Satisfies the Requirements of Rule 23(b)

#### 1.   Common questions predominate over questions affecting individual class members.

"Predominance is satisfied upon showing that a sufficient constellation of common issues bind class members together." Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 296 (1st Cir. 2000). The requirement is "merely that common issues predominate, not that all issues be common to the class." Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003).[11] "A court evaluating predominance must determine whether the elements necessary to establish liability [here, any of the § 148B's three prongs] are susceptible to common proof or, if not, whether there are ways to manage effectively proof of any element that may require individualized evidence." Villalpando, 303 F.R.D. at 608.

Common questions about liability predominate for the same reasons that the proposed class satisfies Rule 23(a)'s commonality requirement – the core claims of all class members turn on the legality of Amazon's misclassification of Amazon Flex drivers. By its plain terms, Mass. Gen. L. c. 149 § 148B's test is conjunctive, meaning that Amazon Flex drivers are Amazon's employees for purposes of the Massachusetts wage laws unless Amazon can satisfy *all three* prongs of the test. See Somers v. Converged Access, Inc., 454 Mass. 582, 590-91 (2009)

---

[10]    Plaintiff's counsel has also associated with local counsel who are highly experienced in litigating class action wage and hour cases.  Michael C. Subit of Frank Freed Subit & Thomas has spent his career litigating employment and civil rights cases.  He was named "Lawyer of the Year" in the field of Labor and Employment Litigation in Seattle in 2016 and has been named a Washington "Super Lawyer" in Labor & Employment.  See https://www.frankfreed.com/Our-Attorneys/Michael-C-Subit.aspx.

[11]    "Where common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied . . . ." In re Neurontin Mktg. and Sale Practices Litig., 244 F.R.D. 89, 106 (D. Mass. 2007) (internal quotation marks and citations omitted). Thus, class certification is "appropriate where common issues of law and fact . . . form the nucleus of a liability claim." Smilow, 323 F.3d at 39.

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                    14
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 123

1    ("[U]nless [the defendant] were to prove at trial the three criteria required to establish that the

2    plaintiff was an independent contractor under G.L. c. 149, §148B the plaintiff, as a matter of

3    law, *was* an employee").

4          Thus, under Massachusetts law, Plaintiff and putative class members will be successful

5    on their misclassification claims unless Amazon can prove: (1) drivers are free from Amazon's

6    control and direction; (2) drivers' services were performed outside of Amazon's usual course of

7    business; *and* (3) drivers were customarily engaged in an independently established trade,

8    occupation, profession or business.  Mass. Gen. L. c. 149, § 148B(a). While Plaintiff submits

9    that common evidence can be used to determine all three prongs, because the test is conjunctive,

10   commonality as to one prong warrants certification. See, e.g., Costello v. Beavex, 810 F. 3d at

11   1060; see also James v. Uber Techs. Inc., 2021 WL 254303, at *7 (N.D. Cal. Jan. 26, 2021)

12   (certifying class based on commonality of Prongs A & B); Roman v. Jan-Pro Franchising Int'l

13   Inc., 2022 WL 3046758 (N.D. Cal. August 2, 2022) (certifying class of cleaning franchisees

14   claiming misclassification under Prong B); Ludlow v. Flowers Foods, Inc., 2022 WL 2441295,

15   at *6 (S.D. Cal. July 5, 2022) (finding common questions predominated as to Prongs A and B

16   and certifying the class); Moreno v. JCT Logistics, Inc., 2019 WL 3858999, at *13 (C.D. Cal.

17   May 29, 2019) (certifying class on Prong B alone); Carr v. Flowers Foods, Inc., 2019 WL

18   2027299, at *20 (E.D. Pa. May 7, 2019) ("[B]ecause two of the three factors of the ABC test are

19   readily provable through common evidence—and Plaintiffs need only establish one to prevail on

20   their claim—their employee status is susceptible to class-wide determination."); see also

21   DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 400 (D. Mass. 2017); Martins v.

22   3PD, Inc., 2013 WL 1320454, at *6 (D. Mass. Mar. 28, 2013).

23         Certification is most obviously appropriate under Prong B of the "ABC" test, which

24   requires the alleged employer to demonstrate that the work performed by the plaintiff is outside

25   its usual course of business. See Mass. Gen. L. c. 149 § 148B(a)(2). The defendant's "usual

26

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                    15
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 124

1   course of business" will obviously be proven through common evidence and will not vary from

2   one worker to another. See Lowes, Ex. 1, at *13 ("Lowe's either is in the businesses of kitchen

3   and bath remodeling, or it isn't."); De Giovanni, 262 F.R.D. at 84–85 ("With respect to prong

4   two, the defendants do not assert that any individualized issues would complicate the

5   identification of (1) the types of businesses operated by the purported class or (2) the type of

6   business operated by Jani–King…"); see also Johnson v. Serenity Transp., Inc., 2018 WL

7   3646540, at *11 (N.D. Cal. Aug. 1, 2018), aff'd, 802 F. App'x 250 (9th Cir. 2020) (certifying

8   class under California's identical ABC test; "whether Plaintiffs provide services within

9   Serenity's usual course of business is subject to common proof because Serenity defines itself as

10  a mortuary transportation service and all drivers perform the same work: mortuary delivery

11  services.").

12          Here, Amazon defines its *own* activities as including package delivery and logistics

13  services – even in filings to the government. For instance, in its 2020 Securities and Exchange

14  Commission ("SEC") filing, Amazon states, "**[t]o increase sales of products and services, we**

15  **focus on** improving all aspects of the customer experience, including lowering prices, improving

16  availability**, [and] offering faster delivery and performance times**." Ex. C at p. 19. Its filings

17  often mention "order fulfillment" as a central part of its business, of which last-mile delivery is a

18  critical component.  Id. at p. 3. In press releases, Amazon promotes the Flex program as one of

19  its "initiatives to ensure fast delivery speeds and supply chain capacity for its customers",

20  alongside efforts like expanding its own cargo aircraft fleet and trucking capacity. See Ex. G.

21  Amazon also holds itself out to the public as offering package delivery service, using the lure of

22  unlimited free shipping to attract customers to its Amazon Prime membership program; its

23  website touts free "One-day delivery", "Same-day delivery," and "2-hour grocery delivery." See

24  Ex. E. Its website also includes a "Shipping and Delivery" FAQ section, including its Shipping

25  Policies, "Delivery Guarantees", and Special Shipping Options. See Ex. F. Indeed, Amazon-

26

PLAINTIFFS' RENEWED MOT.                           16                **LICHTEN & LISS-RIORDAN, P.C.**
FOR CLASS CERTIFICATION                                               729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                                          Boston, MA 02116

App. 125

1  branded boxes and packages are ubiquitous, see Waithaka Decl. ¶ 5, and the public considers

2  Amazon to be in the business of fulfilling online retail delivery orders. As a result, class

3  certification is warranted under Prong B because all putative class members perform the same

4  services (delivery services). Whether that service forms part of Amazon's usual course of

5  business is be capable of common resolution across the class.[12]

6      While Plaintiff need not establish commonality under Prongs A and C, adjudication of

7  these prongs would likewise turn on common evidence. Under Prong A, the issue is whether the

8  alleged employer has the *right* to exercise control over the worker's performance. DaSilva v.

9  Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 400 (D. Mass. 2017). This question would go

10  to Amazon's *contractual* right to control drivers, which will be the same, based on Amazon's

11  uniform contracts with drivers. D'Italia, No. 11-4758-BLS1 (Ex. 1 to Liss-Riordan Decl.) at *13.

12  Here, Plaintiff relies on Amazon's contracts with drivers and its policies related to hiring, firing,

13  discipline, and payment of drivers as "common proof" of control. These policies remained

14  constant throughout the class period with only minor variations. See Ex. K (contract

15  comparison).

16      Under Prong C, the issue is whether the worker is "customarily engaged in an

17  independently established" business of the same nature as the work performed for the putative

18  employer. The Massachusetts Supreme Judicial Court in Coverall N. Am. V. Com'r of Div. of

19  Unemployment Assistance, 447 Mass. 852, 859 (2006), made clear that the relevant examination

20  under Prong C is whether the individual performs the services under his or her own "hat",

21

22  [12]    Amazon may argue that it has multiple courses of business, in addition to providing
23  order fulfillment and delivery service to customers.  However, Prong B does not require that the
   services provided are in the defendant's *only* course of business. See Carey v. Gatehouse, 92
   Mass. App. Ct. 801, 806-07, 811 (2018) (holding that companies may have multiple lines of
24  business under Prong B, and drivers were employees where they provided services within one of
   those businesses). See also Lawson v. Grubhub, Inc., 302 F.Supp.3d 1071, 1090 (N.D. Cal.
25  2018) (finding delivery driver provided services within GrubHub's usual course of business,
   even though GrubHub had multiple lines of business).

26

PLAINTIFFS' RENEWED MOT.                                    **LICHTEN & LISS-RIORDAN, P.C.**
FOR CLASS CERTIFICATION               17                    729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                                Boston, MA 02116

1   reflecting an independently established business, or wears the hat of the employer. In <u>Coverall</u>,

2   the Court held that a cleaning worker who was classified as an independent contractor franchisee

3   was an employee for unemployment purposes. In that case, the Court relied on the defendant's

4   inability to satisfy Prong C because the cleaning worker – even though she could work for other

5   cleaning companies or could expand her business beyond the clients assigned to her by the

6   defendant – wore the "hat" of the defendant when she was performing services for the

7   defendant's customers. Similarly, here, Amazon drivers "wear the hat" of Amazon when

8   transporting Amazon's packages to Amazon's customers, not the hat of their own independent

9   business. Even if they drive for other "gig economy" companies, or have their own independent

10  delivery business, when they transport packages for Amazon, they do so in the name of Amazon

11  and subject to Amazon's terms and policies. Thus, while commonality is clear in this case with

12  respect to Prong B – and that is sufficient for Plaintiff to win class certification – Plaintiff also

13  satisfies the commonality test under Prongs A and C as well.

14          Plaintiff's underlying claims for expense reimbursement and minimum wage likewise

15  turn on common issues—Amazon's failure to reimburse drivers for those expenses, causing

16  earnings to fall below the minimum wage.  Any individualized questions (in terms of amounts of

17  damages, etc.) are secondary to the predominant questions of whether drivers performed

18  services in the usual course of Amazon's business (or whether they performed services under its

19  direction and control). <u>See</u> <u>Gonzalez v. XPO Last Mile, Inc.</u>, 2022 WL 95930, at *7 (D. Mass.

20  Jan. 10, 2022) ("The crucial liability question is whether the class should have been classified as

21  XPO employees… [T]hat individual issues may arise with respect to deductions -- one aspect of

22  the class's alleged damages -- is not enough to defeat class certification at this stage"); <u>Costello</u>,

23  810 F.3d at 1060 ("the common answer on prong two 'represent[s] a significant aspect of [a]

24  case and ... can be resolved for all members of [a] class in a single adjudication.'") (quoting

25  <u>Messner v. Northshore Univ. HealthSystem</u>, 669 F.3d 802, 815 (7th Cir. 2012)); <u>Martins</u>, 2013

26

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                          18
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 127

1    WL 1320454, at *6 ("Not only does [prong two] present common issues of law and fact, but

2    only evidence common to the class is relevant to this consideration"); Salvas v. Wal-Mart

3    Stores, Inc., 452 Mass. 337, 364 (2008) ("Class certification may be appropriate where common

4    issues of law and fact are shown to form the nucleus of a liability claim, even though the

5    appropriateness of class action treatment in the damages phase is an open question."); Weld v.

6    Glaxo Wellcome Inc., 434 Mass. 81, 92 (2001) (noting that even if "an individualized inquiry is

7    necessary to determine damages… [that] does not preclude class certification where all other

8    requirements are met." ). Because common issues predominate, class treatment is appropriate.

9          **2.**     **A class action is the superior method for addressing the drivers' claims**

10         The superiority requirement is designed to ensure the "vindication of the rights of

11   groups of people who individually would be without effective strength to bring their opponents

12   to court at all." Anchem Prods., Inc. v. Windsor, 512 U.S. 591, 617 (1997). A district court has

13   "broad discretion" in determining whether class treatment is superior. Kamm v. Cal. City Dev.

14   Co., 509 F.2d 205, 210 (9th Cir.1975).

15         The following factors are pertinent to this analysis:

16             (A) the class members' interest in individually controlling the
          prosecution or defense of separate actions;

17

18             (B) the extent and nature of any litigation concerning the
          controversy already begun by or against class members;

19

20             (C) the desirability or undesirability of concentrating the litigation
          of the claims in the particular forum; and

21             (D) the likely difficulties in managing a class action.

22   Fed. R. Civ. P. 23(b)(3).

23         A class action is the superior method here.  Forcing each driver to bring individual

24   challenges to Amazon's practices would result in increased expenses, duplication of discovery,

25   the potential for inconsistent results, and more strain on judicial resources. Moreover, the fact

26

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                    19
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

1  that individual drivers might not vindicate their statutory rights would undermine the

2  effectiveness of those rights, which protect workers and ensure fair competition.[13] See Overka,

3  265 F.R.D. at 24 ("class adjudication is superior in the employment context because fear of

4  employer retaliation may have a chilling effect on employees bringing claims on an individual

5  basis."); see also Perez v. Safety-Kleen Systems, Inc., 253 F.R.D. 508, 520 (N.D. Cal. 2008);

6  O'Brien v. Encotech Const. Servs., Inc., 203 F.R.D. 346, 350 (N.D. Ill. 2001) (noting that

7  workers' fear of employer retaliation is "a very important concern" because the "nature of the

8  economic dependency involved in the employment relationship is inherently inhibiting.").

9  Allowing Plaintiff to prosecute claims on behalf of the proposed class resolves these issues and

10 provides a more efficient method of litigation.

11        Finally, this case offers a readily identifiable class of people in a limited geographical

12 area (Massachusetts), which presents no unusual management problems. Thus, for all these

13 reasons, the superiority requirement of Rule 23(b) has been met.

14 **IV.    CONCLUSION**

15        For the foregoing reasons, the Court certify a class of all Amazon Flex delivery drivers

16 who have worked in the Commonwealth of Massachusetts at any time since August 23, 2014.

17
   Dated: August 1, 2024                          *I certify that this memorandum contains 8,279*
18                                                  *words in compliance with the Local Civil Rules.*

19
                                          By:    *s/ Shannon Liss-Riordan*
20                                               Shannon Liss-Riordan (*pro hac vice*)
                                                 Harold L. Lichten (*pro hac vice*)
21                                               Jeremy Abay (*pro hac vice*)
                                                 LICHTEN & LISS-RIORDAN, P.C.
22

23 [13]     See Somers, 454 Mass. at 592 (enforcement is important not only because wage laws
   protect employees, but because they protect the government and competitors); Salvas, 452 Mass.
24 at 368-69, 370-71 (emphasizing importance of class actions); Martin v. Tango's Restaurant,
   Inc., 969 F.2d 1319, 1324 (1st Cir. 1992) (recognizing that wage laws are "intended to protect
25 complying competitors . . . in addition to making the employee whole"); Western States
   Trucking Association v. Becerra 2020 WL 1032348, at *3 (C.D. Cal. Mar. 2, 2020) (same).
26

PLAINTIFFS' RENEWED MOT.                                          **LICHTEN & LISS-RIORDAN, P.C.**
FOR CLASS CERTIFICATION                    20                     729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                                      Boston, MA 02116

App. 129

1

729 Boylston Street, Suite 2000
Boston, MA 02116

2

(617) 994-5800
sliss@llrlaw.com

3

hlichten@llrlaw.com
jabay@llrlaw.com

4

5

Michael C. Subit, WSBA No. 29189

6

FRANK FREED SUBIT & THOMAS LLP
705 Second Avenue, Suite 1200

7

Seattle, WA 98104
(206) 682-6711

8

msubit@frankfreed.com

9

*Attorneys for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' RENEWED MOT.
FOR CLASS CERTIFICATION                    21
Case No.. 2:19-cv-01320-JCC

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 130

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BERNARD WAITHAKA, on behalf of
himself and all others similarly situated,

            Plaintiff,

        v.

AMAZON.COM INC. and
AMAZON LOGISTICS, INC.,

            Defendants.

Case No. 2:19-cv-01320-JCC

**DECLARATION OF BERNARD
WAITHAKA IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION
FOR CLASS CERTIFICATION**

NOTE DATE:
August 20, 2024

I, Bernard Waithaka, hereby declare as follows:

1.     I have personal knowledge of the facts set forth in this declaration.

2.     I am the Plaintiff in the above matter.

3.     I am an adult resident of Massachusetts and have been working as a driver for Amazon Flex since approximately January 2017.

4.     I have worked for Amazon in the Greater Boston Area, though my work has also taken me to Rhode Island on multiple occasions.

5.     To start working for Amazon, I had to download the Amazon Flex Application to my personal smartphone. I could then sign up for shifts using the Amazon Flex Application. These shifts are typically between two and five hours long. I signed up for shifts and make deliveries for Amazon roughly 15-20 hours each week during my first several

BERNARD WAITHAKA DECL.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

1

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 131

years working for Amazon.  In the last three years or so, I have worked more occasionally.

6.     When a driver starts a shift, Amazon informs us where we should start working.  We usually report to an Amazon warehouse, where we are assigned a number of packages and a route to go deliver them.  The packages are typically in cardboard boxes emblazoned with the Amazon logo or sealed with Amazon branded tape. On any given 3-hour shift, I would typically have between 30 and 45 packages to deliver.  I have done many delivery routes from Amazon's warehouse in Milford, Massachusetts, as well as warehouses in Bellingham, Everett, Revere, Dedham, and Norwood.

7.     When making deliveries using the Amazon Flex App, drivers are provided with a prescribed route on the App.  We have to log each delivery as we go by scanning it and taking pictures of where the packages were left.  If there are any packages or items left over at the end of the shift that were not able to be delivered for any reason, we must return them.

8.     Amazon lists how much it will pay for each shift, and it usually breaks this down into an hourly rate. This hourly rate has not changed significantly since I began delivering for Amazon in 2017. Amazon sets the base pay for the shift in its sole discretion. Drivers cannot control how much they get paid for a given shift, and our only option is to accept or reject the shift. For some deliveries, drivers may also receive tips from the customers on top of the base pay that Amazon decides.

9.     Amazon Flex drivers are subject to Amazon's policies and receive emailed warnings from Amazon. For example, I have received such emails if I cancel a block too close to the start time or failed to show up for an assigned block or if my deliveries have otherwise not met Amazon's quality and timeliness standards. In the first half of 2021, Amazon started a "points" system where drivers have points given or taken away based on their reliability, timely cancellation, and delivery quality. Amazon can choose to terminate drivers based on their "points" performance.

10.     Like all other Amazon Flex drivers, I am responsible for paying my own

BERNARD WAITHAKA DECL.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

2

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 132

1   necessary business expenses. For example, I am responsible for car maintenance, car

2   insurance, and for gas associated with the use of my vehicle to make deliveries for Amazon. I

3   also must pay for my own smartphone and data plan to run the Amazon Flex application,

4   which I have to keep running while I make deliveries in order to scan packages as they're

5   delivered and to navigate Amazon's delivery route. Amazon does not separately reimburse me

6   for any expenses.

7          11.     There are hours that I have worked for Amazon for which I have not received

8   Massachusetts minimum wage (currently $15.00 per hour) (particularly if my car expenses,

9   calculated at the IRS mileage reimbursement rate are factored into my earnings).

10         I declare under penalty of perjury that the foregoing is true and correct.

11         Executed on August 1, 2024, under the laws of the United States of America.

12

13

14                                          *Bernard Waithaka* _____

15                                          Bernard Waithaka

16

17

18

19

20

21

22

23

24

25

26

BERNARD WAITHAKA DECL.                                    **LICHTEN & LISS-RIORDAN, P.C.**
FOR CLASS CERTIFICATION            3                      729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                              Boston, MA 02116

App. 133

1

2                                                              The Honorable John C. Coughenour

3

4                              UNITED STATES DISTRICT COURT
                              WESTERN DISTRICT OF WASHINGTON
5                                         AT SEATTLE

6

7   BERNARD WAITHAKA, on behalf of
    himself and all others similarly situated,        Case No. 2:19-cv-01320-JCC
8
                 Plaintiff,                            **DECLARATION OF SHANNON LISS-**
9                                                     **RIORDAN IN SUPPORT OF**
         v.                                           **PLAINTIFF'S RENEWED MOTION**
10                                                    **FOR CLASS CERTIFICATION**

11
    AMAZON.COM INC. and                               NOTE DATE:
12  AMAZON LOGISTICS, INC.,                           August 28, 2024

13               Defendants.                          ORAL ARGUMENT REQUESTED

14

15       I, Shannon Liss-Riordan, hereby declare:

16       1.      I am a partner at the law firm of Lichten & Liss-Riordan, P.C., and counsel for

17  the Plaintiffs in the above-captioned matter.  I submit this declaration in support of Plaintiff's

18  Renewed Motion for Class Certification.  I have personal knowledge of the information set

19  forth herein.

20       2.      I am an honors graduate of Harvard College (A.B., 1990) and Harvard Law

21  School (J.D., 1996).  Following law school, I served as a law clerk for two years for U.S.

22  District Court Judge Nancy F. Atlas in the Southern District of Texas.  After that, I worked as

23  an associate and then a partner at an employee-side labor and employment firm in Boston for

24  more than 10 years, before co-founding my current law firm, Lichten & Liss-Riordan, in

25  2009.

26

SHANNON LISS-RIORDAN DECL.                                    **LICHTEN & LISS-RIORDAN, P.C.**
FOR CLASS CERTIFICATION                    1                  729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                                   Boston, MA 02116

App. 134

3.     I have spent my entire 25-plus-year legal career representing employees, particularly low wage workers.  My specialty for most of that time has been wage-and-hour class actions, with a particular focus on class actions regarding tipped employees and independent contractor misclassification.

4.     This year, I was selected by <u>Forbes</u> as one of "*America's Top 200 Lawyers*" (one of 5 plaintiffs' employment attorneys named for this list nationally).

5.     I have been featured by many major publications for my accomplishments representing low wage workers in a variety of industries. <u>See</u>, <u>e.g.</u>, Kapp, Diana, <u>Uber's Worst Nightmare</u> SAN FRANCISCO MAGAZINE (May 18, 2016) (attached here as **Exhibit O**) ("Liss-Riordan has achieved a kind of celebrity unseen in the legal world since Ralph Nader sued General Motors").

6.     Each year since 2008, I have been selected for inclusion in Best Lawyers in America (Chambers). Our firm, and my law partner and I have consistently been ranked for years in the top tier for our practice area. The 2013 edition referred to me as "*the reigning plaintiffs' champion*", and the 2015 edition said I am "*probably the best known wage class action lawyer on the plaintiff side in this area, if not the entire country*".  <u>See</u> **Exhibit P**, attached hereto.  For more background on my work, see my profile on my firm's website at: https://www.llrlaw.com/shannon-liss-riordan.

7.     Some examples of significant cases that I have successfully litigated on appeal include: <u>Patel v. 7-Eleven, Inc.</u>, 489 Mass. 356 (2022) (Massachusetts Supreme Judicial Court held that franchisees may be employees for purposes of the Wage Act, overturning district court decision that held federal law to preempt Massachusetts law); <u>Lawson v. GrubHub</u>, 13 F.4th 908 (9th Cir. 2021) (reinstating case challenging GrubHub's misclassification of drivers in first and only case to date to go to trial against "gig economy" company); <u>Vazquez v. Jan-Pro Franchising Int'l, Inc.</u>, 10 Cal. 5th 944, 478 P.3d 1207 (2021) (holding landmark <u>Dynamex</u> decision, adopting ABC test for employee-status, applies retroactively); <u>Vazquez v.</u>

SHANNON LISS-RIORDAN DECL.
FOR CLASS CERTIFICATION        2
Case No.. 2:19-cv-01320-JCC

LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 135

1  Jan-Pro Franchising Int'l, Inc., 986 F.3d 1106 (9th Cir. 2021) (holding that landmark

2  Dynamex decision applies to misclassification claims against "cleaning franchisor" and

3  reinstating wage claims on behalf of janitors who challenged paying for their jobs and other

4  wage violations); Waithaka v. Amazon.com, Inc., 966 F.3d 10 (1st Cir. 2020) (holding

5  Amazon Flex delivery drivers exempt from the Federal Arbitration Act, 9 U.S.C. § 1 under

6  the transportation worker exemption); Rittmann v. Amazon.com, Inc. (9th Cir. 2020) 971

7  F.3d 904 (same); Haitayan v. 7-Eleven, Inc., No. 18-55462 (9th Cir. 2019) (reinstating wage

8  claims against 7-Eleven and reversing district court's denial of injunction for plaintiffs and

9  potential class members facing choice of pursuing wage claims or keeping their jobs);

10 Maplebear, Inc. d/b/a Instacart v. Donna Busick (2018) 26 Cal.App.5th 394, 237 Cal.Rptr.3d

11 98 (affirming California Superior Court's decision declining to vacate class arbitration clause

12 construction award); Khanal v. San Francisco Hilton, Inc. (9th Cir. 2017) 681 Fed. Appx. 624

13 (reversing district court's dismissal of claims on behalf of banquet servers as preempted by

14 the LMRA); Williams v. Jani-King of Philadelphia Inc. (3d Cir. 2016) 837 F.3d 314

15 (affirming grant of class certification to class of cleaning workers alleging misclassification

16 and wage violations); Marzuq v. Cadete Enterprises, Inc. (1st Cir. 2015) 2015 U.S. App.

17 LEXIS 21301 (Dunkin Donuts general managers could be eligible for overtime pay by

18 proving management was not their primary duty, distinguishing 1982 precedent, which had

19 held fast food managers to be overtime-exempt); Travers v. Flight Systems & Services (1st

20 Cir. 2015)  2015 U.S. App. LEXIS 21671 (affirming jury verdict in favor of skycap who was

21 terminated in retaliation for leading class action wage complaint challenging policy affecting

22 skycaps' tips and reinstating claim for front pay); Villon v. Marriott Hotel Servs., Inc., 130

23 Haw. 130, 143 (2013) (Supreme Court of Hawaii decided on certified question that employees

24 could enforce rights and seek remedies under Hawaii law when a hotel or restaurant applying

25 a service charge for the sale of food or beverage services does not distribute the full service

26 charge directly to its employees as "tip income" and fails to disclose this practice to the

SHANNON LISS-RIORDAN DECL.
FOR CLASS CERTIFICATION              3
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 136

purchaser of the services); <u>Depianti v. Jan-Pro Franchising International, Inc.</u> (2013) 465 Mass. 607 (Massachusetts Supreme Judicial Court held that national company could not evade liability for independent contractor misclassification by virtue of it not having direct contracts with the workers); <u>Taylor v. Eastern Connection Operating, Inc.</u> (2013) 465 Mass. 191 (Massachusetts Supreme Judicial Court held Massachusetts Independent contractor law applicable to work performed in New York for Massachusetts company); <u>Matamoros v. Starbucks Corp.</u> (1st Cir. 2012) 699 F.3d 129 (holding that Starbucks violated Massachusetts Tips Law by allowing shift supervisors to share in tip pool); <u>DiFiore v. American Airlines, Inc.</u> (2009)  454 Mass. 486, 497 (Massachusetts Supreme Judicial Court decided on certified question that non-employers are covered by Tips Law, affirming jury verdict for plaintiff skycaps); <u>Cooney v. Compass Group Foodservice</u> (2007) 69 Mass. App. Ct. 632 (reversing trial court's denial of summary judgment for plaintiff servers, holding that Massachusetts Tips Law should be strictly construed against establishment that did not distribute proceeds of charges labeled "service charges" to waitstaff employees); <u>Bednark v. Catania Hospitality Group, Inc.</u> (Mass. App. Ct. 2011) 78 Mass. App. Ct. 806 [942 N.E.2d 1007] (reversing trial court's grant of summary judgment to defendant where defendant charged an "administrative fee" that was not distributed to waitstaff).

  8.  Some examples of cases that I have won at trial, include: <u>Nnebe v. Daus</u>, No. 06-cv-4991-RJS (S.D. N.Y. Nov. 16, 2023) (test case trial for 10 plaintiff New York taxi drivers in certified class action who suffered due process violations based on not being able to challenge their license suspension due to an arrest); <u>Ordono v. Marriott Int'l Inc.</u>, CGC-16-550454 (S.F. Super. Ct. June 9, 2023) (class action verdict in favor of plaintiff banquet workers following bench trial on their claim that Defendant illegally retained service charges under Cal. Lab. Code. § 351); <u>Lawson v. GrubHub</u>, No. 15-cv-05128-JSC (N.D. Cal. Mar. 2023) (in the first trial ever addressing whether a gig worker was misclassified as an independent contractor, court ultimately held that GrubHub driver should have been classified

SHANNON LISS-RIORDAN DECL.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

    4

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

as an employee); <u>Norrell v. Spring Valley Country Club</u> (class action jury verdict for

waitstaff) (Mass. Super. 2017); <u>Travers v. Flight Services & Systems</u> (D. Mass. 2014) C.A.

No. 11-10175 (skycap terminated in retaliation for leading class action challenging bag charge

for curbside check-in); <u>DiFiore et al. v. American Airlines, Inc.</u> (D. Mass. 2008) C.A. No. 07-

10070 (verdict for plaintiff skycaps challenging $2 per bag charge for curbside check-in);

<u>Benoit, et al. v. The Federalist, Inc.</u> (Mass. Super. 2007)  C.A. No. 04-3516 (verdict for

plaintiff class for violation of Massachusetts Tips Law); <u>Calcagno, et al. v. High Country</u>

<u>Investor, Inc., d/b/a Hilltop Steak House</u> (Mass. Super. 2006)  C.A. No. 03- 0707 (verdict for

plaintiff class for violation of Massachusetts Tips Law); <u>Bradley et al. v. City of Lynn et al.</u>

(D. Mass. 2006) 443 F.Supp.2d 145 (verdict for plaintiff class where federal court held

following bench trial that Commonwealth's entry level firefighter hiring examination has

disparate impact on minorities and violated Title VII).

9. Attached as **Exhibit A** is a true and correct copy of excerpts of Amazon's SEC

10-K, for Fiscal Year ending Dec. 31, 2020, available online at: <u>Amazon.com, Inc. - SEC</u>

<u>filings - SEC Filings Details (aboutamazon.com)</u>

10. Attached as **Exhibit B** is a true and correct copy of Amazon's website page

titled "Amazon Flex is now in over 50 cities in the U.S.", last accessed on April 13, 2021, and

available at: <u>https://flex.amazon.com/recruiting-cities</u>

11. Attached as **Exhibit C** is a true and correct copy of Amazon's website page

titled "Frequently asked questions about Amazon Flex", last accessed on April 13, 2021, and

available at: <u>https://flex.amazon.com/faq</u>

12. Attached as **Exhibit D** is a true and correct copy of Amazon's website page

titled "Start driving and earning today", last accessed on April 13, 2021, and available at:

<u>https://flex.amazon.com/lets-drive</u>

SHANNON LISS-RIORDAN DECL.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

5

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

13.     Attached as **Exhibit E** is a true and correct copy of Amazon's website page, titled "Prime Delivery", last accessed on April 1, 2021, and available at:

https://www.amazon.com/b?ie=UTF8&node=15247183011

14.     Attached as **Exhibit F** is a true and correct copy of Amazon's website page, titled "Help & Customer Service, Shipping & Delivery", last accessed on April 1, 2021, and available at:

https://www.amazon.com/gp/help/customer/display.html/ref=hp_gt2_shp_more?nodeId=2019 10060.

15.     Attached as **Exhibit G** is a true and correct copy of an Amazon press release, titled, *Continued Growth for Amazon's Air Network to Expand Prime Fast, Free Shipping for Customers – Adding Fifteen Boeing 737-800 Converted Freighter Aircraft to Fleet* (June 18, 2018), available at: https://press.aboutamazon.com/news-releases/news-release-details/continued-growth-amazons-air-network-expand-prime-fast-free

16.     Attached as **Exhibit H** is a true and correct copy of an email from amazonflex-support@amazon.com, dated February 27, 2019, to named plaintiff Bernard Waithaka, introduced as Exhibit 13 at the Deposition of Amazon's Rule 30(b)(6) designee, Alexa Hawrysz, and produced by Plaintiff at WAITHAKA000290-91.

17.     Attached as **Exhibit I** is a true and correct copy of is a true and correct copy of a screenshot from the Amazon Flex Application, dated September 14, 2018, taken by named plaintiff Bernard Waithaka, introduced as Exhibit 8 at the Deposition of Amazon's Rule 30(b)(6) designee, Alexa Hawrysz, and produced by Plaintiff at WAITHAKA001285.

18.     Attached as **Exhibit J** is a true and correct copy of is a true and correct copy of a screenshot from the Amazon Flex Application, taken by named plaintiff Bernard Waithaka, introduced as Exhibit 19 at the Deposition of Amazon's Rule 30(b)(6) designee, Alexa

SHANNON LISS-RIORDAN DECL.
FOR CLASS CERTIFICATION                    6
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

Hawrysz, and produced by Plaintiff at WAITHAKA014233.

19.     Attached as **Exhibit K** is a true and correct copy of which excerpts of contract language has appeared in which versions of Defendants' versions of its contracts with Amazon Flex drivers (i.e. putative class members).

20.     I have reviewed data related to Plaintiff that Amazon produced in discovery and designated as "CONFIDENTIAL," including data at AMAZON_000392. This data confirms that Amazon maintains electronic records of each Amazon Flex driver's daily "planned_miles"—reflecting miles driven on Amazon's generated route.

21.     Attached as **Exhibit L** are excerpts from the Deposition of Amazon's Rule 30(b)(6) designee, Alexa Hawrysz.

22.     Attached as **Exhibit M** are excerpts from the Deposition of named plaintiff Bernard Waithaka.

23.     Attached as **Exhibit N** is a true and correct copy of an article by Diana Kapp, titled Uber's Worst Nightmare SAN FRANCISCO MAGAZINE (May 18, 2016).

24.     Attached as **Exhibit O** is a true and correct copy of the firm's Chambers profile from 2013.

25.     Attached as **Exhibit 1** is a true and correct copy of D'Italia v. Lowe's Home Centers, Inc., Civ. No. 11-4758-BLS1 (Suffolk Super. Ct. December 12, 2012) (Billings, J.)

26.     Attached as **Exhibit 2** is a true and correct copy of Meier v. MasTec North America, Inc., Hampden C.A. No. 13-448 (Super. Ct. Jan. 6, 2015).

27.     Attached as **Exhibit 3** is a true and correct copy of Simmons v. Kilnapp Enterprises, Inc., Essex C.A. No. 13-551 (Super. Ct. June 13, 2014).

28.     Attached as **Exhibit 4** is a true and correct copy of Raposa v. Mardi Gras Entertainment, Inc., Hampden C.A. No. 2010-00034 (Mass. Super. Dec. 11, 2013).

SHANNON LISS-RIORDAN DECL.
FOR CLASS CERTIFICATION          7
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 140

29.    Attached as **Exhibit 5** is a true and correct copy of <u>Vasquez v. Ye Olde Lamplighter II, Inc.</u>, Worcester C. A. No. 2011-1610-D (Mass. Super. Nov. 13, 2013).

30.    Attached as **Exhibit 6** is a true and correct copy of <u>Cruz v. Manlo Enterprises, Inc. d/b/a Mario's Showplace</u>, Worcester C.A. No. 2010-01931 (Mass. Super. June 10, 2011).

31.    Attached as **Exhibit 7** is a true and correct copy of <u>Chaves v. King Arthur's Lounge, Inc.</u>, Suffolk C.A. No. 2007-2505 (Mass. Super. July 31, 2009).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 1, 2024, at Boston, Massachusetts

By:   _/s/ Shannon Liss-Riordan___
Shannon Liss-Riordan, Esq.

SHANNON LISS-RIORDAN DECL.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

8

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 141

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BERNARD WAITHAKA, on behalf of
himself and all others similarly situated,

        Plaintiff,

      v.

AMAZON.COM INC. and
AMAZON LOGISTICS, INC.,

        Defendants.

Case No. 2:19-cv-01320-JCC

**DECLARATION OF BERNARD WAITHAKA IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION**

NOTE DATE:
August 20, 2024

I, Bernard Waithaka, hereby declare as follows:

1.    I have personal knowledge of the facts set forth in this declaration.

2.    I am the Plaintiff in the above matter.

3.    I am an adult resident of Massachusetts and have been working as a driver for Amazon Flex since approximately January 2017.

4.    I have worked for Amazon in the Greater Boston Area, though my work has also taken me to Rhode Island on multiple occasions.

5.    To start working for Amazon, I had to download the Amazon Flex Application to my personal smartphone. I could then sign up for shifts using the Amazon Flex Application. These shifts are typically between two and five hours long. I signed up for shifts and make deliveries for Amazon roughly 15-20 hours each week during my first several

BERNARD WAITHAKA DECL.
FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

1

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

1    years working for Amazon.  In the last three years or so, I have worked more occasionally.

2        6.      When a driver starts a shift, Amazon informs us where we should start

3    working.  We usually report to an Amazon warehouse, where we are assigned a number of

4    packages and a route to go deliver them.  The packages are typically in cardboard boxes

5    emblazoned with the Amazon logo or sealed with Amazon branded tape. On any given 3-hour

6    shift, I would typically have between 30 and 45 packages to deliver.  I have done many

7    delivery routes from Amazon's warehouse in Milford, Massachusetts, as well as warehouses

8    in Bellingham, Everett, Revere, Dedham, and Norwood.

9        7.      When making deliveries using the Amazon Flex App, drivers are provided

10   with a prescribed route on the App.  We have to log each delivery as we go by scanning it and

11   taking pictures of where the packages were left.  If there are any packages or items left over at

12   the end of the shift that were not able to be delivered for any reason, we must return them.

13       8.      Amazon lists how much it will pay for each shift, and it usually breaks this

14   down into an hourly rate. This hourly rate has not changed significantly since I began

15   delivering for Amazon in 2017. Amazon sets the base pay for the shift in its sole discretion.

16   Drivers cannot control how much they get paid for a given shift, and our only option is to

17   accept or reject the shift. For some deliveries, drivers may also receive tips from the

18   customers on top of the base pay that Amazon decides.

19       9.      Amazon Flex drivers are subject to Amazon's policies and receive emailed

20   warnings from Amazon. For example, I have received such emails if I cancel a block too

21   close to the start time or failed to show up for an assigned block or if my deliveries have

22   otherwise not met Amazon's quality and timeliness standards. In the first half of 2021,

23   Amazon started a "points" system where drivers have points given or taken away based on

24   their reliability, timely cancellation, and delivery quality. Amazon can choose to terminate

25   drivers based on their "points" performance.

26       10.     Like all other Amazon Flex drivers, I am responsible for paying my own

BERNARD WAITHAKA DECL.
FOR CLASS CERTIFICATION                    2
Case No.. 2:19-cv-01320-JCC

**Lichten & Liss-Riordan, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 143

1   necessary business expenses. For example, I am responsible for car maintenance, car

2   insurance, and for gas associated with the use of my vehicle to make deliveries for Amazon. I

3   also must pay for my own smartphone and data plan to run the Amazon Flex application,

4   which I have to keep running while I make deliveries in order to scan packages as they're

5   delivered and to navigate Amazon's delivery route. Amazon does not separately reimburse me

6   for any expenses.

7          11.     There are hours that I have worked for Amazon for which I have not received

8   Massachusetts minimum wage (currently $15.00 per hour) (particularly if my car expenses,

9   calculated at the IRS mileage reimbursement rate are factored into my earnings).

10         I declare under penalty of perjury that the foregoing is true and correct.

11         Executed on August 1, 2024, under the laws of the United States of America.

12

13

14                                    _Bernard Waithaka_____

15                                    Bernard Waithaka

16

17

18

19

20

21

22

23

24

25

26

BERNARD WAITHAKA DECL.                              **LICHTEN & LISS-RIORDAN, P.C.**
FOR CLASS CERTIFICATION          3                  729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                         Boston, MA 02116

App. 144

# EXHIBIT A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2020**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from        to        .**

**Commission File No. 000-22513**

# AMAZON.COM, INC.
### (Exact name of registrant as specified in its charter)

| Delaware | 91-1646860 |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**410 Terry Avenue North**
**Seattle, Washington 98109-5210**
**(206) 266-1000**
**(Address and telephone number, including area code, of registrant's principal executive offices)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, par value $.01 per share | AMZN | Nasdaq Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

| | | |
|---|---|---|
| Aggregate market value of voting stock held by non-affiliates of the registrant as of June 30, 2020 | $ | 1,174,367,787,295 |
| Number of shares of common stock outstanding as of January 20, 2021 | | 503,564,743 |

---

### DOCUMENTS INCORPORATED BY REFERENCE

The information required by Part III of this Report, to the extent not set forth herein, is incorporated herein by reference from the registrant's definitive proxy statement relating to the Annual Meeting of Shareholders to be held in 2021, which definitive proxy statement shall be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this Report relates.

Table of Contents

**AMAZON.COM, INC.**
**FORM 10-K**
**For the Fiscal Year Ended December 31, 2020**
**INDEX**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 15 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 16 |
| Item 4. | Mine Safety Disclosures | 16 |
| **PART II** | | |
| Item 5. | Market for the Registrant's Common Stock, Related Shareholder Matters, and Issuer Purchases of Equity Securities | 17 |
| Item 6. | Selected Consolidated Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 33 |
| Item 8. | Financial Statements and Supplementary Data | 35 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 69 |
| Item 9A. | Controls and Procedures | 69 |
| Item 9B. | Other Information | 71 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers, and Corporate Governance | 71 |
| Item 11. | Executive Compensation | 71 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters | 71 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 71 |
| Item 14. | Principal Accountant Fees and Services | 71 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 72 |
| Item 16. | Form 10-K Summary | 73 |
| Signatures | | 74 |

Table of Contents

**AMAZON.COM, INC.**

**PART I**

Item 1.         *Business*

*This Annual Report on Form 10-K and the documents incorporated herein by reference contain forward-looking statements based on expectations, estimates, and projections as of the date of this filing. Actual results may differ materially from those expressed in forward-looking statements. See Item 1A of Part I — "Risk Factors."*

Amazon.com, Inc.'s principal corporate offices are located in Seattle, Washington. We completed our initial public offering in May 1997 and our common stock is listed on the Nasdaq Global Select Market under the symbol "AMZN."

As used herein, "Amazon.com," "we," "our," and similar terms include Amazon.com, Inc. and its subsidiaries, unless the context indicates otherwise.

## General

We seek to be Earth's most customer-centric company. We are guided by four principles: customer obsession rather than competitor focus, passion for invention, commitment to operational excellence, and long-term thinking. In each of our segments, we serve our primary customer sets, consisting of consumers, sellers, developers, enterprises, and content creators. In addition, we provide services, such as advertising to sellers, vendors, publishers, authors, and others, through programs such as sponsored ads, display, and video advertising.

We have organized our operations into three segments: North America, International, and Amazon Web Services ("AWS"). These segments reflect the way the Company evaluates its business performance and manages its operations. Information on our net sales is contained in Item 8 of Part II, "Financial Statements and Supplementary Data — Note 10 — Segment Information."

## Consumers

We serve consumers through our online and physical stores and focus on selection, price, and convenience. We design our stores to enable hundreds of millions of unique products to be sold by us and by third parties across dozens of product categories. Customers access our offerings through our websites, mobile apps, Alexa, devices, streaming, and physically visiting our stores. We also manufacture and sell electronic devices, including Kindle, Fire tablet, Fire TV, Echo, Ring, and other devices, and we develop and produce media content. We seek to offer our customers low prices, fast and free delivery, easy-to-use functionality, and timely customer service. In addition, we offer Amazon Prime, a membership program that includes unlimited free shipping on over 100 million items, access to unlimited streaming of tens of thousands of movies and TV episodes, including Amazon Original content, and other benefits.

We fulfill customer orders in a number of ways, including through: North America and International fulfillment networks that we operate; co-sourced and outsourced arrangements in certain countries; digital delivery; and through our physical stores. We operate customer service centers globally, which are supplemented by co-sourced arrangements. See Item 2 of Part I, "Properties."

## Sellers

We offer programs that enable sellers to grow their businesses, sell their products in our stores, and fulfill orders through us. We are not the seller of record in these transactions. We earn fixed fees, a percentage of sales, per-unit activity fees, interest, or some combination thereof, for our seller programs.

## Developers and Enterprises

We serve developers and enterprises of all sizes, including start-ups, government agencies, and academic institutions, through AWS, which offers a broad set of on-demand technology services, including compute, storage, database, analytics, and machine learning, and other services.

## Content Creators

We serve authors and independent publishers with Kindle Direct Publishing, an online service that lets independent authors and publishers choose a royalty option and make their books available in the Kindle Store, along with Amazon's own publishing arm, Amazon Publishing. We also offer programs that allow authors, musicians, filmmakers, skill and app developers, and others to publish and sell content.

3

App. 148

Table of Contents

**Competition**

Our businesses encompass a large variety of product types, service offerings, and delivery channels. The worldwide marketplace in which we compete is evolving rapidly and intensely competitive, and we face a broad array of competitors from many different industry sectors around the world. Our current and potential competitors include: (1) physical, e-commerce, and omnichannel retailers, publishers, vendors, distributors, manufacturers, and producers of the products we offer and sell to consumers and businesses; (2) publishers, producers, and distributors of physical, digital, and interactive media of all types and all distribution channels; (3) web search engines, comparison shopping websites, social networks, web portals, and other online and app-based means of discovering, using, or acquiring goods and services, either directly or in collaboration with other retailers; (4) companies that provide e-commerce services, including website development and hosting, omnichannel sales, inventory and supply chain management, advertising, fulfillment, customer service, and payment processing; (5) companies that provide fulfillment and logistics services for themselves or for third parties, whether online or offline; (6) companies that provide information technology services or products, including on-premises or cloud-based infrastructure and other services; (7) companies that design, manufacture, market, or sell consumer electronics, telecommunication, and electronic devices; (8) companies that sell grocery products online and in physical stores; and (9) companies that provide advertising services, whether in digital or other formats. We believe that the principal competitive factors in our retail businesses include selection, price, and convenience, including fast and reliable fulfillment. Additional competitive factors for our seller and enterprise services include the quality, speed, and reliability of our services and tools, as well as customers' ability and willingness to change business practices. Some of our current and potential competitors have greater resources, longer histories, more customers, greater brand recognition, and greater control over inputs critical to our various businesses. They may secure better terms from suppliers, adopt more aggressive pricing, pursue restrictive distribution agreements that restrict our access to supply, direct consumers to their own offerings instead of ours, lock-in potential customers with restrictive terms, and devote more resources to technology, infrastructure, fulfillment, and marketing. The Internet facilitates competitive entry and comparison shopping, which enhances the ability of new, smaller, or lesser-known businesses to compete against us. Each of our businesses is also subject to rapid change and the development of new business models and the entry of new and well-funded competitors. Other companies also may enter into business combinations or alliances that strengthen their competitive positions.

**Intellectual Property**

We regard our trademarks, service marks, copyrights, patents, domain names, trade dress, trade secrets, proprietary technologies, and similar intellectual property as critical to our success, and we rely on trademark, copyright, and patent law, trade-secret protection, and confidentiality and/or license agreements with our employees, customers, partners, and others to protect our proprietary rights. We have registered, or applied for the registration of, a number of U.S. and international domain names, trademarks, service marks, and copyrights. Additionally, we have filed U.S. and international patent applications covering certain of our proprietary technology.

**Seasonality**

Our business is affected by seasonality, which historically has resulted in higher sales volume during our fourth quarter, which ends December 31.

**Human Capital**

Our employees are critical to our mission of being Earth's most customer-centric company. As of December 31, 2020, we employed approximately 1,298,000 full-time and part-time employees. Additionally, we utilize independent contractors and temporary personnel to supplement our workforce. Competition for qualified personnel has historically been intense, particularly for software engineers, computer scientists, and other technical staff.

We focus on investment and innovation, inclusion and diversity, safety, and engagement to hire and develop the best talent. We rely on numerous and evolving initiatives to implement these objectives and invent mechanisms for talent development, including industry-leading pay and benefits, skills training programs such as Amazon Career Choice and the Amazon Technical Academy, mentorship and support resources, and programs that advance engagement, communication, and feedback.

**Available Information**

Our investor relations website is amazon.com/ir and we encourage investors to use it as a way of easily finding information about us. We promptly make available on this website, free of charge, the reports that we file or furnish with the Securities and Exchange Commission ("SEC"), corporate governance information (including our Code of Business Conduct and Ethics), and select press releases.

Table of Contents

**Executive Officers and Directors**

The following tables set forth certain information regarding our Executive Officers and Directors as of January 20, 2021:

**Information About Our Executive Officers**

| Name | Age | Position |
|---|---|---|
| Jeffrey P. Bezos | 57 | President, Chief Executive Officer, and Chairman of the Board |
| David H. Clark | 48 | CEO, Worldwide Consumer |
| Andrew R. Jassy | 53 | CEO Amazon Web Services |
| Brian T. Olsavsky | 57 | Senior Vice President and Chief Financial Officer |
| Shelley L. Reynolds | 56 | Vice President, Worldwide Controller, and Principal Accounting Officer |
| David A. Zapolsky | 57 | Senior Vice President, General Counsel, and Secretary |

**Jeffrey P. Bezos.** Mr. Bezos has been Chairman of the Board of Amazon.com since founding it in 1994 and Chief Executive Officer since May 1996. Mr. Bezos served as President of the Company from founding until June 1999 and again from October 2000 to the present.

**David H. Clark.** Mr. Clark has served as CEO Worldwide Consumer since January 2021, and Senior Vice President, Worldwide Operations, from May 2014 until January 2021.

**Andrew R. Jassy.** Mr. Jassy has served as CEO Amazon Web Services since April 2016, and Senior Vice President, Amazon Web Services, from April 2006 until April 2016.

**Brian T. Olsavsky.** Mr. Olsavsky has served as Senior Vice President and Chief Financial Officer since June 2015, Vice President, Finance for the Global Consumer Business from December 2011 to June 2015, and numerous financial leadership roles across Amazon with global responsibility since April 2002.

**Shelley L. Reynolds.** Ms. Reynolds has served as Vice President, Worldwide Controller, and Principal Accounting Officer since April 2007.

**David A. Zapolsky.** Mr. Zapolsky has served as Senior Vice President, General Counsel, and Secretary since May 2014, Vice President, General Counsel, and Secretary from September 2012 to May 2014, and as Vice President and Associate General Counsel for Litigation and Regulatory matters from April 2002 until September 2012.

**Board of Directors**

| Name | Age | Position |
|---|---|---|
| Jeffrey P. Bezos | 57 | President, Chief Executive Officer, and Chairman of the Board |
| Keith B. Alexander | 69 | Co-CEO, President, and Chair of IronNet Cybersecurity, Inc. |
| Rosalind G. Brewer | 58 | Group President, Americas and Chief Operating Officer, Starbucks Corporation |
| Jamie S. Gorelick | 70 | Partner, Wilmer Cutler Pickering Hale and Dorr LLP |
| Daniel P. Huttenlocher | 62 | Dean, MIT Schwarzman College of Computing |
| Judith A. McGrath | 68 | Former Chair and CEO, MTV Networks |
| Indra K. Nooyi | 65 | Former Chief Executive Officer, PepsiCo, Inc. |
| Jonathan J. Rubinstein | 64 | Former co-CEO, Bridgewater Associates, LP |
| Thomas O. Ryder | 76 | Retired, Former Chair, Reader's Digest Association, Inc. |
| Patricia Q. Stonesifer | 64 | Former President and Chief Executive Officer, Martha's Table |
| Wendell P. Weeks | 61 | Chief Executive Officer, Corning Incorporated |

5

Table of Contents

**Item 1A.**  *Risk Factors*

Please carefully consider the following discussion of significant factors, events, and uncertainties that make an investment in our securities risky. The events and consequences discussed in these risk factors could, in circumstances we may or may not be able to accurately predict, recognize, or control, have a material adverse effect on our business, growth, reputation, prospects, financial condition, operating results (including components of our financial results), cash flows, liquidity, and stock price. These risk factors do not identify all risks that we face; our operations could also be affected by factors, events, or uncertainties that are not presently known to us or that we currently do not consider to present significant risks to our operations. In addition to the effects of the COVID-19 pandemic and resulting global disruptions on our business and operations discussed in Item 7 of Part II, "Management's Discussion and Analysis of Financial Condition and Results of Operations," and in the risk factors below, additional or unforeseen effects from the COVID-19 pandemic and the global economic climate may give rise to or amplify many of the risks discussed below.

**Business and Industry Risks**

### We Face Intense Competition

Our businesses are rapidly evolving and intensely competitive, and we have many competitors across geographies, including cross-border competition, and in different industries, including physical, e-commerce, and omnichannel retail, e-commerce services, web and infrastructure computing services, electronic devices, digital content, advertising, grocery, and transportation and logistics services. Some of our current and potential competitors have greater resources, longer histories, more customers, and/or greater brand recognition, particularly with our newly-launched products and services and in our newer geographic regions. They may secure better terms from vendors, adopt more aggressive pricing, and devote more resources to technology, infrastructure, fulfillment, and marketing.

Competition continues to intensify, including with the development of new business models and the entry of new and well-funded competitors, and as our competitors enter into business combinations or alliances and established companies in other market segments expand to become competitive with our business. In addition, new and enhanced technologies, including search, web and infrastructure computing services, digital content, and electronic devices continue to increase our competition. The Internet facilitates competitive entry and comparison shopping, which enhances the ability of new, smaller, or lesser known businesses to compete against us. As a result of competition, our product and service offerings may not be successful, we may fail to gain or may lose business, and we may be required to increase our spending or lower prices, any of which could materially reduce our sales and profits.

### Our Expansion into New Products, Services, Technologies, and Geographic Regions Subjects Us to Additional Risks

We may have limited or no experience in our newer market segments, and our customers may not adopt our product or service offerings. These offerings, which can present new and difficult technology challenges, may subject us to claims if customers of these offerings experience service disruptions or failures or other quality issues. In addition, profitability, if any, in our newer activities may not meet our expectations, and we may not be successful enough in these newer activities to recoup our investments in them. Failure to realize the benefits of amounts we invest in new technologies, products, or services could result in the value of those investments being written down or written off.

### Our International Operations Expose Us to a Number of Risks

Our international activities are significant to our revenues and profits, and we plan to further expand internationally. In certain international market segments, we have relatively little operating experience and may not benefit from any first-to-market advantages or otherwise succeed. It is costly to establish, develop, and maintain international operations and stores, and promote our brand internationally. Our international operations may not become profitable on a sustained basis.

In addition to risks described elsewhere in this section, our international sales and operations are subject to a number of risks, including:

- local economic and political conditions;

- government regulation (such as regulation of our product and service offerings and of competition); restrictive governmental actions (such as trade protection measures, including export duties and quotas and custom duties and tariffs); nationalization; and restrictions on foreign ownership;

- restrictions on sales or distribution of certain products or services and uncertainty regarding liability for products, services, and content, including uncertainty as a result of less Internet-friendly legal systems, local laws, lack of legal precedent, and varying rules, regulations, and practices regarding the physical and digital distribution of media products and enforcement of intellectual property rights;

Table of Contents

- business licensing or certification requirements, such as for imports, exports, web services, and electronic devices;

- limitations on the repatriation and investment of funds and foreign currency exchange restrictions;

- limited fulfillment and technology infrastructure;

- shorter payable and longer receivable cycles and the resultant negative impact on cash flow;

- laws and regulations regarding privacy, data protection, data security, network security, consumer protection, payments, advertising, and restrictions on pricing or discounts;

- lower levels of use of the Internet;

- lower levels of consumer spending and fewer opportunities for growth compared to the U.S.;

- lower levels of credit card usage and increased payment risk;

- difficulty in staffing, developing, and managing foreign operations as a result of distance, language, and cultural differences;

- different employee/employer relationships and the existence of works councils and labor unions;

- compliance with the U.S. Foreign Corrupt Practices Act and other applicable U.S. and foreign laws prohibiting corrupt payments to government officials and other third parties;

- laws and policies of the U.S. and other jurisdictions affecting trade, foreign investment, loans, and taxes; and

- geopolitical events, including war and terrorism.

As international physical, e-commerce, and omnichannel retail and other services grow, competition will intensify, including through adoption of evolving business models. Local companies may have a substantial competitive advantage because of their greater understanding of, and focus on, the local customer, as well as their more established local brand names. The inability to hire, train, retain, and manage sufficient required personnel may limit our international growth.

The People's Republic of China ("PRC") and India regulate Amazon's and its affiliates' businesses and operations in country through regulations and license requirements that may restrict (i) foreign investment in and operation of the Internet, IT infrastructure, data centers, retail, delivery, and other sectors, (ii) Internet content, and (iii) the sale of media and other products and services. For example, in order to meet local ownership, regulatory licensing, and cybersecurity requirements, we provide certain technology services in China through contractual relationships with third parties that hold PRC licenses to provide services. In India, the government restricts the ownership or control of Indian companies by foreign entities involved in online multi-brand retail trading activities. For www.amazon.in, we provide certain marketing tools and logistics services to third-party sellers to enable them to sell online and deliver to customers, and we hold indirect minority interests in entities that are third-party sellers on the www.amazon.in marketplace. Although we believe these structures and activities comply with existing laws, they involve unique risks, and the PRC and India may from time to time consider and implement additional changes in their regulatory, licensing, or other requirements that could impact these structures and activities. There are substantial uncertainties regarding the interpretation of PRC and Indian laws and regulations, and it is possible that these governments will ultimately take a view contrary to ours. In addition, our Chinese and Indian businesses and operations may be unable to continue to operate if we or our affiliates are unable to access sufficient funding or, in China, enforce contractual relationships we or our affiliates have in place. Violation of any existing or future PRC, Indian, or other laws or regulations or changes in the interpretations of those laws and regulations could result in our businesses in those countries being subject to fines and other financial penalties, having licenses revoked, or being forced to restructure our operations or shut down entirely.

Table of Contents

*The Variability in Our Retail Business Places Increased Strain on Our Operations*

Demand for our products and services can fluctuate significantly for many reasons, including as a result of seasonality, promotions, product launches, or unforeseeable events, such as in response to natural or man-made disasters, extreme weather, or geopolitical events. For example, we expect a disproportionate amount of our retail sales to occur during our fourth quarter. Our failure to stock or restock popular products in sufficient amounts such that we fail to meet customer demand could significantly affect our revenue and our future growth. When we overstock products, we may be required to take significant inventory markdowns or write-offs and incur commitment costs, which could materially reduce profitability. We regularly experience increases in our net shipping cost due to complimentary upgrades, split-shipments, and additional long-zone shipments necessary to ensure timely delivery for the holiday season. If too many customers access our websites within a short period of time due to increased demand, we may experience system interruptions that make our websites unavailable or prevent us from efficiently fulfilling orders, which may reduce the volume of goods we offer or sell and the attractiveness of our products and services. In addition, we may be unable to adequately staff our fulfillment network and customer service centers during these peak periods and delivery and other fulfillment companies and customer service co-sourcers may be unable to meet the seasonal demand. Risks described elsewhere in this Item 1A relating to fulfillment network optimization and inventory are magnified during periods of high demand.

We generally have payment terms with our retail vendors that extend beyond the amount of time necessary to collect proceeds from our consumer customers. As a result of holiday sales, as of December 31 of each year, our cash, cash equivalents, and marketable securities balances typically reach their highest level (other than as a result of cash flows provided by or used in investing and financing activities). This operating cycle results in a corresponding increase in accounts payable as of December 31. Our accounts payable balance generally declines during the first three months of the year, resulting in a corresponding decline in our cash, cash equivalents, and marketable securities balances.

*We Are Impacted by Fraudulent or Unlawful Activities of Sellers*

The law relating to the liability of online service providers is currently unsettled. In addition, governmental agencies have in the past and could in the future require changes in the way this business is conducted. Under our seller programs, we maintain policies and processes designed to prevent sellers from collecting payments, fraudulently or otherwise, when buyers never receive the products they ordered or when the products received are materially different from the sellers' descriptions, and to prevent sellers in our stores or through other stores from selling unlawful, counterfeit, pirated, or stolen goods, selling goods in an unlawful or unethical manner, violating the proprietary rights of others, or otherwise violating our policies. When these policies and processes are circumvented or fail to operate sufficiently, it can harm our business or damage our reputation and we could face civil or criminal liability for unlawful activities by our sellers. Under our A2Z Guarantee, we reimburse buyers for payments up to certain limits in these situations, and as our third-party seller sales grow, the cost of this program will increase and could negatively affect our operating results.

*We Face Risks Related to Adequately Protecting Our Intellectual Property Rights and Being Accused of Infringing Intellectual Property Rights of Third Parties*

We regard our trademarks, service marks, copyrights, patents, trade dress, trade secrets, proprietary technology, and similar intellectual property as critical to our success, and we rely on trademark, copyright, and patent law, trade secret protection, and confidentiality and/or license agreements with our employees, customers, and others to protect our proprietary rights. Effective intellectual property protection is not available in every country in which our products and services are made available. We also may not be able to acquire or maintain appropriate domain names in all countries in which we do business. Furthermore, regulations governing domain names may not protect our trademarks and similar proprietary rights. We may be unable to prevent third parties from acquiring domain names that are similar to, infringe upon, or diminish the value of our trademarks and other proprietary rights.

We are not always able to discover or determine the extent of any unauthorized use of our proprietary rights. Actions taken by third parties that license our proprietary rights may materially diminish the value of our proprietary rights or reputation. The protection of our intellectual property requires the expenditure of significant financial and managerial resources. Moreover, the steps we take to protect our intellectual property do not always adequately protect our rights or prevent third parties from infringing or misappropriating our proprietary rights. We also cannot be certain that others will not independently develop or otherwise acquire equivalent or superior technology or other intellectual property rights.

We have been subject to, and expect to continue to be subject to, claims and legal proceedings regarding alleged infringement by us of the intellectual property rights of third parties. Such claims, whether or not meritorious, have in the past, and may in the future, result in the expenditure of significant financial and managerial resources, injunctions against us, or significant payments for damages, including to satisfy indemnification obligations or to obtain licenses from third parties who allege that we have infringed their rights. Such licenses may not be available on terms acceptable to us or at all. These risks have been amplified by the increase in third parties whose sole or primary business is to assert such claims.

Table of Contents

Our digital content offerings depend in part on effective digital rights management technology to control access to digital content. Breach or malfunctioning of the digital rights management technology that we use could subject us to claims, and content providers may be unwilling to include their content in our service.

### We Have Foreign Exchange Risk

The results of operations of, and certain of our intercompany balances associated with, our international stores and product and service offerings are exposed to foreign exchange rate fluctuations. Due to these fluctuations, operating results may differ materially from expectations, and we may record significant gains or losses on the remeasurement of intercompany balances. As we have expanded our international operations, our exposure to exchange rate fluctuations has increased. We also hold cash equivalents and/or marketable securities in foreign currencies including Euros, British Pounds, and Japanese Yen. When the U.S. Dollar strengthens compared to these currencies, cash equivalents, and marketable securities balances, when translated, may be materially less than expected and vice versa.

## Operating Risks

### Our Expansion Places a Significant Strain on our Management, Operational, Financial, and Other Resources

We are continuing to rapidly and significantly expand our global operations, including increasing our product and service offerings and scaling our infrastructure to support our retail and services businesses. The complexity of the current scale of our business can place significant strain on our management, personnel, operations, systems, technical performance, financial resources, and internal financial control and reporting functions, and our expansion increases these factors. Failure to manage growth effectively could damage our reputation, limit our growth, and negatively affect our operating results.

### We Experience Significant Fluctuations in Our Operating Results and Growth Rate

We are not always able to accurately forecast our growth rate. We base our expense levels and investment plans on sales estimates. A significant portion of our expenses and investments is fixed, and we are not always able to adjust our spending quickly enough if our sales are less than expected.

Our revenue growth may not be sustainable, and our percentage growth rates may decrease. Our revenue and operating profit growth depends on the continued growth of demand for the products and services offered by us or our sellers, and our business is affected by general economic and business conditions worldwide. A softening of demand, whether caused by changes in customer preferences or a weakening of the U.S. or global economies, may result in decreased revenue or growth.

Our sales and operating results will also fluctuate for many other reasons, including due to factors described elsewhere in this section and the following:

- our ability to retain and increase sales to existing customers, attract new customers, and satisfy our customers' demands;
- our ability to retain and expand our network of sellers;
- our ability to offer products on favorable terms, manage inventory, and fulfill orders;
- the introduction of competitive stores, websites, products, services, price decreases, or improvements;
- changes in usage or adoption rates of the Internet, e-commerce, electronic devices, and web services, including outside the U.S.;
- timing, effectiveness, and costs of expansion and upgrades of our systems and infrastructure;
- the success of our geographic, service, and product line expansions;
- the extent to which we finance, and the terms of any such financing for, our current operations and future growth;
- the outcomes of legal proceedings and claims, which may include significant monetary damages or injunctive relief and could have a material adverse impact on our operating results;
- variations in the mix of products and services we sell;
- variations in our level of merchandise and vendor returns;
- the extent to which we offer fast and free delivery, continue to reduce prices worldwide, and provide additional benefits to our customers;
- factors affecting our reputation or brand image;
- the extent to which we invest in technology and content, fulfillment, and other expense categories;

Table of Contents

- increases in the prices of fuel and gasoline, as well as increases in the prices of other energy products and commodities like paper and packing supplies and hardware products;
- the extent to which operators of the networks between our customers and our stores successfully charge fees to grant our customers unimpaired and unconstrained access to our online services;
- our ability to collect amounts owed to us when they become due;
- the extent to which new and existing technologies, or industry trends, restrict online advertising or affect our ability to customize advertising or otherwise tailor our product and service offerings;
- the extent to which use of our services is affected by spyware, viruses, phishing and other spam emails, denial of service attacks, data theft, computer intrusions, outages, and similar events; and
- disruptions from natural or man-made disasters, extreme weather, geopolitical events and security issues (including terrorist attacks and armed hostilities), labor or trade disputes, and similar events.

### *We Face Risks Related to Successfully Optimizing and Operating Our Fulfillment Network and Data Centers*

Failures to adequately predict customer demand or otherwise optimize and operate our fulfillment network and data centers successfully from time to time result in excess or insufficient fulfillment or data center capacity, increased costs, and impairment charges, any of which could materially harm our business. As we continue to add fulfillment and data center capability or add new businesses with different requirements, our fulfillment and data center networks become increasingly complex and operating them becomes more challenging. There can be no assurance that we will be able to operate our networks effectively.

In addition, failure to optimize inventory in our fulfillment network increases our net shipping cost by requiring long-zone or partial shipments. We and our co-sourcers may be unable to adequately staff our fulfillment network and customer service centers. Under some of our commercial agreements, we maintain the inventory of other companies, thereby increasing the complexity of tracking inventory and operating our fulfillment network. Our failure to properly handle such inventory or the inability of the other businesses on whose behalf we perform inventory fulfillment services to accurately forecast product demand may result in us being unable to secure sufficient storage space or to optimize our fulfillment network or cause other unexpected costs and other harm to our business and reputation.

We rely on a limited number of shipping companies to deliver inventory to us and completed orders to our customers. The inability to negotiate acceptable terms with these companies or performance problems or other difficulties experienced by these companies or by our own transportation systems could negatively impact our operating results and customer experience. In addition, our ability to receive inbound inventory efficiently and ship completed orders to customers also may be negatively affected by natural or man-made disasters, extreme weather, geopolitical events and security issues, labor or trade disputes, and similar events.

### *We Could Be Harmed by Data Loss or Other Security Breaches*

Because we collect, process, store, and transmit large amounts of data, including confidential, sensitive, proprietary, and business and personal information, failure to prevent or mitigate data loss, theft, misuse, or other security breaches or vulnerabilities affecting our or our vendors' or customers' technology, products, and systems, could: expose us or our customers to a risk of loss, disclosure, or misuse of such information; adversely affect our operating results; result in litigation, liability, or regulatory action (including under laws related to privacy, data protection, data security, network security, and consumer protection); deter customers or sellers from using our stores and services; and otherwise harm our business and reputation. We use third-party technology and systems for a variety of reasons, including, without limitation, encryption and authentication technology, employee email, content delivery to customers, back-office support, and other functions. Some of our systems have experienced past security breaches, and, although they did not have a material adverse effect on our operating results, there can be no assurance of a similar result in the future. Although we have developed systems and processes that are designed to protect customer data and prevent such incidents, including systems and processes designed to reduce the impact of a security breach at a third-party vendor or customer, such measures cannot provide absolute security and may fail to operate as intended or be circumvented.

### *We Face Risks Related to System Interruption and Lack of Redundancy*

We experience occasional system interruptions and delays that make our websites and services unavailable or slow to respond and prevent us from efficiently accepting or fulfilling orders or providing services to third parties, which may reduce our net sales and the attractiveness of our products and services. Steps we take to add software and hardware, upgrade our systems and network infrastructure, and improve the stability and efficiency of our systems may not be sufficient to avoid system interruptions or delays that could adversely affect our operating results.

10

Table of Contents

Our computer and communications systems and operations in the past have been, or in the future could be, damaged or interrupted due to events such as natural or man-made disasters, extreme weather, geopolitical events and security issues (including terrorist attacks and armed hostilities), computer viruses, physical or electronic break-ins, and similar events or disruptions. Any of these events could cause system interruption, delays, and loss of critical data, and could prevent us from accepting and fulfilling customer orders and providing services, which could make our product and service offerings less attractive and subject us to liability. Our systems are not fully redundant and our disaster recovery planning may not be sufficient. In addition, our insurance may not provide sufficient coverage to compensate for related losses. Any of these events could damage our reputation and be expensive to remedy.

### *The Loss of Key Senior Management Personnel or the Failure to Hire and Retain Highly Skilled and Other Key Personnel Could Negatively Affect Our Business*

We depend on our senior management and other key personnel, particularly Jeffrey P. Bezos, our President, CEO, and Chairman. We do not have "key person" life insurance policies. We also rely on other highly skilled personnel. Competition for qualified personnel in the technology industry has historically been intense, particularly for software engineers, computer scientists, and other technical staff. The loss of any of our executive officers or other key employees or the inability to hire, train, retain, and manage qualified personnel, could harm our business.

### *Our Supplier Relationships Subject Us to a Number of Risks*

We have significant suppliers, including content and technology licensors, and in some cases, limited or single-sources of supply, that are important to our sourcing, services, manufacturing, and any related ongoing servicing of merchandise and content. We do not have long-term arrangements with most of our suppliers to guarantee availability of merchandise, content, components, or services, particular payment terms, or the extension of credit limits. Decisions by our current suppliers to limit or stop selling or licensing merchandise, content, components, or services to us on acceptable terms, or delay delivery, including as a result of one or more supplier bankruptcies due to poor economic conditions, as a result of natural disasters, or for other reasons, may result in our being unable to procure alternatives from other suppliers in a timely and efficient manner and on acceptable terms, or at all. In addition, violations by our suppliers or other vendors of applicable laws, regulations, contractual terms, intellectual property rights of others, or our Supply Chain Standards, as well as products or practices regarded as unethical, unsafe, or hazardous, could expose us to claims, damage our reputation, limit our growth, and negatively affect our operating results.

### *Our Commercial Agreements, Strategic Alliances, and Other Business Relationships Expose Us to Risks*

We provide physical, e-commerce, and omnichannel retail and other services to businesses through commercial agreements, strategic alliances, and business relationships. Under these agreements, we provide web services, technology, fulfillment, computing, digital storage, and other services, as well as enable sellers to offer products or services through our stores. These arrangements are complex and require substantial infrastructure capacity, personnel, and other resource commitments, which may limit the amount of business we can service. We may not be able to implement, maintain, and develop the components of these commercial relationships, which may include web services, fulfillment, customer service, inventory management, tax collection, payment processing, hardware, content, and third-party software, and engaging third parties to perform services. The amount of compensation we receive under certain of our commercial agreements is partially dependent on the volume of the other company's sales. Therefore, when the other company's offerings are not successful, the compensation we receive may be lower than expected or the agreement may be terminated. Moreover, we may not be able to enter into additional or alternative commercial relationships and strategic alliances on favorable terms. We also may be subject to claims from businesses to which we provide these services if we are unsuccessful in implementing, maintaining, or developing these services.

As our agreements terminate, we may be unable to renew or replace these agreements on comparable terms, or at all. We may in the future enter into amendments on less favorable terms or encounter parties that have difficulty meeting their contractual obligations to us, which could adversely affect our operating results.

Our present and future e-commerce services agreements, other commercial agreements, and strategic alliances create additional risks such as:

- disruption of our ongoing business, including loss of management focus on existing businesses;

- impairment of other relationships;

- variability in revenue and income from entering into, amending, or terminating such agreements or relationships; and

- difficulty integrating under the commercial agreements.

11

Table of Contents

*Our Business Suffers When We Are Unsuccessful in Making, Integrating, and Maintaining Acquisitions and Investments*

We have acquired and invested in a number of companies, and we may in the future acquire or invest in or enter into joint ventures with additional companies. These transactions create risks such as:

- disruption of our ongoing business, including loss of management focus on existing businesses;

- problems retaining key personnel;

- additional operating losses and expenses of the businesses we acquired or in which we invested;

- the potential impairment of tangible and intangible assets and goodwill, including as a result of acquisitions;

- the potential impairment of customer and other relationships of the company we acquired or in which we invested or our own customers as a result of any integration of operations;

- the difficulty of completing such transactions and achieving anticipated benefits within expected timeframes, or at all;

- the difficulty of incorporating acquired operations, technology, and rights into our offerings, and unanticipated expenses related to such integration;

- the difficulty of integrating a new company's accounting, financial reporting, management, information and data security, human resource, and other administrative systems to permit effective management, and the lack of control if such integration is delayed or not successfully implemented;

- losses we may incur as a result of declines in the value of an investment or as a result of incorporating an investee's financial performance into our financial results;

- for investments in which an investee's financial performance is incorporated into our financial results, either in full or in part, the dependence on the investee's accounting, financial reporting, and similar systems, controls, and processes;

- the difficulty of implementing at companies we acquire the controls, procedures, and policies appropriate for a larger public company;

- the risks associated with businesses we acquire or invest in, which may differ from or be more significant than the risks our other businesses face;

- potential unknown liabilities associated with a company we acquire or in which we invest; and

- for foreign transactions, additional risks related to the integration of operations across different cultures and languages, and the economic, political, and regulatory risks associated with specific countries.

As a result of future acquisitions or mergers, we might need to issue additional equity securities, spend our cash, or incur debt, contingent liabilities, or amortization expenses related to intangible assets, any of which could reduce our profitability and harm our business or only be available on unfavorable terms, if at all. In addition, valuations supporting our acquisitions and strategic investments could change rapidly. We could determine that such valuations have experienced impairments or other-than-temporary declines in fair value which could adversely impact our financial results.

*We Face Significant Inventory Risk*

In addition to risks described elsewhere in this Item 1A relating to fulfillment network and inventory optimization by us and third parties, we are exposed to significant inventory risks that may adversely affect our operating results as a result of seasonality, new product launches, rapid changes in product cycles and pricing, defective merchandise, changes in consumer demand and consumer spending patterns, changes in consumer tastes with respect to our products, spoilage, and other factors. We endeavor to accurately predict these trends and avoid overstocking or understocking products we manufacture and/or sell. Demand for products, however, can change significantly between the time inventory or components are ordered and the date of sale. In addition, when we begin selling or manufacturing a new product, it may be difficult to establish vendor relationships, determine appropriate product or component selection, and accurately forecast demand. The acquisition of certain types of inventory or components requires significant lead-time and prepayment and they may not be returnable. We carry a broad selection and significant inventory levels of certain products, such as consumer electronics, and at times we are unable to sell products in sufficient quantities or to meet demand during the relevant selling seasons. Any one of the inventory risk factors set forth above may adversely affect our operating results.

*We Are Subject to Payments-Related Risks*

We accept payments using a variety of methods, including credit card, debit card, credit accounts (including promotional financing), gift cards, direct debit from a customer's bank account, consumer invoicing, physical bank check, and payment upon delivery. For existing and future payment options we offer to our customers, we currently are subject to, and may become subject to additional, regulations and compliance requirements (including obligations to implement enhanced authentication

Table of Contents

processes that could result in significant costs and reduce the ease of use of our payments products), as well as fraud. For certain payment methods, including credit and debit cards, we pay interchange and other fees, which may increase over time and raise our operating costs and lower profitability. We rely on third parties to provide certain Amazon-branded payment methods and payment processing services, including the processing of credit cards, debit cards, electronic checks, and promotional financing. In each case, it could disrupt our business if these companies become unwilling or unable to provide these services to us. We also offer co-branded credit card programs, which could adversely affect our operating results if renewed on less favorable terms or terminated. We are also subject to payment card association operating rules, including data security rules, certification requirements, and rules governing electronic funds transfers, which could change or be reinterpreted to make it difficult or impossible for us to comply. Failure to comply with these rules or requirements, as well as any breach, compromise, or failure to otherwise detect or prevent fraudulent activity involving our data security systems, could result in our being liable for card issuing banks' costs, subject to fines and higher transaction fees, and loss of our ability to accept credit and debit card payments from our customers, process electronic funds transfers, or facilitate other types of online payments, and our business and operating results could be adversely affected.

In addition, we provide regulated services in certain jurisdictions because we enable customers to keep account balances with us and transfer money to third parties, and because we provide services to third parties to facilitate payments on their behalf. Jurisdictions subject us to requirements for licensing, regulatory inspection, bonding and capital maintenance, the use, handling, and segregation of transferred funds, consumer disclosures, maintaining or processing data, and authentication. We are also subject to or voluntarily comply with a number of other laws and regulations relating to payments, money laundering, international money transfers, privacy, data protection, data security, network security, consumer protection, and electronic fund transfers. If we were found to be in violation of applicable laws or regulations, we could be subject to additional requirements and civil and criminal penalties, or forced to cease providing certain services.

### *We Have a Rapidly Evolving Business Model and Our Stock Price Is Highly Volatile*

We have a rapidly evolving business model. The trading price of our common stock fluctuates significantly in response to, among other risks, the risks described elsewhere in this Item 1A, as well as:

- changes in interest rates;
- conditions or trends in the Internet and the industry segments we operate in;
- quarterly variations in operating results;
- fluctuations in the stock market in general and market prices for Internet-related companies in particular;
- changes in financial estimates by us or decisions to increase or decrease future spending or investment levels;
- changes in financial estimates and recommendations by securities analysts;
- changes in our capital structure, including issuance of additional debt or equity to the public;
- changes in the valuation methodology of, or performance by, other e-commerce or technology companies; and
- transactions in our common stock by major investors and certain analyst reports, news, and speculation.

Volatility in our stock price could adversely affect our business and financing opportunities and force us to increase our cash compensation to employees or grant larger stock awards than we have historically, which could hurt our operating results or reduce the percentage ownership of our existing stockholders, or both.

## Legal and Regulatory Risks

### *Government Regulation Is Evolving and Unfavorable Changes Could Harm Our Business*

We are subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet, physical, e-commerce, and omnichannel retail, digital content, web services, electronic devices, advertising, artificial intelligence technologies and services, and other products and services that we offer or sell. These regulations and laws cover taxation, privacy, data protection, data security, network security, consumer protection, pricing, content, copyrights, distribution, transportation, mobile communications, electronic device certification, electronic waste, energy consumption, environmental regulation, electronic contracts and other communications, competition, employment, trade and protectionist measures, web services, the provision of online payment services, registration, licensing, and information reporting requirements, unencumbered Internet access to our services or access to our facilities, the design and operation of websites, health, safety, and sanitation standards, the characteristics, legality, and quality of products and services, product labeling, the commercial operation of unmanned aircraft systems, and other matters. It is not clear how existing laws governing issues such as property ownership, libel, privacy, data protection, data security, network security, and consumer protection apply to aspects of our operations such as the Internet, e-commerce, digital content, web services, electronic devices, advertising, and artificial

Table of Contents

intelligence technologies and services. A large number of jurisdictions regulate our operations, and the extent, nature, and scope of such regulations is evolving and expanding as the scope of our businesses expand. We are regularly subject to formal and informal reviews and investigations by governments and regulatory authorities under existing laws, regulations, or interpretations or pursuing new and novel approaches to regulate our operations. For example, a number of regulators have opened investigations to assess whether aspects of our operations violate competition rules. Unfavorable regulations, laws, decisions, or interpretations by government or regulatory authorities applying those laws and regulations, or inquiries, investigations, or enforcement actions threatened or initiated by them, could cause us to incur substantial costs, expose us to unanticipated civil and criminal liability or penalties (including substantial monetary fines), diminish the demand for, or availability of, our products and services, increase our cost of doing business, require us to change our business practices in a manner materially adverse to our business, damage our reputation, impede our growth, or otherwise have a material effect on our operations.

### Claims, Litigation, Government Investigations, and Other Proceedings May Adversely Affect Our Business and Results of Operations

As an innovative company offering a wide range of consumer and business products and services around the world, we are regularly subject to actual and threatened claims, litigation, reviews, investigations, and other proceedings, including proceedings by governments and regulatory authorities, involving a wide range of issues, including patent and other intellectual property matters, taxes, labor and employment, competition and antitrust, privacy, data protection, data security, network security, consumer protection, commercial disputes, goods and services offered by us and by third parties, and other matters. The number and scale of these proceedings have increased over time as our businesses have expanded in scope and geographic reach and our products, services, and operations have become more complex and available to, and used by, more people. Any of these types of proceedings can have an adverse effect on us because of legal costs, disruption of our operations, diversion of management resources, negative publicity, and other factors. The outcomes of these matters are inherently unpredictable and subject to significant uncertainties. Determining legal reserves or possible losses from such matters involves judgment and may not reflect the full range of uncertainties and unpredictable outcomes. Until the final resolution of such matters, we may be exposed to losses in excess of the amount recorded, and such amounts could be material. Should any of our estimates and assumptions change or prove to have been incorrect, it could have a material effect on our business, consolidated financial position, results of operations, or cash flows. In addition, it is possible that a resolution of one or more such proceedings, including as a result of a settlement, could involve licenses, sanctions, consent decrees, or orders requiring us to make substantial future payments, preventing us from offering certain products or services, requiring us to change our business practices in a manner materially adverse to our business, requiring development of non-infringing or otherwise altered products or technologies, damaging our reputation, or otherwise having a material effect on our operations.

### We Are Subject to Product Liability Claims When People or Property Are Harmed by the Products We Sell or Manufacture

Some of the products we sell or manufacture expose us to product liability or food safety claims relating to personal injury or illness, death, or environmental or property damage, and can require product recalls or other actions. Third parties who sell products using our services and stores also expose us to product liability claims. Although we maintain liability insurance, we cannot be certain that our coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to us on economically reasonable terms, or at all. Although we impose contractual terms on sellers that are intended to prohibit sales of certain type of products, we may not be able to detect, enforce, or collect sufficient damages for breaches of such agreements. In addition, some of our agreements with our vendors and sellers do not indemnify us from product liability.

14

Table of Contents

### We Face Additional Tax Liabilities and Collection Obligations

We are subject to a variety of taxes and tax collection obligations in the U.S. (federal and state) and numerous foreign jurisdictions. We may recognize additional tax expense and be subject to additional tax liabilities, including other liabilities for tax collection obligations due to changes in laws, regulations, administrative practices, principles, and interpretations related to tax, including changes to the global tax framework, competition, and other laws and accounting rules in various jurisdictions. Such changes could come about as a result of economic, political, and other conditions. An increasing number of jurisdictions are considering or have adopted laws or administrative practices that impose new tax measures, including revenue-based taxes, targeting online commerce and the remote selling of goods and services. These include new obligations to collect sales, consumption, value added, or other taxes on online marketplaces and remote sellers, or other requirements that may result in liability for third party obligations. For example, the European Union, certain member states, and other countries have proposed or enacted taxes on online advertising and marketplace service revenues. Our results of operations and cash flows could be adversely effected by additional taxes of this nature imposed on us prospectively or retroactively or additional taxes or penalties resulting from the failure to comply with any collection obligations or failure to provide information about our customers, suppliers, and other third parties for tax reporting purposes to various government agencies. In some cases we also may not have sufficient notice to enable us to build systems and adopt processes to properly comply with new reporting or collection obligations by the effective date.

Our tax expense and liabilities are also affected by other factors, such as changes in our business operations, acquisitions, investments, entry into new businesses and geographies, intercompany transactions, the relative amount of our foreign earnings, losses incurred in jurisdictions for which we are not able to realize related tax benefits, the applicability of special or extraterritorial tax regimes, changes in foreign currency exchange rates, changes in our stock price, changes to our forecasts of income and loss and the mix of jurisdictions to which they relate, and changes in our tax assets and liabilities and their valuation. In the ordinary course of our business, there are many transactions and calculations for which the ultimate tax determination is uncertain. Significant judgment is required in evaluating and estimating our tax expense, assets, and liabilities.

We are also subject to tax controversies in various jurisdictions that can result in tax assessments against us. Developments in an audit, investigation, or other tax controversy can have a material effect on our operating results or cash flows in the period or periods for which that development occurs, as well as for prior and subsequent periods. We regularly assess the likelihood of an adverse outcome resulting from these proceedings to determine the adequacy of our tax accruals. Although we believe our tax estimates are reasonable, the final outcome of audits, investigations, and any other tax controversies could be materially different from our historical tax accruals.

### We Are Subject to Risks Related to Government Contracts and Related Procurement Regulations

Our contracts with U.S., as well as state, local, and foreign, government entities are subject to various procurement regulations and other requirements relating to their formation, administration, and performance. We are subject to audits and investigations relating to our government contracts, and any violations could result in various civil and criminal penalties and administrative sanctions, including termination of contract, refunding or suspending of payments, forfeiture of profits, payment of fines, and suspension or debarment from future government business. In addition, some of these contracts are subject to periodic funding approval and/or provide for termination by the government at any time, without cause.

**Item 1B.**          *Unresolved Staff Comments*

None.

Table of Contents Case 2:19-cv-01320-JCC   Document 172-3   Filed 08/01/24   Page 17 of 59

**Item 2.**          *Properties*

As of December 31, 2020, we operated the following facilities (in thousands):

| Description of Use | Leased Square Footage (1) | Owned Square Footage | Location |
|---|---|---|---|
| Office space | 23,731 | 5,696 | North America |
| Office space | 19,023 | 1,823 | International |
| Physical stores (2) | 21,157 | 662 | North America |
| Physical stores (2) | 169 | — | International |
| Fulfillment, data centers, and other | 285,677 | 8,461 | North America |
| Fulfillment, data centers, and other | 104,668 | 3,449 | International |
| Total | 454,425 | 20,091 | |

(1)  For leased properties, represents the total leased space excluding sub-leased space.
(2)  This includes 611 North America and 7 International stores as of December 31, 2020.

| Segment | Leased Square Footage (1) | Owned Square Footage (1) |
|---|---|---|
| North America | 298,879 | 3,813 |
| International | 102,192 | 1,294 |
| AWS | 10,599 | 7,465 |
| Total | 411,670 | 12,572 |

(1)  Segment amounts exclude corporate facilities. Shared facilities are allocated among the segments based on usage and primarily relate to facilities that hold our technology infrastructure. See Item 8 of Part II, "Financial Statements and Supplementary Data — Note 10 — Segment Information."

We own and lease our corporate headquarters in Seattle, Washington and Arlington, Virginia.

**Item 3.**          *Legal Proceedings*

See Item 8 of Part II, "Financial Statements and Supplementary Data — Note 7 — Commitments and Contingencies — Legal Proceedings."

**Item 4.**          *Mine Safety Disclosures*

Not applicable.

Table of Contents

**PART II**

**Item 5.**                 *Market for the Registrant's Common Stock, Related Shareholder Matters, and Issuer Purchases of Equity Securities*

*Market Information*

Our common stock is traded on the Nasdaq Global Select Market under the symbol "AMZN."

*Holders*

As of January 20, 2021, there were 6,330 shareholders of record of our common stock, although there is a much larger number of beneficial owners.

*Recent Sales of Unregistered Securities*

None.

*Issuer Purchases of Equity Securities*

None.

App. 162

Table of Contents

**Item 6.**          *Selected Consolidated Financial Data*

The following selected consolidated financial data should be read in conjunction with the consolidated financial statements and the notes thereto in Item 8 of Part II, "Financial Statements and Supplementary Data," and the information contained in Item 7 of Part II, "Management's Discussion and Analysis of Financial Condition and Results of Operations." Historical results are not necessarily indicative of future results.

|  | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | **2016** | **2017 (1)** | **2018** | **2019** | **2020** |
|  | (in millions, except per share data) | | | | |
| **Statements of Operations:** | | | | | |
| Net sales | $ 135,987 | $ 177,866 | $ 232,887 | $ 280,522 | $ 386,064 |
| Operating income | $ 4,186 | $ 4,106 | $ 12,421 | $ 14,541 | $ 22,899 |
| Net income (loss) | $ 2,371 | $ 3,033 | $ 10,073 | $ 11,588 | $ 21,331 |
| Basic earnings per share (2) | $ 5.01 | $ 6.32 | $ 20.68 | $ 23.46 | $ 42.64 |
| Diluted earnings per share (2) | $ 4.90 | $ 6.15 | $ 20.14 | $ 23.01 | $ 41.83 |
| Weighted-average shares used in computation of earnings per share: | | | | | |
| Basic | 474 | 480 | 487 | 494 | 500 |
| Diluted | 484 | 493 | 500 | 504 | 510 |
| **Statements of Cash Flows:** | | | | | |
| Net cash provided by (used in) operating activities (3) | $ 17,203 | $ 18,365 | $ 30,723 | $ 38,514 | $ 66,064 |

|  | December 31, | | | | |
|---|---|---|---|---|---|
|  | **2016** | **2017** | **2018** | **2019 (4)** | **2020** |
|  | (in millions) | | | | |
| **Balance Sheets:** | | | | | |
| Total assets | $ 83,402 | $ 131,310 | $ 162,648 | $ 225,248 | $ 321,195 |
| Total long-term obligations | $ 20,301 | $ 45,718 | $ 50,708 | $ 75,376 | $ 101,406 |

_____

(1)  We acquired Whole Foods Market on August 28, 2017. The results of Whole Foods Market have been included in our results of operation from the date of acquisition.

(2)  For further discussion of earnings per share, see Item 8 of Part II, "Financial Statements and Supplementary Data — Note 1 — Description of Business, Accounting Policies, and Supplemental Disclosures"

(3)  As a result of the adoption of new accounting guidance, we retrospectively adjusted our consolidated statements of cash flows to add restricted cash to cash and cash equivalents, which restated cash provided by operating activities by $(69) million in 2016 and 2017.

(4)  As a result of the adoption of new accounting guidance on January 1, 2019, we recognized lease assets and liabilities for operating leases with terms of more than twelve months. Prior period amounts were not adjusted and continue to be reported in accordance with our historic accounting policies.

Table of Contents

**Item 7.**          ***Management's Discussion and Analysis of Financial Condition and Results of Operations***

**Forward-Looking Statements**

*This Annual Report on Form 10-K includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements other than statements of historical fact, including statements regarding guidance, industry prospects, or future results of operations or financial position, made in this Annual Report on Form 10-K are forward-looking. We use words such as anticipates, believes, expects, future, intends, and similar expressions to identify forward-looking statements. Forward-looking statements reflect management's current expectations and are inherently uncertain. Actual results could differ materially for a variety of reasons, including, among others, fluctuations in foreign exchange rates, changes in global economic conditions and customer spending, world events, the rate of growth of the Internet, online commerce, and cloud services, the amount that Amazon.com invests in new business opportunities and the timing of those investments, the mix of products and services sold to customers, the mix of net sales derived from products as compared with services, the extent to which we owe income or other taxes, competition, management of growth, potential fluctuations in operating results, international growth and expansion, the outcomes of claims, litigation, government investigations, and other proceedings, fulfillment, sortation, delivery, and data center optimization, risks of inventory management, variability in demand, the degree to which we enter into, maintain, and develop commercial agreements, proposed and completed acquisitions and strategic transactions, payments risks, and risks of fulfillment throughput and productivity. In addition, the global economic climate and additional or unforeseen effects from the COVID-19 pandemic amplify many of these risks. These risks and uncertainties, as well as other risks and uncertainties that could cause our actual results to differ significantly from management's expectations, are described in greater detail in Item 1A of Part I, "Risk Factors."*

**Overview**

*Our primary source of revenue is the sale of a wide range of products and services to customers.* The products offered through our stores include merchandise and content we have purchased for resale and products offered by third-party sellers, and we also manufacture and sell electronic devices and produce media content. Generally, we recognize gross revenue from items we sell from our inventory as product sales and recognize our net share of revenue of items sold by third-party sellers as service sales. We seek to increase unit sales across our stores, through increased product selection, across numerous product categories. We also offer other services such as compute, storage, and database offerings, fulfillment, advertising, publishing, and digital content subscriptions.

*Our financial focus is on long-term, sustainable growth in free cash flows.* Free cash flows are driven primarily by increasing operating income and efficiently managing accounts receivable, inventory, accounts payable, and cash capital expenditures, including our decision to purchase or lease property and equipment. Increases in operating income primarily result from increases in sales of products and services and efficiently managing our operating costs, partially offset by investments we make in longer-term strategic initiatives, including capital expenditures focused on improving the customer experience. To increase sales of products and services, we focus on improving all aspects of the customer experience, including lowering prices, improving availability, offering faster delivery and performance times, increasing selection, producing original content, increasing product categories and service offerings, expanding product information, improving ease of use, improving reliability, and earning customer trust. See "Results of Operations — Non-GAAP Financial Measures" below for additional information on our non-GAAP free cash flows financial measures.

*We seek to reduce our variable costs per unit and work to leverage our fixed costs.* Our variable costs include product and content costs, payment processing and related transaction costs, picking, packaging, and preparing orders for shipment, transportation, customer service support, costs necessary to run AWS, and a portion of our marketing costs. Our fixed costs include the costs necessary to build and run our technology infrastructure; to build, enhance, and add features to our online stores, web services, electronic devices, and digital offerings; and to build and optimize our fulfillment networks and related facilities. Variable costs generally change directly with sales volume, while fixed costs generally are dependent on the timing of capacity needs, geographic expansion, category expansion, and other factors. To decrease our variable costs on a per unit basis and enable us to lower prices for customers, we seek to increase our direct sourcing, increase discounts from suppliers, and reduce defects in our processes. To minimize unnecessary growth in fixed costs, we seek to improve process efficiencies and maintain a lean culture.

*Because of our model we are able to turn our inventory quickly and have a cash-generating operating cycle[1].* On average, our high inventory velocity means we generally collect from consumers before our payments to suppliers come due. We expect variability in inventory turnover over time since it is affected by numerous factors, including our product mix, the mix of sales

---

[1] The operating cycle is the number of days of sales in inventory plus the number of days of sales in accounts receivable minus accounts payable days.

[Table of Contents](#)

by us and by third-party sellers, our continuing focus on in-stock inventory availability and selection of product offerings, our investment in new geographies and product lines, and the extent to which we choose to utilize third-party fulfillment providers. We also expect some variability in accounts payable days over time since they are affected by several factors, including the mix of product sales, the mix of sales by third-party sellers, the mix of suppliers, seasonality, and changes in payment terms over time, including the effect of balancing pricing and timing of payment terms with suppliers.

*We expect spending in technology and content will increase over time as we add computer scientists, designers, software and hardware engineers, and merchandising employees. Our technology and content investment and capital spending projects often support a variety of product and service offerings due to geographic expansion and the cross-functionality of our systems and operations. We seek to invest efficiently in several areas of technology and content, including AWS, and expansion of new and existing product categories and service offerings, as well as in technology infrastructure to enhance the customer experience and improve our process efficiencies.* We believe that advances in technology, specifically the speed and reduced cost of processing power, data storage and analytics, improved wireless connectivity, and the practical applications of artificial intelligence and machine learning, will continue to improve users' experience on the Internet and increase its ubiquity in people's lives. To best take advantage of these continued advances in technology, we are investing in AWS, which offers a broad set of on-demand technology services, including compute, storage, database, analytics, and machine learning, and other services, to developers and enterprises of all sizes. We are also investing in initiatives to build and deploy innovative and efficient software and electronic devices.

*We seek to efficiently manage shareholder dilution while maintaining the flexibility to issue shares for strategic purposes, such as financings, acquisitions, and aligning employee compensation with shareholders' interests.* We utilize restricted stock units as our primary vehicle for equity compensation because we believe this compensation model aligns the long-term interest of our shareholders and employees. In measuring shareholder dilution, we include all vested and unvested stock awards outstanding, without regard to estimated forfeitures. Total shares outstanding plus outstanding stock awards were 512 million and 518 million as of December 31, 2019 and 2020.

*Our financial reporting currency is the U.S. Dollar and changes in foreign exchange rates significantly affect our reported results and consolidated trends.* For example, if the U.S. Dollar weakens year-over-year relative to currencies in our international locations, our consolidated net sales and operating expenses will be higher than if currencies had remained constant. Likewise, if the U.S. Dollar strengthens year-over-year relative to currencies in our international locations, our consolidated net sales and operating expenses will be lower than if currencies had remained constant. We believe that our increasing diversification beyond the U.S. economy through our growing international businesses benefits our shareholders over the long-term. We also believe it is useful to evaluate our operating results and growth rates before and after the effect of currency changes.

In addition, the remeasurement of our intercompany balances can result in significant gains and losses associated with the effect of movements in foreign currency exchange rates. Currency volatilities may continue, which may significantly impact (either positively or negatively) our reported results and consolidated trends and comparisons.

For additional information about each line item addressed above, refer to Item 8 of Part II, "Financial Statements and Supplementary Data — Note 1 — Description of Business, Accounting Policies, and Supplemental Disclosures."

Our Annual Report on Form 10-K for the year ended December 31, 2019 includes a discussion and analysis of our financial condition and results of operations for the year ended December 31, 2018 in Item 7 of Part II, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

## Effects of COVID-19

The COVID-19 pandemic and resulting global disruptions have affected our businesses, as well as those of our customers, suppliers, and third-party sellers. To serve our customers while also providing for the safety of our employees and service providers, we have modified numerous aspects of our logistics, transportation, supply chain, purchasing, and third-party seller processes. Beginning in Q1 2020, we made numerous process updates across our operations worldwide, and adapted our fulfillment network, to implement employee and customer safety measures, such as enhanced cleaning and physical distancing, personal protective gear, disinfectant spraying, and temperature checks. Since February 2020, we have hired over 400,000 full-time and part-time employees to increase our fulfillment network capacity. We incurred approximately $4.0 billion in COVID-19 related costs in Q4 2020, for a total of more than $11.5 billion during 2020. We will continue to prioritize employee and customer safety and comply with evolving federal, state, and local standards as well as to implement standards or processes that we determine to be in the best interests of our employees, customers, and communities.

Table of Contents

**Critical Accounting Judgments**

The preparation of financial statements in conformity with generally accepted accounting principles of the United States ("GAAP") requires estimates and assumptions that affect the reported amounts of assets and liabilities, revenues and expenses, and related disclosures of contingent liabilities in the consolidated financial statements and accompanying notes. The SEC has defined a company's critical accounting policies as the ones that are most important to the portrayal of the company's financial condition and results of operations, and which require the company to make its most difficult and subjective judgments, often as a result of the need to make estimates of matters that are inherently uncertain. Based on this definition, we have identified the critical accounting policies and judgments addressed below. We also have other key accounting policies, which involve the use of estimates, judgments, and assumptions that are significant to understanding our results. For additional information, see Item 8 of Part II, "Financial Statements and Supplementary Data — Note 1 — Description of Business, Accounting Policies, and Supplemental Disclosures." Although we believe that our estimates, assumptions, and judgments are reasonable, they are based upon information presently available. Actual results may differ significantly from these estimates under different assumptions, judgments, or conditions.

*Inventories*

Inventories, consisting of products available for sale, are primarily accounted for using the first-in first-out method, and are valued at the lower of cost and net realizable value. This valuation requires us to make judgments, based on currently available information, about the likely method of disposition, such as through sales to individual customers, returns to product vendors, or liquidations, and expected recoverable values of each disposition category. These assumptions about future disposition of inventory are inherently uncertain and changes in our estimates and assumptions may cause us to realize material write-downs in the future. As a measure of sensitivity, for every 1% of additional inventory valuation allowance as of December 31, 2020, we would have recorded an additional cost of sales of approximately $270 million.

In addition, we enter into supplier commitments for certain electronic device components and certain products. These commitments are based on forecasted customer demand. If we reduce these commitments, we may incur additional costs.

*Income Taxes*

We are subject to income taxes in the U.S. (federal and state) and numerous foreign jurisdictions. Tax laws, regulations, administrative practices, principles, and interpretations in various jurisdictions may be subject to significant change, with or without notice, due to economic, political, and other conditions, and significant judgment is required in evaluating and estimating our provision and accruals for these taxes. There are many transactions that occur during the ordinary course of business for which the ultimate tax determination is uncertain. In addition, our actual and forecasted earnings are subject to change due to economic, political, and other conditions, such as the COVID-19 pandemic, and significant judgment is required in determining our ability to use our deferred tax assets.

Our effective tax rates could be affected by numerous factors, such as changes in our business operations, acquisitions, investments, entry into new businesses and geographies, intercompany transactions, the relative amount of our foreign earnings, including earnings being lower than anticipated in jurisdictions where we have lower statutory rates and higher than anticipated in jurisdictions where we have higher statutory rates, losses incurred in jurisdictions for which we are not able to realize related tax benefits, the applicability of special tax regimes, changes in foreign currency exchange rates, changes in our stock price, changes to our forecasts of income and loss and the mix of jurisdictions to which they relate, changes in our deferred tax assets and liabilities and their valuation, changes in the laws, regulations, administrative practices, principles, and interpretations related to tax, including changes to the global tax framework, competition, and other laws and accounting rules in various jurisdictions. In addition, a number of countries have enacted or are actively pursuing changes to their tax laws applicable to corporate multinationals.

We are also currently subject to tax controversies in various jurisdictions, and these jurisdictions may assess additional income tax liabilities against us. Developments in an audit, investigation, or other tax controversy could have a material effect on our operating results or cash flows in the period or periods for which that development occurs, as well as for prior and subsequent periods. We regularly assess the likelihood of an adverse outcome resulting from these proceedings to determine the adequacy of our tax accruals. Although we believe our tax estimates are reasonable, the final outcome of audits, investigations, and any other tax controversies could be materially different from our historical income tax provisions and accruals.

Table of Contents

**Liquidity and Capital Resources**

Cash flow information is as follows (in millions):

| | Year Ended December 31, | |
| | 2019 | 2020 |
|---|---|---|
| Cash provided by (used in): | | |
| Operating activities | $   38,514 | $   66,064 |
| Investing activities | (24,281) | (59,611) |
| Financing activities | (10,066) | (1,104) |

Our principal sources of liquidity are cash flows generated from operations and our cash, cash equivalents, and marketable securities balances, which, at fair value, were $55.0 billion and $84.4 billion as of December 31, 2019 and 2020. Amounts held in foreign currencies were $15.3 billion and $23.5 billion as of December 31, 2019 and 2020, and were primarily Euros, British Pounds, and Japanese Yen.

Cash provided by (used in) operating activities was $38.5 billion and $66.1 billion in 2019 and 2020. Our operating cash flows result primarily from cash received from our consumer, seller, developer, enterprise, and content creator customers, and advertisers, offset by cash payments we make for products and services, employee compensation, payment processing and related transaction costs, operating leases, and interest payments on our long-term obligations. Cash received from our customers and other activities generally corresponds to our net sales. Because consumers primarily use credit cards to buy from us, our receivables from consumers settle quickly. The increase in operating cash flow in 2020, compared to the prior year, was primarily due to the increase in net income, excluding non-cash expenses, and changes in working capital. Working capital at any specific point in time is subject to many variables, including variability in demand, inventory management and category expansion, the timing of cash receipts and payments, vendor payment terms, and fluctuations in foreign exchange rates.

Cash provided by (used in) investing activities corresponds with cash capital expenditures, including leasehold improvements, incentives received from property and equipment vendors, proceeds from asset sales, cash outlays for acquisitions, investments in other companies and intellectual property rights, and purchases, sales, and maturities of marketable securities. Cash provided by (used in) investing activities was $(24.3) billion and $(59.6) billion in 2019 and 2020, with the variability caused primarily by our decision to purchase or lease property and equipment, and purchases, maturities, and sales of marketable securities. Cash capital expenditures were $12.7 billion, and $35.0 billion in 2019 and 2020, which primarily reflect investments in additional capacity to support our fulfillment operations and in support of continued business growth in technology infrastructure (the majority of which is to support AWS), which investments we expect to continue over time. We made cash payments, net of acquired cash, related to acquisition and other investment activity of $2.5 billion and $2.3 billion in 2019 and 2020.

Cash provided by (used in) financing activities was $(10.1) billion and $(1.1) billion in 2019 and 2020. Cash inflows from financing activities resulted from proceeds of short-term debt, and other and long-term-debt of $2.3 billion and $17.3 billion in 2019 and 2020. Cash outflows from financing activities resulted from payments of short-term debt, and other, long-term debt, finance leases, and financing obligations of $12.3 billion and $18.4 billion in 2019 and 2020. Property and equipment acquired under finance leases was $13.7 billion and $11.6 billion in 2019 and 2020, reflecting investments in support of continued business growth primarily due to investments in technology infrastructure for AWS.

We had no borrowings outstanding under the unsecured revolving credit facility (the "Credit Agreement"), $725 million of borrowings outstanding under the commercial paper program (the "Commercial Paper Program"), and $338 million of borrowings outstanding under our secured revolving credit facility (the "Credit Facility") as of December 31, 2020. See Item 8 of Part II, "Financial Statements and Supplementary Data — Note 6 — Debt" for additional information.

As of December 31, 2020, cash, cash equivalents, and marketable securities held by foreign subsidiaries were $17.2 billion. We intend to invest substantially all of our foreign subsidiary earnings, as well as our capital in our foreign subsidiaries, indefinitely outside of the U.S. in those jurisdictions in which we would incur significant, additional costs upon repatriation of such amounts.

Tax benefits relating to excess stock-based compensation deductions and accelerated depreciation deductions are reducing our U.S. taxable income, and all remaining federal tax credits, which were primarily related to the U.S. federal research and development credit, reduced our federal tax liability in 2020. U.S. tax rules provide for enhanced accelerated depreciation deductions by allowing the election of full expensing of qualified property, primarily equipment, through 2022. Our federal tax provision included the election of full expensing of qualified property for 2018 and 2019 and a partial election for 2020. Cash taxes paid (net of refunds) were $881 million and $1.7 billion for 2019 and 2020. We endeavor to manage our global taxes on a cash basis, rather than on a financial reporting basis. In connection with the European Commission's October 2017 decision against us on state aid, Luxembourg tax authorities computed an initial recovery amount, consistent with the

Table of Contents

European Commission's decision, of approximately €250 million, that we deposited into escrow in March 2018, subject to adjustment pending conclusion of all appeals.

As of December 31, 2019 and 2020, restricted cash, cash equivalents, and marketable securities were $321 million and $257 million. See Item 8 of Part II, "Financial Statements and Supplementary Data — Note 7 — Commitments and Contingencies" for additional discussion of our principal contractual commitments, as well as our pledged assets. Additionally, purchase obligations and open purchase orders, consisting of inventory and significant non-inventory commitments, were $26.6 billion as of December 31, 2020. These purchase obligations and open purchase orders are generally cancellable in full or in part through the contractual provisions.

We believe that cash flows generated from operations and our cash, cash equivalents, and marketable securities balances, as well as our borrowing arrangements, will be sufficient to meet our anticipated operating cash needs for at least the next twelve months. However, any projections of future cash needs and cash flows are subject to substantial uncertainty. See Item 1A of Part I, "Risk Factors." We continually evaluate opportunities to sell additional equity or debt securities, obtain credit facilities, obtain finance and operating lease arrangements, enter into financing obligations, repurchase common stock, pay dividends, or repurchase, refinance, or otherwise restructure our debt for strategic reasons or to further strengthen our financial position.

The COVID-19 pandemic and resulting global disruptions have caused significant market volatility. These disruptions can contribute to defaults in our accounts receivable, affect asset valuations resulting in impairment charges, and affect the availability of lease and financing credit as well as other segments of the credit markets. We have utilized a range of financing methods to fund our operations and capital expenditures and expect to continue to maintain financing flexibility in the current market conditions. However, due to the rapidly evolving global situation, it is not possible to predict whether unanticipated consequences of the pandemic are reasonably likely to materially affect our liquidity and capital resources in the future.

The sale of additional equity or convertible debt securities would be dilutive to our shareholders. In addition, we will, from time to time, consider the acquisition of, or investment in, complementary businesses, products, services, capital infrastructure, and technologies, which might affect our liquidity requirements or cause us to secure additional financing, or issue additional equity or debt securities. There can be no assurance that additional credit lines or financing instruments will be available in amounts or on terms acceptable to us, if at all.

Table of Contents

Case 2:19-cv-01320-JCC   Document 172-3   Filed 08/01/24   Page 25 of 59

**Results of Operations**

We have organized our operations into three segments: North America, International, and AWS. These segments reflect the way the Company evaluates its business performance and manages its operations. See Item 8 of Part II, "Financial Statements and Supplementary Data — Note 10 — Segment Information."

*Effects of COVID-19*

As reflected in the discussion below, the impact of the COVID-19 pandemic and actions taken in response to it had varying effects on our 2020 results of operations. Higher net sales in the North America and International segments reflect increased demand, particularly as people are staying at home, including for household staples and other essential and home products, partially offset by fulfillment network capacity and supply chain constraints. Other effects in the North America and International segments include increased fulfillment costs and cost of sales as a percentage of net sales, primarily due to the impact of lower productivity, increased employee hiring and benefits, and costs to maintain safe workplaces.

We expect the effects of fulfillment network capacity and supply chain constraints, elevated collection risk in our accounts receivable, and increased fulfillment costs and cost of sales as a percentage of net sales to continue into all or portions of Q1 2021. However, it is not possible to determine the duration and scope of the pandemic, including any recurrence, the actions taken in response to the pandemic, the scale and rate of economic recovery from the pandemic, any ongoing effects on consumer demand and spending patterns, or other impacts of the pandemic, and whether these or other currently unanticipated consequences of the pandemic are reasonably likely to materially affect our results of operations.

Table of Contents

*Net Sales*

Net sales include product and service sales. Product sales represent revenue from the sale of products and related shipping fees and digital media content where we record revenue gross. Service sales primarily represent third-party seller fees, which includes commissions and any related fulfillment and shipping fees, AWS sales, advertising services, Amazon Prime membership fees, and certain digital content subscriptions. Net sales information is as follows (in millions):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2020 |
| Net Sales: | | |
| North America | $ 170,773 | $ 236,282 |
| International | 74,723 | 104,412 |
| AWS | 35,026 | 45,370 |
| Consolidated | $ 280,522 | $ 386,064 |
| Year-over-year Percentage Growth: | | |
| North America | 21 % | 38 % |
| International | 13 | 40 |
| AWS | 37 | 30 |
| Consolidated | 20 | 38 |
| Year-over-year Percentage Growth, excluding the effect of foreign exchange rates: | | |
| North America | 21 % | 38 % |
| International | 17 | 38 |
| AWS | 37 | 30 |
| Consolidated | 22 | 37 |
| Net sales mix: | | |
| North America | 61 % | 61 % |
| International | 27 | 27 |
| AWS | 12 | 12 |
| Consolidated | 100 % | 100 % |

Sales increased 38% in 2020, compared to the prior year. Changes in foreign currency exchange rates impacted net sales by $(2.6) billion and $1.4 billion for 2019 and 2020. For a discussion of the effect of foreign exchange rates on sales growth, see "Effect of Foreign Exchange Rates" below.

North America sales increased 38% in 2020, compared to the prior year. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products, partially offset by fulfillment network capacity and supply chain constraints.

International sales increased 40% in 2020, compared to the prior year. The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products, partially offset by fulfillment network capacity and supply chain constraints. Changes in foreign currency exchange rates impacted International net sales by $(2.4) billion and $1.7 billion in 2019 and 2020.

AWS sales increased 30% in 2020, compared to the prior year. The sales growth primarily reflects increased customer usage, partially offset by pricing changes. Pricing changes were driven largely by our continued efforts to reduce prices for our customers.

Table of Contents

*Operating Income (Loss)*

Operating income (loss) by segment is as follows (in millions):

|  | Year Ended December 31, | |
|---|---|---|
|  | **2019** | **2020** |
| Operating Income (Loss): | | |
| North America | $ 7,033 | $ 8,651 |
| International | (1,693) | 717 |
| AWS | 9,201 | 13,531 |
| Consolidated | $ 14,541 | $ 22,899 |

Operating income was $14.5 billion and $22.9 billion for 2019 and 2020. We believe that operating income (loss) is a more meaningful measure than gross profit and gross margin due to the diversity of our product categories and services.

The increase in North America operating income in absolute dollars in 2020, compared to the prior year, is primarily due to increased unit sales, including sales by third-party sellers, and advertising sales and slower growth in certain operating expenses, partially offset by increased shipping and fulfillment costs due in part to COVID-19. We expect North America operating income to continue to be negatively impacted through at least Q1 2021 by COVID-19 related costs. Changes in foreign exchange rates impacted operating income by $23 million and $8 million for 2019 and 2020.

The International operating income in 2020, as compared to the operating loss in the prior year, is primarily due to increased unit sales, including sales by third-party sellers, and advertising sales, and slower growth in certain operating expenses, partially offset by increased shipping and fulfillment costs due in part to COVID-19. We expect International operating income to continue to be negatively impacted through at least Q1 2021 by COVID-19 related costs. Changes in foreign exchange rates impacted operating income (loss) by $(116) million and $411 million for 2019 and 2020.

The increase in AWS operating income in absolute dollars in 2020, compared to the prior year, is primarily due to increased customer usage and cost structure productivity, including a reduction in depreciation and amortization expense from our change in the estimated useful life of our servers, partially offset by increased payroll and related expenses and spending on technology infrastructure, both of which were primarily driven by additional investments to support the business growth, and reduced prices for our customers. Changes in foreign exchange rates impacted operating income by $273 million and $30 million for 2019 and 2020.

Table of Contents

*Operating Expenses*

Information about operating expenses is as follows (in millions):

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | | 2019 | | 2020 |
| Operating expenses: | | | | |
| Cost of sales | $ | 165,536 | $ | 233,307 |
| Fulfillment | | 40,232 | | 58,517 |
| Technology and content | | 35,931 | | 42,740 |
| Marketing | | 18,878 | | 22,008 |
| General and administrative | | 5,203 | | 6,668 |
| Other operating expense (income), net | | 201 | | (75) |
| Total operating expenses | $ | 265,981 | $ | 363,165 |
| Year-over-year Percentage Growth: | | | | |
| Cost of sales | | 19 % | | 41 % |
| Fulfillment | | 18 | | 45 |
| Technology and content | | 25 | | 19 |
| Marketing | | 37 | | 17 |
| General and administrative | | 20 | | 28 |
| Other operating expense (income), net | | (32) | | (137) |
| Percent of Net Sales: | | | | |
| Cost of sales | | 59.0 % | | 60.4 % |
| Fulfillment | | 14.3 | | 15.2 |
| Technology and content | | 12.8 | | 11.1 |
| Marketing | | 6.7 | | 5.7 |
| General and administrative | | 1.9 | | 1.7 |
| Other operating expense (income), net | | 0.1 | | — |

*Cost of Sales*

Cost of sales primarily consists of the purchase price of consumer products, inbound and outbound shipping costs, including costs related to sortation and delivery centers and where we are the transportation service provider, and digital media content costs where we record revenue gross, including video and music.

The increase in cost of sales in absolute dollars in 2020, compared to the prior year, is primarily due to increased product and shipping costs resulting from increased sales. We expect cost of sales as a percentage of net sales to continue to be negatively impacted through at least Q1 2021 by COVID-19 related costs.

Shipping costs to receive products from our suppliers are included in our inventory and recognized as cost of sales upon sale of products to our customers. Shipping costs, which include sortation and delivery centers and transportation costs, were $37.9 billion and $61.1 billion in 2019 and 2020. We expect our cost of shipping to continue to increase to the extent our customers accept and use our shipping offers at an increasing rate, we use more expensive shipping methods, including faster delivery, and we offer additional services. We seek to mitigate costs of shipping over time in part through achieving higher sales volumes, optimizing our fulfillment network, negotiating better terms with our suppliers, and achieving better operating efficiencies. We believe that offering low prices to our customers is fundamental to our future success, and one way we offer lower prices is through shipping offers.

Costs to operate our AWS segment are primarily classified as "Technology and content" as we leverage a shared infrastructure that supports both our internal technology requirements and external sales to AWS customers.

Table of Contents

### Fulfillment

Fulfillment costs primarily consist of those costs incurred in operating and staffing our North America and International fulfillment centers, physical stores, and customer service centers and payment processing costs. While AWS payment processing and related transaction costs are included in "Fulfillment," AWS costs are primarily classified as "Technology and content." Fulfillment costs as a percentage of net sales may vary due to several factors, such as payment processing and related transaction costs, our level of productivity and accuracy, changes in volume, size, and weight of units received and fulfilled, the extent to which third party sellers utilize Fulfillment by Amazon services, timing of fulfillment network and physical store expansion, the extent we utilize fulfillment services provided by third parties, mix of products and services sold, and our ability to affect customer service contacts per unit by implementing improvements in our operations and enhancements to our customer self-service features. Additionally, sales by our sellers have higher payment processing and related transaction costs as a percentage of net sales compared to our retail sales because payment processing costs are based on the gross purchase price of underlying transactions.

The increase in fulfillment costs in absolute dollars in 2020, compared to the prior year, is primarily due to variable costs corresponding with increased product and service sales volume and inventory levels, costs from expanding our fulfillment network, and the COVID-19 related impact of lower productivity, increased employee hiring and benefits, and costs to maintain safe workplaces. We expect fulfillment costs as a percentage of net sales to continue to be negatively impacted through at least Q1 2021 by COVID-19 related costs.

We seek to expand our fulfillment network to accommodate a greater selection and in-stock inventory levels and to meet anticipated shipment volumes from sales of our own products as well as sales by third parties for which we provide the fulfillment services. We regularly evaluate our facility requirements.

### Technology and Content

Technology and content costs include payroll and related expenses for employees involved in the research and development of new and existing products and services, development, design, and maintenance of our stores, curation and display of products and services made available in our online stores, and infrastructure costs. Infrastructure costs include servers, networking equipment, and data center related depreciation and amortization, rent, utilities, and other expenses necessary to support AWS and other Amazon businesses. Collectively, these costs reflect the investments we make in order to offer a wide variety of products and services to our customers.

We seek to invest efficiently in numerous areas of technology and content so we may continue to enhance the customer experience and improve our process efficiency through rapid technology developments, while operating at an ever increasing scale. Our technology and content investment and capital spending projects often support a variety of product and service offerings due to geographic expansion and the cross-functionality of our systems and operations. We expect spending in technology and content to increase over time as we continue to add employees and technology infrastructure. These costs are allocated to segments based on usage. The increase in technology and content costs in absolute dollars in 2020, compared to the prior year, is primarily due to increased payroll and related costs associated with technical teams responsible for expanding our existing products and services and initiatives to introduce new products and service offerings and an increase in spending on technology infrastructure, offset by a reduction in depreciation and amortization expense from our change in the estimated useful life of our servers. See Item 8 of Part II, "Financial Statements and Supplementary Data — Note 1 — Description of Business, Accounting Policies, and Supplemental Disclosures — Use of Estimates" for additional information on our change in estimated useful life of our servers.

### Marketing

Marketing costs include advertising and payroll and related expenses for personnel engaged in marketing and selling activities, including sales commissions related to AWS. We direct customers to our stores primarily through a number of marketing channels, such as our sponsored search, third party customer referrals, social and online advertising, television advertising, and other initiatives. Our marketing costs are largely variable, based on growth in sales and changes in rates. To the extent there is increased or decreased competition for these traffic sources, or to the extent our mix of these channels shifts, we would expect to see a corresponding change in our marketing costs.

The increase in marketing costs in absolute dollars in 2020, compared to the prior year, is primarily due to increased payroll and related expenses for personnel engaged in marketing and selling activities, partially offset by lower spending on marketing channels as a result of COVID-19.

While costs associated with Amazon Prime membership benefits and other shipping offers are not included in marketing expense, we view these offers as effective worldwide marketing tools, and intend to continue offering them indefinitely.

Table of Contents

*General and Administrative*

The increase in general and administrative costs in absolute dollars in 2020, compared to the prior year, is primarily due to increases in payroll and related expenses and professional service fees.

*Other Operating Expense (Income), Net*

Other operating expense (income), net was $201 million and $(75) million during 2019 and 2020, and was primarily related to a benefit from accelerated vesting of warrants to acquire equity of a vendor in Q4 2020, offset by a lease impairment in Q2 2020 and the amortization of intangible assets.

*Interest Income and Expense*

Our interest income was $832 million and $555 million during 2019 and 2020. We generally invest our excess cash in AAA-rated money market funds and investment grade short- to intermediate-term fixed income securities. Our interest income corresponds with the average balance of invested funds based on the prevailing rates, which vary depending on the geographies and currencies in which they are invested.

Interest expense was $1.6 billion in 2019 and 2020 and was primarily related to debt and finance leases.

Our long-term lease liabilities were $39.8 billion and $52.6 billion as of December 31, 2019 and 2020. Our long-term debt was $23.4 billion and $31.8 billion as of December 31, 2019 and 2020. See Item 8 of Part II, "Financial Statements and Supplementary Data — Note 4 — Leases and Note 6 — Debt" for additional information.

*Other Income (Expense), Net*

Other income (expense), net was $203 million and $2.4 billion during 2019 and 2020. The primary components of other income (expense), net are related to equity warrant valuations, equity securities valuations and adjustments, and foreign currency.

*Income Taxes*

Our effective tax rate is subject to significant variation due to several factors, including variability in our pre-tax and taxable income and loss and the mix of jurisdictions to which they relate, intercompany transactions, the applicability of special tax regimes, changes in how we do business, acquisitions, investments, audit-related developments, changes in our stock price, changes in our deferred tax assets and liabilities and their valuation, foreign currency gains (losses), changes in statutes, regulations, case law, and administrative practices, principles, and interpretations related to tax, including changes to the global tax framework, competition, and other laws and accounting rules in various jurisdictions, and relative changes of expenses or losses for which tax benefits are not recognized. Our effective tax rate can be more or less volatile based on the amount of pre-tax income or loss. For example, the impact of discrete items and non-deductible expenses on our effective tax rate is greater when our pre-tax income is lower. In addition, we record valuation allowances against deferred tax assets when there is uncertainty about our ability to generate future income in relevant jurisdictions, and the effects of the COVID-19 pandemic on our business make estimates of future income more challenging.

We recorded a provision for income taxes of $2.4 billion and $2.9 billion in 2019 and 2020. See Item 8 of Part II, "Financial Statements and Supplementary Data — Note 9 — Income Taxes" for additional information.

**Non-GAAP Financial Measures**

Regulation G, Conditions for Use of Non-GAAP Financial Measures, and other SEC regulations define and prescribe the conditions for use of certain non-GAAP financial information. Our measures of free cash flows and the effect of foreign exchange rates on our consolidated statements of operations meet the definition of non-GAAP financial measures.

We provide multiple measures of free cash flows because we believe these measures provide additional perspective on the impact of acquiring property and equipment with cash and through finance leases and financing obligations.

Table of Contents

*Free Cash Flow*

Free cash flow is cash flow from operations reduced by "Purchases of property and equipment, net of proceeds from sales and incentives." The following is a reconciliation of free cash flow to the most comparable GAAP cash flow measure, "Net cash provided by (used in) operating activities," for 2019 and 2020 (in millions):

|  | Year Ended December 31, | |
|---|---|---|
|  | **2019** | **2020** |
| Net cash provided by (used in) operating activities | $ 38,514 | $ 66,064 |
| Purchases of property and equipment, net of proceeds from sales and incentives | (12,689) | (35,044) |
| Free cash flow | $ 25,825 | $ 31,020 |
|  |  |  |
| Net cash provided by (used in) investing activities | $ (24,281) | $ (59,611) |
| Net cash provided by (used in) financing activities | $ (10,066) | $ (1,104) |

*Free Cash Flow Less Principal Repayments of Finance Leases and Financing Obligations*

Free cash flow less principal repayments of finance leases and financing obligations is free cash flow reduced by "Principal repayments of finance leases" and "Principal repayments of financing obligations." Principal repayments of finance leases and financing obligations approximates the actual payments of cash for our finance leases and financing obligations. The following is a reconciliation of free cash flow less principal repayments of finance leases and financing obligations to the most comparable GAAP cash flow measure, "Net cash provided by (used in) operating activities," for 2019 and 2020 (in millions):

|  | Year Ended December 31, | |
|---|---|---|
|  | **2019** | **2020** |
| Net cash provided by (used in) operating activities | $ 38,514 | $ 66,064 |
| Purchases of property and equipment, net of proceeds from sales and incentives | (12,689) | (35,044) |
| Free cash flow | 25,825 | 31,020 |
| Principal repayments of finance leases | (9,628) | (10,642) |
| Principal repayments of financing obligations | (27) | (53) |
| Free cash flow less principal repayments of finance leases and financing obligations | $ 16,170 | $ 20,325 |
|  |  |  |
| Net cash provided by (used in) investing activities | $ (24,281) | $ (59,611) |
| Net cash provided by (used in) financing activities | $ (10,066) | $ (1,104) |

30

App. 175

Table of Contents

*Free Cash Flow Less Equipment Finance Leases and Principal Repayments of All Other Finance Leases and Financing Obligations*

Free cash flow less equipment finance leases and principal repayments of all other finance leases and financing obligations is free cash flow reduced by equipment acquired under finance leases, which is included in "Property and equipment acquired under finance leases," principal repayments of all other finance lease liabilities, which is included in "Principal repayments of finance leases," and "Principal repayments of financing obligations." All other finance lease liabilities and financing obligations consists of property. In this measure, equipment acquired under finance leases is reflected as if these assets had been purchased with cash, which is not the case as these assets have been leased. The following is a reconciliation of free cash flow less equipment finance leases and principal repayments of all other finance leases and financing obligations to the most comparable GAAP cash flow measure, "Net cash provided by (used in) operating activities," for 2019 and 2020 (in millions):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2020 |
| Net cash provided by (used in) operating activities | $ 38,514 | $ 66,064 |
| Purchases of property and equipment, net of proceeds from sales and incentives | (12,689) | (35,044) |
| Free cash flow | 25,825 | 31,020 |
| Equipment acquired under finance leases (1) | (12,916) | (9,104) |
| Principal repayments of all other finance leases (2) | (392) | (427) |
| Principal repayments of financing obligations | (27) | (53) |
| Free cash flow less equipment finance leases and principal repayments of all other finance leases and financing obligations | $ 12,490 | $ 21,436 |
| | | |
| Net cash provided by (used in) investing activities | $ (24,281) | $ (59,611) |
| Net cash provided by (used in) financing activities | $ (10,066) | $ (1,104) |

_____

(1)  For the year ended December 31, 2019 and 2020, this amount relates to equipment included in "Property and equipment acquired under finance leases" of $13,723 million and $11,588 million.

(2)  For the year ended December 31, 2019 and 2020, this amount relates to property included in "Principal repayments of finance leases" of $9,628 million and $10,642 million.

All of these free cash flows measures have limitations as they omit certain components of the overall cash flow statement and do not represent the residual cash flow available for discretionary expenditures. For example, these measures of free cash flows do not incorporate the portion of payments representing principal reductions of debt or cash payments for business acquisitions. Additionally, our mix of property and equipment acquisitions with cash or other financing options may change over time. Therefore, we believe it is important to view free cash flows measures only as a complement to our entire consolidated statements of cash flows.

Table of Contents

*Effect of Foreign Exchange Rates*

Information regarding the effect of foreign exchange rates, versus the U.S. Dollar, on our net sales, operating expenses, and operating income is provided to show reported period operating results had the foreign exchange rates remained the same as those in effect in the comparable prior year periods. The effect on our net sales, operating expenses, and operating income from changes in our foreign exchange rates versus the U.S. Dollar is as follows (in millions):

| | Year Ended December 31, 2019 | | | Year Ended December 31, 2020 | | |
|---|---|---|---|---|---|---|
| | As Reported | Exchange Rate Effect (1) | At Prior Year Rates (2) | As Reported | Exchange Rate Effect (1) | At Prior Year Rates (2) |
| Net sales | $ 280,522 | $ 2,560 | $ 283,082 | $ 386,064 | $ (1,438) | $ 384,626 |
| Operating expenses | 265,981 | 2,740 | 268,721 | 363,165 | (989) | 362,176 |
| Operating income | 14,541 | (180) | 14,361 | 22,899 | (449) | 22,450 |

_____
(1) Represents the change in reported amounts resulting from changes in foreign exchange rates from those in effect in the comparable prior year period for operating results.

(2) Represents the outcome that would have resulted had foreign exchange rates in the reported period been the same as those in effect in the comparable prior year period for operating results.

**Guidance**

We provided guidance on February 2, 2021, in our earnings release furnished on Form 8-K as set forth below. These forward-looking statements reflect Amazon.com's expectations as of February 2, 2021, and are subject to substantial uncertainty. Our results are inherently unpredictable and may be materially affected by many factors, such as fluctuations in foreign exchange rates, changes in global economic conditions and customer spending, world events, the rate of growth of the Internet, online commerce, and cloud services, as well as those outlined in Item 1A of Part I, "Risk Factors." This guidance reflects our estimates as of February 2, 2021 regarding the impact of the COVID-19 pandemic on our operations, including those discussed above, and is highly dependent on numerous factors that we may not be able to predict or control, including: the duration and scope of the pandemic, including any recurrence; actions taken by governments, businesses, and individuals in response to the pandemic; the impact of the pandemic on global and regional economies and economic activity, workforce staffing and productivity, and our significant and continuing spending on employee safety measures; our ability to continue operations in affected areas; and consumer demand and spending patterns, as well as the effects on suppliers, creditors, and third-party sellers, all of which are uncertain. This guidance also assumes the impacts on consumer demand and spending patterns, including impacts due to concerns over the current economic outlook, will be in line with those experienced during the first quarter of 2021 to date, and the additional assumptions set forth below. However, it is not possible to determine the ultimate impact on our operations for the first quarter of 2021, or whether other currently unanticipated direct or indirect consequences of the pandemic are reasonably likely to materially affect our operations.

First Quarter 2021 Guidance

- Net sales are expected to be between $100.0 billion and $106.0 billion, or to grow between 33% and 40% compared with first quarter 2020. This guidance anticipates a favorable impact of approximately 300 basis points from foreign exchange rates.
- Operating income is expected to be between $3.0 billion and $6.5 billion, compared with $4.0 billion in first quarter 2020. This guidance assumes approximately $2.0 billion of costs related to COVID-19.
- This guidance assumes, among other things, that no additional business acquisitions, investments, restructurings, or legal settlements are concluded.

Table of Contents

**Item 7A.**        *Quantitative and Qualitative Disclosures About Market Risk*

We are exposed to market risk for the effect of interest rate changes, foreign currency fluctuations, and changes in the market values of our investments. Information relating to quantitative and qualitative disclosures about market risk is set forth below and in Item 7 of Part II, "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources."

*Interest Rate Risk*

Our exposure to market risk for changes in interest rates relates primarily to our investment portfolio and our long-term debt. Our long-term debt is carried at amortized cost and fluctuations in interest rates do not impact our consolidated financial statements. However, the fair value of our debt, which pays interest at a fixed rate, will generally fluctuate with movements of interest rates, increasing in periods of declining rates of interest and declining in periods of increasing rates of interest.

We generally invest our excess cash in AAA-rated money market funds and investment grade short- to intermediate-term fixed income securities. Fixed income securities may have their fair value adversely affected due to a rise in interest rates, and we may suffer losses in principal if forced to sell securities that have declined in market value due to changes in interest rates. The following table provides information about our cash equivalents and marketable fixed income securities, including principal cash flows by expected maturity and the related weighted-average interest rates as of December 31, 2020 (in millions, except percentages):

| | 2021 | 2022 | 2023 | 2024 | 2025 | Thereafter | Total | Estimated Fair Value as of December 31, 2020 |
|---|---|---|---|---|---|---|---|---|
| Money market funds | $ 27,430 | $ — | $ — | $ — | $ — | $ — | $ 27,430 | $ 27,430 |
| Weighted average interest rate | (0.16)% | — % | — % | — % | — % | — % | (0.16)% | |
| Corporate debt securities | 16,505 | 4,459 | 5,531 | 1,990 | 886 | — | 29,371 | 29,988 |
| Weighted average interest rate | 0.42 % | 1.65 % | 1.32 % | 1.86 % | 1.84 % | | 0.92 % | |
| U.S. government and agency securities | 5,439 | 587 | 899 | 298 | 67 | 71 | 7,361 | 7,439 |
| Weighted average interest rate | 0.30 % | 1.38 % | 1.12 % | 1.74 % | 1.13 % | 2.97 % | 0.58 % | |
| Asset-backed securities | 870 | 773 | 472 | 763 | 243 | 46 | 3,167 | 3,235 |
| Weighted average interest rate | 2.08 % | 2.00 % | 1.53 % | 2.13 % | 1.57 % | 1.25 % | 1.94 % | |
| Foreign government and agency securities | 4,932 | 147 | 45 | 3 | — | — | 5,127 | 5,131 |
| Weighted average interest rate | 0.25 % | 0.74 % | 1.28 % | 1.76 % | — % | — % | 0.28 % | |
| Other fixed income securities | 109 | 156 | 230 | 160 | 43 | — | 698 | 710 |
| Weighted average interest rate | 2.10 % | 1.85 % | 1.10 % | 0.84 % | 1.31 % | — % | 1.38 % | |
| | $ 55,285 | $ 6,122 | $ 7,177 | $ 3,214 | $ 1,239 | $ 117 | $ 73,154 | |
| Cash equivalents and marketable fixed income securities | | | | | | | | $ 73,933 |

As of December 31, 2020, we had long-term debt with a face value of $33.2 billion, including the current portion, primarily consisting of fixed rate unsecured senior notes. See Item 8 of Part II, "Financial Statements and Supplementary Data — Note 6 — Debt" for additional information.

*Foreign Exchange Risk*

During 2020, net sales from our International segment accounted for 27% of our consolidated revenues. Net sales and related expenses generated from our internationally-focused stores, including within Canada and Mexico (which are included in our North America segment), are primarily denominated in the functional currencies of the corresponding stores and primarily include Euros, British Pounds, and Japanese Yen. The results of operations of, and certain of our intercompany balances associated with, our internationally-focused stores and AWS are exposed to foreign exchange rate fluctuations. Upon consolidation, as foreign exchange rates vary, net sales and other operating results may differ materially from expectations, and we may record significant gains or losses on the remeasurement of intercompany balances. For example, as a result of fluctuations in foreign exchange rates throughout the year compared to rates in effect the prior year, International segment net sales increased by $1.7 billion in comparison with the prior year.

Table of Contents

We have foreign exchange risk related to foreign-denominated cash, cash equivalents, and marketable securities ("foreign funds"). Based on the balance of foreign funds as of December 31, 2020, of $23.5 billion, an assumed 5%, 10%, and 20% adverse change to foreign exchange would result in fair value declines of $1.2 billion, $2.4 billion, and $4.7 billion. Fluctuations in fair value are recorded in "Accumulated other comprehensive income (loss)," a separate component of stockholders' equity. Equity securities with readily determinable fair values are included in "Marketable securities" on our consolidated balance sheets and are measured at fair value with changes recognized in net income.

We have foreign exchange risk related to our intercompany balances denominated in various foreign currencies. Based on the intercompany balances as of December 31, 2020, an assumed 5%, 10%, and 20% adverse change to foreign exchange rates would result in losses of $245 million, $485 million, and $970 million, recorded to "Other income (expense), net."

See Item 7 of Part II, "Management's Discussion and Analysis of Financial Condition and Results of Operations — Results of Operations — Effect of Foreign Exchange Rates" for additional information on the effect on reported results of changes in foreign exchange rates.

### Equity Investment Risk

As of December 31, 2020, our recorded value in equity and equity warrant investments in public and private companies was $6.9 billion. Our equity and equity warrant investments in publicly traded companies represent $3.2 billion of our investments as of December 31, 2020, and are recorded at fair value, which is subject to market price volatility. We assess our equity investments in private companies for impairment. Valuations of private companies are inherently more complex due to the lack of readily available market data. The current global economic climate provides additional uncertainty. As such, we believe that market sensitivities are not practicable.

Table of Contents

**Item 8.**          *Financial Statements and Supplementary Data*

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Ernst & Young LLP, Independent Registered Public Accounting Firm | 36 |
| Consolidated Statements of Cash Flows | 38 |
| Consolidated Statements of Operations | 39 |
| Consolidated Statements of Comprehensive Income | 40 |
| Consolidated Balance Sheets | 41 |
| Consolidated Statements of Stockholders' Equity | 42 |
| Notes to Consolidated Financial Statements | 43 |

35

Table of Contents

## Report of Independent Registered Public Accounting Firm

The Board of Directors and Shareholders
Amazon.com, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Amazon.com, Inc. (the Company) as of December 31, 2020 and 2019, and the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2020 and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated February 2, 2021 expressed an unqualified opinion thereon.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

***Uncertain Tax Positions***

*Description of the Matter*       The Company is subject to income taxes in the U.S. and numerous foreign jurisdictions and, as discussed in Note 9 of the consolidated financial statements, during the ordinary course of business, there are many tax positions for which the ultimate tax determination is uncertain. As a result, significant judgment is required in evaluating the Company's tax positions and determining its provision for income taxes. The Company uses significant judgment in (1) determining whether a tax position's technical merits are more likely than not to be sustained and (2) measuring the amount of tax benefit that qualifies for recognition. As of December 31, 2020, the Company accrued liabilities of $2.8 billion for various tax contingencies.

Auditing the measurement of the Company's tax contingencies was challenging because the evaluation of whether a tax position is more likely than not to be sustained and the measurement of the benefit of various tax positions can be complex, involves significant judgment, and is based on interpretations of tax laws and legal rulings.

Table of Contents

| | |
|---|---|
| *How We Addressed the Matter in Our Audit* | We tested controls over the Company's process to assess the technical merits of its tax contingencies, including controls over the assessment as to whether a tax position is more likely than not to be sustained, management's process to measure the benefit of its tax positions, and the development of the related disclosures. |

We involved our international tax, transfer pricing, and research and development tax professionals in assessing the technical merits of certain of the Company's tax positions. Depending on the nature of the specific tax position and, as applicable, developments with the relevant tax authorities relating thereto, our procedures included obtaining and examining the Company's analysis including the Company's correspondence with such tax authorities and evaluating the underlying facts upon which the tax positions are based. We used our knowledge of, and experience with, international, transfer pricing, and other income tax laws by the relevant income tax authorities to evaluate the Company's accounting for its tax contingencies. We evaluated developments in the applicable regulatory environments to assess potential effects on the Company's positions, including recent decisions in relevant court cases. We analyzed the Company's assumptions and data used to determine the amount of tax benefits to recognize and tested the accuracy of the Company's calculations. We have also evaluated the Company's income tax disclosures included in Note 9 in relation to these matters.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 1996.
Seattle, Washington
February 2, 2021

App. 182

Table of Contents

**AMAZON.COM, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(in millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2019** | **2020** |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, BEGINNING OF PERIOD | $ 21,856 | $ 32,173 | $ 36,410 |
| OPERATING ACTIVITIES: | | | |
| Net income | 10,073 | 11,588 | 21,331 |
| Adjustments to reconcile net income to net cash from operating activities: | | | |
| Depreciation and amortization of property and equipment and capitalized content costs, operating lease assets, and other | 15,341 | 21,789 | 25,251 |
| Stock-based compensation | 5,418 | 6,864 | 9,208 |
| Other operating expense (income), net | 274 | 164 | (71) |
| Other expense (income), net | 219 | (249) | (2,582) |
| Deferred income taxes | 441 | 796 | (554) |
| Changes in operating assets and liabilities: | | | |
| Inventories | (1,314) | (3,278) | (2,849) |
| Accounts receivable, net and other | (4,615) | (7,681) | (8,169) |
| Accounts payable | 3,263 | 8,193 | 17,480 |
| Accrued expenses and other | 472 | (1,383) | 5,754 |
| Unearned revenue | 1,151 | 1,711 | 1,265 |
| Net cash provided by (used in) operating activities | 30,723 | 38,514 | 66,064 |
| INVESTING ACTIVITIES: | | | |
| Purchases of property and equipment | (13,427) | (16,861) | (40,140) |
| Proceeds from property and equipment sales and incentives | 2,104 | 4,172 | 5,096 |
| Acquisitions, net of cash acquired, and other | (2,186) | (2,461) | (2,325) |
| Sales and maturities of marketable securities | 8,240 | 22,681 | 50,237 |
| Purchases of marketable securities | (7,100) | (31,812) | (72,479) |
| Net cash provided by (used in) investing activities | (12,369) | (24,281) | (59,611) |
| FINANCING ACTIVITIES: | | | |
| Proceeds from short-term debt, and other | 886 | 1,402 | 6,796 |
| Repayments of short-term debt, and other | (813) | (1,518) | (6,177) |
| Proceeds from long-term debt | 182 | 871 | 10,525 |
| Repayments of long-term debt | (155) | (1,166) | (1,553) |
| Principal repayments of finance leases | (7,449) | (9,628) | (10,642) |
| Principal repayments of financing obligations | (337) | (27) | (53) |
| Net cash provided by (used in) financing activities | (7,686) | (10,066) | (1,104) |
| Foreign currency effect on cash, cash equivalents, and restricted cash | (351) | 70 | 618 |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | 10,317 | 4,237 | 5,967 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, END OF PERIOD | $ 32,173 | $ 36,410 | $ 42,377 |

See accompanying notes to consolidated financial statements.

Table of Contents

**AMAZON.COM, INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in millions, except per share data)**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2019** | **2020** |
| Net product sales | $ 141,915 | $ 160,408 | $ 215,915 |
| Net service sales | 90,972 | 120,114 | 170,149 |
| Total net sales | 232,887 | 280,522 | 386,064 |
| Operating expenses: | | | |
| Cost of sales | 139,156 | 165,536 | 233,307 |
| Fulfillment | 34,027 | 40,232 | 58,517 |
| Technology and content | 28,837 | 35,931 | 42,740 |
| Marketing | 13,814 | 18,878 | 22,008 |
| General and administrative | 4,336 | 5,203 | 6,668 |
| Other operating expense (income), net | 296 | 201 | (75) |
| Total operating expenses | 220,466 | 265,981 | 363,165 |
| Operating income | 12,421 | 14,541 | 22,899 |
| Interest income | 440 | 832 | 555 |
| Interest expense | (1,417) | (1,600) | (1,647) |
| Other income (expense), net | (183) | 203 | 2,371 |
| Total non-operating income (expense) | (1,160) | (565) | 1,279 |
| Income before income taxes | 11,261 | 13,976 | 24,178 |
| Provision for income taxes | (1,197) | (2,374) | (2,863) |
| Equity-method investment activity, net of tax | 9 | (14) | 16 |
| Net income | $ 10,073 | $ 11,588 | $ 21,331 |
| Basic earnings per share | $ 20.68 | $ 23.46 | $ 42.64 |
| Diluted earnings per share | $ 20.14 | $ 23.01 | $ 41.83 |
| Weighted-average shares used in computation of earnings per share: | | | |
| Basic | 487 | 494 | 500 |
| Diluted | 500 | 504 | 510 |

See accompanying notes to consolidated financial statements.

39

App. 184

Table of Contents

**AMAZON.COM, INC.**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

**(in millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2019** | **2020** |
| Net income | $ 10,073 | $ 11,588 | $ 21,331 |
| Other comprehensive income (loss): | | | |
| Net change in foreign currency translation adjustments: | | | |
| Foreign currency translation adjustments, net of tax of $6, $(5), and $(36) | (538) | 78 | 561 |
| Reclassification adjustment for foreign currency translation included in "Other operating expense (income), net," net of tax of $0, $29, and $0 | — | (108) | — |
| Net foreign currency translation adjustments | (538) | (30) | 561 |
| Net change in unrealized gains (losses) on available-for-sale debt securities: | | | |
| Unrealized gains (losses), net of tax of $0, $(12), and $(83) | (17) | 83 | 273 |
| Reclassification adjustment for losses (gains) included in "Other income (expense), net," net of tax of $0, $0, and $8 | 8 | (4) | (28) |
| Net unrealized gains (losses) on available-for-sale debt securities | (9) | 79 | 245 |
| Total other comprehensive income (loss) | (547) | 49 | 806 |
| Comprehensive income | $ 9,526 | $ 11,637 | $ 22,137 |

See accompanying notes to consolidated financial statements.

40

Table of Contents

**AMAZON.COM, INC.**

**CONSOLIDATED BALANCE SHEETS**

**(in millions, except per share data)**

| | December 31, | |
|---|---|---|
| | **2019** | **2020** |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 36,092 | $ 42,122 |
| Marketable securities | 18,929 | 42,274 |
| Inventories | 20,497 | 23,795 |
| Accounts receivable, net and other | 20,816 | 24,542 |
| Total current assets | 96,334 | 132,733 |
| Property and equipment, net | 72,705 | 113,114 |
| Operating leases | 25,141 | 37,553 |
| Goodwill | 14,754 | 15,017 |
| Other assets | 16,314 | 22,778 |
| Total assets | $ 225,248 | $ 321,195 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 47,183 | $ 72,539 |
| Accrued expenses and other | 32,439 | 44,138 |
| Unearned revenue | 8,190 | 9,708 |
| Total current liabilities | 87,812 | 126,385 |
| Long-term lease liabilities | 39,791 | 52,573 |
| Long-term debt | 23,414 | 31,816 |
| Other long-term liabilities | 12,171 | 17,017 |
| Commitments and contingencies (Note 7) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value: | | |
| Authorized shares — 500 | | |
| Issued and outstanding shares — none | — | — |
| Common stock, $0.01 par value: | | |
| Authorized shares — 5,000 | | |
| Issued shares — 521 and 527 | | |
| Outstanding shares — 498 and 503 | 5 | 5 |
| Treasury stock, at cost | (1,837) | (1,837) |
| Additional paid-in capital | 33,658 | 42,865 |
| Accumulated other comprehensive income (loss) | (986) | (180) |
| Retained earnings | 31,220 | 52,551 |
| Total stockholders' equity | 62,060 | 93,404 |
| Total liabilities and stockholders' equity | $ 225,248 | $ 321,195 |

See accompanying notes to consolidated financial statements.

Table of Contents

**AMAZON.COM, INC.**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(in millions)**

| | Common Stock | | Treasury Stock | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| Balance as of January 1, 2018 | 484 | $ 5 | $ (1,837) | $ 21,389 | $ (484) | $ 8,636 | $ 27,709 |
| Cumulative effect of change in accounting principles related to revenue recognition, income taxes, and financial instruments | — | — | — | — | (4) | 916 | 912 |
| Net income | — | — | — | — | — | 10,073 | 10,073 |
| Other comprehensive income (loss) | — | — | — | — | (547) | — | (547) |
| Exercise of common stock options | 7 | — | — | — | — | — | — |
| Stock-based compensation and issuance of employee benefit plan stock | — | — | — | 5,402 | — | — | 5,402 |
| Balance as of December 31, 2018 | 491 | 5 | (1,837) | 26,791 | (1,035) | 19,625 | 43,549 |
| Cumulative effect of change in accounting principle related to leases | — | — | — | — | — | 7 | 7 |
| Net income | — | — | — | — | — | 11,588 | 11,588 |
| Other comprehensive income (loss) | — | — | — | — | 49 | — | 49 |
| Exercise of common stock options | 7 | — | — | — | — | — | — |
| Stock-based compensation and issuance of employee benefit plan stock | — | — | — | 6,867 | — | — | 6,867 |
| Balance as of December 31, 2019 | 498 | 5 | (1,837) | 33,658 | (986) | 31,220 | 62,060 |
| Net income | — | — | — | — | — | 21,331 | 21,331 |
| Other comprehensive income (loss) | — | — | — | — | 806 | — | 806 |
| Exercise of common stock options | 5 | — | — | — | — | — | — |
| Stock-based compensation and issuance of employee benefit plan stock | — | — | — | 9,207 | — | — | 9,207 |
| Balance as of December 31, 2020 | 503 | $ 5 | $ (1,837) | $ 42,865 | $ (180) | $ 52,551 | $ 93,404 |

See accompanying notes to consolidated financial statements.

Table of Contents

**AMAZON.COM, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1 — DESCRIPTION OF BUSINESS, ACCOUNTING POLICIES, AND SUPPLEMENTAL DISCLOSURES**

*Description of Business*

We seek to be Earth's most customer-centric company. In each of our segments, we serve our primary customer sets, consisting of consumers, sellers, developers, enterprises, and content creators. We serve consumers through our online and physical stores and focus on selection, price, and convenience. We offer programs that enable sellers to grow their businesses, sell their products in our stores, and fulfill orders through us, and programs that allow authors, musicians, filmmakers, skill and app developers, and others to publish and sell content. We serve developers and enterprises of all sizes through AWS, which offers a broad set of on-demand technology services, including compute, storage, database, analytics, and machine learning, and other services. We also manufacture and sell electronic devices. In addition, we provide services, such as advertising to sellers, vendors, publishers, authors, and others, through programs such as sponsored ads, display, and video advertising.

We have organized our operations into three segments: North America, International, and AWS. See "Note 10 — Segment Information."

*Prior Period Reclassifications*

Certain prior period amounts have been reclassified to conform to the current period presentation. "Proceeds from short-term debt, and other" were reclassified from "Proceeds from long-term debt and other" and "Repayments of short-term debt, and other" were reclassified from "Repayments of long-term debt and other" on our consolidated statements of cash flows.

*Principles of Consolidation*

The consolidated financial statements include the accounts of Amazon.com, Inc. and its consolidated entities (collectively, the "Company"), consisting of its wholly-owned subsidiaries and those entities in which we have a variable interest and of which we are the primary beneficiary, including certain entities in India and certain entities that support our seller lending financing activities. Intercompany balances and transactions between consolidated entities are eliminated.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires estimates and assumptions that affect the reported amounts of assets and liabilities, revenues and expenses, and related disclosures of contingent liabilities in the consolidated financial statements and accompanying notes. Estimates are used for, but not limited to, income taxes, useful lives of equipment, commitments and contingencies, valuation of acquired intangibles and goodwill, stock-based compensation forfeiture rates, vendor funding, inventory valuation, collectability of receivables, and valuation and impairment of investments. Given the global economic climate and additional or unforeseen effects from the COVID-19 pandemic, these estimates have become more challenging, and actual results could differ materially from these estimates.

We review the useful lives of equipment on an ongoing basis, and effective January 1, 2020 we changed our estimate of the useful life for our servers from three years to four years. The longer useful life is due to continuous improvements in our hardware, software, and data center designs. The effect of this change in estimate for the year ended December 31, 2020, based on servers that were included in "Property and equipment, net" as of December 31, 2019 and those acquired during the year ended December 31, 2020, was a reduction in depreciation and amortization expense of $2.7 billion and an increase in net income of $2.0 billion, or $4.06 per basic share and $3.98 per diluted share.

Table of Contents

*Supplemental Cash Flow Information*

The following table shows supplemental cash flow information (in millions):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| SUPPLEMENTAL CASH FLOW INFORMATION: | **2018** | **2019** | **2020** |
| Cash paid for interest on debt | $ 854 | $ 875 | $ 916 |
| Cash paid for operating leases | $ — | $ 3,361 | $ 4,475 |
| Cash paid for interest on finance leases | $ 381 | $ 647 | $ 612 |
| Cash paid for interest on financing obligations | $ 194 | $ 39 | $ 102 |
| Cash paid for income taxes, net of refunds | $ 1,184 | $ 881 | $ 1,713 |
| Assets acquired under operating leases | $ — | $ 7,870 | $ 16,217 |
| Property and equipment acquired under finance leases | $ 10,615 | $ 13,723 | $ 11,588 |
| Property and equipment acquired under build-to-suit arrangements | $ 3,641 | $ 1,362 | $ 2,267 |

*Earnings per Share*

Basic earnings per share is calculated using our weighted-average outstanding common shares. Diluted earnings per share is calculated using our weighted-average outstanding common shares including the dilutive effect of stock awards as determined under the treasury stock method. In periods when we have a net loss, stock awards are excluded from our calculation of earnings per share as their inclusion would have an antidilutive effect.

The following table shows the calculation of diluted shares (in millions):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2019** | **2020** |
| Shares used in computation of basic earnings per share | 487 | 494 | 500 |
| Total dilutive effect of outstanding stock awards | 13 | 10 | 10 |
| Shares used in computation of diluted earnings per share | 500 | 504 | 510 |

*Revenue*

Revenue is measured based on the amount of consideration that we expect to receive, reduced by estimates for return allowances, promotional discounts, and rebates. Revenue also excludes any amounts collected on behalf of third parties, including sales and indirect taxes. In arrangements where we have multiple performance obligations, the transaction price is allocated to each performance obligation using the relative stand-alone selling price. We generally determine stand-alone selling prices based on the prices charged to customers or using expected cost plus a margin.

A description of our principal revenue generating activities is as follows:

*Retail sales* - We offer consumer products through our online and physical stores. Revenue is recognized when control of the goods is transferred to the customer, which generally occurs upon our delivery to a third-party carrier or, in the case of an Amazon delivery, to the customer.

*Third-party seller services* - We offer programs that enable sellers to sell their products in our stores, and fulfill orders through us. We are not the seller of record in these transactions. The commissions and any related fulfillment and shipping fees we earn from these arrangements are recognized when the services are rendered, which generally occurs upon delivery of the related products to a third-party carrier or, in the case of an Amazon delivery, to the customer.

*Subscription services* - Our subscription sales include fees associated with Amazon Prime memberships and access to content including digital video, audiobooks, digital music, e-books, and other non-AWS subscription services. Prime memberships provide our customers with access to an evolving suite of benefits that represent a single stand-ready obligation. Subscriptions are paid for at the time of or in advance of delivering the services. Revenue from such arrangements is recognized over the subscription period.

*AWS* - Our AWS arrangements include global sales of compute, storage, database, and other services. Revenue is allocated to services using stand-alone selling prices and is primarily recognized when the customer uses these services, based on the quantity of services rendered, such as compute or storage capacity delivered on-demand. Certain services, including compute and database, are also offered as a fixed quantity over a specified term, for which revenue is recognized ratably. Sales commissions we pay in connection with contracts that exceed one year are capitalized and amortized over the contract term.

Table of Contents

*Other* - Other revenue primarily includes sales of advertising services, which are recognized as ads are delivered based on the number of clicks or impressions.

### Return Allowances

Return allowances, which reduce revenue and cost of sales, are estimated using historical experience. Liabilities for return allowances are included in "Accrued expenses and other" and were $623 million, $712 million, and $859 million as of December 31, 2018, 2019, and 2020. Additions to the allowance were $2.3 billion, $2.5 billion, and $3.5 billion and deductions from the allowance were $2.3 billion, $2.5 billion, and $3.6 billion in 2018, 2019, and 2020. Included in "Inventories" on our consolidated balance sheets are assets totaling $519 million, $629 million, and $852 million as of December 31, 2018, 2019, and 2020, for the rights to recover products from customers associated with our liabilities for return allowances.

### Cost of Sales

Cost of sales primarily consists of the purchase price of consumer products, inbound and outbound shipping costs, including costs related to sortation and delivery centers and where we are the transportation service provider, and digital media content costs where we record revenue gross, including video and music. Shipping costs to receive products from our suppliers are included in our inventory, and recognized as cost of sales upon sale of products to our customers. Payment processing and related transaction costs, including those associated with seller transactions, are classified in "Fulfillment" on our consolidated statements of operations.

### Vendor Agreements

We have agreements with our vendors to receive consideration primarily for cooperative marketing efforts, promotions, incentives, and volume rebates. We generally consider these amounts received from vendors to be a reduction of the prices we pay for their goods, including property and equipment, or services, and are recorded as a reduction of the cost of inventory, cost of services, or cost of property and equipment. Volume rebates typically depend on reaching minimum purchase thresholds. We evaluate the likelihood of reaching purchase thresholds using past experience and current year forecasts. When volume rebates can be reasonably estimated, we record a portion of the rebate as we make progress towards the purchase threshold.

### Fulfillment

Fulfillment costs primarily consist of those costs incurred in operating and staffing our North America and International segments' fulfillment centers, physical stores, and customer service centers, including costs attributable to buying, receiving, inspecting, and warehousing inventories; picking, packaging, and preparing customer orders for shipment; payment processing and related transaction costs, including costs associated with our guarantee for certain seller transactions; responding to inquiries from customers; and supply chain management for our manufactured electronic devices. Fulfillment costs also include amounts paid to third parties that assist us in fulfillment and customer service operations.

### Technology and Content

Technology and content costs include payroll and related expenses for employees involved in the research and development of new and existing products and services, development, design, and maintenance of our stores, curation and display of products and services made available in our online stores, and infrastructure costs. Infrastructure costs include servers, networking equipment, and data center related depreciation and amortization, rent, utilities, and other expenses necessary to support AWS and other Amazon businesses. Collectively, these costs reflect the investments we make in order to offer a wide variety of products and services to our customers. Technology and content costs are generally expensed as incurred.

### Marketing

Marketing costs primarily consist of advertising and payroll and related expenses for personnel engaged in marketing and selling activities, including sales commissions related to AWS. We pay commissions to third parties when their customer referrals result in sales. We also participate in cooperative advertising arrangements with certain of our vendors, and other third parties.

Advertising and other promotional costs to market our products and services are expensed as incurred and were $8.2 billion, $11.0 billion, and $10.9 billion in 2018, 2019, and 2020.

Table of Contents

### General and Administrative

General and administrative expenses primarily consist of costs for corporate functions, including payroll and related expenses; facilities and equipment expenses, such as depreciation and amortization expense and rent; and professional fees and litigation costs.

### Stock-Based Compensation

Compensation cost for all equity-classified stock awards expected to vest is measured at fair value on the date of grant and recognized over the service period. The fair value of restricted stock units is determined based on the number of shares granted and the quoted price of our common stock. Such value is recognized as expense over the service period, net of estimated forfeitures, using the accelerated method. The estimated number of stock awards that will ultimately vest requires judgment, and to the extent actual results or updated estimates differ from our current estimates, such amounts will be recorded as a cumulative adjustment in the period estimates are revised. We consider many factors when estimating expected forfeitures, including historical forfeiture experience and employee level. Additionally, stock-based compensation includes stock appreciation rights that are expected to settle in cash. These liability-classified awards are remeasured to fair value at the end of each reporting period until settlement or expiration.

### Other Operating Expense (Income), Net

Other operating expense (income), net, consists primarily of a benefit from accelerated vesting of warrants to acquire equity of a vendor in Q4 2020, offset by a lease impairment in Q2 2020 and the amortization of intangible assets.

### Other Income (Expense), Net

Other income (expense), net, consists primarily of valuations and adjustments of equity securities of $145 million, $231 million, and $833 million in 2018, 2019, and 2020, equity warrant valuation gains (losses) of $(131) million, $11 million, and $1.5 billion in 2018, 2019, and 2020, and foreign currency gains (losses) of $(206) million, $(20) million, and $35 million in 2018, 2019, and 2020.

During the period from January 1, 2021 to February 2, 2021, we expect to record upward adjustments relating to equity investments in private companies of approximately $1.5 billion. In addition, for this same period, our equity and equity warrant investments in public companies, which are subject to volatility based on changes in market prices, have experienced gains of approximately $1.5 billion based on available trading prices.

### Income Taxes

Income tax expense includes U.S. (federal and state) and foreign income taxes. Certain foreign subsidiary earnings and losses are subject to current U.S. taxation and the subsequent repatriation of those earnings is not subject to tax in the U.S. We intend to invest substantially all of our foreign subsidiary earnings, as well as our capital in our foreign subsidiaries, indefinitely outside of the U.S. in those jurisdictions in which we would incur significant, additional costs upon repatriation of such amounts.

Deferred income tax balances reflect the effects of temporary differences between the carrying amounts of assets and liabilities and their tax bases, as well as net operating loss and tax credit carryforwards, and are stated at enacted tax rates expected to be in effect when taxes are actually paid or recovered.

Deferred tax assets represent amounts available to reduce income taxes payable in future periods. Deferred tax assets are evaluated for future realization and reduced by a valuation allowance to the extent we believe they will not be realized. We consider many factors when assessing the likelihood of future realization of our deferred tax assets, including our recent cumulative loss experience and expectations of future earnings, capital gains and investment in such jurisdiction, the carry-forward periods available to us for tax reporting purposes, and other relevant factors. The effects of the COVID-19 pandemic on our business make estimates of future earnings in relevant jurisdictions more challenging.

We utilize a two-step approach to recognizing and measuring uncertain income tax positions (tax contingencies). The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not the position will be sustained on audit, including resolution of related appeals or litigation processes. The second step is to measure the tax benefit as the largest amount which is more than 50% likely of being realized upon ultimate settlement. We consider many factors when evaluating our tax positions and estimating our tax benefits, which may require periodic adjustments and which may not accurately forecast actual outcomes. We include interest and penalties related to our tax contingencies in income tax expense.

Table of Contents

### Fair Value of Financial Instruments

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. To increase the comparability of fair value measures, the following hierarchy prioritizes the inputs to valuation methodologies used to measure fair value:

**Level 1** — Valuations based on quoted prices for identical assets and liabilities in active markets.

**Level 2** — Valuations based on observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, or other inputs that are observable or can be corroborated by observable market data.

**Level 3** — Valuations based on unobservable inputs reflecting our own assumptions, consistent with reasonably available assumptions made by other market participants. These valuations require significant judgment.

We measure the fair value of money market funds and certain marketable equity securities based on quoted prices in active markets for identical assets or liabilities. Other marketable securities were valued either based on recent trades of securities in inactive markets or based on quoted market prices of similar instruments and other significant inputs derived from or corroborated by observable market data. We did not hold significant amounts of marketable securities categorized as Level 3 assets as of December 31, 2019 and 2020.

We hold equity warrants giving us the right to acquire stock of other companies. As of December 31, 2019 and 2020, these warrants had a fair value of $669 million and $3.0 billion, and are recorded within "Other assets" on our consolidated balance sheets with gains and losses recognized in "Other income (expense), net" on our consolidated statements of operations. These warrants are primarily classified as Level 2 assets.

### Cash and Cash Equivalents

We classify all highly liquid instruments with an original maturity of three months or less as cash equivalents.

### Inventories

Inventories, consisting of products available for sale, are primarily accounted for using the first-in, first-out method, and are valued at the lower of cost and net realizable value. This valuation requires us to make judgments, based on currently available information, about the likely method of disposition, such as through sales to individual customers, returns to product vendors, or liquidations, and expected recoverable values of each disposition category. The inventory valuation allowance, representing a write-down of inventory, was $1.6 billion and $2.3 billion as of December 31, 2019 and 2020.

We provide Fulfillment by Amazon services in connection with certain of our sellers' programs. Third-party sellers maintain ownership of their inventory, regardless of whether fulfillment is provided by us or the third-party sellers, and therefore these products are not included in our inventories.

We also purchase electronic device components from a variety of suppliers and use several contract manufacturers to provide manufacturing services for our products. During the normal course of business, in order to manage manufacturing lead times and help ensure adequate supply, we enter into agreements with contract manufacturers and suppliers for certain electronic device components. A portion of our reported purchase commitments arising from these agreements consists of firm, non-cancellable commitments. These commitments are based on forecasted customer demand. If we reduce these commitments, we may incur additional costs. We also have firm, non-cancellable commitments for certain products offered in our Whole Foods Market stores.

### Accounts Receivable, Net and Other

Included in "Accounts receivable, net and other" on our consolidated balance sheets are amounts primarily related to customers, vendors, and sellers. As of December 31, 2019 and 2020, customer receivables, net, were $12.6 billion and $14.8 billion, vendor receivables, net, were $4.2 billion and $4.8 billion, and seller receivables, net, were $863 million and $381 million. Seller receivables are amounts due from sellers related to our seller lending program, which provides funding to sellers primarily to procure inventory.

We estimate losses on receivables based on expected losses, including our historical experience of actual losses. Receivables are considered impaired and written-off when it is probable that all contractual payments due will not be collected in accordance with the terms of the agreement. The allowance for doubtful accounts was $495 million, $718 million, and $1.1 billion as of December 31, 2018, 2019, and 2020. Additions to the allowance were $878 million, $1.0 billion, and $1.4 billion, and deductions to the allowance were $731 million, $793 million, and $1.0 billion in 2018, 2019, and 2020.

Table of Contents

### Software Development Costs

We incur software development costs related to products to be sold, leased, or marketed to external users, internal-use software, and our websites. Software development costs capitalized were not significant for the years presented. All other costs, including those related to design or maintenance, are expensed as incurred.

### Property and Equipment, Net

Property and equipment are stated at cost less accumulated depreciation and amortization. Incentives that we receive from property and equipment vendors are recorded as a reduction to our costs. Property includes buildings and land that we own, along with property we have acquired under build-to-suit lease arrangements when we have control over the building during the construction period and finance lease arrangements. Equipment includes assets such as servers and networking equipment, heavy equipment, and other fulfillment equipment. Depreciation and amortization is recorded on a straight-line basis over the estimated useful lives of the assets (generally the lesser of 40 years or the remaining life of the underlying building, three years prior to January 1, 2020 and four years subsequent to January 1, 2020 for our servers, five years for networking equipment, ten years for heavy equipment, and three to ten years for other fulfillment equipment). Depreciation and amortization expense is classified within the corresponding operating expense categories on our consolidated statements of operations.

### Leases

We categorize leases with contractual terms longer than twelve months as either operating or finance. Finance leases are generally those leases that allow us to substantially utilize or pay for the entire asset over its estimated life. Assets acquired under finance leases are recorded in "Property and equipment, net." All other leases are categorized as operating leases. Our leases generally have terms that range from one to ten years for equipment and one to twenty years for property.

Certain lease contracts include obligations to pay for other services, such as operations and maintenance. For leases of property, we account for these services as a component of the lease. For substantially all other leases, the services are accounted for separately and we allocate payments to the lease and other services components based on estimated stand-alone prices.

Lease liabilities are recognized at the present value of the fixed lease payments, reduced by landlord incentives using a discount rate based on similarly secured borrowings available to us. Lease assets are recognized based on the initial present value of the fixed lease payments, reduced by landlord incentives, plus any direct costs from executing the leases or lease prepayments reclassified from "Other assets" upon lease commencement. Leasehold improvements are capitalized at cost and amortized over the lesser of their expected useful life or the lease term.

When we have the option to extend the lease term, terminate the lease before the contractual expiration date, or purchase the leased asset, and it is reasonably certain that we will exercise the option, we consider the option in determining the classification and measurement of the lease. Our leases may include variable payments based on measures that include changes in price indices, market interest rates, or the level of sales at a physical store, which are expensed as incurred.

Costs associated with operating lease assets are recognized on a straight-line basis within operating expenses over the term of the lease. Finance lease assets are amortized within operating expenses on a straight-line basis over the shorter of the estimated useful lives of the assets or, in the instance where title does not transfer at the end of the lease term, the lease term. The interest component of a finance lease is included in interest expense and recognized using the effective interest method over the lease term.

We establish assets and liabilities for the present value of estimated future costs to retire long-lived assets at the termination or expiration of a lease. Such assets are amortized over the lease period into operating expense, and the recorded liabilities are accreted to the future value of the estimated retirement costs.

### Financing Obligations

We record assets and liabilities for estimated construction costs under build-to-suit lease arrangements when we have control over the building during the construction period. If we continue to control the building after the construction period, the arrangement is classified as a financing obligation instead of a lease. The building is depreciated over the shorter of its useful life or the term of the obligation.

If we do not control the building after the construction period ends, the assets and liabilities for construction costs are derecognized, and we classify the lease as either operating or finance.

Table of Contents

### Goodwill and Indefinite-Lived Intangible Assets

We evaluate goodwill and indefinite-lived intangible assets for impairment annually or more frequently when an event occurs or circumstances change that indicate the carrying value may not be recoverable. We may elect to utilize a qualitative assessment to evaluate whether it is more likely than not that the fair value of a reporting unit or indefinite-lived intangible asset is less than its carrying value and if so, we perform a quantitative test. We compare the carrying value of each reporting unit and indefinite-lived intangible asset to its estimated fair value and if the fair value is determined to be less than the carrying value, we recognize an impairment loss for the difference. We estimate the fair value of the reporting units using discounted cash flows. Forecasts of future cash flows are based on our best estimate of future net sales and operating expenses, based primarily on expected category expansion, pricing, market segment share, and general economic conditions.

We completed the required annual impairment test of goodwill for all reporting units and indefinite-lived intangible assets as of April 1, 2020, resulting in no impairments. The fair value of our reporting units substantially exceeded their carrying value. There were no events that caused us to update our annual impairment test. See "Note 5 — Acquisitions, Goodwill, and Acquired Intangible Assets."

### Other Assets

Included in "Other assets" on our consolidated balance sheets are amounts primarily related to video and music content, net of accumulated amortization; acquired intangible assets, net of accumulated amortization; certain equity investments; equity warrant assets; long-term deferred tax assets; and lease prepayments made prior to lease commencement.

### Digital Video and Music Content

We obtain video content, inclusive of episodic television and movies, and music content for customers through licensing agreements that have a wide range of licensing provisions including both fixed and variable payment schedules. When the license fee for a specific video or music title is determinable or reasonably estimable and the content is available to us, we recognize an asset and a corresponding liability for the amounts owed. We reduce the liability as payments are made and we amortize the asset to "Cost of sales" on an accelerated basis, based on estimated usage or viewing patterns, or on a straight-line basis. If the licensing fee is not determinable or reasonably estimable, no asset or liability is recorded and licensing costs are expensed as incurred. We also develop original video content for which the production costs are capitalized and amortized to "Cost of sales" predominantly on an accelerated basis that follows the viewing patterns associated with the content. The weighted average remaining life of our capitalized video content is 2.5 years.

Our produced and licensed video content is primarily monetized together as a unit, referred to as a film group, in each major geography where we offer Amazon Prime memberships. These film groups are evaluated for impairment whenever an event occurs or circumstances change indicating the fair value is less than the carrying value. The total capitalized costs of video, which is primarily released content, and music as of December 31, 2019 and 2020 were $5.8 billion and $6.8 billion. Total video and music expense was $7.8 billion and $11.0 billion for the year ended December 31, 2019 and 2020. Total video and music expense includes licensing and production costs associated with content offered within Amazon Prime memberships, and costs associated with digital subscriptions and sold or rented content.

### Investments

We generally invest our excess cash in AAA-rated money market funds and investment grade short- to intermediate-term fixed income securities. Such investments are included in "Cash and cash equivalents" or "Marketable securities" on the accompanying consolidated balance sheets.

Marketable debt securities are classified as available-for-sale and reported at fair value with unrealized gains and losses included in "Accumulated other comprehensive income (loss)." Each reporting period, we evaluate whether declines in fair value below carrying value are due to expected credit losses, as well as our ability and intent to hold the investment until a forecasted recovery occurs. Expected credit losses are recorded as an allowance through "Other income (expense), net" on our consolidated statements of operations.

Equity investments in private companies for which we do not have the ability to exercise significant influence are accounted for at cost, with adjustments for observable changes in prices or impairments, and are classified as "Other assets" on our consolidated balance sheets with adjustments recognized in "Other income (expense), net" on our consolidated statements of operations. Each reporting period, we perform a qualitative assessment to evaluate whether the investment is impaired. Our assessment includes a review of recent operating results and trends, recent sales/acquisitions of the investee securities, and other publicly available data. If the investment is impaired, we write it down to its estimated fair value. As of December 31, 2019 and 2020, these investments had a carrying value of $1.5 billion and $2.7 billion.

Table of Contents

Equity investments are accounted for using the equity method of accounting if the investment gives us the ability to exercise significant influence, but not control, over an investee. Equity-method investments are included within "Other assets" on our consolidated balance sheets. Our share of the earnings or losses as reported by equity-method investees, amortization of basis differences, related gains or losses, and impairments, if any, are recognized in "Equity-method investment activity, net of tax" on our consolidated statements of operations. Each reporting period, we evaluate whether declines in fair value below carrying value are other-than-temporary and, if so, we write down the investment to its estimated fair value.

Equity investments that have readily determinable fair values are included in "Marketable securities" on our consolidated balance sheets and measured at fair value with changes recognized in "Other income (expense), net" on our consolidated statements of operations.

### Long-Lived Assets

Long-lived assets, other than goodwill and indefinite-lived intangible assets, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets might not be recoverable. Conditions that would necessitate an impairment assessment include a significant decline in the observable market value of an asset, a significant change in the extent or manner in which an asset is used, or any other significant adverse change that would indicate that the carrying amount of an asset or group of assets may not be recoverable.

For long-lived assets used in operations, including lease assets, impairment losses are only recorded if the asset's carrying amount is not recoverable through its undiscounted, probability-weighted future cash flows. We measure the impairment loss based on the difference between the carrying amount and estimated fair value. Long-lived assets are considered held for sale when certain criteria are met, including when management has committed to a plan to sell the asset, the asset is available for sale in its immediate condition, and the sale is probable within one year of the reporting date. Assets held for sale are reported at the lower of cost or fair value less costs to sell. Assets held for sale were not significant as of December 31, 2019 and 2020.

### Accrued Expenses and Other

Included in "Accrued expenses and other" on our consolidated balance sheets are liabilities primarily related to leases and asset retirement obligations, payroll and related expenses, tax-related liabilities, unredeemed gift cards, customer liabilities, current debt, acquired digital media content, and other operating expenses.

As of December 31, 2019 and 2020, our liabilities for payroll related expenses were $4.3 billion and $7.6 billion and our liabilities for unredeemed gift cards were $3.3 billion and $4.7 billion. We reduce the liability for a gift card when redeemed by a customer. The portion of gift cards that we do not expect to be redeemed is recognized based on customer usage patterns.

### Unearned Revenue

Unearned revenue is recorded when payments are received or due in advance of performing our service obligations and is recognized over the service period. Unearned revenue primarily relates to prepayments of AWS services and Amazon Prime memberships. Our total unearned revenue as of December 31, 2019 was $10.2 billion, of which $7.9 billion was recognized as revenue during the year ended December 31, 2020 and our total unearned revenue as of December 31, 2020 was $11.6 billion. Included in "Other long-term liabilities" on our consolidated balance sheets was $2.0 billion and $1.9 billion of unearned revenue as of December 31, 2019 and 2020.

Additionally, we have performance obligations, primarily related to AWS, associated with commitments in customer contracts for future services that have not yet been recognized in our financial statements. For contracts with original terms that exceed one year, those commitments not yet recognized were $50.0 billion as of December 31, 2020. The weighted average remaining life of our long-term contracts is 3.4 years. However, the amount and timing of revenue recognition is largely driven by customer usage, which can extend beyond the original contractual term.

### Other Long-Term Liabilities

Included in "Other long-term liabilities" on our consolidated balance sheets are liabilities primarily related to financing obligations, asset retirement obligations, deferred tax liabilities, unearned revenue, tax contingencies, and digital video and music content.

### Foreign Currency

We have internationally-focused stores for which the net sales generated, as well as most of the related expenses directly incurred from those operations, are denominated in local functional currencies. The functional currency of our subsidiaries that either operate or support these stores is generally the same as the local currency. Assets and liabilities of these subsidiaries are translated into U.S. Dollars at period-end foreign exchange rates, and revenues and expenses are translated at average rates

Table of Contents

prevailing throughout the period. Translation adjustments are included in "Accumulated other comprehensive income (loss)," a separate component of stockholders' equity, and in the "Foreign currency effect on cash, cash equivalents, and restricted cash," on our consolidated statements of cash flows. Transaction gains and losses including intercompany transactions denominated in a currency other than the functional currency of the entity involved are included in "Other income (expense), net" on our consolidated statements of operations. In connection with the settlement and remeasurement of intercompany balances, we recorded gains (losses) of $(186) million, $95 million, and $118 million in 2018, 2019, and 2020.

### Note 2 — FINANCIAL INSTRUMENTS

***Cash, Cash Equivalents, Restricted Cash, and Marketable Securities***

As of December 31, 2019 and 2020, our cash, cash equivalents, restricted cash, and marketable securities primarily consisted of cash, AAA-rated money market funds, U.S. and foreign government and agency securities, and other investment grade securities. Cash equivalents and marketable securities are recorded at fair value. The following table summarizes, by major security type, our cash, cash equivalents, restricted cash, and marketable securities that are measured at fair value on a recurring basis and are categorized using the fair value hierarchy (in millions):

| | December 31, 2019 | | | |
| --- | --- | --- | --- | --- |
| | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
| Cash | $ 9,776 | $ — | $ — | $ 9,776 |
| Level 1 securities: | | | | |
| Money market funds | 18,850 | — | — | 18,850 |
| Equity securities | | | | 202 |
| Level 2 securities: | | | | |
| Foreign government and agency securities | 4,794 | — | — | 4,794 |
| U.S. government and agency securities | 7,070 | 11 | (1) | 7,080 |
| Corporate debt securities | 11,845 | 37 | (1) | 11,881 |
| Asset-backed securities | 2,355 | 6 | (1) | 2,360 |
| Other fixed income securities | 393 | 1 | — | 394 |
| Equity securities | | | | 5 |
| | $ 55,083 | $ 55 | $ (3) | $ 55,342 |
| Less: Restricted cash, cash equivalents, and marketable securities (2) | | | | (321) |
| Total cash, cash equivalents, and marketable securities | | | | $ 55,021 |

51

Table of Contents

|  | December 31, 2020 | | | |
|  | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
|---|---|---|---|---|
| Cash | $ 10,063 | $ — | $ — | $ 10,063 |
| Level 1 securities: | | | | |
| Money market funds | 27,430 | — | — | 27,430 |
| Equity securities (1) | | | | 617 |
| Level 2 securities: | | | | |
| Foreign government and agency securities | 5,130 | 1 | — | 5,131 |
| U.S. government and agency securities | 7,410 | 30 | (1) | 7,439 |
| Corporate debt securities | 29,684 | 305 | (1) | 29,988 |
| Asset-backed securities | 3,206 | 32 | (3) | 3,235 |
| Other fixed income securities | 701 | 9 | — | 710 |
| Equity securities (1) | | | | 40 |
| | $ 83,624 | $ 377 | $ (5) | $ 84,653 |
| Less: Restricted cash, cash equivalents, and marketable securities (2) | | | | (257) |
| Total cash, cash equivalents, and marketable securities | | | | $ 84,396 |

_____

(1)  The related unrealized gain (loss) recorded in "Other income (expense), net" was $448 million for the year ended December 31, 2020.

(2)  We are required to pledge or otherwise restrict a portion of our cash, cash equivalents, and marketable securities as collateral for real estate leases, amounts due to third-party sellers in certain jurisdictions, debt, and standby and trade letters of credit. We classify cash, cash equivalents, and marketable securities with use restrictions of less than twelve months as "Accounts receivable, net and other" and of twelve months or longer as non-current "Other assets" on our consolidated balance sheets. See "Note 7 — Commitments and Contingencies."

The following table summarizes gross gains and gross losses realized on sales of available-for-sale fixed income marketable securities (in millions):

|  | Year Ended December 31, | | |
|  | 2018 | 2019 | 2020 |
|---|---|---|---|
| Realized gains | $ 2 | $ 11 | $ 92 |
| Realized losses | 9 | 7 | 56 |

The following table summarizes the remaining contractual maturities of our cash equivalents and marketable fixed income securities as of December 31, 2020 (in millions):

|  | Amortized Cost | Estimated Fair Value |
|---|---|---|
| Due within one year | $ 52,838 | $ 52,850 |
| Due after one year through five years | 17,222 | 17,546 |
| Due after five years through ten years | 857 | 863 |
| Due after ten years | 2,644 | 2,674 |
| Total | $ 73,561 | $ 73,933 |

Actual maturities may differ from the contractual maturities because borrowers may have certain prepayment conditions.

Table of Contents

*Consolidated Statements of Cash Flows Reconciliation*

The following table provides a reconciliation of the amount of cash, cash equivalents, and restricted cash reported within the consolidated balance sheets to the total of the same such amounts shown in the consolidated statements of cash flows (in millions):

| | December 31, 2019 | December 31, 2020 |
|---|---|---|
| Cash and cash equivalents | $ 36,092 | $ 42,122 |
| Restricted cash included in accounts receivable, net and other | 276 | 233 |
| Restricted cash included in other assets | 42 | 22 |
| Total cash, cash equivalents, and restricted cash shown in the consolidated statements of cash flows | $ 36,410 | $ 42,377 |

## Note 3 — PROPERTY AND EQUIPMENT

Property and equipment, at cost, consisted of the following (in millions):

| | December 31, | |
|---|---|---|
| | 2019 | 2020 |
| Gross property and equipment (1): | | |
| Land and buildings | $ 39,223 | $ 57,324 |
| Equipment | 71,310 | 97,224 |
| Other assets | 3,111 | 3,772 |
| Construction in progress | 6,036 | 15,228 |
| Gross property and equipment | 119,680 | 173,548 |
| Total accumulated depreciation and amortization (1) | 46,975 | 60,434 |
| Total property and equipment, net | $ 72,705 | $ 113,114 |

_____

(1) Includes the original cost and accumulated depreciation of fully-depreciated assets.

Depreciation and amortization expense on property and equipment was $12.1 billion, $15.1 billion, and $16.2 billion which includes amortization of property and equipment acquired under finance leases of $7.3 billion, $10.1 billion, and $8.5 billion for 2018, 2019, and 2020.

## Note 4 — LEASES

Gross assets acquired under finance leases, inclusive of those where title transfers at the end of the lease, are recorded in "Property and equipment, net" and were $57.4 billion and $68.1 billion as of December 31, 2019 and 2020. Accumulated amortization associated with finance leases was $30.0 billion and $36.5 billion as of December 31, 2019 and 2020.

Lease cost recognized in our consolidated statements of operations is summarized as follows (in millions):

| | Year Ended December 31, | |
|---|---|---|
| | 2019 | 2020 |
| Operating lease cost | $ 3,669 | $ 5,019 |
| Finance lease cost: | | |
| Amortization of lease assets | 10,094 | 8,452 |
| Interest on lease liabilities | 695 | 617 |
| Finance lease cost | 10,789 | 9,069 |
| Variable lease cost | 966 | 1,238 |
| Total lease cost | $ 15,424 | $ 15,326 |

Table of Contents

Other information about lease amounts recognized in our consolidated financial statements is as follows:

| | December 31, 2019 | December 31, 2020 |
|---|---|---|
| Weighted-average remaining lease term – operating leases | 11.5 | 11.3 |
| Weighted-average remaining lease term – finance leases | 5.5 | 6.2 |
| Weighted-average discount rate – operating leases | 3.1 % | 2.5 % |
| Weighted-average discount rate – finance leases | 2.7 % | 2.1 % |

Our lease liabilities were as follows (in millions):

| | December 31, 2019 | | |
|---|---|---|---|
| | Operating Leases | Finance Leases | Total |
| Gross lease liabilities | $ 31,963 | $ 28,875 | $ 60,838 |
| Less: imputed interest | (6,128) | (1,896) | (8,024) |
| Present value of lease liabilities | 25,835 | 26,979 | 52,814 |
| Less: current portion of lease liabilities | (3,139) | (9,884) | (13,023) |
| Total long-term lease liabilities | $ 22,696 | $ 17,095 | $ 39,791 |

| | December 31, 2020 | | |
|---|---|---|---|
| | Operating Leases | Finance Leases | Total |
| Gross lease liabilities | $ 46,164 | $ 30,437 | $ 76,601 |
| Less: imputed interest | (7,065) | (2,003) | (9,068) |
| Present value of lease liabilities | 39,099 | 28,434 | 67,533 |
| Less: current portion of lease liabilities | (4,586) | (10,374) | (14,960) |
| Total long-term lease liabilities | $ 34,513 | $ 18,060 | $ 52,573 |

## Note 5 — ACQUISITIONS, GOODWILL, AND ACQUIRED INTANGIBLE ASSETS

### 2018 Acquisition Activity

On April 12, 2018, we acquired Ring Inc. for cash consideration of approximately $839 million, net of cash acquired, and on September 11, 2018, we acquired PillPack, Inc. for cash consideration of approximately $753 million, net of cash acquired, to expand our product and service offerings. During 2018, we also acquired certain other companies for an aggregate purchase price of $57 million.

### 2019 Acquisition Activity

During 2019, we acquired certain companies for an aggregate purchase price of $315 million, net of cash acquired.

### 2020 Acquisition Activity

During 2020, we acquired certain companies for an aggregate purchase price of $1.2 billion, net of cash acquired, of which $1.1 billion was capitalized to in-process research and development intangible assets ("IPR&D").

The primary reason for all acquisitions was to acquire technologies and know-how to enable Amazon to serve customers more effectively. Acquisition-related costs were expensed as incurred.

Pro forma results of operations have not been presented because the effects of 2020 acquisitions, individually and in the aggregate, were not material to our consolidated results of operations.

Table of Contents

*Goodwill*

The goodwill of the acquired companies is primarily related to expected improvements in technology performance and functionality, as well as sales growth from future product and service offerings and new customers, together with certain intangible assets that do not qualify for separate recognition. The goodwill of the acquired companies is generally not deductible for tax purposes. The following summarizes our goodwill activity in 2019 and 2020 by segment (in millions):

| | North America | International | AWS | Consolidated |
|---|---|---|---|---|
| Goodwill - January 1, 2019 | $ 12,191 | $ 1,270 | $ 1,087 | $ 14,548 |
| New acquisitions | 71 | 29 | 89 | 189 |
| Other adjustments (1) | 2 | 1 | 14 | 17 |
| Goodwill - December 31, 2019 | 12,264 | 1,300 | 1,190 | 14,754 |
| New acquisitions | 204 | 6 | 2 | 212 |
| Other adjustments (1) | 59 | (18) | 10 | 51 |
| Goodwill - December 31, 2020 | $ 12,527 | $ 1,288 | $ 1,202 | $ 15,017 |

_____
(1)  Primarily includes changes in foreign exchange rates.

*Intangible Assets*

Acquired identifiable intangible assets are valued primarily by using discounted cash flows. These assets are included within "Other assets" on our consolidated balance sheets and consist of the following (in millions):

| | December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | | | 2020 | | | |
| | Acquired Intangibles, Gross (1) | Accumulated Amortization (1) | Acquired Intangibles, Net | Acquired Intangibles, Gross (1) | Accumulated Amortization (1) | Acquired Intangibles, Net | Weighted Average Life Remaining |
| Finite-lived intangible assets (2): | | | | | | | |
| Marketing-related | $ 2,303 | $ (340) | $ 1,963 | $ 2,289 | $ (445) | $ 1,844 | 20.0 |
| Contract-based | 1,680 | (302) | 1,378 | 1,917 | (418) | 1,499 | 11.0 |
| Technology- and content-based | 1,005 | (477) | 528 | 948 | (555) | 393 | 3.3 |
| Customer-related | 282 | (130) | 152 | 179 | (77) | 102 | 4.0 |
| Total finite-lived intangible assets | 5,270 | (1,249) | 4,021 | 5,333 | (1,495) | 3,838 | 14.4 |
| IPR&D and other (3) | $ 28 | | $ 28 | $ 1,143 | | $ 1,143 | |
| Total acquired intangibles | $ 5,298 | $ (1,249) | $ 4,049 | $ 6,476 | $ (1,495) | $ 4,981 | |

_____
(1)  Excludes the original cost and accumulated amortization of fully-amortized intangibles.
(2)  Finite-lived intangible assets have estimated useful lives of between one and twenty-five years, and are being amortized to operating expenses on a straight-line basis.
(3)  Intangible assets acquired in a business combination that are in-process and used in research and development activities are considered indefinite-lived until the completion or abandonment of the research and development efforts. Once the research and development efforts are completed, we determine the useful life and begin amortizing the assets.

Table of Contents

Amortization expense for acquired finite-lived intangibles was $475 million, $565 million, and $509 million in 2018, 2019, and 2020. Expected future amortization expense of acquired finite-lived intangible assets as of December 31, 2020 is as follows (in millions):

| Year Ended December 31, | | |
|---|---|---|
| 2021 | $ | 464 |
| 2022 | | 430 |
| 2023 | | 368 |
| 2024 | | 303 |
| 2025 | | 251 |
| Thereafter | | 2,022 |
| | $ | 3,838 |

## Note 6 — DEBT

As of December 31, 2020, we had $32.2 billion of unsecured senior notes outstanding (the "Notes"), including $10.0 billion issued in June 2020 for general corporate purposes. We also have other long-term debt and borrowings under our credit facility of $1.6 billion and $924 million as of December 31, 2019 and 2020. Our total long-term debt obligations are as follows (in millions):

| | Maturities (1) | Stated Interest Rates | Effective Interest Rates | December 31, 2019 | December 31, 2020 |
|---|---|---|---|---|---|
| 2012 Notes issuance of $3.0 billion | 2022 | 2.50% | 2.66% | 1,250 | 1,250 |
| 2014 Notes issuance of $6.0 billion | 2021 - 2044 | 3.30% - 4.95% | 3.43% - 5.11% | 5,000 | 5,000 |
| 2017 Notes issuance of $17.0 billion | 2023 - 2057 | 2.40% - 5.20% | 2.56% - 4.33% | 17,000 | 16,000 |
| 2020 Notes issuance of $10.0 billion | 2023 - 2060 | 0.40% - 2.70% | 0.56% - 2.77% | — | 10,000 |
| Credit Facility | | | | 740 | 338 |
| Other long-term debt | | | | 830 | 586 |
| Total face value of long-term debt | | | | 24,820 | 33,174 |
| Unamortized discount and issuance costs, net | | | | (101) | (203) |
| Less current portion of long-term debt | | | | (1,305) | (1,155) |
| Long-term debt | | | | $ 23,414 | $ 31,816 |

_____

(1)  The weighted average remaining lives of the 2012, 2014, 2017, and 2020 Notes were 1.9, 11.8, 16.2, and 18.7 years as of December 31, 2020. The combined weighted average remaining life of the Notes was 15.8 years as of December 31, 2020.

Interest on the Notes is payable semi-annually in arrears. We may redeem the Notes at any time in whole, or from time to time, in part at specified redemption prices. We are not subject to any financial covenants under the Notes. The estimated fair value of the Notes was approximately $26.2 billion and $37.7 billion as of December 31, 2019 and 2020, which is based on quoted prices for our debt as of those dates.

In October 2016, we entered into a $500 million secured revolving credit facility with a lender that is secured by certain seller receivables, which we subsequently increased to $740 million and may from time to time increase in the future subject to lender approval (the "Credit Facility"). The Credit Facility is available until October 2022, bears interest at the London interbank offered rate ("LIBOR") plus 1.40%, and has a commitment fee of 0.50% on the undrawn portion. There were $740 million and $338 million of borrowings outstanding under the Credit Facility as of December 31, 2019 and 2020, which had a weighted-average interest rate of 3.4% and 3.0%, respectively. As of December 31, 2019 and 2020, we have pledged $852 million and $398 million of our cash and seller receivables as collateral for debt related to our Credit Facility. The estimated fair value of the Credit Facility, which is based on Level 2 inputs, approximated its carrying value as of December 31, 2019 and 2020.

Other long-term debt, including the current portion, had a weighted-average interest rate of 4.1% and 2.9% as of December 31, 2019 and 2020. We used the net proceeds from the issuance of this debt primarily to fund certain business operations. The estimated fair value of other long-term debt, which is based on Level 2 inputs, approximated its carrying value as of December 31, 2019 and 2020.

Table of Contents

As of December 31, 2020, future principal payments for our total long-term debt were as follows (in millions):

| Year Ended December 31, | | |
|---|---|---:|
| 2021 | $ | 1,156 |
| 2022 | | 1,629 |
| 2023 | | 2,283 |
| 2024 | | 3,355 |
| 2025 | | 2,251 |
| Thereafter | | 22,500 |
| | $ | 33,174 |

In April 2018, we established a commercial paper program (the "Commercial Paper Program") under which we may from time to time issue unsecured commercial paper up to a total of $7.0 billion at any time, with individual maturities that may vary but will not exceed 397 days from the date of issue. In June 2020, we increased the size of the Commercial Paper Program to $10.0 billion. There were no borrowings outstanding under the Commercial Paper Program as of December 31, 2019. There were $725 million of borrowings outstanding under the Commercial Paper Program as of December 31, 2020, which are included in "Accrued expenses and other" on our consolidated balance sheets and have a weighted average effective interest rate, including issuance costs, of 0.11%. We use the net proceeds from the issuance of commercial paper for general corporate purposes.

In April 2018, in connection with our Commercial Paper Program, we amended and restated our unsecured revolving credit facility (the "Credit Agreement") with a syndicate of lenders to increase our borrowing capacity thereunder to $7.0 billion. In June 2020, we further amended and restated the Credit Agreement to extend the term to June 2023, and it may be extended for up to three additional one-year terms if approved by the lenders. The interest rate applicable to outstanding balances under the amended and restated Credit Agreement is LIBOR plus 0.50%, with a commitment fee of 0.04% on the undrawn portion of the credit facility. There were no borrowings outstanding under the Credit Agreement as of December 31, 2019 and 2020.

We also utilize other short-term credit facilities for working capital purposes. These amounts are included in "Accrued expenses and other" on our consolidated balance sheets. In addition, we had $5.1 billion of unused letters of credit as of December 31, 2020.

Table of Contents

### Note 7 — COMMITMENTS AND CONTINGENCIES

#### Commitments

We have entered into non-cancellable operating and finance leases and financing obligations for equipment and office, fulfillment, sortation, delivery, data center, physical store, and renewable energy facilities.

The following summarizes our principal contractual commitments, excluding open orders for purchases that support normal operations and are generally cancellable, as of December 31, 2020 (in millions):

| | \$ Year Ended December 31, | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2021 | 2022 | 2023 | 2024 | 2025 | Thereafter | Total |
| Long-term debt principal and interest | \$ 2,187 | \$ 2,622 | \$ 3,219 | \$ 4,272 | \$ 3,058 | \$ 35,680 | \$ 51,038 |
| Operating lease liabilities | 5,600 | 5,184 | 4,743 | 4,356 | 3,951 | 22,330 | 46,164 |
| Finance lease liabilities, including interest | 10,778 | 7,246 | 3,456 | 1,389 | 1,035 | 6,533 | 30,437 |
| Financing obligations, including interest | 227 | 230 | 233 | 237 | 240 | 3,751 | 4,918 |
| Leases not yet commenced | 1,010 | 1,738 | 1,876 | 1,973 | 1,951 | 20,321 | 28,869 |
| Unconditional purchase obligations (1) | 3,869 | 3,760 | 3,367 | 3,141 | 2,213 | 136 | 16,486 |
| Other commitments (2)(3) | 3,671 | 2,386 | 945 | 783 | 661 | 8,351 | 16,797 |
| Total commitments | \$ 27,342 | \$ 23,166 | \$ 17,839 | \$ 16,151 | \$ 13,109 | \$ 97,102 | \$ 194,709 |

_____

(1) Includes unconditional purchase obligations related to certain products offered in our Whole Foods Market stores and long-term agreements to acquire and license digital media content that are not reflected on the consolidated balance sheets. For those digital media content agreements with variable terms, we do not estimate the total obligation beyond any minimum quantities and/or pricing as of the reporting date. Purchase obligations associated with renewal provisions solely at the option of the content provider are included to the extent such commitments are fixed or a minimum amount is specified.

(2) Includes the estimated timing and amounts of payments for rent and tenant improvements associated with build-to-suit lease arrangements that are under construction, asset retirement obligations, and liabilities associated with digital media content agreements with initial terms greater than one year.

(3) Excludes approximately \$2.8 billion of accrued tax contingencies for which we cannot make a reasonably reliable estimate of the amount and period of payment, if any.

#### Pledged Assets

As of December 31, 2019 and 2020, we have pledged or otherwise restricted \$994 million and \$875 million of our cash, cash equivalents, and marketable securities, and certain property and equipment as collateral for real estate leases, amounts due to third-party sellers in certain jurisdictions, debt, and standby and trade letters of credit. Additionally, we have pledged our cash and seller receivables for debt related to our Credit Facility. See "Note 6 — Debt."

#### Suppliers

During 2020, no vendor accounted for 10% or more of our purchases. We generally do not have long-term contracts or arrangements with our vendors to guarantee the availability of merchandise, particular payment terms, or the extension of credit limits.

#### Other Contingencies

We are subject to claims related to various indirect taxes (such as sales, value added, consumption, service, and similar taxes), including in jurisdictions in which we already collect and remit such taxes. If the relevant taxing authorities were successfully to pursue these claims, we could be subject to significant additional tax liabilities. For example, in June 2017, the State of South Carolina issued an assessment for uncollected sales and use taxes for the period from January 2016 to March 2016, including interest and penalties. South Carolina is alleging that we should have collected sales and use taxes on transactions by our third-party sellers. In September 2019, the South Carolina Administrative Law Court ruled in favor of the Department of Revenue and we have appealed the decision to the state Court of Appeals. We believe the assessment is without merit and intend to defend ourselves vigorously in this matter. If other tax authorities were successfully to seek additional adjustments of a similar nature, we could be subject to significant additional tax liabilities.

# EXHIBIT E







Goodreads
Book reviews
& recommendations

IMDb
Movies, TV
& Celebrities

IMDbPro
Get Info Entertainment
Professionals Need

Kindle Direct
Publishing
Indie Digital & Print
Publishing
Made Easy

Amazon Photos
Unlimited Photo
Storage
Free With Prime

Prime Video
Direct
Video
Distribution
Made Easy

Shopbop
Designer
Fashion Brands

Amazon
Warehouse
Great Deals on
Quality Used
Products

Whole Foods
Market
America's
Healthiest
Grocery Store

Woot!
Deals and
Shenanigans

Zappos
Shoes &
Clothing

Ring
Smart Home
Security Systems

eero WiFi
Stream 4K Video
in Every Room

Blink
Smart Security
for Every Home

Neighbors App
Real-Time Crime
& Safety Alerts

Amazon Subscription
Boxes
Top subscription boxes –
right to your door

PillPack
Pharmacy Simplified

Amazon
Renewed
Like-new products
you can trust

Conditions of Use    Privacy Notice    Interest-Based Ads    © 1996-2021, Amazon.com, Inc. or its affiliates

# EXHIBIT L

# In the Matter of:

*Bernard Waithaka vs*

*Amazon.com, Inc., et al.*

---

*Alexa Hawrysz*

*October 06, 2021*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



| Bernard Waithaka vs | 30(b)(6), Confidential | Alexa Hawrysz |
|---|---|---|
| Amazon.com, Inc., et al. | | October 06, 2021 |

```
1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF WASHINGTON

3     _____

4     BERNARD WAITHAKA, individually and on  )
      behalf of all others similarly         )
5     situated,                              )
                                             )
6                    Plaintiffs,             ) No. 2:19-cv-01320
                                             )
7            vs.                             )
                                             )
8     AMAZON.COM, INC. and AMAZON            )
      LOGISTICS, INC.,                       )
9                                            )
                     Defendants.             )
10                                           )
      _____
11
                 30(B)(6) DEPOSITION OF ALEXA HAWRYSZ
12
                          CONDUCTED REMOTELY
13
                      425 106TH AVENUE NORTHEAST
14
                      BELLEVUE, WASHINGTON 98004
15
                       ***** Confidential *****
16

17

18

19

20

21

22

23

24    DATE:  Wednesday, October 6, 2021

25    REPORTED BY:  Svetlana Golub, CCR 3445
```

O'Brien & Levine Court Reporting Solutions
888.825.3376 - production@court-reporting.com

App. 210

Bernard Waithaka vs                30(b)(6), Confidential              Alexa Hawrysz
Amazon.com, Inc., et al.                                              October 06, 2021

2

1    APPEARANCES

2

     For the Plaintiffs:

3

         Adelaide Pagano
4        Lichten & Liss-Riordan, P.C.
         729 Boylston Street
5        Suite 2000
         Boston, Massachusetts 02116
6        617.994.5800
         Apagano@llrlaw.com
7

8

     For the Defendants:

9

         Sarah Zenewicz
10       James Walsh, Jr.
         Richard G. Rosenblatt
11       Morgan Lewis Bockius
         502 Carnegie Center
12       Princeton, New Jersey 08540
         609.919.6600
13       Sarah.zenewicz@morganlewis.com
         James.walsh@morganlewis.com
14       Rrosenblatt@morganlewis.com

15

16

         Also present:  Jaclyn Hamlin, Amazon Representative
17                       Jaime Cole, Amazon Representative
                         Mary Vo, Tech
18

19

20

21

22

23

24

25

App. 211

| Bernard Waithaka vs | 30(b)(6), Confidential | Alexa Hawrysz |
|---|---|---|
| Amazon.com, Inc., et al. | | October 06, 2021 |

```
                                                              3
 1                DEPOSITION OF ALEXA HAWRYSZ

 2                   EXAMINATION INDEX

 3    EXAMINATION BY:                              PAGE

 4    MS. PAGANO                                      6

 5    MS. ZENEWICZ                                  132

 6

 7                     EXHIBIT INDEX

 8    EXHIBITS FOR IDENTIFICATION               PAGE

 9     EXHIBIT 1     Notice of Deposition           9

10     EXHIBIT 2     Document Bates Labeled Waithaka      18
                     14246-248
11
       EXHIBIT 3     Document Bates Labeled Waithaka 138-139   20
12
       EXHIBIT 4     Document Bates Labeled Amazon 381-388     29
13
       EXHIBIT 5     Document Bates Labeled Amazon 1-14        39
14
       EXHIBIT 6     Document Bates Labeled Amazon 52-74       43
15
       EXHIBIT 7     Document Bates Labeled Waithaka      48
                     14192-196
16
       EXHIBIT 8     Document Bates Labeled Waithaka 1285      50
17
       EXHIBIT 9     Document Bates Labeled Waithaka      59
                     1307-1309
18
19     EXHIBIT 10    Document Bates Labeled Waithaka 157       61

20     EXHIBIT 11    Document Bates Labeled Waithaka 248-250   62

21     EXHIBIT 12    Document Bates Labeled Waithaka 1-2       64

22     EXHIBIT 13    Document Bates Labeled Waithaka 290-291   70

23     EXHIBIT 14    Document Bates Labeled Waithaka 292       81

24     EXHIBIT 15    Document Bates Labeled Waithaka 413-414   85

25     EXHIBIT 16    Document Bates Labeled Waithaka 89-92     86
```

App. 212

Bernard Waithaka vs
Amazon.com, Inc., et al.
30(b)(6), Confidential
Alexa Hawrysz
October 06, 2021

```
                                                          4
 1
     EXHIBIT 17    Document Bates Labeled Waithaka 818-1047   97
 2
     EXHIBIT 18    Excel Spreadsheet                          101
 3
     EXHIBIT 19    Document Bates Labeled Waithaka 14233      119
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                         October 06, 2021

24

```
 1      familiar with what the specific layout looked like in
 2      Massachusetts.
 3   Q  Is there a scenario where they might be going to an actual
 4      grocery store to pick up the Amazon Fresh deliveries?
 5   A  For an Amazon Fresh delivery, no.  Yeah, I think that's
 6      correct.
 7   Q  Okay.  So they would still be going to a Prime Now delivery
 8      station to pick up an Amazon Fresh delivery?
 9   A  Again, I would need to clarify what the layout looked like
10      and the specifics of Massachusetts.  But generally speaking,
11      yes.
12   Q  In terms of, like, the user interface on the Amazon Flex
13      application, does that function the same for Prime Now
14      deliveries as it does for Amazon.com deliveries?
15              MS. ZENEWICZ:  Objection.  Vague.
16   A  Can you clarify what you mean by "the user interface."
17   Q  Well, sure.  So let me take a step back.
18          So Amazon Flex drivers use the Amazon Flex application
19      in order to make deliveries; is that right?
20   A  They use the application to pick up the block, and then they
21      can use their own maps to make the delivery if they want.
22      But then they use the application to scan the packages to
23      close out.
24   (Reporter clarification.)
25   Q  And so I guess my question is, is it the same application
```

App. 214

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                         October 06, 2021

25

1      that drivers use for Amazon Prime Now deliveries as for

2      Amazon.com deliveries?

3    A  Yes.

4    Q  And does the app generally work the same way in the sense

5      that they have to use it to scan the package when they pick

6      it up and then again when they deliver it?

7    A  Yes.

8    Q  And are Prime Now deliveries subject to the same terms of

9      service as Amazon.com deliveries?

10   A  Yes.

11   Q  When an Amazon Flex driver logs into the Amazon Flex

12     application to pick up a block, are they able to see that a

13     particular block is a Prime Now delivery?

14   A  Yes.

15   Q  When did Amazon Logistics roll out Whole Foods deliveries in

16     Massachusetts?

17   A  I don't know the date of that.  I would expect in the last

18     few years.

19  (Reporter clarification.)

20   Q  Were Whole Foods deliveries something that were added more

21     recently, like, after Prime Now deliveries?

22   A  Yes.

23   Q  How do Whole Foods deliveries differ from Prime Now

24     deliveries?

25                MS. ZENEWICZ:  Objection.  Vague.

App. 215

| Bernard Waithaka vs | 30(b)(6), Confidential | Alexa Hawrysz |
|---|---|---|
| Amazon.com, Inc., et al. | | October 06, 2021 |

26

```
1   A   Can you clarify.
2   Q   For a Whole Foods delivery, would an Amazon Flex driver have
3       to go to a delivery station to pick it up, or do they go to a
4       Whole Foods store?
5   A   They go to a Whole Foods store.
6   Q   Other than the fact that they pick up Whole Foods deliveries
7       from a store as opposed to a delivery station, are there any
8       other differences between the way that Whole Foods deliveries
9       function and Prime Now deliveries function?
10  A   They have a similar -- similar app.
11  Q   So do Amazon Flex drivers use the same application to make
12      Whole Foods deliveries --
13  A   Yes.
14  Q   -- subject to the same terms of service?
15          Sorry, I missed your answer.
16  A   I said yes.
17  Q   So when an Amazon Flex driver is trying to sign up for a
18      block, will it indicate whether it's a Whole Foods delivery?
19  A   Yes.
20  Q   Okay.  So in terms of the mechanics within the app, does it
21      function the same except that they're scanning something on a
22      grocery bag as opposed to on a physical package?
23  A   Yes, yes.
24  Q   So within the app, when a driver arrives at the delivery
25      station or the Whole Foods store, do they have to press a
```

App. 216

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                          October 06, 2021

27

1      button to indicate that they've arrived?

2   A  The experience have changed slightly over time.  But, yes,

3      they indicate that they've arrived at the -- at the store.

4   Q  And then what's the next step once the driver's indicated

5      that they've arrived at a Whole Foods store?

6   A  Again, the -- the experience have changed over time.  But

7      generally speaking, the driver would indicate that they've

8      arrived, and then they would enter the station or enter the

9      store to pick up their package -- their set of packages, scan

10     them and depart.

11  Q  Okay.  And then when they arrive at the customer's doorstep,

12     they're supposed to scan the package or the bags again?

13  A  That's correct.

14  Q  And then if they're not able to deliver a particular set of

15     bags or packages for some reason, are they supposed to return

16     them to the place where they started?

17  A  Generally speaking, yes.

18  Q  So those mechanics that we just described, I mean, do that --

19     is that the same for any type of delivery on the Amazon Flex

20     application?

21          MS. ZENEWICZ:  Objection.  Vague.

22  A  The steps that you're referring to are which steps?

23  Q  So, you know, indicating in the app that they've arrived at

24     the delivery station or the store and then scanning the items

25     at the store or the delivery station, scanning them again at

App. 217

| Bernard Waithaka vs | 30(b)(6), Confidential | Alexa Hawrysz |
|---|---|---|
| Amazon.com, Inc., et al. | | October 06, 2021 |

28

```
1        the customer's location and then returning them if they're
2        not able to deliver them.
3   A    Yes.  Generally speaking, that's -- those are the steps for
4        the different types of deliveries.
5   Q    What are the requirements for somebody who wants to become an
6        Amazon Flex driver?
7   A    There are a few basic requirements, including being 21 years
8        old, having a driver's license and a vehicle and going
9        through the onboarding process.
10  Q    Does the onboarding process include a background check?
11  A    Yes.
12  Q    What else is included in the onboarding process?
13  A    Providing basic information -- like bank account
14       information -- and optional learning videos and providing
15       your preferences about times of working.
16  Q    Does a driver also have to accept Amazon's terms of service
17       in order to work for Amazon Flex?
18  A    Yes.  The terms of service are before the onboarding process.
19  Q    Anything else that someone would have to do in order to work
20       for Amazon Flex?
21  A    Those are the steps I can -- I can think of.
22  Q    Does Amazon have any particular requirements for the type of
23       vehicles that people can use to make Flex deliveries?
24  A    They're very minimal.  They need to essentially be able to
25       fit the packages in their vehicle.
```

App. 218

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                          October 06, 2021

52

1   Q   So the blocks also include a location it looks like, so that

2       would be the location of the delivery station or the Whole

3       Foods store where they would have to go to make the pickup;

4       is that right?

5   A   That's correct.

6   Q   So when a driver picks up a block, they know where they're

7       going to start the block in terms of, like, what delivery

8       station or store; right?

9   A   That's correct.

10  Q   So when they sign up for a block, they don't necessarily know

11      where they're going to be sent to make the deliveries;

12      correct?

13  A   Correct.  When they're picking up the block.

14  Q   So if a driver gets to a delivery station and they are

15      assigned a route that they don't want to do for some reason,

16      are they allowed to refuse the packages or the groceries that

17      they've been assigned?

18  A   Yes.  They can refuse the route.

19  Q   Does refusing a route have any kind of negative ramifications

20      in terms of their ratings or metrics that Amazon tracks?

21  A   I don't know but I -- I would expect, yes, it would impact

22      their rating if they refused a number of -- you know, a large

23      number of routes.

24  Q   I mean, could a driver be offboarded because they refused to

25      accept a route?

Bernard Waithaka vs                    30(b)(6), Confidential              Alexa Hawrysz
Amazon.com, Inc., et al.                                                  October 06, 2021

53

1           MS. ZENEWICZ:  Objection.  Incomplete
2    hypothetical.
3   A  Can you clarify.
4   Q  I mean, are you aware of any driver being offboarded because
5    they refused to accept a route?
6   A  I'm not aware of a driver that would be offboarded for
7    refusing to accept one route.
8   Q  So it's your understanding that it would have to occur more
9    than once for it to be something that would result in
10   termination?
11          MS. ZENEWICZ:  Objection.  Incomplete
12   hypothetical.
13  A  Can you clarify.
14  Q  Well, you said you're not aware of a driver being terminated
15   for refusing one route.  So is it your understanding that
16   they could be terminated for refusing a route more than once?
17          MS. ZENEWICZ:  Objection.  Incomplete
18   hypothetical.
19  A  I would expect that, if a driver consistently was refusing
20   routes, that that could potentially lead to offboarding.
21  Q  Is it written down anywhere how many times a driver can
22   refuse a route before they would be in danger of being
23   offboarded?
24  A  I'm not sure.
25  Q  Okay.  So just getting into the mechanics of how the app

App. 220

Bernard Waithaka vs                 30(b)(6), Confidential                Alexa Hawrysz
Amazon.com, Inc., et al.                                                  October 06, 2021

54

```
 1        works a little bit more.  So when a driver is -- an Amazon
 2        Flex driver is out and they're making a delivery, are they
 3        prompted in the Amazon Flex app to scan the item with their
 4        phone when -- at the point of leaving it with the customer?
 5   A    Yes.
 6   Q    Are they prompted to take a photo of where they've left the
 7        package as well?
 8   A    It depends, but sometimes.
 9   Q    Can customers opt out of having a photo taken of their
10        packages?
11   A    I don't know the answer.
12   Q    As a practical matter, do you know if most of the time
13        drivers are prompted to take a photo of where they leave the
14        item?
15   A    I don't know the answer to that.
16   Q    So if the driver for some reason is not able to complete the
17        delivery, do they have to log that in some way in the
18        application?
19   A    Can you clarify what you mean by if they can't complete the
20        delivery.
21   Q    So let's say, for example, that they're supposed to deliver
22        something to Apartment C and they can't find Apartment C
23        because it looks like the letters just go from B to D or
24        something like that, do they -- is there something they have
25        to do in the app because they're unable to actually leave the
```

Bernard Waithaka vs        30(b)(6), Confidential        Alexa Hawrysz
Amazon.com, Inc., et al.                                       October 06, 2021

59

```
 1        delivery immediately upon picking it up?
 2   A    There is a tighter time frame -- a specific time that they
 3        need to get the packages there by that's provided to them
 4        when they pick up the block.  Again, you know, they can take
 5        however they -- however long they want to do it as long as
 6        they can get it there by the time of the end.
 7   Q    Can Amazon Flex drivers hire employees to make deliveries in
 8        their stead?
 9   A    They need to -- the background check and verification is for
10        the person who is the Flex provider.  The rule would be that
11        they would need to deliver their own packages.
12   Q    Okay.
13                  MS. PAGANO:  I'm going to introduce another
14        exhibit.
15   (Exhibit No. 9 marked.)
16   BY MS. PAGANO:
17   Q    Okay.  I've just introduced Exhibit 9.  This is a three-page
18        document, and it's Bates labeled Waithaka 1307 to 1309.  Let
19        me know when you had a chance to review it.
20   A    Okay.
21   Q    So does Amazon Logistics use facial recognition technology
22        with Amazon Flex drivers?
23                  MS. ZENEWICZ:  Objection.  Vague.
24   A    Can you specify please.
25   Q    Well, I mean, Exhibit 9 appears to be prompting an Amazon
```

App. 222

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                        October 06, 2021

73

1    Q   Do those types of same-day deliveries have a different name?

2    A   They would show up in the Flex app with a specific station

3        notated.  It looks different from the other types.

4    Q   And as a practical matter, how do those same-day deliveries

5        differ from Prime Now deliveries?

6    A   They have a --

7                    MS. ZENEWICZ:  Objection.  Vague.

8    A   They have a different time frame and they -- just a different

9        pickup location layout.

10   Q   What is the typical time frame on a Prime Now delivery?

11   A   I believe it's varied quite a bit and does vary even now by

12       place, but probably roughly two to three hours.

13   Q   And are these other types of same-day deliveries that you're

14       describing, are they, like, faster than Prime Now or are they

15       more flexible in the tame frame?

16   A   In terms of the time frame, they would be a longer time frame

17       than Prime Now.

18   Q   Okay.  Do you want --

19   A   From the driver's perspective --

20   Q   Oh, sorry.

21   A   From the driver's perspective, they would be brown boxes

22       instead of bags is how they differentiate.

23   Q   So the bags would be Prime Now, and the brown boxes would be

24       the other same day?

25   A   Correct, correct.

Bernard Waithaka vs                     30(b)(6), Confidential                     Alexa Hawrysz
Amazon.com, Inc., et al.                                                          October 06, 2021

75

1   A   Any kind of metrics that we're using for drivers would be
2       extremely variable based on the program, the geography, the
3       city -- the country, the city, the -- you know, the types of
4       programs we're operating.
5   Q   Okay.  So there's one team that's responsible for setting the
6       threshold, but they may set different thresholds for
7       different places depending on those variables?
8   A   Correct.
9   Q   Do drivers ever get suspended as opposed to, you know, being
10      offboarded where they, you know, might not be able to pick up
11      blocks for a certain period of time as a consequence of their
12      ratings falling too low?
13  A   A driver can get inactivated, as we talked about previously,
14      for -- if they don't have the updated driver's license or
15      they haven't updated some paperwork, that's kind of an
16      inactivated.  We don't really have a suspended concept.
17  Q   I mean, is it one of the reasons that somebody could get
18      inactivated because their ratings fell too low?
19              MS. ZENEWICZ:  Objection.  Vague.
20  A   A driver would be -- could go at risk.  They would still be
21      able to take work while they're at risk, and then they would
22      eventually be offboarded if they didn't improve on their
23      service levels they that were providing.
24  Q   If a driver is offboarded because of their ratings, is there
25      any way to appeal that decision?

App. 224

| Bernard Waithaka vs | 30(b)(6), Confidential | Alexa Hawrysz |
|---|---|---|
| Amazon.com, Inc., et al. | | October 06, 2021 |

76

```
 1   A   Yes.
 2   Q   What is the process for appealing?
 3   A   The process is to e-mail the Amazon Flex alias.
 4   (Reporter clarification.)
 5   Q   And where do those e-mail requests get routed?
 6   A   I don't know the exact teams, but they would be reviewed
 7       against the driver's history for those -- for whatever the
 8       issues were.
 9   Q   So do you know if it's the service level standards team that
10       would perform that review or someone else?
11   A   I don't know the exact team.  I think it would be a separate
12       team.
13   Q   Do you know if the teams are employees of Amazon Flex as
14       opposed to, for example, third-party contractors that Amazon
15       Flex uses for customer support?
16           MS. ZENEWICZ:  Objection.  Vague.
17   A   I'm not -- I'm not sure.  I expect that they would be.  I'm
18       not sure, actually.  I don't want to...
19   Q   Does Amazon Logistics use third-party contractors for
20       customer support?
21   A   We use the Amazon shipping and delivery support team,
22       essentially customer support for drivers.  They're not part
23       of the Amazon Flex organization.
24   Q   The Amazon shipping and delivery support team, do you know
25       what organization they are part of?
```

App. 225

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                         October 06, 2021

                                                                                           77

 1   A    I don't know where they rule up in the broader Amazon
 2        organization.
 3   Q    So if a driver, for example, thinks that there's something
 4        that's -- for example, there was a delivery that was late but
 5        it was -- there were extenuating circumstances that were
 6        outside of their control, is that the type of thing that they
 7        could write to the Amazon Flex customer support about and try
 8        to get their rating changed?
 9   A    So the rating isn't -- it's not going to decline for just
10        one -- a driver's not going to get offboarded for one
11        incident.  It would be a series of incidents or, you know,
12        they would be dropping and drinking.
13              And so, yes, they can e-mail the support to discuss
14        the specific instances.  But on the whole, that specific
15        instance is likely not what's going to, you know, get them
16        offboarded.
17   Q    So if a driver wants to contest their rating in some way, do
18        they have any options besides e-mailing Amazon customer
19        support?
20   A    They would e-mail the driver support.  But, no, that would be
21        the only option.
22   Q    Can Amazon Flex drivers contact driver support through the
23        app as well?
24   A    They can submit feedback, but they can't specifically contact
25        driver support through the app.

Bernard Waithaka vs                30(b)(6), Confidential                Alexa Hawrysz
Amazon.com, Inc., et al.                                                October 06, 2021

78

1    Q    Is there a phone number that they can reach driver support

2         through or is it only e-mail?

3    A    Yes.  They can contact via phone as well.

4    Q    And the folks on the other end of that call, are they also

5         part of that Amazon shipping and delivery support team that

6         you referred to?

7    A    Yes.

8    Q    Does Amazon Logistics also keep track of packages that an

9         Amazon Flex driver fails to return by the end of the day?

10   A    Can you specify.  Do we keep track of the packages themselves

11        or the fact that it didn't -- the package didn't get

12        returned?

13   Q    Yeah, whether -- if they keep track of whether packages were

14        not -- undeliverable packages were not returned by the end of

15        the day by a particular Amazon Flex driver?

16   A    Yes.  Whether or not the packages got returned to the station

17        is one of the things that we evaluate because that, again, is

18        one of the terms when they sign up is that they would return

19        undeliverable packages.

20   Q    And if that happened a certain number of times, could that

21        result in a driver being offboarded?

22   A    Yes, if that continued --

23             MS. ZENEWICZ:  Objection.  Vague.

24   A    If it's a continued habit that they are not returning

25        packages, that would be something that could be grounds for

App. 227

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                         October 06, 2021

79

1        offboarding.

2    Q   And, again, is there a particular threshold that's determined

3        by that service level standards team, or is that something

4        that would be sort of more on a case-by-case basis, whether

5        somebody has failed to return packages one too many times?

6                    MS. ZENEWICZ:  Objection.  Vague.

7    A   There's not one specific threshold that's been used

8        consistently.  You know, as I said before, the thresholds and

9        concept of how these are evaluated has changed over time.

10       But the -- the process would be --

11   Q   Okay.  So the --

12   A   The process would be an automated process, not a kind of

13       driver-by-driver process.

14   Q   Got it.  Okay.

15               If somebody fails to cancel their block outside of the

16       45-minute window that's required by Amazon, are they able to,

17       you know, write in with an excuse for canceling late?  Is

18       that something that customer support would entertain?

19   A   So that is a reliability issue, if they're not showing up on

20       time, which we would count a 45-minute window.  They can

21       contact customer support about it.  But, again, it's not as

22       though one missed block is going to get them offboarded.  So

23       in the course of things, it's more about a trend.

24                    MS. ZENEWICZ:  Sorry, I'm just going to enter a

25       belated objection because I was muted.  But objection on the

Bernard Waithaka vs
Amazon.com, Inc., et al.

30(b)(6), Confidential

Alexa Hawrysz
October 06, 2021

88

1      and you divide by the expected number of hours that it's
2      going to take to do the block, that would give you an
3      anticipated hourly rate for the block; right?
4    A  So it's not really an hourly rate because the amount of time
5      is totally dependent on how the driver actually executes on
6      the block.  They might take one hour or -- you know, to
7      complete the block.
8    Q  Okay.  So I understand the actual hourly rate might end up
9      being something different.  But you could use what's
10     available here in Exhibit 8 to come up with an anticipated
11     hourly rate based on how long the block is anticipated to
12     take; right?
13   A  Yeah.  Again, it's not really anything that we're doing, but
14     I think, yes, mathematically you could divide 76 by 4.
15   Q  So that does kind of lead to my next question.  I mean, does
16     Amazon ever do any kind of analysis when it's determining the
17     compensation for blocks to figure out whether they average
18     out to an hourly rate that's at least minimum wage in the
19     local jurisdiction?
20   A  That was kind of a complicated question.  Can you restate --
21   Q  Sure.  When Amazon is setting the price for a given block, do
22     they do any kind of analysis to determine what the
23     anticipated hourly rate is and whether that anticipated
24     hourly rate is greater than minimum wage in that particular
25     area?

Bernard Waithaka vs                30(b)(6), Confidential              Alexa Hawrysz
Amazon.com, Inc., et al.                                              October 06, 2021

89

1   A   So the price of the block is -- you know, you see what you've

2       displayed on a screen is a snapshot in time.  The price of

3       the block is highly variable dependent on the surge pricing,

4       and the surge pricing is automatically changing the price of

5       the block depending on whether people are taking it.

6           So the end price of the block is really dependent on

7       how -- whether or not a driver is going to accept it --

8       accept the work that's out there.

9   (Reporter clarification.)

10  Q   When Amazon determines a price for a block, is there, like, a

11      floor below which it gets -- it can't fall?  In other words,

12      there's, like, a minimum base rate that would be paid for the

13      block?

14  A   Yes, there would be -- when the driver sees it, there would

15      be -- that's the price they're going to get.

16  Q   And then that price might be adjusted upward based on demand?

17  A   So the specific price that you see in this exhibit, the

18      driver price, that doesn't necessarily -- that represents the

19      snapshot-in-time price.

20  Q   So when the driver logs into the app, you know, they might

21      see -- they're going to see a price at that particular

22      moment.  And you're saying that moment -- or that price could

23      vary depending on different variables?

24          MS. ZENEWICZ:  Objection.  Vague and it misstates

25      the witness's testimony.

App. 230

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                         October 06, 2021

90

1    A    So a driver, when they log in, they'll see, like, the screen
2         that you had in the example.  That is the price exactly at
3         that moment.  That price could change up or down in the
4         moment.  But if the driver accepts it, that is the price that
5         they will get, the minimum of that range that's shown, if
6         it's a range.
7    Q    I see.  So if the driver logged in 20 minutes later, they
8         might see a different price for the same block?
9    A    Correct.  Or it could be gone.
10   Q    Okay.  But you said there is a minimum sort of base rate or
11        floor that is associated with any particular block; correct?
12   A    Well, for the minimum, essentially if you -- in your example,
13        the minimum there is 20 to $27.  $20 is the minimum they're
14        going to make in that one-hour block.  They're guaranteed
15        $20.  It could go -- and then it could go up from there.
16   Q    Okay.  So I guess my question is, if -- you know, if I log in
17        to the Amazon Flex app and I see a price for a three-hour
18        block, and let's assume that there's no surge pricing in
19        effect so that's -- it's sort of the minimum price for that
20        three-hour block, does Amazon ever engage in the exercise of
21        determining whether that anticipated hourly rate for that
22        block, using the minimum base rate, whether that exceeds
23        minimum wage for the local jurisdiction?
24             MS. ZENEWICZ:  Objection.  I think that was an
25        incomplete hypothetical.

Bernard Waithaka vs                30(b)(6), Confidential                Alexa Hawrysz
Amazon.com, Inc., et al.                                                October 06, 2021

                                                                                    91

1   A   Can you specify what the question is.

2   Q   Yeah, I think I asked this question before, and your answer

3       was, well, you know, the prices vary.  They're dynamic.

4       They're based on a bunch of different variables, surge

5       pricing.

6           So my question is, you know, assuming that there's no

7       surge pricing in effect, that we're just talking about the

8       base rate for a particular block, does Amazon ever analyze

9       the anticipated hourly rate for that block using the base

10      rate to see if it exceeds minimum wage in the local area?

11  A   We would analyze in a more aggregated manner, not for a

12      specific block, kind of at a station or regional level what

13      is the base rate.  We would need to set a -- kind of that

14      base rate.

15  (Reporter clarification.)

16  Q   Who's responsible for determining the base rate for a

17      particular station or region?

18  A   The Amazon Flex pricing team.

19  Q   Who's in charge of the Amazon Flex pricing team currently?

20  A   Max Haubold.

21  Q   And in determining the base rate for a block, does the

22      pricing team take into account other variables associated

23      with that block such as the -- how far away the route is from

24      the delivery station?

25              MS. ZENEWICZ:  Objection.  Vague.

App. 232

Bernard Waithaka vs                   30(b)(6), Confidential                   Alexa Hawrysz
Amazon.com, Inc., et al.                                                       October 06, 2021

92

1   A   The base rate would be generated essentially to be a price

2       that would be compelling for drivers when they see it since

3       it's a supply-and-demand situation.  It would take into

4       account, you know, different factors to ensure we're putting

5       out a good price that drivers are interested in.

6   Q   Do you know what those factors are?

7   A   I think we would look at the -- the minimum wage in the area,

8       some of our marketing messaging as well as any potential

9       expenses.

10  Q   So, like, in this example, Exhibit 8, the last three offers

11      on here, they're all three hours.  They're all $57.  So if

12      one of these routes required a driver to put, you know, twice

13      as many miles on their car as the one below, I mean, would

14      you expect that that is the type of thing that would be

15      reflected in the price?

16              MS. ZENEWICZ:  Objection.  Vague and incomplete

17      hypothetical.

18  A   What do you mean by reflected in the price?

19  Q   In other words, I mean, since these blocks here are all

20      listed as anticipating three hours and they all list the same

21      price, does that mean that we can expect that they're -- they

22      all would require the driver to put an equal number of miles

23      on their vehicle in order to make the required deliveries?

24  A   No.  So, again, the price is set in terms of what we think

25      drivers will be interested in.  The pricing is not being

App. 233

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                         October 06, 2021

93

1      generated kind of on a route-by-route basis.  We're not
2      looking at every specific route combination.
3              Again, a driver could be much more efficient than
4      another.  Maybe one driver will come up with a routing that's
5      much less or maybe they might have to go -- they decide they
6      want to drive Uber in the middle of their route.  We don't
7      really know what is going to happen on the ground.
8  Q   Okay.  So the base rate for a particular region would be set
9      by the pricing team and then is there -- it sounds like
10     there's, like, an algorithm that would kick in to determine
11     surge pricing?
12 A   Yeah, predominantly an automated system.
13 Q   Which types of deliveries that drivers can make on Amazon
14     Flex are tip eligible?
15 A   Prime Now, Amazon Fresh and Whole Foods.
16 Q   Why are the Amazon.com deliveries not tip eligible?
17 A   There is no customer tipping on Amazon.com deliveries.
18 Q   Like, the capability just doesn't exist in -- on the website?
19 A   Correct.
20 Q   Does Amazon keep track of how long it takes a driver to
21     complete their block?
22              MS. ZENEWICZ:  Objection.  Vague.
23 A   We're not tracking any kind of driver-level data on that --
24     you know, driver by driver specifically.  But there's the
25     timestamped information of their first and last deliveries

App. 234

| Bernard Waithaka vs | 30(b)(6), Confidential | Alexa Hawrysz |
|---|---|---|
| Amazon.com, Inc., et al. | | October 06, 2021 |

96

```
 1        exactly who makes the -- makes those kind of decisions.  I

 2        expect they have some procedures that they're following.  But

 3        we would -- they would examine the driver's history to see

 4        does it make sense or is this, you know, a fraudulent

 5        instance, for example.

 6   Q    Does Amazon ever take into account how many hours a

 7        particular Amazon Flex driver has worked that week when

 8        determining their pay?

 9               MS. ZENEWICZ:  Objection.  Vague.

10   A    The pay is determined by the block that they scheduled and

11        showed up for.

12   Q    Is there a cap on the number of hours per week that Amazon

13        Flex drivers can make deliveries?

14   A    Yes.

15   Q    What is the cap?

16   A    It has varied, but predominantly 40 hours per week.

17   Q    At times has that cap been higher than 40 hours?

18   A    For limited periods of time, yes.

19   Q    Would that be, like, around the holidays or, you know, Cyber

20        Monday --

21   A    Yes, yes, yes, exactly.  So, you know, maybe for a week

22        around the Black Friday, Cyber Monday.

23   Q    If a driver gets a parking ticket while they're out making

24        Amazon Flex deliveries, is that something that Amazon would

25        compensate them for?
```

App. 235

Bernard Waithaka vs                  30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                    October 06, 2021

97

```
 1   A   No.  As an independent contractor, they're taking their own
 2       risk.
 3   Q   So I think earlier you talked about drivers providing banking
 4       information as part of the onboarding process.  So are
 5       drivers predominantly paid by direct deposit?
 6   A   Yes, I believe so.
 7   Q   Do you know how often they're paid?
 8   A   Their payments are issued twice per week.
 9   Q   Is that on Tuesdays and Fridays?
10   A   Yes, I believe Tuesdays and Fridays, but I would validate --
11       want to validate but I think that's right.
12   Q   Do you know if that's always been the case for the Amazon
13       Flex program?
14   A   I'm not confident that that's been the case since 2015.
15   Q   Okay.
16               MS. PAGANO:  I'll introduce another exhibit.  This
17       is Exhibit 17.
18   (Exhibit No. 17 marked.)
19   BY MS. PAGANO:
20   Q   And this is a very lengthy document but for present
21       purposes --
22   A   230 pages?
23   Q   Yeah, you don't need to look at all 230 pages.  I think it
24       would have probably sufficed if I just introduced the first
25       page here.
```

App. 236

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                         October 06, 2021

100

1    Foods delivery that was required to be made within a
2    specified time frame and the driver missed the window, can
3    driver support sort of look and see where that driver is and
4    determine their GPS location, for example, to see if they're
5    on their way to make the delivery?
6              MS. ZENEWICZ:  Objection.  Compound.  Incomplete
7    hypothetical.
8    A   I'm not -- I don't think driver support would be looking at a
9    driver's specific location.
10   Q   Is that, like, not a capability that they have?
11   A   I'm not -- I'm not totally sure what the specific
12   capabilities the driver support has are.
13             MS. ZENEWICZ:  Once again, the -- sorry, I was
14   just going to say objection on the -- you know, that this is
15   outside the scope.  We said before, driver support was not
16   part of the noticed topics.
17   Q   So does Amazon Logistics record the address for each delivery
18   that Amazon Flex drivers make?
19   A   We -- yes, we know the address of the customer order.
20   Q   And I think we touched on this earlier.  But when the driver
21   scans the package at the point of delivery, that generates a
22   timestamp as to when that particular package was delivered?
23   A   Yes.
24   Q   So Amazon you said has the addresses for each delivery
25   location.  Does it also have GPS coordinates for each

App. 237

Bernard Waithaka vs                30(b)(6), Confidential              Alexa Hawrysz
Amazon.com, Inc., et al.                                              October 06, 2021

101

1       delivery location?

2              MS. ZENEWICZ:  Objection.  Vague.

3   A   For Amazon Logistics, you know, I don't know -- I don't know

4       that there's a database of GPS coordinates associated with

5       delivery locations.  I'm not sure about that.  But, you know,

6       any address I think could be looked up in a public database

7       most likely.

8   (Exhibit No. 18 marked.)

9   BY MS. PAGANO:

10  Q   All right.  I want to ask you some questions about the

11      spreadsheet that you have in front of you, Exhibit 18.

12  A   Okay.

13  Q   So there's some different tags in this Excel spreadsheet

14      starting with the first one titled "scheduled blocks."  There

15      are some different columns here.  The first column is titled

16      "warehouse ID."

17             Does each delivery station have its own unique code

18      associated with it?

19  A   Yes.

20  Q   And there's a physical address associated with each of the

21      delivery stations?

22  A   Yes.  Each pickup location would have an address.

23  Q   Have those warehouse codes remained consistent over time?

24  A   I would expect yes.  I couldn't be a hundred percent sure,

25      but I think most likely.

| Bernard Waithaka vs | 30(b)(6), Confidential | Alexa Hawrysz |
|---|---|---|
| Amazon.com, Inc., et al. | | October 06, 2021 |

107

```
 1       it?

 2   A   Correct.

 3   Q   Okay.  So then the next tab in the spreadsheet is titled

 4       "mileage."  And, again, the first column is the "provider

 5       ID," which I think you said was sort of the identifier

 6       associated with the particular delivery provider.  And

 7       there's the "warehouse ID" associated with the particular

 8       delivery location.

 9           What is the "route ID," the third column?

10   A   That reflects the internal kind of identifier for the route

11       that was generated -- the suggested route that was generated

12       for that block.

13   Q   So using that route ID, what information would you be able to

14       pull up about a particular route?

15   A   I'm not familiar with what specifically would be available

16       other than what's in this spreadsheet, which is kind of the

17       planned mileage associated with that route.

18   Q   And so the "planned mileage," that's the fifth column over,

19       does that represent the mileage if the person follows

20       Amazon's suggested route?

21   A   Yes.  This would be the mileage for the route that was

22       generated.  But, again, we don't know -- they don't need to

23       follow this route.

24   Q   Does Amazon record actual mileage driven by drivers?

25   A   The data I believe is available for actual mileage.
```

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                         October 06, 2021

114

1      with a specific customer order; correct?

2    A  Correct.

3    Q  And so this was a Prime Now customer order that was -- took

4      place on February 13, 2018, and then there's the delivery

5      time and the pickup time.  Is it your understanding that that

6      would reflect the time that he, you know, scanned the pickup

7      for this order and then the delivery time would be when he

8      scanned to drop it off with the customer?

9    A  My understanding is that the pickup time is when the driver

10     picked up a given order and the delivery time is when it was

11     delivered to the customer.

12   Q  So if we wanted to know -- you know, if we wanted to sort of

13     I guess assign, like, a geographic location to where this

14     driver was at the time of pickup we could use the warehouse

15     ID to look up where he had to pick up this order?

16   A  At the time of pickup, yes, I'd expect the geographic

17     location would be the warehouse or the delivery station or

18     grocery store location.

19   Q  Okay.  And if we wanted to know where this particular driver

20     was at the time that they dropped off the order, we could use

21     the order ID to look up where the customer had it delivered?

22   A  I don't know the specifics of what customer data is being

23     tracked.  But if there were a customer delivery -- the

24     location that they ordered the delivery to, yes, that would

25     make sense.

App. 240

Bernard Waithaka vs   30(b)(6), Confidential   Alexa Hawrysz
Amazon.com, Inc., et al.          October 06, 2021

115

1 Q Okay.  So if you go to the next tab, the "AMZL deliveries,"

2  it looks pretty similar except that there's a tracking ID as

3  opposed to an order ID.  Do you know what the significance is

4  of that difference?

5     MS. ZENEWICZ:  Objection.  Vague.

6 A I believe these are just different firms or different

7  businesses or kind of an order concept.

8 Q It looks like there may be a tracking ID for each distinct

9  item.  I'm just looking at the top, and it looks like the

10  first three were all picked up at the same time but then they

11  were delivered at different times.  Does that seem correct to

12  you?

13 A Yes --

14     MS. ZENEWICZ:  Objection.  Vague.

15 A -- an individual tracking ID I would assume would correlate

16  to kind of an individual customer's packages.

17 (Reporter clarification.)

18 Q Do you think each tracking ID is associated with a different

19  customer?

20 A Customer set of packages.

21 Q Okay.  And so the scanning that takes place both at pickup

22  and drop off is something that the drivers do via the Amazon

23  Flex app on their phone?

24 A Yeah.

25 Q So for the Amazon.com deliveries where they go to the

App. 241

| Bernard Waithaka vs<br>Amazon.com, Inc., et al. | 30(b)(6), Confidential | Alexa Hawrysz<br>October 06, 2021 |
|---|---|---|

116

```
 1      delivery station and they have to get a bunch of packages, is
 2      there someone in the delivery station who helps to do the
 3      scanning or the loading into the car?
 4                  MS. ZENEWICZ:  Objection.  Compound.
 5   A  There are station associates at a station, but the drivers
 6      are responsible for scanning and loading their own packages.
 7   Q  Are the station associates employees of Amazon Logistics?
 8   A  I think we're outside --
 9                  MS. ZENEWICZ:  We're outside the scope of the
10      notice.
11   A  I believe this is part of the corporate structure question,
12      and I'm not confident of the answers.
13   (Reporter clarification.)
14   Q  Okay.  So if you go to the next tab, it's titled
15      "communications."  And it looks like there's -- the first
16      column is something called "comm ID" and then there's
17      "subject" and "creation date" and "resolution date."
18            Is it your understanding that this reflects all
19      communications that this particular driver has submitted to
20      driver support?
21   A  Yes.  That's my expectation of what the data should
22      represent.
23   Q  So this would be e-mail communications?
24   A  Looks like this represents e-mail communications and in-app
25      feedback submission.
```

App. 242

Bernard Waithaka vs                    30(b)(6), Confidential              Alexa Hawrysz
Amazon.com, Inc., et al.                                                  October 06, 2021

117

```
 1   Q   Is there ever a circumstance where a communication would
 2       happen with driver support that wouldn't get logged here?
 3                   MS. ZENEWICZ:  Objection.  Vague.
 4   A   I am not clear what else could -- in terms of a written
 5       communication with driver support, I think they would all be
 6       captured here would be my expectation, but I'd have to look,
 7       you know, very closely at the details.
 8   Q   Do you know if phone communications between drivers and
 9       driver support get logged anywhere?
10   A   Again, I'm not in detail familiar with exactly what's
11       happening with driver support but -- but they -- you know,
12       they can contact driver support while they're on the road via
13       phone.
14   Q   What's the purpose of logging all of the driver's
15       communications in this way?
16                   MS. ZENEWICZ:  I think we're outside the scope of
17       the notice again.
18   A   I think that's kind of part of the driver support system
19       setup to understand why they would be capturing all this
20       information.  I don't want to speculate on the purposes of
21       driver support.
22   Q   Okay.  So the next tab is called "defects."  What is your
23       understanding of what this tab of the spreadsheet reflects?
24   A   This I understand is the set of defects that we logged for
25       this driver over the course of their tenure or over the
```

App. 243

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                         October 06, 2021

118

1     course of their, you know, lifetime delivering with Amazon
2     Flex.
3   Q  So this would be any time they canceled a block outside the
4     45-minute window or they no-show for a block?
5   A  Correct.  So there's a late cancel and no-show looks like are
6     the two kinds of defects that were logged.
7   Q  And I think we talked about this before that the metrics sort
8     of look at how many defects there are in the last however
9     many deliveries; is that right?
10            MS. ZENEWICZ:  Objection.  Misstates the witness's
11    testimony.
12  A  The metrics that you were showing earlier were specifically
13    related to number of defects in an X time period.
14  Q  Is there any kind of threshold where, if a driver hits a
15    certain number of cancellations or no-shows, like, over the
16    lifetime of their time with Amazon that that triggers any
17    kind of adverse effect?
18  A  You know, I think -- again, the specifics have changed over
19    time.  But, you know, I think in practice the defects are
20    really examined at a relatively short timeframe.  And so if
21    the driver is improving over time, we're not looking at their
22    defects from two years ago for their current status.
23  Q  Do you know what "SLS status" stands for in Column B?
24  A  Service level standard.  It's showing these are all the
25    defects that are kind of being used, to think about those --

App. 244

| Bernard Waithaka vs<br>Amazon.com, Inc., et al. | 30(b)(6), Confidential | Alexa Hawrysz<br>October 06, 2021 |
|---|---|---|

127

1   A   I believe since later -- early 2019, but I'm not confident in

2       that.  But I think that's right.

3   Q   Do you know who preceded him?

4   A   Joey Molko preceded him.

5   Q   And what about Nick Dufault?  How long has he been in his

6       role?

7   A   A year or so, but maybe longer.

8   Q   Do you know who held the role before him?

9   A   It's a relatively new role.  He's in a limited scope.  He's a

10      more junior team member.

11  Q   How big was the pricing team when you managed it?

12  A   Two people.

13  Q   So that would be two people besides yourself?

14  A   (Nods.)

15  Q   So what did those other two people, what did they do on that

16      team?

17  A   They would have looked at ensuring that when we set up new

18      sites that there is a pricing -- pricing structure generated.

19      They would have analyzed what -- what kind of prices are

20      drivers taking over time, looking at things like surge.

21  Q   So are those people with, like, strong data analytic skills?

22  A   Yes.  I think they're program managers -- program or product

23      managers.

24  (Reporter clarification.)

25  Q   So when you say they look at prices that drivers are taking,

Bernard Waithaka vs                30(b)(6), Confidential                Alexa Hawrysz
Amazon.com, Inc., et al.                                                 October 06, 2021

128

```
 1        I mean, would that -- that would help inform, like, how big
 2        of a surge you need to do to get people to pick up blocks?
 3   A    Yes.  You know, for example, if the surge is going very high
 4        in a certain region, that might imply we're kind of off on
 5        supply and demand in that region.
 6   Q    And so in that situation, would that influence you to try to
 7        onboard more drivers in that area?
 8   A    If there were not enough drivers to satisfy all the blocks
 9        that we had.  So, you know, if we weren't filling all the
10        blocks that were out there being offered.
11   Q    So did the pricing team have to work closely with other
12        teams, like, the, you know, team that's responsible for
13        onboarding drivers?
14               MS. ZENEWICZ:  Objection.  Vague.
15   A    Can you maybe define a little what do you mean by work
16        closely.
17   Q    Well, I mean, so if you're seeing consistently really high
18        surge pricing and you can't get drivers in a particular
19        market to take the available blocks, in that situation would
20        you then, you know, reach out to your counterparts who are
21        responsible for onboarding more drivers and try to work with
22        them to address that?
23   A    A situation might be that if -- if we weren't filling blocks
24        in a given region even at, you know, high surge prices, we
25        would need more drivers.  And so we would look to see if more
```

App. 246

Bernard Waithaka vs                30(b)(6), Confidential                Alexa Hawrysz
Amazon.com, Inc., et al.                                                October 06, 2021

129

```
1         drivers could be onboarded into the Flex program.

2    Q    And is it marketing that's responsible for trying to attract

3         more drivers?

4    A    Yes.  Predominantly our marketing team would be increasing

5         our advertising in a given region.

6    Q    Do you know if Amazon Flex has advertised, like, hourly rates

7         to try to attract more drivers?

8    A    In our regional advertising, we do advertise an hourly rate

9         because that's sort of the standard for how people understand

10        different types of work.

11   Q    And is that hourly --

12                  THE WITNESS:  Sarah, you're on mute.

13                  MS. ZENEWICZ:  Are we coming close to a good place

14        to take a break?

15                  MS. PAGANO:  I'm very close to finished, so if we

16        can just push through a little bit longer.

17                  MS. ZENEWICZ:  Okay.

18   BY MS. PAGANO:

19   Q    So in determining what those hourly rates are, I mean, that

20        the marketers would use in driver advertising, is that

21        something that they would get from the pricing team?

22   A    The marketed rates would be based off of the historical

23        behavior, what has happened in reality in terms of the blocks

24        that we were putting out there for drivers.

25   (Reporter clarification.)
```

App. 247

Bernard Waithaka vs                30(b)(6), Confidential               Alexa Hawrysz
Amazon.com, Inc., et al.                                             October 06, 2021

                                                                              130

1   Q   And those hourly rates, are those, like, gross or do they
2       reflect -- do they take into account drivers' anticipated
3       expenses?
4   A   They market the rate that is -- the advertised rate would be
5       the same as the offered rate to drivers, so what they see in
6       the app and what they are actually paid.
7   Q   So that would be before expenses?
8   A   Yeah.  I mean, the driver has their own profit and loss
9       statement based off of all their own, you know, things that
10      they're doing, like, if they're finishing earlier, have a
11      really efficient vehicle.  We don't know really how -- what
12      their profit looks like.  So the rates that we're advertising
13      is the rates that are being paid out.
14  Q   So I think at the start of the deposition I asked whether you
15      spoke to anyone other than counsel in preparation for today,
16      and you said no; right?
17  A   Yes.  I would have spoken to counsel and --
18              MS. ZENEWICZ:  I'm going to -- I'm going to --
19      anything that you did in conference with us is -- I'm going
20      to instruct you not to answer.  But outside of that, you can
21      answer.
22  A   Yeah, not outside of anything we did with counsel.
23  Q   Did you review any documents to prepare for today's
24      deposition?
25              MS. ZENEWICZ:  Again, I'm going to instruct you

App. 248

Bernard Waithaka vs                30(b)(6), Confidential              Alexa Hawrysz
Amazon.com, Inc., et al.                                              October 06, 2021

134

1                        S I G N A T U R E

2

3              I declare under penalty of perjury under the

4   laws of the State of Washington that I have read my within

5   deposition, and the same is true and accurate, save and except

6   for changes and/or corrections, if any, as indicated by me on the

7   CHANGE SHEET flyleaf page hereof.

8              Signed in _____,

9   Washington,  this _____ day of _____ 20___.

10

11

12                        _____

13                        ALEXA HAWRYSZ

14                        Taken:  10/6/21

15

16

17

18

19

20

21

22

23

24

25

Bernard Waithaka vs                    30(b)(6), Confidential                  Alexa Hawrysz
Amazon.com, Inc., et al.                                                    October 06, 2021

                                                                                      135
1                          C E R T I F I C A T E

2

3    STATE OF WASHINGTON    )
                            ) ss
4    COUNTY OF KING         )

5

6        I, the undersigned Washington Certified Court Reporter,
     hereby certify:

7        That the foregoing deposition upon oral examination of the
     witness named herein was taken stenographically before me and
8    transcribed under my direction;

9        That the witness was duly sworn by me pursuant to RCW
     5.28.010 to testify truthfully;
10
         That the transcript of the deposition is a full, true and
11   correct transcript to the best of my ability;

12       That I am neither an attorney for, nor a relative or
     employee of any of the parties to the action or any attorney or
13   counsel employed by the parties hereto, nor financially
     interested in its outcome.
14
         I further certify that in accordance with CR 30(e), the
15   witness was given the opportunity to examine, read, and sign the
     deposition, within 30 days upon its completion and submission,
16   unless waiver of signature was indicated in the record.

17

18

19                      _____
20                      Svetlana Golub, CCR
                        Washington Certified Court Reporter No. 3445
21                      License effective until: 02/07/2022

22

23

24

25

1

2          THE HONORABLE JOHN C. COUGHENOUR

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

9             AT SEATTLE

10 BERNARD WAITHAKA, on behalf of    |   Case No. 2:19-cv-01320-JCC
himself and all others similarly situated,

11                             Plaintiff, | **DEFENDANTS' OPPOSITION TO

12      v.                       | PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION**

13 AMAZON.COM, INC., AMAZON
LOGISTICS, INC., | Noted on Motion Calendar:

14                 Defendants | September 18, 2024

15                                | **ORAL ARGUMENT REQUESTED**

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION
CASE NO. 2:19-CV-01320-RSM

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1

**TABLE OF CONTENTS**

2                                                                                                    **Page**

3    I.    INTRODUCTION ................................................................................................. 1

4    II.   FACTUAL BACKGROUND ................................................................................. 3

5    III.  LEGAL STANDARD ........................................................................................... 7

6    IV.   ARGUMENT ........................................................................................................ 7

7          A.    Waithaka Fails To Establish Commonality Or Predominance. ............................. 8

8          B.    Waithaka Has Not Demonstrated That His Claims Are Typical Or That He
                 Is An Adequate Class Representative. ................................................................. 26
9
           C.    A Class Action Is Not Superior. ......................................................................... 27
10
     V.    CONCLUSION .................................................................................................. 29

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION - i
CASE NO. 2:19-CV-01320-JCC

**MORGAN, LEWIS & BOCKIUS LLP**
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AER Advisors, Inc. v. Fid. Brokerage Servs., LLC*,
  921 F.3d 282 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 1105 (2020) ........................................10

*Alvarado v. Wal-Mart Assocs., Inc.*,
  No. 20-01926, 2021 WL 6104234 (C.D. Cal. Nov. 3, 2021) ...................................................23

*Aquino v. Uber Techs., Inc.*,
  2024 WL 3728977 (S.D.N.Y. Aug. 7, 2024) .............................................................................18

*Aronson v. Gannett Publ'g Servs., LLC*,
  2020 WL 2891940 (C.D. Cal. May 29, 2020) ...........................................................................18

*Ass'n of Women with Disabilities v. Mulubrhan*,
  2006 WL 8455500 (S.D. Cal. Aug. 2, 2006) .........................................................1, 16, 26, 27

*Awuah v. Coverall N. Am., Inc.*,
  460 Mass. 484 (2011) .................................................................................................................19

*Baker v. Lvovskiy*,
  2006 WL 2627577 (Mass. Super. 2006) ....................................................................................11

*Bowerman v. Field Asset Servs., Inc.*,
  2014 WL 4676611 (N.D. Cal. Sept. 17, 2014) .........................................................................16

*Bowerman v. Field Asset Servs., Inc.*,
  60 F.4th 459 (9th Cir. 2023) ............................................................................................ *passim*

*Cal. Trucking Ass'n v. Bonta*,
  996 F.3d 644 (9th Cir. 2021) .....................................................................................................10

*Castillo v. Bank of Am.*,
  980 F.3d 723 (9th Cir. 2020) .............................................................................17, 18, 20, 26

*Chambers v. RDI Logistics, Inc.*,
  476 Mass. 95 (2016) .....................................................................................................................9

*Coleman v. United Servs. Auto. Ass'n*,
  2023 WL 3776252 (S.D. Cal. Mar. 21, 2023) ..........................................................................28

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION - ii
CASE NO. 2:19-CV-01320-JCC

**MORGAN, LEWIS & BOCKIUS LLP**
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 253

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Comm'r of Div. of Unemployment Assistance v. Town Taxi of Cape Cod, Inc.*,
   68 Mass. App. Ct. 426 (2007)..................................................................15

*Converse v. Vizio, Inc.*,
   2020 WL 2922490 (W.D. Wash. June 3, 2020)........................................28

*Costello v. BeavEx, Inc.*,
   810 F.3d 1045 (7th Cir. 2016) .................................................................11

*Coverall N. Am., Inc. v. Com'r of Div. of Unemp. Assis.*,
   447 Mass. 852 (2006) ...............................................................................17

*D'Italia v. Lowe's Home Centers, Inc.*,
   No. 11-4758-BLS1 (Suffolk Super. Ct. Dec. 12, 2012) (Pl. Ex. 1).........11

*Darvin v. Int'l Harvester Co.*,
   610 F. Supp. 255 (S.D.N.Y. 1985) ...........................................................27

*Davidson v. O'Reilly Auto Enters., LLC*,
   968 F.3d 955 (9th Cir. 2020) ......................................................................7

*De Giovanni v. Jani-King Intern., Inc.*,
   262 F. R. D. 71 (D. Mass. Sept. 21, 2009)...............................................11

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)..................................................................................27

*In re FedEx Ground Package Sys., Inc. Emp't Practices Litig.*,
   273 F.R.D. 516 (N.D. Ind. 2010) ............................................................11

*Ferens v. John Deere Co.*,
   494 U.S. 516 (1990)..................................................................................10

*Gartin v. S & M NuTec LLC*,
   245 F.R.D. 429 (C.D. Cal. 2007)..............................................................28

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
   169 P.3d 889 (Cal. 2007) .............................................................20, 21, 22

*Gennell v. FedEx Corp.*,
   2014 WL 1091148 (D.N.H. Mar. 19, 2014) .............................................20

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION - iii
Case No. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 254

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Guifu Li v. A Perfect Franchise, Inc.*,
  2011 WL 4635198 (N.D. Cal. Oct. 5, 2011)...........................................................23

*Harris v. Vector Mktg. Corp.*,
  753 F. Supp. 2d 996 (N.D. Cal. 2010) ..................................................................28

*Harvey v. Centene Mgt. Co.*,
  2020 WL 2411510 (E.D. Wash. May 12, 2020).................................17, 23, 26, 28

*Hennighan v. Insphere Ins. Sols., Inc.*,
  38 F. Supp. 3d 1083 (N.D. Cal. 2014), *aff'd*, 650 F. App'x 500 (9th Cir. 2016) ..................16

*Herrera v. Zumiez, Inc.*,
  953 F.3d 1063 (9th Cir. 2020) ..............................................................................23

*Hill v. Walmart Inc.*,
  2021 WL 342574 (N.D. Cal. Jan. 14, 2021), *aff'd* 32 F.4th 811 (9th Cir. 2022) ..................16

*Hoffman v. Blattner Energy, Inc.*,
  315 F.R.D. 324 (C.D. Cal. 2016) ..........................................................................19

*Hoffman v. Thras.io Inc.*,
  538 F. Supp. 3d 196 (D. Mass. 2021) ....................................................................18

*Holland-Hewitt v. Allstate Life Ins. Co.*,
  2024 WL 1304588 (E.D. Cal. Mar. 27, 2024) ......................................................26

*James v. Uber Tech. Inc.*,
  338 F.R.D. 123 (N.D. Cal. 2021)....................................................................13, 15

*Jammeh v. HNN Assocs., LLC*,
  2020 WL 5407864 (W.D. Wash. Sept. 9, 2020).....................................................27

*Konik v. Time Warner Cable*,
  2010 WL 8471923 (C.D. Cal. 2010).......................................................................11

*Lawson v. Grubhub, Inc.*,
  302 F. Supp. 3d 1071 (N.D. Cal. 2018) .................................................................27

*Lucas v. Breg, Inc.*,
  212 F. Supp. 3d 950 (S.D. Cal. 2016) ....................................................................21

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION - iv
Case No. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 255

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Magalhaes v. Lowe's Home Ctrs., Inc.*,
  2014 WL 907675 (D. Mass. Mar. 10, 2014)...............................................................11, 12, 13

*Marlo v. UPS, Inc.*,
  639 F.3d 942 (9th Cir. 2011) ........................................................................................7, 18

*Martinez v. Flower Foods, Inc.*,
  2016 WL 10746664 (C.D. Cal. Feb. 1, 2016).......................................................................15

*Mass. Delivery Ass'n v. Healey*,
  821 F.3d 187 (1st Cir. 2016).................................................................................................9

*Mendoza v. Home Depot, U.S.A. Inc.*,
  2010 WL 424679 (C.D. Cal. Jan. 21, 2010) ..................................................................7, 29

*Miles v. Kirkland's Stores Inc.*,
  89 F.4th 1217 (9th Cir. 2024) ...............................................................................................7

*Mohrbacher v. Alameda Cnty. Sheriffs Off.*,
  2024 WL 1244478 (N.D. Cal. Mar. 22, 2024)......................................................................18

*Newton v. Thomason*,
  22 F.3d 1455 (9th Cir. 1994) ..............................................................................................10

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc) .................................................................................7

*Ouadani v. Dynamex Operations E., LLC*,
  405 F. Supp. 3d 149 (D. Mass. 2019) ..................................................................................10

*Parker v. Battle Creek Pizza, Inc.*,
  95 F.4th 1009 (6th Cir. 2024).......................................................................................21, 26

*Perrin v. Papa John's Int'l, Inc.*,
  114 F. Supp. 3d 707 (E.D. Mo. 2015)..................................................................................21

*Popa v. PSP Grp., LLC*,
  2023 WL 7001456 (W.D. Wash. Oct. 24, 2023) .................................................................19

*Quesada v. Banc of Am. Inv. Servs., Inc.*,
  2013 WL 623288 (N.D. Cal. Feb. 19, 2013) .........................................................................8

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION - v
Case No. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 256

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Ruiz v. Affinity Logistics Corp.*,
2009 WL 648973 (S.D. Cal. Jan. 29, 2009)............................................................22

*Saavedra v. Eli Lilly & Co.*,
2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ........................................................28

*Salter v. Quality Carriers, Inc.*,
2021 WL 2333098 (C.D. Cal. Apr. 9, 2021) ...........................................13, 15, 18

*Schwann v. FedEx Ground Package Sys., Inc.*,
2013 WL 1292432 (D. Mass. Apr. 1, 2013) ...........................10, 11, 14, 15

*Schwann v. FedEx Ground Package Sys., Inc.*,
813 F.3d 429 (1st Cir. 2016)..................................................................................9

*Scott v. Chipotle Mexican Grill, Inc.*,
954 F.3d 502 (2d Cir. 2020)...............................................................................18

*Six Mexican Workers v. Ariz. Citrus Growers*,
904 F.2d 1301 (9th Cir. 1990)...........................................................................28

*Soares v. Flower Foods, Inc.*,
320 F.R.D. 464 (N.D. Cal. 2017).......................................................................15

*Soles v. Zartman Const., Inc.*,
2014 WL 3557197 (M.D. Pa. July 18, 2014).......................................................25

*Somers v. Converged Access, Inc.*,
454 Mass. 582 (2009) ........................................................................................20

*Stallsmith v. Linder Psychiatric Grp.*,
2016 WL 279271 (E.D. Cal. Jan. 22, 2016) ........................................................25

*Standard Fire Ins. Co. v. Knowles*,
568 U.S. 588 (2013)............................................................................................11

*Stiner v. Brookdale Senior Living, Inc.*,
665 F. Supp. 3d 1150 (N.D. Cal. 2023) ...............................................................19

*Thome v. Sayer L. Grp.*,
2021 WL 6144666 (N.D. Iowa Nov. 16, 2021) ....................................................19

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION - vi
Case No. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 257

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Tokoshima v. Pep Boys-Manny Moe & Jack of Cal.*,
   2014 WL 1677979 (N.D. Cal. Apr. 28, 2014) ..................................................23

*Torres v. Wells Fargo Bank, N.A.*,
   2019 WL 7169793 (C.D. Cal. June 25, 2019) ..................................................11

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021)...................................................................................2, 19

*Urena v. Earthgrains Distrib., LLC*,
   2017 WL 4786106 (C.D. Cal. July 19, 2017) ..................................................15

*Van Dusen v. Barrack*,
   376 U.S. 612 (1964)....................................................................................10

*Van v. LLR, Inc.*,
   61 F.4th 1053 (9th Cir. 2023) .....................................................................18

*Vinole v. Countrywide Home Loans, Inc.*,
   571 F.3d 935 (9th Cir. 2009) ........................................................................7

*Vrugtman v. Its Just Lunch Int'l LLC*,
   2023 WL 6369765 (C.D. Cal. Aug. 25, 2023).................................................18

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..........................................................................2, 7, 8, 26

*Washington v. Joe's Crab Shack*,
   271 F.R.D. 629 (N.D. Cal. 2010)....................................................................8

*Zinser v. Accufix Rsch. Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001)................................................................27, 28

**Statutes**

820 ILCS 115/9.5..........................................................................................23

28 U.S.C. § 2072(b) ........................................................................................7

49 U.S.C. § 13102...........................................................................................9

49 U.S.C. § 14501(b)-(c) .................................................................................9

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION - vii
Case No. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 258

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Cal. Lab. Code § 2802 ..................................................................................23

M.G.L. ch. 149 § 148 ...................................................................................19

M.G.L. ch. 149, § 148B ...............................................................................18

M.G.L. ch. 149, § 148B(a)(1) ......................................................................13

M.G.L. ch. 149, § 148B(d) ......................................................................2, 18

M.G.L. ch. 151 § 1 .......................................................................................24

2014 Mass. Legis. Serv. Ch. 144 .................................................................24

2018 Mass. Legis. Serv. Ch. 121 .................................................................24

Massachusetts Wage Act ................................................................................1

Okla. Stat. tit. 40, § 197.17 ..........................................................................23

SDCL 60-2-1 ................................................................................................23

**Rules**

Fed. R. Civ. P.  23 ................................................................................ *passim*

Fed. R. Civ. P.  23(a) ..............................................................................7, 26

Fed. R. Civ. P. 23(b)(3)'s ........................................................................7, 28

Fed. R. Civ. P. 23(b)(3)(D) ..........................................................................27

**Other**

*Taking Advantage Of Your IRS Mileage: Hybrid Cars Can Help*, Green Car
    Reports (Apr. 11, 2011), https://tinyurl.com/25w65ac4; .........................22

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION - viii
Case No. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

# I.   **INTRODUCTION**

Plaintiff Waithaka offers no means to try this case as a class action—nor is there one. Waithaka, a self-described "businessman,"[1] who has provided delivery and rideshare services for over twenty-three years, including running his own delivery company with two box trucks, driving for Uber and Lyft, and since 2017 delivering to Amazon customers, asserts misclassification, minimum wage, and reimbursement claims for a decade-long class of Delivery Partners. Yet he fails to satisfy his burden to show that common evidence could plausibly establish that Amazon is liable on a classwide basis for any of his claims. This case will devolve into thousands of mini-trials that cannot be managed in a single proceeding without sacrificing Amazon's due process rights to defend against each Delivery Partner's claim that they were covered "employees" under the Massachusetts Wage Act (MWA), Amazon paid them a sub-minimum wage and failed to reimburse necessary business expenses under the MWA, and they can establish damages and, if so, in what amount.

1. Waithaka has not shown that common evidence can prove each class member was misclassified as an independent contractor and, therefore, even covered by the MWA. Each prong of Massachusetts' ABC test requires individualized inquiries. Prong A involves alleged control, and the proposed class involves thousands of Delivery Partners who signed different Terms of Service over the years and who have varying experiences of alleged control. Even Waithaka testified that he did not follow Amazon's route and delivery suggestions, despite alleging the opposite in his Complaint. *Compare* Compl.¶7, *with* Waithaka Dep. 111:7-112:6. Prong B cannot support certification (especially not standing alone as Waithaka assumes, Mot. 15-17) because (i) the Federal Aviation Administration Authorization Act (FAAAA) preempts Prong B as applied to the Massachusetts Wage Act and thus it has no applicability here; and (ii) even if Prong B applied, Delivery Partners' relevant experiences differed. And, there is varying evidence showing independent businesses under Prong C, including whether Delivery Partners performed services

---

[1] Declaration of James Walsh (Walsh Decl.), Ex. A, Waithaka Deposition Transcript 137:2-6.

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION - 1
CASE NO. 2:19-CV-01320-JCC

**MORGAN, LEWIS & BOCKIUS LLP**
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1    for other companies, hired helpers, or described themselves as independent contractors on their

2    taxes or otherwise.

3         2. Regardless of whether the employee status question is common to the class (it is not),

4    Waithaka fails to show he can establish classwide *liability* on his substantive MWA claims through

5    common evidence. Merely being misclassified as an independent contractor without proof of harm

6    (e.g., failure to comply with minimum wage, deductions, or overtime laws) is not a cognizable

7    claim under the MWA, M.G.L. ch. 149, § 148B(d). As such, the Ninth Circuit's recent decision in

8    *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459 (9th Cir. 2023), rejecting class certification

9    even in the face of allegedly common misclassification given no common evidence "on whether

10   the class members actually worked overtime or incurred reimbursable business expenses." *Id.* at

11   470. Relatedly, the lack of uniform injury also defeats certification because unharmed class

12   members have no standing to join a class action. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431,

13   439 (2021). Waithaka completely ignores these controlling cases, and it's not hard to see why.

14        To obtain class certification, Waithaka must prove that he has evidence that Amazon

15   illegally failed to reimburse him for necessary business expenses he incurred to make deliveries to

16   Amazon customers, that Amazon failed to pay him at or above the minimum wage under the

17   MWA, that he was an "employee" under the MWA entitled to the MWA's protection and, further,

18   that the evidence on which he will rely is common to the entire class he seeks to represent. *See*

19   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (class must "generate common *answers* apt

20   to drive the resolution of the litigation"). Waithaka's Motion falls far short of the requisite proofs.

21   Waithaka provides no way to determine the hours *he* worked, the miles *he* drove, or which cell

22   phone expenses *he* incurred for use of the Amazon Flex app (as opposed to other apps). Despite

23   long having had access to Amazon's data regarding his delivery history, Walsh Decl.¶11,

24   Waithaka offers no way to prove injury to himself, let alone to any other class member. Instead,

25   he relies on the naked conclusion—supported by no evidence—that "[t]here are hours that I have

26   worked for Amazon for which I have not received Massachusetts minimum wage." ECF 171-1

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 2
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1   ¶11. Even if true (it is not), that provides no common evidence relevant to any other putative class

2   members.

3       3. Nor can Waithaka prove typicality, adequacy, or manageability. He held himself out as

4   a contractor to the Internal Revenue Service and the Small Business Administration, undermining

5   his claim to have been misclassified. And there are other questions about Waithaka's credibility,

6   making him an inadequate class representative. The individualized issues as to misclassification,

7   liability, and damages make this class unmanageable. Waithaka identifies no way to manage a

8   class here without undermining Amazon's due process rights to present defenses regarding each

9   class member.

10       The Court should deny Waithaka's motion.

11   ## II.    FACTUAL BACKGROUND

12       Like many retailers, Amazon maintains "fulfillment" and "logistics" operations to ensure

13   its customers receive products they order. While Amazon arranges for local deliveries, it does not

14   perform deliveries. Order "fulfillment" is the process by which wholesalers, manufacturers, or

15   sellers ship products to Amazon for warehousing and, ultimately, shipment to smaller facilities.

16   From there, Amazon contracts with the United States Postal Service (USPS), UPS, and various

17   other third-party delivery companies to deliver the packages to customers. *See* Declaration of Max

18   Haubold (Haubold Decl.)¶¶5-7. Delivery Partners play no role, *if ever*, until packages get to local

19   delivery stations or locations such as Whole Foods Markets (WFM). *Id.*¶7; Waithaka Dep. 214:6-

20   219:6. Most packages are delivered by national, local, or regional delivery companies. Haubold

21   Decl.¶7. In addition, *thousands* of sellers on Amazon's website ship their own products directly to

22   customers. *Id.*¶9. Only some packages are contracted for pick up by Delivery Partners, who are

23   individual couriers that contract to provide supplemental local delivery services for some orders.

24   *Id.*¶¶5-9.

25       Delivery Partners each contract with Amazon, and the relevant Independent Contractor

26   Terms of Service (TOS) has changed multiple times over the course of the proposed ten-year class

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 3
CASE NO. 2:19-CV-01320-JCC

**MORGAN, LEWIS & BOCKIUS LLP**
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1    period. While each TOS provides that Delivery Partners "decide the means and manner in which
2    to provide the Services and achieve the results that [they] have agreed to provide" and "are free to
3    map out [their] own routes, sequence [their] deliveries and in every other way control the means
4    and manner in which [they] deliver Deliverables," *id.*¶¶14-17, Exs. A-C at Ex. A,¶¶III.B, they also
5    differ in other ways, including their incorporation of different policies, their provision of delivery
6    from restaurants (or not), what state's law applies, and arbitration agreements. Walsh Decl.¶¶15-
7    27. As such, there will be additional individualized questions regarding what TOS applied to which
8    Delivery Partner and at which time. All versions of the TOS unequivocally state, however, that the
9    Service Fees are meant to include both pay and expense reimbursements: they "include all amounts
10   due to you for providing your Vehicle and the Services under this Agreement, including any
11   expenses you may incur." Haubold Decl.¶¶14-17, Exs. A-C¶3.

12          Waithaka breezes past other key differences among putative class members. Different
13   blocks come with different Service Fees based on several factors, Deposition of Alexa Hawrysz
14   (Hawrysz Dep.) 89:1-15, and Delivery Partners choose which types of blocks to accept. Hammond
15   Decl.¶6 (preferring only WFM); Takacs Decl.¶5 (choosing WFM because it is more lucrative for
16   him). Blocks each have unique delivery windows, delivery locations, and number of stops. When
17   Delivery Partners pick up groceries from WFM, for instance, they must deliver the groceries within
18   a two-hour window, but there are fewer destinations. *See* Hammond Decl.¶6; Boman Decl.¶9.
19   "AMZL" brown-box blocks, by contrast, typically have estimated durations of 2-4 hours, but
20   provide drivers substantial flexibility to make deliveries anytime during the day so long as it is
21   before 9:00 p.m. Haubold Decl.¶14. "Global Specialty Fulfillment" (GSF), Prime Now orders, and
22   grocery deliveries, which Delivery Partners did not have the option to perform at the beginning of
23   the class period, provide the opportunity to earn tips—unlike other types of blocks. Boman
24   Decl.¶9; Jewett Decl.¶7 (switched from "brown-box deliveries" to "Whole Foods deliveries
25   because … there are typically more slots available and I now have the option to earn tips"). They
26   also allow Delivery Partners to accept "instant offers" that must be delivered right after accepting,

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 4
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 263

1   unlike AMZL deliveries that Delivery Partners can accept in advance (the timing of which "has

2   varied over time," Hawrysz Dep. 105:9-11), and can be canceled. *Id.* 104:19-21; Takacs Decl.¶7;

3   Ramirez Decl.¶9. Some blocks require driving significantly farther and longer than others and/or

4   having a larger vehicle to deliver more packages, Hawrysz Dep. 104:14-18, and some offer higher

5   Service Fees due to "surge pricing" on account of weather or demand. Boman Decl.¶7. These

6   features distinguish Delivery Partners from a typical employee. If a putative class member claims

7   their experience differs, that is an individualized issue.

8        Delivery Partners also differ in how they operate their businesses. They choose what blocks

9   to accept (and from what site) based on any factor they wish—some prioritizing pricing, location,

10  or other factors. *See* Oswalt Decl.¶11 (chose blocks based on pricing because some block's rate

11  increases if "not immediately picked up earlier in the day"); Hammond Decl.¶7 (making deliveries

12  "days and times when it is most lucrative"); Waithaka Dep. 111:7-1112:6 (making decisions based

13  on "whichever one is closest"); Oswalt Decl.¶12 (prefers deliveries "very close to my home").

14  Many Delivery Partners, like Waithaka, drive or deliver for other companies and apps. Walsh

15  Decl., Ex. B, Interrogatory Resp. "ROG) No. 2; Oswalt Decl.¶¶2, 5; Takacs Decl.¶15; Jewett

16  Decl.¶¶5, 13. Some work full-time jobs for other companies. *E.g.*, Jewett Decl.¶8. Their flexibility

17  to choose when to accept Amazon Flex blocks, Waithaka Dep. 199:13-201:8 (choosing to deliver

18  Flex in the morning to spend afternoon with kids); Takacs Decl.¶6 ("Nobody at Amazon tells me

19  when to work."), and the "flexibility to cancel" some blocks up to 45 minutes before the scheduled

20  start time, Jewett Decl.¶9; Boman Decl.¶7, allows them to operate their businesses as they see fit.

21  Delivery Partners choose whether to take breaks during a delivery block, some choosing not to

22  because they "would rather just get the work done," Boman Decl.¶10, and some choosing to take

23  breaks when they want to. Takacs Decl.¶9; Waithaka Dep. 212:3-214:5 (stopped for food or gas

24  during blocks). Waithaka himself has taken long, unexplained breaks in the middle of delivery

25  blocks. *See* Crandall Decl.¶64 (9.6 hours of gap time in one block); *id.*¶65 (three hours between

26  pick-up and first delivery). And Delivery Partners can take vacations or long breaks without telling

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 5
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 264

1  Amazon. Waithaka Dep. 148:25-149:18; Jewett Decl.¶9; Hammond Decl.¶8; Ramirez Decl.¶¶10-
2  12.

3       Delivery Partners' individualized choices also affect what expenses they incurred. Each
4  one chose the type of vehicle to use for deliveries. Waithaka Dep. 98:18-99:8 (multiple Priuses
5  and Mazda CX-9); Takacs Decl.¶12 (Prius); Jewett Decl.¶13 (Nissan Rogue); Hammond Decl.¶12
6  (personal Toyota); Mainella Decl.¶7 (Kia Optima). These different cars undoubtedly led to
7  different mileage expenses. Crandall Decl.¶¶41-47. And while each Delivery Partner needs a
8  smartphone, some may have "incurred expenses associated with using [their] personal phone" to
9  provide services to Amazon, ROG No. 6, but others (like Waithaka) did not. Waithaka Dep. 26:1-
10 18 ("cellphone cost per month did not go up by virtue" of signing up for Flex). Delivery Partners
11 do not wear uniforms and do not need logos on their cars or anywhere else, Oswalt Decl.¶4;
12 Hammond Decl.¶12; Takacs Decl.¶12—though some choose to place "Amazon stickers" on their
13 cars, Waithaka Dep. 125:15-24. Delivery Partners' choices cannot be determined classwide, and
14 proof that any one was controlled more than others requires individualized inquiries.

15      How Delivery Partners accomplish their routes cannot be determined classwide, either.
16 Some use the Amazon Flex app's navigation function to map out their deliveries, Boman Decl.¶11,
17 but others sometimes deviate from suggested routes, Oswalt Decl.¶9, and others typically or
18 always do. Takacs Decl.¶6 ("I use Google Maps," not the Amazon app suggested route); Jewett
19 Decl.¶11 ("I do not follow the Amazon Flex navigation suggestions," instead using the "Waze
20 app" to account for "traffic"); Mainella Decl.¶6 (use "phone GPS," "faster than Amazon's
21 suggested route"). Some Delivery Partners "quite often" take less time to make deliveries than the
22 estimated delivery time, increasing their effective payment rate. Waithaka Dep. 127:11-128:13;
23 Oswalt Decl.¶11; Takacs Decl.¶¶10-11 ("faster than other drivers" and "paid the same amount";
24 paid more if block takes longer than estimated); Jewett Decl.¶12 ("generally finish" early and "still
25 get paid the same"); Hammond Decl.¶11 (similar); Mainella Decl.¶6 (similar). Some Delivery
26 Partners (but not others) maintain mileage records that need to be scrutinized for accuracy. *See*

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 6
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 265

1  Oswalt Decl.¶9; Takacs Decl.¶8; Hammond Decl.¶12; Jewett Decl.¶13; Mainella Decl.¶7.

2      While Waithaka may disagree, at least some Delivery Partners feel they have great "control

3  over [their] deliveries," Takacs Decl.¶14, and that control impacts the potential for liability on an

4  individualized basis. To the extent any Delivery Partners' experiences differed, individualized

5  evidence is needed regarding those differences.

6                        **III.    LEGAL STANDARD**

7      District courts must perform a "rigorous analysis [to ensure] that the prerequisites of Rule 23(a)

8  have been satisfied." *Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 967 (9th Cir. 2020).

9  Waithaka's assertion that the Court must accept "the substantive allegations of the complaint as true"

10 (Mot. 7) is wrong. *See Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217, 1222 (9th Cir. 2024) ("[A] party

11 cannot plead or speculate her way to class certification."); *Vinole v. Countrywide Home Loans, Inc.*,

12 571 F.3d 935, 942 (9th Cir. 2009) ("pleadings alone will not resolve the question of class

13 certification"). "[P]laintiffs must prove the facts necessary to carry the burden of establishing that the

14 prerequisites of Rule 23 are satisfied." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods

15 LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc). This includes satisfying Rule 23(b)(3)'s heightened

16 requirement that "common questions predominate over individual ones" and that a class action is the

17 superior method of adjudication. *Marlo v. UPS, Inc.*, 639 F.3d 942, 946 (9th Cir. 2011); *see Dukes*,

18 564 U.S. at 350.

19                        **IV.    ARGUMENT**

20     Amazon has a due process right to litigate its defenses with respect to each Delivery Partner.

21 As the Supreme Court has held, "the Rules Enabling Act forbids interpreting Rule 23 to 'abridge,

22 enlarge or modify any substantive right,'" so "a class cannot be certified on the premise that [a

23 defendant] will not be entitled to litigate its … defenses to individual claims." *Dukes*, 564 U.S. at 367

24 (quoting 28 U.S.C. § 2072(b)). Defendants have "a fundamental due process right to raise affirmative

25 defenses as to individual plaintiffs," and class actions are not superior and should not be certified if

26 they would hamper that right. *Mendoza v. Home Depot, U.S.A. Inc.*, 2010 WL 424679, at *10 (C.D.

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 7
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 266

1  Cal. Jan. 21, 2010); *see Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 640 (N.D. Cal. 2010)

2  (denying certification given individualized issues and resulting "due process right to raise

3  individualized defenses").

4          In order for Waithaka to carry his burden to certify his minimum wage and expense

5  reimbursement class claims without depriving Amazon of its due process rights, he must be able

6  to demonstrate through common proof that (1) all putative class members were covered

7  "employees" under the MWA (and not independent contractors), (2) Amazon paid each putative

8  class member a sub-minimum wage and failed to reimburse their necessary business expenses, and

9  (3) damages can be accurately established through common methodology. Waithaka has failed to

10  carry each burden.

11          Rather than take on all three challenges, Waithaka asks this Court to certify a class based on

12  only one element of a multipart misclassification test. This would impermissibly eviscerate Amazon's

13  right to defend against claims from those who *have no liability case against it at all*. Waithaka has

14  not shown all putative class members' claims can be resolved "in one stroke," *Dukes*, 564 U.S. at

15  350, and thus that certification would comport with due process. Whether for lack of commonality,

16  predominance, typicality, adequacy, or superiority, individualized defenses and Amazon's due

17  process rights support denying Waithaka's motion.

18      **A.**      **Waithaka Fails To Establish Commonality Or Predominance.**

19          **1.**      **Waithaka Has Not Met His Burden To Prove That Employment
                          Classification Can Be Adjudicated Through Common Proof For All
20                        Putative Class Members.**

21          Employee status is necessary (but not sufficient) for any of Waithaka's claims to succeed.

22  Waithaka's motion to certify should fail because Waithaka has not shown that common evidence

23  can establish that every Delivery Partner is an employee covered by the MWA. The need for

24  "individualized proof" on each element of the controlling test independently precludes

25  certification. *Quesada v. Banc of Am. Inv. Servs., Inc.*, 2013 WL 623288, at *5 (N.D. Cal. Feb. 19,

26  2013).

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 8
CASE NO. 2:19-CV-01320-JCC

**MORGAN, LEWIS & BOCKIUS LLP**
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 267

a)      *Waithaka's Reliance On Prong B Of The Massachusetts ABC Test Is Misplaced Because The FAAAA Preempts Prong B.*

Waithaka prematurely argues that Amazon cannot carry its *merits* burden to establish Prong B of the ABC test that he operates outside Amazon's usual course of business. Mot. 15-17. But this argument ignores well-established law that the FAAAA preempts Prong B of the Massachusetts ABC test. 49 U.S.C. § 14501(b)-(c) (FAAAA preempts laws relating to a price, route, or service of any "motor carrier" or "broker").

The First Circuit and Massachusetts Supreme Judicial Court (SJC) both have held that Prong B to the Massachusetts Wage Act would impermissibly require motor carriers or brokers providing delivery services to use employees rather than independent contractors. *See Chambers v. RDI Logistics, Inc.*, 476 Mass. 95, 102-03 (2016) (FAAAA preempts Prong B as applied to motor carriers); *see Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429 (1st Cir. 2016) (Prong B preempted because it requires carriers to use employees "to perform first-and-last mile pick-up and delivery services"); *Mass. Delivery Ass'n v. Healey*, 821 F.3d 187, 191-93 (1st Cir. 2016) (similar).

Waithaka has alleged that Amazon is a "logistics company" that "us[es] delivery drivers," and Delivery Partners provide delivery services. Mot. 3-7, 16-17; Compl.¶¶1, 6-7 (alleging Amazon "provid[es] delivery service" of its various products," contracting with Delivery Partners to "provide these delivery services"). Amazon is a "motor carrier" pursuant to the FAAAA and its own registration status with the United States Department of Transportation. 49 U.S.C. § 13102 (defining motor carrier as "a person providing motor vehicle transportation for compensation"); Haubold Decl.¶¶20, Ex. D (Amazon Logistics Inc. DOT registration as "Carrier/Freight Forwarder/Broker"). Given Waithaka's argument that Prong B forces the use of employees for motor carrier services, the FAAAA preempts it. *See Chambers*, 476 Mass. at 102-03.

Massachusetts' highest Court has instructed that courts must sever Prong B and apply a modified "AC" test in cases like this one. *Id.* at 103-05. Subsequent cases confirm that FAAAA

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 9
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 268

1   preemption has erased Massachusetts' Prong B for delivery driver cases like this one. *See, e.g.,*

2   *Ouadani v. Dynamex Operations E., LLC*, 405 F. Supp. 3d 149, 168-69 (D. Mass. 2019).

3          Waithaka initially filed in Massachusetts. Transfer here does not change the critical point:

4   *Massachusetts' highest state court* has held that preemption renders the applicable test to be an

5   AC test—not an ABC test. This is not a "federal claim" requiring the application of Ninth Circuit

6   law. *Cf. Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994). Rather, Waithaka concedes this

7   case involves a question of state law. Mot. 1-2; *see, e.g.*, *AER Advisors, Inc. v. Fid. Brokerage*

8   *Servs., LLC*, 921 F.3d 282, 289 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 1105 (2020) ("federal

9   judges apply state substantive law exactly as a state court would"); *Newton*, 22 F.3d at 1460

10  (applying traditional choice of law rules for transferred state claim). Thus, Amazon is entitled to

11  raise all defenses available under Massachusetts law. *Ferens v. John Deere Co.*, 494 U.S. 516, 524

12  (1990) (transfer "should not deprive parties of state-law advantages"). The Supreme Court has

13  held that "whatever rights the parties have acquired under state law should be unaffected" by

14  transfer. *Van Dusen v. Barrack*, 376 U.S. 612, 633-39 (1964). So, the Ninth Circuit's decision

15  regarding preemption of *California's* Prong B does not apply. *Cal. Trucking Ass'n v. Bonta*, 996

16  F.3d 644 (9th Cir. 2021) (acknowledging it is "contrary to" the First Circuit, *id.* at 663).

17         Because the FAAAA preempts Prong B of Massachusetts' test, it is irrelevant to the

18  Rule 23 inquiry and thus the Court should ignore entirely Plaintiff's argument on Prong B, the

19  focus of his argument for certification.

20              **b)    *Waithaka Has Failed To Prove His Argument That All Delivery Partners***
21              ***Are Employees Is Susceptible to Common Proof.***

22                   (1)    Even if not preempted, relying on Prong B alone cannot support
                            certification, and it requires individualized inquiries in any event.
23

24         Despite preemption, Plaintiff primarily focuses on Prong B. Mot. 15-17. Although Plaintiff

25  claims commonality on one prong suffices for certification, the law is contrary. "The problem with

26  [Waithaka's] argument is that it assumes its own conclusion." *Schwann v. FedEx Ground Package*

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 10
CASE NO. 2:19-CV-01320-JCC

**MORGAN, LEWIS & BOCKIUS LLP**
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 269

1   *Sys., Inc.*, 2013 WL 1292432, at *3 (D. Mass. Apr. 1, 2013) (denying class certification). The

2   Court should reject Waithaka's attempt to "shortcut the statutory [ABC] test," because "while it

3   has the attraction of expedience, [it] effectively [and prematurely] presumes that the drivers [a]re

4   employees." *Id.* A decision on Prong B would be dispositive as to employee status *only if* it is not

5   preempted and Waithaka prevails on that issue. *Id.* Indeed, "a plaintiff who files a proposed class

6   action cannot legally bind members of the proposed class before the class is certified." *See*

7   *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013). Yet, certification on Prong B alone

8   would bind class members to litigate that prong alone.

9       Moreover, certifying solely based on Prong B would require a merits ruling on Plaintiff's

10  Prong B argument that "would run afoul of the rule against one-way intervention." *In re FedEx*

11  *Ground Package Sys., Inc. Emp't Practices Litig.*, 273 F.R.D. 516, 523-25 (N.D. Ind. 2010)

12  (denying certification under Massachusetts' ABC test for same reasons). Amazon has the right to

13  demonstrate that it meets all prongs of the ABC test (assuming Prong B is not preempted).

14      This is why the certification analysis cannot begin and end with Prong B as Plaintiff

15  contends. Instead, "even if Prong B can be subject to common proof … common issues do not

16  predominate over the independent contractor test as a whole because both the first and third prongs

17  require 'individualized factual inquiries.'" *Magalhaes v. Lowe's Home Ctrs., Inc.*, 2014 WL

18  907675, at *8 (D. Mass. Mar. 10, 2014). Accordingly, Waithaka and the Court must "address[]

19  predominance with respect to *each element* in turn." *Torres v. Wells Fargo Bank, N.A.*, 2019 WL

20  7169793, at *8 (C.D. Cal. June 25, 2019) (emphasis added).[2]

21

22

23  [2] *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1060 (7th Cir. 2016), which Plaintiff relies on, unpersuasively ignores that Rule 23 requires the court to consider "all elements of the plaintiffs' causes of action." *Konik v. Time Warner Cable*, 2010 WL 8471923, at *4 (C.D. Cal. 2010). Other cases Plaintiff cites for the notion that classes are "especially suitable

24  for certification under the second prong" are not on point. *See* Mot. 2 (citing *D'Italia v. Lowe's Home Centers, Inc.*, No. 11-4758-BLS1 (Suffolk Super. Ct. Dec. 12, 2012) (Pl. Ex. 1) and *De Giovanni v. Jani-King Intern., Inc.*, 262 F. R. D.

25  71, 84-88 (D. Mass. Sept. 21, 2009)). Both cases held there was common evidence for all three prongs, not that evidence on Prong B was enough. Plaintiff also cites (Mot. 2 n.2) Massachusetts state court cases discussing irrelevant state

26  certification law. *See Baker v. Lvovskiy*, 2006 WL 2627577, at *3 n.5 (Mass. Super. 2006). And most of those state cases do not even mention Prong B.

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 11
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1    Before turning to Prongs A and C—the only relevant Prongs given preemption—it is worth

2    noting that determining the merits of Prong B is individualized as well. Massachusetts law on

3    Prong B considers "whether the service provided is necessary to the defendant's business or merely

4    incidental to it." *Magalhaes*, 2014 WL 907675, at *5. This analysis compares the nature of

5    Amazon's business to the nature of the services provided by each Delivery Partner. *Id.* Starting

6    with the first of the two elements—the nature of Amazon's business—Plaintiff relies on

7    misrepresentations of press releases and securities filings to suggest Amazon is in the delivery

8    business (Mot. 16), including Amazon's 2020 Form 10-K, which does not support the claim that

9    Amazon is in the "delivery" business. *See* Mot. Ex. A (Amazon 10-K), at 45 ("***Fulfillment costs***

10   ... includ[e] costs attributable to buying, receiving, inspecting, and warehousing inventories;

11   picking, packaging, and preparing customer orders for shipment[.]").[3] Other quotes show that

12   Amazon's business is selling "products and services"; it is a retailer, with many ways to get

13   products delivered. *id.* at 8; Mot. Ex. G.

14   Having mischaracterized what Amazon does, Waithaka turns to the second piece of the

15   Prong B analysis and inaccurately homogenizes what Delivery Partners do. Waithaka ignores that

16   different Delivery Partners do different things. Some deliver only groceries, which are refrigerated

17   and must be delivered much quicker than other types of packages and do not require driving to

18   Amazon stations. *See* Hammond Decl.¶6; Boman Decl.¶9; Jewett Decl.¶¶7; Hawrysz Dep. 104:14-

19   21. As reflected in the TOS effective between 2016 and 2019, early in the class period, some

20   Delivery Partners made restaurant deliveries, which require interacting with restaurants and

21   delivering hot foods. Walsh Decl.¶¶16, 25. Others deliver brown boxes (typical cardboard

22   packages) for AMZL, requiring driving to Amazon facilities and providing more flexibility on

23   delivery times. Takacs Decl.¶9; Hawrysz Dep. 58:1-59:6, 93:3-7. Such different delivery services

24   are similar to the "different types of installation services" in *Magalhaes*, which defeated

25

26   ---
     [3] The 10-K makes clear: "We fulfill customer orders in a number of ways"; "We offer programs that enable sellers to
     grow their businesses, sell their products in our stores, and fulfill orders through us." Amazon 10-K, at 3.

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 12
CASE NO. 2:19-CV-01320-JCC

**MORGAN, LEWIS & BOCKIUS LLP**
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1   commonality on Prong B. 2014 WL 907675, at *5.[4]

2           (2)    Waithaka fails to show commonality or predominance on Prong A.

3        Waithaka devotes just three passing sentences to Prong A, arguing that Amazon has a

4   *contractual* right to exercise control over all Delivery Partners. Mot. 17. But Prong A requires both

5   contractual control *and* control "in fact," M.G.L. ch. 149, § 148B(a)(1), a much more complicated

6   and individualized inquiry than Waithaka suggests. *See Magalhaes*, 2014 WL 907675, at *4

7   ("[e]ven assuming that each class member signed an identical contract with Lowe's, this does not

8   demonstrate that there are common issues of fact" as to freedom from control "as a matter of fact").

9   First, Waithaka's argument for contractual control ignores that putative class members have

10  accepted several *different* TOS over the years, with varying terms incorporating different policies,

11  differing on what state's law applies, where Delivery Partners deliver from, only sometimes

12  requiring review of safety guidance, and other differences. *See supra* Section II. Moreover, where

13  each contract states that Amazon does "not have the right to control the 'manner and means' of

14  how any" Delivery Partner performs services, that supports denying certification. *Salter*, 2021 WL

15  2333098, at *9. The TOS here also describe Delivery Partners' freedom in various ways. *See*

16  Haubold Decl.¶¶17-19, Exs. A-C at Ex. A,¶III.B ("free to map out [their] own routes, sequence

17  [their] deliveries and in every other way control the means and manner in which [they] deliver");

18  *see also* Walsh Decl., Ex. H, Wilkins RFA No. 2 (could and sometimes did "choose a different

19  sequence of deliveries"). The *absence* of mandated contractual control precludes class

20  certification. *See Salter*, 2021 WL 2333098, at *9 (denying certification because contractual

21  standards were "immensely broad," not mandating "any specific behavior").

22       Second, Waithaka does not even argue that he can prove control "in fact" through common

23  proof. *Magalhaes*, 2014 WL 907675, at *4-5. Here, unlike the FedEx cases Waithaka cites, there

24  is no evidence of drivers wearing branded uniforms, attending pre-shift meetings, or being so busy

25

---

26  [4] No such differences existed in *James v. Uber Tech. Inc.*, upon which Plaintiff heavily relies, where drivers allegedly all did the exact same thing when they were driving for Uber. 338 F.R.D. 123, 137 (N.D. Cal. 2021).

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 13
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1   that they have no opportunity to contract with other businesses. *See Schwann*, 2013 WL 1292432,

2   at *3; Oswalt Decl.¶4 ("I like not having a uniform or a boss to tell me when to punch in or out.").

3   Waithaka offers no common evidence of control in fact, and the limited evidence in the record

4   shows he cannot. If any putative class member were to suggest more control than is in the record,

5   that would require individualized scrutiny.

6       Although the Complaint pleads Delivery Partners "must follow Amazon's instructions

7   regarding where to make deliveries, in what order, and which route to take," Compl.¶7, declarants

8   attest that they ignore Amazon's suggested routes and use other apps and/or their knowledge of

9   streets (Takacs Decl.¶8; Jewett Decl.¶11; Oswalt Decl.¶9), they decide in what order to make

10  deliveries, and they choose where to deliver by deciding where and when to accept blocks, Takacs

11  Decl.¶7 (accepting instant offers that don't require far travel); Oswalt Decl.¶12 (prefer delivering

12  "very close to my home"). Delivery Partners may choose what kind of block to accept, providing

13  widely varying experiences with (i) how much time they have to deliver, (ii) whether they can

14  cancel the block—indeed, Delivery Partners cancel over a third of blocks for which they previously

15  signed up, Crandall Decl.¶24—(iii) whether they can make tips, (iv) how far from home they must

16  drive, (v) whether they drive to an Amazon facility, and (vi) whether they elected to pick blocks

17  with surge pricing. *See supra* Section II; *see also, e.g.*, Waithaka Dep. 109:3-11 (delivers from

18  Whole Foods); Oswalt Decl.¶10 ("Most blocks that I pick up are three-hour blocks from 5:00 p.m.

19  to 8:00 p.m." but Whole Foods requires "shorter two-hour blocks."); Jewett Decl.¶7 ("prefer

20  [Hadley] location and Whole Foods deliveries because … more slots available and" there is "the

21  option to earn tips"); Hammond Decl.¶6 (similar). Waithaka ignores that employees generally

22  cannot pick and choose if, when, where, and how much they work. Delivery Partners can. Delivery

23  Partners also differ in what transportation they use, what phone and data plan they use, when and

24  for how long they take vacations (or just turn off the Amazon Flex app), and many more

25  differences. *See supra* Section II (discussing Delivery Partner declarations). These choices—and

26  how they may affect the independent contractor classification test and other issues—require

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 14
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 273

1   individualized inquiries. Such "practical variations among drivers" regarding how they chose their

2   blocks or their schedules, how much they interacted with Amazon personnel, and other facts

3   involving Amazon's "exercise of control" mean "Plaintiffs have [not] produced enough evidence

4   to show that the question of control is amenable to class-wide proof." *Martinez v. Flower Foods,*

5   *Inc.*, 2016 WL 10746664, at *11-12 (C.D. Cal. Feb. 1, 2016) ("Defendants very well could have

6   governed some drivers with an iron fist" but "numerous driver declarations indicate" at least some

7   were not); *Salter*, 2021 WL 2333098, at *9 (no certification if policies "not strictly or uniformly

8   enforced").

9                      (3)      Waithaka fails to show commonality or predominance on Prong C.

10      Prong C requires "individualized evidence about each driver's [work] history" to show

11  whether a contractor *actually engaged* in an independent business, *Schwann*, 2013 WL 1292432, at

12  *3, or rather "depend[ed] on a single employer for the continuation of the services." *Comm'r of Div.*

13  *of Unemployment Assistance v. Town Taxi of Cape Cod, Inc.*, 68 Mass. App. Ct. 426, 431 (2007).

14  Waithaka offers no common evidence about the nature/scope of each driver's business, just the

15  misleading assertion that all Delivery Partners "'wear the hat' of Amazon." Mot. 18. Whatever that

16  may mean, it lacks *evidence*. In contrast, many Delivery Partners provide delivery services for

17  various other companies while also performing deliveries using Amazon Flex, *see supra* Section II,

18  showing they are engaged in an independent business. *See James*, 338 F.R.D at 137-39 (variations

19  in using "competitors' apps at the same time" defeat Prong C); *Urena v. Earthgrains Distrib., LLC*,

20  2017 WL 4786106, at *6 (C.D. Cal. July 19, 2017) (difference in "extent to which [class members]

21  make deliveries for [other] companies" defeats commonality); *Soares v. Flower Foods, Inc.*, 320

22  F.R.D. 464, 482 (N.D. Cal. 2017) (same).

23      Waithaka set up his own incorporated delivery business that maintained two delivery box

24  trucks. Waithaka Dep. 32:12-33:24. Further, he simultaneously provided services to Amazon, Uber,

25  and Lyft. Dep. 84:19-86:23. He could accept rides or blocks from any of the three companies at any

26  time, and it was totally up to him which one to choose. Dep. 120:9-122:7. He has finished Flex

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 15
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 274

1  deliveries early and signed onto Uber or Lyft before the end of the Amazon block—"getting paid

2  both by Amazon and by the ride-share app" for the same time. Dep. 129:5-18. And he picked up

3  rides for Uber *while doing Flex deliveries*. Declaration of Peter Nickerson (Nickerson Decl.)¶12.[5]

4  Other Delivery Partners likewise delivered for other app-based companies. Oswalt Decl.¶¶4, 13

5  (enjoys "being in business for myself"; is an "Uber and Lyft driver, a [Delivery Partner], and mak[es]

6  deliveries for private clients"); Ramirez Decl.¶14 ("often open up Uber/Lyft as I am completing a

7  Flex delivery"; tells people "I am self-employed"); *see* Hawrysz Dep. 93:3-7. Others did not. *See*

8  Jewett Decl.¶8. Still others may fill their entire workweek with Amazon Flex blocks. *Compare*

9  Hammond Decl.¶9 (during pandemic, delivered "25-40 hours a week"); Ramirez Decl.¶14 ("eight

10  hours around three to four days a week"), *with* Jewett Decl.¶10 ("generally drive between 2-4

11  hours per week"). Because individualized evidence is needed on whether putative class members

12  have "independent businesses," "d[id] not work full time for [the defendant]," "contract[ed] with

13  competitors of [the defendant]," and could continue their operations even after deactivating with

14  Amazon, common issues will not predominate on Prong C. *Bowerman v. Field Asset Servs., Inc.*,

15  2014 WL 4676611, at *10-12 (N.D. Cal. Sept. 17, 2014); *see Narayan*, 285 F.R.D. at 478 (individual

16  evidence needed regarding provision of services to other companies).

17         Other evidence relevant to whether someone engages "in a distinct occupation or business"

18  includes self-identification on tax returns through deductions. *Hill v. Walmart Inc.*, 2021 WL

19  342574, at *7 (N.D. Cal. Jan. 14, 2021), *aff'd* 32 F.4th 811 (9th Cir. 2022); *Hennighan v. Insphere

20  Ins. Sols., Inc.*, 38 F. Supp. 3d 1083, 1102 (N.D. Cal. 2014), *aff'd*, 650 F. App'x 500 (9th Cir. 2016)

21  ("identified himself as self-employed in his tax returns" showing distinct occupation). Some

22  Delivery Partners deducted their expenses on their taxes. Hammond Decl.¶12; Oswalt Decl.¶13.

23  Waithaka went even further, seeking funds through the federal Paycheck Protection Program,

---

[5] This likely explains how Waithaka allegedly engaged in contracted-for services 15-30 hours/week for Amazon, 32 hours/week for Uber, and 15-20 hours/week for Lyft. ROG Nos. 3-4; *id.* No. 7 (made more than $50,000 from Uber alone in each of 2016 to 2019). Waithaka—perhaps unlike some other putative class members—was clearly in business for himself, defeating predominance and adequacy, but it would require an individual analysis of each putative class member to make this determination.

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 16
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1   explicitly holding himself out as a sole proprietor, Waithaka Dep. 131:21-133:3, "self-employed,"

2   and qualifying as a "small business," Walsh Decl., Ex. D, Loan Records (WAITHAKA001375-

3   1411). He also listed his occupation on his taxes as "entrepreneur," Walsh Decl., Ex. D, and

4   "businessman," Dep. 137:2-6, consistent with having spent twelve years operating his own "delivery

5   company," Dep. 32:12-33, providing ridesharing and delivery services, ROG No. 7, and running an

6   "electronic shopping" business, Walsh Decl., Ex. D.[6] Whether others similarly represent they are

7   independent businesses is an individualized question. Determining the claims of all putative class

8   members based on Waithaka's evidence clearly supporting contractor status under Prong C would

9   unfairly prejudice them and undermine their due process rights.

10        In sum, Waithaka has failed to prove predominance with respect to any prong of the ABC

11  test, or the modified AC test that should apply given that prong B is preempted. Certification

12  should be denied.

13              **2.      In Addition, Individualized Issues Related To Waithaka's Substantive
                          Wage-And-Hour Claims Predominate Over Any Common Questions.**
14

15        In *Bowerman*, the Ninth Circuit held that "individualized questions about 'who was ever

16  exposed'" to certain policies and whether they "'were harmed in a way giving rise to liability'"

17  defeat predominance. 60 F.4th at 469-71 (quoting *Castillo v. Bank of Am.*, 980 F.3d 723, 733 (9th

18  Cir. 2020)); *see Harvey v. Centene Mgt. Co.*, 2020 WL 2411510, at *6 (E.D. Wash. May 12, 2020)

19  (denying certification where "resolving the threshold issue of injury-in-fact" for reimbursements

20  would be "a laborious, record-intensive task"). *Castillo v. Bank of America* likewise held

21  predominance lacking where a plaintiff had "not provided a common method of proof to determine

22  liability" if no overtime was worked or the bonus amount at issue in the litigation was correct even

23  if there is common evidence of allegedly incorrect calculations. 980 F.3d 723, 733 (9th Cir. 2020).

24

25  [6] The *only* case Waithaka cites on Prong C, *Coverall N. Am., Inc. v. Com'r of Div. of Unemp. Assis.*, 447 Mass. 852,
    858-59 (2006), is not a class certification case, and it emphasized that the plaintiff's business would end without the
26  defendant. *Id.* That would not apply to Waithaka or other putative class members. *E.g.*, Jewett Decl.¶5; Tackacs
    Decl.¶15.

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 17
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1  *Bowerman* and its progeny instruct that, in assessing class certification in a misclassification case,

2  the Court must assess whether it "will have to rely on 'individual testimony to establish the

3  existence of an injury,'" *Vrugtman v. Its Just Lunch Int'l LLC*, 2023 WL 6369765, at *10 (C.D.

4  Cal. Aug. 25, 2023); *Mohrbacher v. Alameda Cnty. Sheriffs Off.*, 2024 WL 1244478, at *2 (N.D.

5  Cal. Mar. 22, 2024) ("The question is not whether a great number of plaintiffs will win or lose at

6  trial," but rather whether "class-member-by-class-member" evidence will be needed to "assess

7  thousands of claims one claim at a time").[7]

8        Ignoring *Bowerman* and *Castillo* entirely, Waithaka fails to satisfy his "burden of

9  demonstrating" predominance on the substantive MWA claims. *Marlo*, 639 F.3d at 946-47. Here,

10  as in *Bowerman*, Waithaka's expense and minimum wage claims require "improper"

11  "individualized questions." 60 F.4th at 471. And Waithaka's misclassification claim cannot

12  establish liability on its own. Under Massachusetts law, liability arises under M.G.L. ch. 149,

13  § 148B only if "*both*" an employee was misclassified "*and*" the alleged employer "'fail[ed] to

14  comply, in any respect,' with one of several listed [MWA] provisions," such as minimum wage,

15  overtime, or deductions. *Hoffman v. Thras.io Inc.*, 538 F. Supp. 3d 196, 202 (D. Mass. 2021)

16  (quoting M.G.L. ch. 149, § 148B(d)) (emphasis added). The only alleged failure to comply with

17  other MWA provisions here involve minimum wage and expense reimbursement, and Waithaka

18  musters no classwide evidence of injury under either one. So, here, as *Bowerman* stated relative to

19  class certification: "We need not decide whether common evidence can prove that [the company]

20  has a uniform policy of misclassifying its vendors, because any common question as to

21  misclassification is outweighed by the individual questions going to injury and damages." 60 F.4th

22  at 469-70 (explaining that alleged common evidence regarding misclassification "does not bear on

23  whether the class members actually worked overtime or incurred reimbursable business

24  

---

25  [7] Many other courts also have denied certification where failure of common proof on liability would outweigh any
   misclassification decision. *See, e.g.*, *Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023); *Scott v. Chipotle Mexican
   Grill, Inc.*, 954 F.3d 502, 514 (2d Cir. 2020); *Salter v. Quality Carriers, Inc.*, 2021 WL 2333098, at *10 (C.D. Cal.

26  Apr. 9, 2021); *Aronson v. Gannett Publ'g Servs., LLC*, 2020 WL 2891940, at *6 (C.D. Cal. May 29, 2020); *Aquino v.
   Uber Techs., Inc.*, 2024 WL 3728977 (S.D.N.Y. Aug. 7, 2024).

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 18
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1  expenses").

2      Waithaka's broad stroke approach also presents Article III standing concerns that further

3  warrant denying class certification. Under the Supreme Court's decision in *TransUnion*, 594 U.S.

4  at 431, a class is "fatally overbroad" and must be denied if "it necessarily includes individuals …

5  who did not suffer the concrete injury required for Article III standing," *Thome v. Sayer L. Grp.*,

6  2021 WL 6144666, at *15 (N.D. Iowa Nov. 16, 2021), or where the named plaintiffs themselves

7  haven't demonstrated standing, *Popa v. PSP Grp., LLC*, 2023 WL 7001456, at *5 (W.D. Wash.

8  Oct. 24, 2023). Just like the named plaintiff in *Hoffman v. Blattner Energy, Inc.* had no standing

9  to certify "on-duty meal break" class because he "present[ed] no evidence he ever took an on-duty

10  meal break," 315 F.R.D. 324, 333 (C.D. Cal. 2016), Waithaka has not demonstrated his standing

11  to pursue any claim here, let alone that all putative class members have standing.

12          a)      **Waithaka Fails To Show Commonality Or Predominance For His
                    Expense Claim.**

13

14      Waithaka conclusorily asserts that his "expense reimbursement claim is subject to common

15  proof." Mot. 9. But he never shows how. As an initial matter, M.G.L. ch. 149 § 148 does not

16  mention expense reimbursements, and Waithaka has not shown Massachusetts' statutory

    framework requires expense reimbursement.

17

18      Even if this claim is cognizable, however, it requires classwide proof that (i) expenses were

19  incurred and not reimbursed (ii) on account of services provided to Amazon and (iii) the expenses

20  were necessary. *See Awuah v. Coverall N. Am., Inc*., 460 Mass. 484 (2011). Like the plaintiffs in

21  *Stiner v. Brookdale Senior Living, Inc.*, Waithaka's "theory relies on the idea that as long as each

22  class member paid any amount [for expenses], … there is no need to look to the details of what

23  they actually [incurred] to proceed with a mass trial on behalf of thousands." 665 F. Supp. 3d 1150,

24  1211 (N.D. Cal. 2023). "But that theory ignores … substantial variations" that must "be examined

25  on an individualized basis." *Id.*

26

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 19
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 278

1     **1. <u>No common evidence of unreimbursed expenses.</u>**  While all Delivery Partners must

2    use some form of transportation and a phone, whether they incurred *unreimbursed* expenses

3    requires individualized inquiry. The Service Fees Amazon pays Delivery Partners are "intended to

4    cover all … expenses [Delivery Partners] may incur" in addition to payment for the service

5    performed for Amazon. Haubold Decl.¶¶17-19, Exs. A-C¶3. Given that Service Fees expressly

6    reimburse expenses, the relevant question is not whether Delivery Partners used a car or phone.

7    Instead, the relevant question is whether the payments Amazon *already made* were sufficient to

8    cover (i.e., reimburse) each Delivery Partner's qualifying expenses. That is an inherently

9    individualized inquiry, and Waithaka offers no common evidence that could prove every putative

10    class member incurred *unreimbursed* expenses.[8] *See Castillo*, 980 F.3d at 732 (no predominance

11    where some putative class members were "paid adequately by [the challenged] policies"). Nor

12    does he even offer any individualized proof that *he* incurred any unreimbursed expense.

13        First, no common evidence can establish each putative class member's mileage, let alone

14    whether it was reimbursed. For some types of routes (but not all), Amazon has *estimated* mileage

15    data. Waithaka offers no evidence as to how he will establish mileage for the large percentage of

16    delivery blocks for which no mileage was estimated. Indeed, around 50-60% of blocks in a sample

17    of 1,000 Delivery Partners' data do not include estimated mileage. *See* Crandall Decl.¶26. And for

18    those blocks that do have *estimated* mileage data, Waithaka offers no common evidence that putative

19    class members all drove that estimated distance, which were based on suggested routes. Haubold

20    Decl.¶52 ("free to map out your own routes"). While some putative class members may closely

21    hew to those suggested routes when available, Boman Decl.¶11, others use other mapping software

22    or decide on their own what route to take. Takacs Decl.¶6; Jewett Decl.¶11; *see* Oswalt Decl.¶9.

23

24

25

26

---

[8] Waithaka cites a case that applied California's unique recordkeeping requirement that employers must pay for labor and expense reimbursement separately rather than in one payment. Mot. 10 (citing *Gattuso v. Harte-Hanks Shoppers, Inc.*, 169 P.3d 889 (Cal. 2007)). Indisputably, Massachusetts has no similar statutory requirement. And the only case addressing whether *Gattuso*'s rationale applies to another state's reimbursement law rejected it. *Gennell v. FedEx Corp.*, 2014 WL 1091148, at *6 (D.N.H. Mar. 19, 2014). Waithaka also cites *Somers v. Converged Access, Inc.*, 454 Mass. 582, 594 (2009), but that case involved employers seeking to avoid overtime claims through post-hac rationalizations about alternative worlds. *Somers* says nothing about expenses, and certainly does not hold that employers must reimburse them in separate payments.

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 20
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1   Individualized evidence is needed to determine how many miles each putative class member drove

2   delivering to Amazon customers. Crandall Decl.¶¶48-51 (explaining why average and estimated

3   miles cannot show miles driven).

4          Setting aside the impracticability of collecting individual records from thousands of class

5   members (many of whom may have no records), evaluating the veracity of these records or memories

6   would be inherently individualized. *See Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 973-74 (S.D. Cal.

7   2016) ("inquiries into putative class members' memories … would require … individualized fact-

8   finding and 'mini-trials'"). Waithaka's own records commingle his driving for Uber and Lyft with

9   his driving for Amazon, which was sometimes simultaneous. Waithaka Dep. 188:19-189:3, 197:4-

10  23; Nickerson Decl.¶12. Other Delivery Partners likewise provided services to Uber, Lyft, and

11  other companies. Oswalt Decl.¶¶2, 5; Takacs Decl.¶15; Jewett Decl.¶¶5, 13; Ramirez Decl.¶¶4-8;

12  *see* Hawrysz Dep. 93:3-7 (Delivery Partners can use routes that takes less time or "drive Uber in

13  the middle of their route").

14         Waithaka also skirts around predominance by arguing that "damages are easily

15  ascertainable[] using the IRS [mileage] reimbursement rate." Mot. 10. Not so. Each putative class

16  member must prove "individual entitlement" to "actual costs incurred." *Parker v. Battle Creek*

17  *Pizza, Inc.*, 95 F.4th 1009, 1016-17 (6th Cir. 2024) (rejecting IRS standard-mileage rate for

18  reimbursement claim because it "tends to overpay drivers where gas taxes are relatively low" and

19  "underpay drivers where gas taxes are high"). Amazon's expert, Robert Crandall, has explained in

20  his report, and *Parker* recently recognized, the commonsense point that plaintiffs cannot insist on

21  reimbursement for expenses that they did not incur, and application of the IRS tax reporting

22  assumption can greatly overstate expenses. Crandall Decl.¶¶29-39. Rather, plaintiffs can use

23  alternative methods that reflect "reasonable approximation of employee vehicle expenses," *Perrin*

24  *v. Papa John's Int'l, Inc.*, 114 F. Supp. 3d 707, 721-22 (E.D. Mo. 2015), which will differ

25  depending on the make, model, and year of the vehicle. Yet, Waithaka offers no alternative model.

26  Instead, he cites *Gattuso* (Mot. 10 n.7), which does not apply Massachusetts law and supports

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 21
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 280

1   Amazon on this point by holding an employer "may use" the IRS rate (if it is not concerned with

2   overpaying for mileage reimbursement) *or* "the actual expense method" (if it wants greater

3   precision in calculating reimbursement) under *California* law. 42 Cal. 4th at 568-69.  But this is a

4   class action and Amazon has a due process right to insist that it not overpay for mileage

5   reimbursement, if held liable.

6         Depending on the make, model, and year, each Delivery Partner's vehicle will vary in cost

7   to operate and maintain. Waithaka Dep. 98:18-21 (what vehicle a Delivery Partner uses is "within

8   your discretion"). For example, Waithaka has driven three Priuses and a Mazda CX-9. Dep. 96:15-

9   100:5; Walsh Decl.,Ex. F.[9] Others drove different Toyota vehicles, Hammond Decl.¶ 12, a Nissan

10   Rogue, Jewett Decl.¶ 13, a Kia Optima, Mainella Decl.¶7, and any number of other vehicles.

11   Driving the same miles would lead to different expenses given these different cars. Crandall

12   Decl.¶¶42-48 (demonstrating how adjusting make and model affects expense and minimum wage

13   claims). Answering whether a non-IRS method adequately covers car expenses is a "case-by-case

14   analysis," *Ruiz v. Affinity Logistics Corp.*, 2009 WL 648973, at *8 (S.D. Cal. Jan. 29, 2009), that

15   will require "a series of mini-trials" that defeats predominance. *Bowerman*, 60 F.4th at 470.

16         **2.**  **No common evidence that expenses directly resulted from Amazon Flex.**  Waithaka

17   does not attempt to show he can prove with classwide evidence that all Delivery Partners incurred

18   the same expenditures *because* they used the Flex app. For example, Delivery Partners may sign

19   onto Uber or Lyft during a block. *See* Waithaka Dep. 128:9-129:18; Hawrysz Dep. 93:3-7 (noting

20   ability to "drive Uber in the middle of their route"). Only individualized inquiries can determine

21   which miles and phone-related expenses are attributable to which entity. Further, Delivery

22   Partners, to varying degrees, also perform personal errands while logged onto the Flex app. *See*

23   *supra* Section II. Miles driven on errands clearly are not on account of Amazon. Finally,

24   Waithaka's claim for "insurance" reimbursement (Mot. 9) requires probing the type of insurance,

25

26   [9] Priuses have the most efficient cost to operate, making the IRS mileage rate much higher than actual expenses. *See* John Voelcker, *Taking Advantage Of Your IRS Mileage: Hybrid Cars Can Help*, Green Car Reports (Apr. 11, 2011), https://tinyurl.com/25w65ac4; *see* Crandall Decl.¶¶32-35.

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 22
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 281

1    when it was purchased, the reason for purchasing it, and whether it needs to be apportioned with

2    personal use and other hiring entities. These are all individualized inquiries. *See Alvarado v. Wal-*

3    *Mart Assocs., Inc.*, No. 20-01926, 2021 WL 6104234, at *8-9 (C.D. Cal. Nov. 3, 2021) (denying

4    certification given individualized evidence regarding whether certain expenses were required by

5    employer or necessary).

6    **3.  No common evidence on whether each expense was necessary.**  The few states that

7    require expense reimbursement only require payment for "reasonable" and "necessary" expenses.

8    *See, e.g.*, Cal. Lab. Code § 2802; 820 ILCS 115/9.5; Okla. Stat. tit. 40, § 197.17; SDCL 60-2-1;

9    AR ADC 003.20.2-3. Waithaka has never suggested Massachusetts differs. *See* Mot. 1 (discussing

10   "expenses necessary to perform their job").

11       Yet necessity and reasonableness depend on the context of each employee's choices.

12   *Harvey*, 2020 WL 2411510, at *6 (denying certification where "determining whether excess

13   charges were improper necessitate[d] analysis of each case's specific facts"). While some drivers

14   may choose expensive cars and phones, select models with poor fuel efficiency, pay for premium

15   gas, or replace their vehicles and phones frequently, others are more economical. Waithaka Dep.

16   98:6-21, 106:11-17. The Court would have to engage in "a worker-by-worker, highly individual

17   analysis" to determine whether each unreimbursed expense was reasonable and necessary. *Guifu*

18   *Li v. A Perfect Franchise, Inc.*, 2011 WL 4635198, at *14 (N.D. Cal. Oct. 5, 2011); *Tokoshima v.*

19   *Pep Boys-Manny Moe & Jack of Cal.*, 2014 WL 1677979, at *10 (N.D. Cal. Apr. 28, 2014) (same);

20   *Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1077 (9th Cir. 2020) (employer need not "indemnify

21   unnecessary extra automobile expenses that are incurred based on the choice of car and fuel").

22       No common evidence can establish the required elements of Waithaka's expense claim for

23   the class and no methodology exists for sorting out uninjured putative class members (who

24   suffered no unreimbursed expenses), so certification is improper. *Bowerman*, 60 F.4th at 471.

25

26

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 23
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

        **b)**       ***Waithaka Fails To Show Commonality Or Predominance For His Minimum Wage Claim.***

Nor can Waithaka establish a classwide minimum wage claim using common evidence. As an initial matter, the Massachusetts minimum wage has changed *seven times* over the ten-year class period (from $8/hour to $15/hour). *See* M.G.L. ch. 151 § 1; 2014 Mass. Legis. Serv. Ch. 144 (S.B. 2195); 2018 Mass. Legis. Serv. Ch. 121 (H.B. 4640). Whether any given block pay satisfies the applicable minimum wage (at the time) will require individualized inquiries. Brushing aside these differences, Waithaka claims that "Amazon keeps records of when individual deliveries are made," and that "it will be simple to determine hours for which drivers were unpaid by comparing the time of the shift or 'block' for which drivers were paid versus the actual time it took drivers to deliver" the packages. Mot. 11. Not so.

First, Waithaka offers no common evidence that could prove how much time Delivery Partners actually spent delivering Amazon packages. The "records" Waithaka references (*id.*) show only the Delivery Partner's arrival time at the station and package delivery times.[10] Waithaka wants this Court to assume that every Delivery Partner was delivering for Amazon during the entire time between arrival at the station and the last delivery of the day, every time. That assumption is belied by his own testimony and the sworn statements of other putative class members. Waithaka admitted that Delivery Partners can take long breaks or pick up Uber and Lyft fares while Amazon packages are in their trunk, Waithaka Dep. 158:20-160:3, which others have confirmed. *See* Takacs Decl.¶9 ("If I have a little time between orders, I sometimes take a break for a snack."); Boman Decl.¶10 (can take breaks); *see also* Hawrysz Dep. 93:3-7 (noting ability to "drive Uber in the middle of their route"); *id.* 58:1-59:6 (Delivery Partners can take any amount of time to deliver, doing "other work" after picking up packages, as long as packages arrive by the end of the block or "9:00 or

---

[10]  In his first class certification motion, Waithaka relied on Amazon's pre-route duration estimates (i.e., "block times") as a proxy for time worked. ECF 97 at 16. Having seen Amazon's prior opposition (ECF 103), Waithaka now retreats from that position because it cannot be disputed that block times do not measure working time. *See* Hawrysz Dep. 88:4-7 ("it's not really an hourly rate because the amount of time is totally dependent on how the driver actually executes"); Waithaka Dep. 127:11-128:13; 188:1-14 (usually completes before "estimated amount of time"); *see supra* Section II (many declarants attesting same).

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 24
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1   10:00 p.m." for others). Indeed, Crandall's report highlights large and unexplained "gaps" between

2   deliveries, evidencing that Delivery Partners do *not* necessarily perform services for Amazon

3   between all deliveries. Crandall Decl.¶¶62-66 (up to 9.6 hours of gap time in one block delivery).

4   Such breaks warrant no compensation by Amazon. Only individualized evidence can begin to

5   answer how much time any given Delivery Partner performed services *for Amazon* and thus any

6   given Delivery Partner's effective "hourly rates, again requiring an individuated analysis to

7   determine whether minimum wage was paid." *Stallsmith v. Linder Psychiatric Grp.*, 2016 WL

8   279271, at *2 (E.D. Cal. Jan. 22, 2016); *see Bowerman*, 60 F.4th at 469-70 ("scant" evidence of

9   hours requires "series of mini-trials concerning the work history and credibility of each individual

10  class member"); *Soles v. Zartman Const., Inc.*, 2014 WL 3557197, at *10 (M.D. Pa. July 18, 2014)

11  (no predominance where each plaintiff had to prove how many unrecorded hours they worked).

12         Waithaka provides no evidence of Amazon ever paying him a sub-minimum wage. *E.g.*,

13  Waithaka Dep. 188:1-14. Instead, Waithaka bases his minimum wage claim on his conclusory

14  attestation that "[t]here are hours"—no one knows how many or when—"that I worked for Amazon

15  for which I have not received Massachusetts minimum wage … if my car expenses" are considered.

16  Dkt. 172-1 at 3.[11] He also contends that *some* Delivery Partners *kept* less than the minimum wage in

17  *some* workweeks after accounting for "mileage expenses." Mot. 11. But even had he cited evidence,

18  as explained above at pp. 19-23, determining reimbursable expenses is even more individualized.

19  *See* Crandall Decl.§III. Even if Waithaka's conclusions were reliable and admissible, individual

20  evidence and testimony would be needed for *every* putative class member to assess how many miles

21  they drove delivering Amazon packages, in what vehicle, in how much time, and then determine

22  whether the relevant Service Fees adequately covered expense reimbursements and the minimum

23  wage at the time.

24

25  ────────────────

26  [11] Notably, Waithaka previously relied on a declaration from his counsel's paralegal that claimed she had analyzed
    pay and expense records to find some instances of below minimum wage weeks. But, upon scrutiny, the data proved
    he was paid *above* minimum wage those weeks. Nickerson Decl.¶¶10-11. Waithaka now drops that declaration.

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 25
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 284

Given the fees that Amazon pays per block, most (if not all) Delivery Partners would have *no minimum wage claim* after applying actual hours worked to determine an applicable weekly regular rate of pay. Hammond Decl.¶10 (earns "from $60 to $90" for "every two-hour block I complete"); Mainella Decl.¶5 (usually takes blocks that will make $30 an hour); Oswalt Decl.¶11 (has "earned $96 for a designated 3-hour block" despite completing "deliveries in about 1 hour"). For some Delivery Partners, the relevant statutory minimum wage was lower than others (depending upon when they provided services); and these blocks with effective rates of $30-or-more/per hour dwarf any relevant minimum wage. So too with the higher statutory rates which only reached the $15/hour threshold in 2022. *See, e.g.*, Crandall Decl.¶67.

This absence of classwide proof of injury goes directly to *liability*, not (as Waithaka argues) mere individualized damages. *Contrast Bowerman*, 60 F.4th at 470-71 (common evidence must "establish the employer's liability to each employee"), *with* Mot. 11-12 (contending these are just "damage calculations" issues). "That the proposed class would inevitably contain many members who never suffered the alleged primary injury is itself fatal to Plaintiff's motion." *Harvey*, 2020 WL 2411510, at *6; *see Castillo*, 980 F.3d at 731-32 (cannot certify class where members would have "no claim for compensation," so liability is an individualized inquiry); *Parker*, 95 F.4th at 1018 (whether pay covered "expenses for gas, maintenance, insurance, and so on" is a "difficult" question that must be answered for each "particular delivery" partner). Waithaka cites only out-of-circuit cases pre-dating *Bowerman* and *Castillo* to argue uninjured putative class members do not defeat certification. Mot. 12. The Ninth Circuit disagrees.

Here, neither claim for liability is subject to common proof, so predominance is lacking. *Holland-Hewitt v. Allstate Life Ins. Co.*, 2024 WL 1304588, at *17-18 (E.D. Cal. Mar. 27, 2024) (applying *Bowerman* and holding uninjured class members defeat predominance and typicality).

**B.      Waithaka Has Not Demonstrated That His Claims Are Typical Or That He Is An Adequate Class Representative.**

Rule 23(a) requires that the named plaintiff is an appropriate representative of the class

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 26
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 285

1  whose claims he wishes to litigate. *Dukes*, 564 U.S. at 349. The plaintiff must "show that" his

2  "claims are typical of the class" and that his interests are aligned with other putative class members.

3  *Ellis*, 657 F.3d at 984-85. Waithaka, with an admitted lack of knowledge of other Delivery

4  Partners' experiences, Waithaka Dep. 126:7-11, 146:3-10, has made neither required showing.

5      Waithaka is atypical of the putative class for all the reasons discussed above regarding

6  predominance. "[T]ypicality and commonality are generally considered together," *Ass'n of Women*

7  *with Disabilities v. Mulubrhan*, 2006 WL 8455500, at *5 (S.D. Cal. Aug. 2, 2006), because varying

8  claims or defenses between the named plaintiff and putative class members defeat typicality, *Ellis*,

9  657 F.3d at 984-85.

10     Moreover, Waithaka's deposition revealed a host of credibility issues. He falsely testified

11 that he never picked up Uber and Lyft fares during a Flex block, Dep. 158:20-159:7, when his data

12 proved the opposite. *See* Nickerson Decl.¶12. Inaccuracy about facts affecting *liability* in this case

13 cannot be tolerated. *See Lawson v. Grubhub, Inc.*, 302 F. Supp. 3d 1071, 1082 (N.D. Cal. 2018)

14 (emphasizing plaintiff's lack of credibility in finding contractor status). Waithaka also concealed

15 from his insurance company that he used his car for business, Dep. 237:15-21; and omitted relevant

16 facts from his verified Interrogatory Responses, such as business income from other gig

17 companies, Walsh Decl., Ex. E, and his business loans, in which he admitted he was "self-

18 employed" and qualified as a "small business," *id.*, Ex. D, Loan Records (WAITHAKA001375-

19 1411). Inability to trust Waithaka, defeats both typicality and adequacy. *See Jammeh v. HNN*

20 *Assocs., LLC*, 2020 WL 5407864, at *14 n.17 (W.D. Wash. Sept. 9, 2020) (credibility relevant to

21 both prongs); *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (credibility

22 relevant to adequacy).

23     **C.**     **A Class Action Is Not Superior.**

24     In assessing superiority, the Court must consider "the likely difficulties in managing [the]

25 class action." Fed. R. Civ. P. 23(b)(3)(D). Manageability "encompasses the whole range of

26 practical problems that may render the class action format inappropriate for a particular suit." *Eisen*

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 27
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 286

1    *v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974); *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d

2    1180, 1192 (9th Cir. 2001) (not superior "when the complexities of class action treatment outweigh

3    the benefits").

4           Many issues would require mini-trials for each Delivery Partner, including to determine

5    liability for minimum wage or expense reimbursement, employment, and damages. *Six Mexican*

6    *Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990) ("This 'manageability'

7    requirement includes consideration of the potential difficulties in notifying class members of the suit,

8    calculation of individual damages, and distribution of damages."); *Zinser*, 253 F.3d at 1192 (no

9    superiority where "each class member has to litigate numerous and substantial separate issues to

10   establish his or her right to recover individually"); *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996,

11   1022-23 (N.D. Cal. 2010) ("substantial variance as to what kind of expenses were even incurred"

12   defeats manageability). Waithaka's we'll-figure-it-out-later approach does not suffice.

13          Waithaka has failed to present *any* explanation as to how these issues could be litigated in a

14   class proceeding—whether by presenting a trial plan, damages model, or any means of litigating

15   this case. Amazon served Waithaka with three interrogatories requesting his trial plan for each

16   cause of action. Waithaka never responded. Walsh Decl., Exs. H, I; *Zinser*, 253 F.3d at 1190 (Ninth

17   Circuit affirming denial of certification given "no manageable trial plan"); *Gartin v. S & M NuTec*

18   *LLC*, 245 F.R.D. 429, 441 (C.D. Cal. 2007) (similar). Nor has Waithaka offered "a reliable method

19   of calculating class-wide damages"; he has "advanced no damages model at all." *Saavedra v. Eli*

20   *Lilly & Co.*, 2014 WL 7338930, at *6 (C.D. Cal. Dec. 18, 2014). The "Ninth Circuit [has] explained

21   that" there must "exist[] a common methodology for calculating damages." *Converse v. Vizio, Inc.*,

22   2020 WL 2922490, at *4 (W.D. Wash. June 3, 2020) (citation omitted). Yet Waithaka's vague

23   promises of "easy" and "simple" calculations are unsupported by any evidence and directly refuted

24   by Crandall's report. *See generally* Crandall Decl. This head-in-the-sand approach is further reason

25   to deny class certification. *See Converse*, 2020 WL 2922490, at *4 (denying class certification

26   where plaintiff failed to provide accurate methodology for calculating individual damages);

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 28
CASE NO. 2:19-CV-01320-JCC

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1   *Harvey*, 2020 WL 2411510, at *7 ("Without a damages model, the proposed class fails Rule

2   23(b)(3)'s predominance requirement.") (citing *Comcast*, 569 U.S. at 34); *Coleman v. United*

3   *Servs. Auto. Ass'n*, 2023 WL 3776252, at *8 (S.D. Cal. Mar. 21, 2023) (denying class certification

4   where "Plaintiffs have not undertaken to address to what extent their methodologies" will establish

5   claim elements classwide). It also undermines Amazon's due process right to present

6   individualized defenses. *See Mendoza*, 2010 WL 424679, at *10.

7        A lack of "any sort of representative evidence" and the need to "rely[] on individual

8   testimony to establish the existence of an injury and the amount of damages" shows individualized

9   inquiries predominate common ones and a class action is not superior. *Bowerman*, 60 F.4th at 469.

10                       **V.    <u>CONCLUSION</u>**

11        For these reasons, the Court should deny Waithaka's motion for class certification.

12

13   / / /

14

15   / / /

16

17   / / /

18

19

20

21

22

23

24

25

26

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 29
CASE NO. 2:19-CV-01320-JCC

**MORGAN, LEWIS & BOCKIUS LLP**
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

App. 288

1     Dated:  September 3, 2024

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*I certify that this memorandum contains 10,386 words, in compliance with the Local Civil Rules.*

Respectfully submitted,

By: *s/Andrew DeCarlow*
Andrew DeCarlow, WSBA #54471
MORGAN, LEWIS & BOCKIUS LLP
1301 Second Ave., Suite 3000
Seattle, WA  98101
Telephone:  (206) 274-0154
Fax:  (206) 274-6401
Email: andrew.decarlow@morganlewis.com

Richard G. Rosenblatt (*Pro Hac Vice*)
James P. Walsh, Jr. (*Pro Hac Vice*)
MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center, Second Floor
Princeton, NJ  08540-6241
Telephone:  (609) 919-6600
Fax:  (609) 919-6701
Email: richard.rosenblatt@morganlewis.com
Email: james.walsh@morganlewis.com

Sarah Zenewicz (*Pro Hac Vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA  94105-1596
Telephone:  (415) 442-1790
Fax:  (415) 442-1001
Email: sara.zenewicz@morganlewis.com

*Attorneys for Defendants*

DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION- 30
CASE NO. 2:19-CV-01320-JCC

**MORGAN, LEWIS & BOCKIUS LLP**
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-6400
FAX: (206) 274-6401

1

## CERTIFICATE OF SERVICE

2

3        I hereby certify that on September 3, 2024, I caused to be electronically filed the foregoing

4 **DEFENDANTS' OPPOSITION TO PLAINTIFF BERNARD WAITHAKA'S MOTION**

5 **FOR CLASS CERTIFICATION** with the Clerk of Court using the CM/ECF system, which will

6 automatically send email notification of such filing to the registered attorneys of record.

7

8                                          By: *s/Andrew DeCarlow*
                                           Andrew DeCarlow, WSBA #54471
9                                          MORGAN, LEWIS & BOCKIUS LLP
                                           1301 Second Ave., Suite 3000
10                                         Seattle, WA  98101
                                           Telephone:  (206) 274-0154
11                                         Fax:  (206) 274-6401
                                           Email: andrew.decarlow@morganlewis.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE
Case No. 2:16-cv-01554-JCC

DocuSign Envelope ID: 646366E5-290D-4E03-8D96-1GBB118D368F

The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BERNARD WAITHAKA, on behalf of
himself and all others similarly situated,

                Plaintiff,

    v.

AMAZON.COM, INC., AMAZON
LOGISTICS, INC.,

           Defendants

Case No. 2:19-cv-01320-RSM

**DECLARATION OF MAX HAUBOLD IN
SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION**

## <u>DECLARATION OF MAX HAUBOLD</u>

1.     Pursuant to 28 U.S.C. § 1746, I, Max Haubold, declare as follows:

2.     I am a Director, Amazon Flex NA, employed by Amazon.com Services LLC and have responsibility for certain functions related to the Amazon Flex Program.

3.     I make this Declaration based on my personal knowledge and my review of Amazon's business records. If called to testify to these facts, I would be competent to do so.

4.     As used in connection with Amazon's e-commerce business, "fulfillment" refers generally to when third-party wholesalers, manufacturers, and sellers ship their products to Amazon fulfillment centers, where Amazon warehouses the products, and, once ordered by customers, packages and readies them for shipment to smaller facilities.

DECLARATION OF M. HAUBOLD - 1
Case No. C16-1554-JCC

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
502 Carnegie Center
Princeton, NJ 08540-6241
Telephone: +1.609.919.6600
Facsimile: +1.609.919.6701

DocuSign Envelope ID: 646366E5-299D-4E03-8D96-16BB118D369F

5.       After they are ordered by customers, Amazon packages and readies some products for shipment to different facilities (such as sortation centers, smaller delivery stations, third-party hubs, and postal distribution centers), where third-party delivery services and partners pick them up. Some items ordered by customers are packaged by, and picked up from locations determined by, the seller. Finally, some sellers independently package, ship, and contract with delivery service providers for items ordered by Amazon customers.

6.       Amazon's "logistics" operations refer generally to the processes of coordinating and managing the movement and warehousing of products, equipment, and supplies within Amazon's own facilities, as well as coordinating Amazon's external relationships with the third parties that make local customer deliveries.

7.       In Massachusetts, before and after December 2016, Amazon has contracted with large third-party delivery companies such as FedEx, UPS, and the U.S. Postal Service, and smaller regional and local delivery companies, to make local deliveries of packages ordered online through Amazon. Since approximately December 2016, Amazon has also contracted with thousands of Delivery Partners through the Amazon Flex Program to supplement these third-party local delivery services in some Massachusetts markets.

8.       Delivery Partners do not pick up packages from Amazon fulfillment centers. Instead, Massachusetts Delivery Partners pick up packages from approximately twenty-six Massachusetts delivery stations, which are separate from and smaller than fulfillment centers, or from grocery stores owned and operated by Whole Foods Markets, Inc., a wholly-owned subsidiary of Amazon.com, Inc.

9.       There are thousands of third-party sellers on Amazon.com who choose to warehouse and ship their own products directly to customers. Delivery Partners have no involvement with those deliveries.

10.      Some Delivery Partners only make "brown box" package deliveries to Amazon's customers. Some Delivery Partners have delivered food items from Whole Foods, which can also

DECLARATION OF M. HAUBOLD - 2
Case No. C16-1554-JCC

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
502 Carnegie Center
Princeton, NJ 08540-6241
Telephone: +1.609.919.6600
Facsimile: +1.609.919.6701

App. 292

DocuSign Envelope ID: 646366E5-299D-4E03-8D06-16BB118D369F

1    be ordered through Amazon's website.  Some Delivery Partners have made deliveries through the

2    Amazon Fresh program, which is a service through which Amazon Prime members can order

3    groceries and household items sold by Amazon.

4         11.    In the Amazon Flex app, Delivery Partners can sign up for ("accept") offered

5    delivery "blocks," which are available by location, date, and "blocks" of time.  An offer for a

6    delivery "block" shows the amount (or in some cases a range) of the Service Fees payable for the

7    block and whether customer tips are available.  Delivery Partners are not required to accept any

8    Amazon Flex offer nor required to accept a minimum number of offers.  The lengths of delivery

9    blocks vary.

10        12.    Amazon generally sets Service Fees per block that are intended to roughly equate

11   to a rate of between $18 and $25 per hour, multiplied accordingly by the anticipated duration of a

12   block (e.g., a block estimated to take two hours would have a fee of at least $36).  If Delivery

13   Partners finish providing delivery services before the estimated end of a block, Amazon does not

14   reduce their Service Fees.  Delivery Partners can request additional Service Fees from Amazon

15   after completing a block if, for example, an unforeseen circumstance required a Delivery Partner

16   to take longer to complete a block than estimated due to no fault of their own, and Amazon has

17   paid additional Service Fees depending on the circumstances.

18        13.    Delivery Partners may incorporate a separate business entity through which they

19   operate their delivery business.

20        14.    Delivery Partners are not required by Amazon to record time worked such as by

21   clocking in or out at the beginning and end of each block.  Delivery Partners are also free to take

22   breaks during blocks. In most instances, there is no requirement that Delivery Partners make

23   deliveries within a prescribed period of time, so long as deliveries are completed before 9 p.m.

24   Rather, the duration associated with a "block" is an estimate of the amount of time deliveries may

25   take if delivered without a break and includes additional time for returning to the station if

26   necessary to drop off undeliverable packages.  If a Delivery Partner does not need to return to the

DECLARATION OF M. HAUBOLD - 3
Case No. C16-1554-JCC

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
502 Carnegie Center
Princeton, NJ 08540-6241
Telephone: +1.609.919.6600
Facsimile: +1.609.919.6701

App. 293

DocuSign Envelope ID: 646366E5-299D-4E03-8D06-A6BB148D369F

station after completing a block, then it would normally be expected that the Delivery Partner will complete a block in less time than the estimated duration associated with the block.

15.     The block length, estimated completion time and Service Fees for deliveries from Whole Foods are different than typical brown box package deliveries because, among other reasons, perishable groceries must be delivered more quickly.  Whole Foods deliveries also vary because they allow for customers to tip the Delivery Partner which can mean that the Deliver Partner earns more than the guaranteed Service Fee.

16.     Delivery Partners have agreed to three different versions of the Amazon Flex Independent Contractor Terms of Service since Amazon began contracting with Delivery Partners in Massachusetts in 2016.

17.     Attached hereto as Exhibit A is a true and correct copy of the version of the Amazon Flex Independent Contractor Terms of Service which was effective from December 2016 to October 2019.

18.     Attached hereto as Exhibit B is a true and correct copy of the version of the Amazon Flex Independent Contractor Terms of Service which was effective from October 2019 to May 2021.

19.     Attached hereto as Exhibit C is a true and correct copy of the current version of the Amazon Flex Independent Contractor Terms of Service which has been effective since May 2021.

20.     Attached hereto as Exhibit D is a true and correct copy of Amazon Logistics Inc.'s publicly available Federal Motor Carrier Safety Administration certificate, showing that it is registered as both a "carrier" and "broker."

[Remainder of page intentionally left blank]

DECLARATION OF M. HAUBOLD - 4
Case No. C16-1554-JCC

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
502 Carnegie Center
Princeton, NJ  08540-6241
Telephone: +1.609.919.6600
Facsimile: +1.609.919.6701

App. 294

1    I declare under penalty of perjury under the laws of the United States of America that

2   the foregoing is true and correct.

3

4

5    Executed on _____7/30/2021_____, in Phoenix, Arizona.

6

7                                            _____
                                             MAX HAUBOLD
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF M. HAUBOLD - 5
Case No. C16-1554-JCC

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
502 Carnegie Center
Princeton, NJ  08540-6241
Telephone: +1.609.919.6600
Facsimile: +1.609.919.6701

# Exhibit A

# AMAZON FLEX

## INDEPENDENT CONTRACTOR TERMS OF SERVICE

Welcome to the Amazon Flex program (the "**Program**"). These Terms of Service (this "**Agreement**"), including the Program Policies, attached as an Exhibit A, will govern the transportation and delivery services contemplated by this Agreement (the "**Services**") and constitute a legally binding agreement between Amazon Logistics, Inc. ("**Amazon**") and you. Any reference to this Agreement includes the Program Policies. This Agreement takes effect on the date on which you click through this Agreement when creating your account for the Program (your "**Program Account**") or, if earlier, when you begin to perform the Services (the "**Effective Date**"). If there is a conflict between the Program Policies and any other section of this Agreement, the Program Policies will prevail.

YOU AND AMAZON AGREE TO RESOLVE DISPUTES BETWEEN YOU AND AMAZON ON AN INDIVIDUAL BASIS THROUGH **FINAL AND BINDING ARBITRATION**, UNLESS YOU OPT OUT OF ARBITRATION WITHIN 14 CALENDAR DAYS OF THE EFFECTIVE DATE OF THIS AGREEMENT, AS DESCRIBED BELOW IN SECTION 11. If you do not agree with these terms, do not use the Amazon Flex app or participate in the Program or provide any Services.

**1. The Services.**

a) You agree to provide the Services in a safe and competent manner in accordance with the level of professional care that would be observed by a prudent person rendering similar services and subject to the Service Standards described in the Program Policies. Failure to comply with the Service Standards will constitute a breach of this Agreement.

b) This Agreement requires no minimum amount or frequency of Services. You agree, however, that if you accept an offer to provide Services during a particular confirmed block and you do not cancel your acceptance as permitted under the Program Policies, you will deliver the parcels, packages, totes, bags or other deliverables tendered to you by Amazon or its designees ("Deliverables") during such period ("Delivery Block"). The Delivery Block starts when you receive Deliverables and ends at the time the last Deliverable is delivered or, if undeliverable, is returned as specified by Amazon.

**2. Independent Contractor Relationship.**

This Agreement creates an independent contractor relationship, not an employment relationship. As an independent contractor of Amazon, nothing in this Agreement will create any partnership, joint venture, agency, franchise, or employment relationship between you and Amazon. As an independent contractor, you will not be considered as having the status of an employee of Amazon for any purpose, including federal, state, and local tax purposes, and you will not be required or entitled to participate in any employee benefit or other plans or arrangements in which employees of Amazon and its affiliates may participate. You are solely responsible for all taxes applicable to you, including, but not limited to, income and social security taxes. You are not covered by unemployment insurance or workers' compensation provided by Amazon or any of its affiliates, and you have no right to nor will you seek benefits or any form of payment from or through Amazon or any of its affiliates under state unemployment coverage or workers' compensation. You have no authority to bind Amazon, and you will not make any representation identifying yourself as an employee of Amazon or make any representations to any person or entity that you have any authority to bind Amazon as an employee,

partner, or otherwise. This Agreement applies to each Delivery Block but there will be no relationship between the parties after the end of one Delivery Block and before the start of any subsequent Delivery Block.

**3. Service Fees.**

In consideration of providing Services in accordance with this Agreement and for providing your Vehicle, Amazon will pay you fees in the amounts indicated in the Amazon Flex app at the time of acceptance, or as otherwise agreed between you and Amazon from time to time ("Service Fees"). The Service Fees, unless otherwise expressly provided in this Agreement, will be your only fee for performing the Services. The Service Fees include all amounts due to you for providing your Vehicle and the Services under this Agreement, including any expenses you may incur (such as costs of fuel, taxes, registration fees, permits of all types, and any other assessment, citation, fine, or fee imposed or assed against your Vehicle or you by any applicable governmental authority or otherwise related to your equipment and its use). You understand that Amazon would offer lower Service Fees if Amazon had to pay for your expenses. Amazon will pay Service Fees to you no later than 15 days after completion of the Services. Depending on the location in which the Services are provided and the product or business to which the Services relate, Amazon's customers may be able to provide a tip in connection with the fulfillment of their orders and Amazon will pass through any tips payable to you.

**4. Representations, Warranties, and Covenants.**

You represent and warrant to Amazon that you have all legal capacity and authority to enter into, and perform your obligations under, this Agreement. You agree, at all times, to: (a) comply with all laws, rules, and regulations pertaining to the Services, including all laws, rules, and regulations applicable to (i) transportation, safety and insurance related to the performance of Services, (ii) health and safety of customers and the Deliverables and (iii) anti-bribery and anti-corruption; (b) hold and maintain, throughout your participation in the Program, all licenses, permits, and other authorizations necessary for you to perform the Services (including, if applicable, driver's license, vehicle registration, and automobile insurance), which you will provide to Amazon upon request; (c) notify Amazon immediately after becoming aware that any license, permit, or authorization required for you to perform the Services has expired, been lost or suspended; (d) provide complete and accurate responses to all questions related to the background screening, including questions on prior convictions; (e) notify Amazon immediately if you need to change or update your answers to any questions posed during the background screening process, including if you have any new convictions; (f) notify Amazon immediately of any event or circumstance that impairs the safety of or delays delivery of Deliverables; (g) comply with Amazon's Supplier Code of Conduct posted at **http://www.amazon.com/gp/help/customer/display.html?ie=UTF8&nodeId=200885140** and Amazon's safety policies related to Amazon's premises and Deliverables (collectively, "Amazon Safety Requirements"), and permit, as requested by Amazon from time to time, Amazon's designee to audit your compliance with any Amazon Safety Requirements; (h) not violate or infringe any third party's rights in proprietary or confidential information in performing the Services; and (i) not create any lien on Amazon property or assets, including any Deliverables, and waive all rights to any lien. Throughout the term of this Agreement, you will provide Amazon with any forms, documents, or certifications as may be required for Amazon to verify representations and warranties you made in this Agreement or your compliance with any provision of this Agreement.

**5. Equipment Used to Perform the Services.**

9/30/2016

App. 298

a) You agree that, as part of managing your own business, you will provide and maintain a mobile device compatible with the Amazon Flex app, any vehicle identified by you within the Amazon Flex app ("Vehicle"), any bicycle or other non-motorized mode of transportation used to provide the Services, and any other equipment that you choose to use or that you need in order to provide the Services. Your identification of any Vehicle within the Amazon Flex app will be considered an acknowledgement of and receipt for equipment, as required by applicable law.

b) You agree that while actively performing the Services during a Delivery Block, your Vehicle is under an exclusive lease as defined under Federal Motor Carrier Safety Administration ("FMCSA") section 49 C.F.R. Part 376, which requires exclusive possession, control and use by Amazon of both the Services and your Vehicle during that time. Your obligations under the lease will terminate each time you are done with a Delivery Block and will restart each time a new Delivery Block begins. "Actively performing the Services" means that you are actively delivering Deliverables, waiting to receive more Deliverables, or on your way back to the delivery station with undeliverable or damaged Deliverables. For clarity, exclusive possession, control and use of your Vehicle by Amazon does not mean that you cede physical control or ownership of your Vehicle.

**6. Term and Deactivation.**

a) This Agreement is effective as of the Effective Date and will continue to be in effect until you or Amazon terminates this Agreement.

b) You may terminate this Agreement at any time and for any reason by giving Amazon a notice of termination in accordance with Section 14 below. You will not be eligible to participate in the Program for 12 months following the date of the termination notice.

c) Amazon may terminate this Agreement at any time and for the following reasons by giving you a notice of termination in accordance with Section 14 below: (i) for failure to meet Service Standards, (ii) for failing a background check any time before or after the Effective Date (iii) material violation of the Program Policies, (iv) material breach of this Agreement, (v) if your Amazon.com account is deactivated; or (vi) for other commercially reasonable cause.

d) If you have been inactive for more than 180 days, Amazon may deactivate your account. If your account is deactivated for inactivity, you may apply to re-enroll in the Program.

e) If you opt out of receiving electronic communication (as defined in Section 14 below), your account will be deactivated. Subject to other provisions of this Agreement, you will be able to re-activate your account by notifying Amazon that you agree to receive electronic communication from Amazon.

f) Amazon may cease providing any Licensed Materials (as defined in Section 10 below) and terminate this Agreement if you violate any of the terms related to the Licensed Materials in which case any licenses granted to you by Amazon will terminate immediately, without any notice.

g) If either you or Amazon terminate this Agreement, you must uninstall the Amazon Flex application on your device.

**7. Availability of the Services.**

Amazon makes no promises or representations in this Agreement as to the amount of business that you can expect at any time. You can accept or reject any opportunity offered by Amazon. Nothing in

9/30/2016

App. 299

this Agreement will prohibit you from providing Services or using your Vehicle on behalf of any other person or entity, including competitors of Amazon, except during any Delivery Block. Amazon may also engage the services of other companies and individuals that may perform the same or similar services as those provided by you under this Agreement.

**8. Limitation of Liability.**

Amazon will not be liable for damages of any kind, including direct damages, loss of goodwill, lost opportunities or profits, anticipated amount of business, expenditures, investments, leases, or commitments made by you in connection with the Program or otherwise. Except for your indemnity obligations under Section 9 below and any liability arising out of your breach of the section of the Program Policies entitled "Confidentiality and Personal Information", and except as indicated below, NEITHER PARTY WILL BE LIABLE UNDER ANY CIRCUMSTANCES FOR DIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, INCIDENTAL, OR INDIRECT DAMAGES OF ANY KIND, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER RELATED TO THIS AGREEMENT, LICENSED MATERIALS, THE PROGRAM OR THE SERVICES, AND WHETHER IN CONTRACT, STRICT LIABILITY OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE) EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. Nothing in this Agreement will limit or exclude either party's liability for any matter or individual remedy that may not be limited or excluded by applicable laws, rules, or regulations.

**9. Indemnification.**

a) You will defend, indemnify, and hold harmless Amazon and its affiliates and successors, and each of their respective directors, officers, and employees (each an "Indemnified Party" and, collectively, the "Indemnified Parties") from any third-party allegation or claim based on, or any loss, damage, settlement, cost, expense, and any other liability (including reasonable attorneys' fees and expenses) arising out of or in connection with, (a) your negligence, strict liability, or misconduct, (b) a breach of this Agreement by you, (c) any action or inaction by you (including any and all loss or damage to personal property or bodily harm (including death) relating to or arising out of any such action or inaction), or (d) any allegation or claim that you failed to comply with applicable laws, rules, or regulations.

b) Your duty to defend is independent of your duty to indemnify. You will use counsel reasonably satisfactory to the Indemnified Parties to defend each indemnified claim, and the Indemnified Parties will cooperate (at your expense) with you in the defense. If at any time the Indemnified Parties determine that they may be adversely affected by any indemnified claim, the Indemnified Parties may assume control of the defense of the claim. You will not consent to the entry of any judgment or enter into any settlement relating to an indemnified claim without the Indemnified Parties' prior written consent.

**10. Licensed Materials.**

As used in this Agreement, "Licensed Materials" means any software, application, website, content, or other information made available to you (whether standalone, for use on devices owned by you or Amazon, or otherwise) by Amazon or its affiliates in connection with the Program, together with any related manuals and other documentation. Amazon grants to you, during the term of this Agreement, a limited, non-exclusive, non-transferable, non-sublicensable, revocable license to use the Licensed Materials solely for the purpose of performing the Services and participating in the Program and as

9/30/2016

App. 300

permitted under this Agreement. For additional rights and obligations regarding the Licensed Materials see the Program Policies.

**11. Dispute Resolution, Submission to Arbitration.**

a) SUBJECT TO YOUR RIGHT TO OPT OUT OF ARBITRATION, THE PARTIES WILL RESOLVE BY FINAL AND BINDING ARBITRATION, RATHER THAN IN COURT, ANY DISPUTE OR CLAIM, WHETHER BASED ON CONTRACT, COMMON LAW, OR STATUTE, ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT, INCLUDING TERMINATION OF THIS AGREEMENT, TO YOUR PARTICIPATION IN THE PROGRAM OR TO YOUR PERFORMANCE OF SERVICES. TO THE EXTENT PERMITTED BY LAW, THE PRECEDING SENTENCE APPLIES TO ANY DISPUTE OR CLAIM THAT COULD OTHERWISE BE ASSERTED BEFORE A GOVERNMENT ADMINISTRATIVE AGENCY.

b) TO THE EXTENT PERMITTED BY LAW, THE PARTIES AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS OR COLLECTIVE BASIS.

c) TO THE EXTENT PERMITTED BY LAW, THE PARTIES FURTHER AGREE THAT NO DISPUTE RESOLUTION PROCEEDING WILL BE CONDUCTED ON A REPRESENTATIVE BASIS.

d) TO THE EXTENT PERMITTED BY LAW, THE PARTIES WAIVE ANY RIGHT TO PARTICIPATE IN OR RECEIVE ANY RELIEF FROM ANY NON-INDIVIDUAL PROCEEDING REFERENCED ABOVE.

e) THIS AGREEMENT DOES NOT PROVIDE FOR, AND THE PARTIES DO NOT CONSENT TO, ARBITRATION ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS.

f) NO ARBITRATOR SELECTED TO ARBITRATE ANY DISPUTE BETWEEN THE PARTIES IS AUTHORIZED TO ARBITRATE ANY DISPUTE ON A CLASS, COLLLECTIVE OR REPRESENTATIVE BASIS.

g) THIS AGREEMENT SHALL NOT BE INTERPRETED AS REQUIRING EITHER PARTY TO ARBITRATE DISPUTES ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS, EVEN IF A COURT OR ARBITRATOR INVALIDATES OR MODIFIES OR DECLINES TO ENFORCE THIS AGREEMENT IN WHOLE OR IN PART.

h) You and Amazon agree that, at least 30 days before commencing any legal action relating in any way to this Agreement or to the Services, the aggrieved party will provide the other party a notice of the aggrieved party's claims and at least 30 days in which to cure an alleged breach of this Agreement or other alleged act or omission, if the same is reasonably capable of being cured. Notice shall be provided as set forth in Section 15 of this Agreement. The applicable statute of limitations shall be tolled for 30 days following the provision of such notice.

i) Demand for arbitration under this Agreement must be made in writing, must describe the demanding party's claim, and must be delivered to the other party by hand or by first-class mail within the applicable statute of limitations. Any demand for arbitration made to Amazon must be directed to Amazon's registered agent, Corporation Service Company, at 300 Deschutes Way SW, Suite 304, Tumwater, WA 98051. The arbitration will be conducted by the American Arbitration Association

9/30/2016

App. 301

(the "AAA") under its Commercial Arbitration Rules and Mediation Procedures in effect at the time of filing a Demand for arbitration. The AAA's rules are available at www.adr.org. If the AAA's rules are inconsistent with this Agreement, this Agreement will govern. Payment of all filing, administration, and arbitrator fees will be governed by the AAA's rules, except that if you initiate the arbitration, you will pay for only the first US $200 of the total AAA filing fee. For example, if the AAA filing fee is US $180 you will be responsible for paying the entire AAA filing fee in that instance. But, if the AAA filing fee is US $570 you will be responsible for paying US $200 and Amazon will pay the difference (US $370 in this instance). Amazon will also pay all other costs and expenses unique to arbitration, including the arbitrator's fees. The arbitration will take place at a mutually-convenient location within 45 miles from the last location in which you provided Services.

j) The parties agree that the Federal Arbitration Act and applicable federal law will govern any dispute that may arise between the parties. The parties further agree that, notwithstanding any provision in the AAA rules, any disputes regarding the arbitrability of a claim or the validity, interpretation, or enforcement of any provision (including a waiver) relating to class, collective or representative claims shall be decided by a court of competent jurisdiction, and not by an arbitrator.

k) WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION.  If you wish to opt out of this arbitration agreement—meaning, among other things, that you and Amazon would be free to bring claims against each other in a court of law—you can opt out by sending an e-mail to amazonflex-support@amazon.com before the end of the Opt-Out Period (defined below). The e-mail must include your name and a statement indicating that you are intentionally and knowingly opting out of the arbitration provisions of the Amazon Flex Independent Contractor Terms of Service. You will not be subject to retaliation for asserting claims or opting out of this agreement to arbitrate.

a. If Amazon e-mailed you this Agreement as an update to the Amazon Flex Independent Contractor Terms of Service to which you previously agreed, the Opt-Out Period ends 14 calendar days from the date of Amazon's e-mail to you.

b. If you have not agreed to any previous version of the Amazon Flex Independent Contractor Terms of Service, the Opt-Out Period ends 14 calendar days from the date on which you click "I AGREE AND ACCEPT" to accept this Agreement in the Amazon Flex App.

**12. Governing Law.**

The interpretation of this Agreement is governed by the law of the state of Washington without regard to its conflict of laws principles, except for Section 11 of this Agreement, which is governed by the Federal Arbitration Act and applicable federal law.

**13. Modifications.**

Amazon may modify this Agreement, including the Program Policies, at any time by providing notice to you through the Amazon Flex app or otherwise providing notice to you. You are responsible for reviewing this Agreement regularly to stay informed of any modifications. If you continue to perform the Services or access Licensed Materials (including accessing the Amazon Flex app) after the effective date of any modification to this Agreement, you agree to be bound by such modifications. However, (i) any modification to Service Fees will be provided to you in writing or through the Amazon Flex app before you accept and complete any Delivery Blocks to which such modifications

9/30/2016

App. 302

apply; (ii) any modifications to Section 11 will not apply to claims that accrued or to disputes that arose prior to such modification.

### 14. Notice; Electronic/Mobile Communications.

Amazon will communicate with you via phone, text message, email, or push notifications sent via the Amazon Flex app (each such communication, "electronic communication") in connection with your participation in the Program. By downloading the Amazon Flex app, providing us with your mobile number, and agreeing to this Agreement, you are providing us with written consent to receive push notifications and automated text messages from Amazon in connection with the Program. To stop receiving push notifications, you may adjust the settings on your phone or delete the Amazon Flex app. You will not be able to participate in the Program if you adjust the settings or delete the Amazon Flex app. To stop receiving text messages from Amazon, reply STOP to any message. You consent to Amazon communicating with you concerning the Program via any or all of these means and you are responsible for printing, storing, and maintaining your own records of any such agreements, notices, disclosures or other communications. Standard messaging and data rates may apply. It is your responsibility to keep your email address and phone number current by updating the information you provided to Amazon. Terminating this Agreement will stop all electronic communication. If you want to terminate this Agreement, you can provide a notice of termination to Amazon by sending a message to the following email address: amazonflex-support@amazon.com. If you want to provide notice under this Agreement, other than the notice of termination, you can provide such notice by sending a message to the following email address: amazonflex-support@amazon.com.

### 15. Documents.

You may obtain an e-mailed copy of this Agreement by e-mailing a request to amazonflex-support@amazon.com. This Agreement will be accessible to you at any time in the Amazon Flex app.

### 16. Entire Agreement and Severability; Survival.

a) This Agreement constitutes the complete and final agreement of the parties pertaining to the Services and supersede and replace the parties' prior agreements, understandings, representations, and discussions (whether written or oral) relating to the Services. If any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the fullest extent permissible under applicable law.

b) The following sections of this Agreement, along with any other provisions that by their nature should survive termination of this Agreement, will survive any termination or expiration of this Agreement: Term and Termination; Indemnification; Limitation of Liability; Dispute Resolution, Submission to Arbitration, Governing Law and the following sections of the Program Policies: Confidentiality and Personal Information; Taxes; and Miscellaneous.

**Exhibit A**

**Amazon Flex Program Policies**

9/30/2016

App. 303

## I. Welcome To Amazon Flex.

Welcome to Amazon Flex, an innovative new service offering you the opportunity to deliver Amazon packages through the Amazon Flex app. Amazon is excited to welcome you to the Amazon Flex program and hope that you enjoy being your own boss and running your own business by using the Amazon Flex app.

## II. Program Requirements.

A. In order to participate in the Program, you must:

1. Pass a background check and, if applicable, a motor vehicle record check in accordance with Amazon's standards;
2. Be at least 21 years of age;
3. Be legally qualified to work in each jurisdiction in which you provide Services;
4. Have the ability to effectively operate the Amazon Flex app and communicate with customers; and
5. Install the Amazon Flex app on your smartphone.

B. In performing Services, you may only use:

1. Non-motorized transportation (e.g., walking, cycling);
2. Following Vehicles:
   - a private passenger vehicle,
   - a cargo van (not to exceed 10,000 lbs. in gross vehicle weight rating),
   - a light truck (not to exceed 10,000 lbs. in gross vehicle weight rating); or
3. Public Transportation.

If you are required to advise Amazon of the mode of transportation that you intend to use to transport specified Deliverables, you agree to use only that mode of transportation to transport those Deliverables.

C. If you operate any Vehicle in connection with your performance of Services, you must:

1. Have a current valid driver's license,
2. If applicable, maintain current Vehicle registration,
3. Maintain current automobile insurance coverage required by applicable laws, rules, and regulations to operate such Vehicle; and
4. Be legally authorized and fit to operate such Vehicle.
5. Upon request, you will provide Amazon with proof that these requirements have been satisfied.
6. All Vehicles must be registered and must have passed all applicable local, state and federal standards for safety and environmental compliance.
7. You are not permitted to carry weapons while performing Services, except to the extent local applicable law places restrictions on this policy.
8. You will not provide Services if you are currently an Amazon employee and you will cease providing Services if you become an Amazon employee.

## III. Service Standards.

9/30/2016

App. 304

A. As an independent contractor, you agree to provide results—the timely and effective delivery of undamaged parcels, bags, totes or other items to the customers' and Amazon's satisfaction-- subject to the following standards ("Service Standards"):

1) Safety
i. Failure to comply with health, safety, & other applicable laws. Amazon requires you to comply with all traffic (including observing speed limit laws and distracted driving laws), health, safety, and other laws applicable to Deliverables or Services. Violation of traffic, health, safety, and other laws applicable to Deliverables or Services will make you ineligible to participate in the Program.

2) Reliability
i. Arriving on time for or timely forfeiting Delivery Blocks. Amazon requires that you a) arrive on time and be ready to provide Services for any confirmed Delivery Block or b) forfeit a Delivery Block at least 45 minutes before the start of such Delivery Block. Please note that if you select a Delivery Block close to its start time (i.e. 20 minutes before the start of the Delivery Block), you will still be required to arrive on time for that Delivery Block. If you repeatedly arrive late or forfeit Delivery Blocks late, you will no longer be eligible to participate in the Program.

3) Delivery Quality
i. Late Deliveries. Amazon requires that you deliver the packages to the customers on time. The app will specify the delivery window during which the customer expects the package to be delivered. If you repeatedly deliver packages late, you will no longer be eligible to participate in the Program.

ii. Packages marked as delivered that the customer does not receive. If you deliver a package, Amazon expects that the customer will be able to find it. If customers repeatedly report that they cannot find packages you marked as delivered, you will no longer be eligible to participate in the Program.

iii. Delivery not attempted or undeliverable packages not returned to Amazon timely. Amazon expects that you will deliver all the packages you picked up as part of your Delivery Block. In an instance where delivery is not possible, you are required to return all packages to the Amazon delivery station, unless otherwise directed by Amazon. If you repeatedly do not attempt to deliver all the packages you picked up during a Delivery Block or you do not return the undeliverable packages to a location specified by Amazon, you will no longer be eligible to participate in the Program.

4) Customer Service
i. Rude or inappropriate behavior. Amazon requires you to behave respectfully and professionally when interacting with customers, station operators, merchants and other delivery partners while providing the Services. If customers, station operators, merchants or other delivery partners repeatedly report disrespectful, rude, inappropriate, unprofessional, dangerous or threatening conduct, you will no longer be eligible to participate in the Program. Additionally, a single violation, depending on the seriousness of the infraction, can make you ineligible to participate in the Program.

ii. Failure to follow instructions. Amazon requires you to follow the delivery instructions in the app or from a customer as long as the customer instructions are reasonable and do not conflict with health, safety and other applicable laws. Amazon expects you to use an insulated bag when delivering restaurant orders, not leave chilled/frozen items unattended, always check recipient IDs when delivering alcohol, and collect a signature when instructed to do so in the app. If you repeatedly disregard the instructions, you will no longer be eligible to participate in the Program.

9/30/2016

App. 305

B. As an independent contractor, subject only to this Agreement, it is for you to decide the means and manner in which to provide the Services and achieve the results that you have agreed to provide. Therefore, in performing Services, you are free to map out your own routes, sequence your deliveries and in every other way control the means and manner in which you deliver Deliverables.

### IV. Program Account.

A. Amazon will use information provided by you to create or maintain your Program Account. You will provide accurate, current, and complete information as part of your contracting process and to update your information as necessary so that it remains accurate, current, and complete at all times.

B. You will not permit any other person to access your Program Account or the Licensed Materials, including the Amazon Flex App, or to perform any Services using your identity or log-in credentials. You will not use any other person's access to Program Account or Licensed Materials, including the Amazon Flex App, or perform any Services using any other person's identity or log-in credentials. You will keep secure and confidential any password required to access your Program Account or Amazon Flex App or any identification that Amazon provides to you in connection with the Program or Amazon Flex App and you agree to accept responsibility for all activities that occur under your Program Account and associated password.

### V. Insurance.

A. If you operate any motor vehicle(s) in connection with your performance of the Services, you will maintain, at your expense, personal automobile insurance coverage required by applicable laws, rules, and regulations to operate such vehicle(s). You will provide proof of such insurance coverage to Amazon, upon request. You will notify Amazon if your insurance coverage is cancelled. Your personal automobile insurance policy may not cover commercial activity. As an independent contractor, it is your responsibility to understand the terms of your personal insurance coverage and to contact your personal insurance company if you have any questions.

B. Where allowed by state and federal regulations, Amazon maintains, pursuant to FMCSA regulations, a commercial automobile insurance policy ("Amazon Insurance Coverage") that is intended to provide third-party bodily injury and property damage coverage, uninsured/under-insured motorist coverage, and comprehensive/collision coverage contingent on your personal insurance policy coverage, while actively performing the Services during the Delivery Block, in each case subject to Amazon Insurance Coverage deductibles and coverage limitations. If you maintain commercial automobile insurance coverage applicable to your operation of a Vehicle, your provider will provide primary coverage for you at all times, including during the Delivery Block and Amazon Insurance Coverage will be, only in those geographies where state and federal regulations allow, excess over your commercial automobile insurance. The above description of Amazon Insurance Coverage is a summary only, and if there is a conflict between the above description and the actual terms of the Amazon Insurance Policy, the actual terms of the Amazon Insurance Policy will dictate coverage. You will notify Amazon immediately of any accident or other on-road incident that occurs while you are providing Services during the Delivery Block and you will cooperate with Amazon and the applicable insurance company in the investigation of such accident or on-road incident. Amazon Insurance Coverage will in no way affect your indemnity obligations to Amazon as provided for in the Agreement. Amazon Insurance Coverage limits are available upon request.

### VI. Privacy.

9/30/2016

App. 306

A. Amazon receives and stores any information you enter on our website and mobile applications, while providing Services or participating in the Program, and through other interactions and communications you have with us, our mobile application or our website. Any of the Licensed Materials may provide Amazon with data about your use of such Licensed Materials, your geo-location and related tracking data, including your location, movements, speed at which you are traveling, and other personally identifiable information. Amazon may use any such information and share such information with third parties in connection with the Program or other products or services, including Services, offered by Amazon or its affiliates. By submitting information to Amazon during the contracting process or while providing Services and using any Licensed Materials, you expressly (i) consent to Amazon collecting, using and sharing the above described data and information and (ii) waive and release Amazon from any and all claims, causes of action, liability or damages arising out of or in any way related to Amazon's use of such data and information.

B. Amazon may obtain information about you, including your motor vehicle record and results of your background check. You authorize Amazon and its applicable service provider(s) to, from time to time, (i) perform a background check on you and (ii) obtain your motor vehicle record. Based on a review by Amazon or its service provider of the results of your background check and motor vehicle record, Amazon may immediately terminate this Agreement.

C. Subject to applicable laws, Amazon may release any collected data and information, including personally identifiable information, when Amazon believes such release is appropriate or necessary to (i) comply with the law; (ii) enforce or apply this Agreement, including Program Policies; (iii) protect the rights, property, security or safety of Amazon, its affiliates, Amazon's customers, or others; (iv) detect, prevent or otherwise address fraud, security or technical issues; or (v) prevent or stop activity which Amazon considers to be, or to pose a risk of becoming, illegal, unethical, or legally actionable. Amazon may also receive information you shared with third parties, provided that such party has obtained necessary permissions to share the information with Amazon.

D. When you download or use apps created by Amazon or its affiliates, Amazon will receive information about your location, and your mobile device, including a unique identifier for your device. Most mobile devices provide you with information about these permissions. You have the right to choose whether or not to allow Amazon to receive this information. However, our ability to receive this information is an important part of the performance of Services, so if you choose to deny Amazon access to this information, this could affect the availability and functionality of the Amazon Flex App and your participation in the Program.

### VII. Licensed Materials; Devices.

A. You may not (i) incorporate any portion of the Licensed Materials into your own works or compile any portion of it in combination with your own works, transfer it, in whole or in part, for use with another service, or sell, rent, distribute, copy, modify, adapt, translate, reverse engineer, decompile, or disassemble, or make derivative works based on, or manipulate the Licensed Materials or any part of the Licensed Materials or otherwise sublicense or assign any rights to the Licensed Materials in whole or in part, (ii) cause or launch any programs or scripts for the purpose of surveying, manipulating or data mining any portion of the Licensed Materials or impairing or unduly affecting the operation or functionality of any aspect of the Licensed Materials; or (iii) attempt to gain unauthorized access to any portion of the Licensed Materials, including through scripts or third party applications.

B. Additional third party terms contained within or distributed with certain Licensed Materials may apply to the Licensed Materials (or software incorporated with the Licensed Materials) and will

9/30/2016

App. 307

govern the use of such software in the event of a conflict with this Agreement ("Third Party Software"). Such Third Party Software license terms will apply to the corresponding Third Party Software in lieu of this Agreement. For more information on Third Party Software, refer to the Additional Terms in the Amazon Flex app, which can be accessed via Home > Account > View Legal Information > Additional Terms..

C. All rights not expressly granted to you in this Agreement are reserved and retained by Amazon or other content providers. You may not frame or utilize framing techniques to enclose any trademark, logo, or other proprietary information (including images, text, page layout, or form) of Amazon without express written consent. You may not use any meta tags or any other "hidden text" utilizing Amazon's name or trademarks without the express written consent of Amazon. You may use the Licensed Materials only as permitted by law.

D. You will not attempt to participate or participate in the Program, or provide any Services, for the purpose of gathering information regarding the Program (including any Licensed Materials) or Amazon's processes, building or operating a competitive service or a service that uses similar ideas, features, or functions as the Program (including any Licensed Materials), or copying any idea, feature, or function of the Program (including any Licensed Materials).

E. When you use the Licensed Materials, you may also be using the services of one or more third parties, such as a wireless carrier or a mobile platform provider. Your use of these third party services may be subject to the separate policies, terms of use, and fees of these third parties.

F. Amazon may offer automatic or manual updates to the Licensed Materials at any time and without notice to you.

G. You must comply with all export and re-export restrictions and regulations of the Department of Commerce and other United States agencies and authorities that may apply to the Licensed Materials and agree not to transfer, or encourage, assist, or authorize the transfer of Licensed Materials to a prohibited country or otherwise in violation of any applicable restrictions or regulations.

H. You will notify Amazon immediately after becoming aware that any device on which any Licensed Materials are installed has been lost, stolen, or misplaced. If Amazon provides you with any device or other equipment in connection with the Program and such device or other equipment (or any part of it) is lost, stolen, unreturned, damaged, sold, transferred, or encumbered without the express prior written consent of Amazon, you will promptly pay Amazon the full replacement cost of such device or other equipment, together with any incidental costs that are incurred by Amazon to replace the same.

I. AMAZON LICENSES THE LICENSED MATERIALS TO YOU "AS IS" AND MAKES NO WARRANTIES OF ANY KIND REGARDING THE LICENSED MATERIALS. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AMAZON EXPRESSLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT, TITLE, OR FITNESS FOR A PARTICULAR PURPOSE. AMAZON DOES NOT WARRANT THAT THE LICENSED MATERIALS WILL MEET YOUR REQUIREMENTS OR WILL OPERATE UNINTERRUPTED, ERROR FREE, OR PROVIDE ACCURATE, COMPLETE, OR UP-TO-DATE INFORMATION. AMAZON WILL NOT BE RESPONSIBLE FOR ANY LOSS, DAMAGE, OR CLAIM CAUSED BY OR ATTRIBUTABLE TO ANY DEFECT OR DEFICIENCY IN ANY LICENSED MATERIALS.

9/30/2016

J. If you provide any suggestions, comments, ideas, improvements, or other feedback relating to the Program, Program Policies or the Licensed Materials to Amazon, you assign to Amazon all right, title and interest in and to the same and will provide any assistance Amazon may require to document, perfect, and maintain these rights, and Amazon will be free to use, disclose, reproduce, modify, license, transfer, and otherwise distribute and exploit any of the foregoing.

K. All content included in or made available through Licensed Materials or the Program such as text, graphics, logos, button icons, images, audio clips, digital downloads, data compilations, and software is the property of Amazon or its content suppliers and protected by United States and international copyright laws. The compilation of all content included in or made available through any Licensed Materials or the Program is the exclusive property of Amazon and protected by U.S. and international copyright laws.

L. Graphics, logos, page headers, button icons, scripts, and service names included in or made available through any Licensed Materials or the Program are trademarks or trade dress of Amazon in the U.S. and other countries. All other trademarks not owned by Amazon that appear in the Licensed Materials or the Program are the property of their respective owners, who may or may not be affiliated with, connected to, or sponsored by Amazon.

## VIII. Confidentiality and Personal Information.

A. You will use all personally identifiable information (i) concerning Amazon's customers, including names and addresses and (ii) provided to you or learned by you during performance of Services (collectively, "Personal Information"), solely for the purpose of providing Services using the Amazon Flex app and will not contact Amazon's customers using Personal Information for any reason unless directly related to providing Services.  You will comply with all instructions Amazon provides in respect of the processing of Personal Information, and you will maintain appropriate security measures to prevent unauthorized use or disclosure of Personal Information and will keep confidential and not share Personal Information with any third party unless expressly permitted under this Agreement. You will return all Personal Information to Amazon promptly following a request from Amazon. As between you and Amazon, all Personal Information is and will remain the exclusive property of Amazon, and you will not disclose, share, transfer, rent, barter, trade, or sell Personal Information and will not develop lists of or aggregate Personal Information. For the avoidance of doubt, the contents of Deliverables tendered by Amazon to you are Personal Information.

B. If you are required by any governmental authority to disclose the contents of any Deliverable, you will promptly notify Amazon of such requirement. Amazon will not provide any Personal Information in connection with any disputes or claims between you and Amazon's customers, nor will any Amazon customers be contacted or called to testify, by either you or Amazon, in connection with any dispute or claim between you and Amazon.

C. Without the prior written authorization by a Vice President of Amazon, you will not use any trade name, trademark, service mark, trade dress, logo or commercial symbol, or any other proprietary rights of Amazon or any of its affiliates in any manner (including use in any client list, press release, advertisement, or other promotional material).

## IX. Taxes.

Each party will be responsible, as required under applicable law, for identifying and paying all taxes and other governmental fees and charges (and any penalties, interest, and other additions thereto) that

9/30/2016

App. 309

are imposed on that party upon or with respect to the transactions and payments under this Agreement. Amazon may deduct or withhold any taxes that Amazon may be legally obligated to deduct or withhold from any amounts payable to you under this Agreement, and payment to you as reduced by such deductions or withholdings will constitute full payment and settlement to you of amounts payable under this Agreement. Throughout the term of this Agreement, you will provide Amazon with any forms, documents, or certifications as may be required for Amazon to satisfy any information reporting or withholding tax obligations with respect to any payments under this Agreement.

## X. Additional Terms.

A. A party does not waive any right under any provision of this Agreement, including Program Policies, by failing to insist on compliance with, or by failing to exercise any right under, the applicable provision. Any waivers granted under this Agreement are effective only if recorded in a writing signed by the party granting such waiver. The section headings of this Agreement, including Program Policies, are for convenience only and have no interpretive value.

B. You will not assign, subcontract, or delegate any of your rights or obligations under this Agreement, or your Program Account, without Amazon's prior written consent. Any attempt by you to assign, subcontract, or delegate in violation of this Agreement will be null and void.

9/30/2016

App. 310

# Exhibit B

Last updated:  October 3, 2019

## AMAZON FLEX
## INDEPENDENT CONTRACTOR TERMS OF SERVICE

Welcome to the Amazon Flex program (the "Program"). These Terms of Service (this "Agreement"), including the Program Policies, attached as an Exhibit A, will govern the delivery services contemplated by this Agreement (the "Services") and constitute a legally binding agreement between Amazon Logistics, Inc. ("Amazon") and you. Any reference to this Agreement includes the Program Policies.  If there is a conflict between the Program Policies and any other section of this Agreement, the Program Policies will prevail.

**This Agreement updates and replaces any version of the Terms of Service you previously accepted.**  This Agreement takes effect on the earlier of the date on which you click "I agree and accept" in the box below or, if you accepted a prior version of the Terms of Service, the first date on which you provide Services after Amazon made this Agreement available in the "Legal Information" section of the Amazon Flex app and sent to your email address a hyperlink to this Agreement ("Effective Date").

**YOU AND AMAZON AGREE TO RESOLVE DISPUTES BETWEEN YOU AND AMAZON ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION.  YOU AND AMAZON WAIVE THE RIGHT TO PURSUE THE RESOLUTION OF ANY SUCH DISPUTE IN A COURT AND WAIVE THE RIGHT TO A TRIAL BY JURY.  If you previously opted-out of the dispute resolution provision in a prior version of the Terms of Service, then, to fullest extent permitted by law, you revoke, subject to the exclusions in Section 13, your prior decision to opt out and you agree to individual, binding arbitration by clicking "I agree and accept" in the box below or by providing any Services after the Effective Date.**

1. The Services.

a) You agree to provide the Services in a safe and competent manner in accordance with the level of professional care that would be observed by a prudent person rendering similar services and subject to the Service Standards described in the Program Policies. Failure to comply with the Service Standards will constitute a breach of this Agreement.

b) This Agreement requires no minimum amount or frequency of Services. You agree, however, that if you accept an offer to provide Services during a particular confirmed block and you do not cancel your acceptance as permitted under the Program Policies, you will deliver the parcels, packages, totes, bags or other deliverables tendered to you by Amazon or its designees ("Deliverables") during such period ("Delivery Block"). The Delivery Block starts when you receive Deliverables and ends at the time the last Deliverable is delivered or, if undeliverable, is returned as specified by Amazon.

App. 312

2. Independent Contractor Relationship.

This Agreement creates an independent contractor relationship, not an employment relationship. As such, you agree that this Agreement is not a contract of employment and is not evidence of an employment relationship. As an independent contractor of Amazon you are not required to purchase or rent any products, equipment or services from Amazon as a condition of entering into this Agreement. Nothing in this Agreement will create any partnership, joint venture, agency, franchise, or employment relationship between you and Amazon. As an independent contractor, you will not be considered as having the status of an employee of Amazon for any purpose, including federal, state, and local tax purposes, and you will not be required or entitled to participate in any employee benefit or other plans or arrangements in which employees of Amazon and its affiliates may participate. You are solely responsible for all taxes applicable to you, including, but not limited to, income and social security taxes. Amazon will not withhold taxes from fees paid to you, including taxes for unemployment insurance or workers' compensation benefits. You have no authority to bind Amazon, and you will not make any representation identifying yourself as an employee of Amazon or make any representations to any person or entity that you have any authority to bind Amazon as an employee, partner, or otherwise. This Agreement applies to each Delivery Block but there will be no relationship between the parties after the end of one Delivery Block and before the start of any subsequent Delivery Block.

3. Service Fees.

In consideration of providing Services in accordance with this Agreement and for providing your Vehicle, Amazon will pay you fees in the amounts indicated in the Amazon Flex app at the time of acceptance, or as otherwise agreed between you and Amazon from time to time ("Service Fees"). The Service Fees, unless otherwise expressly provided in this Agreement, will be your only fee for performing the Services. The Service Fees are intended to cover all amounts incurred by you for providing your Vehicle and the Services under this Agreement, including any expenses you may incur (such as costs of fuel, taxes, registration fees, permits of all types, and any other assessment, citation, fine, or fee imposed or assessed against your Vehicle or you by any applicable governmental authority or otherwise related to your equipment and its use). You understand that Amazon would offer lower Service Fees if Amazon had to pay separately for your expenses. Amazon will pay Service Fees to you no later than 15 days after completion of the Services. Depending on the location in which the Services are provided and the product or business to which the Services relate, Amazon's customers may be able to provide a tip in connection with the fulfillment of their orders and Amazon will pass through any tips payable to you.

4. Representations, Warranties, and Covenants.

You represent and warrant to Amazon that you have all legal capacity and authority to enter into, and perform your obligations under, this Agreement. You agree, at all times, to: (a) comply with all laws, rules, and regulations pertaining to the Services, including all laws, rules, and regulations applicable to (i) transportation, safety and insurance related to the performance of Services, (ii) health and safety of customers and the Deliverables and (iii) anti-bribery and anti-corruption; (b) hold and maintain, throughout your participation in the Program, all licenses, permits, and other authorizations necessary for you to perform the Services (including, if applicable, driver's license,

2

App. 313

vehicle registration, and automobile insurance), which you will provide to Amazon upon request; (c) notify Amazon immediately after becoming aware that any license, permit, or authorization required for you to perform the Services has expired, been lost or suspended; (d) provide complete and accurate responses to all questions related to the background screening, including questions on prior convictions; (e) notify Amazon immediately if you need to change or update your answers to any questions posed during the background screening process, including if you have any new convictions; (f) notify Amazon immediately of any event or circumstance that impairs the safety of or delays delivery of Deliverables; (g) comply with Amazon's Supplier Code of Conduct posted at   http://www.amazon.com/gp/help/customer/display.html?ie=UTF8&nodeId=200885140   and Amazon's safety policies related to Amazon's premises and Deliverables (collectively, "Amazon Safety Requirements"), and permit, as requested by Amazon from time to time, Amazon or its designee to audit your compliance with any Amazon Safety Requirements; (h) not violate or infringe any third party's rights in proprietary or confidential information in performing the Services; and (i) not create any lien on Amazon property or assets, including any Deliverables, and waive all rights to any lien. Throughout the term of this Agreement, you will provide Amazon with any forms, documents, or certifications as may be required for Amazon to verify representations and warranties you made in this Agreement or your compliance with any provision of this Agreement.

5. Equipment Used to Perform the Services.

a) You agree that, as part of managing your own business, you will provide and maintain a mobile device compatible with the Amazon Flex app, any vehicle identified by you within the Amazon Flex app ("Vehicle"), any bicycle or other non-motorized mode of transportation used to provide the Services, and any other equipment that you choose to use or that you need in order to provide the Services. Your identification of any Vehicle within the Amazon Flex app will be considered an acknowledgement of and receipt for equipment, as required by applicable law.

b) You agree that while actively performing the Services during a Delivery Block, your Vehicle is under an exclusive lease as defined under Federal Motor Carrier Safety Administration ("FMCSA") section 49 C.F.R. Part 376.12(c)(1), which requires exclusive possession, control and use by Amazon of both the Services and your Vehicle during that time. "Actively performing the Services" means that you are loading or unloading Deliverables, actively delivering Deliverables, specifically waiting to receive more Deliverables, or actively and directly on your way back to the delivery station with undeliverable or damaged Deliverables. For clarity, exclusive possession, control and use of your Vehicle by Amazon does not mean that you cede physical control or ownership of your Vehicle and the requirements of the FMCSA regulations do not affect your status as an independent contractor (49 C.F.R. 376.12(c)(4)).

App. 314

6. Term and Deactivation.

a) This Agreement is effective as of the Effective Date and will continue to be in effect until you or Amazon terminates this Agreement.

b) You may terminate this Agreement at any time and for any reason by giving Amazon a notice of termination in accordance with Section 14 below. You will not be eligible to participate in the Program for 12 months following the date of the termination notice.

c) Amazon may terminate this Agreement for the following reasons ("for cause") by giving you a notice of termination in accordance with Section 14 below: (i) for failure to meet Service Standards, (ii) for failing a background check any time before or after the Effective Date, (iii) material violation of the Program Policies, (iv) material breach of this Agreement, (v) if your Amazon.com account is deactivated; or (vi) for other commercially reasonable cause.

d) If you have been inactive for more than 180 days, Amazon may deactivate your account. If your account is deactivated for inactivity, you may apply to re-enroll in the Program.

e) If you opt out of receiving electronic communication (as defined in Section 14 below), your account will be deactivated. Subject to other provisions of this Agreement, you will be able to reactivate your account by notifying Amazon that you agree to receive electronic communication from Amazon.

f) Amazon may cease providing any Licensed Materials (as defined in Section 10 below) and terminate this Agreement if you violate any of the terms related to the Licensed Materials in which case any licenses granted to you by Amazon will terminate immediately, without any notice.

g) If either you or Amazon terminate this Agreement, you must uninstall the Amazon Flex application on your device.

7. Availability of the Services.

Amazon makes no promises or representations in this Agreement as to the amount of business that you can expect at any time. You can accept or reject any opportunity offered by Amazon. Nothing in this Agreement will prohibit you from providing Services or using your Vehicle on behalf of any other person or entity, including competitors of Amazon, except during any Delivery Block. Amazon may also engage the services of other companies and individuals that may perform the same or similar services as those provided by you under this Agreement.

8. Limitation of Liability.

Amazon will not be liable for damages of any kind, including direct damages, loss of goodwill, lost opportunities or profits, anticipated amount of business, expenditures, investments, leases, or commitments made by you in connection with the Program or otherwise. Except for your indemnity obligations under Section 9 below and any liability arising out of your breach of the section of the Program Policies entitled "Confidentiality and Personal Information," and except as

4

App. 315

indicated below, NEITHER PARTY WILL BE LIABLE UNDER ANY CIRCUMSTANCES FOR DIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, INCIDENTAL, OR INDIRECT DAMAGES OF ANY KIND, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER RELATED TO THIS AGREEMENT, LICENSED MATERIALS, THE PROGRAM OR THE SERVICES, AND WHETHER IN CONTRACT, STRICT LIABILITY OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE) EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. Nothing in this Agreement will limit or exclude either party's liability for any matter or individual remedy that may not be limited or excluded by applicable laws, rules, or regulations.

9. Indemnification.

a) You will defend, indemnify, and hold harmless Amazon and its affiliates and successors, and each of their respective directors, officers, and employees (each an "Indemnified Party" and, collectively, the "Indemnified Parties") from any third-party allegation or claim based on, or any loss, damage, settlement, cost, expense, and any other liability (including reasonable attorneys' fees and expenses) arising out of or in connection with, (a) your negligence, strict liability, or misconduct, (b) a breach of this Agreement by you, (c) any action or inaction by you (including any and all loss or damage to personal property or bodily harm (including death) relating to or arising out of any such action or inaction), or (d) any allegation or claim that you failed to comply with applicable laws, rules, or regulations.

b) Your duty to defend is independent of your duty to indemnify. You will use counsel reasonably satisfactory to the Indemnified Parties to defend each indemnified claim, and the Indemnified Parties will cooperate (at your expense) with you in the defense. If at any time the Indemnified Parties determine that they may be adversely affected by any indemnified claim, the Indemnified Parties may assume control of the defense of the claim. You will not consent to the entry of any judgment or enter into any settlement relating to an indemnified claim without the Indemnified Parties' prior written consent.

10. Licensed Materials.

As used in this Agreement, "Licensed Materials" means any software, application, website, content, or other information made available to you (whether standalone, for use on devices owned by you or Amazon, or otherwise) by Amazon or its affiliates in connection with the Program, together with any related manuals and other documentation. Amazon grants to you, during the term of this Agreement, a limited, non-exclusive, non-transferable, non-sublicensable, revocable license to use the Licensed Materials solely for the purpose of performing the Services and participating in the Program and as permitted under this Agreement. For additional rights and obligations regarding the Licensed Materials see the Program Policies.

App. 316

11. Dispute Resolution, Submission to Arbitration.

By clicking "I agree and accept" in the box below or by providing any Service after the Effective Date, you agree to each of the following terms:

a) THE PARTIES WILL RESOLVE BY FINAL AND BINDING ARBITRATION, RATHER THAN IN COURT OR TRIAL BY JURY, ANY DISPUTE OR CLAIM, WHETHER BASED ON CONTRACT, COMMON LAW, OR STATUTE, ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT, INCLUDING TERMINATION OF THIS AGREEMENT, TO YOUR PARTICIPATION IN THE PROGRAM, OR TO YOUR PERFORMANCE OF SERVICES. TO THE EXTENT PERMITTED BY LAW, THE PRECEDING SENTENCE APPLIES TO ANY DISPUTE OR CLAIM THAT OTHERWISE COULD BE ASSERTED BEFORE A GOVERNMENT ADMINISTRATIVE AGENCY.

b) TO THE EXTENT PERMITTED BY LAW, THE PARTIES AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS OR COLLECTIVE BASIS.

c) TO THE EXTENT PERMITTED BY LAW, THE PARTIES FURTHER AGREE THAT NO DISPUTE RESOLUTION PROCEEDING WILL BE CONDUCTED ON A REPRESENTATIVE BASIS.

d) TO THE EXTENT PERMITTED BY LAW, THE PARTIES WAIVE ANY RIGHT TO PARTICIPATE IN OR RECEIVE ANY RELIEF FROM ANY NON-INDIVIDUAL PROCEEDING REFERENCED ABOVE ANDTHIS AGREEMENT DOES NOT PROVIDE FOR, AND THE PARTIES DO NOT CONSENT TO, ARBITRATION ON A CLASS OR COLLECTIVE OR REPRESENTATIVE BASIS.

g) NO ARBITRATOR SELECTED TO ARBITRATE ANY DISPUTE BETWEEN THE PARTIES IS AUTHORIZED TO ARBITRATE ANY DISPUTE ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS.  FURTHER, NO ARBITRATOR IS AUTHORIZED TO CONSOLIDATE CLAIMS OF MORE THAN ONE INDIVIDUAL UNLESS ALL PARTIES EXPRESSLY AGREE IN WRITING TO ANY SUCH CONSOLIDATION.

h) THIS AGREEMENT SHALL NOT BE INTERPRETED AS REQUIRING EITHER PARTY TO ARBITRATE DISPUTES ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS, EVEN IF A COURT OR ARBITRATOR INVALIDATES OR MODIFIES OR DECLINES TO ENFORCE THIS AGREEMENT IN WHOLE OR IN PART.

i) AN AWARD IN ARBITRATION SHALL DETERMINE THE RIGHTS AND OBLIGATIONS BETWEEN THE NAMED PARTIES ONLY, AND ONLY IN RESPECT OF THE CLAIMS IN SUCH ARBITRATION, AND SHALL NOT HAVE ANY BEARING ON THE RIGHTS AND OBLIGATIONS OF ANY OTHER PERSON OR ON THE RESOLUTION OF ANY OTHER DISPUTE, OR HAVE PRECLUSIVE EFFECT AS TO ISSUES OR CLAIMS IN ANY OTHER DISPUTE.

j) You and Amazon agree that, at least 30 days before commencing an action pursuant to this Agreement that in any way relates to this Agreement or to the Services, the aggrieved party will provide the other party a notice of the aggrieved party's claims and at least 30 days in which to cure an alleged breach of this Agreement or other alleged act or omission, if the same is reasonably capable of being cured. Notice shall be provided as set forth in Section 14 of this Agreement. The applicable statute of limitations shall be tolled for 30 days following the provision of such notice.

k) A party demanding arbitration under this Agreement must file the demand with the American Arbitration Association (the "AAA") and deliver the demand to the other party by hand or by first-class mail within the applicable statute of limitations. Any demand for arbitration by you must be served on Amazon's registered agent, Corporation Service Company, at 300 Deschutes Way SW, Suite 304, Tumwater, WA 98051. The demand must be in writing and describe each claim of the demanding party.   The arbitration will be conducted by the AAA under its **Commercial Arbitration Rules and Mediation Procedures** in effect at the time of filing the demand for arbitration, provided that none of the AAA's expedited procedures will apply to the arbitration unless you and Amazon mutually agree in writing, after the demand has been filed, to the application of such procedure. The AAA's rules are available at www.adr.org. If the AAA's rules are inconsistent with this Agreement, this Agreement will govern. Payment of all filing, administration, and arbitrator fees will be governed by the AAA's rules, except that if you initiate the arbitration, you will pay for only the first US $200 of the total AAA filing fee. For example, if the AAA filing fee is US $180 you will be responsible for paying the entire AAA filing fee in that instance. But, if the AAA filing fee is US $570 you will be responsible for paying US $200 and Amazon will pay the difference (US $370 in this instance). Amazon also will pay all other costs and expenses unique to arbitration, including the arbitrator's fees. The arbitration will take place at a mutually-convenient location within 45 miles from the last location in which you provided Services, or at another mutually-convenient location, or at any location ordered by a court with personal jurisdiction over you and Amazon.

l) Notwithstanding any provision in the AAA rules, the parties agree that a court of law must resolve any dispute concerning the validity and enforceability of the Agreement, the applicability of any exemption to the Federal Arbitration Act, and the validity, enforceability or interpretation of the provisions in subsections b) through i) of this Section 11.  The arbitrator must resolve all other disputes, including the arbitrability of claims pursuant to such other provisions.

m)  If you assert a claim against Amazon that is not subject to individual arbitration pursuant to this Section 11, and there is then pending or later filed any claim against Amazon asserted by you or on your behalf that is subject to individual arbitration, then you agree and consent that any claim not subject to individual arbitration must be stayed until the resolution of such other claim in arbitration, unless such stay is contrary to applicable law.

12. Governing Law.

The interpretation of this Agreement is governed by the law of the state of Delaware without regard to its conflict of laws principles, except for Section 11 of this Agreement, which is governed by the Federal Arbitration Act and applicable federal law.  If, for any reason, the Federal Arbitration Act is held by a court of competent jurisdiction not to apply to Section 11 of this Agreement, the

App. 318

law of the state of Delaware will govern Section 11 of this Agreement, including without limitation the common law of contracts of such state if any statute could be interpreted to limit the right of Amazon or you to arbitrate pursuant to Section 11 of this Agreement.

13. Modifications.

Amazon may modify this Agreement, including the Program Policies, at any time by providing notice to you through the Amazon Flex app or otherwise providing notice to you. You are responsible for reviewing this Agreement regularly to stay informed of any modifications. If you continue to perform the Services or access Licensed Materials (except for accessing the Amazon Flex app for the purpose of considering whether to agree to modifications of the Terms of Service) after the effective date of any modification to this Agreement, you agree to be bound by such modifications. However, (i) any modification to Service Fees will be provided to you in writing or through the Amazon Flex app before you accept and complete any Delivery Blocks to which such modifications apply; (ii) any modifications to Section 11 will not apply to claims or disputes filed by you on or before the Effective Date; and (iii) if you previously opted-out of the dispute resolution provision in a prior version of the Terms of Service, any modifications to Section 11 that eliminate your right to opt out of the dispute resolution provision will not affect any right you may have to participate in a court action previously filed on your own behalf or as a member of a putative or certified class, collective or representative action that was filed on or before, and was pending on, the Effective Date.

14. Notice; Electronic/Mobile Communications.

Amazon will communicate with you via phone, text message, email, or push notifications sent via the Amazon Flex app (each such communication, "electronic communication") in connection with your participation in the Program. By downloading the Amazon Flex app, providing us with your mobile number, and agreeing to this Agreement, you are providing us with written consent to receive push notifications and automated text messages from Amazon in connection with the Program. To stop receiving push notifications, you may adjust the settings on your phone or delete the Amazon Flex app. You will not be able to participate in the Program if you adjust the settings or delete the Amazon Flex app. To stop receiving text messages from Amazon, reply STOP to any message. You consent to Amazon communicating with you concerning the Program via any or all of these means and you are responsible for printing, storing, and maintaining your own records of any such agreements, notices, disclosures or other communications. Standard messaging and data rates may apply. It is your responsibility to keep your email address and phone number current by updating the information you provided to Amazon. Terminating this Agreement will stop all electronic communication. If you want to terminate this Agreement, you can provide a notice of termination to Amazon by sending a message to the following email address: amazonflex-support@amazon.com. If you want to provide notice under this Agreement, other than the notice of termination, you can provide such notice by sending a message to the following email address: amazonflex-support@amazon.com.

8

15. Documents.

You may obtain an e-mailed copy of this Agreement by e-mailing a request to amazonflex-support@amazon.com. This Agreement will be accessible to you at any time in the Amazon Flex app.

16. Entire Agreement and Severability; Survival.

a) This Agreement constitutes the complete and final agreement of the parties pertaining to the Services and supersedes and replaces the parties' prior agreements, understandings, representations, and discussions (whether written or oral) relating to the Services. If any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the fullest extent permissible under applicable law.

b) The following sections of this Agreement, along with any other provisions that by their nature should survive termination of this Agreement, will survive any termination or expiration of this Agreement: Term and Termination; Indemnification; Limitation of Liability; Dispute Resolution, Submission to Arbitration, Governing Law and the following sections of the Program Policies: Confidentiality and Personal Information; Taxes; and Miscellaneous.

17. Knowing and Voluntary Agreement.

You acknowledge and agree that you are entering into this Agreement voluntarily and without any duress or undue influence by Amazon or anyone else.  Further, you confirm that you carefully read this Agreement, asked any questions needed for you to understand this Agreement, and you fully understand the terms, consequences, and binding effect of this Agreement, including that you are waiving the right to go to court, to a jury trial and to proceed on a class, collective or representative basis.  Finally, you agree that you have had an opportunity to seek the advice of an attorney before agreeing to and accepting this Agreement and that you have done so or you knowingly and voluntarily decided not to seek such advice.

App. 320

**EXHIBIT A**
**AMAZON FLEX PROGRAM POLICIES**

I. Welcome To Amazon Flex.

Welcome to Amazon Flex, an innovative new service offering you the opportunity to deliver packages to Amazon customers.  Amazon is excited to welcome you to the Amazon Flex program and hope that you enjoy being your own boss and running your own business by using the Amazon Flex app.

II. Program Requirements.

A. In order to participate in the Program, you must:
1. Pass a background check and, if applicable, a motor vehicle record check in accordance with Amazon's standards;
2. Be at least 21 years of age;
3. Be legally qualified to work in each jurisdiction in which you provide Services;
4. Have the ability to effectively operate the Amazon Flex app and communicate with customers; and
5. Install the Amazon Flex app on your smartphone.

B. In performing Services, you may use:
1. Non-motorized transportation (e.g., walking, cycling);
2. Following Vehicles:
◦a private passenger vehicle,
◦a cargo van (not to exceed 10,000 lbs. in gross vehicle weight rating),
◦a light truck (not to exceed 10,000 lbs. in gross vehicle weight rating); or
3. Public Transportation.

If you are required to advise Amazon of the mode of delivery that you intend to use to deliver specified Deliverables, you agree to use only that mode of delivery to deliver those Deliverables.

C. If you operate any Vehicle in connection with your performance of Services, you must:
1. Have a current valid driver's license,
2. If applicable, maintain current Vehicle registration,
3. Maintain current automobile insurance coverage required by applicable laws, rules, and regulations to operate such Vehicle; and
4. Be legally authorized and fit to operate such Vehicle.
5. Upon request, you will provide Amazon with proof that these requirements have been satisfied.
6. All Vehicles must be registered and must have passed all applicable local, state and federal standards for safety and environmental compliance.
7. You are not permitted to carry weapons while performing Services, except to the extent local applicable law places restrictions on this policy.
8. You will not provide Services if you are currently an Amazon employee and you will cease providing Services if you become an Amazon employee.

10

App. 321

III. Service Standards.

A. As an independent contractor, you agree to provide results—the timely and effective delivery of undamaged parcels, bags, totes or other items to the customers' and Amazon's satisfaction-- subject to the following standards ("Service Standards"):

1) Safety
 i. Failure to comply with health, safety, & other applicable laws. Amazon requires you to comply with all traffic (including observing speed limit laws and distracted driving laws), health, safety, and other laws applicable to Deliverables or Services. Violation of traffic, health, safety, and other laws applicable to Deliverables or Services will make you ineligible to participate in the Program. The "Safety Reminder" video available in the "Videos" section of the Amazon Flex app contains important information for your safety and awareness.  You agree and confirm that you will not provide the Services unless and until (a) you have viewed and fully understood the contents of this video, or (b) you have received hazardous materials training in the past three years that satisfies the Hazardous Materials Regulations (49 CFR 172.704), and you have, or can obtain upon your request, records confirming the same
2) Reliability
 i. Arriving on time for or timely forfeiting Delivery Blocks. As with any vendor of services, Amazon expects that you a) be ready to timely provide Services for any confirmed Delivery Block or b) forfeit a Delivery Block at least 45 minutes before the start of such Delivery Block. Please note that if you select a Delivery Block close to its start time (i.e. 20 minutes before the start of the Delivery Block), you will still be expected to timely complete your Delivery Block. If you repeatedly arrive after the schedule time to receive packages or forfeit Delivery Blocks late, you will no longer be eligible to participate in the Program.

3) Delivery Quality
 i. Late Deliveries. Amazon expects that you deliver the packages to the customers on time. The app will specify the delivery window during which the customer expects the package to be delivered. If you repeatedly deliver packages late, you will no longer be eligible to participate in the Program.

ii. Packages marked as delivered that the customer does not receive. If you deliver a package, Amazon expects that the customer will be able to find it. If customers repeatedly report that they cannot find packages you marked as delivered, you will no longer be eligible to participate in the Program.

iii. Delivery not attempted or undeliverable packages not returned to Amazon timely. Amazon expects that you will deliver all the packages you picked up as part of your Delivery Block. In an instance where delivery is not possible, you are expected to return all packages to the Amazon delivery station, unless otherwise directed by Amazon. If you repeatedly do not attempt to deliver all the packages you picked up during a Delivery Block or you do not return the undeliverable packages to a location specified by Amazon, you will no longer be eligible to participate in the Program.

4) Customer Service

 i. Rude or inappropriate behavior. Amazon expects you to behave respectfully and professionally when interacting with its customers, station operators, merchants and other delivery partners while providing the Services. If customers, station operators, merchants or other delivery partners repeatedly report disrespectful, rude, inappropriate, unprofessional, dangerous or threatening conduct, you will no longer be eligible to participate in the Program. Additionally, a single violation, depending on the seriousness of the infraction, can make you ineligible to participate in the Program.

ii. Failure to follow delivery instructions. Amazon expects you to follow customer delivery instructions as reflected in the app as long as the customer instructions are reasonable and do not conflict with health, safety and other applicable laws. Amazon expects you to perform the Services consistent with industry standards, including with respect to health and safety, always checking recipient IDs when delivering alcohol and collecting a signature when instructed to do so in the app. If you repeatedly disregard the instructions, you will no longer be eligible to participate in the Program.

B. As an independent contractor, subject only to this Agreement, it is for you to decide the means and manner in which to provide the Services and achieve the results that you have agreed to provide. Therefore, in performing Services, you are free to map out your own routes, sequence your deliveries and in every other way control the means and manner in which you deliver Deliverables.

IV. Program Account.

A. Amazon will use information provided by you to create or maintain your user account for the Program ("Program Account"). You will provide accurate, current, and complete information as part of your contracting process and to update your information as necessary so that it remains accurate, current, and complete at all times.

B. You will not permit any other person to access your Program Account or the Licensed Materials, including the Amazon Flex App, or to perform any Services using your identity or log-in credentials. You will not use any other person's access to Program Account or Licensed Materials, including the Amazon Flex App, or perform any Services using any other person's identity or log-in credentials. You will keep secure and confidential any password required to access your Program Account or Amazon Flex App or any identification that Amazon provides to you in connection with the Program or Amazon Flex App and you agree to accept responsibility for all activities that occur under your Program Account and associated password.

V. Insurance.

A. If you operate any motor vehicle(s) in connection with your performance of the Services, you will maintain, at your expense, personal automobile insurance coverage required by applicable laws, rules, and regulations to operate such vehicle(s). You will provide proof of such insurance coverage to Amazon, upon request. You will notify Amazon if your insurance coverage is cancelled. Your personal automobile insurance policy may not cover commercial activity. As an

12

independent contractor, it is your responsibility to understand the terms of your personal insurance coverage and to contact your personal insurance company if you have any questions.

B. Where allowed by state and federal regulations, Amazon maintains, pursuant to FMCSA regulations, a commercial automobile insurance policy ("Amazon Insurance Coverage") that is intended to provide third-party bodily injury and property damage coverage, uninsured/under-insured motorist coverage, and comprehensive/collision coverage contingent on your personal insurance policy coverage, while actively performing the Services during the Delivery Block, in each case subject to Amazon Insurance Coverage deductibles and coverage limitations. If you maintain commercial automobile insurance coverage applicable to your operation of a Vehicle, your provider will provide primary coverage for you at all times, including during the Delivery Block and Amazon Insurance Coverage will be, only in those geographies where state and federal regulations allow, excess over your commercial automobile insurance. The above description of Amazon Insurance Coverage is a summary only, and if there is a conflict between the above description and the actual terms of the Amazon Insurance Policy, the actual terms of the Amazon Insurance Policy will dictate coverage. You will notify Amazon immediately of any accident or other on-road incident that occurs while you are providing Services during the Delivery Block and you will cooperate with Amazon and the applicable insurance company in the investigation of such accident or on-road incident. Amazon Insurance Coverage will in no way affect your indemnity obligations to Amazon as provided for in the Agreement. Amazon Insurance Coverage limits are available upon request.

VI. Privacy.

A. Amazon receives and stores any information you enter on our website and mobile applications, while providing Services or participating in the Program, and through other interactions and communications you have with us, our mobile application or our website. Any of the Licensed Materials may provide Amazon with data about your use of such Licensed Materials, your geo-location and related tracking data, including your location, movements, speed at which you are traveling, and other personally identifiable information. Amazon may use any such information and share such information with third parties in connection with the Program or other products or services, including Services, offered by Amazon or its affiliates. By submitting information to Amazon during the contracting process or while providing Services and using any Licensed Materials, you expressly (i) consent to Amazon collecting, using and sharing the above described data and information and (ii) waive and release Amazon from any and all claims, causes of action, liability or damages arising out of or in any way related to Amazon's use of such data and information.

B. Amazon may obtain information about you, including your motor vehicle record and results of your background check. You authorize Amazon and its applicable service provider(s) to, from time to time, (i) perform a background check on you and (ii) obtain your motor vehicle record. Based on a review by Amazon or its service provider of the results of your background check and motor vehicle record, Amazon may immediately terminate this Agreement.

C. Subject to applicable laws, Amazon may release any collected data and information, including personally identifiable information, when Amazon believes such release is appropriate or

necessary to (i) comply with the law; (ii) enforce or apply this Agreement, including Program Policies; (iii) protect the rights, property, security or safety of Amazon, its affiliates, Amazon's customers, or others; (iv) detect, prevent or otherwise address fraud, security or technical issues; or (v) prevent or stop activity which Amazon considers to be, or to pose a risk of becoming, illegal, unethical, or legally actionable. Amazon may also receive information you shared with third parties, provided that such party has obtained necessary permissions to share the information with Amazon.

D. When you download or use apps created by Amazon or its affiliates, Amazon will receive information about your location, and your mobile device, including a unique identifier for your device. Most mobile devices provide you with information about these permissions. You have the right to choose whether or not to allow Amazon to receive this information. However, our ability to receive this information is an important part of the performance of Services, so if you choose to deny Amazon access to this information, this could affect the availability and functionality of the Amazon Flex App and your participation in the Program.

E. As a condition of delivering Amazon packages using the Amazon delivery application, you consent to allow Amazon to verify your identity and share your photo with Amazon customers for identification purposes from time to time.  Amazon may derive from your photo a facial scan or similar biometric identifier ("Biometric Information"), and collect, store, and use Biometric Information from your submitted photos (including your photos Amazon already has on file), driver's license, or government-issued ID. You also agree to Amazon's Photo Use and Biometric Information Retention Policy, which can be found below:

**Photos Use and Biometric Information Retention Policy**

Amazon uses your submitted photos (including your photos that we already have on file), driver's license, or government-issued ID for identification purposes. This can include making sure it's you who is doing the delivery and using your photo to identify you to customers and Amazon personnel. The photo is also used on your in-app ID card. Amazon will retain your photos while you use the Amazon delivery application and thereafter for so long as permitted by law or until you request that Amazon delete your photo. You may request deletion of your photo by contacting support, but deleting your photo will block your access to the Amazon delivery application until you replace it and it is checked for validity.

Amazon requires that users of the Amazon delivery application provide a photo for identification purposes. Amazon may derive from your photo a facial scan or similar biometric identifier, ("Biometric Information").  This policy governs our retention of users' Biometric Information. Amazon retains a user's Biometric Information for up to 30 days after it is generated.  Thereafter, Amazon will promptly delete the Biometric Information. Note that this means Amazon may need to retain your Biometric Information after you stop using the Amazon delivery application for purposes of ongoing fraud detection and investigation.

14

VII. Licensed Materials; Devices.

A. You may not (i) incorporate any portion of the Licensed Materials into your own works or compile any portion of it in combination with your own works, transfer it, in whole or in part, for use with another service, or sell, rent, distribute, copy, modify, adapt, translate, reverse engineer, decompile, or disassemble, or make derivative works based on, or manipulate the Licensed Materials or any part of the Licensed Materials or otherwise sublicense or assign any rights to the Licensed Materials in whole or in part, (ii) cause or launch any programs or scripts for the purpose of surveying, manipulating or data mining any portion of the Licensed Materials or impairing or unduly affecting the operation or functionality of any aspect of the Licensed Materials; or (iii) attempt to gain unauthorized access to any portion of the Licensed Materials, including through scripts or third party applications.

B. Additional third party terms contained within or distributed with certain Licensed Materials may apply to the Licensed Materials (or software incorporated with the Licensed Materials) and will govern the use of such software in the event of a conflict with this Agreement ("Third Party Software"). Such Third Party Software license terms will apply to the corresponding Third Party Software in lieu of this Agreement. For more information on Third Party Software, refer to the Additional Terms in the Amazon Flex app, which can be accessed via Home > Account > View Legal Information > Additional Terms.

C. All rights not expressly granted to you in this Agreement are reserved and retained by Amazon or other content providers. You may not frame or utilize framing techniques to enclose any trademark, logo, or other proprietary information (including images, text, page layout, or form) of Amazon without express written consent. You may not use any meta tags or any other "hidden text" utilizing Amazon's name or trademarks without the express written consent of Amazon. You may use the Licensed Materials only as permitted by law.

D. You will not attempt to participate or participate in the Program, or provide any Services, for the purpose of gathering information regarding the Program (including any Licensed Materials) or Amazon's processes, building or operating a competitive service or a service that uses similar ideas, features, or functions as the Program (including any Licensed Materials), or copying any idea, feature, or function of the Program (including any Licensed Materials).

E. When you use the Licensed Materials, you may also be using the services of one or more third parties, such as a wireless carrier or a mobile platform provider. Your use of these third party services may be subject to the separate policies, terms of use, and fees of these third parties.

F. Amazon may offer automatic or manual updates to the Licensed Materials at any time and without notice to you.

G. You must comply with all export and re-export restrictions and regulations of the Department of Commerce and other United States agencies and authorities that may apply to the Licensed Materials and agree not to transfer, or encourage, assist, or authorize the transfer of Licensed Materials to a prohibited country or otherwise in violation of any applicable restrictions or regulations.

15

App. 326

H. You will notify Amazon immediately after becoming aware that any device on which any Licensed Materials are installed has been lost, stolen, or misplaced. If Amazon provides you with any device or other equipment in connection with the Program and such device or other equipment (or any part of it) is lost, stolen, unreturned, damaged, sold, transferred, or encumbered without the express prior written consent of Amazon, you will promptly pay Amazon the full replacement cost of such device or other equipment, together with any incidental costs that are incurred by Amazon to replace the same.

I. AMAZON LICENSES THE LICENSED MATERIALS TO YOU "AS IS" AND MAKES NO WARRANTIES OF ANY KIND REGARDING THE LICENSED MATERIALS. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AMAZON EXPRESSLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT, TITLE, OR FITNESS FOR A PARTICULAR PURPOSE. AMAZON DOES NOT WARRANT THAT THE LICENSED MATERIALS WILL MEET YOUR REQUIREMENTS OR WILL OPERATE UNINTERRUPTED, ERROR FREE, OR PROVIDE ACCURATE, COMPLETE, OR UP-TO-DATE INFORMATION. AMAZON WILL NOT BE RESPONSIBLE FOR ANY LOSS, DAMAGE, OR CLAIM CAUSED BY OR ATTRIBUTABLE TO ANY DEFECT OR DEFICIENCY IN ANY LICENSED MATERIALS.

J. If you provide any suggestions, comments, ideas, improvements, or other feedback relating to the Program, Program Policies or the Licensed Materials to Amazon, you assign to Amazon all right, title and interest in and to the same and will provide any assistance Amazon may require to document, perfect, and maintain these rights, and Amazon will be free to use, disclose, reproduce, modify, license, transfer, and otherwise distribute and exploit any of the foregoing.

K. All content included in or made available through Licensed Materials or the Program such as text, graphics, logos, button icons, images, audio clips, digital downloads, data compilations, and software is the property of Amazon or its content suppliers and protected by United States and international copyright laws. The compilation of all content included in or made available through any Licensed Materials or the Program is the exclusive property of Amazon and protected by U.S. and international copyright laws.

L. Graphics, logos, page headers, button icons, scripts, and service names included in or made available through any Licensed Materials or the Program are trademarks or trade dress of Amazon in the U.S. and other countries. All other trademarks not owned by Amazon that appear in the Licensed Materials or the Program are the property of their respective owners, who may or may not be affiliated with, connected to, or sponsored by Amazon.

VIII. Confidentiality and Personal Information.

A. You will use all personally identifiable information (i) concerning Amazon's customers, including names and addresses and (ii) provided to you or learned by you during performance of Services (collectively, "Personal Information"), solely for the purpose of providing Services using the Amazon Flex app and will not contact Amazon's customers using Personal Information for any

reason unless directly related to providing Services. You will comply with all instructions Amazon provides in respect of the processing of Personal Information, and you will maintain appropriate security measures to prevent unauthorized use or disclosure of Personal Information and will keep confidential and not share Personal Information with any third party unless expressly permitted under this Agreement. You will return all Personal Information to Amazon promptly following a request from Amazon. As between you and Amazon, all Personal Information is and will remain the exclusive property of Amazon, and you will not disclose, share, transfer, rent, barter, trade, or sell Personal Information and will not develop lists of or aggregate Personal Information. For the avoidance of doubt, the contents of Deliverables tendered by Amazon to you are Personal Information.

B. If you are required by any governmental authority to disclose the contents of any Deliverable, you will promptly notify Amazon of such requirement. Amazon will not provide any Personal Information in connection with any disputes or claims between you and Amazon's customers, nor will any Amazon customers be contacted or called to testify, by either you or Amazon, in connection with any dispute or claim between you and Amazon.

C. Without the prior written authorization by a Vice President of Amazon, you will not use any trade name, trademark, service mark, trade dress, logo or commercial symbol, or any other proprietary rights of Amazon or any of its affiliates in any manner (including use in any client list, press release, advertisement, or other promotional material).

IX. Taxes.

Each party will be responsible, as required under applicable law, for identifying and paying all taxes and other governmental fees and charges (and any penalties, interest, and other additions thereto) that are imposed on that party upon or with respect to the transactions and payments under this Agreement. Amazon may deduct or withhold any taxes that Amazon may be legally obligated to deduct or withhold from any amounts payable to you under this Agreement, and payment to you as reduced by such deductions or withholdings will constitute full payment and settlement to you of amounts payable under this Agreement. Throughout the term of this Agreement, you will provide Amazon with any forms, documents, or certifications as may be required for Amazon to satisfy any information reporting or withholding tax obligations with respect to any payments under this Agreement.

X. Additional Terms.

A. A party does not waive any right under any provision of this Agreement, including Program Policies, by failing to insist on compliance with, or by failing to exercise any right under, the applicable provision. Any waivers granted under this Agreement are effective only if recorded in a writing signed by the party granting such waiver. The section headings of this Agreement, including Program Policies, are for convenience only and have no interpretive value.

B. You will not assign, subcontract, or delegate any of your rights or obligations under this Agreement, or your Program Account, without Amazon's prior written consent. Any attempt by you to assign, subcontract, or delegate in violation of this Agreement will be null and void.

App. 328

# Exhibit C

AMAZON FLEX

INDEPENDENT CONTRACTOR TERMS OF SERVICE

Welcome to the Amazon Flex program (the "**Program**"). These Terms of Service (this "**Agreement**"), including the Program Policies, attached at Exhibit A, govern the transportation, delivery and related services contemplated by this Agreement (the "**Services**") and constitute a binding agreement between Amazon Logistics, Inc. ("**Amazon**") and you. Any reference to this Agreement includes the Program Policies. If there is a conflict between the Program Policies and any other section of this Agreement, the Program Policies prevail.

**YOU AND AMAZON AGREE TO RESOLVE DISPUTES BETWEEN YOU AND AMAZON ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION. YOU AND AMAZON WAIVE THE RIGHT TO PURSUE THE RESOLUTION OF ANY SUCH DISPUTE IN A COURT AND WAIVE THE RIGHT TO A TRIAL BY JURY. If you previously opted-out of the dispute resolution provision in a prior version of the Terms of Service, then, to fullest extent permitted by law, you revoke, subject to the exclusions in Section 13, your prior decision to opt out and you agree to individual, binding arbitration by clicking "I agree and accept" in the box below or by providing any Services after the Effective Date.**

**This Agreement updates and replaces any version of the Terms of Service you previously accepted.** This Agreement takes effect on the earlier of the date on which you click "I agree and accept" in the box below or, if you accepted a prior version of the Terms of Service and continue to use the Amazon Flex app, 14 calendar days after Amazon made this Agreement available in the "Legal Information" section of the Amazon Flex app or sent you notice of it to your email address("**Effective Date**").

**1. The Services.**

a) You agree to provide the Services in a safe and competent manner in accordance with the level of professional care that would be observed by a prudent person rendering similar services and subject to the Service Standards described in the Program Policies. Failure to comply with the Service Standards will constitute a breach of this Agreement.

b) This Agreement requires no minimum amount or frequency of Services. A "Delivery Block" is the block of time, scheduled to begin and end as specified in the Amazon Flex app, for delivering the parcels, packages, totes, bags or other deliverables tendered to you by Amazon or its designees, or otherwise made available to you for pick-up ("Deliverables"). Unless you cancel a scheduled Delivery Block as permitted under the Program Policies, you will arrive on-time to deliver the assigned Deliverables during the Delivery Block.

**2. Independent Contractor Relationship.**

This Agreement creates an independent contractor relationship, not an employment relationship. As such, you agree that this Agreement is not a contract of employment, does not involve

conditions of employment, and is not evidence of an employment relationship. As an independent contractor of Amazon you are not required to purchase or rent any products, equipment or services from Amazon as a condition of entering into this Agreement. Nothing in this Agreement will create any partnership, joint venture, agency, franchise, or employment relationship between you and Amazon. As an independent contractor, you will not be considered as having the status of an employee of Amazon for any purpose, including federal, state, and local tax purposes, and you will not be required or entitled to participate in any employee benefit or other plans or arrangements in which employees of Amazon and its affiliates may participate. You are solely responsible for all taxes applicable to you, including, but not limited to, income and social security taxes. Amazon will not withhold taxes from fees paid to you, including taxes for unemployment insurance or workers' compensation benefits. You have no authority to bind Amazon, and you will not make any representation identifying yourself as an employee of Amazon or make any representations to any person or entity that you have any authority to bind Amazon as an employee, partner, or otherwise. This Agreement applies while you are actively performing the Services. "Actively performing the Services" means that you are loading or unloading Deliverables, actively delivering Deliverables, waiting to receive more Deliverables during a Delivery Block, or actively and directly on your way back to the delivery station with undeliverable or damaged Deliverables. You will not be engaged to provide Services between the time you are no longer actively performing the Services in connection with one Delivery Block and before the start of any subsequent Delivery Block.

**3. Service Fees.**

In consideration of providing Services in accordance with this Agreement and for providing your Vehicle, Amazon will pay you fees in the amounts indicated in the Amazon Flex app at the time of acceptance, or as otherwise agreed between you and Amazon from time to time ("Service Fees"). The Service Fees, unless otherwise expressly provided in this Agreement, will be your only fee for performing the Services. Unless otherwise indicated by Amazon, the Service Fees are intended to cover all amounts incurred by you for providing your Vehicle and the Services under this Agreement, including any expenses you may incur (such as costs of fuel, taxes, registration fees, permits of all types, and any other assessment, citation, fine, or fee imposed or assessed against your Vehicle or you by any applicable governmental authority or otherwise related to your equipment and its use). You understand that Amazon would offer lower Service Fees if Amazon had to pay separately for your expenses. Amazon will pay Service Fees to you no later than 15 days after completion of the Services. Depending on the location in which the Services are provided and the product or business to which the Services relate, Amazon's customers may be able to provide a tip in connection with the fulfillment of their orders and Amazon will pass through any tips payable to you.

**4. Representations, Warranties, and Covenants.**

You represent and warrant to Amazon that you have all legal capacity and authority to enter into, and perform your obligations under, this Agreement. You agree, at all times, to: (a) comply with all laws, rules, and regulations pertaining to the Services, including all laws, rules, and regulations applicable to (i) transportation, safety and insurance related to the performance of Services, (ii) health and safety of customers and the Deliverables and (iii) anti-bribery and anti-

corruption; (b) hold and maintain, throughout your participation in the Program, all licenses, permits, and other authorizations necessary for you to perform the Services (including, if applicable, driver's license, vehicle registration, and automobile insurance), which you will provide to Amazon upon request; (c) notify Amazon immediately after becoming aware that any license, permit, or authorization required for you to perform the Services has expired, been lost or suspended; (d) provide complete and accurate responses to all questions related to the background screening, including questions on prior convictions; (e) notify Amazon immediately if you need to change or update your answers to any questions posed during the background screening process, including if you have any new convictions; (f) notify Amazon immediately of any event or circumstance that impairs the safety of or delays delivery of Deliverables; (g) comply with Amazon's Supply Chain Standards posted at **http://www.amazon.com/gp/help/customer/display.html?ie=UTF8&nodeId=200885140** and Amazon's safety policies related to Amazon's premises and Deliverables (collectively, "Amazon Safety Requirements"), and permit, as requested by Amazon from time to time, Amazon or its designee to audit your compliance with any Amazon Safety Requirements; (h) not violate or infringe any third party's rights in proprietary or confidential information in performing the Services; (i) provide a photo of yourself during onboarding according to Amazon's instructions and comply with identity verification processes while on Amazon property or providing Services; and (j) not create any lien on Amazon property or assets, including any Deliverables, and waive all rights to any lien. Throughout the term of this Agreement, you will provide Amazon with any forms, documents, or certifications as may be required for Amazon to verify representations and warranties you made in this Agreement or your compliance with any provision of this Agreement.

## 5. Equipment Used to Perform the Services.

a) You agree that, as part of managing your own business, you will provide and maintain a mobile device compatible with the Amazon Flex app, any vehicle identified by you within the Amazon Flex app ("Vehicle"), any bicycle or other non-motorized mode of transportation used to provide the Services, and any other equipment that you choose to use or that you need in order to provide the Services. Your identification of any Vehicle within the Amazon Flex app will be considered an acknowledgement of and receipt for equipment, as required by applicable law.

b) You agree that while actively performing the Services, your Vehicle is under an exclusive lease as defined under Federal Motor Carrier Safety Administration ("FMCSA") section 49 C.F.R. Part 376.12(c)(1), which requires exclusive possession, control and use by Amazon of both the Services and your Vehicle during that time. For clarity, exclusive possession, control and use of your Vehicle by Amazon does not mean that you cede physical control or ownership of your Vehicle and the requirements of the FMCSA regulations do not affect your status as an independent contractor (49 C.F.R. 376.12(c)(4)).

## 6. Term and Deactivation.

a) This Agreement is effective as of the Effective Date and will continue to be in effect until you or Amazon terminates this Agreement.

App. 332

b) You may terminate this Agreement at any time and for any reason by giving Amazon a notice of termination in accordance with Section 14 below. You will not be eligible to participate in the Program for 12 months following the date of the termination notice.

c) Amazon may terminate this Agreement for the following reasons ("for cause") by giving you a notice of termination in accordance with Section 14 below: (i) for failure to meet any of the Service Standards, (ii) for failing or refusing a background check or identity verification check, or for providing false or incomplete information any time before or after the Effective Date, (iii) for material violation of the Program Policies or any other policy provided to you by Amazon, (iv) for material breach of this Agreement, (v) if your Amazon.com account is deactivated; (vi) for misuse of the Amazon Flex app, including incidents of fraud or theft or (vii) for other commercially reasonable cause. You may appeal a for cause termination of this Agreement by sending an email notice to Amazon in the manner specified by Amazon within 10 days of receiving the contract termination notice.

d) If you have been inactive for more than 180 days, Amazon may deactivate your account. If your account is deactivated for inactivity, you may apply to re-enroll in the Program.

e) If you opt out of receiving electronic communication (as defined in Section 14 below), your account will be deactivated. Subject to other provisions of this Agreement, you will be able to reactivate your account by notifying Amazon that you agree to receive electronic communication from Amazon.

f) Amazon may cease providing any Licensed Materials (as defined in Section 10 below) and terminate this Agreement for cause immediately without any notice if you violate any of the terms related to the Licensed Materials in which case any licenses granted to you by Amazon will terminate immediately, without any notice.

g) If either you or Amazon terminate this Agreement, you must uninstall the Amazon Flex application on your device.

## 7. Availability of the Services.

Amazon makes no promises or representations in this Agreement as to the amount of business that you can expect at any time. You can accept or reject any opportunity offered by Amazon. Nothing in this Agreement will prohibit you from providing Services or using your Vehicle on behalf of any other person or entity, including competitors of Amazon, except while you are actively performing the Services. Amazon may also engage the services of other companies and individuals that may perform the same or similar services as those provided by you under this Agreement.

## 8. Limitation of Liability.

Amazon will not be liable for damages of any kind, including direct damages, loss of goodwill, lost opportunities or profits, anticipated amount of business, expenditures, investments, leases, or commitments made by you in connection with the Program or otherwise. Except for your

App. 333

indemnity obligations under Section 9 below and any liability arising out of your breach of the section of the Program Policies entitled "Confidentiality and Personal Information," and except as indicated below, NEITHER PARTY WILL BE LIABLE UNDER ANY CIRCUMSTANCES FOR DIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, INCIDENTAL, OR INDIRECT DAMAGES OF ANY KIND, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER RELATED TO THIS AGREEMENT, LICENSED MATERIALS, THE PROGRAM OR THE SERVICES, AND WHETHER IN CONTRACT, STRICT LIABILITY OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE) EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. Nothing in this Agreement will limit or exclude either party's liability for any matter or individual remedy that may not be limited or excluded by applicable laws, rules, or regulations.

### 9. Indemnification.

a) You will defend, indemnify, and hold harmless Amazon and its affiliates and successors, and each of their respective directors, officers, and employees (each an "Indemnified Party" and, collectively, the "Indemnified Parties") from any third-party allegation or claim based on, or any loss, damage, settlement, cost, expense, and any other liability (including reasonable attorneys' fees and expenses) arising out of or in connection with, (a) your negligence, strict liability, or misconduct, (b) a breach of this Agreement by you, (c) any action or inaction by you (including any and all loss or damage to personal property or bodily harm (including death) relating to or arising out of any such action or inaction), or (d) any allegation or claim that you failed to comply with applicable laws, rules, or regulations.

b) Your duty to defend is independent of your duty to indemnify. You will use counsel reasonably satisfactory to the Indemnified Parties to defend each indemnified claim, and the Indemnified Parties will cooperate (at your expense) with you in the defense. If at any time the Indemnified Parties determine that they may be adversely affected by any indemnified claim, the Indemnified Parties may assume control of the defense of the claim. You will not consent to the entry of any judgment or enter into any settlement relating to an indemnified claim without the Indemnified Parties' prior written consent.

### 10. Licensed Materials.

As used in this Agreement, "Licensed Materials" means any software, application, website, content, or other information made available to you (whether standalone, for use on devices owned by you or Amazon, or otherwise) by Amazon or its affiliates in connection with the Program, together with any related manuals and other documentation. Amazon grants to you, during the term of this Agreement, a limited, non-exclusive, non-transferable, non-sublicensable, revocable license to use the Licensed Materials solely for the purpose of performing the Services and participating in the Program and as permitted under this Agreement. For additional rights and obligations regarding the Licensed Materials see the Program Policies.

### 11. Dispute Resolution, Submission to Arbitration.

App. 334

By clicking "I agree and accept" in the box below or by providing any Service after the Effective Date, you agree to each of the following terms:

a) THE PARTIES WILL RESOLVE BY FINAL AND BINDING ARBITRATION, RATHER THAN IN COURT OR TRIAL BY JURY, ANY DISPUTE OR CLAIM, WHETHER BASED ON CONTRACT, COMMON LAW, OR STATUTE, ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT, INCLUDING TERMINATION OF THIS AGREEMENT, TO YOUR PARTICIPATION IN THE PROGRAM, OR TO YOUR PERFORMANCE OF SERVICES. TO THE EXTENT PERMITTED BY LAW, THE PRECEDING SENTENCE APPLIES TO ANY DISPUTE OR CLAIM THAT OTHERWISE COULD BE ASSERTED BEFORE A GOVERNMENT ADMINISTRATIVE AGENCY.

b) TO THE EXTENT PERMITTED BY LAW, THE PARTIES AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS OR COLLECTIVE BASIS.

c) TO THE EXTENT PERMITTED BY LAW, THE PARTIES FURTHER AGREE THAT NO DISPUTE RESOLUTION PROCEEDING WILL BE CONDUCTED ON A REPRESENTATIVE BASIS.

d) TO THE EXTENT PERMITTED BY LAW, THE PARTIES WAIVE ANY RIGHT TO PARTICIPATE IN OR RECEIVE ANY RELIEF FROM ANY NON-INDIVIDUAL PROCEEDING REFERENCED ABOVE ANDTHIS AGREEMENT DOES NOT PROVIDE FOR, AND THE PARTIES DO NOT CONSENT TO, ARBITRATION ON A CLASS OR COLLECTIVE OR REPRESENTATIVE BASIS.

e) NO ARBITRATOR SELECTED TO ARBITRATE ANY DISPUTE BETWEEN THE PARTIES IS AUTHORIZED TO ARBITRATE ANY DISPUTE ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS. FURTHER, NO ARBITRATOR IS AUTHORIZED TO CONSOLIDATE CLAIMS OF MORE THAN ONE INDIVIDUAL UNLESS ALL PARTIES EXPRESSLY AGREE IN WRITING TO ANY SUCH CONSOLIDATION.

f) THIS AGREEMENT SHALL NOT BE INTERPRETED AS REQUIRING EITHER PARTY TO ARBITRATE DISPUTES ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS, EVEN IF A COURT OR ARBITRATOR INVALIDATES OR MODIFIES OR DECLINES TO ENFORCE THIS AGREEMENT IN WHOLE OR IN PART.

g) AN AWARD IN ARBITRATION SHALL DETERMINE THE RIGHTS AND OBLIGATIONS BETWEEN THE NAMED PARTIES ONLY, AND ONLY IN RESPECT OF THE CLAIMS IN SUCH ARBITRATION, AND SHALL NOT HAVE ANY BEARING ON THE RIGHTS AND OBLIGATIONS OF ANY OTHER PERSON OR ON THE RESOLUTION OF ANY OTHER DISPUTE, OR HAVE PRECLUSIVE EFFECT AS TO ISSUES OR CLAIMS IN ANY OTHER DISPUTE.

h) You and Amazon agree that, at least 30 days before commencing an action pursuant to this Agreement that in any way relates to this Agreement or to the Services, the aggrieved party will

App. 335

provide the other party a notice of the aggrieved party's claims and at least 30 days in which to cure an alleged breach of this Agreement or other alleged act or omission, if the same is reasonably capable of being cured. Notice shall be provided as set forth in Section 14 of this Agreement. The applicable statute of limitations shall be tolled for 30 days following the provision of such notice.

i) A party demanding arbitration under this Agreement must file the demand with the American Arbitration Association (the "AAA") and deliver the demand to the other party by hand or by first-class mail within the applicable statute of limitations. The demand for arbitration must be in writing and include (1) the name and address of the party seeking arbitration, (2) a statement of the legal and factual basis of each claim, (3) a description of the remedy sought (4) the amount in controversy, and (5) the claimant's handwritten or electronic signature. Any demand for arbitration by you must be served on Amazon's registered agent, Corporation Service Company, at 300 Deschutes Way SW, Suite 304, Tumwater, WA 98051. The arbitration will be conducted by the AAA under its **Commercial Arbitration Rules and Mediation Procedures** in effect at the time of filing the demand for arbitration, provided that none of the AAA's expedited procedures will apply to the arbitration unless you and Amazon mutually agree in writing, after the demand has been filed, to the application of such procedure. The AAA's rules are available at www.adr.org. If the AAA's rules are inconsistent with this Agreement, this Agreement will govern. Payment of all filing, administration, and arbitrator fees will be governed by the AAA's rules, except that if you initiate the arbitration, you will pay for only the first US $200 of the total AAA filing fee. For example, if the AAA filing fee is US $180, you will be responsible for paying the entire AAA filing fee in that instance. But, if the AAA filing fee is US $570 you will be responsible for paying US $200 and Amazon will pay the difference (US $370 in this instance). Amazon also will pay all other costs and expenses unique to arbitration, including the arbitrator's fees. Any finding that a claim or counterclaim violates the standards set forth in Federal Rule of Civil Procedure 11 shall entitle the other party to recover their attorneys' fees, costs, and expenses associated with defending against the claim or counterclaim. The arbitration will take place at a mutually-convenient location within 45 miles from the last location in which you provided Services, or at another mutually-convenient location, or at any location ordered by a court with personal jurisdiction over you and Amazon.

j) Notwithstanding any provision in the AAA rules, the parties agree that a court of law must resolve any dispute concerning the validity and enforceability of the Agreement as a whole, the applicability of any exemption to the Federal Arbitration Act, and the validity, enforceability or interpretation of the provisions in subsections b) through i) of this Section 11. The arbitrator must resolve all other disputes, including all other disputes about the arbitrability of claims pursuant to such other provisions. If any portion of the class, collective or representative action waiver is found to be void or unenforceable, then the portion of the waiver found void or unenforceable shall be severed from this Agreement, and all other parts and provisions shall remain in full force and effect. In such a case, the claim or claims (or portion of claims) found to be able to proceed on a class, collective or representative action basis shall proceed in a court of competent jurisdiction and not in arbitration. In no event shall a court or arbitrator order arbitration on a class, collective or representative basis. Any claims or claim in court shall be stayed until the arbitration is concluded, unless such stay is contrary to applicable law.

k) The parties agree that all claims for public injunctive relief shall not be arbitrated, but rather litigated in court, and all claims for private injunctive relief must be arbitrated on an individual basis. A court, not an arbitrator, shall decide whether a claim is for public or private injunctive relief.

l) If you assert a claim against Amazon that is not subject to individual arbitration pursuant to this Section 11, and there is pending or later filed any claim against Amazon asserted by you or on your behalf that is subject to individual arbitration, then you agree and consent that any claim not subject to individual arbitration must be stayed until the resolution of such other claim in arbitration, unless such stay is contrary to applicable law.

m) A judgment upon the final award rendered by the arbitrator may be entered by any court having jurisdiction thereof. However, in any arbitration award issued in an arbitration conducted in accordance with this arbitration provision, the arbitrator shall specify a reasonable time within which the final award shall be satisfied, and no party may seek to confirm the award until the time specified for satisfaction has expired. If the final award is satisfied during the specified time, no party shall seek to confirm the award.

n) Nothing in this Section 11 shall be construed to prohibit settlements on a class-wide, collective, and/or representative basis.

**12. Governing Law.**

The interpretation and enforcement of this Agreement is governed by the law of the state of Delaware without regard to its conflict of laws principles, except for Section 11 of this Agreement, which is governed by the Federal Arbitration Act and applicable federal law. If, for any reason, the Federal Arbitration Act is held by a court of competent jurisdiction not to apply to Section 11 of this Agreement, the law of the state of Delaware and the Delaware Uniform Arbitration Act, 10 Del. C. § 5701 et seq. will govern Section 11 of this Agreement, including without limitation the common law of contracts of such state in the event that any statute could be interpreted as limiting the right of Amazon or you to arbitrate disputes pursuant to Section 11 of this Agreement. Nothing in this choice of law provision shall preclude the application of Delaware law to compel arbitration if a court of competent jurisdiction is unable to determine the application of the Federal Arbitration Act without discovery.

**13. Modifications.**

Amazon may modify this Agreement, including the Program Policies, at any time by providing notice to you through the Amazon Flex app or otherwise providing notice to you. You are responsible for reviewing this Agreement regularly to stay informed of any modifications. If you continue to perform the Services or access Licensed Materials (except for accessing the Amazon Flex app for the purpose of considering whether to agree to modifications of the Terms of Service) after the effective date of any modification to this Agreement, you agree to be bound by such modifications. However, (i) any modification to Service Fees will be provided to you in writing or through the Amazon Flex app before you accept and complete any Delivery Block(s) to which such modifications apply; (ii) any modifications to Section 11 will not apply to claims

App. 337

or disputes filed by you on or before the Effective Date; and (iii) if you previously opted-out of the dispute resolution provision in a prior version of the Terms of Service, any modifications to Section 11 that eliminate your right to opt out of the dispute resolution provision will not affect any right you may have to participate in a court action previously filed on your own behalf or as a member of a putative or certified class, collective or representative action that was filed on or before, and was pending on, the Effective Date.

**14. Notice; Electronic/Mobile Communications.**

Amazon will communicate with you via phone, text message, email, or push notifications sent via the Amazon Flex app (each such communication, "electronic communication") in connection with your participation in the Program. By downloading the Amazon Flex app, providing us with your mobile number, and agreeing to this Agreement, you are providing us with written consent to receive push notifications and automated text messages from Amazon in connection with the Program. To stop receiving push notifications, you may adjust the settings on your phone or delete the Amazon Flex app. You will not be able to participate in the Program if you adjust the settings or delete the Amazon Flex app. To stop receiving text messages from Amazon, reply STOP to any message. You consent to Amazon communicating with you concerning the Program via any or all of these means and you are responsible for printing, storing, and maintaining your own records of any such agreements, notices, disclosures or other communications. Standard messaging and data rates may apply. It is your responsibility to keep your email address and phone number current by updating the information you provided to Amazon. Terminating this Agreement will stop all electronic communication. If you want to terminate this Agreement, you can provide a notice of termination to Amazon by sending a message to the following email address: amazonflex-support@amazon.com. If you want to provide notice under this Agreement, other than the notice of termination, you can provide such notice by sending a message to the following email address: amazonflex-support@amazon.com.

**15. Documents.**

You may obtain an e-mailed copy of this Agreement by e-mailing a request to amazonflex-support@amazon.com. This Agreement will be accessible to you at any time in the Amazon Flex app.

**16. Entire Agreement and Severability; Additional Terms; Survival.**

a) This Agreement constitutes the complete and final agreement of the parties pertaining to the Services and supersedes and replaces the parties' prior agreements, understandings, representations, and discussions (whether written or oral) relating to the Services. If any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the fullest extent permissible under applicable law. A party does not waive any right under any provision of this Agreement, including Program Policies, by failing to insist on compliance with, or by failing to exercise any right under, the applicable provision. Any waivers granted under this Agreement are effective only if recorded in

a writing signed by the party granting such waiver. The section headings of this Agreement, including Program Policies, are for convenience only and have no interpretive value.

b) You will not assign, subcontract, or delegate any of your rights or obligations under this Agreement, or your Program Account, without Amazon's prior written consent. Any attempt by you to assign, subcontract, or delegate in violation of this Agreement will be null and void.

c) The following sections of this Agreement, along with any other provisions that by their nature should survive termination of this Agreement, will survive any termination or expiration of this Agreement: Independent Contractor Relationship; Service Fees; Representations, Warranties and Covenants; Term and Termination; Indemnification; Limitation of Liability; Dispute Resolution, Submission to Arbitration, Governing Law; and the following sections of the Program Policies: Confidentiality and Personal Information; Taxes; and Miscellaneous.

**17. Knowing and Voluntary Agreement.**

You acknowledge and agree that you are entering into this Agreement voluntarily and without any duress or undue influence by Amazon or anyone else. Further, you confirm that you carefully read this Agreement, asked any questions needed for you to understand this Agreement, and you fully understand the terms, consequences, and binding effect of this Agreement, including that you are waiving the right to go to court, to a jury trial and to proceed on a class, collective or representative basis. Finally, you agree that you have had an opportunity to seek the advice of an attorney before agreeing to and accepting this Agreement and that you have done so or you knowingly and voluntarily decided not to seek such advice.

## EXHIBIT A

## AMAZON FLEX PROGRAM POLICIES

### I. Welcome To Amazon Flex.

Welcome to Amazon Flex, an innovative new service offering you the opportunity to deliver packages to Amazon customers. Amazon is excited to welcome you to the Amazon Flex program and hope that you enjoy being your own boss and running your own business by using the Amazon Flex app.

### II. Program Requirements.

A. In order to participate in the Program, you must:

1. Pass a background check and, if applicable, a motor vehicle record check in accordance with Amazon's standards;

App. 339

2. Be at least 21 years of age;
3. Be legally qualified to work in each jurisdiction in which you provide Services;
4. Have the ability to effectively operate the Amazon Flex app and communicate with customers; and
5. Install the Amazon Flex app on your smartphone.

B. In performing Services, you may use:

1. Non-motorized transportation (e.g., walking, cycling);
2. Following Vehicles:
   o a private passenger vehicle,
   o a cargo van (not to exceed 10,000 lbs. in gross vehicle weight rating),
   o a light truck (not to exceed 10,000 lbs. in gross vehicle weight rating); or
3. Public Transportation.

If you are required to advise Amazon of the mode of delivery that you intend to use to deliver specified Deliverables, you agree to use only that mode of delivery to deliver those Deliverables.

C. If you operate any Vehicle in connection with your performance of Services, you must:

1. Have a current valid driver's license,
2. If applicable, maintain current Vehicle registration,
3. Maintain current automobile insurance coverage required by applicable laws, rules, and regulations to operate such Vehicle; and
4. Be legally authorized and fit to operate such Vehicle.
5. Upon request, you will provide Amazon with proof that these requirements have been satisfied.
6. All Vehicles must be registered and must have passed all applicable local, state and federal standards for safety and environmental compliance.
7. You are not permitted to carry weapons while performing Services, except to the extent local applicable law places restrictions on this policy.
8. You will not provide Services if you are currently an Amazon employee and you will cease providing Services if you become an Amazon employee (not-applicable to Amazon employees working in California).

### III. Service Standards.

A. As an independent contractor, you agree to provide results—the timely and effective delivery of undamaged parcels, bags, totes or other items to the customers' and Amazon's satisfaction-- subject to the following standards ("Service Standards"):

1) Safety

 i. Failure to comply with health, safety, & other applicable laws. Amazon requires you to comply with all traffic (including observing speed limit laws and distracted driving laws), health, safety, and other laws applicable to Deliverables or Services. Violation of traffic, health, safety,

App. 340

and other laws applicable to Deliverables or Services will make you ineligible to participate in the Program. The "Safety Reminder" video available in the "Videos" section of the Amazon Flex app contains important information for your safety and awareness. You agree and confirm that you will not provide the Services unless and until (a) you have viewed and fully understood the contents of this video, or (b) you have received hazardous materials training in the past three years that satisfies the Hazardous Materials Regulations (49 CFR 172.704), and you have, or can obtain upon your request, records confirming the same; provided that (b) does not apply in California.

2) Reliability

 i. Arriving on time for or timely forfeiting Delivery Blocks. As with any vendor of services, Amazon expects that you a) be ready to timely provide Services for any confirmed Delivery Block or b) if you elect to do so, forfeit a Delivery Block with sufficient notice (i.e. at least 45 minutes before the start of such Delivery Block). Please note that if you schedule a Delivery Block close to its start time, you will still be expected to arrive on- time for that Delivery Block. If you repeatedly arrive late or forfeit Delivery Blocks late, you will no longer be eligible to participate in the Program. ii. Availability to provide the Services. Once you arrive at the correct pick-up location, unless directed otherwise by Amazon you must remain at that location (or in the local area, as instructed) until Amazon or its designees tender Deliverables to you. If you do not receive any Deliverables by the end of the Delivery Block, you are free to leave at the end of the Delivery Block and will still be paid in full.

3) Delivery Quality

 i. Late Deliveries. Amazon expects that you deliver Deliverables to the customers on time. The app will specify the delivery window(s) during which the customer expects particular Deliverables to be delivered. If you repeatedly deliver Deliverables late, you will no longer be eligible to participate in the Program.

ii. Deliverables marked as delivered that the customer does not receive. If you deliver a Deliverable, Amazon expects that the customer will be able to find it. If customers repeatedly report that they cannot find Deliverables you marked as delivered, you will no longer be eligible to participate in the Program.

iii. Delivery not attempted or undeliverable Deliverables not returned to Amazon timely. Amazon expects that you will deliver all the Deliverables you pick up. In an instance where delivery is not possible, you are expected to return all Deliverables to the Amazon delivery station, unless otherwise directed by Amazon. If you repeatedly do not attempt to deliver all the Deliverables you pick up or you do not return the undeliverable packages to a location specified by Amazon, you will no longer be eligible to participate in the Program.

4) Customer Service

 i. Rude or inappropriate behavior. Amazon expects you to behave respectfully and professionally when interacting with its customers, station operators, merchants and other

App. 341

delivery partners while providing the Services. If customers, station operators, merchants or other delivery partners repeatedly report disrespectful, rude, inappropriate, unprofessional, dangerous or threatening conduct, you will no longer be eligible to participate in the Program. Additionally, a single violation, depending on the seriousness of the infraction, can make you ineligible to participate in the Program.

ii. Failure to follow delivery instructions. Amazon expects you to follow customer delivery instructions as reflected in the app as long as the customer instructions are reasonable and do not conflict with health, safety and other applicable laws. Amazon expects you to perform the Services consistent with industry standards, including with respect to health and safety, always checking recipient IDs when delivering alcohol and collecting a signature when instructed to do so in the app. If you repeatedly disregard the instructions, you will no longer be eligible to participate in the Program.

iii. As an independent contractor, subject only to this Agreement, it is for you to decide the means and manner in which to provide the Services and achieve the results that you have agreed to provide. Therefore, in performing Services, you are free to map out your own routes, sequence your deliveries and in every other way control the means and manner in which you deliver Deliverables.

5) Workplace Harassment Policy

In order to participate in the Program you must comply with the Workplace Harassment Policy (see Policy below).

### IV. Program Account.

A. Amazon will use information provided by you to create or maintain your user account for the Program ("Program Account"). You will only operate one Program Account and not register another Program Account if Amazon disables your Program Account. You will provide accurate, current, and complete information as part of your contracting process and to update your information as necessary so that it remains accurate, current, and complete at all times.

B. You will not permit any other person to access your Program Account or the Licensed Materials, including the Amazon Flex App, or to perform any Services using your identity or log-in credentials. You will not access any other person's Program Account or Licensed Materials, including the Amazon Flex App, or perform any Services using any other person's identity or log-in credentials. You will keep secure and confidential any password required to access your Program Account or Amazon Flex App or any identification that Amazon provides to you in connection with the Program or Amazon Flex App and you agree to accept responsibility for all activities that occur under your Program Account and associated password.

### V. Insurance.

A. If you operate any motor vehicle(s) in connection with your performance of the Services, you will maintain, at your expense, personal automobile insurance coverage required by applicable

laws, rules, and regulations to operate such vehicle(s). You will provide proof of such insurance coverage to Amazon, upon request. You will notify Amazon if your insurance coverage is cancelled. Your personal automobile insurance policy may not cover commercial activity. As an independent contractor, it is your responsibility to understand the terms of your personal insurance coverage and to contact your personal insurance company if you have any questions.

B. Where allowed or required by state and federal regulations, Amazon maintains, pursuant to FMCSA regulations, a commercial automobile insurance policy ("Amazon Insurance Coverage") that is intended to provide third-party bodily injury and property damage coverage, uninsured/underinsured motorist coverage, and comprehensive/collision coverage contingent on your personal insurance policy coverage, while actively performing the Services, in each case subject to Amazon Insurance Coverage deductibles and coverage limitations. If you maintain commercial automobile insurance coverage applicable to your operation of a Vehicle, your provider will provide primary coverage for you at all times, including while you are actively performing the Services and Amazon Insurance Coverage will be, only in those geographies where state and federal regulations allow or require it, excess over your commercial automobile insurance. The above description of Amazon Insurance Coverage is a summary only, and the actual terms of the Amazon Insurance Policy may vary by geographic area and are governed by the Amazon Insurance Policy documents. If there is a conflict between the above description and the actual terms of the Amazon Insurance Policy, the actual terms of the Amazon Insurance Policy will dictate coverage. You will notify Amazon immediately of any accident or other on-road incident that occurs while you are actively performing the Services and you will cooperate with Amazon and the applicable insurance company in the investigation of such accident or on-road incident. Amazon Insurance Coverage will in no way affect your indemnity obligations to Amazon as provided for in the Agreement. Amazon Insurance Coverage limits are available upon request.

## VI. Privacy.

A. Amazon receives and stores any information you enter on our website and mobile applications, while providing Services or participating in the Program, and through other interactions and communications you have with us, our mobile application or our website. Any of the Licensed Materials may provide Amazon with data about your use of such Licensed Materials, your geo-location and related tracking data, including your location, movements, speed at which you are traveling, and other personally identifiable information. Amazon may use any such information and share such information with third parties in connection with the Program or other products or services, including Services, offered by Amazon or its affiliates. By submitting information to Amazon during the contracting process or while providing Services and using any Licensed Materials, you expressly (i) consent to Amazon collecting, using and sharing the above described data and information and (ii) waive and release Amazon from any and all claims, causes of action, liability or damages arising out of or in any way related to Amazon's use of such data and information.

B. Amazon may obtain information about you, including your motor vehicle record and results of your background check. You authorize Amazon and its applicable service provider(s) to, from time to time, (i) perform a background check on you and (ii) obtain your motor vehicle record.

Based on a review by Amazon or its service provider of the results of your background check and motor vehicle record, Amazon may immediately terminate this Agreement.

C. Subject to applicable laws, Amazon may release any collected data and information, including personally identifiable information, when Amazon believes such release is appropriate or necessary to (i) comply with the law; (ii) enforce or apply this Agreement, including Program Policies; (iii) protect the rights, property, security or safety of Amazon, its affiliates, Amazon's customers, or others; (iv) detect, prevent or otherwise address fraud, security or technical issues; or (v) prevent or stop activity which Amazon considers to be, or to pose a risk of becoming, illegal, unethical, or legally actionable. Amazon may also receive information you shared with third parties, provided that such party has obtained necessary permissions to share the information with Amazon.

D. When you download or use apps created by Amazon or its affiliates, Amazon will receive information about your location, and your mobile device, including a unique identifier for your device. Most mobile devices provide you with information about these permissions. You have the right to choose whether or not to allow Amazon to receive this information. However, our ability to receive this information is an important part of the performance of Services, so if you choose to deny Amazon access to this information, this could affect the availability and functionality of the Amazon Flex App and your participation in the Program.

E. As a condition of delivering Amazon packages using the Amazon delivery application, you consent to allow Amazon to verify your identity and share your photo with Amazon customers for identification purposes from time to time. Amazon may derive from your photo a facial scan or similar biometric identifier ("Biometric Information"), and collect, store, and use Biometric Information from your submitted photos (including your photos Amazon already has on file), driver's license, or government-issued ID. You also agree to Amazon's Photo Use and Biometric Information Retention Policy, which can be found below:

**Photos Use and Biometric Information Retention Policy**

Amazon uses your submitted photos (including your photos that we already have on file), driver's license, or government-issued ID for identification purposes. This can include making sure it's you who is doing the delivery and using your photo to identify you to customers and Amazon personnel. The photo is also used on your in-app ID card. Amazon will retain your photos while you use the Amazon delivery application and thereafter for so long as permitted by law or until you request that Amazon delete your photo. You may request deletion of your photo by contacting support, but deleting your photo will block your access to the Amazon delivery application until you replace it and it is checked for validity.

Amazon requires that users of the Amazon delivery application provide a photo for identification purposes. Amazon may derive from your photo a facial scan or similar biometric identifier, ("Biometric Information"). This policy governs our retention of users' Biometric Information. Amazon retains a user's Biometric Information for up to 30 days after it is generated. Thereafter, Amazon will promptly delete the Biometric Information. Note that this means Amazon may need

to retain your Biometric Information after you stop using the Amazon delivery application for purposes of ongoing fraud detection and investigation.

### VII. Licensed Materials; Devices.

A. You may not (i) incorporate any portion of the Licensed Materials into your own works or compile any portion of it in combination with your own works, transfer it, in whole or in part, for use with another service, or sell, rent, distribute, copy, modify, adapt, translate, reverse engineer, decompile, or disassemble, or make derivative works based on, or manipulate the Licensed Materials or any part of the Licensed Materials or otherwise sublicense or assign any rights to the Licensed Materials in whole or in part, (ii) cause or launch any programs or scripts for the purpose of surveying, manipulating or data mining any portion of the Licensed Materials or impairing or unduly affecting the operation or functionality of any aspect of the Licensed Materials; or (iii) attempt to gain unauthorized access to any portion of the Licensed Materials, including through scripts or third party applications.

B. Additional third party terms contained within or distributed with certain Licensed Materials may apply to the Licensed Materials (or software incorporated with the Licensed Materials) and will govern the use of such software in the event of a conflict with this Agreement ("Third Party Software"). Such Third Party Software license terms will apply to the corresponding Third Party Software in lieu of this Agreement. For more information on Third Party Software, refer to the Additional Terms in the Amazon Flex app, which can be accessed via Home > Account > View Legal Information > Additional Terms.

C. All rights not expressly granted to you in this Agreement are reserved and retained by Amazon or other content providers. You may not frame or utilize framing techniques to enclose any trademark, logo, or other proprietary information (including images, text, page layout, or form) of Amazon without express written consent. You may not use any meta tags or any other "hidden text" utilizing Amazon's name or trademarks without the express written consent of Amazon. You may use the Licensed Materials only as permitted by law.

D. You will not attempt to participate or participate in the Program, or provide any Services, for the purpose of gathering information regarding the Program (including any Licensed Materials) or Amazon's processes, building or operating a competitive service or a service that uses similar ideas, features, or functions as the Program (including any Licensed Materials), or copying any idea, feature, or function of the Program (including any Licensed Materials).

E. When you use the Licensed Materials, you may also be using the services of one or more third parties, such as a wireless carrier or a mobile platform provider. Your use of these third party services may be subject to the separate policies, terms of use, and fees of these third parties.

F. Amazon may offer automatic or manual updates to the Licensed Materials at any time and without notice to you.

G. You must comply with all export and re-export restrictions and regulations of the Department of Commerce and other United States agencies and authorities that may apply to the Licensed

App. 345

Materials and agree not to transfer, or encourage, assist, or authorize the transfer of Licensed Materials to a prohibited country or otherwise in violation of any applicable restrictions or regulations.

H. You will notify Amazon immediately after becoming aware that any device on which any Licensed Materials are installed has been lost, stolen, or misplaced. If Amazon provides you with any device or other equipment in connection with the Program and such device or other equipment (or any part of it) is lost, stolen, unreturned, damaged, sold, transferred, or encumbered without the express prior written consent of Amazon, you will promptly pay Amazon the full replacement cost of such device or other equipment, together with any incidental costs that are incurred by Amazon to replace the same.

I. AMAZON LICENSES THE LICENSED MATERIALS TO YOU "AS IS" AND MAKES NO WARRANTIES OF ANY KIND REGARDING THE LICENSED MATERIALS. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AMAZON EXPRESSLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT, TITLE, OR FITNESS FOR A PARTICULAR PURPOSE. AMAZON DOES NOT WARRANT THAT THE LICENSED MATERIALS WILL MEET YOUR REQUIREMENTS OR WILL OPERATE UNINTERRUPTED, ERROR FREE, OR PROVIDE ACCURATE, COMPLETE, OR UP-TO-DATE INFORMATION. AMAZON WILL NOT BE RESPONSIBLE FOR ANY LOSS, DAMAGE, OR CLAIM CAUSED BY OR ATTRIBUTABLE TO ANY DEFECT OR DEFICIENCY IN ANY LICENSED MATERIALS.

J. If you provide any suggestions, comments, ideas, improvements, or other feedback relating to the Program, Program Policies or the Licensed Materials to Amazon, you assign to Amazon all right, title and interest in and to the same and will provide any assistance Amazon may require to document, perfect, and maintain these rights, and Amazon will be free to use, disclose, reproduce, modify, license, transfer, and otherwise distribute and exploit any of the foregoing.

K. All content included in or made available through Licensed Materials or the Program such as text, graphics, logos, button icons, images, audio clips, digital downloads, data compilations, and software is the property of Amazon or its content suppliers and protected by United States and international copyright laws. The compilation of all content included in or made available through any Licensed Materials or the Program is the exclusive property of Amazon and protected by U.S. and international copyright laws.

L. Graphics, logos, page headers, button icons, scripts, and service names included in or made available through any Licensed Materials or the Program are trademarks or trade dress of Amazon in the U.S. and other countries. All other trademarks not owned by Amazon that appear in the Licensed Materials or the Program are the property of their respective owners, who may or may not be affiliated with, connected to, or sponsored by Amazon.

**VIII. Confidentiality and Personal Information.**

A. You will use all personally identifiable information (i) concerning Amazon's customers, including names and addresses and (ii) provided to you or learned by you during performance of Services (collectively, "Personal Information"), solely for the purpose of providing Services using the Amazon Flex app and will not contact Amazon's customers using Personal Information for any reason unless directly related to providing Services. You will comply with all instructions Amazon provides in respect of the processing of Personal Information, and you will maintain appropriate security measures to prevent unauthorized use or disclosure of Personal Information and will keep confidential and not share Personal Information with any third party unless expressly permitted under this Agreement. You will return all Personal Information to Amazon promptly following a request from Amazon. As between you and Amazon, all Personal Information is and will remain the exclusive property of Amazon, and you will not disclose, share, transfer, rent, barter, trade, or sell Personal Information and will not develop lists of or aggregate Personal Information. For the avoidance of doubt, the contents of Deliverables tendered by Amazon to you are Personal Information.

B. If you are required by any governmental authority to disclose the contents of any Deliverable, you will promptly notify Amazon of such requirement. Amazon will not provide any Personal Information in connection with any disputes or claims between you and Amazon's customers, nor will any Amazon customers be contacted or called to testify, by either you or Amazon, in connection with any dispute or claim between you and Amazon.

C. Without the prior written authorization by a Vice President of Amazon, you will not use any trade name, trademark, service mark, trade dress, logo or commercial symbol, or any other proprietary rights of Amazon or any of its affiliates in any manner (including use in any client list, press release, advertisement, or other promotional material).

## IX. Taxes.

Each party will be responsible, as required under applicable law, for identifying and paying all taxes and other governmental fees and charges (and any penalties, interest, and other additions thereto) that are imposed on that party upon or with respect to the transactions and payments under this Agreement. Amazon may deduct or withhold any taxes that Amazon may be legally obligated to deduct or withhold from any amounts payable to you under this Agreement, and payment to you as reduced by such deductions or withholdings will constitute full payment and settlement to you of amounts payable under this Agreement. Throughout the term of this Agreement, you will provide Amazon with any forms, documents, or certifications as may be required for Amazon to satisfy any information reporting or withholding tax obligations with respect to any payments under this Agreement.

## X. Amazon Flex Rewards

Participation in the Amazon Flex Rewards Program (the "Rewards Program") is subject to this Agreement as well as the Amazon Flex "Rewards Terms" set forth at https://flex.amazon.com/amazonflexrewards/terms, as updated by Amazon from time to time. Please read the Rewards Terms carefully. By accessing or participating in the Rewards Program, you agree to be bound by the terms of the Rewards Program and all terms incorporated therein

App. 347

by reference, including terms regarding dispute resolution and a class action waiver. If you do not agree to the Rewards Program Terms, do not access or participate in the Rewards Program.

### Amazon Flex Workplace Harassment Policy

At Amazon, we believe that all workers should be treated with respect and dignity. Therefore, we will not tolerate inappropriate conduct, including discrimination or harassment based on sex. The conduct outlined in this policy is unacceptable and, in many cases, also prohibited by law. This policy applies to all Delivery Partners, as well as to the conduct by others involved in our business, such as employees, subcontractors, consultants, clients, customers, or vendors.

#### Sexual Harassment

Sexual harassment generally consists of unwelcome sexual advances, requests for sexual favors, or other verbal, non-verbal, or physical conduct of a sexual nature when (1) submission to or rejection of such conduct is the basis for work decisions affecting a prospective or active Delivery Partner; or (2) such conduct has the purpose or effect of creating a sexually offensive, hostile, or intimidating work environment that interferes with an individual's ability to perform their work. Examples of sexual harassment include, but are not limited to:

- Physical touching or assault, or impeding or blocking movements;
- Unwelcome or unwanted physical contact or sexual advances;
- Requests or demands for sexual favors in exchange for favorable or preferential treatment;
- Sexual jokes or use of sexually explicit language;
- Leering, gestures, or displaying sexually suggestive objects, pictures, cartoons, or posters;
- Derogatory comments, epithets, slurs, or jokes;
- Graphic comments or sexually degrading words; and
- Suggestive or obscene messages or invitations.

#### Responding to Inappropriate Conduct or Possible Incidents of Harassment

All Delivery Partners, as well as Amazon employees, are responsible for ensuring that our environment is free from offensive behavior and harassment. All Delivery Partners must avoid any conduct that may be perceived as offensive and/or harassing.

**Delivery Partners**: Delivery Partners who observe or experience conduct they believe may be inappropriate or harassing by anyone, including other Delivery Partners, Amazon employees, customers, or visitors, may report the conduct to Amazon by using the "Emergency Help" button in the Amazon Flex app. or by contacting our Last Mile Emergency Team at (844) 311-0406.

**Amazon Employees**: Employees who observe or experience conduct they believe may be inappropriate or harassing should contact his or her manager, or to any member of management at Amazon, or to Human Resources.

**Customers**: Customers should report such incidents by contacting the Customer Service Line.

It is important that Delivery Partners, employees, and customers feel comfortable reporting such incidents; therefore, no retaliation of any kind will be permitted or tolerated against Delivery Partners, employees, or customers for making a good faith report of suspected harassment. Anyone who believes they have been retaliated against for making a good faith complaint should contact the Last Mile Emergency Team at (844) 311-0406.

Amazon will promptly, fairly, and thoroughly investigate any reports of harassment or inappropriate conduct. To the extent possible, the privacy of those involved in any investigation will be protected against disclosure and remain confidential, except as necessary to conduct the investigation. Prompt, corrective action will be taken when appropriate. This action may include temporary suspension or termination of the Delivery Partner's contract with Amazon, or appropriate action against an Amazon employee or customer who engages in prohibited conduct. False complaints of harassment, discrimination, or retaliation that are not made in good faith may be the subject of similar appropriate disciplinary action.

# Exhibit D

Case: 25-252, 01/15/2025, DktEntry: 1.1, Page 380 of 461

6/17/2020  Case 2:19-cv-01320-JCS Document 73-1 SAFER Web - Company Snapshot AMAZON LOGISTICS Filed 09/03/24 Page 61 of 63

○ USDOT Number    ○ MC/MX Number    ● Name

Enter Value: AMAZON LOGISTICS INC

[ Search ]

*Company Snapshot*

**AMAZON LOGISTICS INC**
USDOT Number: 2881058

**ID/Operations | Inspections/Crashes In US | Inspections/Crashes In Canada | Safety Rating**

| Other Information for this Carrier |
| --- |
| ▼ SMS Results |
| ▼ Licensing & Insurance |

**Carriers:** If you would like to update the following ID/Operations information, please complete and submit form MCS-150 which can be obtained online or from your State FMCSA office. If you would like to challenge the accuracy of your company's safety data, you can do so using FMCSA's DataQs system.

**Carrier and other users:** FMCSA provides the Company Safety Profile (CSP) to motor carriers and the general public interested in obtaining greater detail on a particular motor carrier's safety performance then what is captured in the Company Snapshot. To obtain a CSP please visit the CSP order page or call (800)832-5660 or (703)280-4001 (Fee Required).

For help on the explanation of individual data fields, click on any field name or for help of a general nature go to SAFER General Help.

**The information below reflects the content of the FMCSA management information systems as of 06/16/2020.**

**To find out if this entity has a pending insurance cancellation, please click here.**

| | | | |
| --- | --- | --- | --- |
| Entity Type: | CARRIER/FREIGHT FORWARDER/BROKER | | |
| Operating Status: | AUTHORIZED FOR Property | Out of Service Date: | None |
| Legal Name: | AMAZON LOGISTICS INC | | |
| DBA Name: | DBA ALBI DBA PRIME | | |
| Physical Address: | 410 TERRY AVE N SEATTLE, WA 98109-5210 | | |
| Phone: | (206) 266-1000 | | |
| Mailing Address: | 207 BOREN AVE N SEATTLE, WA 98109 | | |
| USDOT Number: | 2881058 | State Carrier ID Number: | |
| MC/MX/FF Number(s): | FF-16223 MC-826094 | DUNS Number: | -- |
| Power Units: | 1,586 | Drivers: | 2,490 |
| MCS-150 Form Date: | 05/19/2020 | MCS-150 Mileage (Year): | 17,290,000 (2019) |

**Operation Classification:**

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| X | Auth. For Hire | | Priv. Pass.(Non-business) | | State Gov't |
| | Exempt For Hire | | Migrant | | Local Gov't |
| | Private(Property) | | U.S. Mail | | Indian Nation |
| | Priv. Pass. (Business) | | Fed. Gov't | | |

**Carrier Operation:**

| | | | | |
| --- | --- | --- | --- | --- |
| X | Interstate | | Intrastate Only (HM) | Intrastate Only (Non-HM) |

**Cargo Carried:**

| | | | | |
| --- | --- | --- | --- | --- |
| X | General Freight | | Liquids/Gases | Chemicals |
| | Household Goods | | Intermodal Cont. | Commodities Dry Bulk |
| | Metal: sheets, coils, rolls | | Passengers | Refrigerated Food |
| | Motor Vehicles | | Oilfield Equipment | Beverages |
| | Drive/Tow away | | Livestock | Paper Products |
| | Logs, Poles, Beams, Lumber | | Grain, Feed, Hay | Utilities |
| | Building Materials | | Coal/Coke | Agricultural/Farm Supplies |
| | Mobile Homes | | Meat | Construction |
| | Machinery, Large Objects | | Garbage/Refuse | Water Well |
| | Fresh Produce | | US Mail | X AMAZON PACKAGES |

App. 351

**ID/Operations** | Inspections/Crashes In US | **Inspections/Crashes In Canada** | **Safety Rating**

**US Inspection results for 24 months prior to: 06/16/2020**

Total Inspections: 86
Total IEP Inspections: 0
**Note:** Total inspections may be less than the sum of vehicle, driver, and hazmat inspections. Go to Inspections Help for further information.

Inspections:

| Inspection Type | Vehicle | Driver | Hazmat | IEP |
|---|---|---|---|---|
| Inspections | 57 | 76 | 0 | 0 |
| Out of Service | 5 | 0 | 0 | 0 |
| Out of Service % | 8.8% | 0% | % | 0% |
| Nat'l Average % (2009- 2010) | 20.72% | 5.51% | 4.50% | N/A |

**Crashes reported to FMCSA by states for 24 months prior to: 06/16/2020**

**Note:** Crashes listed represent a motor carrier's involvement in reportable crashes, without any determination as to responsibility.

Crashes:

| Type | Fatal | Injury | Tow | Total |
|---|---|---|---|---|
| Crashes | 0 | 7 | 10 | 17 |

---

**ID/Operations** | **Inspections/Crashes In US** | Inspections/Crashes In Canada | **Safety Rating**

**Canadian Inspection results for 24 months prior to: 06/16/2020**

Total inspections: 0
**Note:** Total inspections may be less than the sum of vehicle and driver inspections. Go to Inspections Help for further information.

Inspections:

| Inspection Type | Vehicle | Driver |
|---|---|---|
| Inspections | 0 | 0 |
| Out of Service | 0 | 0 |
| Out of Service % | 0% | 0% |

**Crashes results for 24 months prior to: 06/16/2020**

**Note:** Crashes listed represent a motor carrier's involvement in reportable crashes, without any determination as to responsibility.

Crashes:

| Type | Fatal | Injury | Tow | Total |
|---|---|---|---|---|
| Crashes | 0 | 0 | 0 | 0 |

---

**ID/Operations** | **Inspections/Crashes In US** | **Inspections/Crashes In Canada** | Safety Rating

*The Federal safety rating does not necessarily reflect the safety of the carrier when operating in intrastate commerce.*

Carrier Safety Rating:

**The rating below is current as of: 06/16/2020**

**Review Information:**

| Rating Date: | None | Review Date: | 06/20/2019 |
|---|---|---|---|
| Rating: | None | Type: | Non-Ratable |

SAFER Home | Feedback | Privacy Policy | USA.gov | Freedom of Information Act (FOIA) | Accessibility | OIG Hotline | Web Policies and Important Links | Plug-ins

Federal Motor Carrier Safety Administration
1200 New Jersey Avenue SE, Washington, DC 20590 • 1-800-832-5660 • TTY: 1-800-877-8339 • Field Office Contacts

https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&original_query_param=NAME&q…    2/3

App. 352

App. 353

Docusign Envelope ID: F455E910-498F-491B-9512-F66052C8E136

The Honorable John C. Coughenour

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

BERNARD WAITHAKA, on behalf of
himself and all others similarly situated,

Plaintiff,

v.

AMAZON.COM, INC., AMAZON
LOGISTICS, INC.,

Defendants

Case No. 2:19-cv-01320-JCC

**DECLARATION OF CRAIG BOMAN**

15

16

17

18

19

20

21

22

23

24

25

26

I, Craig Boman, hereby declare as follows:

      1.      I have personal knowledge of the factual statements set forth in this declaration.

      2.      I have been an Amazon Flex Delivery Partner mostly in the Boston area for six years.  I live in Boston, Massachusetts.  I first learned about the Amazon Flex program from a Delivery Partner that I met while I was performing shopping and delivery engagements with Instacart.  After the Delivery Partner told me how much he earned through the Flex platform, I read about the platform and signed up to be a Delivery Partner.  Now, I have tons of apps that I use to generate work.  This is what I do professionally, and I'm happy with it.  When I signed up, I knew that I was agreeing to an independent contractor relationship with Amazon, and I have always understood that.

DECLARATION OF CRAIG BOMAN.
(2:19-CV-01320-JCC)             1

Docusign Envelope ID: F455E910-498F-491B-9512-F66052C8E13E

1    3.    After I submitted my driver's license and information for a background check to

2    Amazon Flex, I was approved quickly to make deliveries. There was no interview, and I have not

3    received any formal training to be a Delivery Partner. There was a series of short videos available

4    through the Amazon Flex app that I could choose to watch, but I did not find the videos to be

5    particularly helpful beyond their explanation of how the Amazon Flex App worked.

6    4.    For approximately five years, I exclusively accepted delivery opportunities through

7    the Amazon Flex program. I have since contracted with several other app-based platforms to offer

8    delivery services, including Veho and Walmart Spark, and I also still contract with Instacart. I

9    also occasionally accept delivery engagements with Uber Eats if I am up late at night and want

10   something to do, but the pay is not as good.

11   5.    I drive a 2020 Chrysler Pacifica for the deliveries in perform in the Flex program

12   because it accommodates all of the packages I am delivering. When I accept delivery opportunities

13   from other app-based platforms, sometimes I use the Pacifica and sometimes I use my Subaru

14   Crosstrek.

15   6.    Currently, Amazon Flex accounts for about a third of my working time. Amazon

16   Flex used to be the majority of my working time until the delivery station I primarily accepted

17   delivery blocks from closed. Generally, I accept delivery engagements through Veho in the early

18   morning, then transition to accepting delivery engagements with Walmart Spark or Instacart for a

19   couple of hours, relax at home for a few hours, and then select delivery blocks through the Amazon

20   Flex app for the evening. I usually accept delivery engagements with Amazon Flex about four or

21   five days per week.

22   7.    If I accept a delivery block, I can cancel it at least 45 minutes before the delivery

23   block's scheduled start time without any issues. I prefer that to the shorter cancellation windows

24   offered by the other app-based platforms because it gives me more flexibility. For example, I

25   recall canceling a delivery block once when it started raining hard.

26   DECLARATION OF CRAIG BOMAN
     (2:19-CV-01320-JCC)                    2

Docusign Envelope ID: F455E910-498F-491B-9512-F56052C8E136

8.    If there is bad weather, Amazon Flex might offer surge pricing for delivery blocks. I will choose a delivery block with surge pricing if I am comfortable driving in the conditions, but it is always my choice to accept or not accept any delivery block.

9.    I prefer to accept engagements for grocery deliveries over brown box packages ordered on Amazon.com because there are fewer destinations, and I can receive tips. I also prefer to accept Flex delivery engagements in the evening because there is less traffic.

10.    I almost always finish delivery blocks in much less time than the estimated duration for the delivery block shown in the Amazon Flex app. I usually accept two-hour delivery blocks when making deliveries of groceries ordered from Whole Foods deliveries, and I generally finish my deliveries 30 to 60 minutes before the end of the estimated duration of those delivery blocks. If I wanted to, I could take breaks during my delivery block but there is no reason to do so.  It would take more time to stop and get something to eat than to just finish my deliveries.   I would rather just get the work done and then do what I want, but it is my choice.

11.    When I am driving and making deliveries, I use the Amazon Flex app's navigation function, though I have the option to use a different navigational app. I can manipulate the order of my deliveries in any way I want as long as I complete them within the time allotted.  If a package cannot be delivered, then I bring it back to the warehouse by 10 a.m. the next day.

12.    When I first began in the Amazon Flex program, I drove and delivered in the Boston area. However, because of the flexibility afforded through the Amazon Flex program, I have also done deliveries while on vacation. For example, while on vacation in Colorado, I arranged to have my delivery area updated so that I could select delivery blocks while traveling.

13.    I consider myself a professional gig worker. I enjoy the flexibility to work when I want and the ability to deduct expenses, such as the costs of my van and cell phone, on my taxes. I prefer being an independent contractor to an employee because I get to be my own boss. Amazon does not require me to accept any particular delivery blocks.  Instead, it is up to me whether I

DECLARATION OF CRAIG BOMAN
(2:19-CV-01320-JCC)                              3

Docusign Envelope ID: F455E910-498F-491B-9512-F66052C8E13E

1  accept a delivery block or not.  If something comes up and an employee is unable to make it to

2  work, that employee could lose their job. I don't have any such concerns and I would not want to

3  be classified as Amazon Flex's employee. I can do deliveries when I feel comfortable to deliver.

4     14. I consider myself as the operator of my own business, and I consider Amazon to be

5  my customer.  I could create my own LLC but do not see a benefit for myself at this time.

6     15. I understand and acknowledge that signing this declaration may or may not

7  negatively affect my interest in the pending lawsuit should it be successful and may or may not

8  negatively impact any financial recovery I may be entitled to from this lawsuit. Knowing this

9  information, I have voluntarily chosen to sign this declaration regardless of which side of the case

10  my testimony may benefit to set forth the facts as I understand them.

11     16. I am providing this statement voluntarily and without any duress, threats,

12  intimidation, or coercion.  I further understand that I did not have to give this declaration, can provide

13  or refuse to provide a declaration or testimony, and know that giving this information in this

14  declaration is not a condition of, or in any way required by, my contract with Amazon.  I affirm that

15  the information in this declaration is voluntary and of my own free will.

16     I declare under penalty of perjury and the laws of the United States of America that the

17  foregoing is true and correct to the best of my knowledge, information, and belief.

18     Executed this ___ day of July, 2024.
      July 25, 2024

19

20              _____

21              Craig Boman

22

23

24

25

26  DECLARATION OF CRAIG BOMAN
  (2:19-CV-01320-JCC)     4

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: F455F910408F491B9E12F6C052C8E136 | | Status: Completed |
| Subject: Complete with Docusign: Waithaka v. Amazon - Declaration of Craig Boman.pdf | | |
| Source Envelope: | | |
| Document Pages: 4 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Shane O'Halloran |
| AutoNav: Enabled | | 1701 Market Street |
| EnvelopeId Stamping: Enabled | | Philadelphia, PA  19103 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | shane.ohalloran@morganlewis.com |
| | | IP Address: 152.186.147.242 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Shane O'Halloran | Location: DocuSign |
| 7/25/2024 1:23:31 PM | shane.ohalloran@morganlewis.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Craig Boman | *DocuSigned by:* | Sent: 7/25/2024 1:26:35 PM |
| craig.boman@yahoo.com | [signature: C B] | Viewed: 7/25/2024 1:57:44 PM |
| Security Level: Email, Account Authentication (None) | DBF5A7760EAF456... | Signed: 7/25/2024 2:02:28 PM |
| | Signature Adoption: Drawn on Device | |
| | Using IP Address: 71.233.200.162 | |
| | Signed using mobile | |
| **Electronic Record and Signature Disclosure:** | | |
| Accepted: 7/25/2024 1:57:44 PM | | |
| ID: 1f3570d0-bfd9-4f34-bbdd-ee2f7f2b56e5 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/25/2024 1:26:36 PM |
| Certified Delivered | Security Checked | 7/25/2024 1:57:44 PM |
| Signing Complete | Security Checked | 7/25/2024 2:02:28 PM |
| Completed | Security Checked | 7/25/2024 2:02:28 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 5/19/2020 7:53:11 AM
Parties agreed to: Craig Boman

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Morgan, Lewis & Bockius LLP (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Morgan, Lewis & Bockius LLP:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: brianne.aul@morganlewis.com

**To advise Morgan, Lewis & Bockius LLP of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at brianne.aul@morganlewis.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Morgan, Lewis & Bockius LLP**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to brianne.aul@morganlewis.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Morgan, Lewis & Bockius LLP**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

App. 360

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to brianne.aul@morganlewis.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Morgan, Lewis & Bockius LLP as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Morgan, Lewis & Bockius LLP during the course of your relationship with Morgan, Lewis & Bockius LLP.

# EXHIBIT K

Bernard Waithaka vs      30(b)(6), Confidential      Alexa Hawrysz
Amazon.com, Inc., et al.                                             October 06, 2021

```
 1              UNITED STATES DISTRICT COURT

 2             WESTERN DISTRICT OF WASHINGTON

 3   _____

 4   BERNARD WAITHAKA, individually and on  )
     behalf of all others similarly         )
 5   situated,                              )
                                            )
 6              Plaintiffs,     ) No. 2:19-cv-01320
                                            )
 7        vs.                               )
                                            )
 8   AMAZON.COM, INC. and AMAZON            )
     LOGISTICS, INC.,                       )
 9                                          )
                Defendants.                 )
10   _____

11

12        30(B)(6) DEPOSITION OF ALEXA HAWRYSZ

13               CONDUCTED REMOTELY

14            425 106TH AVENUE NORTHEAST

15            BELLEVUE, WASHINGTON 98004

16             ***** Confidential *****

17

18

19

20

21

22

23

24   DATE:  Wednesday, October 6, 2021

25   REPORTED BY:  Svetlana Golub, CCR 3445
```

Bernard Waithaka vs                 30(b)(6), Confidential                 Alexa Hawrysz
Amazon.com, Inc., et al.                                                   October 06, 2021

58

1    Q   So when a driver picks up packages at the start of a block,

2        can they wait to make deliveries until later in the day?

3    A   Yes.  For example, in an Amazon Logistics block, they can

4        pick up at 9:00 a.m. and they don't need to get the packages

5        there until 9:00 p.m.  So even if they had a three-hour block

6        early in the morning, they could --

7    (Technical difficulties.)

8    Q   So --

9              THE COURT REPORTER:  I'm sorry, Counsel, I think

10       everything just froze on my end.  She left off at "even if

11       they had a three-hour block early in the morning..."

12             THE WITNESS:  If they have a three-hour block

13       early in the morning, they could essentially do other work

14       throughout the day and then just get the packages there by

15       9:00 p.m.

16   BY MS. PAGANO:

17   Q   So is 9:00 p.m. the latest that they're able to -- 9:00 p.m.

18       the same day the latest that they're able to complete the

19       deliveries?

20   A   Yes.  9:00 or 10:00 p.m.  That has differed over time.

21   Q   And is that just the case for the Amazon.com blocks, or is

22       that also true of the Prime Now and Whole Foods blocks?

23   A   The Amazon.com blocks only.

24   Q   So for Prime Now and Whole Foods, is there typically a

25       tighter time frame that would require the driver to make the

Bernard Waithaka vs               30(b)(6), Confidential               Alexa Hawrysz
Amazon.com, Inc., et al.                                              October 06, 2021

59

1        delivery immediately upon picking it up?

2    A   There is a tighter time frame -- a specific time that they

3        need to get the packages there by that's provided to them

4        when they pick up the block.  Again, you know, they can take

5        however they -- however long they want to do it as long as

6        they can get it there by the time of the end.

7    Q   Can Amazon Flex drivers hire employees to make deliveries in

8        their stead?

9    A   They need to -- the background check and verification is for

10       the person who is the Flex provider.  The rule would be that

11       they would need to deliver their own packages.

12   Q   Okay.

13           MS. PAGANO:  I'm going to introduce another

14       exhibit.

15   (Exhibit No. 9 marked.)

16   BY MS. PAGANO:

17   Q   Okay.  I've just introduced Exhibit 9.  This is a three-page

18       document, and it's Bates labeled Waithaka 1307 to 1309.  Let

19       me know when you had a chance to review it.

20   A   Okay.

21   Q   So does Amazon Logistics use facial recognition technology

22       with Amazon Flex drivers?

23           MS. ZENEWICZ:  Objection.  Vague.

24   A   Can you specify please.

25   Q   Well, I mean, Exhibit 9 appears to be prompting an Amazon

Bernard Waithaka vs        30(b)(6), Confidential        Alexa Hawrysz
Amazon.com, Inc., et al.                                                   October 06, 2021

87

```
 1        So if an Amazon Flex driver is delivering a package
 2     and they scan it with their phone as delivered, is that,
 3     like, insufficient?  Are they required to take a photo?
 4            MS. ZENEWICZ:  Objection.  Vague.
 5  A  I'm not sure what the specific guidelines are related to the
 6     photo.
 7  Q  Okay.  Could you go back to Exhibit 6 for a moment.  That's
 8     the FAQs.
 9  A  Okay.
10  Q  Sorry, I'm -- I've lost my place here.  All right.  We'll
11     come back to this one.
12            Sorry, let's go back to Exhibit 8.
13  A  Okay.
14  Q  Okay.  So Exhibit 8 shows the offers through the Amazon Flex
15     app, and it shows an expected amount that the driver will be
16     paid as well as the expected duration of that block; correct?
17  A  Yes.
18  Q  So if you took the total amount and divided it by the
19     expected number of hours, you could basically come up with an
20     anticipated hourly rate for the block; right?
21            MS. ZENEWICZ:  Objection -- sorry, Adelaide, say
22     the question again.
23            MS. PAGANO:  Yeah.
24  BY MS. PAGANO:
25  Q  So if you take the total amount that they're going to be paid
```

Bernard Waithaka vs                    30(b)(6), Confidential              Alexa Hawrysz
Amazon.com, Inc., et al.                                                  October 06, 2021

88

```
 1        and you divide by the expected number of hours that it's
 2        going to take to do the block, that would give you an
 3        anticipated hourly rate for the block; right?
 4   A    So it's not really an hourly rate because the amount of time
 5        is totally dependent on how the driver actually executes on
 6        the block.  They might take one hour or -- you know, to
 7        complete the block.
 8   Q    Okay.  So I understand the actual hourly rate might end up
 9        being something different.  But you could use what's
10        available here in Exhibit 8 to come up with an anticipated
11        hourly rate based on how long the block is anticipated to
12        take; right?
13   A    Yeah.  Again, it's not really anything that we're doing, but
14        I think, yes, mathematically you could divide 76 by 4.
15   Q    So that does kind of lead to my next question.  I mean, does
16        Amazon ever do any kind of analysis when it's determining the
17        compensation for blocks to figure out whether they average
18        out to an hourly rate that's at least minimum wage in the
19        local jurisdiction?
20   A    That was kind of a complicated question.  Can you restate --
21   Q    Sure.  When Amazon is setting the price for a given block, do
22        they do any kind of analysis to determine what the
23        anticipated hourly rate is and whether that anticipated
24        hourly rate is greater than minimum wage in that particular
25        area?
```

Bernard Waithaka vs                30(b)(6), Confidential                Alexa Hawrysz
Amazon.com, Inc., et al.                                                October 06, 2021

89

1    A    So the price of the block is -- you know, you see what you've
2         displayed on a screen is a snapshot in time.  The price of
3         the block is highly variable dependent on the surge pricing,
4         and the surge pricing is automatically changing the price of
5         the block depending on whether people are taking it.
6              So the end price of the block is really dependent on
7         how -- whether or not a driver is going to accept it --
8         accept the work that's out there.
9    (Reporter clarification.)
10   Q    When Amazon determines a price for a block, is there, like, a
11        floor below which it gets -- it can't fall?  In other words,
12        there's, like, a minimum base rate that would be paid for the
13        block?
14   A    Yes, there would be -- when the driver sees it, there would
15        be -- that's the price they're going to get.
16   Q    And then that price might be adjusted upward based on demand?
17   A    So the specific price that you see in this exhibit, the
18        driver price, that doesn't necessarily -- that represents the
19        snapshot-in-time price.
20   Q    So when the driver logs into the app, you know, they might
21        see -- they're going to see a price at that particular
22        moment.  And you're saying that moment -- or that price could
23        vary depending on different variables?
24              MS. ZENEWICZ:  Objection.  Vague and it misstates
25        the witness's testimony.

Bernard Waithaka vs                30(b)(6), Confidential                Alexa Hawrysz
Amazon.com, Inc., et al.                                                October 06, 2021

93

```
 1      generated kind of on a route-by-route basis.  We're not
 2      looking at every specific route combination.
 3              Again, a driver could be much more efficient than
 4      another.  Maybe one driver will come up with a routing that's
 5      much less or maybe they might have to go -- they decide they
 6      want to drive Uber in the middle of their route.  We don't
 7      really know what is going to happen on the ground.
 8   Q  Okay.  So the base rate for a particular region would be set
 9      by the pricing team and then is there -- it sounds like
10      there's, like, an algorithm that would kick in to determine
11      surge pricing?
12   A  Yeah, predominantly an automated system.
13   Q  Which types of deliveries that drivers can make on Amazon
14      Flex are tip eligible?
15   A  Prime Now, Amazon Fresh and Whole Foods.
16   Q  Why are the Amazon.com deliveries not tip eligible?
17   A  There is no customer tipping on Amazon.com deliveries.
18   Q  Like, the capability just doesn't exist in -- on the website?
19   A  Correct.
20   Q  Does Amazon keep track of how long it takes a driver to
21      complete their block?
22              MS. ZENEWICZ:  Objection.  Vague.
23   A  We're not tracking any kind of driver-level data on that --
24      you know, driver by driver specifically.  But there's the
25      timestamped information of their first and last deliveries
```

Bernard Waithaka vs                30(b)(6), Confidential                Alexa Hawrysz
Amazon.com, Inc., et al.                                                October 06, 2021

104

1     Is it your understanding that that's sort of the scheduled

2     start date and time for that particular block?

3   A   Yes, correct.

4   Q   Okay.  And then the next column "planned minutes" is the sort

5     of anticipated duration of the block?

6   A   Yes.  That's the block time similar to the last tab or the

7     first and last timestamp.  Instead of giving the last time,

8     it's just giving you the minutes.

9   Q   Then there's "service type name."  And if you scroll down, it

10     looks like it usually says "Amazon Flex vehicle," but in some

11     places it says "Amazon Flex large vehicle," and then in some

12     places it says "Amazon Flex instant offers."  What is your

13     understanding of what this service type name signifies?

14   A   So this is the type of block that's being generated.  The

15     large vehicle would be the situations in which the driver has

16     stated that they have a larger vehicle that they're using,

17     which would allow them to take more packages and therefore

18     take a different kind of block.

19         And then an instant offer is a situation where the --

20     it's an offer that starts immediately as opposed to a future

21     scheduled time.

22 (Reporter clarification.)

23   Q   So for the AmFlex instant offers, could that represent any

24     type of delivery in terms of Amazon.com, Prime Now, Fresh,

25     Whole Foods?

Bernard Waithaka vs                    30(b)(6), Confidential                    Alexa Hawrysz
Amazon.com, Inc., et al.                                                          October 06, 2021

105

1              MS. ZENEWICZ:  Objection.  Vague.

2    A    Amazon Flex -- or instant offer is a type of offer so it

3         could be used for different types of businesses but you'll --

4         it's predominantly used for the Whole Foods and grocery

5         businesses.

6    Q    So an instant offer would be one that the driver logged into

7         their app and accepted as opposed to signing up in advance?

8    A    Yes.

9    Q    How far in advance can drivers sign up for a block?

10   A    That has varied over time.  But kind of in a general manner,

11        you know, a week ahead.

12   Q    Is that how it currently works that they have up to a week?

13   A    I believe that's the case.

14   Q    Okay.  So the next column is "payment type" and it looks like

15        usually says either "contribution," "adjustment" or "tip."

16        What is your understanding of what these different entries

17        mean?

18   A    Contribution would be kind of the -- the Amazon contribution

19        for whatever that work was, the Amazon payment.  The tip

20        would be a tip that was generated from a customer.  And then

21        a payment adjustment would be, for example, a situation where

22        the driver contacted to negotiate more fees for -- it's a

23        change to the -- it's an upward change from whatever they

24        were already paid.

25   Q    Would there ever be a time when Amazon would adjust

Bernard Waithaka vs                30(b)(6), Confidential                Alexa Hawrysz
Amazon.com, Inc., et al.                                              October 06, 2021

135

1                              C E R T I F I C A T E

2

3    STATE OF WASHINGTON      )
                              ) ss
4    COUNTY OF KING           )

5

6         I, the undersigned Washington Certified Court Reporter,
     hereby certify:

7         That the foregoing deposition upon oral examination of the
     witness named herein was taken stenographically before me and
8    transcribed under my direction;

9         That the witness was duly sworn by me pursuant to RCW
     5.28.010 to testify truthfully;
10

11        That the transcript of the deposition is a full, true and
     correct transcript to the best of my ability;

12        That I am neither an attorney for, nor a relative or
     employee of any of the parties to the action or any attorney or
13   counsel employed by the parties hereto, nor financially
     interested in its outcome.
14

15        I further certify that in accordance with CR 30(e), the
     witness was given the opportunity to examine, read, and sign the
     deposition, within 30 days upon its completion and submission,
16   unless waiver of signature was indicated in the record.

17

18

19

20        _____
          Svetlana Golub, CCR
21        Washington Certified Court Reporter No. 3445
          License effective until: 02/07/2022

22

23

24

25

# EXHIBIT N

**AMAZON FLEX**

**INDEPENDENT CONTRACTOR TERMS OF SERVICE**

Welcome to the Amazon Flex program (the "Program"). These Terms of Service (this "Agreement"), including the Program Policies, attached as an Exhibit A, will govern the delivery services contemplated by this Agreement (the "Services") and constitute a legally binding agreement between Amazon Logistics, Inc. ("Amazon") and you. Any reference to this Agreement includes the Program Policies. If there is a conflict between the Program Policies and any other section of this Agreement, the Program Policies will prevail.

**This Agreement updates and replaces any version of the Terms of Service you previously accepted.** This Agreement takes effect on the earlier of the date on which you click "I agree and accept" in the box below or, if you accepted a prior version of the Terms of Service, the first date on which you provide Services after Amazon made this Agreement available in the "Legal Information" section of the Amazon Flex app and sent to your email address a hyperlink to this Agreement ("Effective Date").

**YOU AND AMAZON AGREE TO RESOLVE DISPUTES BETWEEN YOU AND AMAZON ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION. YOU AND AMAZON WAIVE THE RIGHT TO PURSUE THE RESOLUTION OF ANY SUCH DISPUTE IN A COURT AND WAIVE THE RIGHT TO A TRIAL BY JURY. If you previously opted-out of the dispute resolution provision in a prior version of the Terms of Service, then, to fullest extent permitted by law, you revoke, subject to the exclusions in Section 13, your prior decision to opt out and you agree to individual, binding arbitration by clicking "I agree and accept" in the box below or by providing any Services after the Effective Date.**

1. The Services.

a) You agree to provide the Services in a safe and competent manner in accordance with the level of professional care that would be observed by a prudent person rendering similar services and subject to the Service Standards described in the Program Policies. Failure to comply with the Service Standards will constitute a breach of this Agreement.

b) This Agreement requires no minimum amount or frequency of Services. You agree, however, that if you accept an offer to provide Services during a particular confirmed block and you do not cancel your acceptance as permitted under the Program Policies, you will deliver the parcels, packages, totes, bags or other deliverables tendered to you by Amazon or its designees ("Deliverables") during such period ("Delivery Block"). The Delivery Block starts when you receive Deliverables and ends at the time the last Deliverable is delivered or, if undeliverable, is returned as specified by Amazon.

2. Independent Contractor Relationship.

App. 374

This Agreement creates an independent contractor relationship, not an employment relationship. As such, you agree that this Agreement is not a contract of employment and is not evidence of an employment relationship. As an independent contractor of Amazon you are not required to purchase or rent any products, equipment or services from Amazon as a condition of entering into this Agreement. Nothing in this Agreement will create any partnership, joint venture, agency, franchise, or employment relationship between you and Amazon. As an independent contractor, you will not be considered as having the status of an employee of Amazon for any purpose, including federal, state, and local tax purposes, and you will not be required or entitled to participate in any employee benefit or other plans or arrangements in which employees of Amazon and its affiliates may participate. You are solely responsible for all taxes applicable to you, including, but not limited to, income and social security taxes. Amazon will not withhold taxes from fees paid to you, including taxes for unemployment insurance or workers' compensation benefits. You have no authority to bind Amazon, and you will not make any representation identifying yourself as an employee of Amazon or make any representations to any person or entity that you have any authority to bind Amazon as an employee, partner, or otherwise. This Agreement applies to each Delivery Block but there will be no relationship between the parties after the end of one Delivery Block and before the start of any subsequent Delivery Block.

3. Service Fees.

In consideration of providing Services in accordance with this Agreement and for providing your Vehicle, Amazon will pay you fees in the amounts indicated in the Amazon Flex app at the time of acceptance, or as otherwise agreed between you and Amazon from time to time ("Service Fees"). The Service Fees, unless otherwise expressly provided in this Agreement, will be your only fee for performing the Services. The Service Fees are intended to cover all amounts incurred by you for providing your Vehicle and the Services under this Agreement, including any expenses you may incur (such as costs of fuel, taxes, registration fees, permits of all types, and any other assessment, citation, fine, or fee imposed or assessed against your Vehicle or you by any applicable governmental authority or otherwise related to your equipment and its use). You understand that Amazon would offer lower Service Fees if Amazon had to pay separately for your expenses. Amazon will pay Service Fees to you no later than 15 days after completion of the Services. Depending on the location in which the Services are provided and the product or business to which the Services relate, Amazon's customers may be able to provide a tip in connection with the fulfillment of their orders and Amazon will pass through any tips payable to you.

4. Representations, Warranties, and Covenants.

You represent and warrant to Amazon that you have all legal capacity and authority to enter into, and perform your obligations under, this Agreement. You agree, at all times, to: (a) comply with all laws, rules, and regulations pertaining to the Services, including all laws, rules, and regulations applicable to (i) transportation, safety and insurance related to the performance of Services, (ii) health and safety of customers and the Deliverables and (iii) anti-bribery and anti-corruption; (b) hold and maintain, throughout your participation in the Program, all licenses, permits, and other authorizations necessary for you to perform the Services (including, if

applicable, driver's license, vehicle registration, and automobile insurance), which you will provide to Amazon upon request; (c) notify Amazon immediately after becoming aware that any license, permit, or authorization required for you to perform the Services has expired, been lost or suspended; (d) provide complete and accurate responses to all questions related to the background screening, including questions on prior convictions; (e) notify Amazon immediately if you need to change or update your answers to any questions posed during the background screening process, including if you have any new convictions; (f) notify Amazon immediately of any event or circumstance that impairs the safety of or delays delivery of Deliverables; (g) comply with Amazon's Supplier Code of Conduct posted at http://www.amazon.com/gp/help/customer/display.html?ie=UTF8&nodeId=200885140 and Amazon's safety policies related to Amazon's premises and Deliverables (collectively, "Amazon Safety Requirements"), and permit, as requested by Amazon from time to time, Amazon or its designee to audit your compliance with any Amazon Safety Requirements; (h) not violate or infringe any third party's rights in proprietary or confidential information in performing the Services; and (i) not create any lien on Amazon property or assets, including any Deliverables, and waive all rights to any lien. Throughout the term of this Agreement, you will provide Amazon with any forms, documents, or certifications as may be required for Amazon to verify representations and warranties you made in this Agreement or your compliance with any provision of this Agreement.

5. Equipment Used to Perform the Services.

a) You agree that, as part of managing your own business, you will provide and maintain a mobile device compatible with the Amazon Flex app, any vehicle identified by you within the Amazon Flex app ("Vehicle"), any bicycle or other non-motorized mode of transportation used to provide the Services, and any other equipment that you choose to use or that you need in order to provide the Services. Your identification of any Vehicle within the Amazon Flex app will be considered an acknowledgement of and receipt for equipment, as required by applicable law.

b) You agree that while actively performing the Services during a Delivery Block, your Vehicle is under an exclusive lease as defined under Federal Motor Carrier Safety Administration ("FMCSA") section 49 C.F.R. Part 376.12(c)(1), which requires exclusive possession, control and use by Amazon of both the Services and your Vehicle during that time. "Actively performing the Services" means that you are loading or unloading Deliverables, actively delivering Deliverables, specifically waiting to receive more Deliverables, or actively and directly on your way back to the delivery station with undeliverable or damaged Deliverables. For clarity, exclusive possession, control and use of your Vehicle by Amazon does not mean that you cede physical control or ownership of your Vehicle and the requirements of the FMCSA regulations do not affect your status as an independent contractor (49 C.F.R. 376.12(c)(4)).

6. Term and Deactivation.

a) This Agreement is effective as of the Effective Date and will continue to be in effect until you or Amazon terminates this Agreement.

App. 376

b) You may terminate this Agreement at any time and for any reason by giving Amazon a notice of termination in accordance with Section 14 below. You will not be eligible to participate in the Program for 12 months following the date of the termination notice.

c) Amazon may terminate this Agreement for the following reasons ("for cause") by giving you a notice of termination in accordance with Section 14 below: (i) for failure to meet Service Standards, (ii) for failing a background check any time before or after the Effective Date, (iii) material violation of the Program Policies, (iv) material breach of this Agreement, (v) if your Amazon.com account is deactivated; or (vi) for other commercially reasonable cause.

d) If you have been inactive for more than 180 days, Amazon may deactivate your account. If your account is deactivated for inactivity, you may apply to re-enroll in the Program.

e) If you opt out of receiving electronic communication (as defined in Section 14 below), your account will be deactivated. Subject to other provisions of this Agreement, you will be able to reactivate your account by notifying Amazon that you agree to receive electronic communication from Amazon.

f) Amazon may cease providing any Licensed Materials (as defined in Section 10 below) and terminate this Agreement if you violate any of the terms related to the Licensed Materials in which case any licenses granted to you by Amazon will terminate immediately, without any notice.

g) If either you or Amazon terminate this Agreement, you must uninstall the Amazon Flex application on your device.

7. Availability of the Services.

Amazon makes no promises or representations in this Agreement as to the amount of business that you can expect at any time. You can accept or reject any opportunity offered by Amazon. Nothing in this Agreement will prohibit you from providing Services or using your Vehicle on behalf of any other person or entity, including competitors of Amazon, except during any Delivery Block. Amazon may also engage the services of other companies and individuals that may perform the same or similar services as those provided by you under this Agreement.

8. Limitation of Liability.

Amazon will not be liable for damages of any kind, including direct damages, loss of goodwill, lost opportunities or profits, anticipated amount of business, expenditures, investments, leases, or commitments made by you in connection with the Program or otherwise. Except for your indemnity obligations under Section 9 below and any liability arising out of your breach of the section of the Program Policies entitled "Confidentiality and Personal Information," and except as indicated below, NEITHER PARTY WILL BE LIABLE UNDER ANY CIRCUMSTANCES FOR DIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, INCIDENTAL, OR INDIRECT DAMAGES OF ANY KIND, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER RELATED TO THIS AGREEMENT, LICENSED MATERIALS,

THE PROGRAM OR THE SERVICES, AND WHETHER IN CONTRACT, STRICT LIABILITY OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE) EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. Nothing in this Agreement will limit or exclude either party's liability for any matter or individual remedy that may not be limited or excluded by applicable laws, rules, or regulations.

9. Indemnification.

a) You will defend, indemnify, and hold harmless Amazon and its affiliates and successors, and each of their respective directors, officers, and employees (each an "Indemnified Party" and, collectively, the "Indemnified Parties") from any third-party allegation or claim based on, or any loss, damage, settlement, cost, expense, and any other liability (including reasonable attorneys' fees and expenses) arising out of or in connection with, (a) your negligence, strict liability, or misconduct, (b) a breach of this Agreement by you, (c) any action or inaction by you (including any and all loss or damage to personal property or bodily harm (including death) relating to or arising out of any such action or inaction), or (d) any allegation or claim that you failed to comply with applicable laws, rules, or regulations.

b) Your duty to defend is independent of your duty to indemnify. You will use counsel reasonably satisfactory to the Indemnified Parties to defend each indemnified claim, and the Indemnified Parties will cooperate (at your expense) with you in the defense. If at any time the Indemnified Parties determine that they may be adversely affected by any indemnified claim, the Indemnified Parties may assume control of the defense of the claim. You will not consent to the entry of any judgment or enter into any settlement relating to an indemnified claim without the Indemnified Parties' prior written consent.

10. Licensed Materials.

As used in this Agreement, "Licensed Materials" means any software, application, website, content, or other information made available to you (whether standalone, for use on devices owned by you or Amazon, or otherwise) by Amazon or its affiliates in connection with the Program, together with any related manuals and other documentation. Amazon grants to you, during the term of this Agreement, a limited, non-exclusive, non-transferable, non-sublicensable, revocable license to use the Licensed Materials solely for the purpose of performing the Services and participating in the Program and as permitted under this Agreement. For additional rights and obligations regarding the Licensed Materials see the Program Policies.

11. Dispute Resolution, Submission to Arbitration.

By clicking "I agree and accept" in the box below or by providing any Service after the Effective Date, you agree to each of the following terms:

a) THE PARTIES WILL RESOLVE BY FINAL AND BINDING ARBITRATION, RATHER THAN IN COURT OR TRIAL BY JURY, ANY DISPUTE OR CLAIM, WHETHER BASED ON CONTRACT, COMMON LAW, OR STATUTE, ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT, INCLUDING TERMINATION OF THIS

AGREEMENT, TO YOUR PARTICIPATION IN THE PROGRAM, OR TO YOUR PERFORMANCE OF SERVICES. TO THE EXTENT PERMITTED BY LAW, THE PRECEDING SENTENCE APPLIES TO ANY DISPUTE OR CLAIM THAT OTHERWISE COULD BE ASSERTED BEFORE A GOVERNMENT ADMINISTRATIVE AGENCY.

b) TO THE EXTENT PERMITTED BY LAW, THE PARTIES AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS OR COLLECTIVE BASIS.

c) TO THE EXTENT PERMITTED BY LAW, THE PARTIES FURTHER AGREE THAT NO DISPUTE RESOLUTION PROCEEDING WILL BE CONDUCTED ON A REPRESENTATIVE BASIS.

d) TO THE EXTENT PERMITTED BY LAW, THE PARTIES WAIVE ANY RIGHT TO PARTICIPATE IN OR RECEIVE ANY RELIEF FROM ANY NON-INDIVIDUAL PROCEEDING REFERENCED ABOVE ANDTHIS AGREEMENT DOES NOT PROVIDE FOR, AND THE PARTIES DO NOT CONSENT TO, ARBITRATION ON A CLASS OR COLLECTIVE OR REPRESENTATIVE BASIS.

g) NO ARBITRATOR SELECTED TO ARBITRATE ANY DISPUTE BETWEEN THE PARTIES IS AUTHORIZED TO ARBITRATE ANY DISPUTE ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS. FURTHER, NO ARBITRATOR IS AUTHORIZED TO CONSOLIDATE CLAIMS OF MORE THAN ONE INDIVIDUAL UNLESS ALL PARTIES EXPRESSLY AGREE IN WRITING TO ANY SUCH CONSOLIDATION.

h) THIS AGREEMENT SHALL NOT BE INTERPRETED AS REQUIRING EITHER PARTY TO ARBITRATE DISPUTES ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS, EVEN IF A COURT OR ARBITRATOR INVALIDATES OR MODIFIES OR DECLINES TO ENFORCE THIS AGREEMENT IN WHOLE OR IN PART.

i) AN AWARD IN ARBITRATION SHALL DETERMINE THE RIGHTS AND OBLIGATIONS BETWEEN THE NAMED PARTIES ONLY, AND ONLY IN RESPECT OF THE CLAIMS IN SUCH ARBITRATION, AND SHALL NOT HAVE ANY BEARING ON THE RIGHTS AND OBLIGATIONS OF ANY OTHER PERSON OR ON THE RESOLUTION OF ANY OTHER DISPUTE, OR HAVE PRECLUSIVE EFFECT AS TO ISSUES OR CLAIMS IN ANY OTHER DISPUTE.

j) You and Amazon agree that, at least 30 days before commencing an action pursuant to this Agreement that in any way relates to this Agreement or to the Services, the aggrieved party will provide the other party a notice of the aggrieved party's claims and at least 30 days in which to cure an alleged breach of this Agreement or other alleged act or omission, if the same is reasonably capable of being cured. Notice shall be provided as set forth in Section 14 of this Agreement. The applicable statute of limitations shall be tolled for 30 days following the provision of such notice.

k) A party demanding arbitration under this Agreement must file the demand with the American Arbitration Association (the "AAA") and deliver the demand to the other party by hand or by first-class mail within the applicable statute of limitations. Any demand for arbitration by you must be served on Amazon's registered agent, Corporation Service Company, at 300 Deschutes Way SW, Suite 304, Tumwater, WA 98051. The demand must be in writing and describe each claim of the demanding party. The arbitration will be conducted by the AAA under its **Commercial Arbitration Rules and Mediation Procedures** in effect at the time of filing the demand for arbitration, provided that none of the AAA's expedited procedures will apply to the arbitration unless you and Amazon mutually agree in writing, after the demand has been filed, to the application of such procedure. The AAA's rules are available at www.adr.org. If the AAA's rules are inconsistent with this Agreement, this Agreement will govern. Payment of all filing, administration, and arbitrator fees will be governed by the AAA's rules, except that if you initiate the arbitration, you will pay for only the first US $200 of the total AAA filing fee. For example, if the AAA filing fee is US $180 you will be responsible for paying the entire AAA filing fee in that instance. But, if the AAA filing fee is US $570 you will be responsible for paying US $200 and Amazon will pay the difference (US $370 in this instance). Amazon also will pay all other costs and expenses unique to arbitration, including the arbitrator's fees. The arbitration will take place at a mutually-convenient location within 45 miles from the last location in which you provided Services, or at another mutually-convenient location, or at any location ordered by a court with personal jurisdiction over you and Amazon.

l) Notwithstanding any provision in the AAA rules, the parties agree that a court of law must resolve any dispute concerning the validity and enforceability of the Agreement, the applicability of any exemption to the Federal Arbitration Act, and the validity, enforceability or interpretation of the provisions in subsections b) through i) of this Section 11. The arbitrator must resolve all other disputes, including the arbitrability of claims pursuant to such other provisions.

m) If you assert a claim against Amazon that is not subject to individual arbitration pursuant to this Section 11, and there is then pending or later filed any claim against Amazon asserted by you or on your behalf that is subject to individual arbitration, then you agree and consent that any claim not subject to individual arbitration must be stayed until the resolution of such other claim in arbitration, unless such stay is contrary to applicable law.

12. Governing Law.

The interpretation of this Agreement is governed by the law of the state of Delaware without regard to its conflict of laws principles, except for Section 11 of this Agreement, which is governed by the Federal Arbitration Act and applicable federal law. If, for any reason, the Federal Arbitration Act is held by a court of competent jurisdiction not to apply to Section 11 of this Agreement, the law of the state of Delaware will govern Section 11 of this Agreement, including without limitation the common law of contracts of such state if any statute could be interpreted to limit the right of Amazon or you to arbitrate pursuant to Section 11 of this Agreement.

13. Modifications.

App. 380

Amazon may modify this Agreement, including the Program Policies, at any time by providing notice to you through the Amazon Flex app or otherwise providing notice to you. You are responsible for reviewing this Agreement regularly to stay informed of any modifications. If you continue to perform the Services or access Licensed Materials (except for accessing the Amazon Flex app for the purpose of considering whether to agree to modifications of the Terms of Service) after the effective date of any modification to this Agreement, you agree to be bound by such modifications. However, (i) any modification to Service Fees will be provided to you in writing or through the Amazon Flex app before you accept and complete any Delivery Blocks to which such modifications apply; (ii) any modifications to Section 11 will not apply to claims or disputes filed by you on or before the Effective Date; and (iii) if you previously opted-out of the dispute resolution provision in a prior version of the Terms of Service, any modifications to Section 11 that eliminate your right to opt out of the dispute resolution provision will not affect any right you may have to participate in a court action previously filed on your own behalf or as a member of a putative or certified class, collective or representative action that was filed on or before, and was pending on, the Effective Date.

14. Notice; Electronic/Mobile Communications.

Amazon will communicate with you via phone, text message, email, or push notifications sent via the Amazon Flex app (each such communication, "electronic communication") in connection with your participation in the Program. By downloading the Amazon Flex app, providing us with your mobile number, and agreeing to this Agreement, you are providing us with written consent to receive push notifications and automated text messages from Amazon in connection with the Program. To stop receiving push notifications, you may adjust the settings on your phone or delete the Amazon Flex app. You will not be able to participate in the Program if you adjust the settings or delete the Amazon Flex app. To stop receiving text messages from Amazon, reply STOP to any message. You consent to Amazon communicating with you concerning the Program via any or all of these means and you are responsible for printing, storing, and maintaining your own records of any such agreements, notices, disclosures or other communications. Standard messaging and data rates may apply. It is your responsibility to keep your email address and phone number current by updating the information you provided to Amazon. Terminating this Agreement will stop all electronic communication. If you want to terminate this Agreement, you can provide a notice of termination to Amazon by sending a message to the following email address: amazonflex-support@amazon.com. If you want to provide notice under this Agreement, other than the notice of termination, you can provide such notice by sending a message to the following email address: amazonflex-support@amazon.com.

15. Documents.

You may obtain an e-mailed copy of this Agreement by e-mailing a request to amazonflex-support@amazon.com. This Agreement will be accessible to you at any time in the Amazon Flex app.

16. Entire Agreement and Severability; Survival.

a) This Agreement constitutes the complete and final agreement of the parties pertaining to the Services and supersedes and replaces the parties' prior agreements, understandings, representations, and discussions (whether written or oral) relating to the Services. If any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the fullest extent permissible under applicable law.

b) The following sections of this Agreement, along with any other provisions that by their nature should survive termination of this Agreement, will survive any termination or expiration of this Agreement: Term and Termination; Indemnification; Limitation of Liability; Dispute Resolution, Submission to Arbitration, Governing Law and the following sections of the Program Policies: Confidentiality and Personal Information; Taxes; and Miscellaneous.

17. Knowing and Voluntary Agreement.

You acknowledge and agree that you are entering into this Agreement voluntarily and without any duress or undue influence by Amazon or anyone else. Further, you confirm that you carefully read this Agreement, asked any questions needed for you to understand this Agreement, and you fully understand the terms, consequences, and binding effect of this Agreement, including that you are waiving the right to go to court, to a jury trial and to proceed on a class, collective or representative basis. Finally, you agree that you have had an opportunity to seek the advice of an attorney before agreeing to and accepting this Agreement and that you have done so or you knowingly and voluntarily decided not to seek such advice.

**EXHIBIT A**

**AMAZON FLEX PROGRAM POLICIES**

I. Welcome To Amazon Flex.

Welcome to Amazon Flex, an innovative new service offering you the opportunity to deliver packages to Amazon customers. Amazon is excited to welcome you to the Amazon Flex program and hope that you enjoy being your own boss and running your own business by using the Amazon Flex app.

II. Program Requirements.

A. In order to participate in the Program, you must:

1. Pass a background check and, if applicable, a motor vehicle record check in accordance with Amazon's standards;

2. Be at least 21 years of age;

3. Be legally qualified to work in each jurisdiction in which you provide Services;

4. Have the ability to effectively operate the Amazon Flex app and communicate with customers; and

5. Install the Amazon Flex app on your smartphone.

B. In performing Services, you may use:

1. Non-motorized transportation (e.g., walking, cycling);

2. Following Vehicles:

◦ a private passenger vehicle,

◦ a cargo van (not to exceed 10,000 lbs. in gross vehicle weight rating),

◦ a light truck (not to exceed 10,000 lbs. in gross vehicle weight rating); or

3. Public Transportation.

If you are required to advise Amazon of the mode of delivery that you intend to use to deliver specified Deliverables, you agree to use only that mode of delivery to deliver those Deliverables.

C. If you operate any Vehicle in connection with your performance of Services, you must:

1. Have a current valid driver's license,

2. If applicable, maintain current Vehicle registration,

3. Maintain current automobile insurance coverage required by applicable laws, rules, and regulations to operate such Vehicle; and

4. Be legally authorized and fit to operate such Vehicle.

5. Upon request, you will provide Amazon with proof that these requirements have been satisfied.

6. All Vehicles must be registered and must have passed all applicable local, state and federal standards for safety and environmental compliance.

7. You are not permitted to carry weapons while performing Services, except to the extent local applicable law places restrictions on this policy.

8. You will not provide Services if you are currently an Amazon employee and you will cease providing Services if you become an Amazon employee.

III. Service Standards.

App. 383

A. As an independent contractor, you agree to provide results—the timely and effective delivery of undamaged parcels, bags, totes or other items to the customers' and Amazon's satisfaction--subject to the following standards ("Service Standards"):

1) Safety

 i. Failure to comply with health, safety, & other applicable laws. Amazon requires you to comply with all traffic (including observing speed limit laws and distracted driving laws), health, safety, and other laws applicable to Deliverables or Services. Violation of traffic, health, safety, and other laws applicable to Deliverables or Services will make you ineligible to participate in the Program. The "Safety Reminder" video available in the "Videos" section of the Amazon Flex app contains important information for your safety and awareness. You agree and confirm that you will not provide the Services unless and until (a) you have viewed and fully understood the contents of this video, or (b) you have received hazardous materials training in the past three years that satisfies the Hazardous Materials Regulations (49 CFR 172.704), and you have, or can obtain upon your request, records confirming the same

2) Reliability

 i. Arriving on time for or timely forfeiting Delivery Blocks. As with any vendor of services, Amazon expects that you a) be ready to timely provide Services for any confirmed Delivery Block or b) forfeit a Delivery Block at least 45 minutes before the start of such Delivery Block. Please note that if you select a Delivery Block close to its start time (i.e. 20 minutes before the start of the Delivery Block), you will still be expected to timely complete your Delivery Block. If you repeatedly arrive after the schedule time to receive packages or forfeit Delivery Blocks late, you will no longer be eligible to participate in the Program.

3) Delivery Quality

 i. Late Deliveries. Amazon expects that you deliver the packages to the customers on time. The app will specify the delivery window during which the customer expects the package to be delivered. If you repeatedly deliver packages late, you will no longer be eligible to participate in the Program.

ii. Packages marked as delivered that the customer does not receive. If you deliver a package, Amazon expects that the customer will be able to find it. If customers repeatedly report that they cannot find packages you marked as delivered, you will no longer be eligible to participate in the Program.

iii. Delivery not attempted or undeliverable packages not returned to Amazon timely. Amazon expects that you will deliver all the packages you picked up as part of your Delivery Block. In an instance where delivery is not possible, you are expected to return all packages to the Amazon delivery station, unless otherwise directed by Amazon. If you repeatedly do not attempt to deliver all the packages you picked up during a Delivery Block or you do not return the undeliverable packages to a location specified by Amazon, you will no longer be eligible to participate in the Program.

App. 384

4) Customer Service

 i. Rude or inappropriate behavior. Amazon expects you to behave respectfully and professionally when interacting with its customers, station operators, merchants and other delivery partners while providing the Services. If customers, station operators, merchants or other delivery partners repeatedly report disrespectful, rude, inappropriate, unprofessional, dangerous or threatening conduct, you will no longer be eligible to participate in the Program. Additionally, a single violation, depending on the seriousness of the infraction, can make you ineligible to participate in the Program.

ii. Failure to follow delivery instructions. Amazon expects you to follow customer delivery instructions as reflected in the app as long as the customer instructions are reasonable and do not conflict with health, safety and other applicable laws. Amazon expects you to perform the Services consistent with industry standards, including with respect to health and safety, always checking recipient IDs when delivering alcohol and collecting a signature when instructed to do so in the app. If you repeatedly disregard the instructions, you will no longer be eligible to participate in the Program.

B. As an independent contractor, subject only to this Agreement, it is for you to decide the means and manner in which to provide the Services and achieve the results that you have agreed to provide. Therefore, in performing Services, you are free to map out your own routes, sequence your deliveries and in every other way control the means and manner in which you deliver Deliverables.

IV. Program Account.

A. Amazon will use information provided by you to create or maintain your user account for the Program ("Program Account"). You will provide accurate, current, and complete information as part of your contracting process and to update your information as necessary so that it remains accurate, current, and complete at all times.

B. You will not permit any other person to access your Program Account or the Licensed Materials, including the Amazon Flex App, or to perform any Services using your identity or log-in credentials. You will not use any other person's access to Program Account or Licensed Materials, including the Amazon Flex App, or perform any Services using any other person's identity or log-in credentials. You will keep secure and confidential any password required to access your Program Account or Amazon Flex App or any identification that Amazon provides to you in connection with the Program or Amazon Flex App and you agree to accept responsibility for all activities that occur under your Program Account and associated password.

V. Insurance.

A. If you operate any motor vehicle(s) in connection with your performance of the Services, you will maintain, at your expense, personal automobile insurance coverage required by applicable laws, rules, and regulations to operate such vehicle(s). You will provide proof of such insurance coverage to Amazon, upon request. You will notify Amazon if your insurance coverage is

App. 385

cancelled. Your personal automobile insurance policy may not cover commercial activity. As an independent contractor, it is your responsibility to understand the terms of your personal insurance coverage and to contact your personal insurance company if you have any questions.

B. Where allowed by state and federal regulations, Amazon maintains, pursuant to FMCSA regulations, a commercial automobile insurance policy ("Amazon Insurance Coverage") that is intended to provide third-party bodily injury and property damage coverage, uninsured/under-insured motorist coverage, and comprehensive/collision coverage contingent on your personal insurance policy coverage, while actively performing the Services during the Delivery Block, in each case subject to Amazon Insurance Coverage deductibles and coverage limitations. If you maintain commercial automobile insurance coverage applicable to your operation of a Vehicle, your provider will provide primary coverage for you at all times, including during the Delivery Block and Amazon Insurance Coverage will be, only in those geographies where state and federal regulations allow, excess over your commercial automobile insurance. The above description of Amazon Insurance Coverage is a summary only, and if there is a conflict between the above description and the actual terms of the Amazon Insurance Policy, the actual terms of the Amazon Insurance Policy will dictate coverage. You will notify Amazon immediately of any accident or other on-road incident that occurs while you are providing Services during the Delivery Block and you will cooperate with Amazon and the applicable insurance company in the investigation of such accident or on-road incident. Amazon Insurance Coverage will in no way affect your indemnity obligations to Amazon as provided for in the Agreement. Amazon Insurance Coverage limits are available upon request.

VI. Privacy.

A. Amazon receives and stores any information you enter on our website and mobile applications, while providing Services or participating in the Program, and through other interactions and communications you have with us, our mobile application or our website. Any of the Licensed Materials may provide Amazon with data about your use of such Licensed Materials, your geo-location and related tracking data, including your location, movements, speed at which you are traveling, and other personally identifiable information. Amazon may use any such information and share such information with third parties in connection with the Program or other products or services, including Services, offered by Amazon or its affiliates. By submitting information to Amazon during the contracting process or while providing Services and using any Licensed Materials, you expressly (i) consent to Amazon collecting, using and sharing the above described data and information and (ii) waive and release Amazon from any and all claims, causes of action, liability or damages arising out of or in any way related to Amazon's use of such data and information.

B. Amazon may obtain information about you, including your motor vehicle record and results of your background check. You authorize Amazon and its applicable service provider(s) to, from time to time, (i) perform a background check on you and (ii) obtain your motor vehicle record. Based on a review by Amazon or its service provider of the results of your background check and motor vehicle record, Amazon may immediately terminate this Agreement.

C. Subject to applicable laws, Amazon may release any collected data and information, including personally identifiable information, when Amazon believes such release is appropriate or necessary to (i) comply with the law; (ii) enforce or apply this Agreement, including Program Policies; (iii) protect the rights, property, security or safety of Amazon, its affiliates, Amazon's customers, or others; (iv) detect, prevent or otherwise address fraud, security or technical issues; or (v) prevent or stop activity which Amazon considers to be, or to pose a risk of becoming, illegal, unethical, or legally actionable. Amazon may also receive information you shared with third parties, provided that such party has obtained necessary permissions to share the information with Amazon.

D. When you download or use apps created by Amazon or its affiliates, Amazon will receive information about your location, and your mobile device, including a unique identifier for your device. Most mobile devices provide you with information about these permissions. You have the right to choose whether or not to allow Amazon to receive this information. However, our ability to receive this information is an important part of the performance of Services, so if you choose to deny Amazon access to this information, this could affect the availability and functionality of the Amazon Flex App and your participation in the Program.

E. As a condition of delivering Amazon packages using the Amazon delivery application, you consent to allow Amazon to verify your identity and share your photo with Amazon customers for identification purposes from time to time. Amazon may derive from your photo a facial scan or similar biometric identifier ("Biometric Information"), and collect, store, and use Biometric Information from your submitted photos (including your photos Amazon already has on file), driver's license, or government-issued ID. You also agree to Amazon's Photo Use and Biometric Information Retention Policy, which can be found below:

**Photos Use and Biometric Information Retention Policy**

Amazon uses your submitted photos (including your photos that we already have on file), driver's license, or government-issued ID for identification purposes. This can include making sure it's you who is doing the delivery and using your photo to identify you to customers and Amazon personnel. The photo is also used on your in-app ID card. Amazon will retain your photos while you use the Amazon delivery application and thereafter for so long as permitted by law or until you request that Amazon delete your photo. You may request deletion of your photo by contacting support, but deleting your photo will block your access to the Amazon delivery application until you replace it and it is checked for validity.

Amazon requires that users of the Amazon delivery application provide a photo for identification purposes. Amazon may derive from your photo a facial scan or similar biometric identifier, ("Biometric Information"). This policy governs our retention of users' Biometric Information. Amazon retains a user's Biometric Information for up to 30 days after it is generated. Thereafter, Amazon will promptly delete the Biometric Information. Note that this means Amazon may need to retain your Biometric Information after you stop using the Amazon delivery application for purposes of ongoing fraud detection and investigation.

VII. Licensed Materials; Devices.

App. 387

A. You may not (i) incorporate any portion of the Licensed Materials into your own works or compile any portion of it in combination with your own works, transfer it, in whole or in part, for use with another service, or sell, rent, distribute, copy, modify, adapt, translate, reverse engineer, decompile, or disassemble, or make derivative works based on, or manipulate the Licensed Materials or any part of the Licensed Materials or otherwise sublicense or assign any rights to the Licensed Materials in whole or in part, (ii) cause or launch any programs or scripts for the purpose of surveying, manipulating or data mining any portion of the Licensed Materials or impairing or unduly affecting the operation or functionality of any aspect of the Licensed Materials; or (iii) attempt to gain unauthorized access to any portion of the Licensed Materials, including through scripts or third party applications.

B. Additional third party terms contained within or distributed with certain Licensed Materials may apply to the Licensed Materials (or software incorporated with the Licensed Materials) and will govern the use of such software in the event of a conflict with this Agreement ("Third Party Software"). Such Third Party Software license terms will apply to the corresponding Third Party Software in lieu of this Agreement. For more information on Third Party Software, refer to the Additional Terms in the Amazon Flex app, which can be accessed via Home > Account > View Legal Information > Additional Terms.

C. All rights not expressly granted to you in this Agreement are reserved and retained by Amazon or other content providers. You may not frame or utilize framing techniques to enclose any trademark, logo, or other proprietary information (including images, text, page layout, or form) of Amazon without express written consent. You may not use any meta tags or any other "hidden text" utilizing Amazon's name or trademarks without the express written consent of Amazon. You may use the Licensed Materials only as permitted by law.

D. You will not attempt to participate or participate in the Program, or provide any Services, for the purpose of gathering information regarding the Program (including any Licensed Materials) or Amazon's processes, building or operating a competitive service or a service that uses similar ideas, features, or functions as the Program (including any Licensed Materials), or copying any idea, feature, or function of the Program (including any Licensed Materials).

E. When you use the Licensed Materials, you may also be using the services of one or more third parties, such as a wireless carrier or a mobile platform provider. Your use of these third party services may be subject to the separate policies, terms of use, and fees of these third parties.

F. Amazon may offer automatic or manual updates to the Licensed Materials at any time and without notice to you.

G. You must comply with all export and re-export restrictions and regulations of the Department of Commerce and other United States agencies and authorities that may apply to the Licensed Materials and agree not to transfer, or encourage, assist, or authorize the transfer of Licensed Materials to a prohibited country or otherwise in violation of any applicable restrictions or regulations.

H. You will notify Amazon immediately after becoming aware that any device on which any Licensed Materials are installed has been lost, stolen, or misplaced. If Amazon provides you with any device or other equipment in connection with the Program and such device or other equipment (or any part of it) is lost, stolen, unreturned, damaged, sold, transferred, or encumbered without the express prior written consent of Amazon, you will promptly pay Amazon the full replacement cost of such device or other equipment, together with any incidental costs that are incurred by Amazon to replace the same.

I. AMAZON LICENSES THE LICENSED MATERIALS TO YOU "AS IS" AND MAKES NO WARRANTIES OF ANY KIND REGARDING THE LICENSED MATERIALS. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AMAZON EXPRESSLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT, TITLE, OR FITNESS FOR A PARTICULAR PURPOSE. AMAZON DOES NOT WARRANT THAT THE LICENSED MATERIALS WILL MEET YOUR REQUIREMENTS OR WILL OPERATE UNINTERRUPTED, ERROR FREE, OR PROVIDE ACCURATE, COMPLETE, OR UP-TO-DATE INFORMATION. AMAZON WILL NOT BE RESPONSIBLE FOR ANY LOSS, DAMAGE, OR CLAIM CAUSED BY OR ATTRIBUTABLE TO ANY DEFECT OR DEFICIENCY IN ANY LICENSED MATERIALS.

J. If you provide any suggestions, comments, ideas, improvements, or other feedback relating to the Program, Program Policies or the Licensed Materials to Amazon, you assign to Amazon all right, title and interest in and to the same and will provide any assistance Amazon may require to document, perfect, and maintain these rights, and Amazon will be free to use, disclose, reproduce, modify, license, transfer, and otherwise distribute and exploit any of the foregoing.

K. All content included in or made available through Licensed Materials or the Program such as text, graphics, logos, button icons, images, audio clips, digital downloads, data compilations, and software is the property of Amazon or its content suppliers and protected by United States and international copyright laws. The compilation of all content included in or made available through any Licensed Materials or the Program is the exclusive property of Amazon and protected by U.S. and international copyright laws.

L. Graphics, logos, page headers, button icons, scripts, and service names included in or made available through any Licensed Materials or the Program are trademarks or trade dress of Amazon in the U.S. and other countries. All other trademarks not owned by Amazon that appear in the Licensed Materials or the Program are the property of their respective owners, who may or may not be affiliated with, connected to, or sponsored by Amazon.

VIII. Confidentiality and Personal Information.

A. You will use all personally identifiable information (i) concerning Amazon's customers, including names and addresses and (ii) provided to you or learned by you during performance of Services (collectively, "Personal Information"), solely for the purpose of providing Services using the Amazon Flex app and will not contact Amazon's customers using Personal Information for any reason unless directly related to providing Services. You will comply with all

instructions Amazon provides in respect of the processing of Personal Information, and you will maintain appropriate security measures to prevent unauthorized use or disclosure of Personal Information and will keep confidential and not share Personal Information with any third party unless expressly permitted under this Agreement. You will return all Personal Information to Amazon promptly following a request from Amazon. As between you and Amazon, all Personal Information is and will remain the exclusive property of Amazon, and you will not disclose, share, transfer, rent, barter, trade, or sell Personal Information and will not develop lists of or aggregate Personal Information. For the avoidance of doubt, the contents of Deliverables tendered by Amazon to you are Personal Information.

B. If you are required by any governmental authority to disclose the contents of any Deliverable, you will promptly notify Amazon of such requirement. Amazon will not provide any Personal Information in connection with any disputes or claims between you and Amazon's customers, nor will any Amazon customers be contacted or called to testify, by either you or Amazon, in connection with any dispute or claim between you and Amazon.

C. Without the prior written authorization by a Vice President of Amazon, you will not use any trade name, trademark, service mark, trade dress, logo or commercial symbol, or any other proprietary rights of Amazon or any of its affiliates in any manner (including use in any client list, press release, advertisement, or other promotional material).

IX. Taxes.

Each party will be responsible, as required under applicable law, for identifying and paying all taxes and other governmental fees and charges (and any penalties, interest, and other additions thereto) that are imposed on that party upon or with respect to the transactions and payments under this Agreement. Amazon may deduct or withhold any taxes that Amazon may be legally obligated to deduct or withhold from any amounts payable to you under this Agreement, and payment to you as reduced by such deductions or withholdings will constitute full payment and settlement to you of amounts payable under this Agreement. Throughout the term of this Agreement, you will provide Amazon with any forms, documents, or certifications as may be required for Amazon to satisfy any information reporting or withholding tax obligations with respect to any payments under this Agreement.

X. Additional Terms.

A. A party does not waive any right under any provision of this Agreement, including Program Policies, by failing to insist on compliance with, or by failing to exercise any right under, the applicable provision. Any waivers granted under this Agreement are effective only if recorded in a writing signed by the party granting such waiver. The section headings of this Agreement, including Program Policies, are for convenience only and have no interpretive value.

B. You will not assign, subcontract, or delegate any of your rights or obligations under this Agreement, or your Program Account, without Amazon's prior written consent. Any attempt by you to assign, subcontract, or delegate in violation of this Agreement will be null and void.

# EXHIBIT P

AMAZON FLEX

INDEPENDENT CONTRACTOR TERMS OF SERVICE

Welcome to the Amazon Flex program (the "**Program**"). These Terms of Service (this "**Agreement**"), including the Program Policies, attached at Exhibit A, govern the transportation, delivery and related services contemplated by this Agreement (the "**Services**") and constitute a binding agreement between Amazon Logistics, Inc. ("**Amazon**") and you. Any reference to this Agreement includes the Program Policies. If there is a conflict between the Program Policies and any other section of this Agreement, the Program Policies prevail.

**YOU AND AMAZON AGREE TO RESOLVE DISPUTES BETWEEN YOU AND AMAZON ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION. YOU AND AMAZON WAIVE THE RIGHT TO PURSUE THE RESOLUTION OF ANY SUCH DISPUTE IN A COURT AND WAIVE THE RIGHT TO A TRIAL BY JURY. If you previously opted-out of the dispute resolution provision in a prior version of the Terms of Service, then, to fullest extent permitted by law, you revoke, subject to the exclusions in Section 13, your prior decision to opt out and you agree to individual, binding arbitration by clicking "I agree and accept" in the box below or by providing any Services after the Effective Date.**

**This Agreement updates and replaces any version of the Terms of Service you previously accepted.** This Agreement takes effect on the earlier of the date on which you click "I agree and accept" in the box below or, if you accepted a prior version of the Terms of Service and continue to use the Amazon Flex app, 14 calendar days after Amazon made this Agreement available in the "Legal Information" section of the Amazon Flex app or sent you notice of it to your email address("**Effective Date**").

**1. The Services.**

a) You agree to provide the Services in a safe and competent manner in accordance with the level of professional care that would be observed by a prudent person rendering similar services and subject to the Service Standards described in the Program Policies. Failure to comply with the Service Standards will constitute a breach of this Agreement.

b) This Agreement requires no minimum amount or frequency of Services. A "Delivery Block" is the block of time, scheduled to begin and end as specified in the Amazon Flex app, for delivering the parcels, packages, totes, bags or other deliverables tendered to you by Amazon or its designees, or otherwise made available to you for pick-up ("Deliverables"). Unless you cancel a scheduled Delivery Block as permitted under the Program Policies, you will arrive on-time to deliver the assigned Deliverables during the Delivery Block.

**2. Independent Contractor Relationship.**

This Agreement creates an independent contractor relationship, not an employment relationship. As such, you agree that this Agreement is not a contract of employment, does not involve

App. 392

conditions of employment, and is not evidence of an employment relationship. As an independent contractor of Amazon you are not required to purchase or rent any products, equipment or services from Amazon as a condition of entering into this Agreement. Nothing in this Agreement will create any partnership, joint venture, agency, franchise, or employment relationship between you and Amazon. As an independent contractor, you will not be considered as having the status of an employee of Amazon for any purpose, including federal, state, and local tax purposes, and you will not be required or entitled to participate in any employee benefit or other plans or arrangements in which employees of Amazon and its affiliates may participate. You are solely responsible for all taxes applicable to you, including, but not limited to, income and social security taxes. Amazon will not withhold taxes from fees paid to you, including taxes for unemployment insurance or workers' compensation benefits. You have no authority to bind Amazon, and you will not make any representation identifying yourself as an employee of Amazon or make any representations to any person or entity that you have any authority to bind Amazon as an employee, partner, or otherwise. This Agreement applies while you are actively performing the Services. "Actively performing the Services" means that you are loading or unloading Deliverables, actively delivering Deliverables, waiting to receive more Deliverables during a Delivery Block, or actively and directly on your way back to the delivery station with undeliverable or damaged Deliverables. You will not be engaged to provide Services between the time you are no longer actively performing the Services in connection with one Delivery Block and before the start of any subsequent Delivery Block.

**3. Service Fees.**

In consideration of providing Services in accordance with this Agreement and for providing your Vehicle, Amazon will pay you fees in the amounts indicated in the Amazon Flex app at the time of acceptance, or as otherwise agreed between you and Amazon from time to time ("Service Fees"). The Service Fees, unless otherwise expressly provided in this Agreement, will be your only fee for performing the Services. Unless otherwise indicated by Amazon, the Service Fees are intended to cover all amounts incurred by you for providing your Vehicle and the Services under this Agreement, including any expenses you may incur (such as costs of fuel, taxes, registration fees, permits of all types, and any other assessment, citation, fine, or fee imposed or assessed against your Vehicle or you by any applicable governmental authority or otherwise related to your equipment and its use). You understand that Amazon would offer lower Service Fees if Amazon had to pay separately for your expenses. Amazon will pay Service Fees to you no later than 15 days after completion of the Services. Depending on the location in which the Services are provided and the product or business to which the Services relate, Amazon's customers may be able to provide a tip in connection with the fulfillment of their orders and Amazon will pass through any tips payable to you.

**4. Representations, Warranties, and Covenants.**

You represent and warrant to Amazon that you have all legal capacity and authority to enter into, and perform your obligations under, this Agreement. You agree, at all times, to: (a) comply with all laws, rules, and regulations pertaining to the Services, including all laws, rules, and regulations applicable to (i) transportation, safety and insurance related to the performance of Services, (ii) health and safety of customers and the Deliverables and (iii) anti-bribery and anti-corruption; (b)

hold and maintain, throughout your participation in the Program, all licenses, permits, and other authorizations necessary for you to perform the Services (including, if applicable, driver's license, vehicle registration, and automobile insurance), which you will provide to Amazon upon request; (c) notify Amazon immediately after becoming aware that any license, permit, or authorization required for you to perform the Services has expired, been lost or suspended; (d) provide complete and accurate responses to all questions related to the background screening, including questions on prior convictions; (e) notify Amazon immediately if you need to change or update your answers to any questions posed during the background screening process, including if you have any new convictions; (f) notify Amazon immediately of any event or circumstance that impairs the safety of or delays delivery of Deliverables; (g) comply with Amazon's Supply Chain Standards posted at **http://www.amazon.com/gp/help/customer/display.html?ie=UTF8&nodeId=200885140** and Amazon's safety policies related to Amazon's premises and Deliverables (collectively, "Amazon Safety Requirements"), and permit, as requested by Amazon from time to time, Amazon or its designee to audit your compliance with any Amazon Safety Requirements; (h) not violate or infringe any third party's rights in proprietary or confidential information in performing the Services; (i) provide a photo of yourself during onboarding according to Amazon's instructions and comply with identity verification processes while on Amazon property or providing Services; and (j) not create any lien on Amazon property or assets, including any Deliverables, and waive all rights to any lien. Throughout the term of this Agreement, you will provide Amazon with any forms, documents, or certifications as may be required for Amazon to verify representations and warranties you made in this Agreement or your compliance with any provision of this Agreement.

**5. Equipment Used to Perform the Services.**

a) You agree that, as part of managing your own business, you will provide and maintain a mobile device compatible with the Amazon Flex app, any vehicle identified by you within the Amazon Flex app ("Vehicle"), any bicycle or other non-motorized mode of transportation used to provide the Services, and any other equipment that you choose to use or that you need in order to provide the Services. Your identification of any Vehicle within the Amazon Flex app will be considered an acknowledgement of and receipt for equipment, as required by applicable law.

b) You agree that while actively performing the Services, your Vehicle is under an exclusive lease as defined under Federal Motor Carrier Safety Administration ("FMCSA") section 49 C.F.R. Part 376.12(c)(1), which requires exclusive possession, control and use by Amazon of both the Services and your Vehicle during that time. For clarity, exclusive possession, control and use of your Vehicle by Amazon does not mean that you cede physical control or ownership of your Vehicle and the requirements of the FMCSA regulations do not affect your status as an independent contractor (49 C.F.R. 376.12(c)(4)).

**6. Term and Deactivation.**

a) This Agreement is effective as of the Effective Date and will continue to be in effect until you or Amazon terminates this Agreement.

App. 394

b) You may terminate this Agreement at any time and for any reason by giving Amazon a notice of termination in accordance with Section 14 below. You will not be eligible to participate in the Program for 12 months following the date of the termination notice.

c) Amazon may terminate this Agreement for the following reasons ("for cause") by giving you a notice of termination in accordance with Section 14 below: (i) for failure to meet any of the Service Standards, (ii) for failing or refusing a background check or identity verification check, or for providing false or incomplete information any time before or after the Effective Date, (iii) for material violation of the Program Policies or any other policy provided to you by Amazon, (iv) for material breach of this Agreement, (v) if your Amazon.com account is deactivated; (vi) for misuse of the Amazon Flex app, including incidents of fraud or theft or (vii) for other commercially reasonable cause. You may appeal a for cause termination of this Agreement by sending an email notice to Amazon in the manner specified by Amazon within 10 days of receiving the contract termination notice.

d) If you have been inactive for more than 180 days, Amazon may deactivate your account. If your account is deactivated for inactivity, you may apply to re-enroll in the Program.

e) If you opt out of receiving electronic communication (as defined in Section 14 below), your account will be deactivated. Subject to other provisions of this Agreement, you will be able to reactivate your account by notifying Amazon that you agree to receive electronic communication from Amazon.

f) Amazon may cease providing any Licensed Materials (as defined in Section 10 below) and terminate this Agreement for cause immediately without any notice if you violate any of the terms related to the Licensed Materials in which case any licenses granted to you by Amazon will terminate immediately, without any notice.

g) If either you or Amazon terminate this Agreement, you must uninstall the Amazon Flex application on your device.

## 7. Availability of the Services.

Amazon makes no promises or representations in this Agreement as to the amount of business that you can expect at any time. You can accept or reject any opportunity offered by Amazon. Nothing in this Agreement will prohibit you from providing Services or using your Vehicle on behalf of any other person or entity, including competitors of Amazon, except while you are actively performing the Services. Amazon may also engage the services of other companies and individuals that may perform the same or similar services as those provided by you under this Agreement.

## 8. Limitation of Liability.

Amazon will not be liable for damages of any kind, including direct damages, loss of goodwill, lost opportunities or profits, anticipated amount of business, expenditures, investments, leases, or commitments made by you in connection with the Program or otherwise. Except for your indemnity obligations under Section 9 below and any liability arising out of your breach of the

App. 395

section of the Program Policies entitled "Confidentiality and Personal Information," and except as indicated below, NEITHER PARTY WILL BE LIABLE UNDER ANY CIRCUMSTANCES FOR DIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, INCIDENTAL, OR INDIRECT DAMAGES OF ANY KIND, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER RELATED TO THIS AGREEMENT, LICENSED MATERIALS, THE PROGRAM OR THE SERVICES, AND WHETHER IN CONTRACT, STRICT LIABILITY OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE) EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. Nothing in this Agreement will limit or exclude either party's liability for any matter or individual remedy that may not be limited or excluded by applicable laws, rules, or regulations.

**9. Indemnification.**

a) You will defend, indemnify, and hold harmless Amazon and its affiliates and successors, and each of their respective directors, officers, and employees (each an "Indemnified Party" and, collectively, the "Indemnified Parties") from any third-party allegation or claim based on, or any loss, damage, settlement, cost, expense, and any other liability (including reasonable attorneys' fees and expenses) arising out of or in connection with, (a) your negligence, strict liability, or misconduct, (b) a breach of this Agreement by you, (c) any action or inaction by you (including any and all loss or damage to personal property or bodily harm (including death) relating to or arising out of any such action or inaction), or (d) any allegation or claim that you failed to comply with applicable laws, rules, or regulations.

b) Your duty to defend is independent of your duty to indemnify. You will use counsel reasonably satisfactory to the Indemnified Parties to defend each indemnified claim, and the Indemnified Parties will cooperate (at your expense) with you in the defense. If at any time the Indemnified Parties determine that they may be adversely affected by any indemnified claim, the Indemnified Parties may assume control of the defense of the claim. You will not consent to the entry of any judgment or enter into any settlement relating to an indemnified claim without the Indemnified Parties' prior written consent.

**10. Licensed Materials.**

As used in this Agreement, "Licensed Materials" means any software, application, website, content, or other information made available to you (whether standalone, for use on devices owned by you or Amazon, or otherwise) by Amazon or its affiliates in connection with the Program, together with any related manuals and other documentation. Amazon grants to you, during the term of this Agreement, a limited, non-exclusive, non-transferable, non-sublicensable, revocable license to use the Licensed Materials solely for the purpose of performing the Services and participating in the Program and as permitted under this Agreement. For additional rights and obligations regarding the Licensed Materials see the Program Policies.

**11. Dispute Resolution, Submission to Arbitration.**

By clicking "I agree and accept" in the box below or by providing any Service after the Effective Date, you agree to each of the following terms:

a) THE PARTIES WILL RESOLVE BY FINAL AND BINDING ARBITRATION, RATHER THAN IN COURT OR TRIAL BY JURY, ANY DISPUTE OR CLAIM, WHETHER BASED ON CONTRACT, COMMON LAW, OR STATUTE, ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT, INCLUDING TERMINATION OF THIS AGREEMENT, TO YOUR PARTICIPATION IN THE PROGRAM, OR TO YOUR PERFORMANCE OF SERVICES. TO THE EXTENT PERMITTED BY LAW, THE PRECEDING SENTENCE APPLIES TO ANY DISPUTE OR CLAIM THAT OTHERWISE COULD BE ASSERTED BEFORE A GOVERNMENT ADMINISTRATIVE AGENCY.

b) TO THE EXTENT PERMITTED BY LAW, THE PARTIES AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS OR COLLECTIVE BASIS.

c) TO THE EXTENT PERMITTED BY LAW, THE PARTIES FURTHER AGREE THAT NO DISPUTE RESOLUTION PROCEEDING WILL BE CONDUCTED ON A REPRESENTATIVE BASIS.

d) TO THE EXTENT PERMITTED BY LAW, THE PARTIES WAIVE ANY RIGHT TO PARTICIPATE IN OR RECEIVE ANY RELIEF FROM ANY NON-INDIVIDUAL PROCEEDING REFERENCED ABOVE ANDTHIS AGREEMENT DOES NOT PROVIDE FOR, AND THE PARTIES DO NOT CONSENT TO, ARBITRATION ON A CLASS OR COLLECTIVE OR REPRESENTATIVE BASIS.

e) NO ARBITRATOR SELECTED TO ARBITRATE ANY DISPUTE BETWEEN THE PARTIES IS AUTHORIZED TO ARBITRATE ANY DISPUTE ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS. FURTHER, NO ARBITRATOR IS AUTHORIZED TO CONSOLIDATE CLAIMS OF MORE THAN ONE INDIVIDUAL UNLESS ALL PARTIES EXPRESSLY AGREE IN WRITING TO ANY SUCH CONSOLIDATION.

f) THIS AGREEMENT SHALL NOT BE INTERPRETED AS REQUIRING EITHER PARTY TO ARBITRATE DISPUTES ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS, EVEN IF A COURT OR ARBITRATOR INVALIDATES OR MODIFIES OR DECLINES TO ENFORCE THIS AGREEMENT IN WHOLE OR IN PART.

g) AN AWARD IN ARBITRATION SHALL DETERMINE THE RIGHTS AND OBLIGATIONS BETWEEN THE NAMED PARTIES ONLY, AND ONLY IN RESPECT OF THE CLAIMS IN SUCH ARBITRATION, AND SHALL NOT HAVE ANY BEARING ON THE RIGHTS AND OBLIGATIONS OF ANY OTHER PERSON OR ON THE RESOLUTION OF ANY OTHER DISPUTE, OR HAVE PRECLUSIVE EFFECT AS TO ISSUES OR CLAIMS IN ANY OTHER DISPUTE.

h) You and Amazon agree that, at least 30 days before commencing an action pursuant to this Agreement that in any way relates to this Agreement or to the Services, the aggrieved party will provide the other party a notice of the aggrieved party's claims and at least 30 days in which to cure an alleged breach of this Agreement or other alleged act or omission, if the same is reasonably

capable of being cured. Notice shall be provided as set forth in Section 14 of this Agreement. The applicable statute of limitations shall be tolled for 30 days following the provision of such notice.

i) A party demanding arbitration under this Agreement must file the demand with the American Arbitration Association (the "AAA") and deliver the demand to the other party by hand or by first-class mail within the applicable statute of limitations. The demand for arbitration must be in writing and include (1) the name and address of the party seeking arbitration, (2) a statement of the legal and factual basis of each claim, (3) a description of the remedy sought (4) the amount in controversy, and (5) the claimant's handwritten or electronic signature. Any demand for arbitration by you must be served on Amazon's registered agent, Corporation Service Company, at 300 Deschutes Way SW, Suite 304, Tumwater, WA 98051. The arbitration will be conducted by the AAA under its **Commercial Arbitration Rules and Mediation Procedures** in effect at the time of filing the demand for arbitration, provided that none of the AAA's expedited procedures will apply to the arbitration unless you and Amazon mutually agree in writing, after the demand has been filed, to the application of such procedure. The AAA's rules are available at www.adr.org. If the AAA's rules are inconsistent with this Agreement, this Agreement will govern. Payment of all filing, administration, and arbitrator fees will be governed by the AAA's rules, except that if you initiate the arbitration, you will pay for only the first US $200 of the total AAA filing fee. For example, if the AAA filing fee is US $180, you will be responsible for paying the entire AAA filing fee in that instance. But, if the AAA filing fee is US $570 you will be responsible for paying US $200 and Amazon will pay the difference (US $370 in this instance). Amazon also will pay all other costs and expenses unique to arbitration, including the arbitrator's fees. Any finding that a claim or counterclaim violates the standards set forth in Federal Rule of Civil Procedure 11 shall entitle the other party to recover their attorneys' fees, costs, and expenses associated with defending against the claim or counterclaim. The arbitration will take place at a mutually-convenient location within 45 miles from the last location in which you provided Services, or at another mutually-convenient location, or at any location ordered by a court with personal jurisdiction over you and Amazon.

j) Notwithstanding any provision in the AAA rules, the parties agree that a court of law must resolve any dispute concerning the validity and enforceability of the Agreement as a whole, the applicability of any exemption to the Federal Arbitration Act, and the validity, enforceability or interpretation of the provisions in subsections b) through i) of this Section 11. The arbitrator must resolve all other disputes, including all other disputes about the arbitrability of claims pursuant to such other provisions. If any portion of the class, collective or representative action waiver is found to be void or unenforceable, then the portion of the waiver found void or unenforceable shall be severed from this Agreement, and all other parts and provisions shall remain in full force and effect. In such a case, the claim or claims (or portion of claims) found to be able to proceed on a class, collective or representative action basis shall proceed in a court of competent jurisdiction and not in arbitration. In no event shall a court or arbitrator order arbitration on a class, collective or representative basis. Any claims or claim in court shall be stayed until the arbitration is concluded, unless such stay is contrary to applicable law.

k) The parties agree that all claims for public injunctive relief shall not be arbitrated, but rather litigated in court, and all claims for private injunctive relief must be arbitrated on an individual

basis. A court, not an arbitrator, shall decide whether a claim is for public or private injunctive relief.

l) If you assert a claim against Amazon that is not subject to individual arbitration pursuant to this Section 11, and there is pending or later filed any claim against Amazon asserted by you or on your behalf that is subject to individual arbitration, then you agree and consent that any claim not subject to individual arbitration must be stayed until the resolution of such other claim in arbitration, unless such stay is contrary to applicable law.

m) A judgment upon the final award rendered by the arbitrator may be entered by any court having jurisdiction thereof. However, in any arbitration award issued in an arbitration conducted in accordance with this arbitration provision, the arbitrator shall specify a reasonable time within which the final award shall be satisfied, and no party may seek to confirm the award until the time specified for satisfaction has expired. If the final award is satisfied during the specified time, no party shall seek to confirm the award.

n) Nothing in this Section 11 shall be construed to prohibit settlements on a class-wide, collective, and/or representative basis.

## 12. Governing Law.

The interpretation and enforcement of this Agreement is governed by the law of the state of Delaware without regard to its conflict of laws principles, except for Section 11 of this Agreement, which is governed by the Federal Arbitration Act and applicable federal law. If, for any reason, the Federal Arbitration Act is held by a court of competent jurisdiction not to apply to Section 11 of this Agreement, the law of the state of Delaware and the Delaware Uniform Arbitration Act, 10 Del. C. § 5701 et seq. will govern Section 11 of this Agreement, including without limitation the common law of contracts of such state in the event that any statute could be interpreted as limiting the right of Amazon or you to arbitrate disputes pursuant to Section 11 of this Agreement. Nothing in this choice of law provision shall preclude the application of Delaware law to compel arbitration if a court of competent jurisdiction is unable to determine the application of the Federal Arbitration Act without discovery.

## 13. Modifications.

Amazon may modify this Agreement, including the Program Policies, at any time by providing notice to you through the Amazon Flex app or otherwise providing notice to you. You are responsible for reviewing this Agreement regularly to stay informed of any modifications. If you continue to perform the Services or access Licensed Materials (except for accessing the Amazon Flex app for the purpose of considering whether to agree to modifications of the Terms of Service) after the effective date of any modification to this Agreement, you agree to be bound by such modifications. However, (i) any modification to Service Fees will be provided to you in writing or through the Amazon Flex app before you accept and complete any Delivery Block(s) to which such modifications apply; (ii) any modifications to Section 11 will not apply to claims or disputes filed by you on or before the Effective Date; and (iii) if you previously opted-out of the dispute resolution provision in a prior version of the Terms of Service, any modifications to Section 11

App. 399

that eliminate your right to opt out of the dispute resolution provision will not affect any right you may have to participate in a court action previously filed on your own behalf or as a member of a putative or certified class, collective or representative action that was filed on or before, and was pending on, the Effective Date.

**14. Notice; Electronic/Mobile Communications.**

Amazon will communicate with you via phone, text message, email, or push notifications sent via the Amazon Flex app (each such communication, "electronic communication") in connection with your participation in the Program. By downloading the Amazon Flex app, providing us with your mobile number, and agreeing to this Agreement, you are providing us with written consent to receive push notifications and automated text messages from Amazon in connection with the Program. To stop receiving push notifications, you may adjust the settings on your phone or delete the Amazon Flex app. You will not be able to participate in the Program if you adjust the settings or delete the Amazon Flex app. To stop receiving text messages from Amazon, reply STOP to any message. You consent to Amazon communicating with you concerning the Program via any or all of these means and you are responsible for printing, storing, and maintaining your own records of any such agreements, notices, disclosures or other communications. Standard messaging and data rates may apply. It is your responsibility to keep your email address and phone number current by updating the information you provided to Amazon. Terminating this Agreement will stop all electronic communication. If you want to terminate this Agreement, you can provide a notice of termination to Amazon by sending a message to the following email address: amazonflex-support@amazon.com. If you want to provide notice under this Agreement, other than the notice of termination, you can provide such notice by sending a message to the following email address: amazonflex-support@amazon.com.

**15. Documents.**

You may obtain an e-mailed copy of this Agreement by e-mailing a request to amazonflex-support@amazon.com. This Agreement will be accessible to you at any time in the Amazon Flex app.

**16. Entire Agreement and Severability; Additional Terms; Survival.**

a) This Agreement constitutes the complete and final agreement of the parties pertaining to the Services and supersedes and replaces the parties' prior agreements, understandings, representations, and discussions (whether written or oral) relating to the Services. If any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the fullest extent permissible under applicable law. A party does not waive any right under any provision of this Agreement, including Program Policies, by failing to insist on compliance with, or by failing to exercise any right under, the applicable provision. Any waivers granted under this Agreement are effective only if recorded in a writing signed by the party granting such waiver. The section headings of this Agreement, including Program Policies, are for convenience only and have no interpretive value.

b) You will not assign, subcontract, or delegate any of your rights or obligations under this Agreement, or your Program Account, without Amazon's prior written consent. Any attempt by you to assign, subcontract, or delegate in violation of this Agreement will be null and void.

c) The following sections of this Agreement, along with any other provisions that by their nature should survive termination of this Agreement, will survive any termination or expiration of this Agreement: Independent Contractor Relationship; Service Fees; Representations, Warranties and Covenants; Term and Termination; Indemnification; Limitation of Liability; Dispute Resolution, Submission to Arbitration, Governing Law; and the following sections of the Program Policies: Confidentiality and Personal Information; Taxes; and Miscellaneous.

## 17. Knowing and Voluntary Agreement.

You acknowledge and agree that you are entering into this Agreement voluntarily and without any duress or undue influence by Amazon or anyone else. Further, you confirm that you carefully read this Agreement, asked any questions needed for you to understand this Agreement, and you fully understand the terms, consequences, and binding effect of this Agreement, including that you are waiving the right to go to court, to a jury trial and to proceed on a class, collective or representative basis. Finally, you agree that you have had an opportunity to seek the advice of an attorney before agreeing to and accepting this Agreement and that you have done so or you knowingly and voluntarily decided not to seek such advice.

**EXHIBIT A**

**AMAZON FLEX PROGRAM POLICIES**

**I. Welcome To Amazon Flex.**

Welcome to Amazon Flex, an innovative new service offering you the opportunity to deliver packages to Amazon customers. Amazon is excited to welcome you to the Amazon Flex program and hope that you enjoy being your own boss and running your own business by using the Amazon Flex app.

**II. Program Requirements.**

A. In order to participate in the Program, you must:

1. Pass a background check and, if applicable, a motor vehicle record check in accordance with Amazon's standards;
2. Be at least 21 years of age;
3. Be legally qualified to work in each jurisdiction in which you provide Services;
4. Have the ability to effectively operate the Amazon Flex app and communicate with customers; and
5. Install the Amazon Flex app on your smartphone.

B. In performing Services, you may use:

1. Non-motorized transportation (e.g., walking, cycling);
2. Following Vehicles:
   o a private passenger vehicle,
   o a cargo van (not to exceed 10,000 lbs. in gross vehicle weight rating),
   o a light truck (not to exceed 10,000 lbs. in gross vehicle weight rating); or
3. Public Transportation.

If you are required to advise Amazon of the mode of delivery that you intend to use to deliver specified Deliverables, you agree to use only that mode of delivery to deliver those Deliverables.

C. If you operate any Vehicle in connection with your performance of Services, you must:

1. Have a current valid driver's license,
2. If applicable, maintain current Vehicle registration,
3. Maintain current automobile insurance coverage required by applicable laws, rules, and regulations to operate such Vehicle; and
4. Be legally authorized and fit to operate such Vehicle.
5. Upon request, you will provide Amazon with proof that these requirements have been satisfied.
6. All Vehicles must be registered and must have passed all applicable local, state and federal standards for safety and environmental compliance.

App. 402

7. You are not permitted to carry weapons while performing Services, except to the extent local applicable law places restrictions on this policy.
8. You will not provide Services if you are currently an Amazon employee and you will cease providing Services if you become an Amazon employee (not-applicable to Amazon employees working in California).

**III. Service Standards.**

A. As an independent contractor, you agree to provide results—the timely and effective delivery of undamaged parcels, bags, totes or other items to the customers' and Amazon's satisfaction-- subject to the following standards ("Service Standards"):

1) Safety

i. Failure to comply with health, safety, & other applicable laws. Amazon requires you to comply with all traffic (including observing speed limit laws and distracted driving laws), health, safety, and other laws applicable to Deliverables or Services. Violation of traffic, health, safety, and other laws applicable to Deliverables or Services will make you ineligible to participate in the Program. The "Safety Reminder" video available in the "Videos" section of the Amazon Flex app contains important information for your safety and awareness. You agree and confirm that you will not provide the Services unless and until (a) you have viewed and fully understood the contents of this video, or (b) you have received hazardous materials training in the past three years that satisfies the Hazardous Materials Regulations (49 CFR 172.704), and you have, or can obtain upon your request, records confirming the same; provided that (b) does not apply in California.

2) Reliability

i. Arriving on time for or timely forfeiting Delivery Blocks. As with any vendor of services, Amazon expects that you a) be ready to timely provide Services for any confirmed Delivery Block or b) if you elect to do so, forfeit a Delivery Block with sufficient notice (i.e. at least 45 minutes before the start of such Delivery Block). Please note that if you schedule a Delivery Block close to its start time, you will still be expected to arrive on- time for that Delivery Block. If you repeatedly arrive late or forfeit Delivery Blocks late, you will no longer be eligible to participate in the Program. ii. Availability to provide the Services. Once you arrive at the correct pick-up location, unless directed otherwise by Amazon you must remain at that location (or in the local area, as instructed) until Amazon or its designees tender Deliverables to you. If you do not receive any Deliverables by the end of the Delivery Block, you are free to leave at the end of the Delivery Block and will still be paid in full.

3) Delivery Quality

i. Late Deliveries. Amazon expects that you deliver Deliverables to the customers on time. The app will specify the delivery window(s) during which the customer expects particular Deliverables to be delivered. If you repeatedly deliver Deliverables late, you will no longer be eligible to participate in the Program.

App. 403

ii. Deliverables marked as delivered that the customer does not receive. If you deliver a Deliverable, Amazon expects that the customer will be able to find it. If customers repeatedly report that they cannot find Deliverables you marked as delivered, you will no longer be eligible to participate in the Program.

iii. Delivery not attempted or undeliverable Deliverables not returned to Amazon timely. Amazon expects that you will deliver all the Deliverables you pick up. In an instance where delivery is not possible, you are expected to return all Deliverables to the Amazon delivery station, unless otherwise directed by Amazon. If you repeatedly do not attempt to deliver all the Deliverables you pick up or you do not return the undeliverable packages to a location specified by Amazon, you will no longer be eligible to participate in the Program.

4) Customer Service

 i. Rude or inappropriate behavior. Amazon expects you to behave respectfully and professionally when interacting with its customers, station operators, merchants and other delivery partners while providing the Services. If customers, station operators, merchants or other delivery partners repeatedly report disrespectful, rude, inappropriate, unprofessional, dangerous or threatening conduct, you will no longer be eligible to participate in the Program. Additionally, a single violation, depending on the seriousness of the infraction, can make you ineligible to participate in the Program.

ii. Failure to follow delivery instructions. Amazon expects you to follow customer delivery instructions as reflected in the app as long as the customer instructions are reasonable and do not conflict with health, safety and other applicable laws. Amazon expects you to perform the Services consistent with industry standards, including with respect to health and safety, always checking recipient IDs when delivering alcohol and collecting a signature when instructed to do so in the app. If you repeatedly disregard the instructions, you will no longer be eligible to participate in the Program.

iii. As an independent contractor, subject only to this Agreement, it is for you to decide the means and manner in which to provide the Services and achieve the results that you have agreed to provide. Therefore, in performing Services, you are free to map out your own routes, sequence your deliveries and in every other way control the means and manner in which you deliver Deliverables.

5) Workplace Harassment Policy

In order to participate in the Program you must comply with the Workplace Harassment Policy (see Policy below).

**IV. Program Account.**

A. Amazon will use information provided by you to create or maintain your user account for the Program ("Program Account"). You will only operate one Program Account and not register another Program Account if Amazon disables your Program Account. You will provide accurate,

current, and complete information as part of your contracting process and to update your information as necessary so that it remains accurate, current, and complete at all times.

B. You will not permit any other person to access your Program Account or the Licensed Materials, including the Amazon Flex App, or to perform any Services using your identity or log-in credentials. You will not access any other person's Program Account or Licensed Materials, including the Amazon Flex App, or perform any Services using any other person's identity or log-in credentials. You will keep secure and confidential any password required to access your Program Account or Amazon Flex App or any identification that Amazon provides to you in connection with the Program or Amazon Flex App and you agree to accept responsibility for all activities that occur under your Program Account and associated password.

## V. Insurance.

A. If you operate any motor vehicle(s) in connection with your performance of the Services, you will maintain, at your expense, personal automobile insurance coverage required by applicable laws, rules, and regulations to operate such vehicle(s). You will provide proof of such insurance coverage to Amazon, upon request. You will notify Amazon if your insurance coverage is cancelled. Your personal automobile insurance policy may not cover commercial activity. As an independent contractor, it is your responsibility to understand the terms of your personal insurance coverage and to contact your personal insurance company if you have any questions.

B. Where allowed or required by state and federal regulations, Amazon maintains, pursuant to FMCSA regulations, a commercial automobile insurance policy ("Amazon Insurance Coverage") that is intended to provide third-party bodily injury and property damage coverage, uninsured/underinsured motorist coverage, and comprehensive/collision coverage contingent on your personal insurance policy coverage, while actively performing the Services, in each case subject to Amazon Insurance Coverage deductibles and coverage limitations. If you maintain commercial automobile insurance coverage applicable to your operation of a Vehicle, your provider will provide primary coverage for you at all times, including while you are actively performing the Services and Amazon Insurance Coverage will be, only in those geographies where state and federal regulations allow or require it, excess over your commercial automobile insurance. The above description of Amazon Insurance Coverage is a summary only, and the actual terms of the Amazon Insurance Policy may vary by geographic area and are governed by the Amazon Insurance Policy documents. If there is a conflict between the above description and the actual terms of the Amazon Insurance Policy, the actual terms of the Amazon Insurance Policy will dictate coverage. You will notify Amazon immediately of any accident or other on-road incident that occurs while you are actively performing the Services and you will cooperate with Amazon and the applicable insurance company in the investigation of such accident or on-road incident. Amazon Insurance Coverage will in no way affect your indemnity obligations to Amazon as provided for in the Agreement. Amazon Insurance Coverage limits are available upon request.

## VI. Privacy.

A. Amazon receives and stores any information you enter on our website and mobile applications, while providing Services or participating in the Program, and through other interactions and

communications you have with us, our mobile application or our website. Any of the Licensed Materials may provide Amazon with data about your use of such Licensed Materials, your geo-location and related tracking data, including your location, movements, speed at which you are traveling, and other personally identifiable information. Amazon may use any such information and share such information with third parties in connection with the Program or other products or services, including Services, offered by Amazon or its affiliates. By submitting information to Amazon during the contracting process or while providing Services and using any Licensed Materials, you expressly (i) consent to Amazon collecting, using and sharing the above described data and information and (ii) waive and release Amazon from any and all claims, causes of action, liability or damages arising out of or in any way related to Amazon's use of such data and information. To the extent required by applicable law, you may have the right to request access to or delete your personal information. If you wish to do any of these things, please contact transportation-privacy@amazon.com.

B. Amazon may obtain information about you, including your motor vehicle record and results of your background check. You authorize Amazon and its applicable service provider(s) to, from time to time, (i) perform a background check on you and (ii) obtain your motor vehicle record. Based on a review by Amazon or its service provider of the results of your background check and motor vehicle record, Amazon may immediately terminate this Agreement.

C. Subject to applicable laws, Amazon may release any collected data and information, including personally identifiable information, when Amazon believes such release is appropriate or necessary to (i) comply with the law; (ii) enforce or apply this Agreement, including Program Policies; (iii) protect the rights, property, security or safety of Amazon, its affiliates, Amazon's customers, or others; (iv) detect, prevent or otherwise address fraud, security or technical issues; or (v) prevent or stop activity which Amazon considers to be, or to pose a risk of becoming, illegal, unethical, or legally actionable. Amazon may also receive information you shared with third parties, provided that such party has obtained necessary permissions to share the information with Amazon.

D. When you download or use apps created by Amazon or its affiliates, Amazon will receive information about your location, and your mobile device, including a unique identifier for your device. Most mobile devices provide you with information about these permissions. You have the right to choose whether or not to allow Amazon to receive this information. However, our ability to receive this information is an important part of the performance of Services, so if you choose to deny Amazon access to this information, this could affect the availability and functionality of the Amazon Flex App and your participation in the Program.

E. As a condition of delivering Amazon packages using the Amazon delivery application, you consent to allow Amazon to verify your identity and share your photo with Amazon customers for identification purposes from time to time. Amazon may derive from your photo a facial scan or similar biometric identifier ("Biometric Information"), and collect, store, and use Biometric Information from your submitted photos (including your photos Amazon already has on file),

driver's license, or government-issued ID. You also agree to Amazon's Photo Use and Biometric Information Retention Policy, which can be found below:

**Photos Use and Biometric Information Retention Policy**

Amazon uses your submitted photos (including your photos that we already have on file), driver's license, or government-issued ID for identification purposes. This can include making sure it's you who is doing the delivery and using your photo to identify you to customers and Amazon personnel. The photo is also used on your in-app ID card. Amazon will retain your photos while you use the Amazon delivery application and thereafter for so long as permitted by law or until you request that Amazon delete your photo. You may request deletion of your photo by contacting support, but deleting your photo will block your access to the Amazon delivery application until you replace it and it is checked for validity.

Amazon requires that users of the Amazon delivery application provide a photo for identification purposes. Amazon may derive from your photo a facial scan or similar biometric identifier, ("Biometric Information"). This policy governs our retention of users' Biometric Information. Amazon retains a user's Biometric Information for up to 30 days after it is generated. Thereafter, Amazon will promptly delete the Biometric Information. Note that this means Amazon may need to retain your Biometric Information after you stop using the Amazon delivery application for purposes of ongoing fraud detection and investigation.

**VII. Licensed Materials; Devices.**

A. You may not (i) incorporate any portion of the Licensed Materials into your own works or compile any portion of it in combination with your own works, transfer it, in whole or in part, for use with another service, or sell, rent, distribute, copy, modify, adapt, translate, reverse engineer, decompile, or disassemble, or make derivative works based on, or manipulate the Licensed Materials or any part of the Licensed Materials or otherwise sublicense or assign any rights to the Licensed Materials in whole or in part, (ii) cause or launch any programs or scripts for the purpose of surveying, manipulating or data mining any portion of the Licensed Materials or impairing or unduly affecting the operation or functionality of any aspect of the Licensed Materials; or (iii) attempt to gain unauthorized access to any portion of the Licensed Materials, including through scripts or third party applications.

B. Additional third party terms contained within or distributed with certain Licensed Materials may apply to the Licensed Materials (or software incorporated with the Licensed Materials) and will govern the use of such software in the event of a conflict with this Agreement ("Third Party Software"). Such Third Party Software license terms will apply to the corresponding Third Party Software in lieu of this Agreement. For more information on Third Party Software, refer to the Additional Terms in the Amazon Flex app, which can be accessed via Home > Account > View Legal Information > Additional Terms.

C. All rights not expressly granted to you in this Agreement are reserved and retained by Amazon or other content providers. You may not frame or utilize framing techniques to enclose any trademark, logo, or other proprietary information (including images, text, page layout, or form) of

App. 407

Amazon without express written consent. You may not use any meta tags or any other "hidden text" utilizing Amazon's name or trademarks without the express written consent of Amazon. You may use the Licensed Materials only as permitted by law.

D. You will not attempt to participate or participate in the Program, or provide any Services, for the purpose of gathering information regarding the Program (including any Licensed Materials) or Amazon's processes, building or operating a competitive service or a service that uses similar ideas, features, or functions as the Program (including any Licensed Materials), or copying any idea, feature, or function of the Program (including any Licensed Materials).

E. When you use the Licensed Materials, you may also be using the services of one or more third parties, such as a wireless carrier or a mobile platform provider. Your use of these third party services may be subject to the separate policies, terms of use, and fees of these third parties.

F. Amazon may offer automatic or manual updates to the Licensed Materials at any time and without notice to you.

G. You must comply with all export and re-export restrictions and regulations of the Department of Commerce and other United States agencies and authorities that may apply to the Licensed Materials and agree not to transfer, or encourage, assist, or authorize the transfer of Licensed Materials to a prohibited country or otherwise in violation of any applicable restrictions or regulations.

H. You will notify Amazon immediately after becoming aware that any device on which any Licensed Materials are installed has been lost, stolen, or misplaced. If Amazon provides you with any device or other equipment in connection with the Program and such device or other equipment (or any part of it) is lost, stolen, unreturned, damaged, sold, transferred, or encumbered without the express prior written consent of Amazon, you will promptly pay Amazon the full replacement cost of such device or other equipment, together with any incidental costs that are incurred by Amazon to replace the same.

I. AMAZON LICENSES THE LICENSED MATERIALS TO YOU "AS IS" AND MAKES NO WARRANTIES OF ANY KIND REGARDING THE LICENSED MATERIALS. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AMAZON EXPRESSLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT, TITLE, OR FITNESS FOR A PARTICULAR PURPOSE. AMAZON DOES NOT WARRANT THAT THE LICENSED MATERIALS WILL MEET YOUR REQUIREMENTS OR WILL OPERATE UNINTERRUPTED, ERROR FREE, OR PROVIDE ACCURATE, COMPLETE, OR UP-TO-DATE INFORMATION. AMAZON WILL NOT BE RESPONSIBLE FOR ANY LOSS, DAMAGE, OR CLAIM CAUSED BY OR ATTRIBUTABLE TO ANY DEFECT OR DEFICIENCY IN ANY LICENSED MATERIALS.

J. If you provide any suggestions, comments, ideas, improvements, or other feedback relating to the Program, Program Policies or the Licensed Materials to Amazon, you assign to Amazon all right, title and interest in and to the same and will provide any assistance Amazon may require to

App. 408

document, perfect, and maintain these rights, and Amazon will be free to use, disclose, reproduce, modify, license, transfer, and otherwise distribute and exploit any of the foregoing.

K. All content included in or made available through Licensed Materials or the Program such as text, graphics, logos, button icons, images, audio clips, digital downloads, data compilations, and software is the property of Amazon or its content suppliers and protected by United States and international copyright laws. The compilation of all content included in or made available through any Licensed Materials or the Program is the exclusive property of Amazon and protected by U.S. and international copyright laws.

L. Graphics, logos, page headers, button icons, scripts, and service names included in or made available through any Licensed Materials or the Program are trademarks or trade dress of Amazon in the U.S. and other countries. All other trademarks not owned by Amazon that appear in the Licensed Materials or the Program are the property of their respective owners, who may or may not be affiliated with, connected to, or sponsored by Amazon.

**VIII. Confidentiality and Personal Information.**

A. You will use all personally identifiable information (i) concerning Amazon's customers, including names and addresses and (ii) provided to you or learned by you during performance of Services (collectively, "Personal Information"), solely for the purpose of providing Services using the Amazon Flex app and will not contact Amazon's customers using Personal Information for any reason unless directly related to providing Services. You will comply with all instructions Amazon provides in respect of the processing of Personal Information, and you will maintain appropriate security measures to prevent unauthorized use or disclosure of Personal Information and will keep confidential and not share Personal Information with any third party unless expressly permitted under this Agreement. You will return all Personal Information to Amazon promptly following a request from Amazon. As between you and Amazon, all Personal Information is and will remain the exclusive property of Amazon, and you will not disclose, share, transfer, rent, barter, trade, or sell Personal Information and will not develop lists of or aggregate Personal Information. For the avoidance of doubt, the contents of Deliverables tendered by Amazon to you are Personal Information.

B. If you are required by any governmental authority to disclose the contents of any Deliverable, you will promptly notify Amazon of such requirement. Amazon will not provide any Personal Information in connection with any disputes or claims between you and Amazon's customers, nor will any Amazon customers be contacted or called to testify, by either you or Amazon, in connection with any dispute or claim between you and Amazon.

C. Without the prior written authorization by a Vice President of Amazon, you will not use any trade name, trademark, service mark, trade dress, logo or commercial symbol, or any other proprietary rights of Amazon or any of its affiliates in any manner (including use in any client list, press release, advertisement, or other promotional material).

App. 409

**IX. Taxes.**

Each party will be responsible, as required under applicable law, for identifying and paying all taxes and other governmental fees and charges (and any penalties, interest, and other additions thereto) that are imposed on that party upon or with respect to the transactions and payments under this Agreement. Amazon may deduct or withhold any taxes that Amazon may be legally obligated to deduct or withhold from any amounts payable to you under this Agreement, and payment to you as reduced by such deductions or withholdings will constitute full payment and settlement to you of amounts payable under this Agreement. Throughout the term of this Agreement, you will provide Amazon with any forms, documents, or certifications as may be required for Amazon to satisfy any information reporting or withholding tax obligations with respect to any payments under this Agreement.

**X. Amazon Flex Rewards**

Participation in the Amazon Flex Rewards Program (the "Rewards Program") is subject to this Agreement as well as the Amazon Flex "Rewards Terms" set forth at https://flex.amazon.com/amazonflexrewards/terms, as updated by Amazon from time to time. Please read the Rewards Terms carefully. By accessing or participating in the Rewards Program, you agree to be bound by the terms of the Rewards Program and all terms incorporated therein by reference, including terms regarding dispute resolution and a class action waiver. If you do not agree to the Rewards Program Terms, do not access or participate in the Rewards Program.

**Amazon Flex Workplace Harassment Policy**

At Amazon, we believe that all workers should be treated with respect and dignity. Therefore, we will not tolerate inappropriate conduct, including discrimination or harassment based on sex. The conduct outlined in this policy is unacceptable and, in many cases, also prohibited by law. This policy applies to all Delivery Partners, as well as to the conduct by others involved in our business, such as employees, subcontractors, consultants, clients, customers, or vendors.

**Sexual Harassment**

Sexual harassment generally consists of unwelcome sexual advances, requests for sexual favors, or other verbal, non-verbal, or physical conduct of a sexual nature when (1) submission to or rejection of such conduct is the basis for work decisions affecting a prospective or active Delivery Partner; or (2) such conduct has the purpose or effect of creating a sexually offensive, hostile, or intimidating work environment that interferes with an individual's ability to perform their work. Examples of sexual harassment include, but are not limited to:

- Physical touching or assault, or impeding or blocking movements;
- Unwelcome or unwanted physical contact or sexual advances;
- Requests or demands for sexual favors in exchange for favorable or preferential treatment;
- Sexual jokes or use of sexually explicit language;

- Leering, gestures, or displaying sexually suggestive objects, pictures, cartoons, or posters;
- Derogatory comments, epithets, slurs, or jokes;
- Graphic comments or sexually degrading words; and
- Suggestive or obscene messages or invitations.

**Responding to Inappropriate Conduct or Possible Incidents of Harassment**

All Delivery Partners, as well as Amazon employees, are responsible for ensuring that our environment is free from offensive behavior and harassment. All Delivery Partners must avoid any conduct that may be perceived as offensive and/or harassing.

**Delivery Partners**: Delivery Partners who observe or experience conduct they believe may be inappropriate or harassing by anyone, including other Delivery Partners, Amazon employees, customers, or visitors, may report the conduct to Amazon by using the "Emergency Help" button in the Amazon Flex app. or by contacting our Last Mile Emergency Team at (844) 311-0406.

**Amazon Employees**: Employees who observe or experience conduct they believe may be inappropriate or harassing should contact his or her manager, or to any member of management at Amazon, or to Human Resources.

**Customers**: Customers should report such incidents by contacting the Customer Service Line.

It is important that Delivery Partners, employees, and customers feel comfortable reporting such incidents; therefore, no retaliation of any kind will be permitted or tolerated against Delivery Partners, employees, or customers for making a good faith report of suspected harassment. Anyone who believes they have been retaliated against for making a good faith complaint should contact the Last Mile Emergency Team at (844) 311-0406.

Amazon will promptly, fairly, and thoroughly investigate any reports of harassment or inappropriate conduct. To the extent possible, the privacy of those involved in any investigation will be protected against disclosure and remain confidential, except as necessary to conduct the investigation. Prompt, corrective action will be taken when appropriate. This action may include temporary suspension or termination of the Delivery Partner's contract with Amazon, or appropriate action against an Amazon employee or customer who engages in prohibited conduct. False complaints of harassment, discrimination, or retaliation that are not made in good faith may be the subject of similar appropriate disciplinary action.

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BERNARD WAITHAKA, *et al.*, | CASE NO. C19-1320-JCC |
| Plaintiffs, | MINUTE ORDER |
| v. | |
| AMAZON.COM INC., *et al.*, | |
| Defendants. | |

The following Minute Order is made by direction of the Court, the Honorable John C. Coughenour, United States District Judge:

This matter comes before the Court *sua sponte*. Plaintiff's second motion for class certification (Dkt. No. 172) is presently before the Court. After reviewing the briefing to date, the Court concludes that supplemental briefing is required to fully understand the "common answers apt to drive the resolution of [this] litigation." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

The Court seeks argument as to why the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148 (2009), requires employers to pay employee business expenses, rather than forbids the unlawful wage deductions considered in, for example, *Camara v. Att'y Gen.*, 941 N.E. 2d 1118, 1119 (Mass. 2011) (deduction from wages for damages caused by employee)*, Awuah v. Coverall N. Am., Inc.*, 952 N.E. 2d 890, 897–901 (Mass. 2011) (various deductions from "wages

MINUTE ORDER
C19-1320-JCC
PAGE - 1

1    earned"), *DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 396 (D. Mass. 2017)

2    (deductions from pay for uniforms and damage claims), and *Martins v. 3PD, Inc.*, 2013 WL

3    1230454, slip op. at 1 (D. Mass. 203) ("Under Massachusetts wage law, an employer may not

4    *deduct* certain expenses from its payment to employees") (emphasis added).

5           Plaintiffs shall submit a supplementary brief on the issue described above, not exceeding

6    six pages of argument (excluding declarations and exhibits), no later than October 29, 2024.

7    Defendants shall file a response supplementary brief, also not exceeding six pages of argument,

8    no later than November 12, 2024. Plaintiffs may file a reply supplementary brief, not exceeding

9    four pages, no later than November 19, 2024.

10          The Clerk is, therefore, directed to renote the motion to certify the class to November 19,

11   2024.

12          DATED this 15th day of October 2024.

13

14                                          Ravi Subramanian
                                            Clerk of Court

15                                          s/Kathleen Albert
16                                          Deputy Clerk

17

18

19

20

21

22

23

24

25

26

MINUTE ORDER
C19-1320-JCC
PAGE - 2

1

2

3                                                     The Honorable John C. Coughenour

4

5

6

7

8

9

10                          UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
11                                    AT SEATTLE

12

13    BERNARD WAITHAKA, on behalf of
      himself and all others similarly situated,
14                                                    Case No. 2:19-cv-01320-JCC
                     Plaintiff,
15                                                    **PLAINTIFF'S SUPPLEMENTAL
                                                      BRIEF IN SUPPORT OF MOTION
16          v.                                        FOR CLASS CERTIFICATION**

17                                                    NOTE DATE:
      AMAZON.COM INC. and                             November 19, 2024
18    AMAZON LOGISTICS, INC.,
                                                      ORAL ARGUMENT REQUESTED
19                   Defendants.

20

21

22

23

24

25

26

---

**LICHTEN & LISS-RIORDAN, P.C.**
                                                       729 Boylston Street, Suite 2000
                                                           Boston, MA 02116

App. 414

In connection with Plaintiff's motion for class certification (Dkt. No. 172), the Court has requested supplemental briefing "as to why the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148 (2009), requires employers to pay employee business expenses, rather than forbids the unlawful wage deductions" described in several cases (Dkt. No. 182). Multiple courts in Massachusetts have recognized that, under the Wage Act, employers may not require employees to pay business expenses and so those expenses are recoverable under Section 148.

First, in *Camara v. Att'y Gen.*, 941 N.E.2d 1118, 1119–21 (Mass. 2011), the Massachusetts Supreme Judicial Court (SJC) held unlawful an employer's policy that allowed for deductions from truck drivers' pay when they damaged vehicles. In explaining why this policy violated the Wage Act, the Court noted that "the [employer's] policy shift[ed] to the . . . employees some of what appear to be the ordinary costs of doing business." *Id.* at 1123 n.11.

Soon thereafter, the SJC in *Awuah v. Coverall North America, Inc.*, 952 N.E.2d 890, 893 (Mass. 2011), held that an employer could not lawfully shift the cost of workers' compensation or other insurance coverage onto its employees. Even if the insurance payments are not deducted from the employees' wages, the Court noted that "[a]n employer's insurance costs, when borne by an employee, [will] reduce wages just as effectively as if the employer had obtained the policy and deducted funds from the wages." *Id.* at 900 n.22.

Following those decisions, other courts have recognized that the Massachusetts Wage Act forbids employers from requiring employees to pay ordinary business expenses out of their own pockets. For example, in *Garcia v. Right at Home, Inc.*, 2016 WL 3144372, at *3 (Mass. Super. Ct. Jan. 19, 2016), a group of healthcare aides alleged that the defendants violated the Wage Act by failing to reimburse them for travel expenses. Citing *Camara*, the court held that the plaintiffs stated a valid claim, since "[s]ection 148 of the Wage Act prohibits wage reductions

PL.'S SUPPLEMENTAL BR. IN SUPP.
OF MOT. FOR CLASS CERTIFICATION
Case No.. 2:19-cv-01320-JCC

2

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 415

1    achieved by 'any other means,' thus preventing an employer from effectively reducing wages by

2    shifting ordinary business costs to the employee."

3        Similarly, in *DaSilva v. Border Transfer of MA, Inc.*, 377 F. Supp. 3d 74, 88-89 (D.

4    Mass. 2019), the court recognized that employees cannot be required to pay business expenses

5    themselves.  The court explained:

6

7            Defendants argue the class cannot recover these insurance premiums
             because they paid these expenses out of pocket, not as deductions
8            from wages like the plaintiff in *Awuah*. Because the holding in
             *Awuah* aims to prevent an employer from shifting expenses onto an
9            employee that it is or might be obliged to bear, 952 N.E.2d at 898-
             99, the fact that the class members paid premiums directly to an
10           insurance company is not dispositive.

11   *Id.* at 89.

12       The court reached the same conclusion in *Furtado v. Republic Parking Sys., LLC*, 2020

13   WL 996849, at *4 (D. Mass. Mar. 2, 2020), holding that having an employee personally incur

14   travel expenses stated a valid Wage Act claim, since "incurring these expenses effectively

15   'reduce[s] wages just as effectively as if the employer had . . . [to pay travel expenses] and

16   deducted funds from . . . [the employee's] wages.'" 2020 WL 996849, at *5 (quoting *Awuah*,

17   952 N.E.2d at 900 n.22).

18       In addition to these court decisions, Massachusetts regulations specify that: "[a]n

19   employee required or directed to travel from one place to another after the beginning of or

20   before the close of the work day shall be compensated for all travel time and **shall be**

21   **reimbursed for all transportation expenses**." 454 Mass. Code Regs. 27.04(4)(d) (emphasis

22   added). Consistent with Section 148, this regulation "prevents a wage reduction achieved by

23   'any other means' in that it prohibits employers from shifting the costs of travel related business

24   expenses to employees." *Garcia*, 2016 WL 3144372, at *4.

25

26

PL.'S SUPPLEMENTAL BR. IN SUPP.                           **LICHTEN & LISS-RIORDAN, P.C.**
OF MOT. FOR CLASS CERTIFICATION          3               729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                               Boston, MA 02116

1    In light of these authorities, it is clear that business expenses are recoverable under the

2    Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148.[1]

3

4    Dated:    October 29, 2024              *I certify that this supplemental brief does*
5                                            *not exceed six pages of argument.*

6                                    By:    *s/ Shannon Liss-Riordan*
7                                           Shannon Liss-Riordan (*pro hac vice*)
                                            Harold L. Lichten (*pro hac vice*)
8                                           Jeremy Abay (*pro hac vice*)
                                            LICHTEN & LISS-RIORDAN, P.C.
9                                           729 Boylston Street, Suite 2000
                                            Boston, MA 02116
10                                          (617) 994-5800
                                            sliss@llrlaw.com
11                                          hlichten@llrlaw.com
                                            jabay@llrlaw.com
12

13                                          Michael C. Subit, WSBA No. 29189
                                            FRANK FREED SUBIT & THOMAS LLP
14                                          705 Second Avenue, Suite 1200
                                            Seattle, WA 98104
15                                           (206) 682-6711
                                            msubit@frankfreed.com
16

17                                          *Attorneys for Plaintiff*

18

19   _____

20   [1] Amazon may point to the Massachusetts Appeals Court's decision in *Fraelick v.
     PerkettPR, Inc.*, 989 N.E.2d 517 (Mass. 2013), to argue that requiring employees to pay
21   business expenses out of pocket is not a violation of the Wage Act. The court in *Martins v. 3PD
     Inc.*, 2014 WL 1271761, at *7 (D. Mass. Mar. 27, 2014), addressed that argument and rejected
22   it, noting that *Fraelick* was a retaliation claim that raised a different issue from that raised in
     cases involving misclassified independent contractors being required to bear an employer's
23   business expenses.  And the other cases cited above likewise did not read *Fraelick* as holding
     that business expenses are not recoverable under the Wage Act.  In any event, if there were any
24   question as to whether business expenses are recoverable under the Massachusetts Wage Act,
     that would be a common question for all class members.
25

26

PL.'S SUPPLEMENTAL BR. IN SUPP.                                  **LICHTEN & LISS-RIORDAN, P.C.**
OF MOT. FOR CLASS CERTIFICATION          4                       729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                                      Boston, MA 02116

App. 417

Hon. John C. Coughenour

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10 | BERNARD WAITHAKA, on behalf of himself and all others similarly situated,

Case No. 2:19-cv-01320-JCC

11

Plaintiff,

**DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO CLASS CERTIFICATION**

12 | v.

13 | AMAZON.COM, INC., AMAZON LOGISTICS, INC.,

14

Defendants

15
16
17
18
19
20
21
22
23
24
25
26

MORGAN, LEWIS & BOCKIUS LLP
1301 SECOND AVE., SUITE 3000
SEATTLE, WA 98101
TELEPHONE: (206) 274-0154
FAX: (206) 274-6401

App. 418

The absence of on-point cases supporting Plaintiff's argument speaks volumes. Mass. Gen. Laws ch. 149 § 148 does *not* require expense reimbursement; it simply forbids unlawful withholding or deductions from earned wages. And, even if an expense-reimbursement claim were cognizable, individualized evidence is needed to determine whether any Delivery Partner ("DP") suffered *unreimbursed* expenses—so this Court should deny class certification under the Ninth Circuit's decision in *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469-70 (9th Cir. 2023).

**A.     The Massachusetts Wage Act Contains No Reimbursement Requirement.**

**1.     The text of the Wage Act does not require expense reimbursement.**

There is no language in the Wage Act that imposes a requirement to reimburse business expenses; indeed, the Wage Act does not mention expenses or reimbursements. *See* M.G.L. ch. 149 § 148. The Act requires only that employers pay each employee "the wages earned by him." *Id.*[1] Wages include pay "having been earned during a particular pay period," as well as "commissions, less allowable or authorized deductions," and "holiday or vacation pay due an employee under an oral or written agreement." *Id.* Employers may not "exempt [themselves] from this section"—i.e., withhold "wages earned"—by "special contract" or "any other means." *Id.*

Plaintiff ignores the Act's text entirely, opting to read into a statute focused solely on traditional wages a distinct expense-reimbursement requirement that is simply not there.[2] This Court should not follow suit. The Massachusetts Supreme Judicial Court (SJC) has held in the context of the Wage Act that "we will not add language to a statute where the Legislature itself has not done so." *Tze-Kit Mui v. Mass. Port Auth.*, 478 Mass. 710, 712-13 (2018); *see Prozinski v.*

---

[1] The Wage Act's Title is: "Payment of wages; commissions; exemption by contract; persons deemed employers; provision for cashing check or draft; violation of statute." M.G.L. ch. 149 § 148. Nothing in that title—which is "part of" the Act and "relevant as a guide to legislative intent," *Com. v. Savage*, 31 Mass. App. Ct. 714, 716 n.4 (1991) (citation omitted)—suggests any requirement to reimburse expenses (as opposed to pay for earned wages and commissions).

[2] Very few states require expense reimbursement, and those that do specify that requirement clearly. *See, e.g.*, 820 ILCS 115/9.5 ("An employer shall reimburse an employee for all necessary expenditures … incurred by the employee within the employee's scope of employment[.]"); N.D. Cent. Code § 34-02-01 ("An employer shall indemnify [employee] … for all that the employee necessarily expends or loses in direct consequence of the discharge of the employee's duties"). The Wage Act contains no similar language, indicating no expense-reimbursement requirement.

DEFENDANTS' SUPPLEMENTAL BRIEF IN
OPPOSITION TO CLASS CERTIFICATION - 1
(Case No. 2:19-CV-01320-JCC)

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

1   *Ne. Real Est. Servs., LLC*, 59 Mass. App. Ct. 599, 603 (2003) (noting the Wage Act has been

2   construed "narrowly"); *Sterling Res., Inc. v. Pietrobono*, 2005 WL 3116758, at *13 (D. Mass.

3   2005) (same). And generally, courts should not "read into" statutes "a provision which the

4   Legislature did not see fit to put there." *Chin v. Merriot*, 470 Mass. 527, 537 (2015); *see Frechette*

5   *v. D'Andrea*, 494 Mass. 167, 177 (2024) ("If the Legislature intended the Commonwealth and its

6   taxpayers to assume the much greater expense [advocated for], it would have said so expressly.").

7        The Wage Act requires "prompt and full payment of wages due," nothing more. *Camara*

8   *v. Att'y Gen.*, 458 Mass. 756, 759 (2011); *Grogan v. All My Sons Bus. Dev. LLC*, 552 F. Supp. 3d

9   142, 145-46 (D. Mass. 2021) ("The 'purpose' of the Wage Act is 'to prevent the unreasonable

10  detention of wages[.]'"). A wage is "earned" when the employee has "completed the labor, service,

11  or performance required of him." *Ma. State Police Comm'n'd Offs. Ass'n v. Com.*, 462 Mass. 219,

12  224-26 (2012) (quoting *Awuah v. Coverall N. Am., Inc.*, 460 Mass. 484, 492 (2011)). The Act

13  "does not specify the conditions in which an employee 'earns' wages." *Clee v. MVM, Inc.*, 91 F.

14  Supp. 3d 54, 62-63 (D. Mass. 2015). It simply requires payment of wages agreed to in the parties'

15  contract. *See Grogan*, 552 F. Supp. 3d at 145-46 ("parties are free to use whatever compensation

16  structure they see fit"); *Salerno v. Baystate Ford, Inc.*, 2016 WL 513747, at *3-4 (Mass. Super.

17  2016) (employer must keep wage-related promises); *Tze-Kit Mui*, 478 Mass. at 713-14.

18        Under these definitions, incurred expenses are not earned wages. As long as "the employer

19  pays each of its employees all 'wages earned' in a timely manner," there is no Wage Act violation.

20  *Grogan*, 552 F. Supp. 3d at 145-46. Indeed, a Massachusetts district court twice held that an

21  arrangement in which employees were not reimbursed for supplies and equipment did not

22  implicate the Wage Act because "[t]here is no statute proscribing the parties from agreeing to this

23  cost shifting so long as [the employee] earns at least minimum wage." *Awuah v. Coverall N. Am.,*

24  *Inc.*, 740 F. Supp. 2d 240, 243 (D. Mass. 2010); *see Awuah v. Coverall N. Am., Inc.*, 2012 WL

25  910260, at *1 (D. Mass. 2012) (reaffirming decision as to costs of equipment and supplies

26  following SJC's decision in *Awuah*, 460 Mass. at 495, that workers' compensation costs cannot be

DEFENDANTS' SUPPLEMENTAL BRIEF IN
OPPOSITION TO CLASS CERTIFICATION - 2
(Case No. 2:19-CV-01320-JCC)

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

App. 420

1  shifted to employees). Here, Plaintiff makes no claim that Amazon ever withheld the Service Fees

2  it agreed to pay DPs, Dkt. 178 at 20, so there is no arguable Wage Act claim.

3  **2.    *Case law does not create an expense reimbursement requirement.***

4      Given the Act's clear text, it is no surprise that neither the SJC nor any Massachusetts court

5  has ever held that the Wage Act requires expense reimbursements. Courts that have addressed the

6  issue have held that the "Act does not … prohibit an employer and employee from entering into

7  an agreement in which the employee agrees to pay for certain job-related expenses." *Driscoll v.*

8  *Worcester Telegram & Gazette Corp.*, 2009 WL 3839067, at *2 (Mass. Super. 2009); *Awuah*, 740

9  F. Supp. 2d at 24 (employees may bear equipment and supply expenses); *see also Martins v. 3PD,*

10 *Inc.*, 2013 WL 1320454, at *8 (D. Mass. 2013) (to state a "Wage Act claim, Plaintiffs must

11 ultimately show that 3PD made improper *deductions* from their pay") (emphasis added).

12     Courts have held certain kinds of wage deductions to be improper, but those holdings

13 plainly do not apply here. As this Court noted, *Camara*, *Awuah*, and other cases involved

14 "deductions from 'wages earned.'" Dkt. 182 at 1-2. Employers may not deduct wages to cover

15 costs statutorily imposed on employers, such as workers' compensation insurance, *Awuah*, 460

16 Mass. at 487; they cannot enter "special contracts" to deduct costs such as damage the employee

17 may cause to company trucks or third-party property, *Camara*, 458 Mass. at 758-762; and they

18 cannot renege on contractually agreed-to payments, *Furtado v. Rep. Parking Sys. LLC*, 2020 WL

19 996849, at *1-2 (D. Mass. 2020). The SJC has explained that the statutory phrase "by a special

20 contract or by any other means," M.G.L. ch. 149 § 148, means employers may not violate the Act

21 even if they obtain the "employee's assent." *Crocker v. Townsend Oil Co.*, 464 Mass. 1, 13 (2012).[3]

22 This phrase does not change the scope of the Act itself. Employers may not, by any means, "deduct

23 property damage from paychecks, or disburse wages less frequently than required by law," or

---

24 [3] "Any other means" is not a defined term, but it likely refers to situations like "company stores,"
25 where an employer requires an employee to make purchases from it for tools and uniforms, paying
   with one hand and taking wages back with another. *Hudacs v. Frito-Lay, Inc.*, 90 N.Y.2d 342, 347
26 n.3 (1997) (Massachusetts Wage Act "outlaw[s] the 'company store' … which was prevalent" at
   the time of enaction).

DEFENDANTS' SUPPLEMENTAL BRIEF IN
OPPOSITION TO CLASS CERTIFICATION - 3
(Case No. 2:19-CV-01320-JCC)

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400    FAX +1.206.274.6401

App. 421

1  otherwise withhold wages. *Salerno*, 2016 WL 513747, at *4 (citing *Camara*, 458 Mass. 941).

2  Where an employer does not deduct its own costs from earned wages or otherwise withhold

3  agreed-upon wages, the Wage Act does not apply.

4      The only Massachusetts appellate decision to address the Wage Act's application to

5  expense reimbursement claims is *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698 (2018), and

6  it explained that "[i]n the ordinary course, the violation of a standard expense reimbursement

7  arrangement would not constitute a violation of the Wage Act because *the reimbursement is not*

8  *compensation 'earned' by 'labor, service or performance.'"* *Id.* at 706 (emphasis added). Plaintiff

9  addresses *Fraelick* in a footnote (at 4 n.1), noting that *Martins v. 3PD Inc.* distinguished the

10 decision, but it did so because *Martins* involved actual deductions—not a failure to reimburse.

11 2014 WL 1271761, at *7 (D. Mass. 2014). Plaintiff does not dispute *Fraelick*'s reasoning that a

12 "reimbursement is not compensation 'earned.'" 83 Mass. App. Ct. at 706. In fact, the *Fraelick*

13 court dismissed a claim for expenses, and the plaintiff did not even appeal. *Id.* at 699 n.2.

14     The SJC has made clear that the Wage Act does not create obligations by inference. *Tze-*

15 *Kit Mui*, for example, "declined to expand the meaning of 'wages' under the act to other types of

16 compensation not expressly mentioned in the statute." 478 Mass. at 712-13 (citing, *e.g.*, *Prozinski*,

17 59 Mass. App. Ct. at 603-05); *see Sterling Res.*, 2005 WL 3116758, at *13 (applying same logic

18 to hold promised medical insurance reimbursements were not "wages earned"). Here, too, the

19 Wage Act does not "mention[]" expense reimbursements. It simply requires paying earned wages.

20     None of Plaintiffs' cases can be read to create an obligation to reimburse all employee

21 expenses. The *Camara* court noted the purpose of the Act is to "prevent the unreasonable detention

22 of wages" and held simply that the "special contract" language in the Act meant certain deductions,

23 whether assented to or not, are impermissible. 458 Mass. at 759-61 ("the affected employees have

24 in fact received lower pay"). *Awuah* is telling for its complexity. On Plaintiff's theory, the SJC

25 could have issued a very brief opinion stating that the Wage Act mandates expense reimbursement.

26 Instead, the SJC went to great lengths to state that an employer cannot deduct its own insurance

DEFENDANTS' SUPPLEMENTAL BRIEF IN
OPPOSITION TO CLASS CERTIFICATION - 4
(Case No. 2:19-CV-01320-JCC)

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400  FAX +1.206.274.6401

App. 422

1   costs from employee wages because the employer was "statutorily mandated" to pay for those

2   costs and the "costs [we]re related to future damages that may never come to pass [and] may not

3   be the responsibility of the employee." 460 Mass. at 487, 497. No such statutory mandates apply

4   here.[4] Nothing in these cases requires expense reimbursements.

5          Plaintiff cites two other off-point cases. First, *Furtado* involved a "Letter Agreement" to

6   pay the plaintiff a salary, a vehicle allowance, and "mileage reimbursement" for "all work-related

7   travel" between work locations. 2020 WL 996849, at *1-2. The court concluded the employer's

8   refusal to pay contractually agreed-upon expenses was a failure to pay an earned wage. *Id.* Nothing

9   in *Furtado* suggests a universal right to expense reimbursement absent a contractual commitment

10  to reimburse. And even if *Furtado* could be so read—which it cannot be—such a holding would

11  be divorced from the Wage Act's text. It also would be inapplicable here, where the controlling

12  contract states the fees paid to DPs cover both services and any related expenses. Dkt. 178 at 20.

13         Second, *Garcia v. Right at Home, Inc.*, 2016 WL 3144372, at *4 (Mass. Super. 2016), is a

14  poorly reasoned trial court decision that misinterpreted precedent and misapplied an inapplicable

15  regulation, 454 C.M.R. § 27.04(4)(d). *Garcia* cites *Fraelick* and *Camara* for the idea that expense

16  reimbursement is required under the Wage Act, *id.* at *4, but that is clearly wrong. And the

17  regulation *Garcia* relies on does not interpret the Wage Act (M.G.L. ch. 149) at all. It implements

18  the "Minimum Fair Wages Act," a separate statute that governs payment of minimum wages

19  (M.G.L. ch. 151), and its scope is expressly limited to that statute. 454 C.M.R. § 27.01 (explaining

20  the regulatory section was meant to "clarify practices and policies in the administration and

21  enforcement of the Minimum Fair Wages Act" and its "scope" was limited to "M.G.L. c. 151").

22  The regulation discussed in *Garcia* is simply inapplicable to the Wage Act.

23

24  [4] *Awuah* noted that certain deductions (for employee stock purchases, labor union dues, etc.) are
    expressly permitted by state law. 460 Mass. at 495-96 (quoting M.G.L. ch. 154 § 8). The

25  Legislature used specificity in this area, yet never stated that expense reimbursements are covered.
    And the dicta footnote in *Awuah* that "[a]n employer's insurance costs, when borne by an

26  employee, reduce wages" did not announce a rule that employers must reimburse all expenses, it
    simply reiterated that employers must pay their statutorily mandated costs. 460 Mass. at 497 n.22.

DEFENDANTS' SUPPLEMENTAL BRIEF IN
OPPOSITION TO CLASS CERTIFICATION - 5
(Case No. 2:19-CV-01320-JCC)

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

App. 423

**B.    If The Court Has Any Doubt, It Should Certify This Question To The Massachusetts Supreme Judicial Court.**

Should the Court determine that Massachusetts law is not sufficiently clear on this issue, Amazon respectfully requests that the following question be certified to the SJC:

> Does the Wage Act require putative employers to reimburse certain business expenses, including equipment and mileage costs, that putative employees incur as a necessary and direct consequence of performing their services?

This Court has discretion to certify questions to a state court where the state's certification rules are met. *See Murray v. BEJ Mins., LLC*, 924 F.3d 1070, 1071 (9th Cir. 2019). Under the SJC's rules, a court may certify "questions of law of this State which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of [the SJC]." Mass. S.J.C. Rule 1:03. Both elements are satisfied. First, this question will determine whether Plaintiff can bring an expense claim at all. Second, as discussed above, there is no binding SJC authority on the issue. In fact, a Massachusetts district court previously certified a similar question, though the question was later mooted. *See Schwann v. FedEx Ground Package Sys., Inc.*, 2014 WL 496882, at *3 (D. Mass. 2014).

"[W]hen unsettled state-law questions present significant issues with important public policy ramifications, it may be appropriate to certify those questions to the state court as a matter of deference to the state court on significant state law matters." *N.Y. Life Ins. Co. v. Mitchell*, 2021 WL 5182356, at *2 (W.D. Wash. 2021). Whether the Wage Act provides a right to expense reimbursement will have far-reaching consequences for the many employers and employees in the state, and the question is likely to arise repeatedly.

**C.    Any Expense Claim Would Require Individualized Inquiries.**

Plaintiff suggests (at 4 n.1) that this legal question is justification for class certification. Not so. Even if a reimbursement claim is cognizable, liability depends on individualized inquiries, defeating certification. *Bowerman*, 60 F.4th at 469-70. As Amazon explained, each class member would have to prove he or she incurred expenses not adequately compensated by Service Fees, which no common evidence can show. Dkt. 178 at 20-23. The Court should deny certification.

DEFENDANTS' SUPPLEMENTAL BRIEF IN
OPPOSITION TO CLASS CERTIFICATION - 6
(Case No. 2:19-CV-01320-JCC)

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400    FAX +1.206.274.6401

App. 424

1   Dated: November 12, 2024

*I certify that this memorandum does not exceed six pages, as set forth in the Court's October 15, 2024 Order*

Respectfully submitted,

By: *s/Andrew DeCarlow*
Andrew DeCarlow, WSBA #54471
MORGAN, LEWIS & BOCKIUS LLP
1301 Second Ave., Suite 3000
Seattle, WA  98101
Telephone:  (206) 274-0154
Fax:  (206) 274-6401
Email: andrew.decarlow@morganlewis.com

Richard G. Rosenblatt (*Pro Hac Vice*)
James P. Walsh, Jr. (*Pro Hac Vice*)
MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center
Second Floor
Princeton, NJ  08540-6241
Telephone:  (609) 919-6600
Fax:  (609) 919-6701
Email: richard.rosenblatt@morganlewis.com
Email: james.walsh@morganlewis.com

Sarah Zenewicz (*Pro Hac Vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA  94105-1596
Telephone:  (415) 442-1790
Fax:  (415) 442-1001
Email: sara.zenewicz@morganlewis.com

*Attorneys for Defendants*

DEFENDANTS' SUPPLEMENTAL BRIEF IN
OPPOSITION TO CLASS CERTIFICATION - 7
(Case No. 2:19-CV-01320-JCC)

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

App. 425

# CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, I caused to be electronically filed the foregoing **DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO CLASS CERTIFICATION** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the registered attorneys of record.

By: *s/Andrew DeCarlow*
Andrew DeCarlow, WSBA #54471
MORGAN, LEWIS & BOCKIUS LLP
1301 Second Ave., Suite 3000
Seattle, WA  98101
Telephone:  (206) 274-0154
Fax:  (206) 274-6401
Email: andrew.decarlow@morganlewis.com

CERTIFICATE OF SERVICE
Case No. 2:16-cv-01554-JCC

1
2
3                                                          The Honorable John C. Coughenour
4
5
6
7
8
9
10                          UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
11                                    AT SEATTLE
12

13   BERNARD WAITHAKA, on behalf of
     himself and all others similarly situated,        Case No. 2:19-cv-01320-JCC
14
                    Plaintiff,                          **PLAINTIFF'S SUPPLEMENTAL**
15                                                      **REPLY IN SUPPORT OF MOTION**
            v.                                          **FOR CLASS CERTIFICATION**
16
                                                       NOTE DATE:
17   AMAZON.COM INC. and                               November 19, 2024
     AMAZON LOGISTICS, INC.,
18                                                     ORAL ARGUMENT REQUESTED
                    Defendants.
19
20
21
22
23
24
25
26

PL.'S SUPPLEMENTAL REPLY IN                     **LICHTEN & LISS-RIORDAN, P.C.**
SUPPORT OF MOT. FOR CLASS CERT.                      729 Boylston Street, Suite 2000
Case No.. 2:19-cv-01320-JCC                              Boston, MA 02116

App. 427

Amazon claims that "no on-point cases" support Plaintiff's assertion that employers must reimburse employees' business expenses under the Massachusetts Wage Act, Mass. Gen. Laws Ann. ch. 149, § 148. (Dkt. No. 184 at 1). That is simply not correct. Consistent with the Wage Act's "broad remedial purpose," *Depianti v. Jan–Pro Franchising Int'l,* 990 N.E.2d 1054, 1067 (Mass. 2011), "the SJC has made clear that any attempt by an employer to shift the ordinary costs of doing business to its employees must be met with skepticism and carefully scrutinized." *Martins v. 3PD Inc.*, 2014 WL 1271761, at \*5 (D. Mass. Mar. 27, 2014). On that basis, federal courts in Massachusetts have repeatedly recognized that the Wage Act bars employers from requiring employees to pay business expenses out of their own pockets.

In *DaSilva v. Border Transfer of MA, Inc.*, 377 F. Supp. 3d 74, 89 (D. Mass. 2019), which Amazon ignores, the court rejected any distinction between requiring employees to pay business expenses out of pocket and deducting those expenses from their wages:

> Defendants argue the class cannot recover these insurance premiums because they paid these expenses out of pocket, not as deductions from wages like the plaintiff in *Awuah*. Because the holding in *Awuah* aims to prevent an employer from shifting expenses onto an employee that it is or might be obliged to bear, . . . the fact that the class members paid premiums directly to an insurance company is not dispositive.

*Id.* (citing *Awuah v. Coverall N. Am., Inc.*, 952 N.E.2d 890, 898–99 (Mass. 2011)).

Similarly, in *Furtado v. Republic Parking Sys., LLC*, 2020 WL 996849, at \*4 (D. Mass. Mar. 2, 2020), the employee alleged that his employer "unlawfully failed to reimburse him for travel expenses in violation of the Wage Act and 454 C.M.R. § 27.04(4) (2019)." Like Amazon, the employer argued "travel expenses are not recoverable" because they do not qualify as "wages" under the Wage Act. *Id.* The court rejected this narrow reading, holding that the employer's failure to reimburse the plaintiff for travel expenses violated the Wage Act because

PL.'S SUPPLEMENTAL REPLY IN
SUPPORT OF MOT. FOR CLASS CERT.            1
Case No.. 2:19-cv-01320-JCC

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

"the statute bars wage reduction 'by any other means.'"  *Id.*:

> Here, as alleged, Defendants required Furtado to travel many miles
> using his own vehicle while working on behalf of Republic
> Parking. . . . As a result of this travel, Furtado personally incurred
> expenses for which he has not been reimbursed yet, thereby
> reducing "by any other means" the wages that he received. . . .
> That is, incurring these expenses effectively "reduce[s] wages just
> as effectively as if the employer had ... [to pay travel expenses] and
> deducted funds from ... [Furtado's] wages."

*Id.* at *5 (quoting *Awuah*, 952 N.E.2d at 900 n.22).

Amazon attempts to distinguish *Furtado* by claiming that the court's ruling turned on the

employer's "contractual commitment to reimburse" the employee.  (Dkt. No. 184 at 5).  But the

"Letter Agreement" that Amazon refers to is completely absent from the court's analysis of the

Wage Act.  *See* 2020 WL 996849, at *3–5.  Indeed, the court's analysis addressed "**<u>Whether</u>**

**<u>Travel Expenses are Recoverable</u>**" under the header "***Travel Expenses Under the Wage Act***,"

not under the "Letter Agreement."  *Id.* at *3 (emphasis in original).

A federal court has since reaffirmed *Furtado* in a case that involved no "contractual

commitment to reimburse" business expenses, explaining:

> Requiring employees to front . . . expenses, including travel expenses, can constitute
> wage reductions under the Wage Act. . . .  This is because the Wage Act bars wage
> reduction 'by any other means,' and a company requiring the plaintiff to 'travel many
> miles using his own vehicle while working on behalf of [the company] reduces his
> wages **'just as effectively as if the employer had ... deducted funds from [his] wages.'**

*Serebrennikov v. Proxet Grp. LLC*, 2024 WL 1375971, at *5 (D. Mass. Mar. 29, 2024)

(emphasis in original).

Amazon claims that the Massachusetts Wage Act should be "narrowly interpreted".  This

fundamental misunderstanding ignores the repeated statements by Massachusetts' highest court

about the breadth of the Wage Act.  The SJC has repeated recognized it is a "broad remedial"

PL.'S SUPPLEMENTAL REPLY IN
SUPPORT OF MOT. FOR CLASS CERT.
Case No.. 2:19-cv-01320-JCC

2

**LICHTEN & LISS-RIORDAN, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116

App. 429

statute. *Depianti*, 990 N.E.2d at 1067.  The Wage Act is "meant to protect employees from the dictates and whims of shrewd employers." *Id. See also DiFiore v. Am. Airlines, Inc.*, 910 N.E.2d 889 (Mass. 2009) (noting that the Wage Act prohibits "end runs" around the Act).  In light of the Wage Act's "broad remedial purpose," the SJC has cautioned that "it would be an error to imply . . . a limitation where the statutory language does not require it."  *Depianti*, 990 N.E.2d at 1067 (internal quotation omitted).

In seeking a narrow reading of the Wage Act, Amazon claims that the Act merely ensures that employees receive the minimum wage (after accounting for any business expenses they have incurred).  (Dkt. No. 184 at 2).  However, the Wage Act is a distinct statutory provision from the Massachusetts Minimum Wage Law, Mass. Gen. Laws Ann. ch. 151, § 1.

Under the Minimum Wage Law, there is no question that business expenses need to be taken into account when determining whether employees have suffered minimum wage violations.  *Awuah v. Coverall N. Am., Inc.*, 740 F. Supp. 2d 240, 243 (D. Mass. 2010); 454 Mass. Code Regs. 27.05(1); *cf. Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1236 (11th Cir. 2002) (same principle under FLSA).  But, as described here and in Plaintiff's prior briefing, the Wage Act, Mass. Gen. Laws Ann. ch. 149, § 148, provides additional protections – namely, not allowing employers to shift to employees the expenses of running a business, regardless of whether such expenses would bring the employees' wages to less than minimum wage.[1]

---

[1]     In a similar way, the Massachusetts Tips Law, Mass. Gen. Laws ch. 149, § 152A, prevents employers from retaining any portion of workers' tips, regardless of whether the withholding of tips would bring the workers' wages to less than minimum wage.  *See DiFiore*, 910 N.E.2d at 893–95. This protection has been recognized to be stronger than federal law, which previously only protected workers' tips to the extent they brough the workers' wages to less than minimum wage.  *Cumbie v. Woody Woo, Inc.*, 596 F.3d 577, 580–81 (9th Cir. 2010).  *But see*

1   In its supplemental brief, Amazon argues that individualized issues prevent class

2   certification of Plaintiff's expense reimbursement claim.  There are no individualized issues on

3   liability.  Amazon does not even purport to reimburse drivers' expenses.  Thus, Plaintiff

4   contends that every Amazon Flex driver in Massachusetts has suffered this violation, and the

5   only individualized issue will be in adding up their damages.[2]  Amazon's contention that there

6   will be individualized issues regarding which drivers have suffered an expense reimbursement

7   violation is simply incorrect.[3]

8

9   Finally, as Plaintiff noted earlier, if there is any question as to whether or not the

10  Massachusetts Wage Act provides for expense reimbursement, that question is common to the

11  putative class and should not defeat class certification.

12

13

14

15   _____

16  *Williams v. Sake Hibachi Sushi & Bar Inc.*, 574 F. Supp. 3d 395, 404 (N.D. Tex. 2021) (noting

17  that FLSA has now been amended to prevent employer from retaining workers' tips, regardless
    of whether the net wages fall below minimum wage).

18
    [2]   Courts have regularly recognized that the IRS reimbursement rate can be used to
19  determine drivers' mileage expenses, in cases involving misclassified delivery drivers who have
    not been reimbursed for vehicle expenses.  *See, e.g.*, *O'Connor v. Uber Techs., Inc.*, 311 F.R.D.
20  547, 566–67 (N.D. Cal. 2015), *rev'd on other grounds*, 904 F.3d 1087 (9th Cir. 2018); *Stuart v.
    Radioshack Corp.*, 2009 WL 281941, at *18 (N.D. Cal. Feb. 5, 2009); *Dalton v. Lee Publ'ns,
21  Inc.*, 270 F.R.D. 555, 564 (S.D. Cal. 2010).

22
    [3]   Courts that have recognized expense reimbursement claims have required employers to
23  specifically delineate payments that are for expense reimbursement and which are for wages.
    *See, e.g.*, *Gattuso v. Harte-Hanks Shoppers, Inc.*, 169 P.3d 889, 891, 900–01 (Cal. 2007) ("[I]t is
24  essential that employees and officials charged with enforcing the labor laws be able to
    differentiate between wages and expense reimbursements."); *Espejo v. The Copley Press, Inc.*,
25  221 Cal. Rptr. 3d 1, 33 (Ct. App. 2017); *Villlapando v. Exel Direct Inc.*, 161 F. Supp. 3d 873,
    885–86 (N.D. Cal. 2016).  Thus, no individualized inquiry is needed, since Amazon does not
26  delineate *any* payments to Flex drivers as expense reimbursement.

PL.'S SUPPLEMENTAL REPLY IN
SUPPORT OF MOT. FOR CLASS CERT.          4          **LICHTEN & LISS-RIORDAN, P.C.**
Case No.. 2:19-cv-01320-JCC                         729 Boylston Street, Suite 2000
                                                    Boston, MA 02116

App. 431

1    Dated:   November 19, 2024                 *I certify that this supplemental brief does*
                                                *not exceed four pages of argument.*
2

3                                       By:     s/ Shannon Liss-Riordan
                                                Shannon Liss-Riordan (*pro hac vice*)
4                                               Harold L. Lichten (*pro hac vice*)
                                                Jeremy Abay (*pro hac vice*)
5                                               LICHTEN & LISS-RIORDAN, P.C.
                                                729 Boylston Street, Suite 2000
6                                               Boston, MA 02116
                                                (617) 994-5800
7                                               sliss@llrlaw.com
                                                hlichten@llrlaw.com
8                                               jabay@llrlaw.com
9
                                                Michael C. Subit, WSBA No. 29189
10                                              FRANK FREED SUBIT & THOMAS LLP
                                                705 Second Avenue, Suite 1200
11                                              Seattle, WA 98104
                                                 (206) 682-6711
12                                              msubit@frankfreed.com
13
                                                *Attorneys for Plaintiff*
14

15

16

17

18

19

20

21

22

23

24

25

26

PL.'S SUPPLEMENTAL REPLY IN                    LICHTEN & LISS-RIORDAN, P.C.
SUPPLEMENTAL REPLY IN                5          729 Boylston Street, Suite 2000
SUPPORT OF MOT. FOR CLASS CERT.                       Boston, MA 02116
Case No.. 2:19-cv-01320-JCC

App. 432